UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -


Harry G. Beyoglides, Jr.,
Special Administrator of the
Estate of Robert Andrew
Richardson, Sr., Deceased,
    Plaintiff,

    vs.                         Case No. 3:14-CV-00158


Phil Plummer/Montgomery County
Sheriff, et al.,
    Defendants


                    - - -




            DEPOSITION OF JOHN MICHAEL CLYMER
the Defendant herein, called by the Plaintiff under the
applicable Rules of Civil Procedure, taken before me,
Whitney Layne, a Notary Public for the State of Ohio, at
the law firm of Dinkler & Pregon, 5335 Far Hills Avenue,
Suite 117, Dayton, Ohio 45429 on November 18, 2015 at
3:00 p.m.




                LAYNE & ASSOCIATES
                6723 COOPERSTONE DRIVE
                DUBLIN, OHIO  43017
                614-309-1669

APPEARANCES

NICHOLAS DICELLO, ESQUIRE
SPANGENBERG, SHIBLEY & LIBER
1001 Lakeside Avenue
Suite 1700
Cleveland, Ohio  44114
    on behalf of the Plaintiff

JAMEY PREGON, ESQUIRE
DINKLER & PREGON
5335 Far Hills Avenue
Suite 123
Dayton, Ohio  45429
    on behalf of the Sheriff
    Defendants

CARRIE STARTS, ESQUIRE
REMINGER CO., LPA
525 Vine Street
Suite 1700
Cincinnati, Ohio  45202
    on behalf of the Defendants
    NaphCare, Inc., Nurse Felicia Foster,
    Nurse Jon Boehringer, Nurse Krisandra
    Miles, Medic Steven Stockhauser,
    and Brenda Garrett Ellis, M.D.

MARY MONTGOMERY, ESQUIRE
TODD AHEARN, ESQUIRE
ASSISTANT PROSECUTING ATTORNEY
301 West Third Street
4th Floor
Dayton, Ohio  45422
    on behalf of the Defendant
    Montgomery County Sheriff's
    Office

Page  2

---

EXAMINATION INDEX

JOHN MICHAEL CLYMER

BY MR. DICELLO...............................Page 5

EXHIBIT INDEX

Exhibit                           Marked

2........................................Page 58

Page  4

---

November 18, 2015
Wednesday Session
3:00 p.m.
- - -
STIPULATIONS

    It is stipulated by and among counsel for the
respective parties that the deposition of JOHN MICHAEL
CLYMER, the Defendant herein, called by the Plaintiff
under the applicable Rules of Civil Procedure, may be
taken at this time by the notary Whitney Layne: that said
deposition may be reduced to writing in stenotypy by the
notary, whose notes thereafter may be transcribed out of
the presence of the witness: and that the proof of the
official character and qualification of the notary is
waived.

Page  3

---

JOHN MICHAEL CLYMER

Being first duly sworn, as hereinafter

certified, deposes and says as follows:

CROSS-EXAMINTION

BY MR. DICELLO:

Q  Can you please state your name?

A  Sure.  It's John M. Clymer, C-L-Y-M-E-R.

Q  How do you prefer I address you?  I understand

you're retired now?

A  I am.  I am.

Q  I've been calling --

A  Mike is fine.

Q  Are you sure?

A  Yeah.

Q  I've been calling everybody Detective,

Sergeant.

A  Those days are so far gone.

Q  All right, good.  Well, you can call me Nick,

Mike.

A  Okay.

Q  Do you understand you're here to have your

deposition taken?

A  Yes.

Q  Ever been deposed before?

Page  5

Page 6

1   A  No.
2   Q  You understand you're here to have your
3   deposition taken in connection with a lawsuit that's been
4   filed against some folks at the county sheriff's
5   department --
6   A  Uh-huh.
7   Q  -- as a result of the death of Robert
8   Richardson back in 2012?
9   A  That is correct.
10  Q  I'm sure you figured out by now, but I'm the
11  lawyer that represents the family and the representatives
12  of the deceased, Robert Richardson, okay?
13  A  Yes.
14  Q  A couple ground rules that will help us make a
15  clean record for the purposes of this deposition as we
16  have to try to not that talk over one another.  She can
17  only take down one person at a time, okay?
18  A  Yes.
19  Q  You've done a nice job until now, but keep your
20  voice up and give me your answers verbally with a yes, no,
21  some kind of explanation, as opposed to a shrug, huh-uh or
22  uh-huh, okay?
23  A  Yes.
24  Q  I don't want you to answer questions today that

Page 7

1   you don't understand.  That's very important, okay?
2   A  Okay.
3   Q  So if I ask a question that you don't
4   understand, and I may do that, I do it from time to time,
5   I want you to let me know.
6   A  Yes.
7   Q  If you do answer a question that I've asked,
8   I'm going to assume that you understood it.  Is that fair?
9   A  Yes.
10  Q  You understand you're under oath today?
11  A  Yes.
12  Q  Over the course of your career, have you had
13  occasion to testify in courtrooms?
14  A  Yes.
15  Q  The oath that you're under today is the same
16  type of oath that you take when you're in front of a judge
17  and jury in a court of law.  Do you understand that?
18  A  I understand.
19  Q  Do you understand that I'm going to be relying
20  on the accuracy of the answers you give me today in
21  connection with this lawsuit?
22  A  Yes.
23  Q  You understand this is my only chance to ask
24  you questions under oath before trial, so that's why I'm

Page 8

1   going to be relying on the information you give;
2   understood?
3   A  Yes.
4   Q  If at any point in time during this deposition
5   you want to take a break, we can do that.  Just let me
6   know.  I would ask that if a question is pending, answer
7   the question first, Mike, and then say, "Hey, Nick, let's
8   take a break."  All right?
9   A  Okay.
10  Q  It's also not uncommon that something might jog
11  your memory at some point today, and you may remember I
12  answered that wrong, or you may remember I forgot to tell
13  Nick about that.  I want you to take the opportunity today
14  to revisit any question I've asked or answer that you've
15  given if that should happen, okay?
16  A  Okay.
17  Q  You told me you're currently retired from your
18  employ at the Montgomery County Sheriff's Office; true?
19  A  Yes.
20  Q  When did you retire, sir?
21  A  February 28th of '15.  This year.
22  Q  How many years did you have in before you
23  retired?
24  A  Thirty.

Page 9

1   Q  I saw that your officer number was a lot lower
2   than a lot of the other numbers I saw.
3   A  Yes.
4   Q  Officer number 98?
5   A  Yes.
6   Q  Some of these officer numbers in here are over
7   1100.
8   A  Yes.
9   Q  So over the course of your career, I want to
10  get some understanding, Mike, as to the different
11  positions you've held within the sheriff's office.
12  A  Okay.
13  Q  So can you take me through that however you
14  think is best to walk me through that?
15  A  Okay.  Whether this matters are not, I worked
16  at a smaller department prior to going to the sheriff's
17  office.  I worked there eight and a half years.  During
18  that period of time, I worked as a patrolman.  It was a
19  small community.  I was also promoted to sergeant for six
20  years.  I served as interim chief for a period of about
21  eight months.
22  Q  What community is this?
23  A  New Lebanon.
24  Q  Ohio?

1    A    Yes.  It's in Montgomery County west of Dayton.
2    Q    This was a city police force?
3    A    Village.  It's a town of about 5,500.
4    Q    Okay.
5    A    In 1985, I joined the sheriff's office,
6  February.  During that, my first three years until 1998 I
7  worked as a deputy sheriff in the Montgomery County Jail.
8  Prior to that time, the sheriff's office did not have
9  corrections officers.  They had sworn deputies working the
10 jail.
11    Q    Okay.
12    A    And in 1988, I worked road patrol for several
13 years, I then went back into the jail and worked as a
14 courts officer working trials, security, so on and so
15 forth during that period of time.  I also, at the end of
16 that, I can't remember, it was like '91, '92, '93,
17 somewhere in that neighborhood, I went back to road patrol
18 until March of 1997.  March of 1997, I went into the
19 Special Investigations Section, Detective Section.  I
20 worked in there for 18 years, variety of jobs.  I
21 investigated auto thefts for numerous years, I then
22 eventually, for about 14 years, investigated violent
23 crimes, which included the homicides, felonious assaults,
24 adult rapes.  And then towards the end, along with doing

Page 10

1  in the jail.  We would go into the transport staging area,
2  pick up prisoners, take them to a docket call.  We would
3  also work trials as far as a security, taking someone and
4  handling that.  But as far as actually working day-to-day,
5  it would probably -- I'm trying to think.
6    Q    Mid to late eighties?
7    A    Yeah, late eighties.  '88.  March of '88, I
8  think.
9    Q    Was the jail facility at the same location it
10 is now?
11    A    Part of it.
12    Q    The old part?
13    A    And that's where I worked.  I worked in more
14 the linear style jail.  We now have the pod system, which
15 I'm familiar with, because I would go in -- at least I'm
16 familiar with the layout, because we would go in, there's
17 interview rooms inside the jail to interview suspects
18 during my time as a detective, and I knew how to get
19 around in the jail.  But as far as actually working
20 pulling prisoners, feeding, things of that nature, I
21 never -- you know, I never worked any of that part, never
22 worked any of the camera systems, none of the alarm
23 systems, nothing -- nothing along that line.
24    Q    During your 18 years as a detective in the

Page 12

1  that, I did some of the special investigations, high level
2  fraud, voter fraud, some special investigations that the
3  sheriff needed done only because I was older, I guess.
4    Q    Okay.
5    A    I'm not sure.  But so I did that for -- I was
6  in the Investigation Section for 18 years.
7    Q    I think you said you were in the Special
8  Investigation Section for 18 years?
9    A    Yes.
10    Q    Is that the SIU or is that different?
11    A    Well, we have -- we have a Special
12 Investigation Section that handles the violent crimes, the
13 gun crimes.  We also have district detectives that are
14 assigned to our three districts that handle burglaries,
15 domestic violence crimes.  I don't know how they came up
16 with the name, but it's always been Special
17 Investigations, and then they moved people out to the
18 districts based on the need.
19    Q    So when was the last time that you worked
20 day-to-day inside the jail?  Was that in the late eighties
21 --
22    A    Yes.  I --
23    Q    -- as a courts officer?
24    A    Well, even as a courts officer, I didn't work

Page 11

1  Special Investigations Division, you told me some of the
2  things you investigated.  I'm sure you investigated a lot
3  of different situations.  Can you give me an idea of how
4  often you investigated incidents or occurrences that
5  occurred inside the jail while you were a detective with
6  Special Investigations?
7    A    And it would be a variety of things.  Whether
8  it would be a felonious assault, inmate on inmate assault,
9  inmate on corrections officers or staff, rape, certain
10 amount of -- it's not a -- it's assault, it's harassment
11 by inmate where inmates will throw urine and feces and
12 spit on corrections officers, I would handle those kind of
13 cases.  And the main reason we did, not just me, but in
14 Special, is because we were not in a contract area.  We
15 were downtown, my office was directly across from the
16 jail, and the sheriff, we had five detectives at that time
17 assigned to Special.  We would handle any of the jail
18 issues.
19    Q    Okay.
20    A    We also would handle any other issues with like
21 the Board of Elections, a threatening of a Common Pleas
22 Court judge, things that the county would need a detective
23 to investigate.  The other district detectives would take
24 care of investigating things in that district such as the

Page 13

4 (Pages 10 to 13)

## Page 14

1   Harrison, which is North Dayton, they would handle that

2   district, and handle the auto thefts and things of that

3   nature.

4       **Q  So how often, could you put a number on it, how**

5   **many investigations you've --**

6       A  A year?

7       **Q  A year that occurred, for something to happen**

8   **inside the jail.**

9       A  Me personally, probably five to seven, eight.

10       **Q  How many investigations, excluding the one that**

11   **we're going to talk about today, have you investigated**

12   **where there was a death that occurred inside the jail?**

13       A  Probably maybe ten.

14       **Q  How many of those involve situations where it**

15   **was determined, it was never thought to be inmate on**

16   **inmate?**

17       A  I never had a homicide investigation, which --

18   which if it's an inmate on inmate and someone dies --

19       **Q  That's a homicide investigation?**

20       A  -- that would be a homicide investigation,

21   because it's not a natural death.

22       **Q  But if somebody dies at the hands of a**

23   **corrections officer, it's not a homicide investigation?**

24       A  It's based on the -- of how it's ruled and what

## Page 15

1   the evidence shows.

2       **Q  So have you investigated any homicides at the**

3   **Montgomery County Jail?**

4       A  No.

5       **Q  But you've investigated ten deaths?**

6       A  Yes.

7       **Q  How many of those --**

8       A  That includes suicides.

9       **Q  How many of those were suicides?**

10       A  Probably at least half.

11       **Q  So now we're working our way down.  We have**

12   **about five or six, I'm not holding you to specific**

13   **numbers.**

14       A  Correct.

15       **Q  But about five or six deaths that were not**

16   **suicides.  Why weren't those considered to be homicide**

17   **investigations?**

18       A  Suicides?

19       **Q  No, the non-suicide death investigations at the**

20   **jail.**

21       A  We would have people that just had heart

22   attacks and would die in their cell, older age.  It wasn't

23   as a result of trauma.  There wasn't anything that could

24   not be explained other than a medical condition that we

## Page 16

1   had deaths.

2       **Q  The Robert Richardson investigation, and I'll**

3   **ask your specific involvement in a minute, but was that a**

4   **homicide investigation?**

5       A  It was not.

6       **Q  Why not?**

7       A  It has to do with the manner and the way the

8   death was ruled.  There was no evidence that was found,

9   there was no indication from Dr. Casto, who did the

10   autopsy, that there was any trauma to the body, that there

11   was -- there was no cause created by the corrections

12   officers that were involved in that they did anything

13   improper that caused his death.  The death of

14   Mr. Richardson was determined by Dr. Casto to be a

15   cardiac, based on the post-op report.  And I attended the

16   autopsy.

17       **Q  I understand you did.  While we're kind of**

18   **talking about this, who made the determinations, some of**

19   **the things you just said, that nothing the officers did**

20   **brought about Mr. Richardson's death?**

21       A  It was based on the entire encompassing the

22   whole investigation.

23       **Q  Okay.**

24       A  You know, based on statements that we had,

## Page 17

1   interviews of inmates, interviews of Marcus Maxwell, who

2   was his --

3       **Q  Cellmate?**

4       A  -- cellmate.  Based on Dr. Casto's examination

5   of the body, which is -- which is a large part of the

6   investigation.  And to bring forward criminal charges, the

7   Criminal Division of the Montgomery County Prosecutor's

8   Office, the ruling would have to be some sort of a

9   criminal act, just not a death.  And that inmates were --

10   or corrections officers were there is not enough in my

11   years of experience in dealing with the prosecutor's

12   office that would show that anybody caused his death.

13       **Q  Do you know what the manner of death has been**

14   **ruled to be in Mr. Richardson's case?**

15       A  Manner of death?  It was -- It was ruled

16   natural with -- it was a hypertension cardiac event.  I

17   know that one of his arteries, the left descending, I

18   believe it was, was 75 percent blockage.  Mr. Richardson,

19   based on the information that I received during the early

20   part of my investigation, was he had hypertension, and he

21   also had a blood pressure issue, which he was not being

22   treated for at the jail.  I don't know why.  I can't

23   answer that.  I'm not a -- I'm not the medic.  The medical

24   part of that.  But I know he wasn't under any kind of

**Page 18**

```
 1   medication at that time.  So it was ruled by Dr. Casto as
 2   a natural death --
 3       Q   Can you stop here?  Because it wasn't.  Do
 4   you know that?  Am I the person informing you now that
 5   Dr. Casto did not rule this as a natural death?
 6           MR. PREGON:  Objection.
 7           Go ahead.
 8       A   Can I look at my report based on what I have?
 9   I don't have the autopsy report in front of me.  Do you?
10   BY MR. DICELLO:
11       Q   I'll represent to you that the autopsy rules
12   this as an accidental death.
13       A   Okay.  Accidental, okay.
14       Q   So --
15       A   Then I'm mistaken.
16       Q   Fair enough.  And I know you haven't looked at
17   this stuff in awhile.  But at the time you issued your
18   report, you were under the impression that this was ruled
19   a natural death; correct?
20       A   No, I probably am mistaken.  It may say
21   natural, I'm not sure.  But I thought I wrote off of --
22   because I got a copy of Dr. Casto's post-op report.
23       Q   And I'm sure you've -- you've probably reviewed
24   more autopsy reports than all of us in this room combined,
```

**Page 19**

```
 1   you've probably reviewed a number of them in connection
 2   with your job.
 3       A   I have.
 4       Q   You understand the difference between natural,
 5   accidental, and homicide; correct?
 6       A   Yes.
 7       Q   And accidental death involves death brought
 8   about by the actions of people?
 9       A   Okay.
10       Q   Understood?
11       A   Okay.  I understand.
12       Q   So based on your investigation, who were the
13   people that caused Mr. Richardson's death?
14       A   I can't answer that.  I know who was there.
15       Q   But you are charged with investigating this;
16   true?
17       A   Correct.
18       Q   And so the manner of death indicates that there
19   were people involved in causing his death, and you don't
20   know who those people are?
21       A   Well, the corrections officers were there.  I
22   mean, the officers that were involved.  Whether they
23   caused his death or his health condition and his -- the
24   way he was, was a contributing factor to his death, which
```

**Page 20**

```
 1   I believe goes to manner of death.  And in the report, I
 2   believe Dr. Casto wrote that that is caused by his cardiac
 3   condition.
 4       Q   Is it your understanding, then, that his
 5   atherosclerotic heart disease was accidental?  That's not
 6   how it works, is it?
 7       A   Well, he had that condition.
 8       Q   Right.
 9       A   Which --
10       Q   If he died from atherosclerotic heart disease
11   like a lot of people do, that would be a natural cause of
12   death; correct?
13       A   Right.  But that goes to manner, if I recall
14   correctly, in the report.
15       Q   And the manner of death was accidental.
16       A   Okay.  Then a contributing factor was the heart
17   condition along with, I believe there was also a high
18   level of THC in his system as well.
19       Q   Correct.
20       A   Okay.
21       Q   I'm not trying to be difficult here, I'm just
22   trying to get an understanding from the investigator's
23   standpoint what caused this man's death.  Do you know?
24       A   I would say not based on your -- based on where
```

**Page 21**

```
 1   you're going then.
 2       Q   This is news to you?
 3       A   Well, it's not news to what the report says and
 4   how he died, okay?  As far as who caused his death?  There
 5   was no evidence to show that anybody -- that he -- the
 6   idea that Mr. Richardson was in the county -- he was
 7   trying to be controlled based on the information that I
 8   have.
 9       Q   Okay.
10       A   Based on what I reviewed in the video, he had
11   some sort of a medical event in his cell, corrections
12   officers responded, along with medical personnel, and in
13   trying to control the situation to give him care he had a
14   cardiac -- he stopped breathing, he had some sort of a
15   cardiac event.
16       Q   Okay.
17       A   If I recall what Dr. Casto wrote.
18       Q   Is it your understanding, then, that the
19   cardiac event he had was caused by or that part of the
20   contributing factor of causing that cardiac event was the
21   actions of the corrections officers?
22           MR. PREGON:  Objection.
23           Go ahead.
24       A   I can't tell you that.
```

BY MR. DICELLO:

Q   Okay.

A   I can't answer that question.

Q   All right.  That would be important to know for the folks that are making decisions about whether to pursue criminal charges; correct?

A   If I knew that or if they knew that?  The case was not presented to the prosecutor's office.

Q   My question is:  Knowing whether or not the conduct of the corrections officers contributed to causing Mr. Richardson's death, which I think you've told us you don't know the answer to that?

A   I don't.

Q   Do we agree that the answer to that question is important to know to determine whether or not criminal charges are pursued?

A   Based on what I observed back in 2012 from the video, based on the reports that I read, based on the information concerning the statements from the inmates, there was nothing that I observed, read, or saw that the officers did anything out of line other than trying to control an inmate in the county jail where we are required to take care of the safety of the entire population and keep control within the facility, that there was nothing

Page  22

else there.

Q   I appreciate that.  And I know you have a lot of years of experience, and I'm sure you have to make certain judgment calls in connection with your investigation.  But, Mike, don't we agree that that's not really for you to make that decision as to whether or not the corrections officers caused Mr. Richardson's death and should be prosecuted for it, is it?

A   My call?  It is my call along with my supervisors to determine whether or not something goes forward that officers are in violation or caused the death of him.  And there was nothing that was observed, seen, investigated that showed that, that indicated that.

Q   I appreciate that.  And that was your decision at the time.  But we have -- you have admitted to me today here that based on some of the information I'm explaining to you about the autopsy, you don't know whose actions caused Mr. Richardson's death; correct?

        MR. PREGON:  Objection.

        Go ahead.

A   Nor do we know if any of their actions caused his death.

BY MR. DICELLO:

Q   So why was it ruled an accident?

Page  23

        MR. PREGON:  Objection.

BY MR. DICELLO:

Q   Did Mr. Richardson accidentally cause his own death?

        MR. PREGON:  Objection.

A   But we had a medical condition that he was, as well.

BY MR. DICELLO:

Q   I understand.  I'm trying to understand -- What's your understanding of why this was ruled an accident if it was just a medical condition that caused his death?

A   I would believe an -- I can't answer that question.

Q   Okay.

A   But I believe Dr. Casto would be the doctor -- be the individual.  He has the medical background of why he made the ruling.  He also should have been made, and I can't say for sure sitting here today, all the reports and all the information concerning the investigation.

Q   I mean, if somebody kills somebody for accidentally running a red light, that's ruled an accidental death?

        MR. PREGON:  Objection.

Page  24

        Go ahead.

BY MR. DICELLO:

Q   Right.

A   There's a violation of law, they ran a red light.

Q   Okay.

A   That is a clear violation.  We have a witness that tells us that car went through the red light or we have photographic, whatever, we have to have -- we have clear.  Based on the scenario you gave me, we have a violation of law.

Q   Okay.

A   So therefore, due to their negligence, they caused the accident.  Someone died as a result of that individual violating the law, whether it be a traffic law or a, you know, a criminal felony law, caused the death in a traffic accident.

Q   So your understanding of this situation is some people caused Mr. Richardson's death but it was accidental and nobody did anything wrong?

A   I didn't say that they --

        MR. PREGON:  Objection.

A   I didn't say that no one -- I'm sorry.  Can you restate that question?

Page  25

BY MR. DICELLO:

Q   Yeah.

A   Yeah.

Q   Because you and I seem to know what the meaning of accidental is in a manner of a death ruling; correct?

A   Intent.

Q   Is that how you interpret it?

A   An accident is -- If you intend to do something, it's not an accident.  It's not an accident.

Q   But an accident means that people's actions caused the death; correct?

MR. PREGON:  Objection.

Go ahead.

BY MR. DICELLO:

Q   Whether you fall out of a tree, whether you -- somebody drops something and hits you on the head, I mean, that's -- it's not a natural death, it's an accidental death.  That means people were involved in bringing about the death.  Is that your understanding, or is it not?

A   Well, it can be ruled -- I -- I guess it's like -- My thought, and again, when looking at the -- an accident is an accident.  No one intends on killing someone in a car accident or in having an accident and killing someone.  But if you run a red light.

Page 26

Q   Go ahead, I'm still listening.  Sorry.

A   The intent -- Okay.  I'm -- The intent has to be there when you're looking at -- or a negligence in your actions caused the injury.  And based on the information that we had at the time, nothing showed that the officers were negligent in their duties.

Q   Okay.  Bear with me one second here.  Sorry.  Try to bring all the documents with you, but you always forget something.

The CDC issues a manual for medical examiners.  In fact, it's the National Association of Medical Examiners that defines these terms.

A   Okay.

Q   Okay?  Natural is defined as "due solely or nearly totally to disease and/or the aging process."  Is that consistent with your understanding of what natural is as a ruling of a manner of death?

A   I guess.  I mean, I can tell you I've never read that or seen that.

Q   And then there's accident.  "There is little or no evidence that the injury or poisoning occurred with intent to harm or cause death.  In essence, the fatal outcome was unintentional."  Is that the concept you were kind of trying to say?

Page 27

MR. PREGON:  Objection.

Go ahead.

A   You were asking whether or not I am saying --

BY MR. DICELLO:

Q   Let me ask you:  When you're reviewing manners of deaths in -- because I think what you told me is a big part of the investigation, in terms of which direction it's going to head, is based on the coroner's finding as to the manner of death; correct?  That's what you said earlier.

A   Well, absolutely.  It's very important.

Q   So the coroner can come up with natural, accident, suicide, homicide, or could not be determined; right?

A   Undetermined, correct.

Q   Right?  So in this case it wasn't natural, it wasn't due solely or nearly totally to disease; did you understand that?

A   Correct.

Q   So there was something other than just his heart disease that caused his death; correct?

MR. PREGON:  Objection.

A   I don't know that.  I mean -- I guess you have to look at what the doctor said.

Page 28

BY MR. DICELLO:

Q   And I'll have a chance to ask the doctor these questions, but I'm asking you, and you were in the room when the autopsy was performed, and you spoke with the coroner and reviewed his results in connection with your investigation.  So I'm really interested in what your understanding is about the coroner's ruling here.  And we know the coroner didn't rule it as natural.  And the definition for natural is due solely or nearly totally to disease or the aging process.  We know he didn't die from old age?

A   That is correct.

Q   Okay.

A   We know that.

Q   And because it wasn't ruled natural, we know Mr. Richardson didn't die solely or near little totally as a result of his heart disease; correct?

MR. PREGON:  Objection.

BY MR. DICELLO:

Q   Because that's what the definition is.  I'm showing you my phone.

A   I understand what you're saying.  What I'm saying is what his report -- what his report said was it was a cardiac event that caused his death.

Page 29

**Page 30**

Q   What caused the cardiac event?

A   We don't know that.

Q   Well, we know it wasn't due to natural causes, don't we?

A   We also know due to the --

Q   Can you answer my question?

A   I'm sorry.

Q   We know that it wasn't due to natural causes; correct?

MR. PREGON:  Objection.

A   Well, he had a disease.  He had a cardiac disease.

BY MR. DICELLO:

Q   Correct.

A   He did have that.  I understand that.

Q   And if he died from his cardiac disease, it would be ruled a natural death?

A   That is correct.

Q   But it wasn't ruled a natural death, was it?

A   That's correct.

Q   So it wasn't just his cardiac disease that caused Mr. Richardson's death, was it?

A   And again, it says, based on my report, and what I recall what was in my report, was it was a sudden

**Page 31**

cardiac event.  And based on the information, we also had an event that occurred prior to the officers getting involved.  Mr. Richardson went to the floor, and this is according to Mr. Maxwell, went to the floor, and went into what he used the term "seizure mode."

Q   Yeah.

A   Which based on the way Mr. Maxwell -- And I interviewed Mr. Maxwell.  Based on the way -- There was some sort of a health, some sort of a medical condition that occurred which caused him to summons help where the corrections officers came, the medical staff came to assist Mr. Richardson.

Q   Yeah.

A   So it wasn't -- The event occurred prior to officers being involved --

Q   Okay.

A   -- with him.

Q   Okay.

A   Okay?  So there was a medical condition going on.  That is a factor in me determining my determination -- me determining, that doesn't even sound right.

Q   Yeah, it does.

A   The determination made through not only the evidence, the video, everything that we had, that it was

**Page 32**

not reviewed.

Q   And I appreciate that.  And I know that's the sum and substance of your investigation.  You looked at a lot of different things, and I understand that.  I'm really trying to focus on one component, and that is the manner in which Mr. Richardson died and how that affected your assessment of the situation, okay?

A   (Nods head.)

Q   And we've gone through the definitions, we know the coroner didn't rule this a natural death.  I think you've agreed with me then we know this death didn't occur solely as a result of Mr. Richardson's heart disease or the medical condition that he was dealing with; correct?

A   I can't say that I know that, that I totally -- I know that there was a natural something occurred, which caused him to go into seizure mode, which caused him to need medical attention, where eventually CPR was performed, or attempted to be performed.

Q   So based on the definition of accident that I've read to you --

A   Okay.

Q   -- what is the injury that occurred without intent to harm or cause death; do you know?

A   The injury that occurred?

**Page 33**

Q   Yeah.

A   Well, what injury did he have?

Q   I'm asking you.

A   I don't know.  He didn't have any injuries.

Q   Okay.  So do you know why this was ruled an accident?

A   I can't say, no.

Q   Who contacted you to involve you in this investigation?

A   Sergeant Stevens.

Q   Was Sergeant Stevens your supervisor?

A   No, she -- she is assigned -- she's -- she may have been filling in that day for Sergeant Hutchinson.  Sergeant Hutchinson at that time was my direct supervisor.  Sergeant Stevens previously worked in the section and was my direct supervisor, but she works with another set of detectives, our Sexual Oriented Offenders Program, but -- so therefore, she kind of fills in when Sergeant Hutchinson is not available or not working that day.

Q   When you arrived at the jail and got your bearings on March 19th, 2012, did you go about investigating this as a potential homicide?

A   That is one thing that we consider.  We -- We had a death in the jail.  It's investigated as a death.

**Page 34**

1 And at that point in time, we look at all of the evidence.
2 So I guess at that point, to answer your question,
3 everything is on the table.
4 Q   So this should have been investigated as a
5 potential homicide; true?
6 A   I didn't say "should have."  It's things that
7 we consider.  We have to see the entire -- it encompasses
8 everything.
9 Q   Okay.
10 A   I didn't know what his medical condition was.
11 I did not know whether or not there -- There -- We -- I
12 know that there was no trauma.  There was no blood.  There
13 was no sign of blunt force trauma.  Nothing of that.
14 Q   Yeah.  Let me ask you this:  As of May 19th of
15 2012, did you know whether or not prone restraint is
16 prohibited in the State of Ohio?
17 MR. PREGON:  Objection.
18 Go ahead.
19 A   No, I did not.
20 BY MR. DICELLO:
21 Q   Did you know whether or not the governor had
22 issued an executive order banning prone restraint at the
23 time you were investigating this death?
24 A   No, I did not.

**Page 35**

1 MR. PREGON:  Objection.
2 BY MR. DICELLO:
3 Q   Am I the person who is telling you that today
4 for the first time?
5 A   Yes.
6 Q   Have you ever seen that executive order from
7 the governor?
8 A   No.
9 Q   Do you know why you were unaware of an
10 executive order that bans prone restraint at the time that
11 you were summoned to investigate the death of someone who
12 was restrained in a prone position?
13 MR. PREGON:  Objection.
14 A   That would go to more of our policy and our
15 training of our corrections officers, not into the
16 criminal aspect.  And I don't -- I would not, working with
17 the ISU Section at that time.  So the policies and
18 procedures, no.
19 BY MR. DICELLO:
20 Q   One of the reasons I asked that question is
21 because I was listening carefully earlier when you told me
22 that, based on your review, none of the officers did
23 anything that violated policy or procedure or did anything
24 wrong.  And that is what you said; correct?

**Page 36**

1 MR. PREGON:  Objection.
2 A   If you're listening carefully, then that's what
3 you heard.
4 BY MR. DICELLO:
5 Q   And if the policies and procedures in fact said
6 that the use of prone restraint is unacceptable and
7 prohibited, that should have been something you considered
8 in your investigation; true?
9 A   Again, I didn't handle the policies and
10 procedures.  I looked at the actions of the officers from
11 the criminal aspect of it.
12 Q   Well, how are you evaluating the actions of the
13 officers if you don't know what rules their conduct is
14 governed by?
15 A   I didn't know that that was a -- I didn't know
16 that there was an executive order.
17 Q   Okay.
18 A   That's the best answer I can give you.
19 Q   Fair enough.
20 When you got to the jail, who did you report
21 to?
22 A   Well, I met with Sergeant Stevens.
23 Q   Okay.
24 A   She was still on the scene.

**Page 37**

1 Q   Anybody else that you remember?
2 A   I met with also Sergeant Lewis, who was the
3 jail supervisor at the time for that shift, I believe.
4 Q   Yep.
5 A   I think Captain Crosby was there.  I don't know
6 if he was there when I got there immediately, but that's
7 probably who I would have checked into, at least to start
8 with, based on what I -- my report, based on my
9 information.
10 Q   Have you ever been involved in situations where
11 an independent outside agency is brought in to investigate
12 the conduct of a corrections officer or a Montgomery
13 County Sheriff's deputy?
14 A   As far as conduct, I have conducted -- I have
15 conducted outside -- for outside agencies.  I've been
16 involved in officer-involved shootings, okay, for other --
17 Q   Let me break that down a little bit.  There's
18 been times where other agencies, other law enforcement
19 agencies, have wanted to investigate a member of their own
20 for shooting and killing a member of the public?
21 A   Correct.
22 Q   And they brought you in to try to maintain some
23 independence in connection with that investigation;
24 correct?

**Page 38**

1    A  Yes.

2    Q  Have you ever been involved in any situation

3 where the Montgomery County Sheriff's Office followed that

4 same approach, where they brought in an independent

5 outside agency to investigate the death of a member of the

6 public?

7    A  Not that I'm aware of.

8    Q  Do you think that that was a good practice, the

9 times that you were brought in as an outside agency not

10 affiliated with the individual who was being investigated?

11 Do you think that was a good practice to maintain

12 independence in the investigation?

13    A  For when I was brought in?

14    Q  Yeah.

15    A  I think -- To say that it was proper, a lot of

16 it has to do with the manpower involved.  They were

17 smaller agencies, not the size of the sheriff's office.

18 The larger agencies within the Dayton area, based on my

19 experience, the larger agencies take care of -- they

20 investigate, they have their own ISU personnel, they have

21 -- which is the Internal Affairs or Inspectional Services

22 is what we call it.  I worked -- I did my investigations

23 for smaller departments, departments of ten to 15, 20

24 officers.  And --

**Page 39**

1    Q  You're familiar with the practice, though?

2    A  Oh, yeah.

3    Q  In law enforcement, that to maintain an

4 independent investigation, sometimes the Feds are brought

5 in; right?

6    A  Sometimes.

7    Q  And sometimes jurisdiction or a law enforcement

8 agency will go to a neighboring agency and bring in those

9 people to investigate their own to maintain some

10 appearance of independence; correct?

11    A  Appearance, true.

12    Q  Why wasn't that done in connection with

13 Mr. Richardson's death?

14    MR. PREGON:  Objection.

15    Go ahead.

16 BY MR. DICELLO:

17    Q  If you know?

18    A  Above my pay grade.  I have no idea.

19    Q  Okay.

20    A  Not our common practice, I will tell you that.

21    Q  Did Captain Crosby and Sergeant Lewis debrief

22 you on kind of what happened before you started your

23 investigation?

24    A  Captain Crosby did not.  I do know that.

**Page 40**

1 Because I'm -- like I said, I'm not sure if he was

2 actually there when I got there, which was about an hour

3 after the -- after I was contacted.  We were gone -- I was

4 gone for the day.  Our normal day of work would have been

5 until 4:00.  It was like 4:30 when I was contacted.  So I

6 had to get dressed, come back in, so on and so forth.  So

7 Captain Crosby was there, but he didn't brief me.  I

8 talked to Sergeant Lewis, which is common practice, you

9 contact the first line supervisors for the most part.  And

10 then at that point in time, we started -- I knew that I

11 was told that Mr. Richardson had already been removed to

12 the coroner's office, the evidence technician was there

13 photographing, and there were -- the inmates obviously

14 were still there.  So interviews began.  Some of the

15 interviews had already been done.  Sergeant Stevens had

16 done some of that.  And then we just started -- I started

17 the investigation based on what I had.

18    Q  Were you the lead investigator into

19 Mr. Richardson's death?

20    A  The case was assigned to me, that is correct.

21    Q  And at the time that you started your

22 investigation, what were the goals of the investigation?

23 What questions was it intended to answer?

24    A  I wouldn't say they were goals.  I would say

**Page 41**

1 that we try to do a thorough investigation.

2    Q  And at the end of that investigation, is a

3 decision made?

4    A  I don't know about always at the end.  There's

5 decisions made as you go through the process.

6    Q  I'm just trying to get an understanding of why

7 are you investigating?  What's the end game?  What's the

8 purpose of it?

9    A  The end game?  To find out as much as we

10 possibly can.

11    Q  For what purpose?  To do what with it is what

12 I'm trying to get at.  I know you're gathering facts,

13 you're interviewing people.  But what is the next step

14 with all this information you gather?  Do you know?

15    A  I'm not really sure what -- I am -- We try to

16 find out as much as we possibly can, put the case

17 together, and determine what happened.

18    Q  Let me tell you where I'm coming from.  If I

19 held somebody down at my house for 22 minutes and they

20 died, you would arrest me and you would investigate me for

21 a homicide; true?

22    MR. PREGON:  Objection.

23    A  Based on -- We would have to look at the entire

24 case.

BY MR. DICELLO:

Q   Yeah.

A   For me to sit here and tell you "I'm going to charge you and arrest you for homicide," I would be totally out of line.  How can I -- I can't sit here today based on those facts and make that determination.  I mean, that's not -- that's not my call.  But based on, until a thorough investigation is complete.  But we -- But there's a little -- No, go ahead.  I'm sorry.

Q   That's all right.  I'm just trying to get an understanding of why this investigation is performed and what's going to happen with it once it's done.  Can you answer those questions?

A   If there's criminal activity that warrants it being sent to the Montgomery County Prosecutor, it is reviewed with the prosecutor's office.

Q   So was that the intention of your investigation, to determine whether or not this situation should be presented to the prosecutor, or was it just to find out what happened?

A   Well, that's always -- that's always an option.  That's always an option, you know.  If criminal activity is involved, then it is -- it is presented.  If we have enough evidence to present to the prosecutor's office,

Page 42

they make a determination, it goes before a grand jury, then they make a determination on charges.

Q   Have you ever been involved in an investigation where a fellow Montgomery County Sheriff's deputy or officer was ever indicted?

A   No.

Q   Have you ever been involved in an investigation where after your investigation you concluded I need to present this to the prosecutor for an indictment?

A   I have reviewed cases, yes, with the prosecutor's office.

Q   Against a fellow officer.

A   Oh, wow.

MR. PREGON:  I'll object.

But go ahead.

BY MR. DICELLO:

Q   Very few; true?

A   A few.

Q   And of those, no one has ever been indicted; correct?

A   Incorrect.

Q   How many fellow corrections officers or Montgomery County Sheriff's officers have been indicted as a result of an investigation you performed?

Page 43

MR. PREGON:  Can I have a continuing on that?

MR. DICELLO:  Is it relevance based?

MR. PREGON:  Yeah.

MR. DICELLO:  Yeah.  Those objections are preserved.  But go ahead.

A   Three or four.

BY MR. DICELLO:

Q   Any of those stem from any deaths in the jail?

A   No.

Q   Any of those stem from any deaths at all?

A   No.

Q   I'm going to rely on your narrative report here.  I've had the chance to depose Detective Conley.  I think he assisted you in interviewing some people?

A   Yes.

Q   And Detective Conley told me he started interviewing people that night, May 19th, 2012, at the jail.  Is that what you did?

A   Yes.

Q   And you told me you worked all day and then you had to come in and probably work a big part of the night; huh?

A   Yes.  Well, I don't know.

Q   That was part of the job?

Page 44

A   It is, yeah.

Q   All right.  So when you responded to the jail, did you know that you would be interviewing people about a death?

A   Yes.

Q   Did you bring any recording equipment to record the interviews of these people who witnessed this young man die?

A   No.

Q   Why not?

A   We don't record interviews.

Q   Why not?

A   It's just our policy.  We don't record them.

Q   But if you recorded those interviews, we would know exactly what the witnesses said.

A   I generate a report.

Q   Did you write down word-for-word what every witness told you they saw?  I mean, that's not possible, is it?

A   Two questions.

Q   Unless Whitney is there, you can't.

A   The answer is no.  And no.

Q   So you're right.  I asked a poor question.

A   Oh, no.

Page 45

1  Q   The first question was did you write down
2  everything all the witnesses stated, and your answer was
3  no?
4  A   No.
5  Q   And the second question is:  Is it possible to
6  write down everything a witness said when you interviewed
7  them?
8  A   No.
9  Q   So we have to rely on the notes you took as
10 writing down what you felt was important; correct?
11 A   That is correct.
12 Q   I presume you took notes of what people were
13 telling you happened?
14 A   Yes.
15 Q   Did you keep those notes?
16 A   I don't believe so.  And the reason, once my
17 supplemental report is completed, the notes are destroyed.
18 Q   Why?
19 A   It's common practice.
20 Q   Why would you destroy your contemporaneous
21 notes of what witnesses say they saw when you're
22 investigating a death of a 28-year-old member of the
23 public?
24 A   Because that's our common -- that's my common

Page 46

1  practice.  Once I generate a report, the notes are no
2  longer needed.  The case was closed.
3  Q   By looking at the report -- And I think yours
4  is at MC 1271 in Plaintiff's Exhibit 1 there, Mike.
5  MR. PREGON:  It's at the bottom corner.
6  BY MR. DICELLO:
7  Q   Yeah, there's some numbers, Bates numbers at
8  the bottom there.
9  A   There it is.  Okay.
10 Q   Based on looking at this, can you tell me when
11 you completed this narrative Investigative Supplemental
12 Report?
13 A   When it was completed?  Well, on the date it
14 says, 9-6 of '12 down at the bottom, where my name is.
15 Q   Well, that says the date it was printed?
16 A   Printed, correct.
17 Q   I want to know the date that you completed
18 this.  When did you type it into the computer?  And I
19 think that looks to be September 5th, 2012 at 7:45 a.m.
20 A   I'm looking at -- Which one are you looking at?
21 MR. PREGON:  Look at the first page.
22 BY MR. DICELLO:
23 Q   Yeah, the first page.
24 MR. PREGON:  Right there.

Page 47

1  A   That's when the report was entered.  Okay.
2  BY MR. DICELLO:
3  Q   Help me out here.
4  A   I will.  I'll explain to you how we do our
5  reports --
6  Q   Okay.
7  A   -- or how I did my report.  The report, we have
8  an overall system called the Tiburon system, okay?  All
9  offense reports, all reports go through that system.  When
10 that is done, the original is made, it's entered, we start
11 a report.  From that point forward, supplemental reports
12 are done and added to it.  My supplement was number five,
13 okay?
14 Q   Yep.
15 A   Now, I can't tell you the date that I started
16 my report, because I started my report on Word, okay?  The
17 reason that we do that is because the entire department or
18 anybody that has the opportunity can pull this report up
19 and review where the investigation is, okay?  So
20 therefore, as a safeguard, for my supplemental report, I
21 put it on Word.  And then as things progress, which again
22 I added to that different dates such as with the death
23 certificate, which was in June 7th of '12, and then on the
24 26th of June, Dr. Casto sent me a copy of the postmortem

Page 48

1  examination.  So it is as -- it's an ongoing report.  I
2  will start, I will put my -- and then I will add to.  Then
3  when the report is completed, it's then at that point in
4  time that I generate the supplement in the Tiburon.  It
5  doesn't mean my report, I haven't been typing it and
6  staying on top of it, it just means that I, on that day,
7  September 5th, I generated and started supplement number
8  five in the Tiburon system.
9  Q   Okay.
10 A   So --
11 Q   So do you keep a copy of your Word reports?
12 A   No.  It's cut and pasted and sent over.  I
13 review it prior to approving it, it's been -- once it's
14 approved by me, it's then an approved by the supervisor,
15 which I believe would have been Sergeant Hutchinson, was
16 my supervisor at the time, and --
17 Q   What happens to the Word version of your
18 reports?
19 A   It's deleted.  Because it's the same report.
20 It's cut and pasted.
21 Q   Now, between June 26th of 2012 and
22 September 5th of 2012, was there any documentation of you
23 having done anything on this investigation?
24 A   Is there any documentation?  No.

Page 49

13 (Pages 46 to 49)

1    Q   Based on reviewing your report, did you do
2  anything between June 26th, 2012 and September 5th?
3    A   During -- I know that after June 26th there was
4  some additional testing based on the supplement by --
5  after we received the toxicology report.  There was some
6  additional testing don't by Dr. Marinetti, which went to
7  the level of THC in Mr. Richardson's body.  So when that
8  was completed, and I got that result, sometime in that
9  point, that's when I -- I put that in the report.  And
10  then ultimately I completed and entered it, what was it,
11  September something.
12    Q   Okay.  Bear with me just a moment.
13        It sounds to me like you interviewed -- Did you
14  interview the people in the order as they're listed in
15  your report, meaning the first person you interviewed, was
16  that Mr. Maxwell?
17    A   I know that that was the first inmate that I
18  interviewed.
19    Q   All right.
20    A   Yes.
21    Q   And Mr. Maxwell, as you've already told us, he
22  described what he perceived as looked like Mr. Richardson
23  was having a seizure inside the cell, correct, went into
24  seizure mode like you said?

Page 50

1    A   Seizure mode, yes, that's how he described it
2  to me.  And that's the reason, I believe, I don't see it
3  right here, because I probably have it out of order, I
4  think I had that in quotations, if I'm not mistaken.
5    Q   Yeah, "seizure mode."
6    A   Okay.
7    Q   According to Mr. Maxwell, Mr. Richardson was
8  moving and saying, "Get off of me," but he was not aware
9  of what was going on.  Is that what Mr. Maxwell told you?
10    A   He told me -- Okay.  You said that he said "Get
11  off of me," not aware of his circumstances.  That was --
12  Yeah.  He told me that he kind of went out, did the
13  seizure mode, then he woke -- when he kind of like woke up
14  or came to, whatever, he had a blank stare and wasn't --
15  didn't appear to be understanding where he was at.
16    Q   Yeah.
17    A   Okay.
18    Q   Mr. Maxwell told you, among other things, he
19  said the COs kept the deceased on his stomach restraining
20  him in handcuffs behind his back.  That's what Mr. Maxwell
21  told you?
22    A   That's exactly -- That's what I have in my
23  report, yes.
24    Q   And some of the things the other inmates told

Page 51

1  you, Gary Edmond, you interviewed him and he told you he
2  could hear Mr. Richardson saying, "Let me up, let me up";
3  correct?
4    A   That is correct.
5    Q   Also, Billy Carpenter told you that he observed
6  Mr. Richardson being pinned down by four, five or six
7  corrections officers and putting handcuffs on
8  Mr. Richardson; correct?
9    A   That is correct.
10    Q   Mr. Carpenter told you he heard Mr. Richardson
11  yell several times, "Let me up"; correct?
12    A   Correct.
13    Q   Mr. Lewis, you interviewed him, and he said he
14  didn't see anything -- well, actually he said he was
15  trying to watch it on the reflection of the TV screen, but
16  he did hear someone saying, "Get off of me, get off of
17  me"; correct?
18    A   Yes.
19    Q   You interviewed Mr. Kylon Lorenzo, and he told
20  you he heard someone saying, "Please stop, please stop";
21  correct?
22    A   Yes.
23    Q   You interviewed Mr. Gage Hurlburt, and among
24  other things -- I'm sorry, you interviewed Mr. Jessie

Page 52

1  Hubbs at the third page of your report, and he told you,
2  among other things, that Mr. Richardson was pulled out of
3  his cell and was being held down on the ground; correct?
4    A   Yes.
5    Q   You interviewed Mr. Brandon Webb, and he stated
6  that he observed officers holding someone down; correct?
7    A   Yes.
8    Q   You interviewed Mr. Morris, and he said he
9  heard corrections officers telling Mr. Richardson to stay
10  down on the ground; correct?
11    A   Yes.
12    Q   You interviewed Mr. Sowards, and he said he
13  heard someone yelling "Get off of me" approximately six
14  times and he heard some moaning and groaning, that's some
15  information you had in your investigation; correct?
16    A   Yes.
17    Q   You interviewed Mr. Scott Reynolds, and
18  Mr. Reynolds told you, among other things, that
19  Mr. Richardson continued to be held facedown, but he was
20  saying, "Let me up, I can't breathe"; correct?
21    A   Yes.
22    Q   And you reviewed the video as well; true?
23    A   Yes.
24    Q   And do we agree that at times -- Well, we agree

Page 53

14 (Pages 50 to 53)

1  Mr. Richardson is handcuffed behind his back?
2      A   I will tell you this.  I watched the video
3  within the first five to six days of the incident.  I do
4  know that he was handcuffed or restrained.  For me to sit
5  here and say we agree -- I know that he was restrained, I
6  know that he was handcuffed, and based on all the
7  witnesses, they tell me he was handcuffed behind his back.
8      Q   Do you have any reason to question that?
9      A   I don't.
10      Q   Okay.
11      A   But I haven't reviewed the video in almost
12  three years.
13      Q   All right.  Did you also understand -- Well,
14  based on your review of the video, Mr. Richardson was
15  facedown on the ground; correct?
16      A   Yes.
17      Q   Let me ask a follow-up question.  Do you
18  remember at times Mr. Richardson appeared to be rolled
19  onto his right side?
20      A   He was moved, absolutely, yes, uh-huh.
21      Q   And then there were other times when
22  Mr. Richardson was lying facedown on the ground; correct?
23      A   Yes.
24      Q   With both his shoulders on the ground and his

Page 54

1      Q   Is it your understanding that during that
2  entire time Mr. Richardson was on the ground?
3      A   He never got up to his feet, that is correct.
4      Q   Is it your understanding that he was trying to
5  get up?
6      A   I can't say that.
7      Q   You didn't investigate this to try to determine
8  whether or not Mr. Richardson was held in prone restraint,
9  did you?
10      A   No.
11      Q   Do you know if anyone up to this day has ever
12  investigated this situation to determine whether or not
13  Mr. Richardson was held in prone restraint?
14      A   I do not.
15      Q   You didn't do that; correct?
16      A   Not specifically, no.
17      Q   And you're not aware of anyone else who did;
18  true?
19      A   That is correct.
20      Q   So no one has done that yet.  Fair to say the
21  jury will be the first people who evaluate whether or not
22  Mr. Richardson was held in prone restraint?
23          MR. PREGON:  Objection.
24          Go ahead.

Page 56

1  head turned to the left; correct?
2      A   I can't -- I -- I don't recall that.  I -- I
3  know he was down.  And I know that there was struggling
4  going on and there were officers trying to -- I shouldn't
5  -- that they were working with him.  Whether they were
6  controlling him, trying to make sure that he didn't hurt
7  himself or any of them.
8      Q   Well, folks --
9      A   There was a struggle.
10      Q   You knew there was a struggle; correct?
11      A   Correct.
12      Q   And this struggle lasted an extended period of
13  time; correct?
14          MR. PREGON:  Objection.
15          Go ahead.
16      A   It was not a short time.  I mean, extended, I
17  -- I didn't put a clock on it.
18  BY MR. DICELLO:
19      Q   I'll represent to you that the video shows from
20  the time that Mr. Richardson is being pulled out of his
21  cell until the time the officers notice that he stopped
22  breathing is about 22 minutes.  Is that consistent with
23  your memory?
24      A   Okay.

Page 55

1      A   I can't say -- Again, I'm not aware, so
2  therefore I don't know.
3  BY MR. DICELLO:
4      Q   Do you know if he was held in prone restraint,
5  Mr. Richardson?
6      A   I haven't seen the video.
7      Q   In a long time.
8      A   And I have not -- And I have not seen what the
9  definition of prone restraint is defined by I guess you
10  said an executive order.
11      Q   At the time you investigated this, did you know
12  how prone restraint was defined by Ohio law?
13      A   No.
14      Q   Did you know how prone restraint was defined by
15  the Ohio Department of Rehabilitation and Correction?
16      A   No.
17      Q   Did you know how prone restraint was treated
18  within the policies and procedures of the Montgomery
19  County Sheriff's Department?
20      A   No.
21      Q   At any point in time during your investigation,
22  did you ever review the jail operations manual?
23      A   No.
24      Q   So you didn't review the jail operations

Page 57

15 (Pages 54 to 57)

1   manual's restraint policies at any time during this
2   investigation; correct?
3       A   I don't.
4       Q   You didn't?
5       A   I didn't, and I don't.  We have our -- It's an
6   independent investigation is conducted along with mine.
7   And that is done by the Inspectional Services Unit.
8       Q   So do you know who was investigating whether or
9   not the policies and procedures were followed?
10      A   I cannot tell you.  Someone within our
11  Inspectional Services, and I don't know who was assigned
12  to that unit at that time.
13      Q   Is that SIU, or is this something different
14  now?
15      A   No, it's Inspectional Services.  It's like
16  Internal Affairs.  It's the same thing.  It's just our --
17  It's the -- It's the unit that investigates policies and
18  procedures.
19      (Exhibit No. 2 marked for identification.)
20  BY MR. DICELLO:
21      Q   I'm handing you what's been marked as
22  Plaintiff's Exhibit 2.
23      MR. DICELLO:  I might have a couple copies of
24  these, guys, but maybe not.  Oh, I've got copies for

Page 58

1   everybody.
2   BY MR. DICELLO:
3       Q   Handing you what's been marked as Plaintiff's
4   Exhibit 2, is this the Inspectional Services Unit that
5   you're talking about?
6       A   Well, that's how this is entitled, that's
7   correct.
8       Q   And this is a Risk Management Review Report.
9   What does "risk management review" mean?
10      A   How this report is titled.  I mean, it's -- it
11  looks like it's by the Inspectional Services Unit.
12      Q   Right.
13      A   I don't review their reports.
14      Q   Let me ask you this as somebody who has
15  investigated jail deaths:  Why would the investigation
16  into the death of a member of the public in the jail be
17  entitled a risk management review?
18      A   I don't know.  But I do know that any time,
19  whether it's suicide, any type of a death in the county
20  jail, Inspectional Services conducts an investigation as
21  well.
22      Q   Is that investigation a risk management review?
23      A   I can't tell you how they've been titled.  This
24  is the first one I've ever reviewed or seen.

Page 59

1       Q   When I hear the words "risk management review,"
2   in my mind it sounds like somebody is performing an
3   investigation to see whether or not the officers, the
4   sheriff's office, has any liability.  Is that how you read
5   this?
6       MR. PREGON:  Objection.
7       A   I guess that would be your opinion --
8   BY MR. DICELLO:
9       Q   Yeah.
10      A   -- of that word.
11      Q   I'm asking yours.
12      A   Well, I'm telling -- again, why it's entitled
13  risk management, I don't know.  I really don't.
14      Q   That's okay.
15      A   I understand what risk is.
16      Q   I appreciate that.  Does the Montgomery County
17  Sheriff's office have a risk management committee that you
18  know of?
19      A   Not that I'm aware of.
20      Q   Is there a risk manager employed by the
21  Montgomery County Sheriff's Office if you know?
22      A   Not that I'm aware of.
23      Q   If you turn to page 11 of this report, this is
24  MC 1728.  You see this is signed by the sheriff himself;

Page 60

1   correct?
2       A   That's correct.
3       Q   And it's signed by somebody named Sergeant Tom
4   Flanders; correct?
5       A   That is correct.
6       Q   Is it your understanding then that Sergeant Tom
7   Flanders performed this risk management review?
8       A   He signed off on it.
9       Q   Do you know that Sergeant Flanders has been
10  terminated from the Montgomery County Sheriff's office for
11  engaging in racist text messages?
12      MR. PREGON:  Objection.
13      Continuing objection?
14      MR. DICELLO:  You've got it.
15      MR. PREGON:  Go ahead.
16      A   He was terminated, and I know the allegations,
17  there were text messages.
18  BY MR. DICELLO:
19      Q   Do you know what the substance of those text
20  messages were, Mike?
21      A   I don't.
22      Q   You don't?
23      A   I don't.  The specifics of them.
24      Q   Assuming that those text messages used the

Page 61

16 (Pages 58 to 61)

1  word, and forgive me, okay, but used the word "nigger" --
2      A  Yes.
3      Q  -- we agree Sergeant Flanders has no business
4  investigating the death of a black man in a jail, does he?
5          MR. PREGON:  Objection.
6      A  Not my call.
7  BY MR. DICELLO:
8      Q  I'm asking you as a man.
9      A  That is inappropriate, absolutely.
10     Q  Robert Richardson's family members deserved
11 better; agreed?
12         MR. PREGON:  Objection.
13     A  Deserved better as far as?
14 BY MR. DICELLO:
15     Q  Than having Sergeant Tom Flanders investigate,
16 perform a risk management review investigation into their
17 son's death.
18         MR. PREGON:  Objection.
19         Go ahead.
20 BY MR. DICELLO:
21     Q  You know he's black; right?  You understand?
22     A  Well, absolutely.
23     Q  And Sergeant Flanders is white?
24     A  Yes.

Page 62

1  Sheriff Plummer terminated him.  He was a captain at that
2  time.
3          So based on that, Sheriff Plummer felt that he
4  was inappropriate and not the person to be working as a
5  captain on his department.  But as far as his ability to
6  conduct the investigation in May of 2012, I can't tell you
7  that.
8  BY MR. DICELLO:
9      Q  Do you agree that Mr. Richardson's family, and
10 Mr. Richardson himself, were entitled to an unbiased
11 investigation?
12     A  Everybody --
13         MR. PREGON:  Objection.
14     A  That is correct.  And that's -- that was my
15 goal and has been for -- and was for 38 years.
16 BY MR. DICELLO:
17     Q  Did you investigate at all how it was that
18 Mr. Richardson had the level of marijuana in his system
19 that was found?
20     A  No.
21     Q  Based on -- it sounds to me like based on your
22 discussions with Dr. Marinetti, Dr. Marinetti opined to
23 you that Mr. Richardson ingested marijuana sometime within
24 six hours of his death?

Page 64

1      Q  So my question is:  Do you think that
2  Mr. Richardson's mother and his family deserve better than
3  to have Sergeant Flanders perform this risk management
4  review into his death?
5          MR. PREGON:  Objection.
6          Go ahead.
7      A  The --
8  BY MR. DICELLO:
9      Q  This is the part where you get to tell us how
10 you feel about it.
11     A  About what?
12     Q  About Sergeant Tom Flanders performing this
13 investigation based on the information you understand
14 concerning his texts.
15         MR. PREGON:  Objection.
16         Go ahead.
17     A  Well, to say -- to say -- to say whether or not
18 Tom Flanders on -- in 2012 was capable or had -- was a, in
19 your term, racist, when he conducted this investigation
20 and this Risk Management Review Report, I can't answer
21 that.  I don't know what his thoughts were, I don't know
22 what his feelings were.  I do know, because I was still
23 employed when he was terminated, I do know what the
24 allegations were.  And I do know that sergeant -- or that

Page 63

1      A  That's what my report says and what she
2  reported to me, yes.
3      Q  So if Dr. Marinetti is correct, and we'll have
4  to ask the doctors about that, but assuming Dr. Marinetti
5  was correct, did you do anything to investigate how it is
6  that Mr. Richardson was -- had access to marijuana inside
7  the jail?
8      A  How it -- No.
9      Q  Do you know if anybody has ever determined who
10 gave him the marijuana inside the jail or --
11     A  No.
12     Q  Did you ask Dr. Marinetti if these results were
13 consistent with him -- with Mr. Richardson having ingested
14 marijuana prior to coming into the jail?
15     A  Well, based on the information she gave me,
16 which you put in my report, six hours.
17     Q  Six hours.
18     A  And he had been in since the 17th, I believe --
19     Q  Right.
20     A  -- in the evening hours.  Or I don't know when
21 he wax actually arrested.  I know Mr. Maxwell said he was
22 brought to the pod or the cell in the evening of 17th.
23     Q  You attended the autopsy; correct?
24     A  Yes.

Page 65

17 (Pages 62 to 65)

**Page 66**

1    Q   Is that standard practice?
2    A   Yes.
3    Q   Was anybody from Mr. Richardson's family
4  invited to attend the autopsy?
5    A   No.
6    Q   So why is it that you're given permission to
7  attend the autopsy and the family isn't?
8    A   Because it's my --
9    MR. PREGON:  Objection.
10    Go ahead.
11    A   Because it's my investigation.  Because I
12  wanted to see, and I go for all homicides and deaths to
13  determine -- to actually be able to see what the injuries
14  are, if any, and whatever the doctor found.
15  BY MR. DICELLO:
16    Q   Were you ever interviewed by anybody from
17  Internal Affairs?
18    A   No.
19    Q   Were you ever interviewed by anybody who was
20  performing any other kind of investigations into this
21  death?
22    A   No.
23    MR. PREGON:  Are we at a good break point?
24    MR. DICELLO:  Yeah, and I'm almost done.  I'm

**Page 67**

1  very close to being done.
2    MR. PREGON:  Okay, just a quick one.
3    MR. DICELLO:  Yeah, sure.
4    (Discussion held off the record.)
5  BY MR. DICELLO:
6    Q   We're just back from a short break, Mike.  What
7  is your understanding as to why Mr. Richardson was
8  handcuffed; do you know?
9    A   Do I know?  No.
10    Q   What was your understanding as to why
11  Mr. Richardson was placed in the position or positions
12  that he was placed in by the corrections officers; do you
13  know?
14    A   The simple answer is no.
15    Q   Looking at your report, and it appears to be
16  one, two, three -- three full pages.
17    A   Okay.
18    Q   Correct?
19    A   Yes.
20    Q   Did you generate any other documentation in
21  connection with your investigation other than what we're
22  look at in Exhibit 1 that is MC 1271 to MC 1274?
23    MR. PREGON:  Him personally; right?
24    MR. DICELLO:  Correct.

**Page 68**

1    A   No.
2  BY MR. DICELLO:
3    Q   There's an approving officer of number 138.  Do
4  you know who that is?
5    A   That is Sergeant Hutchinson.
6    Q   Sergeant Hutchinson.  Did Sergeant Hutchinson
7  work in the jail as of May of 2012?
8    A   No, he did not.
9    Q   What division or unit was --
10    A   He was my direct supervisor.
11    Q   In Special Investigations?
12    A   Special Investigations.  Sergeant Stevens
13  called me in, because she -- I don't know where Hutch was,
14  I don't know if he was off that day, I don't recall.  I
15  don't know if he was not available, I don't know.
16    Q   So you told me you entered this report into the
17  Tiburon system, and then apparently, was it Sergeant
18  Hutchinson?
19    A   Yes.
20    Q   Sergeant Hutchinson becomes aware of it through
21  the computer somehow.  Is that how it works?
22    A   Yes.
23    Q   And it looks like Sergeant Hutchinson approved
24  this report on September 6th, 2012, the day after it was

**Page 69**

1  entered; fair?
2    A   Correct.
3    Q   What happened after that, if anything, in
4  connection with this investigation that you either
5  participated in or knew took place?
6    A   I conducted no further investigations on it.
7    Q   Did you have any discussions with anybody where
8  there was some kind of meeting to come to any decisions
9  about the investigation?
10    A   I don't recall having any.
11    Q   So is it fair to say that the last involvement
12  you recall in connection with this investigation is when
13  you entered this report into the Tiburon system on your
14  computer on September 5th, 2012?
15    A   That is correct.
16    Q   And you had no other further involvement?
17    A   I don't recall any further.
18    Q   Did anybody ever come and report to you the
19  outcome of anything involving Mr. Richardson after you
20  entered this information into Tiburon?
21    Q   What was your understanding as to the status of
22  the investigation as of the point that you entered this?
23    A   Well --

18 (Pages 66 to 69)

**Page 70**

1  Q  I mean, it says on page three, it says "status
2  closed."
3  A  Closed.  The case was closed.
4  Q  Who closed it, you?
5  A  Yes.
6  Q  I just want to review my notes.  And I was
7  doing that while you were out, see if I have anything else
8  for you.
9  MR. DICELLO:  Carrie, do you have any
10  questions?
11  MS. STARTS:  No.
12  MR. DICELLO:  All right.
13  BY MR. DICELLO:
14  Q  Did you interview the officers?
15  A  I did not.
16  Q  Did anyone?
17  A  Not that I'm aware of.
18  Q  Why not?
19  A  Their report stands on what they -- what they
20  documented.  If there was follow-up investigation, it
21  would have been done based on what we observed.  Their
22  actions were observed on the video, okay?  So therefore,
23  nothing came to light that showed a necessity to interview
24  them.

**Page 72**

1  said, "Well, the officers completed narrative reports."
2  So I sense from your answer that there was no need to
3  interview because they completed a narrative report.
4  Well, so did all the medical people that were interviewed.
5  So why were they interviewed even though they filled out
6  reports and the officers weren't?
7  A  My practice -- I can't tell you why Detective
8  Conley interviewed the medical staff, okay?  I interviewed
9  Boehringer because he was the first medic on the scene, I
10  believe, and he helped with the CPR.  I was looking to see
11  whether or not -- what he observed, so that I would have a
12  better understanding from Mr. Richardson's actions,
13  because I was going to the autopsy report, the autopsy the
14  next morning.  So if there was something there that he saw
15  in Mr. Richardson's actions, I could report that to
16  Dr. Casto.
17  Q  Okay.
18  A  So therefore, it could be something that would
19  aid him upon conducting the autopsy.  And that has a lot
20  to do with why we go to autopsies, okay?  We have -- That
21  way we can see with our eyes, prior to the report --
22  Because the report takes six to eight weeks to be
23  completed.  He can call me on the phone.  But if we have
24  conversation standing there -- And that's the reason I --

**Page 71**

1  Q  Some of the medical folks, they completed the
2  same kind of reports as the corrections officers; correct?
3  A  Yes.  It's all part of the jail incident
4  report.
5  Q  But the medical personnel were interviewed by
6  Detective Conley; true?
7  A  Oh, I interviewed --
8  Q  You interviewed?
9  A  -- Boehringer.
10  Q  You interviewed Boehringer.  And we just had
11  Detective Conley in here, and Detective Conley told me,
12  his report is just before yours, Detective Conley
13  interviewed Medic Stockhauser, LPN Kassandra Miles,
14  interviewed LPN Kristy Kruse, interviewed Nurse Felicia
15  Foster; correct?
16  A  Yes.
17  Q  Those folks all filled out narratives in the
18  incident report just like the corrections officers;
19  correct?
20  A  Correct.
21  Q  So why were they interviewed by the sheriff's
22  office folks who were investigating this death and the
23  officers were not interviewed?  The reason I'm asking is
24  because I asked you this question once before and you

**Page 73**

1  I specifically interviewed -- is it Mr. Boehringer?
2  Q  Boehringer.
3  A  Boehringer, yeah.
4  Q  But as far as why Detective Conley interviewed
5  all the medical personnel, even though they had filled out
6  the same reports that the COs filled out, you don't know
7  why that was done?
8  A  I don't.
9  Q  You understand there's an appearance that the
10  officers are purposefully not being interviewed about what
11  happened?
12  MR. PREGON:  Objection.
13  A  Well, whatever the appearance is, we also have
14  their report and we also have the video.
15  BY MR. DICELLO:
16  Q  Did you provide the video to the coroner?
17  A  I honestly can tell you I don't know.  In a lot
18  of -- and I can't -- Well, I don't have it reported, so I
19  can't tell you.
20  Q  As of the time that you met with the coroner
21  when he was conducting the autopsy, did you know whether
22  or not the coroner had seen the video?
23  A  No.  Because the only time that I met was the
24  next day.  The autopsy was performed the next morning.

**19 (Pages 70 to 73)**

1    Q   Yeah.
2    A   I don't even think I had the video at that
3    point.
4    Q   Were you investigating Mr. Richardson's
5    actions?
6    A   We look at the entire, everyone's actions.
7    Q   Did you come to any conclusions that
8    Mr. Richardson committed any crimes?
9    A   Crimes? No.
10   Q   Did you come to any conclusions that
11   Mr. Richardson violated any jail rules?
12   A   No.
13   Q   Did Mr. Richardson, based on your
14   investigation, hurt anybody?
15   A   Hurt anybody? No.
16   Q   Did he try to hurt anybody?
17   A   I know there was a cooperation issue.
18   Q   Do you know --
19   A   There was a re -- Based on what I saw, based on
20   what was reported, complying with commands, complying with
21   what he was told to do was not done.
22   Q   Do you know if he was capable of complying with
23   the commands?
24   A   That, I do not know.

Page 74

1    Q   Do you have reason to believe, based on your
2    investigation, that he wasn't?
3    A   To believe? I know that Mr. Maxwell said -- of
4    what he said when I interviewed him. But to what point --
5    I do know based on what other inmates said and what he
6    even said, he was coherent enough to tell the officers to
7    "Get off of me." He was -- And he was heard making those
8    statements.
9    Q   Okay.
10   A   So therefore, there was a certain amount of
11   being coherent to understand what was going on.
12   Q   I'm not sure I got an answer. But based on
13   your investigation, did Mr. Richardson try to hurt anyone?
14   A   Not that I saw.
15   Q   Based on your investigation, and what you
16   viewed on the video, did Mr. Richardson pose an immediate
17   threat to anyone?
18   A   I don't know.
19   Q   You actually got to -- had access to some
20   specific information about Mr. Richardson based on you
21   attending the autopsy. Mr. Richardson was obese; correct?
22   A   Yes.
23   Q   He had pre-existing heart disease; correct?
24   A   That's what I was told, yes.

Page 75

1    Q   He had an enlarged heart; true?
2    A   Yes.
3    Q   Based on what you observed, Mr. Richardson had
4    participated in a struggle with corrections officers;
5    correct?
6    A   Yes.
7    Q   Based on what you observed, the corrections
8    officers used force against Mr. Richardson; true?
9    A   Force was used, yes.
10   Q   As of 2012, Mike, were you familiar with a
11   general rule in law enforcement that once somebody is
12   handcuffed behind their back in a prone position that you
13   need to get that person off their belly as soon as
14   possible?
15       MR. PREGON:  Objection.
16       Go ahead.
17   A   It's not quite as simple as that. But you
18   would want them moved, yes.
19   BY MR. DICELLO:
20   Q   And why is it that you would want them moved
21   off their belly as soon as possible when their hands are
22   cuffed behind their back?
23   A   If you can do that safely with them complying,
24   you can do that.

Page 76

1    Q   But my question is:  Why do you want to do it
2    as soon as possible? Why do you want to get them off
3    their belly when their hands are cuffed behind their back?
4    A   So nothing further occurs: injuries, things of
5    that nature.
6    Q   As of May of 2012, were you familiar with the
7    risk of death by positional asphyxiation?
8    A   I can't say that I specifically had that term.
9    Obviously, I'm aware of it now. But to specifically say
10   that, I can't -- I can't tell you that -- The answer was
11   was I aware of it?  No.
12   Q   Back in May of 2012, were you aware of an
13   increased risk of somebody dying from being positioned on
14   their belly with their hands cuffed behind their back?
15   A   The issue is whether you can breathe or not,
16   and is always a danger.
17   Q   My specific question -- And I agree with you.
18   My specific question is:  Were you aware in your field, in
19   the law enforcement field, as of May of 2012, whether
20   there was an increased risk of death from being positioned
21   in a prone position with your hands cuffed behind your
22   back?
23   A   My answer I guess would be yes.
24   Q   You were aware of that?

Page 77

20 (Pages 74 to 77)

| | |
|---|---|
| 1    A   Aware of it? Aware that something could | 1                 December 4, 2015 |

**Page 78 (left column)**

1    A   Aware of it? Aware that something could

2 happen, yes.

3    **Q   As of May of 2012, were you aware of what the**

4 **risk factors are that are associated with an increased**

5 **risk of death in that position?**

6    A   No.

7    **Q   Did anything in your investigation lead you to**

8 **conclude that Mr. Richardson was armed at any time?**

9    A   With physical weapons, he had his hands, he had

10 his legs, yes.

11    **Q   Other than his hands --**

12    A   Are you talking guns, knives?

13    **Q   Yeah.**

14    A   Clubs? He had -- Based on -- There was no

15 information that he had any.

16    **Q   Did the coroner tell you when Mr. Richardson**

17 **had his heart attack?**

18    A   No.

19    **Q   Do you know when he had a heart attack?**

20    A   No, I do not.

21    **Q   Do you know if he had a heart attack?**

22    A   Based on Dr. Casto's report is he had a cardiac

23 arrhythmia death. Now, what that terminology, that

24 definition means, I can't tell you. But that was based on

Page 78

**Page 80 (right column)**

1                 December 4, 2015

2 Dear Mr. Clymer,

3     You have chosen to read and sign your transcript.

Please do not mark on the transcript. Any

4 corrections/changes you may desire to make in your

testimony should be typewritten or printed on the errata

5 sheet at the end of testimony, giving the page number,

line number and desired correction/change. After you have

6 read the transcript, sign your name on the correction

sheet and where indicated at the close of testimony before

7 a notary public.

8     The Rules of Civil Procedure allow thirty days for

you to read and sign. Please return the signature page

9 and errata sheet to Whitney Layne, 6723 Cooperstone Drive,

Dublin, Ohio 43017 within that time. Failure to do so in

10 the allotted time will result in your transcript being

used as though read and signed by you.

11

12               Sincerely,

13               _____

              Whitney Layne

              Professional Reporter

14

   Cc:

15    Nick DiCello

   Carrie Starts

16    Jamey Pregon

17

18

19

20

21

22

23

24

Page 80

**Page 79 (left column)**

1 the findings of Dr. Casto.

2    **Q   Mike, those are all the questions I have for**

3 **you.**

4    A   Okay.

5    **Q   I appreciate your patience with me.**

6    A   No problem.

7      MR. PREGON: We'll read.

8          - - -

9      (Signature not waived.)

10          - - -

11      And, thereupon, the deposition was concluded at

12 4:45 p.m.

13          - - -

14

15

16

17

18

19

20

21

22

23

24

Page 79

**Page 81 (right column)**

1    State of _____

2    County of _____

3      I, JOHN MICHAEL CLYMER, do hereby certify that I

4 have read the foregoing transcript of my deposition given

5 on November 18, 2015: that together with the correction

6 page attached hereto noting changes in form or substance,

7 if any, it is true and correct.

8          _____

9          JOHN MICHAEL CLYMER

10      I do hereby certify that the foregoing transcript

11 of the deposition of JOHN MICHAEL CLYMER was submitted to

12 the witness for reading and signing: that after he had

13 stated to the undersigned Notary Public that he had read

14 and examined his deposition, he signed the same in my

15 presence on the _____ day of _____, 2015.

16          _____

17          Notary Public

18 My Commission Expires on _____

19          - - -

20

21

22

23

24

Page 81

Page 81

1   State of _Ohio_

2   County of _Montgomery_

3       I, JOHN MICHAEL CLYMER, do hereby certify that I

4   have read the foregoing transcript of my deposition given

5   on November 18, 2015; that together with the correction

6   page attached hereto noting changes in form or substance,

7   if any, it is true and correct.

8

9                                       JOHN MICHAEL CLYMER

10      I do hereby certify that the foregoing transcript

11  of the deposition of JOHN MICHAEL CLYMER was submitted to

12  the witness for reading and signing; that after he had

13  stated to the undersigned Notary Public that he had read

14  and examined his deposition, he signed the same in my

15  presence on the _4th_ day of _December_, 2015

16

17                                       Notary Public

18  My Commission Expires on _____

19                                       TINA C. SABO
                                         Notary Public, State of Ohio
20                                       My Comm. Expires April 27, 2016

21

22

23

24

Page 82

1   TO THE  REPORTER:

2   I have read the entire transcript of my deposition taken

3   on the _5ᵗʰ_ day of _December_, 20 _15_, or the same has been

4   read to me.  I request that the following changes be

5   entered upon the record for the reasons indicated.

6

7   Page    Line    Correction and reason therefore

8   _____

9   _No Changes -_

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  Date _12/9/15_    Signature _____

24

```
 1                      CERTIFICATE

 2    State of Ohio      :

 3    County of Franklin:

 4

 5          I, Whitney Layne, Notary Public in and for the

 6    State of Ohio, duly commissioned and qualified, certify

 7    that the within named JOHN MICHAEL CLYMER was by me duly

 8    sworn to testify to the whole truth in the cause

 9    aforesaid; that the testimony was taken down by me in

10    stenotype in the presence of said witness; afterwards

11    transcribed upon a computer; that the foregoing is a true

12    and correct transcript of the testimony given by said

13    witness taken at the time and place in the foregoing

14    caption specified.

15

16          IN WITNESS WHEREOF, I have set my hand and

17    affixed my seal of office at Dublin, Ohio, on this 4th day

18    of Decemer, 2015.

19    _____

20          Whitney Layne, Notary Public

21          In and for the State of Ohio

22    My Commission expires May 4, 2020

23

24
```

**A**

**a.m** 47:19
**ability** 64:5
**able** 66:13
**absolutely** 28:11
54:20 62:9,22
**access** 65:6 75:19
**accident** 23:24
24:11 25:14,17
26:8,9,9,10,22,22
26:23,23 27:20
28:13 32:19 33:6
**accidental** 18:12,13
19:5,7 20:5,15
24:23 25:19 26:5
26:17
**accidentally** 24:3,22
**accuracy** 7:20
**act** 17:9
**actions** 19:8 21:21
23:17,21 26:10
27:4 36:10,12
70:22 72:12,15
74:5,6
**activity** 42:14,22
**add** 49:2
**added** 48:12,22
**additional** 50:4,6
**address** 5:8
**Administrator** 1:4
**admitted** 23:15
**adult** 10:24
**Affairs** 38:21 58:16
66:17
**affiliated** 38:10
**affixed** 83:17
**aforesaid** 83:9
**age** 15:22 29:11
**agencies** 37:15,18
37:19 38:17,18,19
**agency** 37:11 38:5,9
39:8,8
**aging** 27:15 29:10
**agree** 22:14 23:5
53:24,24 54:5
62:3 64:9 77:17
**agreed** 32:11 62:11
**ahead** 18:7 21:23
23:20 25:1 26:13
27:1 28:2 34:18
39:15 42:9 43:15
44:5 55:15 56:24
61:15 62:19 63:6
63:16 66:10 76:16
**AHEARN** 2:18
**aid** 72:19
**al** 1:9
**alarm** 12:22
**allegations** 61:16
63:24

**allotted** 80:10
**allow** 80:8
**amount** 13:10 75:10
**and/or** 27:15
**Andrew** 1:5
**answer** 6:24 7:7 8:6
8:14 17:23 19:14
22:3,12,14 24:13
30:6 34:2 36:18
40:23 42:13 45:22
46:2 63:20 67:14
72:2 75:12 77:10
77:23
**answered** 8:12
**answers** 6:20 7:20
**anybody** 17:12 21:5
37:1 48:18 65:9
66:3,16,19 69:7
69:18 74:14,15,16
**apparently** 68:17
**appear** 51:15
**appearance** 39:10
39:11 73:9,13
**APPEARANCES**
2:1
**appeared** 54:18
**appears** 67:15
**applicable** 1:15 3:6
**appreciate** 23:2,14
32:2 60:16 79:5
**approach** 38:4
**approved** 49:14,14
68:23
**approving** 49:13
68:3
**approximately**
53:13
**area** 12:1 13:14
38:18
**armed** 78:8
**arrest** 41:20 42:4
**arrested** 65:21
**arrhythmia** 78:23
**arrived** 33:20
**arteries** 17:17
**asked** 7:7 8:14
35:20 45:23 71:24
**asking** 28:3 29:3
33:3 60:11 62:8
71:23
**aspect** 35:16 36:11
**asphyxiation** 77:7
**assault** 13:8,8,10
**assaults** 10:23
**assessment** 32:7
**assigned** 11:14
13:17 33:12 40:20
58:11
**assist** 31:12
**ASSISTANT** 2:18
**assisted** 44:14

**associated** 78:4
**ASSOCIATES** 1:21
**Association** 27:11
**assume** 7:8
**assuming** 61:24
65:4
**atherosclerotic** 20:5
20:10
**attached** 81:6
**attack** 78:17,19,21
**attacks** 15:22
**attempted** 32:18
**attend** 66:4,7
**attended** 16:15
65:23
**attending** 75:21
**attention** 32:17
**ATTORNEY** 2:18
**auto** 10:21 14:2
**autopsies** 72:20
**autopsy** 16:10,16
18:9,11,24 23:17
29:4 65:23 66:4,7
72:13,13,19 73:21
73:24 75:21
**available** 33:19
68:15
**Avenue** 1:16 2:3,7
**aware** 38:7 51:8,11
56:17 57:1 60:19
60:22 68:20 70:17
77:9,11,12,18,24
78:1,1,3
**awhile** 18:17

**B**

**back** 6:8 10:13,17
22:17 40:6 51:20
54:1,7 67:6 76:12
76:22 77:3,12,14
77:22
**background** 24:17
**banning** 34:22
**bans** 35:10
**based** 11:18 14:24
16:15,21,24 17:4
17:19 18:8 19:12
20:24,24 21:7,10
22:17,18,18 23:16
25:10 27:4 28:8
30:23 31:1,7,8
32:19 35:22 37:8
37:8 38:18 40:17
41:23 42:6,7 44:2
47:10 50:1,4 54:6
54:14 63:13 64:3
64:21,21 65:15
70:21 74:13,19,19
75:1,5,12,15,20
76:3,7 78:14,22
78:24

**Bates** 47:7
**Bear** 27:7 50:12
**bearings** 33:21
**began** 40:14
**behalf** 2:5,9,13,20
**believe** 17:18 20:1,2
20:17 24:13,16
37:3 46:16 49:15
51:2 65:18 72:10
75:1,3
**belly** 76:13,21 77:3
77:14
**best** 9:14 36:18
**better** 62:11,13 63:2
72:12
**Beyoglides** 1:4
**big** 28:6 44:21
**Billy** 52:5
**bit** 37:17
**black** 62:4,21
**blank** 51:14
**blockage** 17:18
**blood** 17:21 34:12
**blunt** 34:13
**Board** 13:21
**body** 16:10 17:5
50:7
**Boehringer** 2:14
71:9,10 72:9 73:1
73:2,3
**bottom** 47:5,8,14
**Brandon** 53:5
**break** 8:5,8 37:17
66:23 67:6
**breathe** 53:20 77:15
**breathing** 21:14
55:22
**Brenda** 2:15
**brief** 40:7
**bring** 17:6 27:8
39:8 45:6
**bringing** 26:18
**brought** 16:20 19:7
37:11,22 38:4,9
38:13 39:4 65:22
**burglaries** 11:14
**business** 62:3

**C**

**C-L-Y-M-E-R** 5:7
**call** 5:18 12:2 23:9,9
38:22 42:7 62:6
72:23
**called** 1:14 3:5 48:8
68:13
**calling** 5:11,15
**calls** 23:4
**camera** 12:22
**capable** 63:18 74:22
**captain** 37:5 39:21
39:24 40:7 64:1,5

**caption** 83:14
**car** 25:8 26:23
**cardiac** 16:15 17:16
20:2 21:14,15,19
21:20 29:24 30:1
30:11,16,21 31:1
78:22
**care** 13:24 21:13
22:23 38:19
**career** 7:12 9:9
**carefully** 35:21 36:2
**Carpenter** 52:5,10
**Carrie** 2:11 70:9
80:15
**case** 1:7 17:14 22:7
28:16 40:20 41:16
41:24 47:2 70:3
**cases** 13:13 43:10
**Casto** 16:9,14 18:1
18:5 20:2 21:17
24:16 48:24 72:16
79:1
**Casto's** 17:4 18:22
78:22
**cause** 16:11 20:11
24:3 27:22 32:23
83:8
**caused** 16:13 17:12
19:13,23 20:2,23
21:4,19 23:7,11
23:18,21 24:11
25:14,16,19 26:11
27:4 28:21 29:24
30:1,22 31:10
32:16,16
**causes** 30:3,8
**causing** 19:19 21:20
22:10
**Cc** 80:14
**CDC** 27:10
**cell** 15:22 21:11
50:23 53:3 55:21
65:22
**cellmate** 17:3,4
**certain** 13:9 23:4
75:10
**certificate** 48:23
83:1
**certified** 5:3
**certify** 81:3,10 83:6
**chance** 7:23 29:2
44:13
**changes** 81:6 82:4
**character** 3:8
**charge** 42:4
**charged** 19:15
**charges** 17:6 22:6
22:16 43:2
**checked** 37:7
**chief** 9:20
**chosen** 80:3

Cincinnati 2:13
circumstances
  51:11
city 10:2
Civil 1:15 3:6 80:8
clean 6:15
clear 25:7,10
Cleveland 2:4
clock 55:17
close 67:1 80:6
closed 47:2 70:2,3,3
  70:4
Clubs 78:14
Clymer 1:14 3:5 4:2
  5:1,7 80:2 81:3,9
  81:11 83:7
coherent 75:6,11
combined 18:24
come 28:12 40:6
  44:21 69:8,18
  74:7,10
coming 41:18 65:14
commands 74:20,23
Commission 81:18
  83:22
commissioned 83:6
committed 74:8
committee 60:17
common 13:21
  39:20 40:8 46:19
  46:24,24
community 9:19,22
complete 42:8
completed 46:17
  47:11,13,17 49:3
  50:8,10 71:1 72:1
  72:3,23
complying 74:20,20
  74:22 76:23
component 32:5
computer 47:18
  68:21 69:14 83:11
concept 27:23
concerning 22:19
  24:20 63:14
conclude 78:8
concluded 43:8
  79:11
conclusions 74:7,10
condition 15:24
  19:23 20:3,7,17
  24:6,11 31:9,19
  32:13 34:10
conduct 22:10
  36:13 37:12,14
  64:6
conducted 37:14,15
  58:6 63:19 69:6
conducting 72:19
  73:21
conducts 59:20

Conley 44:13,16
  71:6,11,11,12
  72:8 73:4
connection 6:3 7:21
  19:1 23:4 29:5
  37:23 39:12 67:21
  69:4,12
consider 33:23 34:7
considered 15:16
  36:7
consistent 27:16
  55:22 65:13
contact 40:9
contacted 33:8 40:3
  40:5
contemporaneous
  46:20
continued 53:19
continuing 44:1
  61:13
contract 13:14
contributed 22:10
contributing 19:24
  20:16 21:20
control 21:13 22:22
  22:24
controlled 21:7
controlling 55:6
conversation 72:24
cooperation 74:17
Cooperstone 1:21
  80:9
copies 58:23,24
copy 18:22 48:24
  49:11
corner 47:5
coroner 28:12 29:5
  29:8 32:10 73:16
  73:20,22 78:16
coroner's 28:8 29:7
  40:12
correct 6:9 15:14
  18:19 19:5,17
  20:12,19 22:6
  23:18 26:5,11
  28:9,15,19,21
  29:12,17 30:9,14
  30:18,20 32:13
  35:24 37:21,24
  39:10 40:20 43:20
  46:10,11 47:16
  50:23 52:3,4,8,9
  52:11,12,17,21
  53:3,6,10,15,20
  54:15,22 55:1,10
  55:11,13 56:3,15
  56:19 58:2 59:7
  61:1,2,4,5 64:14
  65:3,5,23 67:18
  67:24 69:2,15
  71:2,15,19,20

75:21,23 76:5
  81:7 83:12
correction 57:15
  80:6 81:5 82:7
correction/change
  80:5
corrections 10:9
  13:9,12 14:23
  16:11 17:10 19:21
  21:11,21 22:10
  23:7 31:11 35:15
  37:12 43:22 52:7
  53:9 67:12 71:2
  71:18 76:4,7
corrections/chang...
  80:4
correctly 20:14
COs 51:19 73:6
counsel 3:4
county 1:8 2:21 6:4
  8:18 10:1,7 13:22
  15:3 17:7 21:6
  22:22 37:13 38:3
  42:15 43:4,23
  57:19 59:19 60:16
  60:21 61:10 81:2
  83:3
couple 6:14 58:23
course 7:12 9:9
court 1:1 7:17 13:22
courtrooms 7:13
courts 10:14 11:23
  11:24
CPR 32:17 72:10
created 16:11
crimes 10:23 11:12
  11:13,15 74:8,9
criminal 17:6,7,9
  22:6,15 25:16
  35:16 36:11 42:14
  42:22
Crosby 37:5 39:21
  39:24 40:7
CROSS-EXAMI...
  5:4
cuffed 76:22 77:3
  77:14,21
currently 8:17
cut 49:12,20

_____
        D
danger 77:16
date 47:13,15,17
  48:15 82:23
dates 48:22
day 33:13,19 40:4,4
  44:20 49:6 56:11
  68:14,24 73:24
  81:15 82:3 83:17
day-to-day 11:20
  12:4

days 5:17 54:3 80:8
Dayton 1:16 2:8,20
  10:1 14:1 38:18
dealing 17:11 32:13
Dear 80:2
death 6:7 14:12,21
  15:19 16:8,13,13
  16:20 17:9,12,13
  17:15 18:2,5,12
  18:19 19:7,7,13
  19:18,19,23,24
  20:1,12,15,23
  21:4 22:11 23:7
  23:11,18,22 24:4
  24:12,23 25:16,19
  26:5,11,17,18,19
  27:17,22 28:9,21
  29:24 30:17,19,22
  32:10,11,23 33:24
  33:24 34:23 35:11
  38:5 39:13 40:19
  45:4 46:22 48:22
  59:16,19 62:4,17
  63:4 64:24 66:21
  71:22 77:7,20
  78:5,23
deaths 15:5,15 16:1
  28:6 44:8,10
  59:15 66:12
debrief 39:21
deceased 1:6 6:12
  51:19
December 80:1
Decemer 83:18
decision 23:6,14
  41:3
decisions 22:5 41:5
  69:8
Defendant 1:14
  2:20 3:5
Defendants 1:9 2:9
  2:13
defined 27:14 57:9
  57:12,14
defines 27:12
definition 29:9,20
  32:19 57:9 78:24
definitions 32:9
deleted 49:19
department 6:5
  9:16 48:17 57:15
  57:19 64:5
departments 38:23
  38:23
depose 44:13
deposed 5:24
deposes 5:3
deposition 1:14 3:5
  3:7 5:22 6:3,15
  8:4 79:11 81:4,11
  81:14 82:2

deputies 10:9
deputy 10:7 37:13
  43:4
descending 17:17
described 50:22
  51:1
deserve 63:2
deserved 62:10,13
desire 80:4
desired 80:5
destroy 46:20
destroyed 46:17
detective 5:15 10:19
  12:18,24 13:5,22
  44:13,16 71:6,11
  71:11,12 72:7
  73:4
detectives 11:13
  13:16,23 33:17
determination
  31:20,23 42:6
  43:1,2
determinations
  16:18
determine 22:15
  23:10 41:17 42:18
  56:7,12 66:13
determined 14:15
  16:14 28:13 65:9
determining 31:20
  31:21
DiCello 2:2 4:4 5:5
  18:10 22:1 23:23
  24:2,8 25:2 26:1
  26:14 28:4 29:1
  29:19 30:13 34:20
  35:2,19 36:4
  39:16 42:1 43:16
  44:2,4,7 47:6,22
  48:2 55:18 57:3
  58:20,23 59:2
  60:8 61:14,18
  62:7,14,20 63:8
  64:8,16 66:15,24
  67:3,5,24 68:2
  70:9,12,13 73:15
  76:19 80:15
die 15:22 29:10,16
  45:8
died 20:10 21:4
  25:14 30:16 32:6
  41:20
dies 14:18,22
difference 19:4
different 9:10 11:10
  13:3 32:4 48:22
  58:13
difficult 20:21
Dinkler 1:16 2:7
direct 33:14,16
  68:10

direction 28:7
directly 13:15
Discussion 67:4
discussions 64:22
    69:7
disease 20:5,10
    27:15 28:17,21
    29:10,17 30:11,12
    30:16,21 32:12
    75:23
district 1:1,1 11:13
    13:23,24 14:2
districts 11:14,18
division 1:2 13:1
    17:7 68:9
docket 12:2
doctor 24:16 28:24
    29:2 66:14
doctors 65:4
documentation
    49:22,24 67:20
documented 70:20
documents 27:8
doing 10:24 70:7
domestic 11:15
downtown 13:15
Dr 16:9,14 17:4
    18:1,5,22 20:2
    21:17 24:16 48:24
    50:6 64:22,22
    65:3,4,12 72:16
    78:22 79:1
dressed 40:6
Drive 1:21 80:9
drops 26:16
Dublin 1:22 80:9
    83:17
due 25:13 27:14
    28:17 29:9 30:3,5
    30:8
duly 5:2 83:6,7
duties 27:6
dying 77:13

_____ E _____
earlier 28:10 35:21
early 17:19
Edmond 52:1
eight 9:17,21 14:9
    72:22
eighties 11:20 12:6
    12:7
either 69:4
Elections 13:21
Ellis 2:15
employ 8:18
employed 60:20
    63:23
encompasses 34:7
encompassing
    16:21

enforcement 37:18
    39:3,7 76:11
    77:19
engaging 61:11
enlarged 76:1
entered 48:1,10
    50:10 68:16 69:1
    69:13,20,23 82:5
entire 16:21 22:23
    34:7 41:23 48:17
    56:2 74:6 82:2
entitled 59:6,17
    60:12 64:10
equipment 45:6
errata 80:4,9
ESQUIRE 2:2,6,11
    2:17,18
essence 27:22
Estate 1:5
et 1:9
evaluate 56:21
evaluating 36:12
evening 65:20,22
event 17:16 21:11
    21:15,19,20 29:24
    30:1 31:1,2,14
eventually 10:22
    32:17
everybody 5:15
    59:1 64:12
everyone's 74:6
evidence 15:1 16:8
    21:5 27:21 31:24
    34:1 40:12 42:24
exactly 45:15 51:22
examination 4:1
    17:4 49:1
examined 81:14
examiners 27:10,12
excluding 14:10
executive 34:22
    35:6,10 36:16
    57:10
Exhibit 4:6,6 47:4
    58:19,22 59:4
    67:22
experience 17:11
    23:3 38:19
expires 81:18 83:22
explain 48:4
explained 15:24
explaining 23:16
explanation 6:21
extended 55:12,16
eyes 72:21

_____ F _____
facedown 53:19
    54:15,22
facility 12:9 22:24
fact 27:11 36:5

factor 19:24 20:16
    21:20 31:20
factors 78:4
facts 41:12 42:6
Failure 80:9
fair 7:8 18:16 36:19
    56:20 69:1,11
fall 26:15
familiar 12:15,16
    39:1 76:10 77:6
family 6:11 62:10
    63:2 64:9 66:3,7
far 1:16 2:7 5:17
    12:3,4,19 21:4
    37:14 62:13 64:5
    73:4
fatal 27:22
February 8:21 10:6
feces 13:11
Feds 39:4
feeding 12:20
feel 63:10
feelings 63:22
feet 56:3
Felicia 2:14 71:14
fellow 43:4,12,22
felonious 10:23 13:8
felony 25:16
felt 46:10 64:3
field 77:18,19
figured 6:10
filed 6:4
filled 71:17 72:5
    73:5,6
filling 33:13
fills 33:18
find 41:9,16 42:20
finding 28:8
findings 79:1
fine 5:12
firm 1:16
first 5:2 8:7 10:6
    35:4 40:9 46:1
    47:21,23 50:15,17
    54:3 56:21 59:24
    72:9
five 13:16 14:9
    15:12,15 48:12
    49:8 52:6 54:3
Flanders 61:4,7,9
    62:3,15,23 63:3
    63:12,18
floor 2:19 31:3,4
focus 32:5
folks 6:4 22:5 55:8
    71:1,17,22
follow-up 54:17
    70:20
followed 38:3 58:9
following 82:4
follows 5:3

force 10:2 34:13
    76:8,9
foregoing 81:4,10
    83:11,13
forget 27:9
forgive 62:1
forgot 8:12
form 81:6
forth 10:15 40:6
forward 17:6 23:11
    48:11
Foster 2:14 71:15
found 16:8 64:19
    66:14
four 44:6 52:6
Franklin 83:3
fraud 11:2,2
front 7:16 18:9
full 67:16
further 69:6,16,17
    77:4

_____ G _____
G 1:4
Gage 52:23
game 41:7,9
Garrett 2:15
Gary 52:1
gather 41:14
gathering 41:12
general 76:11
generate 45:16 47:1
    49:4 67:20
generated 49:7
getting 31:2
give 6:20 7:20 8:1
    13:3 21:13 36:18
given 8:15 66:6 81:4
    83:12
giving 80:5
go 12:1,15,16 18:7
    21:23 23:20 25:1
    26:13 27:1 28:2
    32:16 33:21 34:18
    35:14 39:8,15
    41:5 42:9 43:15
    44:5 48:9 55:15
    56:24 61:15 62:19
    63:6,16 66:10,12
    72:20 76:16
goal 64:15
goals 40:22,24
goes 20:1,13 23:10
    43:1
going 7:8,19 8:1
    9:16 14:11 21:1
    28:8 31:19 42:3
    42:12 44:12 51:9
    55:4 72:13 75:11
good 5:18 38:8,11
    66:23

governed 36:14
governor 34:21
    35:7
grade 39:18
grand 43:1
groaning 53:14
ground 6:14 53:3
    53:10 54:15,22,24
    56:2
guess 1:3 26:20
    27:18 28:23 34:2
    57:9 60:7 77:23
gun 11:13
guns 78:12
guys 58:24

_____ H _____
half 9:17 15:10
hand 83:16
handcuffed 54:1,4,6
    54:7 67:8 76:12
handcuffs 51:20
    52:7
handing 58:21 59:3
handle 11:14 13:12
    13:17,20 14:1,2
    36:9
handles 11:12
handling 12:4
hands 14:22 76:21
    77:3,14,21 78:9
    78:11
happen 8:15 14:7
    42:12 78:2
happened 39:22
    41:17 42:20 46:13
    69:3 73:11
happens 49:17
harassment 13:10
harm 27:22 32:23
Harrison 14:1
Harry 1:4
head 26:16 28:8
    32:8 55:1
health 19:23 31:9
hear 52:2,16 60:1
heard 36:3 52:10,20
    53:9,13,14 75:7
heart 15:21 20:5,10
    20:16 28:21 29:17
    32:12 75:23 76:1
    78:17,19,21
held 9:11 41:19
    53:3,19 56:8,13
    56:22 57:4 67:4
help 6:14 31:10
    48:3
helped 72:10
hereinafter 5:2
hereto 81:6
Hey 8:7

**high** 11:1 20:17
**Hills** 1:16 2:7
**hits** 26:16
**holding** 15:12 53:6
**homicide** 14:17,19
  14:20,23 15:16
  16:4 19:5 28:13
  33:22 34:5 41:21
  42:4
**homicides** 10:23
  15:2 66:12
**honestly** 73:17
**hour** 40:2
**hours** 64:24 65:16
  65:17,20
**house** 41:19
**Hubbs** 53:1
**huh** 44:22
**huh-uh** 6:21
**Hurlburt** 52:23
**hurt** 55:6 74:14,15
  74:16 75:13
**Hutch** 68:13
**Hutchinson** 33:13
  33:14,19 49:15
  68:5,6,6,18,20,23
**hypertension** 17:16
  17:20

**I**

**idea** 13:3 21:6 39:18
**identification** 58:19
**immediate** 75:16
**immediately** 37:6
**important** 7:1 22:4
  22:15 28:11 46:10
**impression** 18:18
**improper** 16:13
**inappropriate** 62:9
  64:4
**incident** 54:3 71:3
  71:18
**incidents** 13:4
**included** 10:23
**includes** 15:8
**Incorrect** 43:21
**increased** 77:13,20
  78:4
**independence** 37:23
  38:12 39:10
**independent** 37:11
  38:4 39:4 58:6
**INDEX** 4:1,6
**indicated** 23:13
  80:6 82:5
**indicates** 19:18
**indication** 16:9
**indicted** 43:5,19,23
**indictment** 43:9
**individual** 24:17
  25:15 38:10

**information** 8:1
  17:19 21:7 22:19
  23:16 24:20 27:4
  31:1 37:9 41:14
  53:15 63:13 65:15
  69:20 75:20 78:15
**informing** 18:4
**ingested** 64:23
  65:13
**injuries** 33:4 66:13
  77:4
**injury** 27:4,21
  32:22,24 33:2
**inmate** 13:8,8,9,11
  14:15,16,18,18
  22:22 50:17
**inmates** 13:11 17:1
  17:9 22:19 40:13
  51:24 75:5
**inside** 11:20 12:17
  13:5 14:8,12
  50:23 65:6,10
**Inspectional** 38:21
  58:7,11,15 59:4
  59:11,20
**intend** 26:8
**intended** 40:23
**intends** 26:22
**intent** 26:6 27:2,2
  27:22 32:23
**intention** 42:17
**interested** 29:6
**interim** 9:20
**Internal** 38:21
  58:16 66:17
**interpret** 26:7
**interview** 12:17,17
  50:14 70:14,23
  72:3
**interviewed** 31:8
  46:6 50:13,15,18
  52:1,13,19,23,24
  53:5,8,12,17
  66:16,19 71:5,7,8
  71:10,13,14,14,21
  71:23 72:4,5,8,8
  73:1,4,10 75:4
**interviewing** 41:13
  44:14,17 45:3
**interviews** 17:1,1
  40:14,15 45:7,11
  45:14
**investigate** 13:23
  35:11 37:11,19
  38:5,20 39:9
  41:20 56:7 62:15
  64:17 65:5
**investigated** 10:21
  10:22 13:2,2,4
  14:11 15:2,5
  23:13 33:24 34:4

38:10 56:12 57:11
  59:15
**investigates** 58:17
**investigating** 13:24
  19:15 33:22 34:23
  41:7 46:22 58:8
  62:4 71:22 74:4
**investigation** 11:6,8
  11:12 14:17,19,20
  14:23 16:2,4,22
  17:6,20 19:12
  23:5 24:20 28:7
  29:6 32:3 33:9
  36:8 37:23 38:12
  39:4,23 40:17,22
  40:22 41:1,2 42:8
  42:11,18 43:3,7,8
  43:24 48:19 49:23
  53:15 57:21 58:2
  58:6 59:15,20,22
  60:3 62:16 63:13
  63:19 64:6,11
  66:11 67:21 69:4
  69:9,12,23 70:20
  74:14 75:2,13,15
  78:7
**investigations** 10:19
  11:1,2,17 13:1,6
  14:5,10 15:17,19
  38:22 66:20 68:11
  68:12 69:6
**Investigative** 47:11
**investigator** 40:18
**investigator's** 20:22
**invited** 66:4
**involve** 14:14 33:8
**involved** 16:12
  19:19,22 26:18
  31:3,15 37:10,16
  38:2,16 42:23
  43:3,7
**involvement** 16:3
  69:11,16
**involves** 19:7
**involving** 69:19
**issue** 17:21 74:17
  77:15
**issued** 18:17 34:22
**issues** 13:18,20
  27:10
**ISU** 35:17 38:20

**J**

**jail** 10:7,10,13
  11:20 12:1,9,14
  12:17,19 13:5,16
  13:17 14:8,12
  15:3,20 17:22
  22:22 33:20,24
  36:20 37:3 44:8
  44:18 45:2 57:22

57:24 59:15,16,20
  62:4 65:7,10,14
  68:7 71:3 74:11
**Jamey** 2:6 80:16
**Jessie** 52:24
**job** 6:19 19:2 44:24
**jobs** 10:20
**jog** 8:10
**John** 1:14 3:5 4:2
  5:1,7 81:3,9,11
  83:7
**joined** 10:5
**Jon** 2:14
**Jr** 1:4
**judge** 7:16 13:22
**judgment** 23:4
**June** 48:23,24 49:21
  50:2,3
**jurisdiction** 39:7
**jury** 7:17 43:1
  56:21

**K**

**Kassandra** 71:13
**keep** 6:19 22:24
  46:15 49:11
**kept** 51:19
**killing** 26:22,24
  37:20
**kills** 24:21
**kind** 6:21 13:12
  16:17 17:24 27:24
  33:18 39:22 51:12
  51:13 66:20 69:8
  71:2
**knew** 12:18 22:7,7
  40:10 55:10 69:5
**knives** 78:12
**know** 7:5 8:6 11:15
  12:21 16:24 17:13
  17:17,22,24 18:4
  18:16 19:14,20
  20:23 22:4,12,15
  23:2,17,21 25:16
  26:4 28:23 29:8
  29:10,14,15 30:2
  30:3,5,8 32:2,9,11
  32:14,15,23 33:4
  33:5 34:10,11,12
  34:15,21 35:9
  36:13,15,15 37:5
  39:17,24 41:4,12
  41:14 42:22 44:23
  45:3,15 47:17
  50:3,17 54:4,5,6
  55:3,3 56:11 57:2
  57:4,11,14,17
  58:8,11 59:18,18
  60:13,18,21 61:9
  61:16,19 62:21
  63:21,21,22,23,24

65:9,20,21 67:8,9
  67:13 68:4,13,14
  68:15,15 73:6,17
  73:21 74:17,18,22
  74:24 75:3,5,18
  78:19,21
**Knowing** 22:9
**Krisandra** 2:14
**Kristy** 71:14
**Kruse** 71:14
**Kylon** 52:19

**L**

**Lakeside** 2:3
**large** 17:5
**larger** 38:18,19
**lasted** 55:12
**late** 11:20 12:6,7
**law** 1:16 7:17 25:4
  25:11,15,15,16
  37:18 39:3,7
  57:12 76:11 77:19
**lawsuit** 6:3 7:21
**lawyer** 6:11
**Layne** 1:15,21 3:6
  80:9,13 83:5,20
**layout** 12:16
**lead** 40:18 78:7
**Lebanon** 9:23
**left** 17:17 55:1
**legs** 78:10
**let's** 8:7
**level** 11:1 20:18
  50:7 64:18
**Lewis** 37:2 39:21
  40:8 52:13
**liability** 60:4
**LIBER** 2:3
**light** 24:22 25:5,8
  26:24 70:23
**line** 12:23 22:21
  40:9 42:5 80:5
  82:7
**linear** 12:14
**listed** 50:14
**listening** 27:1 35:21
  36:2
**little** 27:20 29:16
  37:17 42:9
**location** 12:9
**long** 57:7
**longer** 47:2
**look** 18:8 28:24
  34:1 41:23 47:21
  67:22 74:6
**looked** 18:16 32:3
  36:10 50:22
**looking** 26:21 27:3
  47:3,10,20,20
  67:15 72:10
**looks** 47:19 59:11

68:23
**Lorenzo** 52:19
**lot** 9:1,2 13:2 20:11
23:2 32:4 38:15
72:19 73:17
**lower** 9:1
**LPA** 2:11
**LPN** 71:13,14
**lying** 54:22

_____

**M**

**M** 5:7
**M.D** 2:15
**main** 13:13
**maintain** 37:22
38:11 39:3,9
**making** 22:5 75:7
**man** 45:8 62:4,8
**man's** 20:23
**management** 59:8,9
59:17,22 60:1,13
60:17 61:7 62:16
63:3,20
**manager** 60:20
**manner** 16:7 17:13
17:15 19:18 20:1
20:13,15 26:5
27:17 28:9 32:6
**manners** 28:5
**manpower** 38:16
**manual** 27:10 57:22
**manual's** 58:1
**March** 10:18,18
12:7 33:21
**Marcus** 17:1
**marijuana** 64:18,23
65:6,10,14
**Marinetti** 50:6
64:22,22 65:3,4
65:12
**mark** 80:3
**marked** 4:6 58:19
58:21 59:3
**MARY** 2:17
**matters** 9:15
**Maxwell** 17:1 31:4
31:7,8 50:16,21
51:7,9,18,20
65:21 75:3
**MC** 47:4 60:24
67:22,22
**mean** 19:22 24:21
26:16 27:18 28:23
42:6 45:18 49:5
55:16 59:9,10
70:1
**meaning** 26:4 50:15
**means** 26:10,18
49:6 78:24
**medic** 2:15 17:23
71:13 72:9

**medical** 15:24 17:23
21:11,12 24:6,11
24:17 27:10,11
31:9,11,19 32:13
32:15,17 34:10
71:1,5 72:4,8 73:5
**medication** 18:1
**meeting** 69:8
**member** 37:19,20
38:5 46:22 59:16
**members** 62:10
**memory** 8:11 55:23
**messages** 61:11,17
61:20,24
**met** 36:22 37:2
73:20,23
**MICHAEL** 1:14
3:5 4:2 5:1 81:3,9
81:11 83:17
**Mid** 12:6
**Mike** 5:12,19 8:7
9:10 23:5 47:4
61:20 67:6 76:10
79:2
**Miles** 2:15 71:13
**mind** 60:2
**mine** 58:6
**minute** 16:3
**minutes** 41:19
55:22
**mistaken** 18:15,20
51:4
**moaning** 53:14
**mode** 31:5 32:16
50:24 51:1,5,13
**moment** 50:12
**Montgomery** 2:17
2:21 8:18 10:1,7
15:3 17:7 37:12
38:3 42:15 43:4
43:23 57:18 60:16
60:21 61:10
**months** 9:21
**morning** 72:14
73:24
**Morris** 53:8
**mother** 63:2
**moved** 11:17 54:20
76:18,20
**moving** 51:8

_____

**N**

**name** 5:6 11:16
47:14 80:6
**named** 61:3 83:7
**NaphCare** 2:14
**narrative** 44:12
47:11 72:1,3
**narratives** 71:17
**National** 27:11
**natural** 14:21 17:16

18:2,5,19,21 19:4
20:11 26:17 27:14
27:16 28:12,16
29:8,9,15 30:3,8
30:17,19 32:10
**nature** 12:20 14:3
77:5
**near** 29:16
**nearly** 27:15 28:17
29:9
**necessity** 70:23
**need** 11:18 13:22
32:17 43:8 72:2
76:13
**needed** 11:3 47:2
**negligence** 25:13
27:3
**negligent** 27:6
**neighborhood**
10:17
**neighboring** 39:8
**never** 12:21,21,21
14:15,17 27:18
56:3
**New** 9:23
**news** 21:2,3
**nice** 6:19
**NICHOLAS** 2:2
**Nick** 5:18 8:7,13
80:15
**nigger** 62:1
**night** 44:17,21
**Nods** 32:8
**non-suicide** 15:19
**normal** 40:4
**North** 14:1
**notary** 1:15 3:6,7,8
80:7 81:13,17
83:5,20
**notes** 3:7 46:9,12,15
46:17,21 47:1
70:6
**notice** 55:21
**noting** 81:6
**November** 1:16 3:1
81:5
**number** 9:1,4 14:4
19:1 48:12 49:7
68:3 80:5,5
**numbers** 9:2,6
15:13 47:7,7
**numerous** 10:21
**Nurse** 2:14,14,14
71:14

_____

**O**

**oath** 7:10,15,16,24
**obese** 75:21
**object** 43:14
**objection** 18:6
21:22 23:19 24:1

24:5,24 25:22
26:12 28:1,22
29:18 30:10 34:17
35:1,13 36:1
39:14 41:22 55:14
56:23 60:6 61:12
61:13 62:5,12,18
63:5,15 64:13
66:9 73:12 76:15
**objections** 44:4
**observed** 22:17,20
23:12 52:5 53:6
70:21,22 72:11
76:3,7
**obviously** 40:13
77:9
**occasion** 7:13
**occur** 32:1
**occurred** 13:5 14:7
14:12 27:21 31:2
31:10,14 32:15,22
32:24
**occurrences** 13:4
**occurs** 77:4
**Offenders** 33:17
**offense** 48:9
**office** 2:21 8:18
9:11,17 10:5,8
13:15 17:8,12
22:8 38:3,17
40:12 42:16,24
43:11 60:4,17,21
61:10 71:22 83:17
**officer** 9:1,4,6 10:14
11:23,24 14:23
37:12 43:5,12
68:3
**officer-involved**
37:16
**officers** 10:9 13:9
13:12 16:12,19
17:10 19:21,22
21:12,21 22:10,21
23:7,11 27:5 31:2
31:11,15 35:15,22
36:10,13 38:24
43:22,23 52:7
53:6,9 55:4,21
60:3 67:12 70:14
71:2,18,23 72:1,6
73:10 75:6 76:4,8
**official** 3:8
**Oh** 39:2 43:13
45:24 58:24 71:7
**Ohio** 1:1,15,16,22
2:4,8,13,20 9:24
34:16 57:12,15
80:9 83:2,6,17,21
**okay** 5:20 6:12,17
6:22 7:1,2 8:9,15
8:16 9:12,15 10:4

10:11 11:4 13:19
16:23 18:13,13
19:9,11 20:16,20
21:4,9,16 22:2
24:15 25:6,12
27:2,7,13,14
29:13 31:16,18,19
32:7,21 33:5 34:9
36:17,23 37:16
39:19 47:9 48:1,6
48:8,13,16,19
49:9 50:12 51:6
51:10,17 54:10
55:24 60:14 62:1
67:2,17 70:22
72:8,17,20 75:9
79:4
**old** 12:12 29:11
**older** 11:3 15:22
**once** 42:12 46:16
47:1 49:13 71:24
76:11
**ongoing** 49:1
**operations** 57:22,24
**opined** 64:22
**opinion** 60:7
**opportunity** 8:13
48:18
**opposed** 6:21
**option** 42:21,22
**order** 34:22 35:6,10
36:16 50:14 51:3
57:10
**Oriented** 33:17
**original** 48:10
**outcome** 27:23
69:19
**outside** 37:11,15,15
38:5,9
**overall** 48:8

_____

**P**

**p.m** 1:17 3:2 79:12
**page** 4:4,7 47:21,23
53:1 60:23 70:1
80:5,8 81:6 82:7
**pages** 67:16
**part** 12:11,12,21
17:5,20,24 21:19
28:7 40:9 44:21
44:24 63:9 71:3
**participated** 69:5
76:4
**parties** 3:5
**pasted** 49:12,20
**patience** 79:5
**patrol** 10:12,17
**patrolman** 9:18
**pay** 39:18
**pending** 8:6
**people** 11:17 15:21

19:8,13,19,20
20:11 25:19 26:18
39:9 41:13 44:14
44:17 45:3,7
46:12 50:14 56:21
72:4
**people's** 26:10
**perceived** 50:22
**percent** 17:18
**perform** 62:16 63:3
**performed** 29:4
32:18,18 42:11
43:24 61:7 73:24
**performing** 60:2
63:12 66:20
**period** 9:18,20
10:15 55:12
**permission** 66:6
**person** 6:17 18:4
35:3 50:15 64:4
76:13
**personally** 14:9
67:23
**personnel** 21:12
38:20 71:5 73:5
**Phil** 1:8
**phone** 29:21 72:23
**photographic** 25:9
**photographing**
40:13
**physical** 78:9
**pick** 12:2
**pinned** 52:6
**place** 69:5 83:13
**placed** 67:11,12
**Plaintiff** 1:6,14 2:5
3:5
**Plaintiff's** 47:4
58:22 59:3
**Pleas** 13:21
**please** 5:6 52:20,20
80:3,8
**Plummer** 64:1,3
**Plummer/Montgo...**
1:8
**pod** 12:14 65:22
**point** 8:4,11 34:1,2
40:10 48:11 49:3
50:9 57:21 66:23
69:23 74:3 75:4
**poisoning** 27:21
**police** 10:2
**policies** 35:17 36:5
36:9 57:18 58:1,9
58:17
**policy** 35:14,23
45:13
**poor** 45:23
**population** 22:23
**pose** 75:16
**position** 35:12

67:11 76:12 77:21
78:5
**positional** 77:7
**positioned** 77:13,20
**positions** 9:11 67:11
**possible** 45:18 46:5
76:14,21 77:2
**possibly** 41:10,16
**post-op** 16:15 18:22
**postmortem** 48:24
**potential** 33:22 34:5
**practice** 38:8,11
39:1,20 40:8
46:19 47:1 66:1
72:7
**pre-existing** 75:23
**prefer** 5:8
**Pregon** 1:16 2:6,7
18:6 21:22 23:19
24:1,5,24 25:22
26:12 28:1,22
29:18 30:10 34:17
35:1,13 36:1
39:14 41:22 43:14
44:1,3 47:5,21,24
55:14 56:23 60:6
61:12,15 62:5,12
62:18 63:5,15
64:13 66:9,23
67:2,23 73:12
76:15 79:7 80:16
**presence** 3:8 81:15
83:10
**present** 42:24 43:9
**presented** 22:8
42:19,23
**preserved** 44:5
**pressure** 17:21
**presume** 46:12
**previously** 33:15
**printed** 47:15,16
80:4
**prior** 9:16 10:8 31:2
31:14 49:13 65:14
72:21
**prisoners** 12:2,20
**probably** 12:5 14:9
14:13 15:10 18:20
18:23 19:1 37:7
44:21 51:3
**problem** 79:6
**procedure** 1:15 3:6
35:23 80:8
**procedures** 35:18
36:5,10 57:18
58:9,18
**process** 27:15 29:10
41:5
**Professional** 80:13
**Program** 33:17
**progress** 48:21

**prohibited** 34:16
36:7
**promoted** 9:19
**prone** 34:15,22
35:10,12 36:6
56:8,13,22 57:4,9
57:12,14,17 76:12
77:21
**proof** 3:8
**proper** 38:15
**prosecuted** 23:8
**PROSECUTING**
2:18
**prosecutor** 42:15,19
43:9
**prosecutor's** 17:7
17:11 22:8 42:16
42:24 43:11
**provide** 73:16
**public** 1:15 37:20
38:6 46:23 59:16
80:7 81:13,17
83:5,20
**pull** 48:18
**pulled** 53:2 55:20
**pulling** 12:20
**purpose** 41:8,11
**purposefully** 73:10
**purposes** 6:15
**pursue** 22:6
**pursued** 22:16
**put** 14:4 41:16
48:21 49:2 50:9
55:17 65:16
**putting** 52:7

_____
**Q**

**qualification** 3:8
**qualified** 83:6
**question** 7:3,7 8:6,7
8:14 22:3,9,14
24:14 25:24 30:6
34:2 35:20 45:23
46:1,5 54:8,17
63:1 71:24 77:1
77:17,18
**questions** 6:24 7:24
29:3 40:23 42:13
45:20 70:10 79:2
**quick** 67:2
**quite** 76:17
**quotations** 51:4

_____
**R**

**racist** 61:11 63:19
**ran** 25:4
**rape** 13:9
**rapes** 10:24
**read** 22:18,20 27:19
32:20 60:4 79:7
80:3,6,8,10 81:4

81:13 82:2,4
**reading** 81:12
**really** 23:6 29:6
32:5 41:15 60:13
**reason** 13:13 46:16
48:17 51:2 54:8
71:23 72:24 75:1
82:7
**reasons** 35:20 82:5
**recall** 20:13 21:17
30:24 55:2 68:14
69:10,12,17
**received** 17:19 50:5
**record** 6:15 45:6,11
45:13 67:4 82:5
**recorded** 45:14
**recording** 45:6
**red** 24:22 25:4,8
26:24
**reduced** 3:7
**reflection** 52:15
**Rehabilitation**
57:15
**relevance** 44:2
**rely** 44:12 46:9
**relying** 7:19 8:1
**remember** 8:11,12
10:16 37:1 54:18
**REMINGER** 2:11
**removed** 40:11
**report** 16:15 18:8,9
18:18,22 20:1,14
21:3 29:23,23
30:23,24 36:20
37:8 44:12 45:16
46:17 47:1,3,12
48:1,7,7,11,16,16
48:18,20 49:1,3,5
49:19 50:1,5,9,15
51:23 53:1 59:8
59:10 60:23 63:20
65:1,16 67:15
68:16,24 69:13,18
70:19 71:4,12,18
72:3,13,15,21,22
73:14 78:22
**reported** 65:2 73:18
74:20
**Reporter** 80:13
82:1
**reports** 18:24 22:18
24:19 48:5,9,9,11
49:11,18 59:13
71:2 72:1,6 73:6
**represent** 18:11
55:19
**representatives**
6:11
**represents** 6:11
**request** 82:4
**required** 22:22

**respective** 3:5
**responded** 21:12
45:2
**restate** 25:24
**restrained** 35:12
54:4,5
**restraining** 51:19
**restraint** 41:15,22
35:10 36:6 56:8
56:13,22 57:4,9
57:12,14,17 58:1
**result** 6:7 15:23
25:14 29:17 32:12
43:24 50:8 80:10
**results** 29:5 65:12
**retire** 8:20
**retired** 5:9 8:17,23
**return** 80:8
**review** 35:22 48:19
49:13 54:14 57:22
57:24 59:8,9,13
59:17,22 60:1
61:7 62:16 63:4
63:20 70:6
**reviewed** 18:23 19:1
21:10 29:5 32:1
42:16 43:10 53:22
54:11 59:24
**reviewing** 28:5 50:1
**revisit** 8:14
**Reynolds** 53:17,18
**Richardson** 1:5 6:8
6:12 16:2,14
17:18 21:6 24:3
29:16 31:3,12
32:6 40:11 50:22
51:7 52:2,6,8,10
53:2,9,19 54:1,14
54:18,22 55:20
56:2,8,13,22 57:5
64:10,18,23 65:6
65:13 67:7,11
69:19 74:8,11,13
75:13,16,20,21
76:3,8 78:8,16
**Richardson's** 16:20
17:14 19:13 22:11
23:7,18 25:19
30:22 32:12 39:13
40:19 50:7 62:10
63:2 64:9 66:3
72:12,15 74:4
**right** 5:18 8:8 20:8
20:13 22:4 25:3
28:14,16 31:21
39:5 42:10 45:2
45:23 47:24 50:19
51:3 54:13,19
59:12 62:21 65:19
67:23 70:12
**risk** 59:8,9,17,22

60:1,13,15,17,20
61:7 62:16 63:3
63:20 77:7,13,20
78:4,5
**road** 10:12,17
**Robert** 1:5 6:7,12
16:2 62:10
**rolled** 54:18
**room** 18:24 29:3
**rooms** 12:17
**rule** 18:5 29:8 32:10
76:11
**ruled** 14:24 16:8
17:14,15 18:1,18
23:24 24:10,22
26:20 29:15 30:17
30:19 33:5
**rules** 1:15 3:6 6:14
18:11 36:13 74:11
80:8
**ruling** 17:8 24:18
26:5 27:17 29:7
**run** 26:24
**running** 24:22

_____
S

**safeguard** 48:20
**safely** 76:23
**safety** 22:23
**saw** 9:1,2 22:20
45:18 46:21 72:14
74:19 75:14
**saying** 28:3 29:22
29:23 51:8 52:2
52:16,20 53:20
**says** 5:3 21:3 30:23
47:14,15 65:1
70:1,1
**scenario** 25:10
**scene** 36:24 72:9
**Scott** 53:17
**screen** 52:15
**seal** 83:17
**second** 27:7 46:5
**section** 10:19,19
11:6,8,12 33:15
35:17
**security** 10:14 12:3
**see** 34:7 51:2 52:14
60:3,24 66:12,13
70:7 72:10,21
**seen** 23:12 27:19
35:6 57:6,8 59:24
73:22
**seizure** 31:5 32:16
50:23,24 51:1,5
51:13
**sense** 72:2
**sent** 42:15 48:24
49:12
**September** 47:19

49:7,22 50:2,11
68:24 69:14
**sergeant** 5:16 9:19
33:10,11,13,14,15
33:18 36:22 37:2
39:21 40:8,15
49:15 61:3,6,9
62:3,15,23 63:3
63:12,24 68:5,6,6
68:12,17,20,23
**served** 9:20
**Services** 38:21 58:7
58:11,15 59:4,11
59:20
**Session** 3:1
**set** 33:16 83:16
**seven** 14:9
**Sexual** 33:17
**sheet** 80:5,6,9
**sheriff** 1:9 2:9 10:7
11:3 13:16 60:24
64:1,3
**sheriff's** 2:21 6:4
8:18 9:11,16 10:5
10:8 37:13 38:3
38:17 43:4,23
57:19 60:4,17,21
61:10 71:21
**SHIBLEY** 2:3
**shift** 37:3
**shooting** 37:20
**shootings** 37:16
**short** 55:16 67:6
**shoulders** 54:24
**show** 17:12 21:5
**showed** 23:13 27:5
70:23
**showing** 29:21
**shows** 15:1 55:19
**shrug** 6:21
**side** 54:19
**sign** 34:13 80:3,6,8
**signature** 79:9 80:8
82:23
**signed** 60:24 61:3,8
80:10 81:14
**signing** 81:12
**simple** 67:14 76:17
**Sincerely** 80:12
**sir** 8:20
**sit** 42:3,5 54:4
**sitting** 24:19
**situation** 21:13
25:18 32:7 38:2
42:18 56:12
**situations** 13:3
14:14 37:10
**SIU** 11:10 58:13
**six** 9:19 15:12,15
52:6 53:13 54:3
64:24 65:16,17

72:22
**size** 38:17
**small** 9:19
**smaller** 9:16 38:17
38:23
**solely** 27:14 28:17
29:9,16 32:12
**somebody** 14:22
24:21,21 26:16
41:19 59:14 60:2
61:3 76:11 77:13
**son's** 62:17
**soon** 76:13,21 77:2
**sorry** 25:23 27:1,7
30:7 42:9 52:24
**sort** 7:18 21:11,14
31:9,9
**sound** 31:21
**sounds** 50:13 60:2
64:21
**SOUTHERN** 1:1
**Sowards** 53:12
**SPANGENBERG**
2:3
**special** 1:4 10:19
11:1,2,7,11,16
13:1,6,14,17
68:11,12
**specific** 15:12 16:3
75:20 77:17,18
**specifically** 56:16
73:1 77:8,9
**specifics** 61:23
**specified** 83:14
**spit** 13:12
**spoke** 29:4
**Sr** 1:5
**staff** 13:9 31:11
72:8
**staging** 12:1
**standard** 66:1
**standing** 72:24
**standpoint** 20:23
**stands** 70:19
**stare** 51:14
**start** 37:7 48:10
49:2
**started** 39:22 40:10
40:16,16,21 44:16
48:15,16 49:7
**Starts** 2:11 70:11
80:15
**state** 1:15 5:6 34:16
81:1 83:2,6,21
**stated** 46:2 53:5
81:13
**statements** 16:24
75:5 75:8
**STATES** 1:1
**status** 69:22 70:1
**stay** 53:9

**staying** 49:6
**stem** 44:8,10
**stenotype** 83:10
**stenotypy** 3:7
**step** 41:13
**Steven** 2:15
**Stevens** 33:10,11,15
36:22 40:15 68:12
**stipulated** 3:4
**STIPULATIONS**
3:3
**Stockhauser** 2:15
71:13
**stomach** 51:19
**stop** 18:3 52:20,20
**stopped** 21:14 55:21
**Street** 2:12,19
**struggle** 55:9,10,12
76:4
**struggling** 55:3
**stuff** 18:17
**style** 12:14
**submitted** 81:11
**substance** 32:3
61:19 81:6
**sudden** 30:24
**suicide** 28:13 59:19
**suicides** 15:8,9,16
15:18
**Suite** 1:16 2:4,8,12
**sum** 32:3
**summoned** 35:11
**summons** 31:10
**supervisor** 33:11,14
33:16 37:3 49:14
49:16 68:10
**supervisors** 23:10
40:9
**supplement** 48:12
49:4,7 50:4
**supplemental** 46:17
47:11 48:11,20
**sure** 5:7,13 6:10
11:5 13:2 18:21
18:23 23:3 24:19
40:1 41:15 55:6
67:3 75:12
**suspects** 12:17
**sworn** 5:2 10:9 83:8
**system** 12:14 20:18
48:8,8,9 49:8
64:18 68:17 69:13
**systems** 12:22,23

_____
T

**table** 34:3
**take** 6:17 7:16 8:5,8
8:13 9:13 12:2
13:23 22:23 38:19
**taken** 1:15 3:6 5:22
6:3 82:2 83:9,13

**takes** 72:22
**talk** 6:16 14:11
**talked** 40:8
**talking** 16:18 59:5
78:12
**technician** 40:12
**tell** 8:12 21:24
27:18 39:20 41:18
42:3 47:10 48:15
54:2,7 58:10
59:23 63:9 64:6
72:7 73:17,19
75:6 77:10 78:16
78:24
**telling** 35:3 46:13
53:9 60:12
**tells** 25:8
**ten** 14:13 15:5
38:23
**term** 31:5 63:19
77:8
**terminated** 61:10
61:16 63:23 64:1
**terminology** 78:23
**terms** 27:12 28:7
**testify** 7:13 19:8
**testimony** 80:4,5,6
83:9,12
**testing** 50:4,6
**text** 61:11,17,19,24
**texts** 63:14
**THC** 20:18 50:7
**thefts** 10:21 14:2
**thing** 33:23 58:16
**things** 12:20 13:2,7
13:22,24 14:2
16:19 32:4 34:6
48:21 51:18,24
52:24 53:2,18
77:4
**think** 9:14 11:7 12:5
12:8 22:11 28:6
32:10 37:5 38:8
38:11,15 44:14
47:3,19 51:4 63:1
74:2
**third** 2:19 53:1
**thirty** 8:24 80:8
**thorough** 41:1 42:8
**thought** 14:15 18:21
26:21
**thoughts** 63:21
**threat** 75:17
**threatening** 13:21
**three** 10:6 11:14
44:6 54:12 67:16
67:16 70:1
**throw** 13:11
**Tiburon** 48:8 49:4,8
68:17 69:13,20
**time** 3:6 6:17 7:4,4

8:4 9:18 10:8,15
11:19 12:18 13:16
18:1,17 23:15
27:5 33:14 34:1
34:23 35:4,10,17
37:3 40:10,21
49:4,16 55:13,16
55:20,21 56:2
57:7,11,21 58:1
58:12 59:18 64:2
73:20,23 78:8
80:9,10 83:13
**times** 37:18 38:9
52:11 53:14,24
54:18,21
**titled** 59:10,23
**today** 6:24 7:10,15
7:20 8:11,13
14:11 23:15 24:19
35:3 42:5
**TODD** 2:18
**told** 8:17 13:1 22:11
28:6 35:21 40:11
44:16,20 45:18
50:21 51:9,10,12
51:18,21,24 52:1
52:5,10,19 53:1
53:18 68:16 71:11
74:21 75:24
**Tom** 61:3,6 62:15
63:12,18
**top** 49:6
**totally** 27:15 28:17
29:9,16 32:14
42:5
**town** 10:3
**toxicology** 50:5
**traffic** 25:15,17
**training** 35:15
**transcribed** 3:7
83:11
**transcript** 80:3,3,6
80:10 81:4,10
82:2 83:12
**transport** 12:1
**trauma** 15:23 16:10
34:12,13
**treated** 17:22 57:17
**tree** 26:15
**trial** 7:24
**trials** 10:14 12:3
**true** 8:18 19:16 34:5
36:8 39:11 41:21
43:17 53:22 56:18
71:6 76:1,8 81:7
83:11
**truth** 83:8
**try** 6:16 27:8 37:22
41:1,15 56:7
74:16 75:13
**trying** 12:5 20:21

20:22 21:7,13
22:21 24:9 27:24
32:5 41:6,12
42:10 52:15 55:4
55:6 56:4
**turn** 60:23
**turned** 55:1
**TV** 52:15
**two** 45:20 67:16
**type** 7:16 47:18
59:19
**typewritten** 80:4
**typing** 49:5

**U**

**uh-huh** 6:6,22
54:20
**ultimately** 50:10
**unacceptable** 36:6
**unaware** 35:9
**unbiased** 64:10
**uncommon** 8:10
**undersigned** 81:13
**understand** 5:8,21
6:2 7:1,4,10,17,18
7:19,23 16:17
19:4,11 24:9,9
28:18 29:22 30:15
32:4 54:13 60:15
62:21 63:13 73:9
75:11
**understanding** 9:10
20:4,22 21:18
24:10 25:18 26:19
27:16 29:7 41:6
42:11 51:15 56:1
56:4 61:6 67:7,10
69:22 72:12
**understood** 7:8 8:2
19:10
**Undetermined**
28:15
**unintentional** 27:23
**unit** 58:7,12,17 59:4
59:11 68:9
**UNITED** 1:1
**urine** 13:11
**use** 36:6

**V**

**variety** 10:20 13:7
**verbally** 6:20
**version** 49:17
**video** 21:10 22:18
31:24 53:22 54:2
54:11,14 55:19
57:6 70:22 73:14
73:16,22 74:2
75:16
**viewed** 75:16
**Village** 10:3

**Vine** 2:12
**violated** 35:23
74:11
**violating** 25:15
**violation** 23:11 25:4
25:7,11
**violence** 11:15
**violent** 10:22 11:12
**voice** 6:20
**voter** 11:2
**vs** 1:7

**W**

**waived** 3:9 79:9
**walk** 9:14
**want** 6:24 7:5 8:5
8:13 9:9 47:17
70:6 76:18,20
77:1,2
**wanted** 37:19 66:12
**warrants** 42:14
**wasn't** 15:22,23
17:24 18:3 28:16
28:17 29:15 30:3
30:8,19,21 31:14
39:12 51:14 75:2
**watch** 52:15
**watched** 54:2
**wax** 65:21
**way** 15:11 16:7
19:24 31:7,8
72:21
**we'll** 65:3 79:7
**we're** 14:11 15:11
16:17 67:6,21
**we've** 32:9
**weapons** 78:9
**Webb** 53:5
**Wednesday** 3:1
**weeks** 72:22
**went** 10:13,17,18
25:8 31:3,4,4 50:6
50:23 51:12
**weren't** 15:16 72:6
**west** 2:19 10:1
**WESTERN** 1:2
**WHEREOF** 83:16
**white** 62:23
**Whitney** 1:15 3:6
45:21 80:9,13
83:5,20
**witness** 3:8 25:7
45:18 46:6 81:12
83:10,13,16
**witnessed** 45:7
**witnesses** 45:15
46:2,21 54:7
**woke** 51:13,13
**word** 48:16,21
49:11,17 60:10
62:1,1

**word-for-word**
45:17
**words** 60:1
**work** 11:24 12:3
40:4 44:21 68:7
**worked** 9:15,17,18
10:7,12,13,20
11:19 12:13,13,21
12:22 33:15 38:22
44:20
**working** 10:9,14
12:4,19 15:11
33:19 35:16 55:5
64:4
**works** 20:6 33:16
68:21
**wouldn't** 40:24
**wow** 43:13
**write** 45:17 46:1,6
**writing** 3:7 46:10
**wrong** 8:12 25:20
35:24
**wrote** 18:21 20:2
21:17

**X**

**Y**

**yeah** 5:14 12:7 26:2
26:3 31:6,13,22
33:1 34:14 38:14
39:2 42:2 44:3,4
45:1 47:7,23 51:5
51:12,16 60:9
66:24 67:3 73:3
74:1 78:13
**year** 8:21 14:6,7
**years** 8:22 9:17,20
10:6,13,20,21,22
11:6,8 12:24
17:11 23:3 54:12
64:15
**yell** 52:11
**yelling** 53:13
**Yep** 37:4 48:14
**young** 45:7

**Z**

**0**

**1**

**1** 47:4 67:22
**1001** 2:3
**11** 60:23
**1100** 9:7
**117** 1:16
**12** 47:14 48:23
**123** 2:8
**1271** 47:4 67:22
**1274** 67:22

**138** 68:3
**14** 10:22
**15** 8:21 38:23
**1700** 2:4,12
**1728** 60:24
**17th** 65:18,22
**18** 1:16 3:1 10:20
11:6,8 12:24 81:5
**1985** 10:5
**1988** 10:12
**1997** 10:18,18
**1998** 10:6
**19th** 33:21 34:14
44:17

**2**

**2** 4:7 58:19,22 59:4
**20** 38:23 82:3
**2012** 6:8 22:17
33:21 34:15 44:17
47:19 49:21,22
50:2 63:18 64:6
68:7,24 69:14
76:10 77:6,12,19
78:3
**2015** 1:16 3:1 80:1
81:5,15 83:18
**2020** 83:22
**22** 41:19 55:22
**26th** 48:24 49:21
50:2,3
**28-year-old** 46:22
**28th** 8:21

**3**

**3:00** 1:17 3:2
**3:14-CV-00158** 1:7
**301** 2:19
**38** 64:15

**4**

**4** 80:1 83:22
**4:00** 40:5
**4:30** 40:5
**4:45** 79:12
**43017** 1:22 80:9
**44114** 2:4
**45202** 2:13
**45422** 2:20
**45429** 1:16 2:8
**4th** 2:19 83:17

**5**

**5** 4:4
**5,500** 10:3
**525** 2:12
**5335** 1:16 2:7
**58** 4:7
**5th** 47:19 49:7,22
50:2 69:14

| 6 | | | | |
|---|---|---|---|---|
| **614-309-1669** 1:22 | | | | |
| **6723** 1:21 80:9 | | | | |
| **6th** 68:24 | | | | |

| 7 | | | | |
|---|---|---|---|---|
| **7:45** 47:19 | | | | |
| **75** 17:18 | | | | |
| **7th** 48:23 | | | | |

| 8 | | | | |
|---|---|---|---|---|
| **88** 12:7,7 | | | | |

| 9 | | | | |
|---|---|---|---|---|
| **9-6** 47:14 | | | | |
| **91** 10:16 | | | | |
| **92** 10:16 | | | | |
| **93** 10:16 | | | | |
| **98** 9:4 | | | | |