UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -

Harry G. Beyoglides, Jr.,
Special Administrator of the
Estate of Robert Andrew
Richardson, Sr., Deceased,
    Plaintiff,

    vs.                                Case No. 3:14-CV-00158

Phil Plummer/Montgomery County
Sheriff, et al.,
    Defendants

                        - - -


                DEPOSITION OF CHARLES CROSBY
the Witness herein, called by the Plaintiff under the
applicable Rules of Civil Procedure, taken before me,
Whitney Layne, a Notary Public for the State of Ohio, at
the law firm of Dinkler & Pregon, 5335 Far Hills Avenue,
Suite 117, Dayton, Ohio 45429 on December 9, 2015 at
1:00 p.m.


                LAYNE & ASSOCIATES
                6723 COOPERSTONE DRIVE
                DUBLIN, OHIO  43017
                  614-309-1669

1  APPEARANCES
2
3  NICHOLAS DICELLO, ESQUIRE
   SPANGENBERG, SHIBLEY & LIBER
   1001 Lakeside Avenue
4  Suite 1700
   Cleveland, Ohio  44114
5     on behalf of the Plaintiff
6
   JAMEY PREGON, ESQUIRE
7  DINKLER & PREGON
   5335 Far Hills Avenue
8  Suite 123
   Dayton, Ohio  45429
9     on behalf of the Sheriff
      Defendants
10
11 CARRIE STARTS, ESQUIRE
   REMINGER CO., LPA
12 525 Vine Street
   Suite 1700
13 Cincinnati, Ohio  45202
      on behalf of the Defendants
14    NaphCare, Inc., Nurse Felicia Foster,
      Nurse Jon Boehringer, Nurse Krisandra
15    Miles, Medic Steven Stockhauser,
      and Brenda Garrett Ellis, M.D.
16
17
18
19
20
21
22
23
24

Page  2

1      December 9, 2015
       Wednesday Session
2         1:00 p.m.
3          - - -
       STIPULATIONS
4
5     It is stipulated by and among counsel for the
   respective parties that the deposition of CHARLES CROSBY,
6  the Witness herein, called by the Plaintiff under the
   applicable Rules of Civil Procedure, may be taken at this
7  time by the notary Whitney Layne; that said deposition may
   be reduced to writing in stenotypy by the notary, whose
8  notes thereafter may be transcribed out of the presence of
   the witness; and that the proof of the official character
   and qualification of the notary is waived.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page  3

1         EXAMINATION INDEX
2
   CHARLES CROSBY
3
4  BY MR. DICELLO..............................Page 5
5
6         EXHIBIT INDEX
   Exhibit                    Marked
7
   10.........................................Page 79
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page  4

1         CHARLES CROSBY
2     Being first duly sworn, as hereinafter
3  certified, deposes and says as follows:
4         CROSS-EXAMINTION
5  BY MR. DICELLO:
6     Q  Good afternoon.  Can you please state your name
7  for Whitney and spell your last name, please, Captain?
8     A  Charles K. Crosby.  That's C-R-O-S-B-Y.  I'm a
9  captain with the Montgomery County Sheriff's Office.
10    Q  Captain, my name is Nick DiCello.  We met off
11 the record just very briefly.  I represent the family of
12 Robert Richardson in connection with a lawsuit that's been
13 filed in Federal Court surrounding his death.  Do you
14 understand that?
15    A  Yes, sir.
16    Q  You understand you're here today to have your
17 deposition taken in connection with those proceedings?
18    A  Yes, sir.
19    Q  Ever been deposed before, Captain?
20    A  No, sir.
21    Q  I'm sure counsel has told you what to expect,
22 but just to make sure we have an understanding between
23 each other for the deposition, the way it goes is I ask
24 the questions and you provide the answers; understood?

Page  5

2 (Pages 2 to 5)

**Page 6**

1    A   Yes.

2    Q   You've done a nice job up until now, but you

3  have to make sure your answer are audible; yes, no, or

4  words as opposed to gestures, shrugs of the shoulders, and

5  uh-huh and huh-uh.

6    A   That's why I follow with the words.

7    Q   Okay, good.  If I remind you at any time to

8  turn an uh-huh into a yes, it's not to be rude, it's just

9  to get a clear record.

10    A   That's not a usual part of my repertoire, so we

11  should be fine.

12    Q   Good.  She can only take down one person at a

13  time.  So even though you know what I'm asking and you

14  know what your answer is going to be, please wait until

15  I'm done with my question until you give a response, okay?

16    A   I'm clear.

17    Q   And I'll do the same, wait for you to finish

18  your answer before I state another question.

19        Have you ever testified in court before,

20  Officer?

21    A   Yes, sir.

22    Q   And do you understand that you're under oath

23  here today?

24    A   Yes, sir.

**Page 7**

1    Q   Do you understand that the oath you're under

2  today is the same kind of oath that you take when you take

3  the stand in court and testify in front of a jury?

4    A   Yes, sir.

5    Q   I don't expect this deposition to go long, but

6  sometimes they take longer than others.  So if at any

7  point in time you need a break for any reason at all, let

8  me know, we'll take a break.  If a question is pending to

9  you, Captain, I would ask that you answer the question

10  first and then say, "Nick, let's take a break;" fair?

11    A   Fair enough.

12    Q   If you don't understand a question that I've

13  asked, I want you to tell me that, okay?

14    A   I will.

15    Q   And I'm going to rely on you to let me know if

16  you don't understand a question that I've asked.

17    A   I will.

18    Q   Given that arrangement, if you answer a

19  question that I've asked, I'm going to assume that you

20  understood it.  Is that fair?

21    A   Absolutely.

22    Q   Do you understand that I'm relying on the

23  truthfulness of your answers given today in connection

24  with this lawsuit?

**Page 8**

1    A   I only know one kind of answer, sir.

2    Q   What kind of --

3    A   That's the truth.

4    Q   Any reason you wouldn't be able to answer

5  truthfully today?

6    A   No, sir.

7    Q   Not uncommon, we're talking about things that

8  happened some years back, Captain, not uncommon for your

9  memory to get jogged about something.  If that happens and

10  you want to revisit any question that I've asked or any

11  answer that you've given, I want you to take the

12  opportunity during today's deposition to revisit the

13  subject.  Fair?

14    A   Fair.

15    Q   I've been referring to you as Captain and you

16  stated your rank.  Can you just state your official title

17  with the Montgomery County Sheriff's Department?

18    A   I am a captain with the Montgomery County

19  Sheriff's Office, I'm the assistant jail administrator,

20  and I was at the time of the incident we're about to

21  discuss.

22    Q   How long have you held the rank of captain

23  within the Montgomery County Sheriff's Office, sir?

24    A   I believe since January of 2010.  So it would

**Page 9**

1  have been five -- coming up to six years.

2    Q   And you said you are the assistant commander

3  for the jail?

4    A   Well, it's semantics, but the title is

5  assistant jail administrator.

6    Q   Can you tell me how long have you had that

7  position?

8    A   As the assistant jail administrator?

9    Q   Yes.

10    A   Since January of 2010.

11    Q   Can you tell me what the job responsibilities

12  are generally as the assistant jail administrator?

13    A   I oversee the day-to-day operation of the

14  facility.

15    Q   And is that the same description you would give

16  for your position as captain at the jail, or is there a

17  different description for the job of captain?

18    A   Well, the -- I'm trying to think of the best

19  way to put it.  My jobs are broad.  I ensure that everyone

20  -- I do not do the HR function.  I do not do any hiring,

21  firing.  However, I oversee performance investigations.  I

22  oversee the training to make sure that it's compliant with

23  -- I mean, we are a multi-accredited facility.  We're

24  certified by the State of Ohio.  Our accreditations are

1  through the American Corrections Association, we're
2  accredited by the National Correctional Commission -- the
3  National Commission on Correctional Healthcare.  Just
4  don't ask me to say it three times fast.
5      Q   NCCHC?
6      A   Correct, sir.
7          We're certified through the State of Ohio,
8  which is the Bureau of Adult Detention.  We are also
9  certified through PREA.  PREA stands for the Prison Rape
10 Elimination Act, which is a federal requirement.  And then
11 that's -- So I oversee the training to make sure that it's
12 compliant there.  That also influences the developmental
13 policies, our procedures and protocols as we respond to
14 incidents within the facility.  So I also, any incident
15 that occurs, a report is generated, I have the -- I do the
16 administrative review within the jail on that incident.
17     Q   Okay.
18     A   So as not to confuse with other questions
19 you're probably -- you may ask me later on.
20     Q   That's helpful.  I appreciate that.
21         Are you involved in creating policy, written
22 policies?
23     A   The sheriff is the ultimate approval on the
24 policy, but one of my responsibilities is to make

Page 10

1  recommendations on policy revisions, policy development.
2      Q   All right.  Excuse me one second.  I apologize
3  for turning my back, but I'm looking for something.  I
4  apologize, Captain.  Bear with me one second.
5      A   No problem, sir.
6          THE WITNESS:  Make sure you get that, I'm being
7  nice.
8          MR. PREGON:  The record so reflects.
9          MR. DICELLO:  Stipulated.
10 BY MR. DICELLO:
11     Q   You mentioned, was it the bureau, the Ohio
12 Bureau of Adult Detention is one of the agencies that
13 certifies the jail?  Is that what you said?  Did I get
14 that right?
15     A   They have the responsibility for inspecting the
16 county jails in the State of the Ohio.  And detention
17 facilities.
18     Q   Is there an actual certification as well that
19 they bestow upon the Montgomery County Jail?
20     A   We do receive a letter attesting to the fact
21 that we met the standard.
22     Q   All right.
23     A   That we are certified, yes, sir.
24     Q   Captain, at any time prior to this litigation,

Page 11

1  were you familiar with an executive order issued by the
2  governor of the State of Ohio governing or banning the use
3  of prone restraint in the State of Ohio across all state
4  agencies?
5          MR. PREGON:  Objection to form.
6          Go ahead.
7      A   Can you say the question one more time?
8  BY MR. DICELLO:
9      Q   Sure.  At any time before this lawsuit was
10 filed, and it was filed in May of 2014, okay, so at any
11 time prior to this lawsuit being filed, were you ever
12 aware of an executive order issued by the governor of the
13 State of Ohio banning the use of prone restraint?
14         MR. PREGON:  Objection.
15         Go ahead.
16     A   Across state -- Are you asking about in county
17 jails?
18 BY MR. DICELLO:
19     Q   I'm asking if you're aware of an executive
20 order that was issued by the governor of the State of Ohio
21 in 2009 banning prone restraint.
22         MR. PREGON:  If you are aware before this
23 lawsuit.
24     A   No, sir.

Page 12

1  BY MR. DICELLO:
2      Q   Do you know if that executive order applied to
3  the Bureau of Adult Detention?
4          MR. PREGON:  Objection.
5          Go ahead.
6      A   Sir, I wasn't aware of the executive order, so
7  that question to me means -- I would have to answer no.
8  BY MR. DICELLO:
9      Q   Yeah, exactly.
10         As a captain who is a jail administrator,
11 assistant jail administrator, whose job functions involve,
12 as you told me, training and making recommendations on
13 policy amendments and policy development, do you think
14 that that is the kind of executive order you should be
15 aware of?
16         MR. PREGON:  Objection.
17     A   Sir, I'm going to have to ask you to rephrase
18 that question.  I'm not sure I understand what you're
19 asking me.
20 BY MR. DICELLO:
21     Q   Well, I can represent to you that there is a
22 public record in the State of Ohio issued by the governor,
23 it's an executive order.  Are you familiar with what
24 executive orders are from the governor?

Page 13

4 (Pages 10 to 13)

1    A  Yes, sir.

2    **Q  Do you understand they're directives directed**

3  **toward certain state agencies to do or not do certain**

4  **things?**

5    MR. PREGON:  Objection.

6    Go ahead.

7    A  I agree.

8  BY MR. DICELLO:

9    **Q  And do you know that executive orders are**

10  **public documents?**

11    MR. PREGON:  Objection.

12    Go ahead.

13    A  It comes from the governor who is an elected

14  official, so I would assume that it's a public document,

15  yes.

16  BY MR. DICELLO:

17    **Q  So I want you to assume that there is an**

18  **executive order that has been in place in Ohio since 2009**

19  **that bans the use of prone restraint.  Assuming that's the**

20  **case, do you think that that's the kind of executive order**

21  **that you as an assistant jail administrator, who works at**

22  **a jail that is certified by the Ohio Adult -- the Ohio**

23  **Adult Detention, that you should be aware of?**

24    MR. PREGON:  Objection.

Page 14

---

1    Go ahead.

2    A  Well, sir, first of all, I can't assume that it

3  exists.

4  BY MR. DICELLO:

5    **Q  Would you like me to show it to you?**

6    A  Well, if you do, it will be the first time I've

7  seen it.  But what I am saying is that if an executive

8  order were to be issued or if a decision was made by the

9  legislative body from the State of Ohio, we are accustomed

10  to getting updates and recommendations for changes or

11  directives to change policy through the Ohio Peace

12  Officers Training Counsel, the Ohio Peace Officer's

13  Training Academy, the Bureau of Adult Detention, and then

14  we are also guided by the accrediting bodies.  So ACA goes

15  more specific to the corrections side of the jail, whereas

16  NCCHC would guide medical protocols.  So I'm speaking more

17  specifically with the ACA because I'm not a medical

18  person.

19    **Q  Okay.**

20    MR. DICELLO:  Did we ever make this an exhibit?

21    MR. PREGON:  I don't think we did.

22  BY MR. DICELLO:

23    **Q  Well, let me share with you my copy that I am**

24  **handing you what's entitled Executive Order 2009-13 S**

Page 15

---

1  Establishing Restraint Policies Including a Ban on Prone

2  Restraints.  So go ahead and review that.  First, let me

3  ask you, Captain:  Have you ever seen that document before

4  today?

5    MR. PREGON:  Objection: asked and answered.

6    A  No, sir.

7  BY MR. DICELLO:

8    **Q  So the first time that you are seeing an**

9  executive order issued by the governor that includes a ban

10  on prone restraints is having received it during this

11  wrongful death lawsuit from a civil rights lawyer; true?

12    MR. PREGON:  Objection.

13    A  Sir, I've answered no three times previously.

14  I have not seen this document before.

15  BY MR. DICELLO:

16    **Q  My question is a little different, Captain.  My**

17  question now is:  The first time that you are receiving a

18  copy of this is from a civil rights attorney in the midst

19  of a pending wrongful death case against the county; true?

20    A  If you're asking me if this is the first time

21  I've seen a physical copy of this document, yes.

22    **Q  Okay.**

23    A  Then when I get a chance to review it, it will

24  be the first time I've read it.

Page 16

---

1    **Q  Do you think that that's the kind of document**

2  **that somebody in your position at the jail should be**

3  **familiar with?**

4    MR. PREGON:  Objection.  He hasn't read it yet.

5    A  Can I have an opportunity to review it?

6  BY MR. DICELLO:

7    **Q  Sure.  Go ahead.**

8    A  (Reviewing document.)

9    I'd like to have a minute, if I could, to speak

10  with my attorney.

11    MR. PREGON:  There's no question pending.  Give

12  him the chance to read it.

13    MR. DICELLO:  No problem.

14    (Recess taken.)

15  BY MR. DICELLO:

16    **Q  Captain, we're back after a break that you**

17  **requested to exit the room with the executive order I**

18  **furnished you to talk to your counsel.**

19    A  Yes.

20    **Q  Did you have an opportunity to do that?**

21    MR. PREGON:  And to read it as well.  That's

22  the other reason he left.

23    A  Yes, sir, I read it.

24  BY MR. DICELLO:

Page 17

1    Q    And so with respect to -- Have you had a chance

2  to read the executive order?

3    A    Yes, sir.

4    Q    And I think the question that I had posed

5  before you indicated, well, I haven't read it yet, and you

6  wanted to step out and talk with your lawyer is:  Do you

7  think as a jail administrator at the Montgomery County

8  Jail, who is responsible to some extent for developing and

9  making recommendations on written policy, do you think

10  this is something that you should have been made aware of?

11    MR. PREGON:  Objection.

12    Go ahead.

13    A    If the decision was made to implement something

14  like this, then it would have come down to us, the

15  agencies that I mentioned previously, Peace Officer

16  Training Counsel, Peace Officer Training Academy, the

17  Bureau of Adult Detention.  That is normally how things

18  come down to us.  And the training is developed through

19  our training section, which we have a training section,

20  and then things are implemented to comply with an order.

21  BY MR. DICELLO:

22    Q    Okay.

23    A    Or a change in policy.

24    Q    So I appreciate the answer.  I'm not sure it

**Page 18**

1  answered my specific question.  I'm asking your personal

2  opinion.  Based on what you've told me about your role as

3  a jail administrator, do you think this is an order that

4  you should have been made aware of?

5    MR. PREGON:  Objection.

6    Go ahead.

7    A    Sir, if an order is put out and there's an

8  expectation that it's going to be implemented and it comes

9  down to us, my personal opinion is not the question.  It's

10  my job to execute and comply, comply with the law.

11  BY MR. DICELLO:

12    Q    So you don't have any opinion as to whether or

13  not you should have been made aware of this?

14    MR. PREGON:  Objection.

15    Go ahead.

16    A    If there was an expectation that our agency was

17  going to comply, then I think it's logical to say that

18  awareness of the existence of this requirement, that's a

19  reasonable expectation.

20  BY MR. DICELLO:

21    Q    Based on what you understand your agency to do

22  or not do, does the Montgomery County Jail comply with

23  this executive order, or no?

24    MR. PREGON:  Objection.

**Page 19**

1    Go ahead.

2    A    Well, as I read it, and I would have to go

3  back, it talks -- and actually, I'm looking at page one of

4  four?

5  BY MR. DICELLO:

6    Q    Yeah.

7    A    It talks brief physical and manual positioning

8  of an individual facedown.  I'm assuming that prone means

9  the facedown position.  Then it -- I would say that we did

10  comply to the extent possible, considering the

11  circumstances here.

12    Q    This order specifically applies to the Ohio

13  Department of Rehabilitation and Correction; true?

14    MR. PREGON:  Objection.  And you're showing him

15  page four of four that has the list of agencies,

16  departments that are supposed to form a committee to come

17  up with a policy.

18    MR. DICELLO:  To implement the order.

19    A    As I look at page three, it talks about a

20  committee.  Paragraph five on page three of four says,

21  "Ohio will take steps to address the use of restraints and

22  seclusion."  And then it goes to this committee.  And I'm

23  assuming that in here, and I'm not arguing, I'm just

24  saying that this is saying that a committee will likely be

**Page 20**

1  formed.  As I look at subsection -- at five, subsection A,

2  it says "the committee will be comprised of the members of

3  the following departments."  So what this tells me is that

4  when a committee is formed that ODRC would be on that

5  committee, the director.

6    Q    So do you understand whether this executive

7  order bans prone restraint, or not?

8    MR. PREGON:  Objection.

9  BY MR. DICELLO:

10    Q    Or you don't know?

11    A    That comes from above me.

12    Q    Yeah, I'm just asking.  Now you've had a chance

13  to read it, you've had a chance to step outside of the

14  room and talk with your attorney about it.  Do you have an

15  understanding that this executive order includes a ban on

16  prone restraints, or not?

17    A    I understand that what is written on there,

18  sir, is that they're saying that it should be banned.  But

19  then as I read the whole document, it alludes to the fact

20  that somehow a committee is going to be formed to develop

21  an implementation plan of that ban.  Now, is my

22  interpretation correct?  I don't know.  But that's what

23  I'm reading.

24    Q    The jail is required to follow standards

**Page 21**

6 (Pages 18 to 21)

1  promulgated by the Ohio Department of Rehabilitation and
2  Correction; true?
3      MR. PREGON: Objection.
4      You can answer if you know.
5      A  Well, I know it comes through the Bureau of
6  Adult Detention, which is a subordinate element of the
7  Ohio Department of Rehabilitation and Correction, yes.
8  BY MR. DICELLO:
9      Q  Are the General Orders part of the policies and
10 procedures you're responsible for?
11     A  The jail manual?
12     Q  Yes.
13     A  Yes, sir.
14     Q  Isn't the very first jail General Order,
15 doesn't it state what the law states, and that is the
16 sheriff shall keep such person safely, attend to the jail,
17 and govern and regulate the jail according to the minimum
18 standards for jails in Ohio promulgated by the Department
19 of Rehabilitation and Correction?
20     A  Yes, sir.
21     Q  So you knew that before you came in for the
22 deposition today; correct?
23     A  Yes, sir.
24     Q  All right.  And are you familiar with the

Page 22

1      Q  Those standards define what physical force is,
2  don't they?
3      A  Yes, sir.
4      Q  And don't they define them as any violence,
5  compulsion, or constraint physically exerted upon or
6  against a person's body by any means, including the use of
7  firearms, chemical agents, clubs, or direct bodily
8  contact?
9      MR. PREGON:  And you're showing him, just for
10 the record, you're showing him the May 2014 version of the
11 standards for jails in Ohio from the Department of
12 Rehabilitation and Correction?
13     MR. DICELLO:  I am.
14 BY MR. DICELLO:
15     Q  Isn't that how physical force is described by
16 the minimum standards that your jail has to abide by?
17     MR. PREGON: Objection.
18     Go ahead.
19     A  That's the way it's written in the book, yes,
20 sir.
21 BY MR. DICELLO:
22     Q  So under the definition of physical force as
23 it's defined in the minimum standards that your jail has
24 to follow, physical force was used against Mr. Richardson;

Page 24

1  minimum standards for jails as promulgated by the
2  Department of Rehabilitation and Correction?
3      A  I have read them, yes, sir.
4      Q  I understand, Captain, that you drafted a memo
5  that went to Major Daryl Wilson concerning the Robert
6  Richardson death; correct?
7      A  Yes, sir.
8      Q  And I'm going to ask you questions about that
9  today.
10     A  Okay.
11     Q  But was part of your review to determine
12 whether or not your staff members, the corrections
13 officers, the sergeants, the folks that are employed by
14 the Montgomery County Sheriff, complied with internal
15 policies and procedures?
16     A  That is part of it, yes, sir.
17     Q  Did your corrections officers use force against
18 Mr. Richardson?
19     A  I did not believe they used force, no, sir.
20     Q  Those standards for jails in Ohio, I think we
21 agree your jail has to follow; correct?
22     A  Yes, sir.
23     MR. PREGON: Objection.
24 BY MR. DICELLO:

Page 23

1  correct?
2      A  No.
3      MR. PREGON: Objection.
4      A  No, sir.  In the internal --
5  BY MR. DICELLO:
6      Q  Explain that to me.  Was constraint physically
7  exerted upon or against Mr. Richardson?
8      A  Our officers were sent up there for an unknown
9  medical emergency.  They were not up there dealing with
10 somebody that was completely out of control.
11     Q  Okay, good.
12     A  What they were doing, the actions that were
13 taken by the officers, as you watch the video, was to try
14 and look out for his welfare, because they were trying to
15 figure out what was wrong, to try to keep him from harming
16 himself.  I apologize.
17     Q  You go ahead.
18     A  With the construction of the facility, with
19 concrete, hard tile floors, metal bars, looking out for
20 someone's welfare is a big part of what we do.
21     Q  Good.
22     Is it your testimony, based on your review of
23 the incident, that no officer constrained Mr. Richardson
24 physically?

Page 25

7 (Pages 22 to 25)

1     A   What does "constrained" mean?

2     Q   You know, these are the jail standards you have

3   to follow.  So I guess I'm interested in what you

4   understand "constraint" to mean in the minimum standards.

5     A   Basically, as I watched the officers, because I

6   did have an opportunity to review the report, it was not

7   my opinion that the officers used force.  They prevented

8   him from harming himself.  They went through extra steps

9   to make sure the position of the officers, one on a limb,

10   the medic on his head to control the motion of his head,

11   so that he didn't harm himself.  When they rolled him to

12   his side so that he wouldn't be in the prone position, and

13   held him there for extended periods of time to try and

14   look out for his welfare, I did not interpret that as

15   force, either.

16     Q   Your corrections officers testified in this

17   case that they were holding Mr. Richardson down against

18   his will.  Do you understand that?

19     MR. PREGON:  Objection.

20     Go ahead.

21     A   Well, I have no way of knowing what the

22   officers testified to.

23   BY MR. DICELLO:

24     Q   We'll let their testimony speak for itself.

Page 26

1   But several of them testified Mr. Richardson was trying to

2   get up and that they were restraining him so that he

3   couldn't.  Is that what you understand happened?

4     MR. PREGON:  Objection.

5     Go ahead.

6     A   Because of his confused state.  He was making

7   unintelligible statements and different actions that if

8   they feel he's a risk to himself and the officers kept him

9   from harming himself, I did not interpret that to be a use

10   of force.

11   BY MR. DICELLO:

12     Q   Okay.  But assume the officers have testified

13   in this case that they were constraining Mr. Richardson --

14   restraining Mr. Richardson from getting up.  How is that

15   not constraint physically exerted upon or against his body

16   by any means?

17     MR. PREGON:  Objection.  And it's also asked

18   and answered.  I think he's answered this a couple times,

19   now.

20     MR. DICELLO:  I'm very confused then.  Because

21   I'm not understanding.

22   BY MR. DICELLO:

23     Q   How did they keep him on the ground if they

24   didn't use physical constraint?  Did they do it without

Page 27

1   their hands touching him?

2     MR. PREGON:  Objection.

3     A   I've explained what I observed the officers

4   doing.

5   BY MR. DICELLO:

6     Q   Holding him on the ground?

7     A   There was one officer per limb.  They were

8   trying to keep him from harming himself.

9     Q   By holding him on the ground; yes?

10     A   By keeping him from moving, because he was in

11   the vicinity of those objects I described, the

12   construction of the facility, there is a real concern.  I

13   wasn't there and I did the review and I've watched the

14   same video that I'm sure you've watched.

15     Q   Yeah.

16     A   And the concern is they don't want him to hurt

17   himself.  If he is not presenting himself in a way that he

18   can look out for his own welfare, we have an obligation to

19   look out for his welfare.  And we take that seriously.  We

20   get them secured, you can see the medical is right there,

21   the medic is positioned at his head, and the nurses are

22   not far behind.  This was being treated as a medical

23   emergency.  It was not a disturbance of some sorts.

24     Q   So the best thing medically for Mr. Richardson

Page 28

1   was to hold him in the position he was in for 22 minutes;

2   correct?

3     MR. PREGON:  Objection.

4     A   I need you to rephrase the question.

5   BY MR. DICELLO:

6     Q   I think you said what your officers were doing

7   was going out of their way to protect Mr. Richardson; yes?

8     A   Going out of their way?  I think they were

9   being as careful as they could to look out for him.  And I

10   also described where they had him positioned on his side

11   as the medic was trying to do an assessment.

12     Q   So I think what you're trying to tell me is you

13   think your officers were doing what was best for

14   Mr. Richardson?  Is that what you're telling us?

15     A   That's my interpretation of what I saw, yes.

16     Q   So based on your opinion of what you saw, what

17   was best for Mr. Richardson was for him to be restrained

18   in the position he was in; correct?

19     MR. PREGON:  Objection.

20     A   "Restrained in the position he was in"?  What

21   does that mean?

22   BY MR. DICELLO:

23     Q   Was he restrained, or no?

24     A   He was placed into handcuffs for his own

Page 29

8 (Pages 26 to 29)

1  safety, yes, sir.

2  **Q   So he was restrained and he was held in a**

3  **certain position or positions by the officers; true?**

4       A   His movement was controlled as they were trying

5  to assess him medically, yes.

6       **Q   So are you telling us that the manner in which**

7  **your officers restrained Mr. Richardson's movement was**

8  **what was safest for Mr. Richardson?**

9       MR. PREGON:  Object to form.

10       Go ahead.

11       A   As the officers were trying to manage his

12  movements, the officers were on the limbs.  I think that

13  with the prone position and the way they managed his head,

14  his body, and his movements, they were trying to be

15  careful.  Because Mr. Richardson was a pretty large man.

16  And there was a concern.  And as they moved him, you can

17  see in the video where more than one officer was

18  maneuvering his body as they were trying to assess him.

19  BY MR. DICELLO:

20       **Q   Yeah.**

21       A   I'm not sure I understand -- maybe I'm missing

22  understanding your question.  I'm not sure.

23       **Q   I'm not understanding.  But it's not up to me.**

24  **The jury will decide what's going on.  I'm just showing**

Page  30

1  left or right, looking out for his own safety I thought

2  was reasonable.

3       **Q   Well, that's -- that's a different question, if**

4  **you think the use of force was reasonable.  My question is**

5  **--**

6       A   I didn't say use of force, sir.

7       **Q   So there was no force used against**

8  **Mr. Richardson; correct?**

9       MR. PREGON:  Objection.

10       Go ahead.

11       A   I simply stated that I believe their bodies

12  were positioned to limit his movement for his own safety.

13  BY MR. DICELLO:

14       **Q   Was there force used against him?**

15       MR. PREGON:  Objection: asked and answered.

16       A   Sir, I did not interpret it to be a use of

17  force, which is why I didn't require any Use of Force

18  Reports to be completed with the report.

19  BY MR. DICELLO:

20       **Q   Okay.  We agree that Mr. Richardson was**

21  **restrained in a prone position at times throughout the**

22  **incident; correct?**

23       MR. PREGON:  Object to form.

24       A   I would agree that he was restrained.  We did

Page  32

1  **you the video at 21:09.  You're going to tell this jury**

2  **this is not physical constraint exerted upon or against**

3  **Mr. Richardson's body?**

4       MR. PREGON:  Objection.

5       A   What specifically are you referring to looking

6  at the video?

7  BY MR. DICELLO:

8       **Q   I'm trying to -- I thought this was going to be**

9  **a yes or no answer.  You're telling me they're not using**

10  **physical force against Mr. Richardson.  Physical force is**

11  **defined, under the minimum jail standards, as any**

12  **constraint physically exerted upon or against a person's**

13  **body by any means, including bodily contact.**

14       A   Well, if you're asking me about bodily contact,

15  there is bodily contact, absolutely.

16       **Q   So doesn't it qualify as physical force under**

17  **the minimum standards?**

18       A   As I'm watching this video, though, when you

19  first started it, you can see that Mr. Richardson is still

20  moving under his own power.

21       **Q   Okay.**

22       A   And as they're trying to assess and figure out

23  what's going on, security being one of the measures that

24  we have to ensure, for them to limit his ability to move

Page  31

1  put him in handcuffs, specifically to a prone position, I

2  believe is what you said?

3  BY MR. DICELLO:

4       **Q   Yeah.**

5       A   At times, yes.

6       **Q   Okay.**

7       A   But for an extended period of time, I think

8  that the position of his body, at least it appeared to me

9  as I was looking at it and with my experience based on my

10  review of many other incidents, they were trying to

11  position him for medical assessment and their own

12  observation to see what is going on.  They were trying to

13  figure out what was wrong.

14       **Q   They never let him up; correct?**

15       A   No, sir.

16       **Q   They never rolled him onto his back until he**

17  **stopped breathing; correct?**

18       A   They did not roll him to his back.  They rolled

19  him to his side.

20       **Q   They never sat him up on his butt; correct?**

21       A   I did not see that, no, sir.

22       **Q   And based on your review, they never tried to**

23  **do any of those three things; correct?**

24       A   I did not see any efforts to do that, no, sir.

Page  33

9 (Pages 30 to 33)

1    Q   Did you when you reviewed the video go through

2  and calculate the length of time that Mr. Richardson was

3  restrained in a prone position with his hands cuffed

4  behind his back?

5    A   No, sir.

6    Q   Do you know how long that period of time is?

7    A   You've mentioned 22 minutes.  I'm assuming

8  there's some significance there.

9    Q   Well, I don't want to confuse the record.  My

10 suggestion about 22 minutes is just that's the -- the

11 duration of the incident more or less from the time the

12 officers pull Mr. Richardson out of his cell and the time

13 he is noticed to have stopped breathing.  Would we agree

14 with that?

15     MR. PREGON:  Objection.

16 BY MR. DICELLO:

17   Q   More or less 22 minutes?

18   A   I did not calculate the time, sir.

19   Q   So --

20   A   I'm not arguing, I just did not calculate the

21 time.

22   Q   Fair enough.

23     As you sit here today, you don't know how long

24 Mr. Richardson was restrained in a prone position with his

Page 34

---

1  being called.  I know we have a scene log that is done as

2  part of that -- as part of the documentation of the

3  incident.

4    Q   Yeah.

5    A   And I would be on there.

6    Q   Okay.

7    A   If you want me to look at that, I can give you

8  a time.

9    Q   I can look at that.  That's a good point to

10 point me to that.  I appreciate that.

11     You told me that you didn't interpret this as a

12 use of force and so, therefore, no one was required to

13 fill out Use of Force Reports; correct?

14   A   I did not require that Use of Force Reports be

15 completed, no.  And it was not directed by the

16 supervisors, no.

17   Q   So there was no use of force review performed

18 in connection with Mr. Richardson's death; correct?

19   A   A use of force review?  I'm not familiar with

20 that concept.

21   Q   Well, your policies say, because I've read

22 them, your policies say that any time someone fills out a

23 Use of Force Report there's a review associated with that.

24   A   Absolutely.

Page 36

---

1  hands behind his back on May 19th, 2012; correct?

2    A   I don't know exactly how long, no, sir.

3    Q   Captain, were you present at the jail on May

4  19th, 2012, sir?

5    A   May 19th would typically be a day off for me.

6    Q   Okay.

7    A   And I was enjoying my day off.

8    Q   Until?

9    A   And my phone rang.

10   Q   Did your phone ring after it was determined

11 that Mr. Richardson was deceased?

12   A   I can't answer that question definitively.  But

13 I would say that based on past practice, if it's something

14 critical where it could go this route, where someone may

15 pass in custody, I typically get a call as soon as

16 practical.

17   Q   Okay.

18   A   But when they're in the midst of dealing with

19 the incident, just get me notified so I can come in.

20   Q   And did you come in?

21   A   Yes, sir.

22   Q   Do you recall what time you arrived at the

23 jail?

24   A   Probably within a half hour to 45 minutes of

Page 35

---

1    Q   So that kind of review didn't take place in

2  this situation; correct?

3    A   Well, it's still a thorough review.  We're

4  still dealing with an in-custody death, an unfortunate

5  incident.  That is still going to receive close scrutiny.

6  The report travels the same path as a Use of Force Report,

7  but then there's extra steps.  There's also a risk

8  management review that's completed, which is the

9  Inspectional Services.

10   Q   Then Sergeant Flanders did that, and he then

11 became a captain, and now he's no longer with the office;

12 correct?

13   A   Correct, sir.

14   Q   Do you know why they call it a risk management

15 review?

16     MR. PREGON:  Objection.

17     Go ahead.

18 BY MR. DICELLO:

19   Q   Do you know?

20   A   No.

21   Q   What risk do you think is being managed by that

22 report?

23     MR. PREGON:  Objection.

24     Go ahead.

Page 37

10 (Pages 34 to 37)

1    A   We're a learning organization, sir.  We're
2    always wanting to look at the way we do things and see if
3    there's a way we can do it better.
4    BY MR. DICELLO:
5        Q   Captain, I want to ask you kind of some general
6    rules, see if you agree or disagree.  Corrections officers
7    must never apply restraints in ways that may restrict
8    breathing; true?
9        A   I would agree.
10       Q   Corrections officers are only permitted to use
11   force that is reasonable under the circumstances; true?
12       A   True.
13       Q   Corrections officers are only allowed to use
14   force that is reasonably necessary under the
15   circumstances; correct?
16       A   Say that one more time.
17       Q   Sure.  Corrections officers must only use force
18   that is reasonably necessary under the circumstances;
19   correct?
20       A   True.
21       Q   And so when a corrections officer uses force
22   that is unnecessary under the totality of the
23   circumstances, the corrections officer is using excessive
24   force; true?

Page 38

---

1        MR. PREGON:  Objection.
2        Go ahead.
3        A   Not necessarily excessive.  It could be
4    improper as well, depending on their training.
5    BY MR. DICELLO:
6        Q   So it could be both excessive and improper?
7        A   It could be either/or/and.
8        Q   Okay.
9        A   I'm trying to say it could be one or the other
10   or both.  Does that make sense?
11       Q   I guess what's the difference between excessive
12   force and improper force?
13       A   Well, improper force, when you're trying to
14   obtain -- when you're trying to achieve a legal objective,
15   which is to secure somebody, and they're trying to -- I'm
16   trying to think of an example.  Where the force is not
17   proper for the resistance that's being encountered.
18       Q   That's excessive force?
19       MR. PREGON:  Objection.
20       Go ahead.
21       A   Depending on the application.  It could be
22   improper.
23   BY MR. DICELLO:
24       Q   But not excessive?

Page 40

---

1        MR. PREGON:  Objection: legal conclusion.
2        Go ahead.
3        A   Say that one more time.
4    BY MR. DICELLO:
5        Q   I think you told me corrections officers, as
6    you understand it, and I know you're not a lawyer and I'm
7    not asking you for legal conclusions, but as someone who
8    is responsible for training, you would agree that you do
9    have to train your officers to comply with the
10   Constitution of the United States; correct?
11       A   Yes, sir.
12       Q   And so there is some component of your job that
13   requires you to implement policies and procedures that
14   respect someone's constitutional rights; true?
15       A   Absolutely.
16       Q   And one of those rights is to be free from
17   excessive force; correct?
18       A   Agreed.
19       Q   So you told me that correction officers are
20   only allowed to use force that is reasonably necessary
21   under the circumstances.  My follow-up question is:  When
22   a corrections officer uses force that is unnecessary under
23   the circumstances, the corrections officer is using
24   excessive force; true?

Page 39

---

1        A   Sir, one thing that hasn't made it into the
2    discussion yet, and -- is the fact that the officers from
3    the time they came in contact, when Officer Benjamin first
4    went up and opened the door and the officers were there,
5    they were trying to talk to him.  And the response they're
6    receiving, and I'll paraphrase, "get off me, leave me
7    alone," and the direction that they're trying to provide
8    him is really to stay down, calm down, you know.  So if
9    someone is not complying with a directive that they're
10   being given, keeping him to the ground makes sense.
11           When you're handcuffing someone or trying to
12   get someone under control who is not cooperating, and you
13   have multiple officers, it makes sense to lay him on the
14   ground.  But he was already on the ground.  They pulled
15   him out into the hallway so they would have more room to
16   try and assess him.  I didn't interpret that to be force.
17   They're responding to an unknown medical emergency.
18           We respond to seizures numerous times a week.
19   And we have to keep people -- If you've ever seen someone,
20   and I'm not trying to make it personal, but someone who is
21   having a seizure, the reaction can range on what we run
22   into.  But we're trying to keep them from banging their
23   head, because they're not in control of their physical
24   reactions.  So we have to take measures to just make sure

Page 41

1 they don't do something where they're going to hurt
2 themselves.
3     **Q  You have to take measures to keep them safe?**
4     A  To provide for their safety, yes, sir. Safety
5 of others is one of the --
6     **Q  And you need to position detainees who are in**
7 **the condition you just described in a way that is safe for**
8 **them; correct?**
9     MR. PREGON: Object to form.
10     Go ahead.
11     A  Position them -- Say that one more time.
12 BY MR. DICELLO:
13     **Q  I think you just told me that for somebody who**
14 **is in the throws of a seizure and may not be able to**
15 **control their body, you want to keep them on the ground so**
16 **they're safe; correct?**
17     A  Yes. That's a common practice, yes, sir.
18     **Q  And you want to position their body in a way on**
19 **the ground so they're safe; correct?**
20     A  Yes, sir.
21     **Q  I want to get back to my question. I wasn't**
22 **necessarily talking about Mr. Richardson. I know that is**
23 **why we're here ultimately. But my question was: When a**
24 **corrections officer uses unnecessary force, force that is**

Page 42

1 not necessary under the circumstances, do you agree that
2 that's excessive force?
3     MR. PREGON: Objection.
4     Go ahead.
5     A  You told me in the beginning of the question
6 that unnecessary force is unnecessary force. That's what
7 I'm hearing. Is that what you're asking me?
8 BY MR. DICELLO:
9     **Q  Yeah, I'm trying to get an answer to the**
10 **question. Is unnecessary force, force that is not**
11 **necessary to be used under the circumstances, is that**
12 **excessive force?**
13     MR. PREGON: I think he's answered that.
14     MR. DICELLO: I haven't heard it yet.
15     A  If I saw improper and excessive force, then as
16 part of my administrative review, I would have referred
17 that matter for performance investigation.
18 BY MR. DICELLO:
19     **Q  My question is: Is unnecessary force excessive**
20 **force according to you, Captain?**
21     MR. PREGON: And objection: asked and answered.
22     A  Is unnecessary force excessive force?
23 BY MR. DICELLO:
24     **Q  I think the options are yes, no, or I don't**

Page 43

1 know.
2     MR. PREGON: Objection.
3     A  I'm not sure at this juncture, because I'm not
4 sure of --
5 BY MR. DICELLO:
6     **Q  Okay. Placing members of the community who are**
7 **in restraints in a prone position is never an acceptable**
8 **practice and is prohibited; do you agree?**
9     MR. PREGON: Objection.
10     A  No, sir.
11 BY MR. DICELLO:
12     **Q  I want to show you the use of restraint policy**
13 **for the Montgomery County Jail manual.**
14     A  Yes, sir.
15     **Q  And this MC 2909 here, this just means that**
16 **this was produced through Jamey's office for me in this**
17 **case.**
18     A  That's fine.
19     **Q  But this is policy that you're responsible for;**
20 **correct?**
21     A  Yes, sir.
22     **Q  And you're responsible for implementing this**
23 **policy and providing training on it to your direct**
24 **reports; correct?**

Page 44

1     A  Yes, sir.
2     **Q  So the corrections officers who are handling**
3 **Mr. Richardson should have been trained on this use of**
4 **restraint policy; correct?**
5     A  They would have been, yes, sir.
6     **Q  And the policy says, "When applying handcuffs,**
7 **staff members must never tie the handcuffs to leg or ankle**
8 **restraints." That didn't happen in this case; right?**
9     A  No, sir.
10     **Q  And then it goes on to say, "Hog-tying**
11 **prisoners" -- that didn't happen; right? There was no**
12 **hog-tying here, was there?**
13     A  No, sir. That's simply paraphrasing what's
14 written in the first sentence.
15     **Q  It says, "Hog-tying prisoners or placing**
16 **prisoners who are in restraints in prone or spread eagle**
17 **positions are never acceptable practices and are**
18 **prohibited." That's what the policy says; correct?**
19     A  Yes.
20     **Q  And the word "or" is a disjunctive connector;**
21 **correct?**
22     MR. PREGON: Objection.
23     A  Disjunctive?
24 BY MR. DICELLO:

Page 45

12 (Pages 42 to 45)

1    Q   As opposed to "and"?  "Or" is different than
2    "and," isn't it?
3    A   Yes.
4    Q   Those words have two different meanings, we
5    agree?
6    A   Absolutely.
7    Q   One is inclusive and one is exclusive; correct?
8    This and that, this or that; right?
9    A   Yes, sir.
10   Q   According to where the "or" is placed in your
11   written policies, hog-tying prisoners is something
12   different than placing prisoners who are in restraints in
13   prone position, isn't it?
14   A   As I look at the first sentence, there's
15   actually more than one question written into this.  When
16   it talks about must never tie handcuffs to leg or ankle
17   restraints, that can be the practice, depending on the
18   tension, could be the practice of hog-tying prisoners.
19   Q   Right.
20   A   "Hog-tying" being a generic term that is used
21   and has been for years.
22   Q   But then the policy goes on to say, "Hog-tying
23   prisoners or" -- We do agree that placing prisoners who
24   are in a prone position is not hog-tying; correct?

Page 46

1    A   Well, sir, I guess what I would submit to you
2    is based on my review, placing prisoners who are in
3    restraints, Mr. Richardson was already on the floor, and
4    they were in the process of trying to get him secured, he
5    was already facedown, and they applied the restraints.
6    Now, also in my review, I see where the officers move him
7    to the side as they're doing the assessment.
8    Q   I'm not really talking about Mr. Richardson
9    here.  I asked you a question.  I said, placing members of
10   the community who are in restraints in prone position is
11   never an acceptable practice and is prohibited, and you
12   said you disagreed with that.  So now we're looking at the
13   written policy.  And I'm reading to you where it says
14   "placing prisoners who are in restraints in prone or
15   spread eagle positions are never acceptable practices and
16   are prohibited."
17   A   Well, sir, are we talking about prisoners or
18   members of the community?
19   Q   Are prisoners members of the community?
20   A   Yes.
21   Q   Okay.
22   A   But when the prisoner is in the facility, there
23   are certain requirements.
24   Q   Well, this applies to the jail.

Page 47

1    A   Yes, sir.
2    Q   So I don't think this policy -- Correct me if
3    I'm wrong, Captain, but I don't think this policy applies
4    to people who aren't in the jail, does it?
5    A   No, sir.
6    MR. PREGON:  He's explaining why he said no to
7    your earlier question.
8    A   That's what I'm saying.  Based on your earlier
9    question, I would ask you to repeat that question.
10   BY MR. DICELLO:
11   Q   Do you agree that placing members of the
12   community who are detained in the Montgomery County Jail
13   who are in restraints in a prone position is never an
14   acceptable practice and is prohibited?
15   A   I know that the policy is written that way.
16   However, in situations where security of the facility has
17   to be maintained and somebody's behavior has to be
18   controlled, which in Mr. Richardson's case was so we could
19   do a medical assessment to figure out what was going on,
20   he was placed in restraints, he was in the prone position
21   to get him in the handcuffs, because it's common to
22   handcuff people behind their back.  Once that occurred, he
23   was maneuvered by our staff to his side with his head
24   being controlled by the medic.

Page 48

1    Where I got confused when you asked me the
2    question the first time is the question starts out with
3    members of the community who are in the Montgomery County
4    Jail.  And I apologize.  That confusion was on my part.
5    Q   That's all right.
6    A   To say that they should never be in the prone
7    position, the restraints had to be applied somehow, and
8    then I would submit that accommodations were made to try
9    to look out for his welfare as he was maneuvered to his
10   side.
11   Q   So why does the policy say those are never
12   acceptable practices and they're prohibited?  That's very
13   strong language; isn't it?
14   A   It is very strong language.
15   Q   And you approved of these policies?
16   MR. PREGON:  Objection.
17   BY MR. DICELLO:
18   Q   You signed off on these, didn't you, Captain?
19   MR. PREGON:  I don't know that he testified to
20   that.
21   MR. DICELLO:  I'm asking.
22   MR. PREGON:  Did you?
23   THE WITNESS:  No, I didn't.
24   BY MR. DICELLO:

Page 49

13 (Pages 46 to 49)

1    Q   I'm asking you.  You signed off on these,
2   correct?
3    A   What's the year of the policy?
4    Q   You know, they didn't provide me with the
5   revision date.  I can tell you this.
6    A   Go to the beginning.
7    Q   I can tell you this.  When I asked Jamey's
8   office to produce them, I asked for the policies that were
9   in effect at the time of Mr. Richardson's death.  So I
10  could probably go through here and find that date for you.
11  But my understanding is that these are the policies that
12  were in effect as of the date of Mr. Richardson's death.
13   A   Okay.
14   Q   Okay?  So let's assume that they are.
15   A   Okay.  I can do that.
16   Q   So assuming that --
17       MR. PREGON:  He still may not have signed off
18  on it.
19  BY MR. DICELLO:
20   Q   I'm asking.
21   A   Yeah, I do not recall specifically.  If the
22  policy was modified, it would have come through my desk.
23   Q   The sheriff signed off on these?
24   A   The sheriff signs off on all our policies.

Page 50

1    Q   So the sheriff signed off on this statement
2   that says "Placing prisoners who are in restraints in
3   prone positions is never an acceptable practice and is
4   prohibited"; correct?
5       MR. PREGON:  Asked and answered.
6       Go ahead.
7    A   I've answered that question, sir.  I would say
8   yes.
9   BY MR. DICELLO:
10   Q   And I think the concept that you're talking
11  about, and I understand there's written policies and then
12  there's customs, kind of there's things that are written
13  down and then there's the way things are actually done,
14  but I think the concept that you're talking about,
15  Captain, so I'll ask you, is you may have to put somebody
16  in a prone position to get them cuffed.  But once they're
17  cuffed, they no longer can be restrained in a prone
18  position.  Do you agree with that?
19   A   Yeah, typically.  I mean, I can even give you
20  an example.
21   Q   I don't want to get too far afield.
22   A   I'm not trying to take you there, either.  If
23  someone is handcuffed, they are not typically left in a
24  prone position very long at all.  We want to get them out

Page 51

1   of the prone position.
2    Q   And the reason you want to get them out of the
3   prone position is the prone position is dangerous for the
4   inmate; correct?
5       MR. PREGON:  Objection.
6       Go ahead.
7    A   I'm not a medical person, but I've been told it
8   can be, yes.
9   BY MR. DICELLO:
10   Q   So part of the job of the corrections staff is
11  to get somebody out of the prone position as soon as
12  possible when their hands are cuffed behind their back;
13  true?
14   A   I would agree with as soon as possible, yes,
15  sir.
16   Q   Now, I've got a very wordy definition of prone
17  restraint.  It's not my definition, okay?  But I want to
18  ask you if you agree with it.  Prone restraint includes
19  all items or measures used to limit or control the
20  movement or normal functioning of any portion or all of an
21  individual's body while the individual is in a facedown
22  position for an extended period of time.  Would you agree
23  with that definition of prone restraint?
24       MR. PREGON:  Same objection I made the other

Page 52

1   day.  This is from the Mental Health Code.
2       But go ahead.
3       MR. DICELLO:  I don't understand that.  I'm
4   asking this witness if he agrees with this definition and
5   he's free to say if he doesn't.
6    A   Can you read it one more time, sir?
7   BY MR. DICELLO:
8    Q   Yes, I can --
9    A   There's a lot --
10   Q   I know there is.
11       MR. PREGON:  I just want it to be fair, Nick,
12  and that's all I'm doing.  And I don't know that that's
13  fair -- I'm assuming you have a good faith basis for
14  asking that and presenting it the way you are.  So I'm
15  going to let him answer the question.
16  BY MR. DICELLO:
17   Q   Prone restraint is defined as all items or
18  measures used to limit or control the movement or normal
19  functioning of any portion or all of an individual's body
20  while the individual is in a facedown position for an
21  extended period of time.  Do you agree with that
22  definition of prone restraint?
23       MR. PREGON:  Objection.
24       Go ahead.

Page 53

14 (Pages 50 to 53)

1      A   I don't know what the definition of prone
2   restraint is.
3   BY MR. DICELLO:
4      Q   Well, let's look at the executive order.
5      A   As I look at --
6      Q   Did you just read the executive order?
7      A   Yes.
8      Q   Did it define prone restraint?
9      A   If you give me another chance to review it.
10     Q   "Prone restraint is defined as all items or
11   measures" -- Go ahead.
12     A   (Reviewing document.)
13         Okay.
14     Q   Do you agree with that definition?
15     A   This is the first time I've seen it.  I
16   have no reason to argue or agree.
17     Q   So you take no position whether that is an
18   acceptable definition of prone restraint from your
19   perspective?
20     A   No, sir.
21     Q   Can you define prone restraint?
22     A   No, sir.  I've never heard that term
23   specifically.
24     Q   Until today, you've never heard of the term

Page 54

1   "prone restraint"?
2      A   Not to the best of my recollection, no.
3      Q   All right.
4      A   Restraining someone in a prone position, but
5   not prone restraint.  Maybe it's semantics, I don't know.
6      Q   So it also says right above this definition of
7   prone restraint, what does the executive order say?
8      A   Are you talking about the bold print?
9      Q   I'm talking about this first sentence under
10   prone restraint.  Can you read that into the record?
11     A   Prone restraint is defined --
12     Q   The use of prone restraint.  That sentence.
13     A   "The use of the prone restraint is prohibited
14   across all state systems."
15     Q   So when you were looking at the page four of
16   this and you were saying, well, a committee is going to be
17   developed and these are the people that are going to be on
18   the committee when I was asking you that the use of prone
19   restraint is banned for the Ohio Department of
20   Rehabilitation and Correction, now having just shown you
21   this portion of the order that says the use of prone
22   restraint is banned across all Ohio --
23     A   No, sir, I don't agree with that.
24     Q   -- state systems.

Page 55

1      A   You asked for my opinion earlier and I took the
2   opportunity to review it.  What I looked at is there
3   were interpretations and opinions in there, and then I
4   brought to your attention sharing my opinion was that a
5   committee was going to be formed to implement the
6   executive order.  That's how I interpreted it.
7      Q   To be fair to you, you haven't seen the
8   document before I gave it to you today, you don't know if
9   prone restraint is or isn't prohibited in the State of
10   Ohio; fair?
11     A   I know it's not prohibited in our facility.
12     Q   Okay.
13     A   As a matter of applying restraints when someone
14   is in a prone position.  But then also as a matter of
15   practice, we get people out of the prone position because
16   we are aware and we've been trained on the dangers of
17   positional asphyxia and other medical issues, and we're
18   not looking to exacerbate a problem, we're looking to
19   solve problems and help people.
20     Q   Do you agree corrections officers must never
21   restrain people in ways that pose unnecessary risk of
22   death?
23     A   Yes.
24     Q   When faced with two or more reasonable ways to

Page 56

1   restrain a detainee, do you agree that the corrections
2   officers must choose the safer way?
3          MR. PREGON:  Object to form.
4          Go ahead.
5      A   Say the question one more time, please.
6   BY MR. DICELLO:
7      Q   Yeah.  When corrections officers are faced with
8   two or more reasonable ways to restrain a member of the
9   community who is detained at the Montgomery County Jail,
10   the corrections officers must choose the safer way?
11         MR. PREGON:  Object to form.
12         Go ahead.
13     A   Well, when you mentioned the word "safer," the
14   security of the facility and the situation, that being
15   vague and could include any one of a multitude of
16   circumstances, we're as safe as we can be, absolutely.
17   We're not looking to cause additional harm.  But if we
18   have to restrain someone and then go back, it's like if we
19   put someone in the restraint chair, medical authority
20   comes in and examines the straps, they're checking the
21   pulses and doing what medics do.  We make adjustments
22   based off of their observations.
23         Now, if the officers respond to the call and a
24   supervisor hasn't made it there yet, but they have the

Page 57

15 (Pages 54 to 57)

1    person secured and the supervisor gets there, the
2    supervisor is going to correct it.  Or make it the way
3    they want it to be.
4        So to be safer, I would say safety is the
5    reason you're going to want to strain someone.  Does that
6    answer your question?
7    BY MR. DICELLO:
8    **Q**  **No.  So I'll ask you again.  When faced with**
9    **two or more reasonable ways to restrain someone who is**
10   **detained at the Montgomery County Jail, do you agree that**
11   **the corrections officers must choose the safer way?**
12        MR. PREGON:  Object to form.
13        Go ahead.
14   BY MR. DICELLO:
15   **Q**  **And if you can't answer it, I would appreciate**
16   **you telling me "I can't answer that" and I can move on to**
17   **another question.  Because I -- I did ask for your man to**
18   **be here at three, and it's ten after two already.  I don't**
19   **want him to have to sit around.  But you're allowed to**
20   **answer the question however you see fit.**
21   **A**  They should choose the safer option because
22   it's safer for the inmate and it's safer for them.  As
23   long as it accomplishes the agenda of maintaining security
24   of the facility.

1    **Q**  **Thank you.**
2    **Are you personally certified by any**
3    **correctional professional organizations, Captain?**
4    **A**  Certified?  I'm a member of some professional
5    organizations.  But as far as certified, I'm in the
6    process of doing that now.  I'm a member of the American
7    Jail Association.
8    **Q**  **Okay.**
9    **A**  I'm an auditor for the American Corrections
10   Association.  I have done an audit for them.
11   **Q**  **Are you a member of the NCCHC?**
12   **A**  No, sir.  But I did do a co-presentation at one
13   of their annual conferences.
14   **Q**  **You told me you're in the process of getting**
15   **certified.  What certification are you pursuing?**
16   A  Well, no.
17   **Q**  **No?**
18   A  What I'm doing is I'm looking into it.
19   **Q**  **Okay.**
20   A  I'm not trying to overstate it.  Not at all.
21   **Q**  **Okay.**
22   A  I've done the school thing.  I'm taking a
23   little bit of a break.
24   **Q**  **What certification are you looking into?**

1    **A**  I want to become a certified jail manager
2    through the American Jail Association.
3    **Q**  **Okay.**
4    **A**  I believe learning is lifelong, and I like to
5    pursue it.  I've been to the jail administrator's course
6    through the State of Ohio, I've done the local management,
7    I've completed the Northwestern course Staff and Police
8    Command.
9    **Q**  **Yep, that's a big one.**
10   **A**  I've been fortunate I've been provided some
11   opportunities and I've also pursued a lot of schooling on
12   my own.
13   **Q**  **Okay, good.  You mentioned the term "positional**
14   **asphyxia."  I know you're not a medical person, but from a**
15   **corrections standpoint, what is your understanding of what**
16   **positional asphyxia is?**
17   **A**  When someone can be in a position where it
18   restricts their ability to breathe.
19   **Q**  **Do you understand -- Did you understand as of**
20   **May of 2012 that the prone position is associated with**
21   **positional asphyxia?**
22   **A**  That stands to reason.  I mean, through our
23   training, positional asphyxia was commonly presented as a
24   danger of not only having someone handcuffed behind their

1    back on their stomach, but then also possibly additional
2    weight, if you're kneeling on that person, then that --
3    the way that we were trained is it would restrict the
4    ability of the chest cavity to expand, and it makes sense,
5    you can't breathe.
6    **Q**  **And you expected that your officers should know**
7    **that as of May 19th, 2012; true?**
8    **A**  Yes, sir.
9    **Q**  **Before we leave this policy that I was showing**
10   **you, the restraint policy states "Violent behavior may**
11   **mask dangerous medical conditions."  Is that something**
12   **that your corrections officers need to be trained on?**
13   **A**  Our officers are trained on that, sir.
14   **Q**  **And the reason training on that is important is**
15   **because someone's combativeness or inability to comply**
16   **with orders may be the result of a medical condition, not**
17   **the result of willful disobedience; correct?**
18   **A**  That's always a possibility, yes, sir.
19   **Q**  **And are you familiar with the concept that when**
20   **someone's breathing is restricted that the body**
21   **autonomically or automatically without volition fights to**
22   **get air to survive?  Are you familiar with that concept?**
23   **A**  That makes sense, yes, sir.
24   **Q**  **So one of the things that corrections officers**

1   have to be aware of when they're restraining someone is
2   that the person's combativeness may be that person
3   subconsciously fighting to get air to live; correct?
4     A   Are you asking me?
5   Q   Yeah.
6     A   That stands to reason, yes, sir.
7   Q   So that's something that corrections officers
8   on May 19th, 2012 had to be aware of, that that might be
9   the reason why Mr. Richardson was trying to get off the
10   ground?
11     MR. PREGON: Objection.
12     Go ahead.
13     A   I can't say that.
14   BY MR. DICELLO:
15   Q   Well, why shouldn't they be aware of that on
16   May 19th, 2012?
17     A   They can be aware of the concerns. But you're
18   asking me to testify to you as to what the officers were
19   thinking. I can't do that.
20   Q   My question was a little different.
21     A   Or Mr. Richardson's actions. I can't testify
22   to what -- you know, everything is unfortunate, but --
23   Q   My question was: The officers that responded
24   and were restraining Mr. Richardson for this

Page 62

---

1   20-plus-minute interval that we're talking about had to be
2   conscientious of the fact that Mr. Richardson's behavior
3   may be his body trying to just get up off the ground to
4   breathe; true?
5     MR. PREGON: Objection.
6     Go ahead.
7     A   If you're asking me if it was possible, I'd say
8   yes.
9   BY MR. DICELLO:
10   Q   So that possibility is something that should be
11   in their minds at the time they're restraining
12   Mr. Richardson; true?
13     MR. PREGON: Objection.
14     Go ahead.
15     A   Yes, sir.
16   BY MR. DICELLO:
17   Q   Now, with respect to positional asphyxia, are
18   you aware that there are certain characteristics of
19   certain people that make them at higher risk from dying
20   from positional asphyxia? Are you aware of that?
21     A   Yes, sir.
22   Q   And among those, I call them risk factors, that
23   make a detainee more at risk of dying from positional
24   asphyxia are folks who are obese; correct?

Page 63

---

1     A   Yes, sir. I've been trained on that.
2   Q   And particularly with respect to obesity, folks
3   who have a large or protuberant belly are at particularly
4   high risk of dying from positional asphyxia. Are you
5   aware of that?
6     A   Not as specific as you've just listed it. But
7   if someone had a big belly, it stands to reason they're
8   probably overweight.
9   Q   Okay.
10     A   So I just kind of categorized that together.
11   Q   Somebody who has preexisting heart disease is
12   at higher risk of dying from positional asphyxia when
13   they're in the prone position; true?
14     A   I have no way of knowing that. I don't know.
15   Q   Pressure on the abdomen while someone is
16   restrained in the prone position puts them at higher risk
17   of death from positional asphyxia; true?
18     A   On the abdomen?
19   Q   Yes.
20     A   That stands to reason.
21   Q   Okay.
22     A   I'd say yes.
23   Q   A struggle, somebody who is participating in or
24   has recently participated in a struggle is at a higher

Page 64

---

1   risk of death from positional asphyxiation when restrained
2   in the prone position; true?
3     A   I don't know that I can answer that
4   definitively. You said a prolonged struggle? Having been
5   in a few of those, a prolonged struggle, you're breathing
6   harder. So if you're restrained in the prone position and
7   there's pressures applied, it would stand to reason to me
8   that, yes, you would have trouble breathing.
9   Q   So in terms of risk factors, the detainee who
10   is participating in a struggle or who has been in a
11   struggle is at higher risk of death from positional
12   asphyxia when in the prone position; true?
13     MR. PREGON: Objection.
14     Go ahead. If you know.
15     A   I'm going to say I don't know. Because in my
16   mind, there's a lot of mitigating factors.
17   BY MR. DICELLO:
18   Q   Got it.
19     Do you know whether or not the sign of -- signs
20   are things you can actually see, symptoms are things that
21   people report to you, so kind of the difference between
22   signs and symptoms. But the sign of foam or mucus coming
23   from the nose or mouth, were you trained or have your
24   officers been -- Let's start with you. Were you trained

Page 65

1  that that is a sign that can be indicative of positional

2  asphyxia?

3    A  I don't recall.

4    Q  Any sign that someone is having trouble

5  breathing while in the prone position is a sign that

6  raises the risk of death by positional asphyxia; true?

7    A  If they're in the prone position and they're

8  having difficulty breathing?

9    Q  Yes.

10    A  I would say yes.

11    Q  Verbal complaints by the detainee who is being

12  restrained that he or she can't breathe or is having

13  trouble breathing is a sign that raises the risk of

14  positional asphyxia; true?

15    A  That's not -- I know it should seem like an

16  easy question to answer. But we hear people scream all

17  the time "I can't breathe." And most of those people are

18  intoxicated and at times they're on their side when

19  they're yelling it. So you're asking me if somebody is

20  laying on their stomach?

21    Q  Yes.

22    A  Can you lay out the circumstances for me?

23    Q  Somebody who is being restrained in a prone

24  position who verbally complains that he or she can't

Page 66

---

1  breathe is another sign that raises the risk that that

2  person could die from positional asphyxia; true?

3    A  I don't know that I'm qualified to make that

4  connection.

5    Q  Have you reviewed any literature that warns

6  against the dangers of positional asphyxia?

7    A  Yes.

8    Q  What literature have you reviewed?

9    A  I went online.

10    Q  When did you do that?

11    A  This was six, seven years ago.

12    Q  Okay.

13    A  I mean, this is something where I was just --

14  it was brought up if I went to a jail conference,

15  positional asphyxia is mentioned, depending on what I take

16  from the conference, because some provide more information

17  than others, I went to -- I would go to a website and try

18  to learn some more on my own.

19    Q  Did you download any of that material and start

20  --

21    A  No, sir.

22    Q  Let me finish my question.

23    A  I apologize.

24    Q  Did you download any of that information that

Page 67

---

1  you looked up on positional asphyxia and put it anywhere

2  in the jail for other people to review?

3    A  I don't believe I did, sir, no.

4    Q  Do you know if any of the correctional officers

5  who were on scene on May 19th, 2012 were given literature

6  about positional asphyxia through the Montgomery County

7  Sheriff's Office?

8    A  Literature or training?

9    Q  Literature.

10    A  I don't know.

11    MR. PREGON: Do you know what he means by

12  "literature"?

13    THE WITNESS: Well, yeah, something that's not

14  -- I'm interpreting something outside of our normal

15  training curriculum.

16  BY MR. DICELLO:

17    Q  Yeah, something that's written down. Are you

18  aware of any written training materials or literature,

19  pamphlets, instructions, memos, anything that have been

20  given to your officers that warn against the risks of

21  positional asphyxia?

22    A  I'm sure there has been. But to tell you

23  definitively that I know where it is or that I have it, I

24  don't.

Page 68

---

1    Q  Because I've -- I've asked for all of that

2  documentation.

3    A  Yes, sir.

4    Q  And, you know, I've got binders and binders and

5  I think I've been pretty good about looking at all the

6  stuff. Jamey might point something out and say you missed

7  a paper here or there, and I'm happy to let him do that

8  for me. But I haven't seen any written memos, pamphlets,

9  paper, training keys that warn against the risks of

10  positional asphyxia. So as you sit here today, are you

11  aware of any?

12    A  No, not personally.

13    Q  All right.

14    A  It was something that was talked about, because

15  I seem to recall national cases that made the national

16  news. But again, I couldn't tell you specifically where

17  or what the circumstances were. And positional asphyxia

18  is something that would normally be covered in defensive

19  tactics in our training, because that's where we cover

20  handcuffing and different things like that.

21    Q  Based on your investigation, and we're going to

22  get into that, which you did to create this memo that you

23  sent to Major Wilson, some of the things that you knew

24  after reviewing the statements and looking at the video

Page 69

18 (Pages 66 to 69)

1    and the other steps you took to inform yourself about what
2    happened, some of the things that you knew is that
3    Mr. Richardson was unarmed during this incident; correct?
4        A    Yeah, I don't recall any mention of any type of
5    weapon, no, sir.
6        Q    Mr. Richardson was handcuffed throughout the
7    majority of the incident; correct?
8        A    He was handcuffed eventually, yes, sir.
9        Q    And Mr. Richardson was handcuffed with his
10   hands cuffed behind his back; true?
11       A    With two sets of handcuffs, yes, sir.  And I
12   believe they even switched from handcuffs to restraints.
13       Q    Leg shackles?
14       A    Yes, the leg shackles, to allow for more
15   freedom of movement while they were doing their
16   assessment.
17       Q    You understood the nature of the call, as you
18   told us today, was not a disturbance, but instead was
19   because Mr. Richardson was having a medical episode;
20   correct?
21       A    Yes.
22       Q    You understood that Mr. Richardson was obese?
23       A    I knew he was once I went up to the housing
24   unit.  I did not know Mr. Richardson until that day until

Page 70

---

1    this incident occurred.
2        Q    I understand.
3            Based on your review of the circumstances, you
4    understood Mr. Richardson was obese on May 19th, 2012;
5    true?
6        A    Yes.
7        Q    Based on your investigation, did you learn that
8    Mr. Richardson was trying to get up off the ground?
9        A    On review of the reports, yes, sir.
10       Q    Based on your review of the information, did
11   you understand that Mr. Richardson was asking to be let
12   up?
13       A    Yes, sir.
14       Q    Based on your review of the statements, do you
15   understand that some eyewitnesses report Mr. Richardson
16   announcing that he couldn't breathe?
17            MR. PREGON:  Object to form.
18            Go ahead.
19       A    Can you say that one more time?
20   BY MR. DICELLO:
21       Q    I take it you reviewed, because you attached it
22   to your memo, but I take it you reviewed the statements by
23   the eyewitnesses to the death; correct?
24       A    Yeah, I read --

Page 71

---

1            MR. PREGON:  Object to form.
2            Go ahead.
3        A    I read the reports.
4    BY MR. DICELLO:
5        Q    Okay.  Did you review eyewitness accounts
6    whereby some eyewitnesses, the detainees primarily,
7    reported and accounted that Mr. Richardson was saying he
8    couldn't breathe?
9            MR. PREGON:  Object to form.
10           Go ahead.
11       A    I don't recall reading the contents of all the
12   statements.  I don't recall word for word everything that
13   was in the reports.  I'm sorry.
14   BY MR. DICELLO:
15       Q    All right.  Based on your review of the
16   circumstances, did you understand that Mr. Richardson was
17   disoriented during this encounter?
18       A    Yes.
19       Q    Based on your review of the circumstances, did
20   you understand that Mr. Richardson was in need of medical
21   attention?
22           MR. PREGON:  Objection.
23           Go ahead.
24       A    I was -- Based on my review, did I know he

Page 72

---

1    needed medical attention?
2    BY MR. DICELLO:
3        Q    Yes.
4        A    I knew it was an unknown medical emergency.
5    But I would have -- based on my review?
6        Q    Yeah.
7        A    It appeared that there were some mental or some
8    medical problems, yes.
9        Q    That needed attention; correct?
10       A    If we could determine what the problem was.
11   That was the -- That's really the crux of the whole issue.
12       Q    Based on your review of the circumstances
13   surrounding Mr. Richardson's death, you knew that at the
14   time officers encountered him he was bleeding from the
15   mouth; correct?
16       A    I read that in one of the supplementals.
17       Q    Based on your review of the circumstances
18   surrounding Mr. Richardson's death, you understand that
19   Mr. Richardson was on the ground when the officers first
20   encountered him; correct?
21       A    I know he was in the cell and I know that two
22   officers brought him out to the hall, the area immediately
23   outside the cell.  I can't remember specifically what
24   position he was in in his cell.  All I know is that the

Page 73

19 (Pages 70 to 73)

1    cell -- his celly, I can't even remember the guy's name.

2    **Q  Maxwell?**

3    A  He said that, as I recall, I think Richardson

4    went up to the sink and then fell.

5    **Q  Okay.**

6    A  And that's -- Now, based off of that, then,

7    okay, maybe he was on the ground. But to tell you that he

8    didn't try to get back up or I know that based on the

9    statements that I reviewed in the reports that it was his

10   desire to get back up, but he was also -- he was confused

11   based on the officers' reports that I reviewed.

12   **Q  Okay.**

13   A  He was disoriented. And that would lead us to

14   be concerned whether or not he's making the right

15   decisions for himself. So that's where the officers are

16   going to try and assess and try to figure out what the

17   best course of action might be.

18   **Q  Captain, all of the corrections officers and**

19   **sergeants that I have had the opportunity to depose**

20   **testified from the chair you're sitting in at some point**

21   **during this case that Mr. Richardson didn't violate any**

22   **jail rules on May 19th, 2012. Based on your review, would**

23   **you agree?**

24   A  I would agree.

Page 74

---

1    **Q  And they also testified that based on their**

2    **observations that Mr. Richardson didn't commit any crime**

3    **against anyone on May 19th, 2012.**

4    A  I agree.

5    **Q  Based on your review of the circumstances,**

6    **Mr. Richardson never hurt anyone, did he?**

7    A  I agree.

8    **Q  Based on your review of the circumstances,**

9    **Mr. Richardson never tried to hurt anybody; true?**

10   MR. PREGON:  Object to form.

11   A  I can't testify to what Richardson's intent

12   was. Based on my review of the reports, he was having

13   trouble following direction. I recall reading and

14   reviewing reports where his arms are moving and he's

15   moving his body back and forth, he's not listening to the

16   officers' directions. I can't -- I can't tell you what

17   Mr. Richardson's intent was.

18   BY MR. DICELLO:

19   **Q  Fair enough.**

20   **Folks have told me that in terms of**

21   **classification the D Pod houses detainees who are deemed**

22   **by the Montgomery County Sheriff's Office to be at low**

23   **risk of violence. Is that true?**

24   A  Lower risk, yes, sir.

Page 75

---

1    **Q  When you were performing your investigation,**

2    **did you look into Mr. Richardson's criminal history at**

3    **all?**

4    A  I don't recall.

5    **Q  Do you know if Mr. Richardson has any violent**

6    **criminal history?**

7    A  I have no firsthand knowledge of that. It may

8    be in his records. But it's not something that I made a

9    point of --

10   **Q  Based on your understanding of the risk factors**

11   **of positional asphyxia and based on your understanding of**

12   **the circumstances surrounding Mr. Richardson's death and**

13   **Mr. Richardson's characteristics, do you agree that**

14   **Mr. Richardson was at high risk of death from positional**

15   **asphyxiation if restrained in the prone position?**

16   MR. PREGON:  Objection.

17   Go ahead.

18   A  I'm not a medical person and I can't give you a

19   medical opinion.

20   BY MR. DICELLO:

21   **Q  I'm looking for a corrections opinion.**

22   A  Based on my observations, I would say no.

23   MR. PREGON:  Do you need a restroom break with

24   all the water you've been drinking?

Page 76

---

1    THE WITNESS:  Getting there.

2    MR. PREGON:  Just let me know.

3    MR. DICELLO:  Let me know and we can take a

4    break.

5    BY MR. DICELLO:

6    **Q  Did you interview anybody from medical prior to**

7    **completing your memo, if you remember?**

8    A  I don't recall. But it is common if we have

9    someone pass in custody, if someone dies in custody, we do

10   a mortality and morbidity review. We do a review with the

11   medical staff, the mental health staff. And the jail

12   administration will want to review the incident to see if

13   there's anything that we can do better.

14   **Q  Did you participate in the mortality and**

15   **morbidity review for Mr. Richardson?**

16   A  I didn't review the memo, sir, I can't tell

17   you. I would say yes, as a matter of practice, we do.

18   **Q  So as a matter of practice, is that a**

19   **responsibility that falls onto you, Captain, or is that**

20   **somebody else who would participate in that mortality and**

21   **morbidity review meeting?**

22   A  The mortality and morbidity review meeting is

23   guided by the jail physician and the health services

24   administrator.

Page 77

**Page 78**

1　Q　But does somebody from corrections participate?

2　A　Yes, sir.

3　Q　And who is that person?

4　A　That would be typically me and quite possibly

5　the jail administrator, also.

6　Q　And are minutes of that meeting made?

7　A　Medical should have minutes of that, yes, sir.

8　Q　Have you seen those minutes of that meeting for

9　Mr. Richardson?

10　A　I have no independent recollection.  I'll have

11　to go back.  I didn't anticipate that question, so --

12　Q　Based on your experience at the jail and the

13　customs and habits and practices in the event of an

14　in-custody death, is it your expectation that, first, that

15　meeting occurred?

16　A　Yes.

17　Q　And is it your expectation that there were

18　meeting minutes of that meeting?

19　A　Yes, sir.  And those would be generated by the

20　medical section.

21　Q　If you wanted to review those meeting minutes,

22　who would you ask for?  Who would you go to?

23　A　I would have to talk to NaphCare.

24　Q　Who at NaphCare would you ask?

**Page 79**

1　A　Right now it's Tony Jones.  He's the health

2　services administrator.

3　Q　All right.

4　(Exhibit No. 10 marked for identification.)

5　BY MR. DICELLO:

6　Q　Captain, I'm handing you what's been marked for

7　purposes of your deposition as Plaintiff's Exhibit 10.  Do

8　you recognize this as the in-custody death memorandum that

9　you authored and sent to Major Daryl Wilson regarding

10　Mr. Richardson?

11　A　Yes, sir.

12　Q　It looks like this was completed on May 23rd,

13　2012; correct?

14　A　I would say yes, sir.

15　Q　And is that your signature at page two?

16　A　Yes, sir.

17　Q　Is this a document that is maintained in the

18　ordinary course of business at the Montgomery County Jail?

19　A　In the ordinary course of business?

20　Q　Yeah.

21　A　I have it on my computer.  Sure.

22　Q　So when there's an in-custody death, is this

23　something that you routinely do, type up a memo like this

24　and send it to the major?

**Page 80**

1　A　This is the last one I did because it kind of

2　duplicates the effort of the risk management review.

3　Q　What I'm trying to get at, a memo like this

4　that you did on your computer at work and sent to Major

5　Daryl Wilson, this a business record that is kept in the

6　ordinary course of business at the jail?

7　A　I would send it to the major.  What the major

8　did with it, I can't respond to.  What I'm saying when I

9　say I have it on my computer, if I created it, I can

10　probably go back and get it.

11　Q　On page two under your conclusion, you say, "I

12　have completed my preliminary review of this incident".

13　A　Yes, sir.

14　Q　Did you perform a second review?

15　A　No, sir, because I'm not the risk management

16　review, who is the official review of the office.  The

17　Inspectional Services Unit conducts that.  This was more

18　informational.  This was a summary for the major.

19　Q　Okay.  And that's why you're calling it a

20　preliminary review?

21　A　Yes, sir.

22　Q　So I shouldn't interpret this as this is your

23　preliminary review --

24　A　And then I go back and do a secondary?  No,

**Page 81**

1　sir.

2　Q　Right.

3　A　This was a summary -- As this incident occurs,

4　and you've had an opportunity to see at least the

5　paperwork directly related to this incident, I would be the

6　one to make sure that we have all that paperwork, it's all

7　put together.  At the time, I was putting a cover memo on

8　so the major can do this, and he can dissect the report

9　however he saw fit.  I don't know what he --

10　Q　Okay.  There's a reference to Investigator

11　Fannin?

12　A　Yes, sir.

13　Q　Have you worked with Investigator Fannin in the

14　past?

15　A　Coroner's Investigator Fannin I believe used to

16　work for the Butler Township Police Department here in

17　Montgomery County years ago.

18　Q　The reason I'm following up is because

19　Dr. Casto, the coroner, testified and indicated that

20　Investigator Fannin was a former Montgomery County

21　Sheriff's Office employee.  Is that your understanding?

22　A　Many years ago I was told that he was.  But

23　that was before I hired on.

24　Q　Okay.

1    A   I know him from his time working, he was on

2  midnights in Butler Township when I knew him before.

3    Q   Do you know what position he held back when he

4  worked for MCSO?

5    A   No.  Our relationship, if there was any at all,

6  we're familiar with each other, but it's professional.

7    Q   Do you remember when Investigator Fannin called

8  Mr. Richardson's family from your office?

9    A   I recall letting him use my phone, yes.

10   Q   Were you there when he had the conversation?

11   A   I was in the office, I was letting him do

12  his business, because I had other administrative matters

13  related to the incident that I was working on.

14   Q   Now, you do put together a timeline in this

15  memo; correct?

16   A   Yes, sir.

17   Q   And the timeline is based on your review of the

18  video and the narrative statements on the Tiburon; true?

19   A   Yes, sir.  It's the best that I can assemble

20  for a review like this, yes, sir.

21   Q   And with all -- to be fair, this is within four

22  days of this happening; correct?

23   A   Yes, sir.

24   Q   So you didn't have access to anything from the

Page 82

1  coroner at this point; correct?

2    A   Oh, no, sir.  No.  As a matter of fact, at this

3  point it would be exceptional -- I mean, there's

4  paperwork, because we did call Dayton Fire in.  We collect

5  their run sheets.  We collect all available records to

6  include with the report, because this goes not only to our

7  ISU but to our detectives for follow-up.

8    Q   According to your timeline, which I presume a

9  lot of your timeline you're using the video to put

10  together; correct?

11   A   Yes, sir.  Because for the majority of this

12  time, if I got a call at home, I would have no -- some of

13  this I wasn't here for.

14   Q   Right.  According to your timeline, from the

15  time that Inmate Richardson was removed from his cell to

16  the time it took to get him handcuffed was about --

17   A   About 16 seconds.

18   Q   Yeah.  About 16 seconds more or less; true?

19   A   Okay.

20   Q   Yes?

21   A   Yes, sir, that's what I have written here.

22   Q   And the time from when medical was first on

23  scene to the point where the first shot was attempted is

24  about 14 minutes; is that fair based on your timeline?

Page 83

1    A   From what to what, sir?

2    Q   The time that medical staff was in the pod to

3  the time that medical tried to make the first injection of

4  Ativan was about 14 minutes; is that fair?

5    A   Based on what's written here, yes, sir.

6    Q   Okay.

7    A   I'm assuming the shot was Ativan.

8    Q   Yeah.  Yes, it was.

9        And from the time that Mr. Richardson's

10  handcuffs were applied to the time he was rolled on his

11  back is about 22 minutes; fair?

12   A   Let's do that one more time, please.

13   Q   Yeah.  From the time where the handcuffs were

14  applied to Mr. Richardson --

15   A   Yes, sir.

16   Q   -- to the time Mr. Richardson was rolled onto

17  his back, according to your timeline, is about 22 minutes;

18  fair?  15:18:54 to 15:41:11?

19   A   18 to 41?  That stands to reason.

20   Q   I didn't notice in your memo any reference to

21  Mr. Richardson's medical history or medical condition.  Is

22  that fair?

23   A   No, sir.  I wouldn't include anything like that

24  because I'm not a medical person.

Page 84

1    Q   Okay.  So I thought you told me that you would

2  interview medical staff in connection with your

3  investigation.

4    A   No, sir.

5    Q   No?  You wouldn't?

6    A   No.  I rely on the health service administrator

7  to do a review of his section's performance.

8    Q   And the health services administrator would be

9  more familiar with the medical diagnosis of positional

10  asphyxia than you would; correct?

11   A   The medical?  As it pertains to this incident,

12  sir?

13   Q   Well, as it pertains to positional asphyxia as

14  a medical diagnosis.  An HSA would be more familiar with

15  that diagnosis?

16   A   He would probably be able to speak to it more

17  than I would, yes, sir.

18   Q   The incident report from the health services

19  administrator indicates that prior to the injection

20  Mr. Richardson was being restrained in a prone position by

21  several corrections officers.  Were you aware of that?

22   A   I'll take your word for it, sir.  If you had a

23  document I could look at.

24   Q   Do you disagree with that description, of that

Page 85

22  (Pages 82 to 85)

1    account of the events?

2         A    I don't agree or disagree.  The incident was

3    three years ago.  For clarity and to give you the best

4    response, I mean, the health services administrator

5    typically does a thorough job.

6         Q    So showing you the incident report that is

7    Plaintiff's Exhibit 8.

8         A    Yes, sir.

9         Q    This is the incident report from NaphCare from

10   the health services administrator.  Do you see that?  HSA?

11        A    And that is Karina Carlisle.

12        Q    Yep.

13        A    Yes.

14        Q    And she indicates -- Sorry, I have to read it.

15   Her writing is difficult.

16        Q    "Prior to injection, patient was being held

17   down in a prone position by several correctional

18   officers."  Is that what she reported?

19        A    That's what she wrote in her report, yes, sir.

20        Q    And do you think she did the same thorough job

21   that you expect her to do?

22        A    I expect her to be thorough.

23        Q    And so do you agree with her statement?

24             MR. PREGON:  Objection.

1         Go ahead.

2         A    Well, sir, I'm not trying to be difficult, but

3    this goes back to what we were talking about before, when

4    the officers were around him.

5    BY MR. DICELLO:

6         Q    I'm just asking if you agree with her statement

7    that I just read to you.

8         A    No, sir, I don't.

9         Q    Did you bring that to her attention at the

10   mortality and morbidity review meeting?

11        A    I don't recall, sir.

12             MR. PREGON:  How about a quick restroom break?

13             MR. DICELLO:  Yep.  And I'll look at my notes.

14   I'm very close, Captain.

15             THE WITNESS:  Okay.

16             MR. DICELLO:  And I'll try to finish up as soon

17   as you get back, okay?

18             THE WITNESS:  Thank you.

19             (Discussion held off the record.)

20   BY MR. DICELLO:

21        Q    So within four days of Mr. Richardson's death,

22   you had concluded that there were no violations of office

23   policy; true?

24        A    I put that I did not find any violations of

1    office policy, yes, sir.

2         Q    And that was under your section entitled

3    "Conclusion"; true?

4         A    Yeah, I did title that "Conclusion," yes, sir.

5         Q    And so this memo is reporting that conclusion,

6    along with the other information in the memo, to Major

7    Daryl Wilson on May 23rd, 2012; correct?

8         A    Yes, sir.

9         Q    Now, at any time between May 19th, 2012 --

10   First of all, I should ask you.  Did you work on Sunday,

11   May 20th, 2012?

12        A    No, sir.

13        Q    All right.

14        A    I can't say that definitively.  But based on

15   the circumstances here, this would not be any reason that

16   I would come into the office for, not on the 20th.

17        Q    All right.  So fair to say that your

18   investigation primarily took place on the 21st an 22nd and

19   23rd?

20             MR. PREGON:  His review you're talking about?

21             MR. DICELLO:  Yes.

22        A    My review, yes, sir.

23   BY MR. PREGON:

24        Q    All right.  So --

1         A    One of these incidents like this, it would be

2    my primary focus.

3         Q    So for the three to four days that you spent

4    reviewing this to create this memorandum and come to the

5    conclusion we talked about, during that time, Captain, did

6    you review the use of restraint policy?

7         A    I don't believe I pulled out the policy

8    specifically to look at it, no.

9         Q    Why not?

10        A    If I feel a comfort level with my knowledge of

11   the policies, if there's anything questionable, then I

12   pull the policy out.  If I don't have a question, I mean,

13   I've -- I'm fairly knowledgeable.

14        Q    Because we did go through the policy today and

15   as written it does indicate that placing prisoners who are

16   in restraints in a prone position is not acceptable and is

17   prohibited.  We went through that; correct?

18        A    We had discussion on that, yes, sir.

19        Q    Yeah.  And so you didn't review that policy

20   before coming to your conclusion that there was no

21   violation of that policy; true?

22        A    I cannot tell you definitively yes or no.  But

23   as I review things, if it's something where I become --

24   maybe I feel it's necessary I should go back and refresh

Page 90

1 myself, I do that almost daily. But to tell you
2 definitively yes or no sitting here today, I can't do
3 that.
4     Q   Based on our review of the policy that we
5 looked at today, as written, did the officers violate it?
6     A   Sir, I don't believe they did.
7     Q   But I think you did admit that they did put
8 Mr. Richardson in a prone position for some unknown period
9 of time; true?
10     MR. PREGON:  Objection.
11     Go ahead.
12 BY MR. PREGON:
13     Q   Well, let me deal with the objection. Isn't
14 that what you said? You said at times he was in a prone
15 position with his hands behind his back, and you couldn't
16 tell me how long that period was because you didn't total
17 it up on the video. Isn't that what you said?
18     A   Yeah, I said I didn't break down the exact
19 amount of times. But as I recall my response to you, I
20 said that the officers, in order to get him secured so he
21 could be more safely assessed by medical, they did. He
22 was already on the ground when they brought him out of the
23 cell. And they did apply the restraints. And then I
24 believe I even went so far as to say that you can see our

Page 91

1 officers moving him to his side.
2     Q   Right. But my question is: You did
3 acknowledge that there was some period of time where
4 Mr. Richardson was restrained by officers in a prone
5 position with his hands behind his back; correct?
6     MR. PREGON:  Objection.
7     Go ahead.
8     A   I'm listening to your question and I want to
9 give you the best answer I can. And we keep going over
10 this question. They applied the handcuffs to get him
11 secured so that he could be assessed. He was in a prone
12 position on the floor.
13 BY MR. PREGON:
14     Q   He was.
15     A   And he was moved from that position at the
16 earliest possible opportunity.
17     Q   22:22, Mr. Richardson is in a prone position;
18 true?
19     MR. PREGON:  Objection.
20     Go ahead.
21     A   22:22? Is that how far into the video you are?
22 BY MR. DICELLO:
23     Q   Yeah. I'm just using this as a time stamp. I
24 apologize. 22:22 is the time stamp right now on the video

Page 92

1 in the format that I have it here.
2     A   Can I bring it a little closer?
3     Q   Yeah. We can turn out the lights, too.
4     A   Sir, I can see it. I just needed to maneuver.
5     Q   Let me turn the lights out, because it does
6 really help. 22:22 --
7     A   Yes, sir.
8     Q   -- Mr. Richardson is in a prone position;
9 correct?
10     A   I would say yes.
11     Q   He's being restrained in that position; true?
12     A   Restrained? How so?
13     Q   His hands are cuffed behind his back. That's a
14 form of restraint, isn't it?
15     A   He is in handcuffs, yes, sir.
16     Q   So at 22:22 --
17     A   Handcuffs or the leg shackles, I don't know
18 which.
19     Q   Fair.
20         So at 22:22, Mr. Richardson is restrained in a
21 prone position; true?
22     A   By the time on the video, yes, sir.
23     Q   And any time that Mr. Richardson's position
24 looks like it does in the frame 22:22, Mr. Richardson

Page 93

1 would be restrained in a prone position; agreed?
2     MR. PREGON:  Objection.
3     A   Any time he's viewed in a prone position --
4 BY MR. DICELLO:
5     Q   No, no. Let me restate it.
6         You just admitted that at 22:22, that position
7 that Mr. Richardson is in right there is being restrained
8 in a prone position. My question for you now is: Instead
9 of me trying to go through frame by frame by frame, any
10 time Mr. Richardson is depicted on this video where he is
11 in the position that he is in at 22:22, he would be
12 restrained in a prone position; correct?
13     A   If he was in --
14     MR. PREGON:  Objection.
15     Go ahead.
16     A   If he was in that position, I would agree.
17 BY MR. DICELLO:
18     Q   So we agree that there are times on this video
19 where Mr. Richardson is being restrained in a prone
20 position with his hands cuffed behind his back by
21 corrections officers; true?
22     MR. PREGON:  Objection.
23     Go ahead.
24     A   Based on our discussion here, yes.

BY MR. DICELLO:

Q   That violates the policy; correct?

MR. PREGON:  Objection.

Go ahead.

A   The application of handcuffs in and of itself, sir, I don't believe is a use of force.

BY MR. DICELLO:

Q   Well, we're talking about the use of restraints policy.

A   Well, yes, sir.  But listening to what you said, I thought you said it was a violation.  I thought you mentioned use of force.

Q   I didn't.  So let me clarify that.

A   Okay.  Thank you.

Q   Maintaining Mr. Richardson in a prone position with his hands cuffed behind his back as we've just indicated he is, at least at 22:22, violates the written policy on the use of restraints; true?

MR. PREGON:  Objection.

Go ahead.

A   Can you read the policy to me one more time?

BY MR. DICELLO:

Q   Yeah.  The policy reads, when it talks about use of restraints, it says, "When applying handcuffs,

Page 94

staff members must never tie handcuffs to leg or ankle restraints."  That's not at issue.  Hog-tying prisoners, that's not what happened either.  It says, "Placing prisoners who are in restraints in prone or spread eagle positions are never acceptable practices and are prohibited."  So my question now is -- Mr. Richardson, you've admitted, is being restrained in a prone position with his hands cuffed behind his back at 22:22.  And any time on this video where he's depicted to be in the same position that is depicted at 22:22, he would be restrained in a prone position with his hands cuffed behind his back.  The question is:  Does that position that he's being restrained in violate the use of restraints policy as written at the Montgomery County Jail?

MR. PREGON:  And objection.

Go ahead.

BY MR. DICELLO:

Q   It does, doesn't it, Captain?

MR. PREGON:  Objection.

Go ahead.

A   As you see them placed there, he is in restraints and he is in a prone position.  But in a fluid environment, does it violate the policy of the black and white?  It could.  But in the totality of the

Page 95

circumstances, I'm not talking about a one frame in a video.  So --

BY MR. DICELLO:

Q   Okay.  Well, the video goes on for 22 minutes before he dies, as we know; correct?

A   Based on what you've been telling me, yes, sir.

Q   And so are you telling us that because it's a fluid situation the officers were justified in putting Mr. Richardson at times in a prone position with his hands cuffed behind his back?

A   Well, in previous questions, sir, and also as he was placed in the restraints, he was not complying with what he was being directed to do.  Whether it was a medical issue, a mental issue, or what the issue may have been was beyond what my officers would normally be expected to know.  That's why there was a medical response.

Now, as he was placed in restraints, and we talked about this previously, it is common practice to put someone in restraints and then reposition them.  And in the video, it does show that.  Now, do I recall what everything -- I'm trying to be thorough, not difficult.

Q   It's also your job to enforce the policies as written, isn't it, Captain?

Page 96

A   Yes, sir, it is.

Q   And you didn't suggest to any of these corrections officers that they violated this policy; true?

A   I did not refer anybody for rule violations, no, sir.

Q   Today in this deposition, you did just say the position that he's in at 22:22 may violate the written policies; correct?

MR. PREGON:  Objection.

A   I did.

BY MR. DICELLO:

Q   Isn't that what you just said?

A   I can agree with that based on a very isolated one frame of the video.

Q   Let's watch the frames.  22:23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, that's just -- is he still in the prone position with hands cuffed behind his back?

A   Yes, sir.  If he's being assessed, they put him in handcuffs for security while he's being assessed.

Q   My question was:  Is he still in the prone position with his hands cuffed behind his back at 22:37?

A   Yes, sir.

Q   Do you see any medical staff assessing him?

Page 97

1    A   I'm not sure who this is, but it appears that
2  someone is lifting up on his left shoulder.
3    Q   Yeah.
4    A   And looking at his face.  Now, I can't tell you
5  specifically what they're doing, but they look like
6  they're looking for something.
7    Q   Well, let's go back to 15:52.  Is
8  Mr. Richardson restrained with his hands cuffed behind his
9  back in a prone position there?
10       MR. PREGON:  Objection.
11   A   It appears he is, yes.
12 BY MR. DICELLO:
13   Q   Okay.
14   A   With the nurse standing by.
15   Q   15:53, 54, 55, 15:56, 57, 58, 59, 60, 61.  Now
16 we're at 16:03, 4, 5.  Let's just stop at 16:06.  Is
17 Mr. Richardson still being restrained with his hands
18 cuffed behind his back in a prone position?
19       MR. PREGON:  Objection.
20   A   I can't see the restraints, but I can't see
21 anybody remove them, so I would say that he is in a prone
22 position and he has the leg shackles on.
23 BY MR. DICELLO:
24   Q   So he's still in the prone position there?

Page 98

1    A   I would agree.
2    Q   Keep going.  08, 9, 10, 11.  Still in the prone
3  position?
4    A   Yes, sir.
5    Q   Hands still cuffed behind his back?
6    A   Yes, sir.
7    Q   He's still being restrained?
8    A   Yes, sir.
9    Q   16:25, 26, 27.  Still being restrained in the
10 prone position with his hands cuffed behind his back?
11   A   He still has handcuffs on him and he's still in
12 the prone position, yes, sir.
13   Q   This violates the policy, doesn't it?
14       MR. PREGON:  Objection.
15   A   Policies can often be guidelines, sir.  And the
16 thing is they're looking out for his welfare, as I've
17 explained to you.  Is the policy written in the clearest
18 language?  You know --
19 BY MR. DICELLO:
20   Q   Seems pretty clear to me, Captain.
21       MR. PREGON:  Objection.  Move on strike.
22 BY MR. DICELLO:
23   Q   It uses the word "never," doesn't it?
24   A   Sorry?

Page 99

1    Q   It uses the word "never," doesn't it?
2    A   Yes, it does.
3    Q   And it uses the word "prohibited" and
4  "unacceptable," doesn't it?
5    A   Yes, sir.
6    Q   Are those clear terms?
7        MR. PREGON:  Objection.
8    A   Yes, sir.
9  BY MR. DICELLO:
10   Q   Is this prohibited or not prohibited in your
11 jail, what we're looking at at 16:33, sir?
12       MR. PREGON:  Objection.
13       Go ahead and answer.
14   A   As the policy is written in the book, that
15 appears to violate the policy.
16 BY MR. DICELLO:
17   Q   And for the time we've been watching, which
18 started before the 16-minute mark, just on this segment,
19 this about 30-second period, that whole time period
20 violates the policy, doesn't it?
21       MR. PREGON:  Objection.
22   A   He is in a prone position and I have not seen
23 the restraints removed, so I would say that he's still
24 restrained in the prone position.

Page 100

1  BY MR. DICELLO:
2    Q   In violation of the policy; correct?
3    A   As the policy is written, yes, sir.
4        MR. PREGON:  Objection.
5    Q   And as you understand the executive order that
6  was showed, the conduct that we're seeing, this
7  positioning of Mr. Richardson in the clips that I've been
8  showing you on this video, it violates the executive
9  order, too, as you understand it; correct?
10       MR. PREGON:  Objection.
11   A   No, sir, that's not what I spoke to.
12 BY MR. DICELLO:
13   Q   No?  Keep going here.
14   A   He appears to be on his side.
15   Q   Do you think Mr. Richardson is on his side
16 there?
17   A   If you go back a few frames.  I think you see
18 his body is being maneuvered.
19   Q   So we were at 16:44.  I'll go back to 16:22.
20 Let me just stop.  I mean at 16:22, you can see hands on
21 Mr. Richardson's back; correct?
22       MR. PREGON:  Objection.
23   A   Okay, I see hands on his back, but I don't see

Page 101

26  (Pages 98 to 101)

1 -- where is the -- are you saying that pressure is being
2 applied?
3 BY MR. DICELLO:
4 Q Do you know how much pressure is or isn't being
5 applied?
6 A By the positioning of the bodies, no.
7 Q And do you see that this is Officer Mayes here
8 in the front, he's about six-four, 275?
9 A He's a good sized guy, yes, sir.
10 Q And he's holding Mr. Richardson's head down,
11 isn't he?
12 MR. PREGON: Objection.
13 A Well, I see him positioned at the head. And it
14 looks -- Is that his left hand, sir?
15 BY MR. DICELLO:
16 Q Yeah.
17 A It appears he's controlling the head, yes.
18 Q So you told me you think you saw Mr. Richardson
19 get rolled up on his side somewhere. Let me know when to
20 freeze it.
21 A Somehow his body is moving. See how his body
22 is positioned here?
23 Q You think at 16:40 he's on his side?
24 MR. PREGON: I think he hit a little tiny bit

Page 102

1 Q It's not my intention, Captain, to go through
2 this entire 22-minute video. But based on just some of
3 the sections I've shown you, we can agree that
4 Mr. Richardson is being restrained with his hands cuffed
5 behind his back in a prone position for an extended period
6 of time; true?
7 MR. PREGON: Objection. Objection; form.
8 A For periods of time. I don't know what
9 "extended" means. But I would agree that he was cuffed
10 and in the prone position.
11 BY MR. DICELLO:
12 Q Okay. Now, we're at 17:19. Still in the prone
13 position with his hands cuffed behind his back?
14 A It appears, yes, sir.
15 Q 17:30. Still being held down on his belly?
16 A Still being held.
17 Q 17:40. Still in a prone position?
18 A Yes, sir.
19 Q 17:50. Still in a prone position?
20 A Yes, sir.
21 Q And that's how this video goes on and on like
22 this, doesn't it?
23 MR. PREGON: Objection.
24 BY MR. DICELLO:

Page 104

1 earlier, but I don't know how far. Because you didn't
2 stop it right away.
3 BY MR. DICELLO:
4 Q 16:37. Are you saying he's on his side?
5 A That's why I asked you to go back.
6 Q Yeah, I understand. And Mayes is still holding
7 his head down?
8 MR. PREGON: Objection.
9 A I mean, what's the position of the body?
10 BY MR. DICELLO:
11 Q Can you tell?
12 A That's what I'm trying to determine, sir.
13 Q Well --
14 A Is this his buttocks? If his head is here,
15 does it stand to reason that his buttocks is here? I'm
16 sorry, I didn't mean to touch your screen.
17 Q No, that's all right. I'm asking you. Do you
18 think he's in a prone position here or you just can't
19 tell?
20 A I do not think he's in a prone position at that
21 time.
22 Q All right. Now we're back at 16:45. He's back
23 in a prone position there, isn't he?
24 A It appears, yes, sir.

Page 103

1 Q 18 minutes. Still in a prone position? 18:05,
2 07, 08?
3 A The only thing, sir, I'm not completely sure of
4 is I can see that his head is being controlled, I'm just
5 not sure the rest of the body. It's not clear to me.
6 Q Were you aware that one officer was straddling
7 Mr. Richardson?
8 A Straddling?
9 Q Like a horse? Like you straddle a horse?
10 A I know there was one person controlling his
11 legs.
12 Q Do you know whether or not there was an officer
13 straddling Mr. Richardson's lower body?
14 A I don't recall seeing that. Lower body? His
15 legs? I'm asking for clarification.
16 Q And I think -- You know, I don't want to
17 misrepresent the record. I think the testimony will say
18 that there's some testimony saying that straddling over
19 the knees and thighs area and also some testimony saying
20 they were straddling his hip area.
21 A For controlling the legs, I would say, yes,
22 sir, to make sure he didn't kick.
23 Q Did he kick anybody?
24 A Not to my knowledge, sir.

Page 105

27 (Pages 102 to 105)

**Page 106**

1    Q   Captain, what was your last involvement with
2    this situation involving Mr. Richardson, if you remember?
3    We know that you did the memo.  You told us you were
4    working on this pretty exclusively for three days.  You
5    were called in on Saturday, and that's an occupational
6    hazard; right?
7    A   Oh, yeah.
8    Q   So do you remember what kind of your last
9    involvement was with this situation?  I know other people
10   were doing other things.  I want to try to figure out when
11   you stopped working on it.
12   A   When I presented this to the major.
13   Q   So as of May 23rd, 2012, you were no longer
14   kind of officially involved in this investigation; is that
15   fair?
16   A   Not actively.
17   Q   All right.
18   A   I mean, if I was called and asked to do
19   something, I don't recall.
20   Q   Sure.
21   A   If the major needed something or he wanted
22   something else, he would direct me to make sure that it
23   got done.  But I can't tell you that I have any
24   recollection of that.

**Page 107**

1    Q   Were you ever interviewed by any other
2    investigators, Clymer or Flanders?
3    A   No, sir.
4    Q   I think you answered this, make sure I get a
5    clear answer.  You never ordered any retraining for any of
6    the corrections officers that were involved in this
7    incident; correct?
8    A   No, sir.
9    Q   Because based on what you observed and based on
10   how you understand the customs and practices are at the
11   Montgomery County Jail, everything these corrections
12   officers did is consistent with the customs and practices
13   at the jail; true?
14   MR. PREGON:  Objection.
15   Go ahead.
16   A   I did not have any issues with what I observed
17   or what I reviewed.  And that's what I conveyed to the
18   major.
19   BY MR. DICELLO:
20   Q   And the reason you didn't have any issues with
21   what you reviewed is because the conduct on behalf of the
22   corrections officers as depicted in the video is
23   consistent with the acceptable customs and practices at
24   the jail; correct?

**Page 108**

1    MR. PREGON:  Objection.
2    A   Not just at the jail.
3    BY MR. DICELLO:
4    Q   I just want to limit it to the jail.
5    A   Well, but our practices, our policies and
6    different things, it's not all developed internally.  The
7    accreditations and the different things that I was talking
8    to you about, that influences how we develop our
9    practices.
10   Q   Are you familiar with the ODRC policies and
11   procedures?
12   A   No, sir.  Prison is a whole different beast.
13   Q   Do you think it's a whole different beast with
14   respect to restraining people?
15   A   Well, I don't know.  I've never worked for the
16   state prison.
17   Q   You've never worked in a prison?
18   A   No, sir.  County jail.
19   Q   Did you ever do anything to determine how
20   Mr. Richardson died?
21   A   To determine how he died?
22   Q   Yes.
23   A   No, sir.
24   Q   Do you know how he died?

**Page 109**

1    A   I recall a heart attack.
2    Q   Do you remember who told you that?  If it's a
3    lawyer, then say "I can't answer the question."
4    A   I'd have to say I can't answer the question.
5    Q   Dr. Casto testified earlier today that death by
6    positional asphyxia is still within his differential
7    diagnosis for Mr. Richardson.  Were you aware of that?
8    MR. PREGON:  Objection.
9    A   I have no idea what you just said.
10   BY MR. DICELLO:
11   Q   Welcome to the party.
12   A   When you're talking about differential
13   diagnoses, I'm like --
14   Q   You're right.
15   A   I went to school, but not that one.
16   MR. PREGON:  Hence my objection.
17   BY MR. DICELLO:
18   Q   Did you have any interest in determining
19   whether or not Mr. Richardson's death was brought about by
20   the manner in which your officers restrained him?
21   A   I would have found that out if there was -- if
22   there was a determination made.  Because of the way our
23   process is, we have checks and balances.  I know you've
24   put a lot of weight and you've asked me a lot of questions

1 about my memo. But I'm not the only person who takes a
2 look at this.
3     Q   Understood.
4     A   There's the jail administrator, our chief
5 deputy, our sheriff, our training staff. We take these
6 incidents, they're very unfortunate, we do feel bad that
7 it happened, and we take it very seriously and conduct a
8 very thorough investigation.
9     Q   Did you guys communicate those feelings to
10 Mr. Richardson's family?
11    A   I know that Major Wilson managed that. I was
12 not directly involved with the Richardson family.
13    Q   But wouldn't you be interested as somebody who
14 is responsible for training in discovering whether or not
15 the manner in which your corrections officers restrained
16 Mr. Richardson contributed to causing his death?
17    A   Oh, absolutely, I would want to know.
18    Q   The reason you would want to know that is
19 because you would want to evaluate what can we do to maybe
20 eliminate that risk of causing someone's death by the way
21 we restrain them; correct?
22    A   We review every incident like this.
23    Q   So when Dr. Casto testified that positional
24 asphyxia due to restraint was still within his

Page 110

1 differential diagnosis, and I'm not a medical person,
2 either, but my understanding means that is still within
3 the list of possibilities as to the reasons Mr. Richardson
4 died.
5     A   Sir, it's my understanding that positional --
6 what is it, positional --
7     Q   Positional asphyxiation.
8     A   Yeah, was not listed as a cause of death.
9 That's my understanding. So if it's within his realm, I
10 have no idea the coroner's responsibilities or his -- I'm
11 in no position to question that.
12    Q   As of today, over at the jail, if a member of
13 the community finds themselves in the same position that
14 Mr. Richardson found himself in, your corrections officers
15 are instructed to respond in the same way and do the same
16 thing, aren't they?
17    MR. PREGON: Objection.
18    Go ahead.
19    A   They're instructed to secure so that medical
20 can do an assessment.
21    BY MR. DICELLO:
22    Q   And they're instructed to restrain people in
23 the way that we saw on the video that we just watched?
24 They're still doing that over there, aren't they?

Page 111

1     A   Handcuff behind the back?
2     Q   Yeah.
3     A   We handcuff people behind the back almost
4 everyday.
5     Q   And your corrections officers are still holding
6 people in a prone position with their hands cuffed behind
7 their back on their bellies like they were in this video,
8 that's the still going on over at the jail; correct?
9     MR. PREGON: Objection.
10    A   I'm speculating, sir. I don't know what you're
11 referring to. Are you asking me -- I don't understand
12 what you're asking me.
13    BY MR. DICELLO:
14    Q   Here's what I understand. Did you review this?
15    A   Yes, sir.
16    Q   Nobody has received any retraining or been told
17 "You didn't follow policy." So these officers, I
18 understand, are walking around over at the jail and
19 saying, "If I have to restrain another guy like I did
20 Richardson, I'm going to do it in the same way"; correct?
21    MR. PREGON: Objection.
22    If you can answer what people are thinking.
23    A   That's why I'm asking you to rephrase. I can't
24 tell you what the other officers are thinking.

Page 112

1 BY MR. DICELLO:
2     Q   Well, you never told these officers, "Hey,
3 don't hold guys down the way you did Richardson." You've
4 never told them that; correct?
5     A   No, sir.
6     Q   In fact, what they've been told implicitly was
7 "what you guys did was correct and it's fine to do again";
8 correct?
9     MR. PREGON: Objection.
10    A   Are you saying by failing to take corrective
11 action?
12    BY MR. DICELLO:
13    Q   Yeah.
14    A   I didn't feel there was any corrective action
15 to be taken. And if they are going to treat someone the
16 way they treated Mr. Richardson, I did not have an issue
17 with what I saw.
18    Q   Sure.
19    A   So I would say the answer would be, if I saw
20 that today, the officers took due care and diligence.
21    Q   Right. That's what I'm trying to get at.
22    A   I would expect them to do it again.
23    Q   The officers, when presented with the same
24 circumstances on behalf of another member of the community

Page 113

1  like Mr. Richardson, you would expect the officers to do
2  the same thing they did to Mr. Richardson?
3      MR. PREGON:  Asked and answered.
4  BY MR. DICELLO:
5    **Q**  **Right?**
6    A  Yes.
7    **Q**  **Okay.  I appreciate your time, Captain.**
8    A  No problem.
9    **Q**  **Thank you.**
10   A  No problem at all.
11     MR. PREGON:  And we'll read.
12       - - -
13     (Signature not waived.)
14       - - -
15     And, thereupon, the deposition was concluded at
16 3:17 p.m.
17       - - -
18
19
20
21
22
23
24

**Page 114**

---

1  State of _____
2  County of _____
3      I, CHARLES CROSBY, do hereby certify that I have
4  read the foregoing transcript of my deposition given on
5  December 9, 2015; that together with the correction page
6  attached hereto noting changes in form or substance, if
7  any, it is true and correct.
8        _____
9        CHARLES CROSBY
10     I do hereby certify that the foregoing transcript
11 of the deposition of CHARLES CROSBY was submitted to the
12 witness for reading and signing: that after he had stated
13 to the undersigned Notary Public that he had read and
14 examined his deposition, he signed the same in my presence
15 on the _____ day of _____, 2015.
16       _____
17       Notary Public
18 My Commission Expires on _____
19       - - -
20
21
22
23
24

**Page 116**

---

1        December 28, 2015
2  Dear Mr. Crosby,
3      You have chosen to read and sign your transcript.
   Please do not mark on the transcript.  Any
4  corrections/changes you may desire to make in your
   testimony should be typewritten or printed on the errata
5  sheet at the end of testimony, giving the page number,
   line number and desired correction/change.  After you have
6  read the transcript, sign your name on the correction
   sheet and where indicated at the close of testimony before
7  a notary public.
8      The Rules of Civil Procedure allow thirty days for
   you to read and sign.  Please return the signature page
9  and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
   Dublin, Ohio 43017 within that time.  Failure to do so in
10 the allotted time will result in your transcript being
   used as though read and signed by you.
11
12       Sincerely,
         _____
13       Whitney Layne
         Professional Reporter
14
   Cc:
15 Nick DiCello
   Carrie Starts
16 Jamey Pregon
17
18
19
20
21
22
23
24

**Page 115**

Page 116

1   State of OHIO

2   County of Montgomery

3        I, CHARLES CROSBY, do hereby certify that I have

4   read the foregoing transcript of my deposition given on

5   December 9, 2015; that together with the correction page

6   attached hereto noting changes in form or substance, if

7   any, it is true and correct.

8

9                          CHARLES CROSBY

10       I do hereby certify that the foregoing transcript

11  of the deposition of CHARLES CROSBY was submitted to the

12  witness for reading and signing; that after he had stated

13  to the undersigned Notary Public that he had read and

14  examined his deposition, he signed the same in my presence

15  on the 21 day of January, 2016.

16

17                          Notary Public

18  My Commission Expires on 12-10-17

19                 - - -

20

21

22

23

24

Page 117

1    TO THE   REPORTER:

2    I have read the entire transcript of my deposition taken

3    on the _21_ day of _January_, 20_16_, or the same has been

4    read to me.  I request that the following changes be

5    entered upon the record for the reasons indicated.

6

7    Page    Line    Correction and reason therefore

8    _____ No CHANGES NEEDED_____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   Date_ _01/21/16_ Signature_ _____

24

Page 118

1                      CERTIFICATE

2    State of Ohio      :

3    County of Franklin:

4

5        I, Whitney Layne, Notary Public in and for the

6    State of Ohio, duly commissioned and qualified, certify

7    that the within named CHARLES CROSBY was by me duly sworn

8    to testify to the whole truth in the cause aforesaid; that

9    the testimony was taken down by me in stenotype in the

10   presence of said witness; afterwards transcribed upon a

11   computer; that the foregoing is a true and correct

12   transcript of the testimony given by said witness taken at

13   the time and place in the foregoing caption specified.

14

15       IN WITNESS WHEREOF, I have set my hand and

16   affixed my seal of office at Dublin, Ohio, on this 28th

17   day of Decemer, 2015.

18                            _____

19                            Whitney Layne, Notary Public

20                            In and for the State of Ohio

21   My Commission expires May 4, 2020

22

23

24

**A**

abdomen 64:15,18
abide 24:16
ability 31:24 60:18
  61:4
able 8:4 42:14 85:16
absolutely 7:21
  31:15 36:24 39:15
  46:6 57:16 110:17
ACA 15:14,17
Academy 15:13
  18:16
acceptable 44:7
  45:17 47:11,15
  48:14 49:12 51:3
  54:18 89:16 95:5
  107:23
access 82:24
accommodations
  49:8
accomplishes 58:23
account 86:1
accounted 72:7
accounts 72:5
accreditations 9:24
  108:7
accredited 10:2
accrediting 15:14
accustomed 15:9
achieve 40:14
acknowledge 91:3
Act 10:10
action 74:17 113:11
  113:14
actions 25:12 27:7
  62:21
actively 106:16
actual 11:18
additional 57:17
  61:1
address 20:21
adjustments 57:21
administration
  77:12
administrative
  10:16 43:16 82:12
administrator 1:4
  8:19 9:5,8,12
  13:10,11 14:21
  18:7 19:3 77:24
  78:5 79:2 85:6,8
  85:19 86:4,10
  110:4
administrator's
  60:5
admit 90:7
admitted 93:6 95:7
Adult 10:8 11:12
  13:3 14:22,23
  15:13 18:17 22:6

affixed 118:16
afield 51:21
aforesaid 118:8
afternoon 5:6
agencies 11:12 12:4
  14:3 18:15 20:15
agency 19:16,21
agenda 58:23
agents 24:7
ago 67:11 81:17,22
  86:3
agree 14:7 23:21
  32:20,24 34:13
  38:6,9 39:8 43:1
  44:8 46:5,23
  48:11 51:18 52:14
  52:18,22 53:21
  54:14,16 55:23
  56:20 57:1 58:10
  74:23,24 75:4,7
  76:13 86:2,23
  87:6 93:16,18
  97:13 99:1 104:3
  104:9
agreed 39:18 93:1
agrees 53:4
ahead 12:6,15 13:5
  14:6,12 15:1 16:2
  17:7 18:12 19:6
  19:15 20:1 24:18
  25:17 26:20 27:5
  30:10 32:10 37:17
  37:24 39:2 40:2
  40:20 42:10 43:4
  51:6 52:6 53:2,24
  54:11 57:4,12
  58:13 62:12 63:6
  63:14 65:14 71:18
  72:2,10,23 76:17
  87:1 90:11 91:7
  91:20 93:15,23
  94:4,20 95:16,20
  100:13 107:15
  111:18
air 61:22 62:3
al 1:8
allotted 115:10
allow 70:14 115:8
allowed 38:13 39:20
  58:19
alludes 21:19
amendments 13:13
American 10:1 59:6
  59:9 60:2
amount 90:19
Andrew 1:5
ankle 45:7 46:16
  95:1
announcing 71:16
annual 59:13
answer 6:3,14,18

7:9,18 8:1,4,11
  13:7 18:24 22:4
  31:9 35:12 43:9
  53:15 58:6,15,16
  58:20 65:3 66:16
  91:9 100:13 107:5
  109:3,4 112:22
  113:19
answered 16:5,13
  19:1 27:18,18
  32:15 43:13,21
  51:5,7 107:4
  114:3
answers 5:24 7:23
anticipate 78:11
anybody 75:9 77:6
  97:4 98:21 105:23
apologize 11:2,4
  25:16 49:4 67:23
  91:24
APPEARANCES
  2:1
appeared 33:8 73:7
appears 98:1,11
  100:15 101:15
  102:17 103:24
  104:14
applicable 1:14 3:6
application 40:21
  94:5
applied 13:2 47:5
  49:7 65:7 84:10
  84:14 91:10 102:2
  102:5
applies 20:12 47:24
  48:3
apply 38:7 90:23
applying 45:6 56:13
  94:24
appreciate 10:20
  18:24 36:10 58:15
  114:7
approval 10:23
approved 49:15
area 73:22 105:19
  105:20
argue 54:16
arguing 20:23 34:20
arms 75:14
arrangement 7:18
arrived 35:22
asked 7:13,16,19
  8:10 16:5 27:17
  32:15 43:21 47:9
  49:1 50:7,8 51:5
  56:1 69:1 103:5
  106:18 109:24
  114:3
asking 6:13 12:16
  12:19 13:19 16:20
  19:1 21:12 31:14

39:7 43:7 49:21
  50:1,20 53:4,14
  55:18 62:4,18
  63:7 66:19 71:11
  87:6 103:17
  105:15 112:11,12
  112:23
asphyxia 56:17
  60:14,16,21,23
  63:17,20,24 64:4
  64:12,17 65:12
  66:2,6,14 67:2,6
  67:15 68:1,6,21
  69:10,17 76:11
  85:10,13 109:6
  110:24
asphyxiation 65:1
  76:15 111:7
assemble 82:19
assess 30:5,18 31:22
  41:16 74:16
assessed 90:21
  91:11 97:19,20
assessing 97:24
assessment 29:11
  33:11 47:7 48:19
  70:16 111:20
assistant 8:19 9:2,5
  9:8,12 13:11
  14:21
associated 36:23
  60:20
ASSOCIATES 1:20
Association 10:1
  59:7,10 60:2
assume 7:19 14:14
  14:17 15:2 27:12
  50:14
assuming 14:19
  20:8,23 34:7
  50:16 53:13 84:7
Ativan 84:4,7
attached 71:21
  116:6
attack 109:1
attempted 83:23
attend 22:16
attention 56:4 72:21
  73:1,9 87:9
attesting 11:20
attorney 16:18
  17:10 21:14
audible 6:3
audit 59:10
auditor 59:9
authored 79:9
authority 57:19
automatically 61:21
autonomically
  61:21
available 83:5

Avenue 1:15 2:3,7
aware 12:12,19,22
  13:6,15 14:23
  18:10 19:4,13
  56:16 62:1,8,15
  62:17 63:18,20
  64:5 68:18 69:11
  85:21 105:6 109:7
awareness 19:18

**B**

back 8:8 11:3 17:16
  20:3 33:16,18
  34:4 35:1 42:21
  48:22 52:12 57:18
  61:1 70:10 74:8
  74:10 75:15 78:11
  80:10,24 82:3
  84:11,17 87:3,17
  89:24 90:15 91:5
  92:13 93:20 94:16
  95:8,11 96:10
  97:18,22 98:7,9
  98:18 99:5,10
  101:18,20,22,24
  103:5,22,22 104:5
  104:13 112:1,3,7
bad 110:6
balances 109:23
ban 16:1,9 21:15,21
banging 41:22
banned 21:18 55:19
  55:22
banning 2:12,13,21
bans 14:19 21:7
bars 25:19
based 19:2,21 25:22
  29:16 33:9,22
  35:13 47:2 48:8
  57:22 69:21 71:3
  71:7,10,14 72:15
  72:19,24 73:5,12
  73:17 74:6,8,11
  74:22 75:1,5,8,12
  76:10,11,22 78:12
  82:17 83:24 84:5
  88:14 90:4 93:24
  96:6 97:13 104:2
  107:9,9
Basically 26:5
basis 53:13
Bear 11:4
beast 108:12,13
beginning 43:5 50:6
behalf 2:5,9,13
  107:21 113:24
behavior 48:17
  61:10 63:2
believe 8:24 23:19
  32:11 33:2 60:4
  68:3 70:12 81:15

89:7 90:6,24 94:6
**bellies** 112:7
**belly** 64:3,7 104:15
**Benjamin** 41:3
**best** 9:18 28:24
29:13,17 55:2
74:17 82:19 86:3
91:9
**bestow** 11:19
**better** 38:3 77:13
**Beyoglides** 1:4
**beyond** 96:15
**big** 25:20 60:9 64:7
**binders** 69:4,4
**bit** 59:23 102:24
**black** 95:23
**bleeding** 73:14
**bodies** 15:14 32:11
102:6
**bodily** 24:7 31:13
31:14,15
**body** 15:9 24:6
27:15 30:14,18
31:3,13 33:8
42:15,18 52:21
53:19 61:20 63:3
75:15 101:19
102:21,21 103:9
105:5,13,14
**Boehringer** 2:15
**bold** 55:8
**book** 24:19 100:14
**break** 7:7,8,10
17:16 59:23 76:23
77:4 87:12 90:18
**breathe** 60:18 61:5
63:4 66:12,17
67:1 71:16 72:8
**breathing** 33:17
34:13 38:8 61:20
65:5,8 66:5,8,13
**Brenda** 2:15
**brief** 20:7
**briefly** 5:11
**bring** 87:9 92:2
**broad** 9:19
**brought** 56:4 67:14
73:22 90:22
109:19
**bureau** 10:8 11:11
11:12 13:3 15:13
18:17 22:5
**business** 79:18,19
80:5,6 82:12
**Butler** 81:16 82:2
**butt** 33:20
**buttocks** 103:14,15

—————————
C
**C-R-O-S-B-Y** 5:8
**calculate** 34:2,18,20

**call** 35:15 37:14
57:23 63:22 70:17
83:4,12
**called** 1:14 3:5 36:1
82:7 106:5,18
**calling** 80:19
**calm** 41:8
**captain** 5:7,9,10,19
7:9 8:8,15,18,22
9:16,17 11:4,24
13:10 16:3,16
17:16 23:4 35:3
37:11 38:5 43:20
48:3 49:18 51:15
59:3 74:18 77:19
79:6 87:14 89:5
95:18 96:24 99:20
104:1 106:1 114:7
**caption** 118:13
**care** 113:20
**careful** 29:9 30:15
**Carlisle** 86:11
**Carrie** 2:11 115:15
**case** 1:7 14:20 16:19
26:17 27:13 44:17
45:8 48:18 74:21
**cases** 69:15
**Casto** 81:19 109:5
110:23
**categorized** 64:10
**cause** 57:17 111:8
118:8
**causing** 110:16,20
**cavity** 61:4
**Cc** 115:14
**cell** 34:12 73:21,23
73:24 74:1 83:15
90:23
**celly** 74:1
**certain** 14:3,3 30:3
47:23 63:18,19
**CERTIFICATE**
118:1
**certification** 11:18
59:15,24
**certified** 5:3 9:24
10:7,9 11:23
14:22 59:2,4,5,15
60:1
**certifies** 11:13
**certify** 116:3,10
118:6
**chair** 57:19 74:20
**chance** 16:23 17:12
18:1 21:12,13
54:9
**change** 15:11 18:23
**changes** 15:10
116:6 117:4
**character** 3:8
**characteristics**

63:18 76:13
**Charles** 1:13 3:5
4:2 5:1,8 116:3,9
116:11 118:7
**checking** 57:20
**checks** 109:23
**chemical** 24:7
**chest** 61:4
**chief** 110:4
**choose** 57:2,10
58:11,21
**chosen** 115:3
**Cincinnati** 2:13
**circumstances**
20:11 38:11,15,18
38:23 39:21,23
43:1,11 57:16
66:22 69:17 71:3
72:16,19 73:12,17
75:5,8 76:12
88:15 96:1 113:24
**civil** 1:14 3:6 16:11
16:18 115:8
**clarification** 105:15
**clarify** 94:13
**clarity** 86:3
**classification** 75:21
**clear** 6:9,16 99:20
100:6 105:5 107:5
**clearest** 99:17
**Cleveland** 2:4
**clips** 101:8
**close** 37:5 87:14
115:6
**closer** 92:2
**clubs** 24:7
**Clymer** 107:2
**co-presentation**
59:12
**Code** 53:1
**collect** 83:4,5
**combativeness**
61:15 62:2
**come** 18:14,18
20:16 35:19,20
50:22 88:16 89:4
**comes** 14:13 19:8
21:11 22:5 57:20
**comfort** 89:10
**coming** 9:1 65:22
89:20
**Command** 60:8
**commander** 9:2
**Commission** 10:2,3
116:18 118:21
**commissioned**
118:6
**commit** 75:2
**committee** 20:16,20
20:22,24 21:2,4,5
21:20 55:16,18

56:5
**common** 42:17
48:21 77:8 96:19
**commonly** 60:23
**communicate** 110:9
**community** 44:6
47:10,18,19 48:12
49:3 57:9 111:13
113:24
**complains** 66:24
**complaints** 66:11
**completed** 32:18
36:15 37:8 60:7
79:12 80:12
**completely** 25:10
105:3
**completing** 77:7
**compliant** 9:22
10:12
**complied** 23:14
**comply** 18:20 19:10
19:10,17,22 20:10
39:9 61:15
**complying** 41:9
96:12
**component** 39:12
**comprised** 21:2
**compulsion** 24:5
**computer** 79:21
80:4,9 118:11
**concept** 36:20 51:10
51:14 61:19,22
**concern** 28:12,16
30:16
**concerned** 74:14
**concerning** 23:5
**concerns** 62:17
**concluded** 87:22
114:15
**conclusion** 39:1
80:11 88:3,4,5
89:5,20
**conclusions** 39:7
**concrete** 25:19
**condition** 42:7
61:16 84:21
**conditions** 61:11
**conduct** 101:7
107:21 110:7
**conducts** 80:17
**conference** 67:14,16
**conferences** 59:13
**confuse** 10:18 34:9
**confused** 27:6,20
49:1 74:10
**confusion** 49:4
**connection** 5:12,17
7:23 36:18 67:4
85:2
**connector** 45:20
**conscientious** 63:2

**considering** 20:10
**consistent** 107:12
107:23
**Constitution** 39:10
**constitutional** 39:14
**constrained** 25:23
26:1
**constraining** 27:13
**constraint** 24:5 25:6
26:4 27:15,24
31:2,12
**construction** 25:18
28:12
**contact** 24:8 31:13
31:14,15 41:3
**contents** 72:11
**contributed** 110:16
**control** 25:10 26:10
41:12,23 42:15
52:19 53:18
**controlled** 30:4
48:18,24 105:4
**controlling** 102:17
105:10,21
**conversation** 82:10
**conveyed** 107:17
**cooperating** 41:12
**Cooperstone** 1:21
115:9
**copy** 15:23 16:18,21
**coroner** 81:19 83:1
**coroner's** 81:15
111:10
**correct** 10:6 21:22
22:22 23:6,21
25:1 29:2,18 32:8
32:22 33:14,17,20
33:23 35:1 36:13
36:18 37:2,12,13
38:15,19 39:10,17
42:8,16,19 44:20
44:24 45:4,18,21
46:7,24 48:2 50:2
51:4 52:4 58:2
61:17 62:3 63:24
70:3,7,20 71:23
73:9,15,20 79:13
82:15,22 83:1,10
85:10 88:7 89:17
91:5 92:9 93:12
94:2 96:5 97:8
101:2,10,22 107:7
107:24 110:21
112:8,20 113:4,7
113:8 116:7
118:11
**correction** 20:13
22:2,7,19 23:2
24:12 39:19 55:20
115:6 116:5 117:7
**correction/change**

115:5
**correctional** 10:2,3
59:3 68:4 86:17
**corrections** 10:1
15:15 23:12,17
26:16 38:6,10,13
38:17,21,23 39:5
39:22,23 42:24
45:2 52:10 56:20
57:1,7,10 58:11
59:9 60:15 61:12
61:24 62:7 74:18
76:21 78:1 85:21
93:21 97:3 107:6
107:11,22 110:15
111:14 112:5
**corrections/chang...**
115:4
**corrective** 113:10
113:14
**counsel** 3:4 5:21
15:12 17:18 18:16
**county** 1:8 5:9 8:17
8:18,23 11:16,19
12:16 16:19 18:7
19:22 23:14 44:13
48:12 49:3 57:9
58:10 68:6 75:22
79:18 81:17,20
95:14 107:11
108:18 116:2
118:3
**couple** 27:18
**course** 60:5,7 74:17
79:18,19 80:6
**court** 1:1 5:13 6:19
7:3
**cover** 69:19 81:7
**covered** 69:18
**create** 69:22 89:4
**created** 80:9
**creating** 10:21
**crime** 75:2
**criminal** 76:2,6
**critical** 35:14
**Crosby** 1:13 3:5 4:2
5:1,8 115:2 116:3
116:9,11 118:7
**CROSS-EXAMI...**
5:4
**crux** 73:11
**cuffed** 34:3 51:16
51:17 52:12 70:10
92:13 93:20 94:16
95:8,11 96:10
97:17,22 98:8,18
99:5,10 104:4,9
104:13 112:6
**curriculum** 68:15
**custody** 35:15 77:9
77:9

**customs** 51:12
78:13 107:10,12
107:23

**D**

**D** 75:21
**daily** 90:1
**danger** 60:24
**dangerous** 52:3
61:11
**dangers** 56:16 67:6
**Daryl** 23:5 79:9
80:5 88:7
**date** 50:5,10,12
117:23
**day** 35:5,7 53:1
70:24 116:15
117:3 118:17
**day-to-day** 9:13
**days** 82:22 87:21
89:3 106:4 115:8
**Dayton** 1:16 2:8
83:4
**deal** 90:13
**dealing** 25:9 35:18
37:4
**Dear** 115:2
**death** 5:13 16:11,19
23:6 36:18 37:4
50:9,12 56:22
64:17 65:1,11
66:6 71:23 73:13
73:18 76:12,14
78:14 79:8,22
87:21 109:5,19
110:16,20 111:8
**deceased** 1:5 35:11
**December** 1:16 3:1
115:1 116:5
**Decemer** 118:17
**decide** 30:24
**decision** 15:8 18:13
**decisions** 74:15
**deemed** 75:21
**Defendants** 1:9 2:9
2:13
**defensive** 69:18
**define** 24:1,4 54:8
54:21
**defined** 24:23 31:11
53:17 54:10 55:11
**definition** 24:22
52:16,17,23 53:4
53:22 54:1,14,18
55:6
**definitively** 35:12
65:4 68:23 88:14
89:22 90:2
**Department** 8:17
20:13 22:1,7,18
23:2 24:11 55:19

81:16
**departments** 20:16
21:3
**depending** 40:4,21
46:17 67:15
**depicted** 93:10 95:9
95:10 107:22
**depose** 74:19
**deposed** 5:19
**deposes** 5:3
**deposition** 1:13 3:5
3:6 5:17,23 7:5
8:12 22:22 79:7
97:6 114:15 116:4
116:11,14 117:2
**deputy** 110:5
**described** 24:15
28:11 29:10 42:7
**description** 9:15,17
85:24
**desire** 74:10 115:4
**desired** 115:5
**desk** 50:22
**detained** 48:12 57:9
58:10
**detainee** 57:1 63:23
65:9 66:11
**detainees** 42:6 72:6
75:21
**detectives** 83:7
**detention** 10:8
11:12,16 13:3
14:23 15:13 18:17
22:6
**determination**
109:22
**determine** 23:11
73:10 103:12
108:19,21
**determined** 35:10
**determining** 109:18
**develop** 21:20 108:8
**developed** 18:18
55:17 108:6
**developing** 18:8
**development** 11:1
13:13
**developmental**
10:12
**diagnoses** 109:13
**diagnosis** 85:9,14
85:15 109:7 111:1
**DiCello** 2:2 4:4 5:5
5:10 11:9,10 12:8
12:18 13:1,8,20
14:8,16 15:4,20
15:22 16:7,15
17:6,13,15,24
18:21 19:11,20
20:5,18 21:9 22:8
23:24 24:13,14,21

25:5 26:23 27:11
27:20,22 28:5
29:5,22 30:19
31:7 32:13,19
33:3 34:16 37:18
38:4 39:4 40:5,23
42:12 43:8,14,18
43:23 44:5,11
45:24 48:10 49:17
49:21,24 50:19
51:9 52:9 53:3,7
53:16 54:3 57:6
58:7,14 62:14
63:9,16 65:17
68:16 71:20 72:4
72:14 73:2 75:18
76:20 77:3,5 79:5
87:5,13,16,20
88:21 91:22 93:4
93:17 94:1,7,22
95:17 96:3 97:11
98:12,23 99:19,22
100:9,16 101:1,5
101:13 102:3,15
103:3,10 104:11
104:24 107:19
108:3 109:10,17
111:21 112:13
113:1,12 114:4
115:15
**die** 67:2
**died** 108:20,21,24
111:4
**dies** 77:9 96:5
**difference** 40:11
65:21
**different** 9:17 16:16
27:7 32:3 46:1,4
46:12 62:20 69:20
108:6,7,12,13
**differential** 109:6
109:12 111:1
**difficult** 86:15 87:2
96:22
**difficulty** 66:8
**diligence** 113:20
**Dinkler** 1:15 2:7
**direct** 24:7 44:23
106:22
**directed** 14:2 36:15
96:13
**direction** 41:7 75:13
**directions** 75:16
**directive** 41:9
**directives** 14:2
15:11
**directly** 81:5 110:12
**director** 21:5
**disagree** 38:6 85:24
86:2
**disagreed** 47:12

**discovering** 110:14
**discuss** 8:21
**discussion** 41:2
87:19 89:18 93:24
**disease** 64:11
**disjunctive** 45:20
45:23
**disobedience** 61:17
**disoriented** 72:17
74:13
**dissect** 81:8
**DISTRICT** 1:1,1
**disturbance** 28:23
70:18
**DIVISION** 1:2
**document** 14:14
16:3,14,21 17:1,8
21:19 54:12 56:8
79:17 85:23
**documentation**
36:2 69:2
**documents** 14:10
**doing** 25:12 28:4
29:6,13 47:7
53:12 57:21 59:6
59:18 70:15 98:5
106:10 111:24
**door** 41:4
**download** 67:19,24
**Dr** 81:19 109:5
110:23
**drafted** 23:4
**drinking** 76:24
**Drive** 1:21 115:9
**Dublin** 1:21 115:9
118:16
**due** 110:24 113:20
**duly** 5:2 118:6,7
**duplicates** 80:2
**duration** 34:11
**dying** 63:19,23 64:4
64:12

**E**

**eagle** 45:16 47:15
95:4
**earlier** 48:7,8 56:1
103:1 109:5
**earliest** 91:16
**easy** 66:16
**effect** 50:9,12
**effort** 80:2
**efforts** 33:24
**either** 26:15 51:22
95:3 111:2
**either/or/and** 40:7
**elected** 14:13
**element** 22:6
**eliminate** 110:20
**Elimination** 10:10
**Ellis** 2:15

emergency 25:9
    28:23 41:17 73:4
employed 23:13
employee 81:21
encounter 72:17
encountered 40:17
    73:14,20
enforce 96:23
enjoying 35:7
ensure 9:19 31:24
entered 117:5
entire 104:2 117:2
entitled 15:24 88:2
environment 95:23
episode 70:19
errata 115:4,9
ESQUIRE 2:2,6,11
Establishing 16:1
Estate 1:5
et 1:8
evaluate 110:19
event 78:13
events 86:1
eventually 70:8
everyday 112:4
exacerbate 56:18
exact 90:18
exactly 13:9 35:2
EXAMINATION
    4:1
examined 116:14
examines 57:20
example 40:16
    51:20
exceptional 83:3
excessive 38:23
    39:17,24 40:3,6
    40:11,18,24 43:2
    43:12,15,19,22
exclusive 46:7
exclusively 106:4
Excuse 11:2
execute 19:10
executive 12:1,12
    12:19 13:2,6,14
    13:23,24 14:9,18
    14:20 15:7,24
    16:9 17:17 18:2
    19:23 21:6,15
    54:4,6 55:7 56:6
    101:6,9
exerted 24:5 25:7
    27:15 31:2,12
exhibit 4:6,6 15:20
    79:4,7 86:7
existence 19:18
exists 15:3
exit 17:17
expand 61:4
expect 5:21 7:5
    86:21,22 113:22

114:1
expectation 19:8,16
    19:19 78:14,17
expected 61:6 96:16
experience 33:9
    78:12
expires 116:18
    118:21
Explain 25:6
explained 28:3
    99:17
explaining 48:6
extended 26:13 33:7
    52:22 53:21 104:5
    104:9
extent 18:8 20:10
extra 26:8 37:7
eyewitness 72:5
eyewitnesses 71:15
    71:23 72:6

_____

F

face 98:4
faced 56:24 57:7
    58:8
facedown 20:8,9
    47:5 52:21 53:20
facilities 11:17
facility 9:14,23
    10:14 25:18 28:12
    47:22 48:16 56:11
    57:14 58:24
fact 11:20 21:19
    41:2 63:2 83:2
    113:6
factors 63:22 65:9
    65:16 76:10
failing 113:10
Failure 115:9
fair 7:10,11,20 8:13
    8:14 34:22 53:11
    53:13 56:7,10
    75:19 82:21 83:24
    84:4,11,18,22
    88:17 92:19
    106:15
fairly 89:13
faith 53:13
falls 77:19
familiar 12:1 13:23
    17:3 22:24 36:19
    61:19,22 82:6
    85:9,14 108:10
family 5:11 82:8
    110:10,12
Fannin 81:11,13,15
    81:20 82:7
far 1:15 2:7 28:22
    51:21 59:5 90:24
    91:21 103:1
fast 10:4

federal 5:13 10:10
feel 27:8 89:10,24
    110:6 113:14
feelings 110:9
Felicia 2:14
fell 74:4
fighting 62:3
fights 61:21
figure 25:15 31:22
    33:13 48:19 74:16
    106:10
filed 5:13 12:10,10
    12:11
fill 36:13
fills 36:22
find 50:10 87:24
finds 111:13
fine 6:11 44:18
    113:7
finish 6:17 67:22
    87:16
Fire 83:4
firearms 24:7
firing 9:21
firm 1:15
first 5:2 7:10 15:2,6
    16:2,8,17,20,24
    22:14 31:19 41:3
    45:14 46:14 49:2
    54:15 55:9 73:19
    78:14 83:22,23
    84:3 88:10
firsthand 76:7
fit 58:20 81:9
five 9:1 20:20 21:1
Flanders 37:10
    107:2
floor 47:3 91:12
floors 25:19
fluid 95:22 96:8
foam 65:22
focus 89:2
folks 23:13 63:24
    64:2 75:20
follow 6:6 21:24
    23:21 24:24 26:3
    112:17
follow-up 39:21
    83:7
following 21:3
    75:13 81:18 117:4
follows 5:3
force 23:17,19 24:1
    24:15,22,24 26:7
    26:15 27:10 31:10
    31:10,16 32:4,6,7
    32:14,17,17 36:12
    36:13,14,17,19,23
    37:6 38:11,14,17
    38:21,24 39:17,20
    39:22,24 40:12,12

40:13,16,18 41:16
    42:24,24 43:2,6,6
    43:10,10,12,15,19
    43:20,22,22 94:6
    94:12
foregoing 116:4,10
    118:11,13
form 12:5 20:16
    30:9 32:23 42:9
    57:3,11 58:12
    71:17 72:1,9
    75:10 92:14 104:7
    116:6
format 92:1
formed 21:1,4,20
    56:5
former 81:20
forth 75:15
fortunate 60:10
Foster 2:14
found 109:21
    111:14
four 20:4,15,15,20
    55:15 82:21 87:21
    89:3
frame 92:24 93:9,9
    93:9 96:1 97:14
frames 97:15
    101:18
Franklin 118:3
free 39:16 53:5
freedom 70:15
freeze 102:20
front 7:3 102:8
function 9:20
functioning 52:20
    53:19
functions 13:11
furnished 17:18

_____

G

G 1:4
Garrett 2:15
general 22:9,14
    38:5
generally 9:12
generated 10:15
    78:19
generic 46:20
gestures 6:4
getting 15:10 27:14
    59:14 77:1
give 6:15 9:15 17:11
    36:7 51:19 54:9
    76:18 86:3 91:9
given 7:18,23 8:11
    41:10 68:5,20
    116:4 118:12
giving 115:5
go 7:5 12:6,15 13:5
    14:6,12 15:1 16:2

17:7 18:12 19:6
    19:15 20:1,2
    24:18 25:17 26:20
    27:5 30:10 32:10
    34:1 35:14 37:17
    37:24 39:2 40:2
    40:20 42:10 43:4
    50:6,10 51:6 52:6
    53:2,24 54:11
    57:4,12,18 58:13
    62:12 63:6,14
    65:14 67:17 71:18
    72:2,10,23 76:17
    78:11,22 80:10,24
    87:1 89:14,24
    90:11 91:7,20
    93:9,15,23 94:4
    94:20 95:16,20
    98:7 100:13
    101:18,20 103:5
    104:1 107:15
    111:18
goes 5:23 15:14
    20:22 45:10 46:22
    83:6 87:3 96:4
    104:21
going 6:14 7:15,19
    13:17 19:8,17
    21:20 23:8 29:7,8
    30:24 31:1,8,23
    33:12 37:5 42:1
    48:19 53:15 55:16
    55:17 56:5 58:2,5
    65:15 69:21 74:16
    91:9 99:2 101:14
    112:8,20 113:15
good 5:6 6:7,12
    25:11,21 36:9
    53:13 60:13 69:5
    102:9
govern 22:17
governing 12:2
governor 12:2,12
    12:20 13:22,24
    14:13 16:9
ground 27:23 28:6
    28:9 41:10,14,14
    42:15,19 62:10
    63:3 71:8 73:19
    74:7 90:22
guess 26:3 40:11
    47:1
guide 15:16
guided 15:14 77:23
guidelines 99:15
guy 102:9 112:19
guy's 74:1
guys 110:9 113:3,7

_____

H

habits 78:13

half 35:24
hall 73:22
hallway 41:15
hand 102:14 118:15
handcuff 48:22
　112:1,3
handcuffed 51:23
　60:24 70:6,8,9
　83:16
handcuffing 41:11
　69:20
handcuffs 29:24
　33:1 45:6,7 46:16
　48:21 70:11,12
　84:10,13 91:10
　92:15,17 94:5,24
　95:1 97:20 99:11
handing 15:24 79:6
handling 45:2
hands 28:1 34:3
　35:1 52:12 70:10
　90:15 91:5 92:13
　93:20 94:16 95:8
　95:11 96:9 97:17
　97:22 98:8,17
　99:5,10 101:21,24
　104:4,13 112:6
happen 45:8,11
happened 8:8 27:3
　70:2 95:3 110:7
happening 82:22
happens 8:9
happy 69:7
hard 25:19
harder 65:6
harm 26:11 57:17
harming 25:15 26:8
　27:9 28:8
Harry 1:4
hazard 106:6
head 26:10,10 28:21
　30:13 41:23 48:23
　102:10,13,17
　103:7,14 105:4
health 53:1 77:11
　77:23 79:1 85:6,8
　85:18 86:4,10
Healthcare 10:3
hear 66:16
heard 43:14 54:22
　54:24
hearing 43:7
heart 64:11 109:1
held 8:22 26:13
　30:2 82:3 86:16
　87:19 104:15,16
help 56:19 92:6
helpful 10:20
hereinafter 5:2
hereto 116:6
Hey 113:2

high 64:4 76:14
higher 63:19 64:12
　64:16,24 65:11
Hills 1:15 2:7
hip 105:20
hired 81:23
hiring 9:20
history 76:2,6 84:21
hit 102:24
hog-tying 45:10,12
　45:15 46:11,18,20
　46:22,24 95:2
hold 29:1 113:3
holding 26:17 28:6
　28:9 102:10 103:6
　112:5
home 83:12
horse 105:9,9
hour 35:24
houses 75:21
housing 70:23
HR 9:20
HSA 85:14 86:10
huh-uh 6:5
hurt 28:16 42:1
　75:6,9

I
idea 109:9 111:10
identification 79:4
immediately 73:22
implement 18:13
　20:18 39:13 56:5
implementation
　21:21
implemented 18:20
　19:8
implementing
　44:22
implicitly 113:6
important 61:14
improper 40:4,6,12
　40:13,22 43:15
in-custody 37:4
　78:14 79:8,22
inability 61:15
incident 8:20 10:14
　10:16 25:23 32:22
　34:11 35:19 36:3
　37:5 70:3,7 71:1
　77:12 80:12 81:3
　81:5 82:13 85:11
　85:18 86:2,6,9
　107:7 110:22
incidents 10:14
　33:10 89:1 110:6
include 57:15 83:6
　84:23
includes 16:9 21:15
　52:18
including 16:1 24:6

31:13
inclusive 46:7
independent 78:10
INDEX 4:1,6
indicate 89:15
indicated 18:5
　81:19 94:17 115:6
　117:5
indicates 85:19
　86:14
indicative 66:1
individual 20:8
　52:21 53:20
individual's 52:21
　53:19
influences 10:12
　108:8
inform 70:1
information 67:16
　67:24 71:10 88:6
informational
　80:18
injection 84:3 85:19
　86:16
inmate 52:4 58:22
　83:15
inspecting 11:15
Inspectional 37:9
　80:17
instructed 111:15
　111:19,22
instructions 68:19
intent 75:11,17
intention 104:1
interest 109:18
interested 26:3
　110:13
internal 23:14 25:4
internally 108:6
interpret 26:14 27:9
　32:16 36:11 41:16
　80:22
interpretation
　21:22 29:15
interpretations
　56:3
interpreted 56:6
interpreting 68:14
interval 63:1
interview 77:6 85:2
interviewed 107:1
intoxicated 66:18
investigation 43:17
　69:21 71:7 76:1
　85:3 88:18 106:14
　110:8
investigations 9:21
Investigator 81:10
　81:13,15,20 82:7
investigators 107:2
involve 13:11

involved 10:21
　106:14 107:6
　110:12
involvement 106:1
　106:9
involving 106:2
isolated 97:13
issue 73:11 95:2
　96:14,14,14
　113:16
issued 12:1,12,20
　13:22 15:8 16:9
issues 56:17 107:16
　107:20
ISU 83:7
items 52:19 53:17
　54:10

J
jail 8:19 9:3,5,8,12
　9:16 10:16 11:13
　11:19 13:10,11
　14:21,22 15:15
　17:2 18:7,8 19:3
　19:22 21:24 22:11
　22:14,16,17 23:21
　24:16,23 26:2
　31:11 35:3,23
　44:13 47:24 48:4
　48:12 49:4 57:9
　58:10 59:7 60:1,2
　60:5 67:14 68:2
　74:22 77:11,23
　78:5,12 79:18
　80:6 95:14 100:11
　107:11,13,24
　108:2,4,18 110:4
　111:12 112:8,18
jails 11:16 12:17
　22:18 23:1,20
　24:11
Jamey 2:6 69:6
　115:16
Jamey's 44:16 50:7
January 8:24 9:10
job 6:2 9:11,17
　13:11 19:10 39:12
　52:10 86:5,20
　96:23
jobs 9:19
jogged 8:9
Jon 2:14
Jones 79:1
Jr 1:4
juncture 44:3
jury 7:3 30:24 31:1
justified 96:8

K
K 5:8
Karina 86:11

keep 22:16 25:15
　27:23 28:8 41:19
　41:22 42:3,15
　91:9 99:2 101:14
keeping 28:10 41:10
kept 27:8 80:5
keys 69:9
kick 105:22,23
kind 7:2 8:1,2 13:14
　14:20 17:1 37:1
　38:5 51:12 64:10
　65:21 80:1 106:8
　106:14
kneeling 61:2
knees 105:19
knew 22:21 69:23
　70:2,23 73:4,13
　82:2
know 6:13,14 7:8,15
　8:1 13:2 14:9
　21:10,22 22:4,5
　26:2 34:6,23 35:2
　36:1 37:14,19
　39:6 41:8 42:22
　44:1 48:15 49:19
　50:4 53:10,12
　54:1 55:5 56:8,11
　60:14 61:6 62:22
　64:14 65:3,14,15
　65:19 66:15 67:3
　68:4,10,11,23
　69:4 70:24 72:24
　73:21,21,24 74:8
　76:5 77:2,3 81:9
　82:1,3 92:17 96:5
　96:16 99:18 102:4
　102:19 103:1
　104:8 105:10,12
　105:16 106:3,9
　108:15,24 109:23
　110:11,17,18
　112:10
knowing 26:21
　64:14
knowledge 76:7
　89:10 105:24
knowledgeable
　89:13
Krisandra 2:14

L
Lakeside 2:3
language 49:13,14
　99:18
large 30:15 64:3
law 1:15 19:10
　22:15
lawsuit 5:12 7:24
　12:9,11,23 16:11
lawyer 16:11 18:6
　39:6 109:3

**lay** 41:13 66:22
**laying** 66:20
**Layne** 1:15,20 3:6
115:9,13 118:5,19
**lead** 74:13
**learn** 67:18 71:7
**learning** 38:1 60:4
**leave** 41:6 61:9
**left** 17:22 32:1
51:23 98:2 102:14
**leg** 45:7 46:16 70:13
70:14 92:17 95:1
98:22
**legal** 39:1,7 40:14
**legislative** 15:9
**legs** 105:11,15,21
**length** 34:2
**let's** 7:10 50:14 54:4
65:24 84:12 97:15
98:7,16
**letter** 11:20
**letting** 82:9,11
**level** 89:10
**LIBER** 2:3
**lifelong** 60:4
**lifting** 98:2
**lights** 92:3,5
**limb** 26:9 28:7
**limbs** 30:12
**limit** 31:24 32:12
52:19 53:18 108:4
**line** 115:5 117:7
**list** 20:15 111:3
**listed** 64:6 111:8
**listening** 75:15 91:8
94:10
**literature** 67:5,8
68:5,8,9,12,18
**litigation** 11:24
**little** 16:16 59:23
62:20 92:2 102:24
**live** 62:3
**local** 60:6
**log** 36:1
**logical** 19:17
**long** 7:5 8:22 9:6
34:6,23 35:2
51:24 58:23 90:16
**longer** 7:6 37:11
51:17 106:13
**look** 20:19 21:1
25:14 26:14 28:18
28:19 29:9 36:7,9
38:2 46:14 49:9
54:4,5 76:2 85:23
87:13 89:8 98:5
110:2
**looked** 56:2 68:1
90:5
**looking** 11:3 20:3
25:19 31:5 32:1

33:9 47:12 55:15
56:18,18 57:17
59:18,24 69:5,24
76:21 98:4,6
99:16 100:11
**looks** 79:12 92:24
102:14
**lot** 53:9 60:11 65:16
83:9 109:24,24
**low** 75:22
**lower** 75:24 105:13
105:14
**LPA** 2:11

---

**M**

**M.D** 2:15
**maintained** 48:17
79:17
**maintaining** 58:23
94:15
**major** 23:5 69:23
79:9,24 80:4,7,7
80:18 81:8 88:6
106:12,21 107:18
110:11
**majority** 70:7 83:11
**making** 13:12 18:9
27:6 74:14
**man** 30:15 58:17
**manage** 30:11
**managed** 30:13
37:21 110:11
**management** 37:8
37:14 60:6 80:2
80:15
**manager** 60:1
**maneuver** 92:4
**maneuvered** 48:23
49:9 101:19
**maneuvering** 30:18
**manner** 30:6 109:20
110:15
**manual** 20:7 22:11
44:13
**mark** 100:18 115:3
**marked** 4:6 79:4,6
**mask** 61:11
**material** 67:19
**materials** 68:18
**matter** 43:17 56:13
56:14 77:17,18
83:2
**matters** 82:12
**Maxwell** 74:2
**Mayes** 102:7 103:6
**MC** 44:15
**MCSO** 82:4
**mean** 9:23 26:1,4
29:21 51:19 60:22
67:13 83:3 86:4
89:12 101:21

103:9,16 106:18
**meanings** 46:4
**means** 29:1 34:7
24:6 27:16 31:13
44:15 68:11 104:9
111:2
**measures** 31:23
41:24 42:3 52:19
53:18 54:11
**medic** 2:15 26:10
28:21 29:11 48:24
**medical** 15:16,17
25:9 28:20,22
33:11 41:17 48:19
52:7 56:17 57:19
60:14 61:11,16
70:19 72:20 73:1
73:4,8 76:18,19
77:6,11 78:7,20
83:22 84:2,3,21
84:21,24 85:2,9
85:11,14 90:21
96:14,16 97:24
111:1,19
**medically** 28:24
30:5
**medics** 57:21
**meeting** 77:21,22
78:6,8,15,18,18
78:21 87:10
**member** 57:8 59:4,6
59:11 111:12
113:24
**members** 21:2
23:12 44:6 45:7
47:9,18,19 48:11
49:3 95:1
**memo** 23:4 69:22
71:22 77:7,16
79:23 80:3 81:7
82:15 84:20 88:5
88:6 106:3 110:1
**memorandum** 79:8
89:4
**memory** 8:9
**memos** 68:19 69:8
**mental** 53:1 73:7
77:11 96:14
**mention** 70:4
**mentioned** 11:11
18:15 34:7 57:13
60:13 67:15 94:12
**met** 5:10 11:21
**metal** 25:19
**midnights** 82:2
**midst** 16:18 35:18
**Miles** 2:15
**mind** 65:16
**minds** 63:11
**minimum** 22:17
23:1 24:16,23

26:4 31:11,17
**minute** 17:9
**minutes** 29:1 34:7
34:10,17 35:24
78:6,7,8,18,21
83:24 84:4,11,17
96:4 105:1
**misrepresent**
105:17
**missed** 69:6
**missing** 30:21
**mitigating** 65:16
**modified** 50:22
**Montgomery** 5:9
8:17,18,23 11:19
18:7 19:22 23:14
44:13 48:12 49:3
57:9 58:10 68:6
75:22 79:18 81:17
81:20 95:14
107:11
**morbidity** 77:10,15
77:21,22 87:10
**mortality** 77:10,14
77:20,22 87:10
**motion** 26:10
**mouth** 65:23 73:15
**move** 31:24 47:6
58:16 99:21
**moved** 30:16 91:15
**movement** 30:4,7
32:12 52:20 53:18
70:15
**movements** 30:12
30:14
**moving** 28:10 31:20
75:14,15 91:1
102:21
**mucus** 65:22
**multi-accredited**
9:23
**multiple** 41:13
**multitude** 57:15

---

**N**

**name** 5:6,7,10 74:1
115:6
**named** 118:7
**NaphCare** 2:14
78:23,24 86:9
**narrative** 82:18
**national** 10:2,3
69:15,15
**nature** 70:17
**NCCHC** 10:5 15:16
59:11
**necessarily** 40:3
42:22
**necessary** 38:14,18
39:20 43:1,11
89:24

**need** 7:7 29:4 42:6
61:12 72:20 76:23
**needed** 73:1,9 92:4
106:21
**never** 33:14,16,20
33:22 38:7 44:7
45:7,17 46:16
47:11,15 48:13
49:6,11 51:3
54:22,24 56:20
75:6,9 95:1,5
99:23 100:1 107:5
108:15,17 113:2,4
**news** 69:16
**nice** 6:2 11:7
**NICHOLAS** 2:2
**Nick** 5:10 7:10
53:11 115:15
**normal** 52:20 53:18
68:14
**normally** 18:17
69:18 96:15
**Northwestern** 60:7
**nose** 65:23
**notary** 1:15 3:6,7,8
115:7 116:13,17
118:5,19
**notes** 3:7 87:13
**notice** 84:20
**noticed** 34:13
**notified** 35:19
**noting** 116:6
**number** 115:5,5
**numerous** 41:18
**nurse** 2:14,14,14
98:14
**nurses** 28:21

---

**O**

**oath** 6:22 7:1,2
**obese** 63:24 70:22
71:4
**obesity** 64:2
**Object** 30:9 32:23
42:9 57:3,11
58:12 71:17 72:1
72:9 75:10
**objection** 12:5,14
13:4,16 14:5,11
14:24 16:5,12
17:4 18:11 19:5
19:14,24 20:14
21:8 22:3 23:23
24:17 25:3 26:19
27:4,17 28:2 29:3
29:19 31:4 32:9
32:15 34:15 37:16
37:23 39:1 40:1
40:19 43:3,21
44:2,9 45:22
49:16 52:5,24

53:23 62:11 63:5
63:13 65:13 72:22
76:16 86:24 90:10
90:13 91:6,19
93:2,14,22 94:3
94:19 95:15,19
97:9 98:10,19
99:14,21 100:7,12
100:21 101:4,11
101:23 102:12
103:8 104:7,7,23
107:14 108:1
109:8,16 111:17
112:9,21 113:9
**objective** 40:14
**objects** 28:11
**obligation** 28:18
**observation** 33:12
**observations** 57:22
75:2 76:22
**observed** 28:3 107:9
107:16
**obtain** 40:14
**occupational** 106:5
**occurred** 48:22 71:1
78:15
**occurs** 10:15 81:3
**ODRC** 21:4 108:10
**office** 5:9 8:19,23
37:11 44:16 50:8
68:7 75:22 80:16
81:21 82:8,11
87:22 88:1,16
118:16
**officer** 6:20 18:15
18:16 25:23 28:7
30:17 38:21,23
39:22,23 41:3
42:24 102:7 105:6
105:12
**Officer's** 15:12
**officers** 15:12 23:13
23:17 25:8,13
26:5,7,9,16,22
27:8,12 28:3 29:6
29:13 30:3,7,11
30:12 34:12 38:6
38:10,13,17 39:5
39:9,19 41:2,4,13
45:2 47:6 56:20
57:2,7,10,23
58:11 61:6,12,13
61:24 62:7,18,23
65:24 68:4,20
73:14,19,22 74:15
74:18 85:21 86:18
87:4 90:5,20 91:1
91:4 93:21 96:8
96:15 97:3 107:6
107:12,22 109:20
110:15 111:14

112:5,17,24 113:2
113:20,23 114:1
**officers'** 74:11
75:16
**official** 3:8 8:16
14:14 80:16
**officially** 106:14
**Oh** 83:2 106:7
110:17
**Ohio** 1:1,15,16,21
2:4,8,13 9:24 10:7
11:11,16 12:2,3
12:13,20 13:22
14:18,22,22 15:9
15:11,12 20:12,21
22:1,7,18 23:20
24:11 55:19,22
56:10 60:16 115:9
118:2,6,16,20
**okay** 6:7,15 7:13
10:17 12:10 15:19
16:22 18:22 23:10
25:11 27:12 31:21
32:20 33:6 35:6
35:17 36:6 40:8
44:6 47:21 50:13
50:14,15 52:17
54:13 56:12 59:8
59:19,21 60:3,13
64:9,21 67:12
72:5 74:5,7,12
80:19 81:10,24
83:19 84:6 85:1
87:15,17 94:14
96:4 98:13 101:24
104:12 114:7
**once** 48:22 51:16
70:23
**online** 67:9
**opened** 41:4
**operation** 9:13
**opinion** 19:2,9,12
26:7 29:16 56:1,4
76:19,21
**opinions** 56:3
**opportunities** 60:11
**opportunity** 8:12
17:5,20 26:6 56:2
74:19 81:4 91:16
**opposed** 6:4 46:1
**option** 58:21
**options** 43:24
**order** 12:1,12,20
13:2,6,14,23
14:18,20 15:8,24
16:9 17:17 18:2
18:20 19:3,7,23
20:12,18 21:7,15
22:14 54:4,6 55:7
55:21 56:6 90:20
101:6,10

**ordered** 107:5
**orders** 13:24 14:9
22:9 61:16
**ordinary** 79:18,19
80:6
**organization** 38:1
**organizations** 59:3
59:5
**outside** 21:13 68:14
73:23
**oversee** 9:13,21,22
10:11
**overstate** 59:20
**overweight** 64:8

_____
**P**
_____
**p.m** 1:16 3:2 114:16
**page** 4:4,7 20:3,15
20:19,20 55:15
79:15 80:11 115:5
115:8 116:5 117:7
**pamphlets** 68:19
69:8
**paper** 69:7,9
**paperwork** 81:5,6
83:4
**Paragraph** 20:20
**paraphrase** 41:6
**paraphrasing** 45:13
**part** 6:10 22:9
23:11,16 25:20
36:2,2 43:16 49:4
52:10
**participate** 77:14
77:20 78:1
**participated** 64:24
**participating** 64:23
65:10
**particularly** 64:2,3
**parties** 3:5
**party** 109:11
**pass** 35:15 77:9
**path** 37:6
**patient** 86:16
**Peace** 15:11,12
18:15,16
**pending** 7:8 16:19
17:11
**people** 41:19 48:4
48:22 55:17 56:15
56:19,21 63:19
65:21 66:16,17
68:2 106:9 108:14
111:22 112:3,6,22
**perform** 80:14
**performance** 9:21
43:17 85:7
**performed** 36:17
**performing** 76:1
**period** 33:7 34:6
52:22 53:21 90:8

90:16 91:3 100:19
100:19 104:5
**periods** 26:13 104:8
**permitted** 38:10
**person** 6:2 15:18
22:16 52:7 58:1
60:14 61:2 62:2
67:2 76:18 78:3
84:24 105:10
110:1 111:1
**person's** 24:6 31:12
62:2
**personal** 19:1,9
41:20
**personally** 59:2
69:12
**perspective** 54:19
**pertains** 85:11,13
**Phil** 1:8
**phone** 35:9,10 82:9
**physical** 16:21 20:7
24:1,15,22,24
27:24 31:2,10,10
31:16 41:23
**physically** 24:5 25:6
25:24 27:15 31:12
**physician** 77:23
**place** 14:18 37:1
88:18 118:13
**placed** 29:24 46:10
48:20 95:21 96:12
96:18
**placing** 44:6 45:15
46:12,23 47:2,9
47:14 48:11 51:2
89:15 95:3
**Plaintiff** 1:6,14 2:5
3:5
**Plaintiff's** 79:7 86:7
**plan** 21:21
**please** 5:6,7 6:14
57:5 84:12 115:3
115:8
**Plummer/Montgo...**
1:8
**pod** 75:21 84:2
**point** 7:7 36:9,10
69:6 74:20 76:9
83:1,3,23
**Police** 60:7 81:16
**policies** 10:13,22
16:1 22:9 23:15
36:21,22 39:13
46:11 49:15 50:8
50:11,24 51:11
89:11 96:23 97:8
99:15 108:5,10
**policy** 10:21,24 11:1
11:1 13:13,13
15:11 18:9,23
20:17 44:12,19,23

45:4,6,18 46:22
47:13 48:2,3,15
49:11 50:3,22
61:9,10 87:23
88:1 89:6,7,12,14
89:19,21 90:4
94:2,9,18,21,23
95:13,23 97:3
99:13,17 100:14
100:15,20 101:2,3
112:17
**portion** 52:20 53:19
55:21
**pose** 56:21
**posed** 18:4
**position** 9:7,16 17:2
20:9 26:9,12 29:1
29:18,20 30:3,13
32:21 33:1,8,11
34:3,24 42:6,11
42:18 44:7 46:13
46:24 47:10 48:13
48:20 49:7 51:16
51:18,24 52:1,3,3
52:11,22 53:20
54:17 55:4 56:14
56:15 60:17,20
64:13,16 65:2,6
65:12 66:5,7,24
73:24 76:15 82:3
85:20 86:17 89:16
90:8,15 91:5,12
91:15,17 92:8,11
92:21,23 93:1,3,6
93:8,11,12,16,20
94:15 95:7,10,11
95:12,22 96:9
97:7,17,22 98:9
98:18,22,24 99:3
99:10,12 100:22
100:24 103:9,18
103:20,23 104:5
104:10,13,17,19
105:1 111:11,13
112:6
**positional** 56:17
60:13,16,21,23
63:17,20,23 64:4
64:12,17 65:1,11
66:1,6,14 67:2,6
67:15 68:1,6,21
69:10,17 76:11,14
85:9,13 109:6
110:23 111:5,6,7
**positioned** 28:21
29:10 32:12
102:13,22
**positioning** 20:7
101:8 102:6
**positions** 30:3 45:17
47:15 51:3 95:5

**possibilities** 111:3
**possibility** 61:18
63:10
**possible** 20:10
52:12,14 63:7
91:16
**possibly** 61:1 78:4
**power** 31:20
**practical** 35:16
**practice** 35:13
42:17 44:8 46:17
46:18 47:11 48:14
51:3 56:15 77:17
77:18 96:19
**practices** 45:17
47:15 49:12 78:13
95:5 107:10,12,23
108:5,9
**PREA** 10:9,9
**preexisting** 64:11
**Pregon** 1:15 2:6,7
11:8 12:5,14,22
13:4,16 14:5,11
14:24 15:21 16:5
16:12 17:4,11,21
18:11 19:5,14,24
20:14 21:8 22:3
23:23 24:9,17
25:3 26:19 27:4
27:17 28:2 29:3
29:19 30:9 31:4
32:9,15,23 34:15
37:16,23 39:1
40:1,19 42:9 43:3
43:13,21 44:2,9
45:22 48:6 49:16
49:19,22 50:17
51:5 52:5,24
53:11,23 57:3,11
58:12 62:11 63:5
63:13 65:13 68:11
71:17 72:1,9,22
75:10 76:16,23
77:2 86:24 87:12
88:20,23 90:10,12
91:6,13,19 93:2
93:14,22 94:3,19
95:15,19 97:9
98:10,19 99:14,21
100:7,12,21 101:4
101:11,23 102:12
102:24 103:8
104:7,23 107:14
108:1 109:8,16
111:17 112:9,21
113:9 114:3,11
115:16
**preliminary** 80:12
80:20,23
**presence** 3:7 116:14
118:10

**present** 35:3
**presented** 60:23
106:12 113:23
**presenting** 28:17
53:14
**pressure** 64:15
102:1,4
**pressures** 65:7
**presume** 83:8
**pretty** 30:15 69:5
99:20 106:4
**prevented** 26:7
**previous** 96:11
**previously** 16:13
18:15 96:19
**primarily** 72:6
88:18
**primary** 89:2
**print** 55:8
**printed** 115:4
**prior** 11:24 12:11
77:6 85:19 86:16
**prison** 10:9 108:12
108:16,17
**prisoner** 47:22
**prisoners** 45:11,15
45:16 46:11,12,18
46:23,23 47:2,14
47:17,19 51:2
89:15 95:2,4
**probably** 10:19
35:24 50:10 64:8
80:10 85:16
**problem** 11:5 17:13
56:18 73:10 114:8
114:10
**problems** 56:19
73:8
**Procedure** 1:14 3:6
115:8
**procedures** 10:13
22:10 23:15 39:13
108:11
**proceedings** 5:17
**process** 47:4 59:6
59:14 109:23
**produce** 50:8
**produced** 44:16
**professional** 59:3,4
82:6 115:13
**prohibited** 44:8
45:18 47:11,16
48:14 49:12 51:4
55:13 56:9,11
89:17 95:6 100:3
100:10,10
**prolonged** 65:4,5
**promulgated** 22:1
22:18 23:1
**prone** 12:3,13,21
14:19 16:1,10

20:8 21:7,16
26:12 30:13 32:21
33:1 34:3,24 44:7
45:16 46:13,24
47:10,14 48:13,20
49:6 51:3,16,17
51:24 52:1,3,3,11
52:16,18,23 53:17
53:22 54:1,8,10
54:18,21 55:1,4,5
55:7,10,11,12,13
55:18,21 56:9,14
56:15 60:20 64:13
64:16 65:2,6,12
66:5,7,23 76:15
85:20 86:17 89:16
90:8,14 91:4,11
91:17 92:8,21
93:1,3,8,12,19
94:15 95:4,7,11
95:22 96:9 97:17
97:21 98:9,18,21
98:24 99:2,10,12
100:22,24 103:18
103:20,23 104:5
104:10,12,17,19
105:1 112:6
**proof** 3:8
**proper** 40:17
**protect** 29:7
**protocols** 10:13
15:16
**protuberant** 64:3
**provide** 5:24 41:7
42:4 50:4 67:16
**provided** 60:10
**providing** 44:23
**public** 1:15 13:22
14:10,14 115:7
116:13,17 118:5
118:19
**pull** 34:12 89:12
**pulled** 41:14 89:7
**pulses** 57:21
**purposes** 79:7
**pursue** 60:5
**pursued** 60:11
**pursuing** 59:15
**put** 9:19 19:7 33:1
51:15 57:19 68:1
81:7 82:14 83:9
87:24 90:7 96:19
97:19 109:24
**puts** 64:16
**putting** 81:7 96:8

---
**Q**
**qualification** 3:8
**qualified** 67:3 118:6
**qualify** 31:16
**question** 6:15,18

7:8,9,12,16,19
8:10 12:7 13:7,18
16:16,17 17:11
18:4 19:1,9 29:4
30:22 32:3,4
35:12 39:21 42:21
42:23 43:5,10,19
46:15 47:9 48:7,9
48:9 49:2,2 51:7
53:15 57:5 58:6
58:17,20 62:20,23
66:16 67:22 78:11
89:12 91:2,8,10
93:8 95:6,12
97:21 109:3,4
111:11
**questionable** 89:11
**questions** 5:24
10:18 23:8 96:11
109:24
**quick** 87:12
**quite** 78:4

---
**R**
**raises** 66:6,13 67:1
**rang** 35:9
**range** 41:21
**rank** 8:16,22
**Rape** 10:9
**reaction** 41:21
**reactions** 41:24
**read** 16:24 17:4,12
17:21,23 18:2,5
20:2 21:13,19
23:3 36:21 53:6
54:6 55:10 71:24
72:3 73:16 86:14
87:7 94:21 114:11
115:3,6,8,10
116:4,13 117:2,4
**reading** 21:23 47:13
72:11 75:13
116:12
**reads** 94:23
**real** 28:12
**really** 41:8 47:8
73:11 92:6
**realm** 111:9
**reason** 7:7 8:4
17:22 52:2 54:16
58:5 60:22 61:14
62:6,9 64:7,20
65:7 81:18 84:19
88:15 103:15
107:20 110:18
117:7
**reasonable** 19:19
32:2,4 38:11
56:24 57:8 58:9
**reasonably** 38:14
38:18 39:20

**reasons** 111:3 117:5
**recall** 35:22 50:21
66:3 69:15 70:4
72:11,12 74:3
75:13 76:4 77:8
82:9 87:11 90:19
96:21 105:14
106:19 109:1
**receive** 11:20 37:5
**received** 16:10
112:16
**receiving** 16:17
41:6
**Recess** 17:14
**recognize** 79:8
**recollection** 55:2
78:10 106:24
**recommendations**
11:1 13:12 15:10
18:9
**record** 5:11 6:9
11:8 13:22 24:10
34:9 55:10 80:5
87:19 105:17
117:5
**records** 76:8 83:5
**reduced** 3:7
**refer** 97:4
**reference** 81:10
84:20
**referred** 43:16
**referring** 8:15 31:5
112:11
**reflects** 11:8
**refresh** 89:24
**regarding** 79:9
**regulate** 22:17
**Rehabilitation**
20:13 22:1,7,19
23:2 24:12 55:20
**related** 81:5 82:13
**relationship** 82:5
**rely** 7:15 85:6
**relying** 7:22
**remember** 73:23
74:1 77:7 82:7
106:2,8 109:2
**remind** 6:7
**REMINGER** 2:11
**remove** 98:21
**removed** 83:15
100:23
**repeat** 48:9
**repertoire** 6:10
**rephrase** 13:17 29:4
112:23
**report** 10:15 26:6
32:18 36:23 37:6
37:6,22 65:21
71:15 81:8 83:6
85:18 86:6,9,19

**reported** 72:7 86:18
**Reporter** 115:13
  117:1
**reporting** 88:5
**reports** 32:18 36:13
  36:14 44:24 71:9
  72:3,13 74:9,11
  75:12,14
**reposition** 96:20
**represent** 5:11
  13:21
**request** 117:4
**requested** 17:17
**require** 32:17 36:14
**required** 21:24
  36:12
**requirement** 10:10
  19:18
**requirements** 47:23
**requires** 39:13
**resistance** 40:17
**respect** 18:1 39:14
  63:17 64:2 108:14
**respective** 3:5
**respond** 10:13
  41:18 57:23 80:8
  111:15
**responded** 62:23
**responding** 41:17
**response** 6:15 41:5
  86:4 90:19 96:17
**responsibilities**
  9:11 10:24 111:10
**responsibility** 11:15
  77:19
**responsible** 18:8
  22:10 39:8 44:19
  44:22 110:14
**rest** 105:5
**restate** 93:5
**restrain** 56:21 57:1
  57:8,18 58:9
  110:21 111:22
  112:19
**restrained** 29:17,20
  29:23 30:2,7
  32:21,24 34:3,24
  51:17 64:16 65:1
  65:6 66:12,23
  76:15 85:20 91:4
  92:11,12,20 93:1
  93:7,12,19 95:7
  95:10,13 98:8,17
  99:7,9 100:24
  104:4 109:20
  110:15
**restraining** 27:2,14
  55:4 62:1,24
  63:11 108:14
**restraint** 12:3,13,21
  14:19 16:1 21:7

44:12 45:4 52:17
52:18,23 53:17,22
54:2,8,10,18,21
55:1,5,7,10,11,12
55:13,19,22 56:9
57:19 61:10 89:6
92:14 110:24
**restraints** 16:2,10
  20:21 21:16 38:7
  44:7 45:8,16
  46:12,17 47:3,5
  47:10,14 48:13,20
  49:7 51:2 56:13
  70:12 89:16 90:23
  94:8,18,24 95:2,4
  95:13,22 96:12,18
  96:20 98:20
  100:23
**restrict** 38:7 61:3
**restricted** 61:20
**restricts** 60:18
**restroom** 76:23
  87:12
**result** 61:16,17
  115:10
**retraining** 107:5
  112:16
**return** 115:8
**review** 10:16 16:2
  16:23 17:5 23:11
  25:22 26:6 28:13
  33:10,22 36:17,19
  36:23 37:1,3,8,15
  43:16 47:2,6 54:9
  56:2 68:2 71:3,9
  71:10,14 72:5,15
  72:19,24 73:5,12
  73:17 74:22 75:5
  75:8,12 77:10,10
  77:12,15,16,21,22
  78:21 80:2,12,14
  80:16,16,20,23
  82:17,20 85:7
  87:10 88:20,22
  89:6,19,23 90:4
  110:22 112:14
**reviewed** 34:1 67:5
  67:8 71:21,22
  74:9,11 107:17,21
**reviewing** 17:8
  54:12 69:24 75:14
  89:4
**revision** 50:5
**revisions** 11:1
**revisit** 8:10,12
**Richardson** 1:5
  5:12 23:6,18
  24:24 25:7,23
  26:17 27:1,13,14
  28:24 29:7,14,17
  30:8,15 31:10,19

32:8,20 34:2,12
34:24 35:11 42:22
45:3 47:3,8 62:9
62:24 63:12 70:3
70:6,9,19,22,24
71:4,8,11,15 72:7
72:16,20 73:19
74:3,21 75:2,6,9
76:5,14 77:15
78:9 79:10 83:15
84:14,16 85:20
90:8 91:4,17 92:8
92:20,24 93:7,10
93:19 94:15 95:6
96:9 98:8,17
101:8,16 102:18
104:4 105:7 106:2
108:20 109:7
110:12,16 111:3
111:14 112:20
113:3,16 114:1,2
**Richardson's** 30:7
  31:3 36:18 48:18
  50:9,12 62:21
  63:2 73:13,18
  75:11,17 76:2,12
  76:13 82:8 84:9
  84:21 87:21 92:23
  101:22 102:10
  105:13 109:19
  110:10
**right** 11:2,14,22
  22:24 28:20 32:1
  45:8,11 46:8,19
  49:5 55:3,6 69:13
  72:15 74:14 79:1
  79:3 81:2 83:14
  88:13,17,24 91:2
  91:24 93:7 103:2
  103:17,22 106:6
  106:17 109:14
  113:21 114:5
**rights** 16:11,18
  39:14,16
**ring** 35:10
**risk** 27:8 37:7,14,21
  56:21 63:19,22,23
  64:4,12,16 65:1,9
  65:11 66:6,13
  67:1 75:23,24
  76:10,14 80:2,15
  110:20
**risks** 68:20 69:9
**Robert** 1:5 5:12
  23:5
**role** 19:2
**roll** 33:18
**rolled** 26:11 33:16
  33:18 84:10,16
  102:19
**room** 17:17 21:14

41:15
**route** 35:14
**routinely** 79:23
**rude** 6:8
**rule** 97:4
**rules** 1:14 3:6 38:6
  74:22 115:8
**run** 41:21 83:5

————————
**S**

**S** 15:24
**safe** 42:3,7,16,19
  57:16
**safely** 22:16 90:21
**safer** 57:2,10,13
  58:4,11,21,22,22
**safest** 30:8
**safety** 30:1 32:1,12
  42:4,4 58:4
**sat** 33:20
**Saturday** 106:5
**saw** 29:15,16 43:15
  81:9 102:18
  111:23 113:17,19
**saying** 15:7 20:24
  20:24 21:18 48:8
  55:16 72:7 80:8
  102:1 103:4
  105:18,19 112:19
  113:10
**says** 5:3 20:20 21:2
  45:6,15,18 47:13
  51:2 55:6,21
  94:24 95:3
**scene** 36:1 68:5
  83:23
**school** 59:22 109:15
**schooling** 60:11
**scream** 66:16
**screen** 103:16
**scrutiny** 37:5
**seal** 118:16
**seclusion** 20:22
**second** 11:2,4 80:14
**secondary** 80:24
**seconds** 83:17,18
**section** 18:19,19
  78:20 88:2
**section's** 85:7
**sections** 104:3
**secure** 40:15 111:19
**secured** 28:20 47:4
  58:1 90:20 91:11
**security** 31:23
  48:16 57:14 58:23
  97:20
**see** 28:20 30:17
  31:19 33:12,21,24
  38:2,6 47:6 58:20
  65:20 77:12 81:4
  86:10 90:24 92:4

95:21 97:24 98:20
98:20 101:18,21
101:24,24 102:7
102:13,21 105:4
**seeing** 16:8 101:7
  105:14
**seen** 15:7 16:3,14,21
  41:19 54:15 56:7
  69:8 78:8 100:22
**segment** 100:18
**seizure** 41:21 42:14
**seizures** 41:18
**semantics** 9:4 55:5
**send** 79:24 80:7
**sense** 40:10 41:10
  41:13 61:4,23
**sent** 25:8 69:23 79:9
  80:4
**sentence** 45:14
  46:14 55:9,12
**Sergeant** 37:10
**sergeants** 23:13
  74:19
**seriously** 28:19
  110:7
**service** 85:6
**services** 37:9 77:23
  79:2 80:17 85:8
  85:18 86:4,10
**Session** 3:1
**set** 118:15
**sets** 70:11
**seven** 67:11
**shackles** 70:13,14
  92:17 98:22
**share** 15:23
**sharing** 56:4
**sheet** 115:5,6,9
**sheets** 83:5
**sheriff** 1:8 2:9 10:23
  22:16 23:14 50:23
  50:24 51:1 110:5
**Sheriff's** 5:9 8:17
  8:19,23 68:7
  75:22 81:21
**SHIBLEY** 2:3
**shot** 83:23 84:7
**shoulder** 98:2
**shoulders** 6:4
**show** 15:5 44:12
  96:21
**showed** 101:7
**showing** 20:14 24:9
  24:10 30:24 61:9
  86:6 101:9
**shown** 55:20 104:3
**shrugs** 6:4
**side** 15:15 26:12
  29:10 33:19 47:7
  48:23 49:10 66:18
  91:1 101:15,16

102:19,23 103:4
**sign** 65:19,22 66:1,4
66:5,13 67:1
115:3,6,8
**signature** 79:15
114:13 115:8
117:23
**signed** 49:18 50:1
50:17,23 51:1
115:10 116:14
**significance** 34:8
**signing** 116:12
**signs** 50:24 65:19
65:22
**simply** 32:11 45:13
**Sincerely** 115:12
**sink** 74:4
**sir** 5:15,18,20 6:21
6:24 7:4 8:1,6,23
10:6 11:5,23
12:24 13:6,17
14:1 15:2 16:6,13
17:23 18:3 19:7
21:18 22:13,20,23
23:3,7,16,19,22
24:3,20 25:4 30:1
32:6,16 33:15,21
33:24 34:5,18
35:2,4,21 37:13
38:1 39:11 41:1
42:4,17,20 44:10
44:14,21 45:1,5,9
45:13 46:9 47:1
47:17 48:1,5 51:7
52:15 53:6 54:20
54:22 55:23 59:12
61:8,13,18,23
62:6 63:15,21
64:1 67:21 68:3
69:3 70:5,8,11
71:9,13 75:24
77:16 78:2,7,19
79:11,14,16 80:13
80:15,21 81:1,12
82:16,19,20,23
83:2,11,21 84:1,5
84:15,23 85:4,12
85:17,22 86:8,19
87:2,8,11 88:1,4,8
88:12,22 89:18
90:6 92:4,7,15,22
94:6,10 96:6,11
97:1,5,19,23 99:4
99:6,8,12,15
100:5,8,11 101:3
101:12 102:9,14
103:12,24 104:14
104:18,20 105:3
105:22,24 107:3,8
108:12,18,23
111:5 112:10,15

113:5
**sit** 34:23 58:19
69:10
**sitting** 74:20 90:2
**situation** 37:2 57:14
96:8 106:2,9
**situations** 48:16
**six** 9:1 67:11
**six-four** 102:8
**sized** 102:9
**solve** 56:19
**somebody** 17:2
25:10 40:15 42:13
51:15 52:11 64:11
64:23 66:19,23
77:20 78:1 110:13
**somebody's** 48:17
**someone's** 25:20
39:14 61:15,20
110:20
**soon** 35:15 52:11,14
87:16
**sorry** 72:13 86:14
99:24 103:16
**sorts** 28:23
**SOUTHERN** 1:1
**SPANGENBERG**
2:3
**speak** 17:9 26:24
85:16
**speaking** 15:16
**Special** 1:4
**specific** 15:15 19:1
64:6
**specifically** 15:17
20:12 31:5 33:1
50:21 54:23 69:16
73:23 89:8 98:5
**specified** 118:13
**speculating** 112:10
**spell** 5:7
**spent** 89:3
**spoke** 101:12
**spread** 45:16 47:15
95:4
**Sr** 1:5
**staff** 23:12 45:7
48:23 52:10 60:7
77:11,11 84:2
85:2 95:1 97:24
110:5
**stamp** 91:23,24
**stand** 7:3 65:7
103:15
**standard** 11:21
**standards** 21:24
22:18 23:1,20
24:1,11,16,23
26:2,4 31:11,17
**standing** 98:14
**standpoint** 60:15

**stands** 10:9 60:22
62:6 64:7,20
84:19
**start** 65:24 67:19
**started** 31:19
100:18
**starts** 2:11 49:2
115:15
**state** 1:15 5:6 6:18
8:16 9:24 10:7
11:16 12:2,3,3,13
12:16,20 13:22
14:3 15:9 22:15
27:6 55:14,24
56:9 60:6 108:16
116:1 118:2,6,20
**stated** 8:16 32:11
116:12
**statement** 51:1
86:23 87:6
**statements** 27:7
69:24 71:14,22
72:12 74:9 82:18
**states** 1:1 22:15
39:10 61:10
**stay** 41:8
**stenotype** 118:9
**stenotypy** 3:7
**step** 18:6 21:13
**steps** 20:21 26:8
37:7 70:1
**Steven** 2:15
**stipulated** 3:4 11:9
**STIPULATIONS**
3:3
**Stockhauser** 2:15
**stomach** 61:1 66:20
**stop** 98:16 101:21
103:2
**stopped** 33:17 34:13
106:11
**straddle** 105:9
**straddling** 105:6,8
105:13,18,20
**strain** 58:5
**straps** 57:20
**Street** 2:12
**strike** 99:21
**strong** 49:13,14
**struggle** 64:23,24
65:4,5,10,11
**stuff** 69:6
**subconsciously** 62:3
**subject** 8:13
**submit** 47:1 49:8
**submitted** 116:11
**subordinate** 22:6
**subsection** 21:1,1
**substance** 116:6
**suggest** 97:2
**suggestion** 34:10

**Suite** 1:16 2:4,8,12
**summary** 80:18
81:3
**Sunday** 88:10
**supervisor** 57:24
58:1,2
**supervisors** 36:16
**supplementals**
73:16
**supposed** 20:18
**sure** 5:21,22 6:3
9:22 10:11 11:6
12:9 13:18 17:7
18:24 26:9 28:14
30:21,22 38:17
41:24 44:3,4
68:22 79:21 81:6
98:1 105:3,5,22
106:20,22 107:4
113:18
**surrounding** 5:13
73:13,18 76:12
**survive** 61:22
**switched** 70:12
**sworn** 5:2 118:7
**symptoms** 65:20,22
**systems** 55:14,24

---

**T**
**tactics** 69:19
**take** 6:12 7:2,2,6,8
7:10 8:11 20:21
28:19 37:1 41:24
42:3 51:22 54:17
67:15 71:21,22
77:3 85:22 110:5
110:7 113:10
**taken** 1:14 3:6 5:17
17:14 25:13
113:15 117:2
118:9,12
**takes** 110:1
**talk** 17:18 18:6
21:14 41:5 78:23
**talked** 69:14 89:5
96:19
**talking** 8:7 42:22
47:8,17 51:10,14
55:8,9 63:1 87:3
88:20 94:8 96:1
108:7 109:12
**talks** 20:3,7,19
46:16 94:23
**tell** 7:13 9:6,11
29:12 31:1 50:5,7
68:22 69:16 74:7
75:16 77:16 89:22
90:1,16 98:4
103:11,19 106:23
112:24
**telling** 29:14 30:6

31:9 58:16 96:6,7
**tells** 21:3
**ten** 58:18
**tension** 46:18
**term** 46:20 54:22,24
60:13
**terms** 65:9 75:20
100:6
**testified** 6:19 26:16
26:22 27:1,12
49:19 74:20 75:1
81:19 109:5
110:23
**testify** 7:3 62:18,21
75:11 118:8
**testimony** 25:22
26:24 105:17,18
105:19 115:4,5,6
118:9,12
**Thank** 59:1 87:18
94:14 114:9
**thighs** 105:19
**thing** 28:24 41:1
59:22 99:16 105:3
111:16 114:2
**things** 8:7 14:4
18:17,20 33:23
38:2 51:12,13
61:24 65:20,20
69:20,23 70:2
89:23 106:10
108:6,7
**think** 9:18 13:13
14:20 15:21 17:1
18:4,7,9 19:3,17
23:20 27:18 29:6
29:8,12,13 30:12
32:4 33:7 37:21
39:5 40:16 42:13
43:13,24 48:2,3
51:10,14 69:5
74:3 86:20 90:7
101:16,18 102:18
102:23,24 103:18
103:20 105:16,17
107:4 108:13
**thinking** 62:19
112:22,24
**thirty** 115:8
**thorough** 37:3 86:5
86:20,22 96:22
110:8
**thought** 31:8 32:1
85:1 94:11,11
**three** 10:4 16:13
20:19,20 33:23
58:18 86:3 89:3
106:4
**throws** 42:14
**Tiburon** 82:18
**tie** 45:7 46:16 95:1

**tile** 25:19
**time** 3:6 6:7,13 7:7
  8:20 11:24 12:7,9
  12:11 15:6 16:8
  16:17,20,24 26:13
  33:7 34:2,6,11,12
  34:18,21 35:22
  36:8,22 38:16
  39:3 41:3 42:11
  49:2 50:9 52:22
  53:6,21 54:15
  57:5 63:11 66:17
  71:19 73:14 81:7
  82:1 83:12,15,16
  83:22 84:2,3,9,10
  84:12,13,16 88:9
  89:5 90:9 91:3,23
  91:24 92:22,23
  93:3,10 94:21
  95:9 100:17,19
  103:21 104:6,8
  114:7 115:9,10
  118:13
**timeline** 82:14,17
  83:8,9,14,24
  84:17
**times** 10:4 16:13
  27:18 32:21 33:5
  41:18 66:18 90:14
  90:19 93:18 96:9
**tiny** 102:24
**title** 8:16 9:4 88:4
**today** 5:16 6:23 7:2
  7:23 8:5 16:4
  22:22 23:9 34:23
  54:24 56:8 69:10
  70:18 89:14 90:2
  90:5 97:6 109:5
  111:12 113:20
**today's** 8:12
**told** 5:21 13:12 19:2
  36:11 39:5,19
  42:13 43:5 52:7
  59:14 70:18 75:20
  81:22 85:1 102:18
  106:3 109:2
  112:16 113:2,4,6
**Tony** 79:1
**total** 90:16
**totality** 38:22 95:24
**touch** 103:16
**touching** 28:1
**Township** 81:16
  82:2
**train** 39:9
**trained** 45:3 56:16
  61:3,12,13 64:1
  65:23,24
**training** 9:22 10:11
  13:12 15:12,13
  18:16,16,18,19,19

39:8 40:4 44:23
  60:23 61:14 68:8
  68:15,18 69:9,19
  110:5,14
**transcribed** 3:7
  118:10
**transcript** 115:3,3,6
  115:10 116:4,10
  117:2 118:12
**travels** 37:6
**treat** 113:15
**treated** 28:22
  113:16
**tried** 33:22 75:9
  84:3
**trouble** 65:8 66:4
  66:13 75:13
**true** 16:11,19 20:13
  22:2 30:3 38:8,11
  38:12,20,24 39:14
  39:24 52:13 61:7
  63:4,12 64:13,17
  65:2,12 66:6,14
  67:2 70:10 71:5
  75:9,23 82:18
  83:18 87:23 88:3
  89:21 90:9 91:18
  92:11,21 93:21
  94:18 97:3 104:6
  107:13 116:7
  118:11
**truth** 8:3 118:8
**truthfully** 8:5
**truthfulness** 7:23
**try** 25:13,15 26:13
  41:16 49:8 67:17
  74:8,16,16 87:16
  106:10
**trying** 9:18 25:14
  27:1 28:8 29:11
  29:12 30:4,11,14
  30:18 31:8,22
  33:10,12 40:9,13
  40:14,15,16 41:5
  41:7,11,20,22
  43:9 47:4 51:22
  59:20 62:9 63:3
  71:8 80:3 87:2
  93:9 96:2 103:12
  113:21
**turn** 6:8 92:3,5
**turning** 11:3
**two** 46:4 56:24 57:8
  58:9,18 70:11
  73:21 79:15 80:11
**type** 70:4 79:23
**typewritten** 115:4
**typically** 35:5,15
  51:19,23 78:4
  86:5

## U

**uh-huh** 6:5,8
**ultimate** 10:23
**ultimately** 42:23
**unacceptable** 100:4
**unarmed** 70:3
**uncommon** 8:7,8
**undersigned** 116:13
**understand** 5:14,16
  6:22 7:1,12,16,22
  13:18 14:2 19:21
  21:6,17 23:4 26:4
  26:18 27:3 30:21
  39:6 51:11 53:3
  60:19,19 71:2,11
  71:15 72:16,20
  73:18 101:6,10
  103:6 107:10
  112:11,14,18
**understanding** 5:22
  21:15 27:21 30:22
  30:23 50:11 60:15
  76:10,11 81:21
  111:2,5,9
**understood** 5:24
  7:20 70:17,22
  71:4 110:3
**unfortunate** 37:4
  62:22 110:6
**unintelligible** 27:7
**unit** 70:24 80:17
**United** 1:1 39:10
**unknown** 25:8
  41:17 73:4 90:8
**unnecessary** 38:22
  39:22 42:24 43:6
  43:6,10,19,22
  56:21
**updates** 15:10
**use** 12:2,13 14:19
  20:21 23:17 24:6
  27:9,24 32:4,6,16
  32:17 36:12,13,14
  36:17,19,23 37:6
  38:10,13,17 39:20
  44:12 45:3 55:12
  55:13,18,21 82:9
  89:6 94:6,8,12,18
  94:24 95:13
**uses** 38:21 39:22
  42:24 99:23 100:1
  100:3
**usual** 6:10

## V

**vague** 57:15
**Verbal** 66:11
**verbally** 66:24
**version** 24:10
**vicinity** 28:11

**video** 25:13 28:14
  30:17 31:1,6,18
  34:1 69:24 82:18
  83:9 90:17 91:21
  91:24 92:22 93:10
  93:18 95:9 96:2,4
  96:21 97:14 101:9
  104:2,21 107:22
  111:23 112:7
**viewed** 93:3
**Vine** 2:12
**violate** 74:21 90:5
  95:13,23 97:7
  100:15
**violated** 97:3
**violates** 94:2,17
  99:13 100:20
  101:9
**violation** 89:21
  94:11 101:2
**violations** 87:22,24
  97:4
**violence** 24:4 75:23
**violent** 61:10 76:5
**volition** 61:21
**vs** 1:7

## W

**wait** 6:14,17
**waived** 3:8 114:13
**walking** 112:18
**want** 7:13 8:10,11
  14:17 28:16 34:9
  36:7 38:5 42:15
  42:18,21 44:12
  51:21,24 52:2,17
  53:11 58:3,5,19
  60:1 77:12 91:8
  105:16 106:10
  108:4 110:17,18
  110:19
**wanted** 18:6 78:21
  106:21
**wanting** 38:2
**warn** 68:20 69:9
**warns** 67:5
**wasn't** 13:6 28:13
  42:21 83:13
**watch** 25:13 97:15
**watched** 26:5 28:13
  28:14 111:23
**watching** 31:18
  100:17
**water** 76:24
**way** 5:23 9:19 24:19
  26:21 28:17 29:7
  29:8 30:13 38:2,3
  42:7,18 48:15
  51:13 53:14 57:2
  57:10 58:2,11
  61:3 64:14 109:22

110:20 111:15,23
  112:20 113:3,16
**ways** 38:7 56:21,24
  57:8 58:9
**we'll** 7:8 26:24
  114:11
**we're** 8:7,20 9:23
  10:1,7 17:16 37:3
  38:1,1 41:22
  42:23 47:12 56:17
  56:18 57:16,17
  63:1 69:21 82:6
  94:8 98:16 100:11
  101:7 103:22
  104:12
**we've** 56:16 94:16
  100:17
**weapon** 70:5
**website** 67:17
**Wednesday** 3:1
**week** 41:18
**weight** 61:2 109:24
**Welcome** 109:11
**welfare** 25:14,20
  26:14 28:18,19
  49:9 99:16
**went** 23:5 26:8 41:4
  67:9,14,17 70:23
  74:4 89:17 90:24
  109:15
**WESTERN** 1:2
**WHEREOF** 118:15
**white** 95:24
**Whitney** 1:15 3:6
  5:7 115:9,13
  118:5,19
**willful** 61:17
**Wilson** 23:5 69:23
  79:9 80:5 88:7
  110:11
**witness** 1:14 3:5,8
  11:6 49:23 53:4
  68:13 77:1 87:15
  87:18 116:12
  118:10,12,15
**word** 45:20 57:13
  72:12,12 85:22
  99:23 100:1,3
**words** 6:4,6 46:4
**wordy** 52:16
**work** 80:4 81:16
  88:10
**worked** 81:13 82:4
  108:15,17
**working** 82:1,13
  106:4,11
**works** 14:21
**wouldn't** 8:4 26:12
  84:23 85:5 110:13
**writing** 3:7 86:15
**written** 10:21 18:9

21:17 24:19 45:14
46:11,15 47:13
48:15 51:11,12
68:17,18 69:8
83:21 84:5 89:15
90:5 94:17 95:14
96:24 97:7 99:17
100:14 101:3
**wrong** 25:15 33:13
48:3
**wrongful** 16:11,19
**wrote** 86:19

_____
**X**
_____

_____
**Y**
_____
**yeah** 13:9 20:6
21:12 28:15 30:20
33:4 36:4 43:9
50:21 51:19 57:7
62:5 68:13,17
70:4 71:24 73:6
79:20 83:18 84:8
84:13 88:4 89:19
90:18 91:23 92:3
94:23 98:3 102:16
103:6 106:7 111:8
112:2 113:13
**year** 50:3
**years** 8:8 9:1 46:21
67:11 81:17,22
86:3
**yelling** 66:19
**Yep** 60:9 86:12
87:13

_____
**Z**
_____

_____
**0**
_____
**07** 105:2
**08** 99:2 105:2

_____
**1**
_____
**1:00** 1:16 3:2
**10** 4:7 79:4,7 99:2
**1001** 2:3
**11** 99:2
**117** 1:16
**123** 2:8
**14** 83:24 84:4
**15:18:54** 84:18
**15:41:11** 84:18
**15:52** 98:7
**15:53** 98:15
**15:56** 98:15
**16** 83:17,18
**16-minute** 100:18
**16:03** 98:16
**16:06** 98:16
**16:22** 101:20,21
**16:25** 99:9

**16:33** 100:11
**16:37** 103:4
**16:40** 102:23
**16:44** 101:20
**16:45** 103:22
**17:19** 104:12
**17:30** 104:15
**17:40** 104:17
**17:50** 104:19
**1700** 2:4,12
**18** 84:19 105:1
**18:05** 105:1
**19th** 35:1,4,5 61:7
62:8,16 68:5 71:4
74:22 75:3 88:9

_____
**2**
_____
**20** 117:3
**20-plus-minute**
63:1
**2009** 12:21 14:18
**2009-13** 15:24
**2010** 8:24 9:10
**2012** 35:1,4 60:20
61:7 62:8,16 68:5
71:4 74:22 75:3
79:13 88:7,9,11
106:13
**2014** 12:10 24:10
**2015** 1:16 3:1 115:1
116:5,15 118:17
**2020** 118:21
**20th** 88:11,16
**21:09** 31:1
**21st** 88:18
**22** 29:1 34:7,10,17
84:11,17 96:4
**22-minute** 104:2
**22:22** 91:17,21,24
92:6,16,20,24
93:6,11 94:17
95:8,10 97:7
**22:23** 97:15
**22:37** 97:22
**22nd** 88:18
**23rd** 79:12 88:7,19
106:13
**24** 97:15
**25** 97:15
**26** 97:15 99:9
**27** 97:15 99:9
**275** 102:8
**28** 97:16 115:1
**28th** 118:16
**29** 97:16
**2909** 44:15

_____
**3**
_____
**3:14-CV-00158** 1:7
**3:17** 114:16
**30** 97:16

**30-second** 100:19
**31** 97:16
**32** 97:16
**33** 97:16
**34** 97:16
**35** 97:16
**36** 97:16
**37** 97:16

_____
**4**
_____
**4** 98:16 118:21
**41** 84:19
**43017** 1:21 115:9
**44114** 2:4
**45** 35:24
**45202** 2:13
**45429** 1:16 2:8

_____
**5**
_____
**5** 4:4 98:16
**525** 2:12
**5335** 1:15 2:7
**54** 98:15
**55** 98:15
**57** 98:15
**58** 98:15
**59** 98:15

_____
**6**
_____
**60** 98:15
**61** 98:15
**614-309-1669** 1:22
**6723** 1:21 115:9

_____
**7**
_____
**79** 4:7

_____
**8**
_____
**8** 86:7

_____
**9**
_____
**9** 1:16 3:1 99:2
116:5