IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

\* \* \*

HARRY G. BEYOGLIDES, JR.,
Special Administrator of
the Estate of Robert Andrew
Richardson, Sr., Deceased,

       Plaintiff,

vs.                              Case No:  3:14-CV-00158

PHIL PLUMMER/MONTGOMERY
COUNTY SHERIFF, et al.,

       Defendants.

              \* \* \*

      Volume one of the deposition of MATTHEW H.
HENNING, Witness herein, called by the Plaintiff for
cross-examination pursuant to the Federal Rules of
Civil Procedure, taken before me, Daniel M. Gershwin,
Certified Court Reporter and Notary Public in and for
the State of Georgia, at 5855 Sandy Springs Circle,
Suite 140, Atlanta, Georgia, on Tuesday, March 1st,
2016, at 2:00 p.m.

              \* \* \*

                                   Page 1

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

---

REPORTER DISCLOSURE OF NO CONTRACT

I, Daniel M. Gershwin, Certified Court Reporter, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that I am a Georgia Certified Court Reporter. D'Amico Gershwin/I was contacted by Mike Mobley Reporting to provide court reporting services for this deposition: D'Amico Gershwin/I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7C of the Board: and I am not disqualified for a relationship of interest under the provisions of O.C.G.A. 9-11-28(c).

There is no contract to provide reporting services between myself or any person with whom I have a principal and agency relationship nor any attorney at law in this action, party to this action, having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond my/D'Amico Gershwin's usual and customary rates have been disclosed and offered to all parties.

This, the 14th day of March, 2016.

_____
DANIEL M. GERSHWIN, CCR-B-1012

---

FIRM DISCLOSURE OF NO CONTRACT

I, Todd Mobley, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Mike Mobley Reporting was contacted by the taking attorney to provide court reporting services for this deposition and there is no disclosed contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7C of the Rules and Regulations of the Board for the taking of this deposition.

There is no contract to provide reporting services between Mike Mobley Reporting or any person with whom Mike Mobley Reporting has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond Mike Mobley Reporting's usual and customary rates have been disclosed and offered to all parties.

This, the 14th day of March, 2016.

TODD MOBLEY
MIKE MOBLEY REPORTING

---

FIRM DISCLOSURE OF NO CONTRACT

I, Daniel M. Gershwin, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that D'Amico Gershwin, Inc. was contacted by Mike Mobley Reporting to provide court reporting services for this deposition and there is no disclosed contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7C of the Rules and Regulations of the Board for the taking of this deposition.

There is no contract to provide reporting services between D'Amico Gershwin, Inc. and Mike Mobley Reporting or any person with whom D'Amico Gershwin, Inc. has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond D'Amico Gershwin's usual and customary rates have been disclosed and offered to all parties.

This, the 14th day of March, 2016.

DANIEL M. GERSHWIN,
D'AMICO GERSHWIN, INC.

---

APPEARANCES OF COUNSEL (all via videoconference):
On behalf of the Plaintiff:
    NICHOLAS A. DICELLO, ESQUIRE
    Spangenberg, Shibley & Liber LLP
    1001 Lakeside Avenue
    Suite 1700
    Cleveland, Ohio  44114
    T:  (877) 696-3303
    F:  (216) 696-3924
    E:  Ndicello@spanglaw.com

On behalf of the Defendants Sheriff Phil Plummer, Sergeants Ted Jackson and Brian Lewis, Corrections Officers Dustin Johnson, Matthew Henning, Michael Beach, Keith Mayes, Bradley Marshall, Michael Stumpff and Tonya Benjamin, and Sheriff Deputies Linda Shutts and Andrew Wittman:

    JAMEY T. PREGON, ESQUIRE
    Dinkler Pregon, LLC
    5335 Far Hills Avenue
    Suite 123
    Dayton, Ohio  45429
    T:  (937) 426-4200
    F:  (866) 831-0904
    E:  Jamey@dinklerpregon.com

On behalf of the Defendants NaphCare, Inc., Nurse Kristy Kruse, Nurse Felicia Foster, Nurse Jon Boehringer, Nurse Krisandra Miles, Medic Steven Stockhauser, and Brenda Garrett Ellis, M.D.:

    ROBERT J. HOJNOSKI, ESQUIRE
    Reminger
    525 Vine Street
    Suite 1700
    Cincinnati, Ohio  45202
    T:  (513) 721-1311
    F:  (513) 721-2553
    E:  Rhojnoski@reminger.com

                - - -

Mike Mobley Reporting
800-894-4327

```
 1          MATTHEW H. HENNING,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4              EXAMINATION
 5   BY MR. DiCELLO:
 6      Q    Hi, Mr. Henning.
 7      A    Hello, sir.
 8      Q    My name's Nick DiCello.  I appreciate you
 9   making yourself available today down there.  You're in
10   Georgia?
11      A    Yes, sir.
12      Q    And I represent the estate of Robert
13   Richardson in connection with a lawsuit that's been
14   filed surrounding Robert Richardson's death that took
15   place back in May of 2012.
16          You understand that you're here to give a
17   deposition in connection with that matter?
18      A    Yes, sir.
19      Q    Okay.  I appreciate you making yourself
20   available.  We're doing this over video, as you can
21   see, so it's important that we make sure to wait for
22   each other to finish talking.  Okay?
23      A    Yes, sir.
24      Q    Ever been deposed before?
25      A    No, sir.
```

Page 6

```
 1      Q    So this is a question-and-answer session.
 2   I'll ask the questions, you provide the answers.
 3   Okay?
 4      A    Yes, sir.
 5      Q    You're under oath.  You understand that
 6   you're under oath?
 7      A    Yes, sir.
 8      Q    You understand that this is the same kind
 9   of oath that you would be under when you're called to
10   testify at trial in front of a jury?
11      A    Yes, sir.
12      Q    And do you understand that I'm going to
13   be relying on the truthfulness of your answers today
14   in connection with this matter?
15      A    Yes, sir.
16      Q    All right.  Officer Henning, did you
17   happen -- well, I should ask you, what's your current
18   employment down there in Georgia?
19      A    It's the Covington Police Department.
20   It's a municipal police department for a city.
21      Q    How long have you been a police officer
22   down there in Covington?
23      A    A little over two and a half years.
24      Q    Did you leave the employment of the
25   Montgomery County Sheriff's Office to pursue that
```

Page 7

```
 1   position?
 2      A    Yes, sir.
 3      Q    And how long were you a corrections
 4   officer in Montgomery County?
 5      A    Right about one year.
 6      Q    Are you from the Dayton area originally?
 7      A    No, sir.
 8      Q    Where are you from?
 9      A    I was born in Colorado, but I grew up --
10   most of my younger years were actually here in
11   Georgia.
12      Q    So how did you end up in Dayton?
13      A    Short version, military.
14      Q    Tell me about your military background,
15   please.
16      A    Yes, sir.  Went to high school here in
17   Georgia and then I received an ROTC scholarship
18   through the Air Force, which ROTC is the Reserve
19   Officer Training Corps.  I started at UGA and
20   basically was a normal college student for my studies
21   and whatnot, but after classes and additional classes
22   I would take through the Air Force, and so I would
23   have Air Force training along with a bachelor's
24   degree.  Unfortunately I was not able to finish the
25   ROTC program, and so that's whenever I moved up to the
```

Page 8

```
 1   Dayton area.  I was actually looking for more of a
 2   contractor's job at the federal level, and I did
 3   obtain one.  It was working base security there at
 4   Wright-Patterson.  And whenever that contract died,
 5   that's whenever I looked toward the law enforcement
 6   side.
 7      Q    Okay.  Thanks for that.  I participated
 8   in the ROTC program in college as well, so I know a
 9   little bit about what that involves.
10          Can you tell me why it was that you
11   didn't complete the program?
12      A    I actually failed out because of my
13   grades.  Unfortunately I was a little bit too focused
14   on the Air Force side of it, and whenever I started
15   hitting my junior year, you know, classes like
16   calculus three and physics --
17      Q    Enough said, yeah, enough said.
18          So how long were you employed at
19   Wright-Patterson Air Force Base?
20      A    I want to say it was only two months.  It
21   was a very short-term, fill-in position because the
22   contract was going under, and they knew that.
23      Q    And that was a security job you said?
24      A    Yes, sir.  Basically we controlled the
25   entry and exit points for the Air Force base, so we
```

Page 9

3 (Pages 6 to 9)

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

---

1   are standing at gates mainly checking IDs and
2   verifying security personnel were able to enter and
3   exit the base.
4        Q        Did you have any kind of security
5   licensure or certifications or anything at that time?
6        A        I do not believe so.
7        Q        So what did you do after the couple of
8   months when, like you said, the contract expired?
9        A        I had already started the application
10  process with Montgomery County. And whenever they
11  gave me -- or they notified me that I was going to be
12  hired, I went ahead and resigned from the security
13  position and went ahead and took the corrections
14  officer's position.
15       Q        Mr. Henning, what's your date of birth?
16               MR. PREGON: Can we go off the record and
17  do that?
18               MR. DiCELLO: Sure.
19               (Thereupon, an off-the-record discussion
20  was held.)
21  BY MR. DiCELLO:
22       Q        So what position were you hired into at
23  the Montgomery Sheriff's Department?
24       A        The corrections officer position.
25       Q        I've heard some folks pursue a role or

Page 10

---

1        A        Yes, sir.
2        Q        Do you remember what shift you worked
3   that day?
4        A        It was the morning shift or the day
5   shift. I don't remember exactly the -- whether it's
6   first or second because here at the police department
7   we have it -- it's different than the way it was
8   there. But it was like the 7:00 to 3:00 was the
9   shift.
10       Q        Were you assigned to one corrections
11  officer that you shadowed for the day?
12       A        Yes, sir. It was Dustin Johnson. He was
13  my field training officer or the officer that I would
14  shadow and learn from.
15       Q        I don't have the opportunity to be in the
16  same room with you, but this case involves some issues
17  involving restraint, so I've been asking all the COs
18  that were involved in the restraint of Mr. Richardson
19  what their height and weight is, so I'm going to ask
20  you the same question. What was your height and
21  weight back in 2012?
22       A        Six-one. I was probably 210, 215,
23  somewhere around in there.
24       Q        Before you started that first day in the
25  jail, had Montgomery County ever provided you with any

Page 12

---

1   career in law enforcement through the Montgomery
2   County Sheriff with the goal of getting onto the road
3   patrol or an investigative unit outside the jail. Was
4   that your goal or career path, that you had to start
5   at the jail to get there, or did you want to work at
6   the jail?
7        A        No, sir. I was using that as transition
8   to the road. It would have gotten me in the door with
9   the sheriff's department, and that generally makes it
10  a little easier transition.
11       Q        Understood.
12               So when did you start with the Montgomery
13  County Jail, if you remember?
14       A        I don't remember the date. I know it's
15  the same day that the incident that we're going to
16  discuss was. That was actually my first day on the
17  job.
18       Q        So the incident we're going to discuss is
19  the death of Robert Richardson. Do you understand
20  that?
21       A        Yes, sir.
22       Q        Okay. That occurred on May 19th, 2012,
23  which I think we've figured out was a Saturday. So is
24  that consistent with your recollection, that that was
25  your first day on the job, Saturday, May 19th, 2012?

Page 11

---

1   training on the topic of positional asphyxia?
2        A        Not that I'm aware of. Like I said, I've
3   been working down here for two and a half years, so
4   I've learned a lot more about restraints and different
5   medical things that can happen. To be honest, I'm not
6   sure I was aware of it at the time, but I'm not a
7   hundred percent sure.
8        Q        I appreciate that, and I am going to ask
9   you to do your best to try to differentiate some of
10  the training you might have gotten down in Georgia
11  versus some of the training you got up here in Ohio.
12  And just as you've done, just do your best and let us
13  know that. Okay?
14       A        Yes, sir.
15       Q        So down in Georgia, do you believe you've
16  gotten some training about positional asphyxia?
17       A        Yes, sir. That is actually covered in
18  our basic mandate courses or our basic academy to
19  become a police officer. They go over positional
20  asphyxia kind of as a brief topic of constantly
21  checking on the person that if they're put in a tight
22  spot it could inhibit their breathing, and so you have
23  to check on them if they're in a position that isn't
24  keeping their body upright where they can breathe.
25       Q        All right. Is there a general rule that

Page 13

---

4 (Pages 10 to 13)

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

| | |
|---|---|
| 1  you've learned down there in Georgia in connection | 1  could recall that I had, but I'm not sure on that. |
| 2  with your police training that once somebody is | 2      Q.    Okay.  You said you went through the |
| 3  handcuffed, the goal is to get them up off their belly | 3  corrections academy after the incident where |
| 4  as soon as possible? | 4  Mr. Richardson died in the jail? |
| 5      A.    It's a situation dictates, officer | 5      A.    Yes, sir. |
| 6  safety, what's going on around you, where you are, | 6      Q.    So what kind of training had you had |
| 7  what you can and can't do.  To say there's a rule of | 7  prior to your first day on the job in the jail from |
| 8  thumb, not really.  The rule of thumb you go by is to | 8  Montgomery County? |
| 9  check on them, you know, because -- | 9      A.    I know I had had -- |
| 10      Q.    Check on them? | 10          MR. PREGON:  Objection; asked and |
| 11      A.    Right. | 11  answered. |
| 12      Q.    Do you recall ever reviewing any kind of | 12          THE WITNESS:  Huh? |
| 13  written materials down there that your municipality | 13          MR. PREGON:  I'm sorry.  I said |
| 14  provides that deal with positioning a restrained | 14  objection, asked and answered.  Go ahead. |
| 15  suspect or positional asphyxia, anything like that? | 15          THE WITNESS:  Oh, okay. |
| 16      A.    I know it's been gone over.  As far as a | 16      A.    I would have to say that I went through |
| 17  specific policy, I don't know that I could point you | 17  an orientation period.  They would have given us a |
| 18  to one. | 18  belt, handcuff cases, radio, so we would have gone |
| 19      Q.    Okay.  You did mention kind of -- the | 19  over basics.  But I don't know that I received any |
| 20  reason I asked, you mentioned there's a basic mandate. | 20  formal training before that time. |
| 21  What were you talking about when you mentioned that | 21  BY MR. DiCELLO: |
| 22  mandate? | 22      Q.    How long was the orientation period? |
| 23      A.    That's the actual police academy, and | 23      A.    I couldn't tell you.  I honestly don't |
| 24  they go over ways of handcuffing, you know, things -- | 24  remember. |
| 25  hogtying where you're binding the feet and hands | 25      Q.    Was it conducted at one time or over the |
| Page 14 | Page 16 |
| 1  together behind someone's back, you know, is illegal. | 1  course of multiple days? |
| 2  They go over those kind of topics, what you can and | 2      A.    I'm not a hundred percent sure, but I |
| 3  can't do legally based upon Georgia law. | 3  believe it's multiple days because you go -- |
| 4      Q.    Okay.  Prior to your first day on the job | 4      Q.    How many -- go ahead. |
| 5  at the Montgomery County jail, had you ever reviewed | 5      A.    How many days, I'm not sure.  I know we |
| 6  the written policies and procedures governing | 6  did like a tour of the jail.  We did the sheriff's |
| 7  restraint at the jail? | 7  office.  We went to different departments related to |
| 8          MR. PREGON:  Did you say before his first | 8  the sheriff's department.  But how many days and what |
| 9  day? | 9  I did, I'm sorry, that was too long ago to be able to |
| 10          MR. DiCELLO:  Yeah. | 10  give you too many specifics. |
| 11      A.    I honestly don't know.  That long ago I | 11      Q.    Were you a corrections officer as of |
| 12  know I had a brief orientation period, but to say what | 12  May 19th, 2012? |
| 13  I did during that orientation period, I honestly don't | 13      A.    Yes, sir.  That was my first day. |
| 14  remember. | 14      Q.    But you hadn't been to the corrections |
| 15  BY MR. DiCELLO: | 15  academy yet; correct? |
| 16      Q.    As you sit here today, can you recall | 16      A.    Correct, I had not been. |
| 17  ever being educated about prone restraint before your | 17      Q.    When you graduate from the corrections |
| 18  first day on the job at the jail? | 18  academy, you receive a certification; correct? |
| 19      A.    It would be hard for me to point out. | 19      A.    Yes, sir. |
| 20  Like I said, unfortunately for my memory working at | 20      Q.    So as of May 19th, 2012, you had no |
| 21  that agency and then the agency here in Georgia, I've | 21  certifications as a corrections officer; true? |
| 22  been through more training, basic mandate. | 22      A.    Not from the state, no, sir. |
| 23          After the incident, I actually went | 23      Q.    From any agency? |
| 24  through the corrections academy, and so I've received | 24      A.    No, sir. |
| 25  a lot more training since then.  I don't believe I | 25      Q.    Yes, that's correct? |
| Page 15 | Page 17 |

5 (Pages 14 to 17)

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff      Matthew H. Henning

---

**Page 18**

1   A   Yes, sir, that is correct.

2   Q   So just to make sure. Sometimes I asked

3 a poorly phrased question, but let me make sure to get

4 the question and answer. As of May 19th, 2012, you

5 had no certifications from any agency that you were a

6 certified corrections officer; correct?

7   A   That is correct, I did not have any

8 certifications.

9   Q   As of May 19th, 2012, had you ever been

10 inside of a jail before?

11   A   Only on a tour capacity.

12   Q   How long was the corrections academy to

13 become a certified corrections officer?

14   A   I would have to guess, and I believe it

15 was two weeks. Like I said, that's a guess. I know

16 it was an extended time. It wasn't just like a

17 one-day class. It was a prolonged class.

18      MR. PREGON: And just so we're clear,

19      nobody's asking you to guess today. He's not

20      asking you to guess. Just tell him what you

21      know.

22   A   Yes, sir. I'm not sure the exact

23 duration of the academy.

24 BY MR. DiCELLO:

25   Q   To graduate from the academy, did you

---

**Page 19**

1 have to take any kind of tests or anything?

2   A   Yes, sir.

3   Q   Prior to May 19th, 2012, had you ever

4 restrained anyone?

5      MR. PREGON: For the jail or for

6      anywhere?

7      MR. DiCELLO: Anywhere.

8 BY MR. DiCELLO:

9   Q   I'm not talking about wrestling around

10 with your brother or anything.

11   A   Right.

12   Q   I'm talking prior to May 19th, 2012, had

13 you ever participated in restraining a suspect or an

14 inmate?

15   A   We had area detained working the security

16 for the Air Force. And what I mean by that is if a

17 car pulls up to the gate, we would redirect them to a

18 secondary area. But no, sir, I don't believe I'd ever

19 applied handcuffs or any type of individual restraints

20 on a person.

21   Q   So the first time you ever applied any

22 restraint to anyone was Robert Richardson; correct?

23   A   I may have applied earlier that day. I

24 couldn't tell you if he was the first one that I had

25 been with.

---

**Page 20**

1   Q   Prior to May 19th, 2012, had you ever

2 been on the D-pod at the jail?

3   A   Maybe in a tour, but no, sir, not in a

4 working capacity. And just to clarify, I'd never been

5 arrested in the jail either.

6   Q   Okay. Thank you.

7      So have you had a chance to review your

8 narrative report in the Tiburon system before today's

9 deposition?

10   A   Yes, sir.

11   Q   Did that help refresh your recollection

12 about some of the events you witnessed?

13   A   Yes, sir.

14   Q   Something from your Tiburon report that

15 you documented indicates that Richardson appeared to

16 be in a daze, unaware of what was going on. Why is it

17 that you believe that Mr. Richardson was in a daze and

18 was unaware of what was going on, if you remember?

19   A   He had a confused look on his face, like

20 he didn't understand what was going on, a distant, not

21 recognizing who we were kind of look. It's hard to

22 explain.

23   Q   Fair enough.

24      And you understood that Mr. Richardson

25 was having a medical episode; correct?

---

**Page 21**

1   A   Yes, sir.

2   Q   You also say he appeared to be in a state

3 of panic; correct?

4   A   Yes, sir.

5   Q   Did he look scared?

6      MR. PREGON: Objection. Objection to

7      foundation and form. Go ahead.

8   A   Scared, confused, more confused and

9 disoriented than I would say scared, kind of looked

10 like he was cornered and didn't know what to do kind

11 of.

12 BY MR. DiCELLO:

13   Q   The date on your Tiburon report indicates

14 that you filled it out the day after the incident. Is

15 that consistent with your recollection?

16   A   Yes, sir.

17   Q   Had you ever filled out a narrative

18 report like this prior to May 20th, 2012?

19   A   I'm not sure. Like I said, that was the

20 first day on the job.

21   Q   Right. So do you remember who instructed

22 you to fill out this narrative? The reason I ask is

23 it sounds to me like you wouldn't necessarily know

24 that's what you had to do if it was your first day on

25 the job.

---

6 (Pages 18 to 21)

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff          Matthew H. Henning

---

1      A    Right. I know I was told the next
2 morning when I came into work. As to who told me, I
3 don't know. I was informed that Mr. Richardson had
4 passed and that I needed to write a report. I don't
5 recall who informed me of that.
6      **Q**    **Did somebody have to show you how to**
7 **access the computer and where to write the report?**
8      A    Yes. That would have been --
9      **Q**    **Did somebody -- go ahead.**
10      A    I'm sorry. That would have been Dustin
11 Johnson. He would have been the one that would have
12 walked me through that as my field training officer.
13      **Q**    **And did Dustin Johnson sit there with you**
14 **while you created your report?**
15      A    I don't know. Through my field training
16 program, I know we wrote several reports. He always
17 reviewed them. But if he was sitting beside me while
18 I wrote it, I don't know.
19      **Q**    **Fair to say that you and Dusty Johnson**
20 **talked about what you were going to put in the report;**
21 **correct?**
22      A    Yes, sir.
23      **Q**    **Because there's a -- I want to focus on a**
24 **phrase you use here. It says: To prevent an**
25 **unintentional attack on corrections officers. That's**

Page 22

---

1 person I see use the words "unintentional attack" are
2 Dusty Johnson. You and Dustin are the only people
3 that documented that you were taking action to prevent
4 Robert Richardson from unintentionally attacking
5 people. Does that refresh your recollection at all or
6 help you to understand whether or not those are your
7 words or Dustin's?
8      MR. PREGON: And I'll object to the --
9 the narratives will speak for themselves. It's
10 not word for word as you're characterizing it.
11 BY MR. DiCELLO:
12      **Q**    **No. I'm saying the word "unintentional**
13 **attack" only exists in your statement and in Dustin**
14 **Johnson's statement. It doesn't exist in any anybody**
15 **else's statements.**
16      A    I understand.
17      **Q**    **Do you think that you guys talked about**
18 **that phraseology then?**
19      MR. PREGON: Objection: asked and
20 answered.
21      A    I believe we would have since he was
22 training me, but he never wrote my reports for me.
23 BY MR. DiCELLO:
24      **Q**    **Understood. Okay. Appreciate that.**
25 **That helps.**

Page 24

---

1 not your language; is it? Dustin Johnson told you to
2 write that; correct?
3      MR. PREGON: Objection.
4      A    I don't know. That would have been maybe
5 an explanation.
6 BY MR. DiCELLO:
7      **Q**    **The reason I ask, do you think that you,**
8 **as somebody whose first day on the job in a jail who**
9 **hadn't been through the corrections officer academy**
10 **yet, would use the term "to prevent an unintentional**
11 **attack on corrections officers" in a report?**
12      MR. PREGON: Objection to form and
13 foundation.
14      A    I'm not sure. I know I use similar
15 terminology now whenever I do a use-of-force report or
16 any other report because I describe the purpose of
17 what I'm doing. Because for someone outside of law
18 enforcement, they may not understand the actions we're
19 taking. So whether or not those are my exact words, I
20 really can't tell you.
21 BY MR. DiCELLO:
22      **Q**    **Okay. We have all the Tiburon report**
23 **narratives as an exhibit in this case, and the record**
24 **will reflect how each corrections officer went about**
25 **choosing the words they used, but the only other**

Page 23

---

1      A    Yes.
2      **Q**    **Did you review Dustin Johnson's narrative**
3 **report before you wrote yours?**
4      A    I don't know.
5      **Q**    **Is that something you did with field**
6 **training officers while you were being trained, that**
7 **you would read their reports before you wrote yours?**
8      A    He had me read other people's reports to
9 look at style, how other people would write their
10 reports, and he always tried to get me to do better
11 and always wanted me to write in a fashion that would
12 explain what was going on. So yes, I would have read
13 other people's reports.
14      As to this incident, I couldn't tell you
15 if I'd read anybody else's report before I wrote mine
16 or not.
17      **Q**    **Okay. Did Mr. Richardson unintentionally**
18 **attack anybody on May 19th, 2012?**
19      A    I know he kicked me.
20      MR. PREGON: Objection. Go ahead.
21      A    When we were securing him and trying to
22 help him, I was near his ankles, and because of the
23 way he was moving, he unintentionally struck me, but
24 it was not an aggressive manner.
25 BY MR. DiCELLO:

Page 25

---

7 (Pages 22 to 25)

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

---

**Page 26**

1    Q    At the time that he unintentionally
2  struck you with his foot, he was being restrained by
3  other officers; correct?
4         MR. PREGON:  Objection to form.
5    A    We were trying to help him.  At what
6  point in time he was in handcuffs versus when I was
7  trying to control his legs, I couldn't tell you.
8  BY MR. PREGON:
9    Q    Define what an unintentional attack is
10  for us, this phrase you use in your report.  How do
11  you define "unintentional attack" when you're using it
12  in a report to communicate what's happening?
13    A    Mainly intent is what I use as a factor.
14  An intentional attack I believe the person's intent
15  would be to cause harm.  I don't believe that he was
16  trying to cause any harm, but the mannerisms in which
17  he was moving could cause harm, and so that's why I
18  said it was unintentional because I don't believe
19  anywhere during the time of my interaction with him do
20  I believe he was trying to harm anyone.
21    Q    Okay.  You also use the phrase that
22  Mr. Richardson was "assisted onto his stomach."  What
23  do you mean by that?
24    A    When we entered the cell, I know he was
25  already on the ground, and we didn't just like pull

---

**Page 27**

1  him (indicating) or he didn't fall over.  We placed
2  him or assisted him to the ground.  We would have
3  controlled his general motion to distinguish us
4  helping him versus him just falling over or us doing a
5  like takedown.
6    Q    Did Mr. Richardson unintentionally attack
7  anybody while you were assisting him onto his stomach?
8         MR. PREGON:  Object to form.
9    A    I don't recall.  I really couldn't tell
10  you.
11  BY MR. DiCELLO:
12    Q    Did he resist being assisted onto his
13  stomach, if you remember?
14    A    I don't remember.
15    Q    Again, the Tiburon reports will speak for
16  themselves, but the only other person that I saw that
17  used the phraseology that Mr. Richardson was assisted
18  onto his stomach was Dustin Johnson.  Assuming that's
19  true, does that refresh your recollection as to
20  whether or not those are your words or whether those
21  are Dustin Johnson's words?
22         MR. PREGON:  Objection to form.
23    A    It is my report.  As a field training
24  officer, he would have assisted me, but he would have
25  not written my report for me.

---

**Page 28**

1  BY MR. DiCELLO:
2    Q    So where did you come up with the term
3  "assisted onto the stomach" then, if you remember?
4    A    I couldn't tell you.
5    Q    You indicate that Mr. Richardson was
6  struggling while he was on his stomach.  That's what
7  happened; correct?
8    A    Yes, sir.
9    Q    And then you placed your left knee over
10  Mr. Richardson's lower legs to prevent him from
11  kicking.  That's what your narrative report states;
12  correct?
13    A    Yes, sir.
14    Q    And then you say:  Richardson still
15  appeared to be in a state of panic and disorientation;
16  correct?
17    A    Yes, sir.
18    Q    So after he was restrained and in
19  handcuffs and you had your knee over his legs to
20  prevent Mr. Richardson from kicking, he still appeared
21  to be disoriented to you; true?
22    A    Yes, sir.
23    Q    He still appeared to not know what was
24  going on; true?
25    A    Yes, sir.

---

**Page 29**

1    Q    Do you know whether or not Mr. Richardson
2  was able to comply with commands?
3    A    I don't know.  I was focused on his lower
4  body right around his -- if I remember correctly, his
5  lower body was still near the door frame, and so I was
6  trying to prevent him from kicking the steel frame of
7  the wall.  I didn't want him to injure himself.  I
8  mean, that was my purpose for being there and trying
9  to help was to keep him from hurting himself.  I was
10  more focused on where I was.  What other people were
11  doing I really honestly can't tell you.
12    Q    Did anybody tell you what to do during
13  this encounter with Mr. Richardson or did you just
14  follow your instincts?
15    A    I don't know.  I really don't recall.  It
16  kind of all just happened.
17    Q    Were you surprised that you were
18  participating in actively restraining an inmate as a
19  field training office the first day on the job who
20  hadn't been through the corrections academy yet?
21         MR. PREGON:  Objection.  Go ahead.
22    A    I don't really understand your question.
23  BY MR. DiCELLO:
24    Q    Well, we've seen the video.  Do you agree
25  there were plenty of corrections officers on the scene

---

8 (Pages 26 to 29)

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

---

**Page 30**

1 to handle the situation; agreed?
2         MR. PREGON: Objection.
3         A     At what point in time? I know I was one
4 of the first ones there. Later on we were relieved as
5 more officers arrived. But I'm not following really
6 what you're asking to be honest.
7 BY MR. DiCELLO:
8         Q     So you weren't surprised that there you
9 were, your first day on the job, you're not a
10 certified corrections officer, you haven't been to the
11 certified corrections academy yet, it didn't surprise you that
12 you were in there restraining members of the community
13 in the jail; true?
14        A     True. I accepted a position working in a
15 jail that comes with the job description.
16        Q     Did you hear Mr. Richardson saying
17 anything?
18        A     Not that I can recall.
19        Q     He said he couldn't breathe; didn't he?
20        MR. PREGON: Objection: asked and
21 answered.
22        A     I don't remember him saying anything.
23 BY MR. DiCELLO:
24        Q     Didn't he say get off me, let me up?
25        MR. PREGON: Same objection.

**Page 31**

1         A     Again, sir, I don't remember him saying
2 anything.
3 BY MR. DiCELLO:
4         Q     I presume you don't remember the
5 corrections officer saying anything either; correct?
6         A     I know verbal commands were given. The
7 exact commands that were given, no, sir, I couldn't
8 tell you.
9         Q     Do you remember any of the inmates saying
10 anything?
11        A     I know his cellmate -- I apologize. I
12 don't remember his name. He was talking to him. What
13 he was saying, I don't remember, sir. I do know he
14 was speaking whenever we entered the cell.
15        Q     There was a sergeant with you when you
16 responded or a sergeant was there or arrived shortly
17 after you responded initially to Mr. Richardson;
18 correct?
19        A     Yes, sir.
20        Q     And the sergeant has testified in this
21 case that it took less than 20 seconds to get
22 Mr. Richardson handcuffed. Is that consistent with
23 your memory?
24        MR. PREGON: Objection. Go ahead.
25        A     I know it was fairly quickly. Once we

**Page 32**

1 were there, we did handcuff him. The time frame, I
2 don't know, sir.
3 BY MR. DiCELLO:
4         Q     Once he was handcuffed and put on his
5 stomach, were the corrections officers that were there
6 able to control Mr. Richardson's movements?
7         A     In a broad sense, yes, he wasn't going
8 anywhere. He wasn't like fleeing. But he still had
9 the jerking mannerisms. So yes, he was controlled,
10 but he was not smothered. He could still move about,
11 but he wasn't going to be able to go anywhere or run
12 into any walls.
13        Q     You had a concern that he'd run into a
14 wall?
15        A     I was afraid he was going to kick a wall.
16 That's why I placed my leg over his so that he could
17 still move forward and backwards but he couldn't go
18 side to side (indicating) because it's a concrete
19 wall, and had he kicked that, that would have probably
20 hurt really bad.
21        Q     What was the plan?
22        A     I don't understand. My plan or the
23 overall plan?
24        Q     Well, yeah. It's my understanding that
25 you've got three, four, five, or more corrections

**Page 33**

1 officers now restraining Mr. Richardson after being
2 called for a medical emergency; correct?
3         A     There were corrections officers there,
4 yes, and I know that --
5         Q     So what was this plan?
6         A     Have medical assess him. We had medical
7 personnel there in the jail, the NaphCare, and I know
8 that they are trained in various levels, and so we
9 were there to assist them in any way we could.
10        Q     And what did you do to assist NaphCare?
11        A     I made sure that he didn't hurt himself
12 further by kicking a wall. That was my main concern.
13        Q     Okay. And beyond your initial concern of
14 making sure he didn't kick a wall with his legs, did
15 you understand what the plan was from the corrections
16 side of things? I mean, was Mr. Richardson going to
17 be sat up, was he going to be rolled over, was he
18 going to be put in a restraint chair, were they going
19 to set him on his butt, or was he just going to be
20 held in that position indefinitely, if you know?
21        A     I don't know.
22        Q     Nobody ever communicated to you what the
23 plan was?
24        A     I wasn't there very long, and we got
25 transitioned out at shift change. I don't remember a

Mike Mobley Reporting
800-894-4327

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

---

1   plan being -- a huddle being formed and a plan being
2   gone over. I know that when it's a medical emergency,
3   we rely on the medical personnel.
4       Q       Do you know, as you sit here today, about
5   how long you were involved in restraining
6   Mr. Richardson?
7       A    I do not.
8       Q       According to the scene log that we have,
9   it shows you arriving on the scene at 15:21 and it
10  shows you exiting the pod at 15:30. Okay. So do you
11  recall once you were changed out like you told us, so
12  a corrections officer took over for you; correct?
13          MR. PREGON: You said he entered at
14      15:21? Is that what you said?
15          MR. DiCELLO: Yeah.
16          MR. PREGON: Okay.
17  BY MR. DiCELLO:
18      Q       So you told us that a corrections officer
19  swapped you out because it was probably near the end
20  of your shift; right?
21      A    Yes, sir.
22      Q       And once that corrections officer swapped
23  you out, did you stay in the pod or did you leave
24  pretty shortly thereafter?
25      A    I believe I left immediately. If I

                                          Page 34

---

1   remember right, I followed my FTO out, and we went
2   down and would have done our normal outtake procedure,
3   turning in our radios, turning in the keys, that sort
4   of deal.
5       Q       So if the scene log shows that you
6   responded at 15:21 -- I've seen the video, so I'll
7   ask you: When you responded to the pod, you responded
8   immediately to Mr. Richardson's cell; correct?
9       A    Yes.
10      Q       With haste; true?
11      A    Yes.
12      Q       Okay. So fair to say that you were
13  involved in restraining Mr. Richardson for
14  approximately upwards of nine minutes if you entered
15  the pod at 15:21 and you exited the pod at 15:30;
16  correct?
17          MR. PREGON: Objection. I don't think
18      that's what he said.
19          MR. DiCELLO: I'm asking.
20      A    No, sir. I don't believe I was actively
21  restraining him for nine minutes.
22  BY MR. DiCELLO:
23      Q       Mr. Richardson was actively being
24  restrained during those nine minutes, though; correct?
25      A    I would have a problem saying he was

                                          Page 35

---

1   actively restrained. Yes, we were in control of him,
2   but I even reviewed the video, and at least once
3   during the time I was there I stood up, and so I know
4   I was not actively restraining him during that time,
5   and so that's why I kind of have a problem with the
6   terminology "actively restraining him." We were
7   there. We had control of the situation. But we
8   weren't -- myself, that's who I'm speaking for, I was
9   not always touching him.
10      Q       Was Mr. Richardson ever permitted to be
11  let up?
12          MR. PREGON: Object to form. Go ahead.
13      A    I don't know what you mean. I know
14  positions were changed. He was put in different
15  positions. But as far as being let up, I don't really
16  know what you mean.
17  BY MR. DiCELLO:
18      Q       Did anybody ever say we should put
19  Mr. Richardson on his butt?
20      A    I don't recall.
21      Q       As you sit here today, do you know
22  whether Mr. Richardson was at risk of positional
23  asphyxia based on what was going on with him on
24  May 19th, 2012, that you saw?
25          MR. PREGON: Objection. Go ahead.

                                          Page 36

---

1       A    I don't know that I would have -- at that
2   time, knowing what I knew then, I don't know that I
3   would have known. I know I've received a lot more
4   training since then, and a lot more of it deals with
5   the back of a patrol car. And I know, you know, some
6   of the ways you can't put people in a patrol car.
7   Then I don't know that I would have known.
8   BY MR. DiCELLO:
9       Q       Okay. So how about based on what you
10  know now, was Mr. Richardson, based on the positions
11  that you saw him in and based on his characteristics
12  that you were aware of on May 19th, 2012, was he at
13  risk of positional asphyxia?
14          MR. PREGON: Objection.
15          MR. HOJNOSKI: Objection.
16      A    I don't know that my training now,
17  looking back three years, four years, I don't know
18  that my memory of that incident is applicable to the
19  training I have now. I don't know that I could
20  realistically relate the two and give you an honest
21  answer on that.
22  BY MR. DiCELLO:
23      Q       So you can't tell us whether
24  Mr. Richardson was at risk of positional asphyxia as
25  of 2012? And even now, having reviewed the video and

                                          Page 37

---

                                    10 (Pages 34 to 37)

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

1   based on your memory, you can't tell us if he was at
2   risk of positional asphyxia even now; correct?
3        A    The minimal training I have, I'm not a
4   medical professional. I don't know indicators and
5   risk factors that they would. No, sir, I don't know
6   that I could.
7        Q    Okay. You don't know what the risk
8   factors are for positional asphyxia; fair?
9        A    No, sir.
10       Q    Yes, that's correct?
11       A    That is correct, I do not know. I
12   know --
13       Q    So obviously back in May of 2012 you
14   didn't know either; correct?
15       A    No, sir, I would not have known.
16       Q    Yes, that's correct?
17       A    I apologize. No, sir.
18       Q    Finishing up with you here, Mr. Henning,
19   I want to be respectful of your time. I appreciate
20   you making yourself available.
21       A    Yes, sir.
22       Q    So how long did you go on to work at the
23   jail? I know you've told us the dates. I should have
24   this figured out, but I can't remember. How long did
25   you work at the jail?

Page 38

1   well, what do you do in a medical emergency, it really
2   depends on the situation and who we're dealing with.
3   BY MR. DiCELLO:
4        Q    So who's responsible for making those
5   decisions you just explained?
6        A    I would say it would be a joint decision
7   between the medical personnel and the officer. If a
8   nurse is uncomfortable going into a cell with an
9   inmate, I'm not going to put her or him in that
10   position that they're going to be in an uncomfortable
11   place or possibly what they would view as danger.
12       Q    So do you agree that there's got to be
13   good communication between the corrections and the
14   medical staff when responding to a medical emergency
15   for a detainee?
16       A    Ideally, yes.
17       Q    When you were there on May 19th, 2012, do
18   you remember a medic and a nurse responding?
19       A    I don't know that I can distinguish
20   between my memory and the video. I know they were
21   there. I don't know that I can distinguish it from my
22   own memory.
23       Q    Do you ever recall any medic or nurse
24   providing you or any other corrections officer with
25   any instructions or recommendations about how to

Page 40

1        A    Right at a year.
2        Q    All right, sir. Over the course of that
3   year, did you have occasion to respond to other
4   medical emergency calls?
5        A    I would have, yes.
6        Q    And what was your understanding in the
7   jail as to when it's a medical call, as between
8   medical staff and corrections staff, who is
9   responsible for the positioning of the inmate and the
10   patient?
11       MR. PREGON: Objection.
12       A    I believe it came down to circumstances.
13   If someone was having a diabetic complication where if
14   their blood sugar is low, normally in my experience
15   there they're compliant and we generally didn't have
16   problems with them, so they could be taken out of
17   their cell and evaluated either in a hall or in a
18   separate room. So the situation and what the problem
19   was would have dictated what we would have done. Our
20   response as a corrections officer is to maintain the
21   safety of the jail and to make sure that both the
22   inmate and the medical professional are safe. And so
23   if a treatment needed to be done between the inmate
24   and medical staff between bars, then that's what we
25   would have done in that situation. So a blanket,

Page 39

1   position Mr. Richardson?
2        A    I don't recall, (shakes head negatively).
3        Q    Based on your understanding of the
4   customs, you know, the practices, how things were done
5   around the jail, was prone restraint, meaning
6   restrained on the belly with the hands cuffed behind
7   the back (indicating), was that prohibited or was that
8   acceptable?
9        A    I believe it was acceptable if that was
10   necessary in the particular incident.
11       Q    Are you aware of any written policies and
12   procedures that were enforced as of May 2012 that said
13   prone restraint was prohibited in the Montgomery
14   County Jail?
15       A    No, sir, not that I know of.
16       Q    You don't recall reviewing any procedures
17   that said that; true?
18       A    Between working in the jail and now
19   working on the road, I can't tell you the differences
20   in the policies.
21       Q    Okay. My question was you don't remember
22   reviewing any Montgomery County Jail policies that
23   said prone restraint is prohibited; correct?
24       A    I don't remember a particular policy, no,
25   sir.

Page 41

11 (Pages 38 to 41)

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff            Matthew H. Henning

---

1      Q     Because the fact of the matter is during
2 your year at the jail, you saw inmates placed in prone
3 restraint more than once; correct?
4        MR. PREGON: Object to the form.
5      A     I don't recall any particular incident.
6 BY MR. DiCELLO:
7      Q     Mr. Richardson was restrained in a prone
8 position; true?
9      A     Yes.
10        MR. PREGON: Objection.
11      A     He was handcuffed on the ground.
12 BY MR. DiCELLO:
13      Q     While you were up here working for the
14 Montgomery County Sheriff, I presume but I have to ask
15 you, did anybody ever make you aware of an executive
16 order issued by the governor banning the use of prone
17 restraint in the state of Ohio that was issued in
18 2009?
19        MR. PREGON: And I'll object to this.
20      A     I do not recall being made aware of it.
21 BY MR. DiCELLO:
22      Q     Before today has anybody ever made you
23 aware that there was an executive order issued in 2009
24 in the state of Ohio banning prone restraint?
25        MR. PREGON: And I caution you. Don't

Page 42

---

1 reveal anything that you've talked about with
2 attorneys such as me. Anybody besides me?
3        THE WITNESS: No, sir.
4 BY MR. DiCELLO:
5      Q     Down where you work now for the police
6 department, I don't know how things work down there,
7 but is there an equivalent function by the governor
8 down there where they're able to issue executive
9 orders from time to time that govern police officers'
10 conduct?
11        MR. PREGON: Objection.
12      A     The state governor can issue executive
13 orders. Our department policies are generally
14 stricter than the state requirements. So to answer
15 your question, yes, the governor of the state can
16 write executive orders.
17 BY MR. DiCELLO:
18      Q     And I'm not suggesting that it's your job
19 to do this, but do you have an expectation that your
20 department is going to make you aware of the executive
21 orders you need to be aware of to do your job?
22        MR. PREGON: Objection: assumes facts not
23 in evidence.
24      A     Our department does try to keep us
25 abreast of any new laws or changes in laws, yes, sir.

Page 43

---

1 BY MR. DiCELLO:
2      Q     Well, whether there's judicial notice of
3 it or testimony or whatever, I'll represent to you
4 that there was an executive order issued in 2009 by
5 Governor Ted Strickland that was continued by Governor
6 Kasich that banned prone restraint across all state
7 agencies, including the Department of Corrections. As
8 a corrections officer working in a jail in 2012, do
9 you think that's something you should have been made
10 aware of?
11        MR. PREGON: Objection.
12      A     I don't recall in Ohio if the county jail
13 is part of the state system. Here in Georgia it's
14 not. And so I don't know that any state orders for
15 state agencies would apply. So I don't know that
16 there's an expectation of an order like that being
17 necessary.
18 BY MR. DiCELLO:
19      Q     So you wouldn't expect to be made aware
20 of it. Is that what you're telling us?
21      A     Not if it doesn't apply to my position or
22 my agency.
23      Q     Why do you think the governor would issue
24 an order like that banning prone restraint?
25        MR. PREGON: Objection. How's he going

Page 44

---

1 to know that?
2        MR. DiCELLO: He's a law enforcement
3 officer who restrains people.
4 BY MR. DiCELLO:
5      Q     Right?
6      A     Yes, sir, I do restrain people.
7        MR. PREGON: Same objection.
8 BY MR. DiCELLO:
9      Q     So why do you think a governor would
10 issue a ban against prone restraint?
11        MR. PREGON: Objection.
12      A     Sir, he's a governor. He could have done
13 anything from a political move to try to obtain more
14 votes to he could have actually seen that there was a
15 reason for it. I don't know. He's a governor. I'm
16 just a police officer.
17 BY MR. DiCELLO:
18      Q     Do you know how Mr. Richardson died?
19      A     No, sir, not entirely.
20      Q     Who informed you that he died, if you
21 remember?
22      A     I don't remember. It was the morning
23 after when I came into work. I don't remember if it
24 was in roll call or preparing for my individual
25 position.

Page 45

---

12 (Pages 42 to 45)

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff          Matthew H. Henning

| | |
|---|---|
| 1    **Q**    Did anybody interview you about what<br>2  happened to Mr. Richardson?<br>3    A   No, sir.<br>4    **Q**    Did you understand there was an<br>5  investigation into the circumstances surrounding his<br>6  death?<br>7    A   I was made aware of that after the fact.<br>8    **Q**    Did anybody share with you the results of<br>9  the investigation?<br>10    A   Beyond him passing, I don't know that any<br>11  other details were made apparent to me.<br>12    **Q**    Do you know if the manner in which he was<br>13  restrained caused or contributed to causing his death?<br>14    MR. PREGON:  Objection.<br>15    A   I don't know that.<br>16  BY MR. DiCELLO:<br>17    **Q**    Is that something you want to know?<br>18    A   If it could make my job better or if<br>19  something needed to be fixed, then yes, but it is not<br>20  my place to try to go and solve those problems.  There<br>21  are people that that is their job.<br>22    MR. DiCELLO:  Mr. Henning, thanks for<br>23  your patience.  I don't have any other questions.<br>24  I appreciate your time.<br>25    THE WITNESS:  Yes, sir.  Thank you.<br><br>Page 46 | 1    C E R T I F I C A T E<br>2<br>3    I hereby certify that the foregoing<br>transcript was reported, as stated in the<br>4  caption; that the witness was duly sworn and<br>elected to reserve signature in this matter; that<br>5  the colloquies, questions and answers were<br>reduced to writing under my direction; and that<br>6  the foregoing pages 1 through 47 represent a<br>true, correct, and complete record of the<br>7  evidence given.<br>    I further certify that I am not<br>8  disqualified for a relationship of interest under<br>O.C.G.A. 9-11-28(c); that I am a Georgia<br>9  Certified Court Reporter here as a representative<br>of D'Amico Gershwin, Inc.; that D'Amico Gershwin<br>10  was contacted by Mike Mobley Reporting to provide<br>court reporting services for this deposition;<br>11  that I will not be taking this deposition under<br>any contract that is prohibited by O.C.G.A.<br>12  15-14-37(a) and (b) or Article 7C of the Rules<br>and Regulations of the Board; and by the attached<br>13  disclosure forms I confirm that I/D'Amico<br>Gershwin is not a party to a contract prohibited<br>14  by O.C.G.A. 15-14-37 or Article 7C of the Rules<br>and Regulations of the Board.<br>15    This, the 14th day of March, 2016.<br>16<br>17<br>18<br>19    _____<br>20    DANIEL M. GERSHWIN, CCR-B-1012<br>21<br>22<br>23<br>24<br>25<br><br>Page 48 |
| 1    MR. DiCELLO:  Okay.  Good luck with<br>2  everything.<br>3    MR. PREGON:  Okay.  Officer, you've got<br>4  the right to read through this if it's ordered.<br>5  You have an errata sheet that would come with it.<br>6  And as you read it, if you think something was<br>7  taken down inaccurately, you could make a note of<br>8  that.  And then once you do that, you can sign<br>9  off on it or you can waive that right and just<br>10  not sign off on and it just gets enters as is.<br>11  It's entirely up to you.  A lot of people are<br>12  reading.  Some people have waived it, but I'll<br>13  leave that up to you.  If you have any concerns<br>14  about whether or not you heard everything that<br>15  Mr. DiCello was asking you, I'd tell you you<br>16  probably should not waive it and read, but it's<br>17  up to you.  I don't know what the connection was<br>18  like on your end.<br>19    THE WITNESS:  Yes, sir.  I believe we had<br>20  a good connection, but I'll more than likely<br>21  review it.<br>22    MR. PREGON:  Okay.  Very good.  He won't<br>23  waive reading.<br>24    (Deposition concluded at 3:00 p.m.)<br>25    - - -<br><br>Page 47 | |

13 (Pages 46 to 48)

48

1              C E R T I F I C A T E

2

3          I hereby certify that the foregoing
   transcript was reported, as stated in the
4  caption; that the witness was duly sworn and
   elected to reserve signature in this matter; that
5  the colloquies, questions and answers were
   reduced to writing under my direction; and that
6  the foregoing pages 1 through 47 represent a
   true, correct, and complete record of the
7  evidence given.
           I further certify that I am not
8  disqualified for a relationship of interest under
   O.C.G.A. 9-11-28(c); that I am a Georgia
9  Certified Court Reporter here as a representative
   of D'Amico Gershwin, Inc.; that D'Amico Gershwin
10 was contacted by Mike Mobley Reporting to provide
   court reporting services for this deposition;
11 that I will not be taking this deposition under
   any contract that is prohibited by O.C.G.A.
12 15-14-37(a) and (b) or Article 7C of the Rules
   and Regulations of the Board; and by the attached
13 disclosure forms I confirm that I/D'Amico
   Gershwin is not a party to a contract prohibited
14 by O.C.G.A. 15-14-37 or Article 7C of the Rules
   and Regulations of the Board.
15         This, the 14th day of March, 2016.

16

17

18

19    _____
      DANIEL M. GERSHWIN, CCR-B-1012
20

21

22

23

24

25

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

Page 49

1                          E R R A T A   S H E E T

2              Pursuant to Rule 30(e) of the Federal Rules
    of Civil Procedure and/or O.C.G.A. 9-11-30(e), any
3   changes in form or substance which you desire to make
    to your deposition testimony shall be entered upon the
4   deposition with a statement of the reasons given for
    making them.

5

6              To assist you in making any such
    corrections, please use the form below.  If
7   supplemental or additional pages are necessary, please
    furnish same and attach them to this errata sheet.

8

9                            - - -

10

             I, the undersigned, MATTHEW H. HENNING, do
11  hereby certify that I have read the foregoing
    deposition and that said transcript is true and
12  accurate, with the exception of the following changes
    noted below, if any:

13

14  Page_____/Line_____/Should Read:_____

15  _____

16  Reason:_____

17

18  Page_____/Line_____/Should Read:_____

19  _____

20  Reason:_____

21

22  Page_____/Line_____/Should Read:_____

23  _____

24  Reason:_____

25

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

Page 50

1    Page_____/Line_____/Should Read:_____

2    _____

3    Reason:_____

4

5    Page_____/Line_____/Should Read:_____

6    _____

7    Reason:_____

8

9    Page_____/Line_____/Should Read:_____

10   _____

11   Reason:_____

12

13   Page_____/Line_____/Should Read:_____

14   _____

15   Reason:_____

16

17   Page_____/Line_____/Should Read:_____

18   _____

19   Reason:_____

20

21                         _____
                           MATTHEW H. HENNING,

22
     Sworn to and subscribed before me,
23
     _____, Notary Public.
24
     This ___2nd___ day of __April__, 20_16_
25   My Commission Expires: Feb 21, 2017

ANNIE R. REED
NOTARY
EXPIRES
GEORGIA
Feb. 21, 2017
PUBLIC
DEKALB COUNTY

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

**A**

**able** 8:24 10:2 17:9 29:2 32:6,11 43:8
**abreast** 43:25
**academy** 13:18 14:23 15:24 16:3 17:15,18 18:12,23 18:25 23:9 29:20 30:11
**acceptable** 41:8,9
**accepted** 30:14
**access** 22:7
**accurate** 49:12
**action** 2:11,12,12,13 2:13,13 3:11,11 3:11,12,12,13 4:10,10,11,11,11 4:12 24:3
**actions** 23:18
**actively** 29:18 35:20 35:23 36:1,4,6
**actual** 14:23
**additional** 8:21 49:7
**Administrator** 1:4
**afraid** 32:15
**agencies** 44:7,15
**agency** 2:11 3:10 4:9 15:21,21 17:23 18:5 44:22
**agent** 2:12 3:11 4:11
**aggressive** 25:24
**ago** 15:11 17:9
**agree** 29:24 40:12
**agreed** 30:1
**ahead** 10:12,13 16:14 17:4 21:7 22:9 25:20 29:21 31:24 36:12,25
**Air** 8:18,22,23 9:14 9:19,25 19:16
**al** 1:9
**and/or** 49:2
**Andrew** 1:5 5:10
**ankles** 25:22
**answer** 18:4 37:21 43:14
**answered** 16:11,14 24:20 30:21
**answers** 7:2,13 48:5
**anybody** 24:14 25:15,18 27:7 29:12 36:18 42:15 42:22 43:2 46:1,8
**apologize** 31:11 38:17
**apparent** 46:11

**APPEARANCES** 5:1
**appeared** 20:15 21:2 28:15,20,23
**applicable** 37:18
**application** 10:9
**applied** 19:19,21,23
**apply** 44:15,21
**appreciate** 6:8,19 13:8 24:24 38:19 46:24
**approximately** 35:14
**area** 8:6 9:1 19:15 19:18
**arrangements** 2:14 3:13 4:12
**arrested** 20:5
**arrived** 30:5 31:16
**arriving** 34:9
**Article** 2:3,8 3:3,7 4:3,7 48:12,14
**asked** 14:20 16:10 16:14 18:2 24:19 30:20
**asking** 12:17 18:19 18:20 30:6 35:19 47:15
**asphyxia** 13:1,16,20 14:15 36:23 37:13 37:24 38:2,8
**assess** 33:6
**assigned** 12:10
**assist** 33:9,10 49:6
**assisted** 26:22 27:2 27:12,17,24 28:3
**assisting** 27:7
**assumes** 43:22
**Assuming** 27:18
**Atlanta** 1:20
**attach** 49:7
**attached** 48:12
**attack** 22:25 23:11 24:1,13 25:18 26:9,11,14 27:6
**attacking** 24:4
**attorney** 2:11,12 3:10,12 4:5,10,11
**attorneys** 43:2
**available** 6:9,20 38:20
**Avenue** 5:4,12
**aware** 13:2,6 37:12 41:11 42:15,20,23 43:20,21 44:10,19 46:7

**B**

**b** 2:8 3:7 4:7 48:12
**bachelor's** 8:23
**back** 6:15 12:21 15:1 37:5,17 38:13 41:7
**background** 8:14
**backwards** 32:17
**bad** 32:20
**ban** 45:10
**banned** 44:6
**banning** 42:16,24 44:24
**bars** 39:24
**base** 9:3,19,25 10:3
**based** 15:3 36:23 37:9,10,11 38:1 41:3
**basic** 13:18,18 14:20 15:22
**basically** 8:20 9:24
**basics** 16:19
**Beach** 5:9
**behalf** 5:2,8,17
**believe** 10:6 13:15 15:25 17:13 18:14 19:18 20:17 24:21 26:14,15,18,20 34:25 35:20 39:12 41:9 47:19
**belly** 14:3 41:6
**belt** 16:18
**Benjamin** 5:10
**best** 13:9,12
**better** 25:10 46:18
**BEYOGLIDES** 1:4
**beyond** 2:14 3:13 4:12 33:13 46:10
**binding** 14:25
**birth** 10:15
**bit** 9:9,13
**blanket** 39:25
**blood** 39:14
**Board** 2:4,8 3:4,7 4:4,7 48:12,14
**body** 13:24 29:4,5
**Boehringer** 5:18
**born** 8:9
**Bradley** 5:9
**breathe** 13:24 30:19
**breathing** 13:22
**Brenda** 5:18
**Brian** 5:8
**brief** 13:20 15:12
**broad** 32:7
**brother** 19:10
**butt** 33:19 36:19

**C**

**C** 48:1,1
**calculus** 9:16
**call** 39:7 45:24
**called** 1:15 7:9 33:2
**calls** 39:4
**capacity** 18:11 20:4
**caption** 48:4
**car** 19:17 37:5,6
**career** 11:1,4
**case** 1:7 12:16 23:23 31:21
**cases** 16:18
**cause** 26:15,16,17
**caused** 46:13
**causing** 46:13
**caution** 42:25
**CCR-B-1012** 2:20 48:19
**cell** 26:24 31:14 35:8 39:17 40:8
**cellmate** 31:11
**certification** 17:18
**certifications** 10:5 17:21 18:5,8
**certified** 1:18 2:3,5 18:6,13 30:10 48:9
**certify** 48:3,7 49:11
**chair** 33:18
**chance** 20:7
**change** 33:25
**changed** 34:11 36:14
**changes** 43:25 49:3 49:12
**characteristics** 37:11
**characterizing** 24:10
**check** 13:23 14:9,10
**checking** 10:1 13:21
**choosing** 23:25
**Cincinnati** 5:21
**Circle** 1:19
**circumstances** 39:12 46:5
**city** 7:20
**Civil** 1:17 49:2
**clarify** 20:4
**class** 18:17,17
**classes** 8:21,21 9:15
**clear** 18:19
**Cleveland** 5:5
**college** 8:20 9:17
**colloquies** 48:5
**Colorado** 8:9

**come** 28:2 47:5
**comes** 30:15
**commands** 29:2 31:6,7
**Commission** 50:25
**communicate** 26:12
**communicated** 33:22
**communication** 40:13
**community** 30:12
**complete** 9:11 48:6
**compliant** 39:15
**complication** 39:13
**comply** 29:2
**computer** 22:7
**concern** 32:13 33:12,13
**concerns** 47:13
**concluded** 47:24
**concrete** 32:18
**conduct** 43:10
**conducted** 16:25
**confirm** 48:13
**confused** 20:19 21:8 21:8
**connection** 6:13,17 7:14 14:1 47:17 47:20
**consistent** 11:24 21:15 31:22
**constantly** 13:20
**contacted** 2:5 3:5 4:5 48:10
**continued** 44:5
**contract** 2:1,7,10 3:1,6,8 4:1,6,8 9:4 9:22 10:8 48:11 48:13
**contractor's** 9:2
**contributed** 46:13
**control** 26:7 32:6 36:1,7
**controlled** 9:24 27:3 32:9
**cornered** 21:10
**Corps** 8:19
**correct** 17:15,16,18 17:25 18:1,6,7 19:22 20:25 21:3 22:21 23:2 26:3 28:7,12,16 31:5 31:18 33:2 34:12 35:8,16,24 38:2 38:10,11,14,16 41:23 42:3 48:6
**corrections** 5:8 8:3

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

10:13,24 12:10
15:24 16:3 17:11
17:14,17,21 18:6
18:12,13 22:25
23:9,11,24 29:20
29:25 30:10,11
31:5 32:5,25 33:3
33:15 34:12,18,22
39:8,20 40:13,24
44:7,8 49:6
**correctly** 29:4
**COs** 12:17
**Council** 2:4 3:4 4:4
**COUNSEL** 5:1
**county** 1:9 7:25 8:4
10:10 11:2,13
12:25 15:5 16:8
41:14,22 42:14
44:12
**couple** 10:7
**course** 17:1 39:2
**courses** 13:18
**court** 1:1,18 2:3,4,5
2:6 3:4,5 4:4,5
48:9,10
**covered** 13:17
**Covington** 7:19,22
**created** 22:14
**cross-examination**
1:16
**cuffed** 41:6
**current** 7:17
**customary** 2:14
3:13 4:13
**customs** 41:4

**D**

**D'Amico** 2:5,6 3:4,9
3:9,13,19 48:9,9
**D-pod** 20:2
**danger** 40:11
**Daniel** 1:17 2:3,20
3:3,19 48:19
**date** 10:15 11:14
21:13
**dates** 38:23
**day** 2:15 3:15 4:14
11:15,16,25 12:3
12:4,11,24 15:4,9
15:18 16:7 17:13
19:23 21:14,20,24
23:8 29:19 30:9
48:15 50:24
**days** 17:1,3,5,8
**Dayton** 5:13 8:6,12
9:1
**daze** 20:16,17

**deal** 14:14 35:4
**dealing** 40:2
**deals** 37:4
**death** 6:14 11:19
46:6,13
**Deceased** 1:5
**decision** 40:6
**decisions** 40:5
**Defendants** 1:10 5:8
5:17
**define** 26:9,11
**degree** 8:24
**department** 7:19,20
10:23 11:9 12:6
17:8 43:6,13,20
43:24 44:7
**departments** 17:7
**depends** 40:2
**deposed** 6:24
**deposition** 1:14 2:6
2:7 3:6,8 4:6,7
6:17 20:9 47:24
48:10,11 49:3,4
49:11
**Deputies** 5:10
**describe** 23:16
**description** 30:15
**desire** 49:3
**details** 46:11
**detained** 19:15
**detainee** 40:15
**diabetic** 39:13
**DiCELLO** 5:3 6:5,8
10:18,21 15:10,15
16:21 18:24 19:7
19:8 21:12 23:6
23:21 24:11,23
25:25 27:11 28:1
29:23 30:7,23
31:3 32:3 34:15
34:17 35:19,22
36:17 37:8,22
40:3 42:6,12,21
43:4,17 44:1,18
45:2,4,8,17 46:16
46:22 47:1,15
**dictated** 39:19
**dictates** 14:5
**died** 9:4 16:4 45:18
45:20
**differences** 41:19
**different** 12:7 13:4
17:7 36:14
**differentiate** 13:9
**Dinkler** 5:12
**direction** 48:5
**disclose** 2:3 3:3 4:3

**disclosed** 2:15 3:6
3:14 4:6,13
**disclosure** 2:1 3:1
4:1 48:13
**discuss** 11:16,18
**discussion** 10:19
**disorientation**
28:15
**disoriented** 21:9
28:21
**disqualified** 2:8
48:8
**distant** 20:20
**distinguish** 27:3
40:19,21
**DISTRICT** 1:1,1
**DIVISION** 1:2
**documented** 20:15
24:3
**doing** 6:20 23:17
27:4 29:11
**door** 11:8 29:5
**duly** 6:2 48:4
**duration** 18:23
**Dustin** 5:9 12:12
22:10,13 23:1
24:2,13 25:2
27:18,21
**Dustin's** 24:7
**Dusty** 22:19 24:2

**E**

**E** 5:6,15,23 48:1,1
49:1,1,1
**earlier** 19:23
**easier** 11:10
**educated** 15:17
**either** 20:5 31:5
38:14 39:17
**elected** 48:4
**Ellis** 5:18
**else's** 24:15 25:15
**emergency** 33:2
34:2 39:4 40:1,14
**employed** 9:18
**employment** 7:18
7:24
**encounter** 29:13
**enforced** 41:12
**enforcement** 9:5
11:1 23:18 45:2
**enter** 10:2
**entered** 26:24 31:14
34:13 35:14 49:3
**enters** 47:10
**entirely** 45:19 47:11
**entry** 9:25

**episode** 20:25
**equivalent** 43:7
**errata** 47:5 49:7
**ESQUIRE** 5:3,11
5:19
**estate** 1:5 6:12
**et** 1:9
**evaluated** 39:17
**events** 20:12
**evidence** 43:23 48:7
**exact** 18:22 23:19
31:7
**exactly** 12:5
**EXAMINATION**
6:4
**examined** 6:2
**exception** 49:12
**executive** 42:15,23
43:8,12,16,20
44:4
**exhibit** 23:23
**exist** 24:14
**exists** 24:13
**exit** 9:25 10:3
**exited** 35:15
**exiting** 34:10
**expect** 44:19
**expectation** 43:19
44:16
**experience** 39:14
**expired** 10:8
**Expires** 50:25
**explain** 20:22 25:12
**explained** 40:5
**explanation** 23:5
**extended** 18:16

**F**

**F** 5:6,14,22 48:1
**face** 20:19
**fact** 42:1 46:7
**factor** 26:13
**factors** 38:5,8
**facts** 43:22
**failed** 9:12
**fair** 20:23 22:19
35:12 38:8
**fairly** 31:25
**fall** 27:1
**falling** 27:4
**far** 5:12 14:16 36:15
**fashion** 25:11
**federal** 1:16 9:2
49:2
**feet** 14:25
**Felicia** 5:17
**field** 12:13 22:12,15

25:5 27:23 29:19
**figured** 11:23 38:24
**filed** 6:14
**fill** 21:22
**fill-in** 9:21
**filled** 21:14,17
**financial** 2:12,13,14
3:11,12,13 4:10
4:12,12
**finish** 6:22 8:24
**Finishing** 38:18
**FIRM** 3:1 4:1
**first** 6:2 11:16,25
12:6,24 15:4,8,18
16:7 17:13 19:21
19:24 21:20,24
23:8 29:19 30:4,9
**five** 32:25
**fixed** 46:19
**fleeing** 32:8
**focus** 22:23
**focused** 9:13 29:3
29:10
**folks** 10:25
**follow** 29:14
**followed** 35:1
**following** 30:5
49:12
**follows** 6:3
**foot** 26:2
**Force** 8:18,22,23
9:14,19,25 19:16
**foregoing** 48:3,6
49:11
**form** 21:7 23:12
26:4 27:8,22
36:12 42:4 49:3,6
**formal** 16:20
**formed** 34:1
**forms** 48:13
**forward** 32:17
**Foster** 5:17
**foundation** 21:7
23:13
**four** 32:25 37:17
**frame** 29:5,6 32:1
**front** 7:10
**FTO** 35:1
**function** 43:7
**furnish** 49:7
**further** 33:12 48:7

**G**

**G** 1:4
**Garrett** 5:18
**gate** 19:17
**gates** 10:1

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

**general** 13:25 27:3
**generally** 11:9
  39:15 43:13
**Georgia** 1:19,20 2:5
  2:5 3:4 4:4 6:10
  7:18 8:11,17
  13:10,15 14:1
  15:3,21 44:13
  48:8
**Gershwin** 1:17 2:3
  2:20 3:3,5,9,10,19
  3:19 48:9,9,13,19
**Gershwin's** 2:14
  3:13
**Gershwin/I** 2:5,6
**getting** 11:2
**give** 6:16 17:10
  37:20
**given** 16:17 31:6,7
  48:7 49:4
**go** 10:16 13:19 14:8
  14:24 15:2 16:14
  17:3,4 21:7 22:9
  25:20 29:21 31:24
  32:11,17 36:12,25
  38:22 46:20
**goal** 11:2,4 14:3
**going** 7:12 9:22
  10:11 11:15,18
  12:19 13:8 14:6
  20:16,18,20 22:20
  25:12 28:24 32:7
  32:11,15 33:16,17
  33:18,18,19 36:23
  40:8,9,10 43:20
  44:25
**good** 40:13 47:1,20
  47:22
**gotten** 11:8 13:10
  13:16
**govern** 43:9
**governing** 15:6
**governor** 42:16
  43:7,12,15 44:5,5
  44:23 45:9,12,15
**grades** 9:13
**graduate** 17:17
  18:25
**grew** 8:9
**ground** 26:25 27:2
  42:11
**guess** 18:14,15,19
  18:20
**guys** 24:17

————————
**H**
————————
**H** 1:14 6:1 49:1,10

**50**:21
**half** 7:23 13:3
**hall** 39:17
**handcuff** 16:18 32:1
**handcuffed** 14:3
  31:22 32:4 42:11
**handcuffing** 14:24
**handcuffs** 19:9
  26:6 28:19
**handle** 30:1
**hands** 14:25 41:6
**happen** 7:17 13:5
**happened** 28:7
  29:16 46:2
**happening** 26:12
**hard** 15:19 20:21
**harm** 26:15,16,17
  26:20
**HARRY** 1:4
**haste** 35:10
**head** 41:2
**hear** 30:16
**heard** 10:25 47:14
**height** 12:19,20
**held** 10:20 33:20
**Hello** 6:7
**help** 20:11 24:6
  25:22 26:5 29:9
**helping** 27:4
**helps** 24:25
**Henning** 1:15 5:9
  6:1,6 7:16 10:15
  38:18 46:22 49:10
  50:21
**Hi** 6:6
**high** 8:16
**Hills** 5:12
**hired** 10:12,22
**hitting** 9:15
**hogtying** 14:25
**HOJNOSKI** 5:19
  37:15
**honest** 13:5 30:6
  37:20
**honestly** 15:11,13
  16:23 29:11
**How's** 44:25
**huddle** 34:1
**Huh** 16:12
**hundred** 13:7 17:2
**hurt** 32:20 33:11
**hurting** 29:9

————————
**I**
————————
**I/D'Amico** 48:13
**Ideally** 40:16
**IDs** 10:1

**illegal** 15:1
**immediately** 34:25
  35:8
**important** 6:21
**inaccurately** 47:7
**incident** 11:15,18
  15:23 16:3 21:14
  25:14 37:18 41:10
  42:5
**including** 44:7
**indefinitely** 33:20
**indicate** 28:5
**indicates** 20:15
  21:13
**indicating** 27:1
  32:18 41:7
**indicators** 38:4
**individual** 19:19
  45:24
**informed** 22:3,5
  45:20
**inhibit** 13:22
**initial** 33:13
**initially** 31:17
**injure** 29:7
**inmate** 19:14 29:18
  39:9,22,23 40:9
**inmates** 31:9 42:2
**inside** 18:10
**instincts** 29:14
**instructed** 21:21
**instructions** 40:25
**intent** 26:13,14
**intentional** 26:14
**interaction** 26:19
**interest** 2:9,12,13
  3:11,12 4:10,12
  48:8
**interview** 46:1
**investigation** 46:5,9
**investigative** 11:3
**involved** 12:18 34:5
  35:13
**involves** 9:9 12:16
**involving** 12:17
**issue** 43:8,12 44:23
  45:10
**issued** 42:16,17,23
  44:4
**issues** 12:16

————————
**J**
————————
**J** 5:19
**Jackson** 5:8
**jail** 11:3,5,6,13
  12:25 15:5,7,18
  16:4,7 17:6 18:10

**19**:5 20:2,5 23:8
  30:13,15 33:7
  38:23,25 39:7,21
  41:5,14,18,22
  42:2 44:8,12
**JAMEY** 5:11
**Jamey@dinklerp...**
  5:15
**jerking** 32:9
**job** 9:2,23 11:17,25
  15:4,18 16:7
  21:20,25 23:8
  29:19 30:9,15
  43:18,21 46:18,21
**Johnson** 5:9 12:12
  22:11,13,19 23:1
  24:2 27:18
**Johnson's** 24:14
  25:2 27:21
**joint** 40:6
**Jon** 5:17
**JR** 1:4
**judicial** 2:4 3:4 4:4
  44:2
**junior** 9:15
**jury** 7:10

————————
**K**
————————
**Kasich** 44:6
**keep** 29:9 43:24
**keeping** 13:24
**Keith** 5:9
**keys** 35:3
**kick** 32:15 33:14
**kicked** 25:19 32:19
**kicking** 28:11,20
  29:6 33:12
**kind** 7:8 10:4 13:20
  14:12,19 15:2
  16:6 19:1 20:21
  21:9,10 29:16
  36:5
**knee** 28:9,19
**knew** 9:22 37:2
**know** 9:8,15 11:14
  13:13 14:9,16,17
  14:24 15:1,11,12
  16:9,19 17:5
  18:15,21 21:10,23
  22:1,3,15,16,18
  23:4,14 25:4,19
  26:24 28:23 29:1
  29:3,15 30:3 31:6
  31:11,13,25 32:2
  33:4,7,20,21 34:2
  34:4 36:3,13,13
  36:16,21 37:1,2,3

**37**:5,5,7,10,16,17
  37:19 38:4,5,7,11
  38:12,14,23 40:19
  40:20,21 41:4,15
  43:6 44:14,15
  45:1,15,18 46:10
  46:12,15,17 47:17
**knowing** 37:2
**known** 37:3,7 38:15
**Krisandra** 5:18
**Kristy** 5:17
**Kruse** 5:17

————————
**L**
————————
**Lakeside** 5:4
**language** 23:1
**law** 2:11,12 3:10,12
  4:10,11 9:5 11:1
  15:3 23:17 45:2
**laws** 43:25,25
**lawsuit** 6:13
**learn** 12:14
**learned** 13:4 14:1
**leave** 7:24 34:23
  47:13
**left** 28:9 34:25
**leg** 32:16
**legally** 15:3
**legs** 26:7 28:10,19
  33:14
**level** 9:2
**levels** 33:8
**Lewis** 5:8
**Liber** 5:3
**licensure** 10:5
**Linda** 5:10
**Line** 49:14,18,22
  50:1,5,9,13,17
**little** 7:23 9:9,13
  11:10
**LLC** 5:12
**LLP** 5:3
**log** 34:8 35:5
**long** 7:21 8:3 9:18
  15:11 16:22 17:9
  18:12 33:24 34:5
  38:22,24
**look** 20:19,21 21:5
  25:9
**looked** 9:5 21:9
**looking** 9:1 37:17
**lot** 13:4 15:25 37:3
  37:4 47:11
**low** 39:14
**lower** 28:10 29:3,5
**luck** 47:1

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff          Matthew H. Henning

Page 4

**M**

**M** 1:17 2:3,20 3:3 3:19 48:19
**M.D** 5:18
**main** 33:12
**maintain** 39:20
**making** 6:9,19 33:14 38:20 40:4 49:4,6
**mandate** 13:18 14:20,22 15:22
**manner** 25:24 46:12
**mannerisms** 26:16 32:9
**March** 1:20 2:15 3:15 4:14 48:15
**Marshall** 5:9
**materials** 14:13
**matter** 6:17 7:14 42:1 48:4
**Matthew** 1:14 5:9 6:1 49:10 50:21
**Mayes** 5:9
**mean** 19:16 26:23 29:8 33:16 36:13 36:16
**meaning** 41:5
**medic** 5:18 40:18,23
**medical** 13:5 20:25 33:2,6,6 34:2,3 38:4 39:4,7,8,22 39:24 40:1,7,14 40:14
**members** 30:12
**memory** 15:20 31:23 37:18 38:1 40:20,22
**mention** 14:19
**mentioned** 14:20,21
**Michael** 5:9,9
**Mike** 2:6 3:5,9 4:4,8 4:9,12,18 48:10
**Miles** 5:18
**military** 8:13,14
**mine** 25:15
**minimal** 38:3
**minutes** 35:14,21 35:24
**Mobley** 2:6 3:5,9 4:3,4,8,9,12,18,18 48:10
**Montgomery** 7:25 8:4 10:10,23 11:1 11:12 12:25 15:5 16:8 41:13,22 42:14
**months** 9:20 10:8

**N**

**name** 31:12
**name's** 6:8
**NaphCare** 5:17 33:7,10
**narrative** 20:8 21:17,22 25:2 28:11
**narratives** 23:23 24:9
**Ndicello@spangl...** 5:6
**near** 25:22 29:5 34:19
**necessarily** 21:23
**necessary** 41:10 44:17 49:7
**need** 43:21
**needed** 22:4 39:23 46:19
**negatively** 41:2
**never** 20:4 24:22
**new** 43:25
**NICHOLAS** 5:3
**Nick** 6:8
**nine** 35:14,21,24
**nobody's** 18:19
**normal** 8:20 35:2
**normally** 39:14
**Notary** 1:18 50:23
**note** 47:7
**noted** 49:12
**notice** 44:2
**notified** 10:11
**nurse** 5:17,17,17,18 40:8,18,23

**O**

**O.C.G.A** 2:7,9 3:6 4:6 48:8,11,14 49:2
**oath** 7:5,6,9
**object** 24:8 27:8 36:12 42:4,19

**objection** 16:10,14 21:6,6 23:3,12 24:19 25:20 26:4 27:22 29:21 30:2 30:20,25 31:24 35:17 36:25 37:14 37:15 39:11 42:10 43:11,22 44:11,25 45:7,11 46:14
**obtain** 9:3 45:13
**obviously** 38:13
**occasion** 39:3
**occurred** 11:22
**off-the-record** 10:19
**offered** 2:15 3:14 4:13
**office** 7:25 17:7 29:19
**officer** 7:16,21 8:4 8:19 10:24 12:11 12:13,13 13:19 14:5 17:11,21 18:6,13 22:12 23:9,24 27:24 30:10 31:5 34:12 34:18,22 39:20 40:7,24 44:8 45:3 45:16 47:3
**officer's** 10:14
**officers** 5:9 22:25 23:11 25:6 26:3 29:25 30:5 32:5 33:1,3
**officers'** 43:9
**Oh** 16:15
**Ohio** 1:1 5:5,13,21 13:11 42:17,24 44:12
**okay** 6:19,22 7:3 9:7 11:22 13:13 14:19 15:4 16:2,15 20:6 23:22 24:24 25:17 26:21 33:13 34:10 34:16 35:12 37:9 38:7 41:21 47:1,3 47:22
**once** 14:2 31:25 32:4 34:11,22 36:2 42:3 47:8
**one-day** 18:17
**ones** 30:4
**opportunity** 12:15
**order** 42:16,23 44:4 46:16,23
**ordered** 47:4
**orders** 43:9,13,16

43:21 44:14
**orientation** 15:12 15:13 16:17,22
**originally** 8:6
**outside** 11:3 23:17
**outtake** 35:2
**overall** 32:23

**P**

**p.m** 1:21 47:24
**Page** 49:14,18,22 50:1,5,9,13,17
**pages** 48:6 49:7
**panic** 21:3 28:15
**part** 44:13
**participated** 9:7 19:13
**participating** 29:18
**particular** 41:10,24 42:5
**parties** 2:15 3:14 4:13
**party** 2:11,12,13,13 3:11,11,12,12 4:10,10,11,11 48:13
**passed** 22:4
**passing** 46:10
**path** 11:4
**patience** 46:23
**patient** 39:10
**patrol** 11:3 37:5,6
**people** 24:2,5 25:9 29:10 37:6 45:3,6 46:21 47:11,12
**people's** 25:8,13
**percent** 13:7 17:2
**period** 15:12,13 16:17,22
**permitted** 36:10
**person** 2:10 3:9 4:9 13:21 19:20 24:1 27:16
**person's** 26:14
**personnel** 10:2 33:7 34:3 40:7
**Phil** 1:8 5:8
**phrase** 22:24 26:10 26:21
**phrased** 18:3
**phraseology** 24:18 27:17
**physics** 9:16
**place** 6:15 40:11 46:20
**placed** 27:1 28:9 32:16 42:2

**Plaintiff** 1:6,15 5:2
**plan** 32:21,22,23 33:5,15,23 34:1,1
**please** 8:15 49:6,7
**plenty** 29:25
**Plummer** 5:8
**PLUMMER/MO...** 1:8
**pod** 34:10,23 35:7 35:15,15
**point** 14:17 15:19 26:6 30:3
**points** 9:25
**police** 7:19,20,21 12:6 13:19 14:2 14:23 43:5,9 45:16
**policies** 15:6 41:11 41:20,22 43:13
**policy** 14:17 41:24
**political** 45:13
**poorly** 18:3
**position** 8:1 9:21 10:13,14,22,24 13:23 30:14 33:20 40:10 41:1 42:8 44:21 45:25
**positional** 13:1,16 13:19 14:15 36:22 37:13,24 38:2,8
**positioning** 14:14 39:9
**positions** 36:14,15 37:10
**possible** 14:4
**possibly** 40:11
**practices** 41:4
**Pregon** 5:11,12 10:16 15:8 16:10 16:13 18:18 19:5 21:6 23:3,12 24:8 24:19 25:20 26:4 26:8 27:8,22 29:21 30:2,20,25 31:24 34:13,16 35:17 36:12,25 37:14 39:11 42:4 42:10,19,25 43:11 43:22 44:11,25 45:7,11 46:14 47:3,22
**preparing** 45:24
**presume** 31:4 42:14
**pretty** 34:24
**prevent** 22:24 23:10 24:3 28:10,20 29:6

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

Page 5

**principal** 2:11 3:10 4:9
**prior** 15:4 16:7 19:3 19:12 20:1 21:18
**probably** 12:22 32:19 34:19 47:16
**problem** 35:25 36:5 39:18
**problems** 39:16 46:20
**procedure** 1:17 35:2 49:2
**procedures** 15:6 41:12,16
**process** 10:10
**professional** 38:4 39:22
**program** 8:25 9:8 9:11 22:16
**prohibited** 2:7 3:6 4:6 41:7,13,23 48:11,13
**prolonged** 18:17
**prone** 15:17 41:5,13 41:23 42:2,7,16 42:24 44:6,24 45:10
**provide** 2:6,10 3:5,8 4:5,8 7:2 48:10
**provided** 12:25
**provides** 14:14
**providing** 40:24
**provisions** 2:9
**Public** 1:18 50:23
**pull** 26:25
**pulls** 19:17
**purpose** 23:16 29:8
**pursuant** 1:16 2:3 3:3 4:3 49:2
**pursue** 7:25 10:25
**put** 13:21 22:20 32:4 33:18 36:14 36:18 37:6 40:9

——————
**Q**
**question** 12:20 18:3 18:4 29:22 41:21 43:15
**question-and-ans...** 7:1
**questions** 7:2 46:23 48:5
**quickly** 31:25

——————
**R**
**R** 48:1 49:1,1
**radio** 16:18

**radios** 35:3
**rates** 2:14 3:14 4:13
**read** 25:7,8,12,15 47:4,6,16 49:11 49:14,18,22 50:1 50:5,9,13,17
**reading** 47:12,23
**realistically** 37:20
**really** 14:8 23:20 27:9 29:11,15,22 30:5 32:20 36:15 40:1
**reason** 14:20 21:22 23:7 45:15 49:16 49:20,24 50:3,7 50:11,15,19
**reasons** 49:4
**recall** 14:12 15:16 16:1 22:5 27:9 29:15 30:18 34:11 36:20 40:23 41:2 41:16 42:5,20 44:12
**receive** 17:18
**received** 8:17 15:24 16:19 37:3
**recognizing** 20:21
**recollection** 11:24 20:11 21:15 24:5 27:19
**recommendations** 40:25
**record** 10:16 23:23 48:6
**redirect** 19:17
**reduced** 48:5
**reflect** 23:24
**refresh** 20:11 24:5 27:19
**Regulations** 2:4 3:4 3:7 4:4,7 48:12,14
**relate** 37:20
**related** 17:7
**relationship** 2:8,11 3:10 4:9 48:8
**relieved** 30:4
**rely** 34:3
**relying** 7:13
**remember** 11:13,14 12:2,5 15:14 16:24 20:18 21:21 27:13,14 28:3 29:4 30:22 31:1,4 31:9,12,13 33:25 35:1 38:24 40:18 41:21,24 45:21,22 45:23

**Reminger** 5:20
**report** 20:8,14 21:13,18 22:4,7 22:14,20 23:11,15 23:16,22 25:3,15 26:10,12 27:23,25 28:11
**reported** 48:3
**Reporter** 1:18 2:1,3 2:5 48:9
**reporting** 2:4,6,6,10 3:4,5,5,8,9 4:4,5,5 4:8,8,9,18 48:10 48:10
**Reporting's** 4:13
**reports** 22:16 24:22 25:7,8,10,13 27:15
**represent** 6:12 44:3 48:6
**representative** 48:9
**requirements** 43:14
**reserve** 8:18 48:4
**resigned** 10:12
**resist** 27:12
**respectful** 38:19
**respond** 39:3
**responded** 31:16,17 35:6,7,7
**responding** 40:14 40:18
**response** 39:20
**responsible** 39:9 40:4
**restrain** 45:6
**restrained** 14:14 19:4 26:2 28:18 35:24 36:1 41:6 42:7 46:13
**restraining** 19:13 29:18 30:12 33:1 34:5 35:13,21 36:4,6
**restrains** 45:3
**restraint** 12:17,18 15:7,17 19:22 33:18 41:5,13,23 42:3,17,24 44:6 44:24 45:10
**restraints** 13:4 19:19
**results** 46:8
**reveal** 43:1
**review** 20:7 25:2 47:21
**reviewed** 15:5 22:17 36:2 37:25

**reviewing** 14:12 41:16,22
**Rhojnoski@remi...** 5:23
**Richardson** 1:5 6:13 11:19 12:18 16:4 19:22 20:15 20:17,24 22:3 24:4 25:17 26:22 27:6,17 28:5,14 28:20 29:1,13 30:16 31:17,22 33:1,16 34:6 35:13,23 36:10,19 36:22 37:10,24 41:1 42:7 45:18 46:2
**Richardson's** 6:14 28:10 32:6 35:8
**right** 7:16 8:5 13:25 14:11 19:11 21:21 22:1 29:4 34:20 35:1 39:1,2 45:5 47:4,9
**risk** 36:22 37:13,24 38:2,5,7
**road** 11:2,8 41:19
**Robert** 1:5 5:19 6:12,14 11:19 19:22 24:4
**role** 10:25
**roll** 45:24
**rolled** 33:17
**room** 12:16 39:18
**ROTC** 8:17,18,25 9:8
**rule** 13:25 14:7,8 49:2
**Rules** 1:16 2:4 3:3,7 4:3,7 48:12,14 49:2
**run** 32:11,13

——————
**S**
**S** 49:1
**safe** 39:22
**safety** 14:6 39:21
**Sandy** 1:19
**sat** 33:17
**Saturday** 11:23,25
**saw** 27:16 36:24 37:11 42:2
**saying** 24:12 30:16 30:22 31:1,5,9,13 35:25
**says** 22:24
**scared** 21:5,8,9

**scene** 29:25 34:8,9 35:5
**scholarship** 8:17
**school** 8:16
**second** 12:6
**secondary** 19:18
**seconds** 31:21
**securing** 25:21
**security** 9:3,23 10:2 10:4,12 19:15
**see** 6:21 24:1
**seen** 29:24 35:6 45:14
**sense** 32:7
**separate** 39:18
**sergeant** 31:15,16 31:20
**Sergeants** 5:8
**services** 2:6,10 3:5 3:9 4:5,8 48:10
**session** 7:1
**set** 33:19
**shadow** 12:14
**shadowed** 12:11
**shakes** 41:2
**share** 46:8
**sheet** 47:5 49:7
**Sheriff** 1:9 5:8,10 11:2 42:14
**sheriff's** 7:25 10:23 11:9 17:6,8
**Shibley** 5:3
**shift** 12:2,4,5,9 33:25 34:20
**Short** 8:13
**short-term** 9:21
**shortly** 31:16 34:24
**show** 22:6
**shows** 34:9,10 35:5
**Shutts** 5:10
**side** 9:6,14 32:18,18 33:16
**sign** 47:8,10
**signature** 48:4
**similar** 23:14
**sir** 6:7,11,18,23,25 7:4,7,11,15 8:2,7 8:16 9:24 11:7,21 12:1,12 13:14,17 16:5 17:13,19,22 17:24 18:1,22 19:2,18 20:3,10 20:13 21:1,4,16 22:22 28:8,13,17 28:22,25 31:1,7 31:13,19 32:2 34:21 35:20 38:5

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

Page 6

38:9,15,17,21
39:2 41:15,25
43:3,25 45:6,12
45:19 46:3,25
47:19
**sit** 15:16 22:13 34:4
36:21
**sitting** 22:17
**situation** 14:5 30:1
36:7 39:18,25
40:2
**Six-one** 12:22
**smothered** 32:10
**solve** 46:20
**somebody** 14:2 22:6
22:9 23:8
**someone's** 15:1
**soon** 14:4
**sorry** 16:13 17:9
22:10
**sort** 35:3
**sounds** 21:23
**SOUTHERN** 1:1
**Spangenberg** 5:3
**speak** 24:9 27:15
**speaking** 31:14 36:8
**Special** 1:4
**specific** 14:17
**specifics** 17:10
**spot** 13:22
**Springs** 1:19
**Sr** 1:5
**staff** 39:8,8,24
40:14
**standing** 10:1
**start** 11:4,12
**started** 8:19 9:14
10:9 12:24
**state** 1:19 17:22
21:2 28:15 42:17
42:24 43:12,14,15
44:6,13,14,15
**stated** 48:3
**statement** 24:13,14
49:4
**statements** 24:15
**states** 1:1 28:11
**stay** 34:23
**steel** 29:6
**Steven** 5:18
**Stockhauser** 5:18
**stomach** 26:22 27:7
27:13,18 28:3,6
32:5
**stood** 36:3
**Street** 5:20
**Strickland** 44:5

**stricter** 43:14
**struck** 25:23 26:2
**struggling** 28:6
**student** 8:20
**studies** 8:20
**Stumpff** 5:9
**style** 25:9
**subscribed** 50:22
**substance** 49:3
**sugar** 39:14
**suggesting** 43:18
**Suite** 1:20 5:4,13,21
**supplemental** 49:7
**sure** 6:21 10:18
13:6,7 16:1 17:2,5
18:2,3,22 21:19
23:14 33:11,14
39:21
**surprise** 30:11
**surprised** 29:17
30:8
**surrounding** 6:14
46:5
**suspect** 14:15 19:13
**swapped** 34:19,22
**sworn** 6:2 48:4
50:22
**system** 20:8 44:13

— **T** —
**T** 5:5,11,14,22 48:1
48:1 49:1,1
**take** 8:22 19:1
**takedown** 27:5
**taken** 1:17 39:16
47:7
**talked** 22:20 24:17
43:1
**talking** 6:22 14:21
19:9,12 31:12
**Ted** 5:8 44:5
**tell** 8:14 9:10 16:23
18:20 19:24 23:20
25:14 26:7 27:9
28:4 29:11,12
31:8 37:23 38:1
41:19 47:15
**telling** 44:20
**term** 23:10 28:2
**terminology** 23:15
36:6
**testified** 6:3 31:20
**testify** 7:10
**testimony** 44:3 49:3
**tests** 19:1
**Thank** 20:6 46:25
**thanks** 9:7 46:22

**things** 13:5 14:24
33:16 41:4 43:6
**think** 11:23 23:7
24:17 35:17 44:9
44:23 45:9 47:6
**three** 9:16 32:25
37:17
**thumb** 14:8,8
**Tiburon** 20:8,14
21:13 23:22 27:15
**tight** 13:21
**time** 10:5 13:6
16:20,25 18:16
19:21 26:1,6,19
30:3 32:1 36:3,4
37:2 38:19 43:9,9
46:24
**today** 6:9 7:13
15:16 18:19 34:4
36:21 42:22
**today's** 20:8
**Todd** 4:3,18
**told** 22:1,2 23:1
34:11,18 38:23
**Tonya** 5:10
**topic** 13:1,20
**topics** 15:2
**touching** 36:9
**tour** 17:6 18:11
20:3
**trained** 25:6 33:8
**training** 8:19,23
12:13 13:1,10,11
13:16 14:2 15:22
15:25 16:6,20
22:12,15 24:22
25:6 27:23 29:19
37:4,16,19 38:3
**transcript** 48:3
49:11
**transition** 11:7,10
**transitioned** 33:25
**treatment** 39:23
**trial** 7:10
**tried** 25:10
**true** 17:21 27:19
28:21,24 30:13,14
35:10 41:17 42:8
48:6 49:11
**truthfulness** 7:13
**try** 13:9 43:24 45:13
46:20
**trying** 25:21 26:5,7
26:16,20 29:6,8
**Tuesday** 1:17
**turning** 35:3,3
**two** 7:23 9:20 13:3

18:15 37:20
**type** 19:19

— **U** —
**UGA** 8:19
**unaware** 20:16,18
**uncomfortable** 40:8
40:10
**undersigned** 49:10
**understand** 6:16
7:5,8,12 11:19
20:20 23:18 24:6
24:16 29:22 32:22
33:15 46:4
**understanding**
32:24 39:6 41:3
**understood** 11:11
20:24 24:24
**unfortunately** 8:24
9:13 15:20
**unintentional** 22:25
23:10 24:1,12
26:9,11,18
**unintentionally**
24:4 25:17,23
26:1 27:6
**unit** 11:3
**UNITED** 1:1
**upright** 13:24
**upwards** 35:14
**use** 22:24 23:10,14
24:1 26:10,13,21
42:16 49:6
**use-of-force** 23:15
**usual** 2:14 3:13 4:13

— **V** —
**various** 33:8
**verbal** 31:6
**verifying** 10:2
**version** 8:13
**versus** 13:11 26:6
27:4
**video** 6:20 29:24
35:6 36:2 37:25
40:20
**videoconference**
5:1
**view** 40:11
**Vine** 5:20
**Volume** 1:14
**votes** 45:14
**vs** 1:7

— **W** —
**wait** 6:21
**waive** 47:9,16,23

**waived** 47:12
**walked** 22:17
**wall** 29:7 32:14,15
32:19 33:12,14
**walls** 32:12
**want** 9:20 11:5
22:23 29:7 38:19
46:17
**wanted** 25:11
**wasn't** 18:16 32:7,8
32:11 33:24
**way** 12:7 25:23 33:9
**ways** 14:24 37:6
**we're** 6:20 11:15,18
18:18 23:18 40:2
**we've** 11:23 29:24
**weeks** 18:15
**weight** 12:19,21
**went** 8:16 10:12,13
15:23 16:2,16
17:7 23:24 35:1
**weren't** 30:8 36:8
**WESTERN** 1:2
**whatnot** 8:21
**witness** 1:15 16:12
16:15 43:3 46:25
47:19 48:4
**witnessed** 20:12
**Wittman** 5:10
**word** 24:10,10,12
**words** 23:19,25
24:1,7 27:20,21
**work** 11:5 22:2
38:22,25 43:5,6
45:23
**worked** 12:2
**working** 9:3 13:3
15:20 19:15 20:4
30:14 41:18,19
42:13 44:8
**wouldn't** 21:23
44:19
**wrestling** 19:9
**Wright-Patterson**
9:4,19
**write** 22:4,7 23:2
25:9,11 43:16
**writing** 48:5
**written** 14:13 15:6
27:25 41:11
**wrote** 22:16,18
24:22 25:3,7,15

— **X** —

— **Y** —
**yeah** 9:17 15:10

Beyoglides, Jr., Harry G. v. Montgomery County Sheriff                    Matthew H. Henning

32:24 34:15
**year** 8:5 9:15 39:1,3
    42:2
**years** 7:23 8:10 13:3
    37:17,17
**younger** 8:10

_____
**Z**
_____

_____
**0**
_____

_____
**1**
_____
**1** 48:6
**10.B** 2:4 3:3 4:3
**1001** 5:4
**123** 5:13
**140** 1:20
**14th** 2:15 3:15 4:14
    48:15
**15-14-37** 48:14
**15-14-37(a)** 2:8 3:7
    4:6 48:12
**15:21** 34:9,14 35:6
    35:15
**15:30** 34:10 35:15
**1700** 5:4,21
**19th** 11:22,25 17:12
    17:20 18:4,9 19:3
    19:12 20:1 25:18
    36:24 37:12 40:17
**1st** 1:20

_____
**2**
_____
**2:00** 1:21
**20** 31:21 50:24
**2009** 42:18,23 44:4
**2012** 6:15 11:22,25
    12:21 17:12,20
    18:4,9 19:3,12
    20:1 21:18 25:18
    36:24 37:12,25
    38:13 40:17 41:12
    44:8
**2016** 1:21 2:15 3:15
    4:14 48:15
**20th** 21:18
**210** 12:22
**215** 12:22
**216** 5:6

_____
**3**
_____
**3:00** 12:8 47:24
**3:14-CV-00158** 1:7
**30(e)** 49:2

_____
**4**
_____
**426-4200** 5:14

**44114** 5:5
**45202** 5:21
**45429** 5:13
**47** 48:6

_____
**5**
_____
**513** 5:22,22
**525** 5:20
**5335** 5:12
**5855** 1:19

_____
**6**
_____
**696-3303** 5:5
**696-3924** 5:6

_____
**7**
_____
**7:00** 12:8
**721-1311** 5:22
**721-2553** 5:22
**7C** 2:8 3:7 4:7 48:12
    48:14

_____
**8**
_____
**831-0904** 5:14
**866** 5:14
**877** 5:5

_____
**9**
_____
**9-11-28(c)** 2:9 48:8
**9-11-30(e)** 49:2
**937** 5:14