UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -


Harry G. Beyoglides, Jr.,
Special Administrator of the
Estate of Robert Andrew
Richardson, Sr., Deceased,
    Plaintiff,

    vs.                Case No. 3:14-CV-00158


Phil Plummer/Montgomery County
Sheriff, et al.,
    Defendants


- - -




DEPOSITION OF TED JACKSON
the Defendant herein, called by the Plaintiff under the
applicable Rules of Civil Procedure, taken before me,
Whitney Layne, a Notary Public for the State of Ohio, at
the law firm of Dinkler & Pregon, 5335 Far Hills Avenue,
Suite 117, Dayton, Ohio 45429 on November 18, 2015 at
8:00 a.m.




LAYNE & ASSOCIATES
6723 COOPERSTONE DRIVE
DUBLIN, OHIO  43017
614-309-1669

APPEARANCES

NICHOLAS DICELLO, ESQUIRE
SPANGENBERG, SHIBLEY & LIBER
1001 Lakeside Avenue
Suite 1700
Cleveland, Ohio 44114
    on behalf of the Plaintiff

JAMEY PREGON, ESQUIRE
DINKLER & PREGON
5335 Far Hills Avenue
Suite 123
Dayton, Ohio 45429
    on behalf of the Sheriff Defendants

CARRIE STARTS, ESQUIRE
REMINGER CO., LPA
525 Vine Street
Suite 1700
Cincinnati, Ohio 45202
    on behalf of the Defendants
    NaphCare, Inc., Nurse Felicia Foster,
    Nurse Jon Boehringer, Nurse Krisandra
    Miles, Medic Steven Stockhauser,
    and Brenda Garrett Ellis, M.D.

ANNE M. JAGIELSKI, ESQUIRE
ASSISTANT PROSECUTING ATTORNEY
301 West Third Street
4th Floor
Dayton, Ohio 45422
    on behalf of the Defendant
    Montgomery County Sheriff's
    Office

---

November 18, 2015
Wednesday Session
8:00 a.m.
    - - -
STIPULATIONS

    It is stipulated by and among counsel for the respective parties that the deposition of TED JACKSON, the Defendant herein, called by the Plaintiff under the applicable Rules of Civil Procedure, may be taken at this time by the notary Whitney Layne; that said deposition may be reduced to writing in stenotypy by the notary, whose notes thereafter may be transcribed out of the presence of the witness; and that the proof of the official character and qualification of the notary is waived.

---

EXAMINATION INDEX

TED JACKSON

BY MR. DICELLO...............................Page 5

---

TED JACKSON

    Being first duly sworn, as hereinafter certified, deposes and says as follows:

CROSS-EXAMINTION

BY MR. DICELLO:

    Q    Good morning.

    A    Good morning.

    Q    Can you please state your name for the record and spell your last name for the court reporter?

    A    Ted L. Jackson, J-A-C-K-S-O-N.

    Q    Sergeant Jackson, my name is Nick DiCello. We've had a chance to meet off the record. You understand you're here to have your deposition taken today?

    A    That's correct.

    Q    You probably realize, but I represent the estate and the family of Robert Richardson. He passed away in the Montgomery County Jail back in 2012. Do you understand you're here to have your deposition taken in connection with a lawsuit that's been filed against the county sheriff and a number of sheriff's deputies?

    A    I understand.

    Q    Have you ever been deposed before?

    A    I have.

    Q    When was the last time you sat for a

**Page 6**

1     deposition?

2     A   Possibly, I'm not exactly sure, 2002, maybe.

3     **Q   Was that in connection with a civil lawsuit?**

4     A   Yes.

5     **Q   And did it involve a claim being made by an**

6     **inmate or detainee against the county sheriff?**

7     A   No.

8     **Q   Were you a party to the lawsuit or were you a**

9     **witness?**

10     A   I was a party to the lawsuit.

11     **Q   What kind of civil case was it?**

12     A   It was in relation to a traffic accident in

13     relation to a pursuit.

14     **Q   Were you named as a defendant in the case or**

15     **were you a plaintiff?**

16     A   I was a --

17     **Q   Were you suing or were you being sued?**

18     A   I was being sued, yes.

19     **Q   That would be a defendant.**

20     A   Okay.

21     **Q   Did that case go to trial, do you know, or was**

22     **it resolved before trial?**

23     A   I would say a portion of it. Because there was

24     -- I was in conjunction with or part of the sheriff's

**Page 7**

1     office in conjunction with insurance companies.

2     **Q   Yeah.**

3     A   So I -- they had a trial portion of it against

4     an insurance company. I then became a witness.

5     **Q   I understand.**

6     A   If, you know, they --

7     **Q   That makes sense.**

8     A   They kind of released me off of it and then

9     refiled. So at one point I became a witness for, you

10     know, for the plaintiff against the insurance company.

11     **Q   Right. The coverage issues that probably were**

12     **involved?**

13     A   Yes.

14     **Q   So did you testify in court --**

15     A   Yes.

16     **Q   -- in that case? All right.**

17     A   Yeah. Only on -- only as a witness.

18     **Q   Understood.**

19     A   In that perspective.

20     **Q   I assume, but you tell me, in connection with**

21     **your official duties that you've testified in court**

22     **before?**

23     A   Yes.

24     **Q   How many times do you think you might have done**

**Page 8**

1     that?

2     A   In excess of a hundred probably.

3     **Q   So I think you probably understand the basic**

4     **rules of a deposition, but let me just put a couple on the**

5     **record so we have understanding. Whitney is taking**

6     **everything that we say down, so it's important that we not**

7     **speak over one another, okay?**

8     A   Yes.

9     **Q   All your answers have to be verbal; words, yes,**

10     **no, instead of nods and shrugs, uh-huhs and huh-uhs, that**

11     **kind of thing.**

12     A   I understand.

13     **Q   I only want you to answer questions that you**

14     **understand today. So if I ask a question that you don't**

15     **understand, which can happen, I want you to tell me that,**

16     **okay?**

17     A   Okay.

18     **Q   Given that understanding that we have, if I ask**

19     **you a question and you answer it, on the record, I'm going**

20     **to assume you understood the question. Is that fair?**

21     A   That is fair.

22     **Q   If you want to take a break at any time for any**

23     **reason, sometimes these things are very quick, sometimes**

24     **they take a long time, we can do that. I would just ask**

**Page 9**

1     if a question is pending, please answer the question and

2     then say, "Hey, Nick, let's take a break," okay?

3     A   Okay.

4     **Q   You understand you're under oath today?**

5     A   I do understand.

6     **Q   And that's the same kind of oath you understand**

7     **that you've taken when you're in a court of law in front**

8     **of a jury; correct?**

9     A   That is correct. I do understand that.

10     **Q   And you understand that I'm going to be relying**

11     **on the accuracy of your answers that you give me today in**

12     **connection with this lawsuit?**

13     A   Yes.

14     **Q   One other thing that's not uncommon, we're**

15     **talking about things that happened years ago, it's not**

16     **uncommon, human nature, where your memory might get jogged**

17     **about something later on about a topic we were talking**

18     **about earlier in a deposition. If that happens, I want**

19     **you to take an opportunity to revisit the answer. Just**

20     **come out and say, Oh, Nick, I just remember that guy's**

21     **name or I just remembered something, it's actually a**

22     **different date or it happened a little differently. Take**

23     **the opportunity to do that today, okay?**

24     A   Okay.

1    Q   So you are currently a sergeant with the
2    Montgomery County Sheriff's Office; is that correct?
3    A   That's correct.
4    Q   And how long have you been with the sheriff?
5    A   For a little over 20 years.
6    Q   Can you tell me a little bit about your
7    employment history with the sheriff; where you started,
8    where you worked, the ranks that you've achieved, that
9    kind of thing?
10   A   Actually, October 30th, '95 is when I started
11   with the sheriff's office as a corrections officer.
12   Q   Okay.
13   A   And then in '99, I went through the police
14   academy and was promoted to the rank of deputy.  And then
15   from there, I was promoted to detective.
16   Q   What year was that; do you remember?
17   A   That was 2005 or 2006.
18   Q   Okay.
19   A   I'm not a hundred percent sure.
20       And then from there -- Do you want to know
21   duties within the detective's position or --
22   Q   Not yet.
23   A   Okay.
24   Q   Why don't you tell me the next --

Page 10

1    Q   We won't hold you to those dates specifically.
2    So the detective position, that promotion, tell me how
3    your job changed.
4    A   I was promoted into a detective's position in
5    what was called the Organized Crime Unit through the
6    Montgomery County Sheriff's Office.  And then do you want
7    to know --
8    Q   Were you working in the jail at all during that
9    time as a detective?
10   A   No.
11   Q   So I don't know if road patrol is the right
12   word, but you were investigating crimes that happened
13   outside of the jail?
14   A   That's correct.  From the time I got promoted
15   to deputy to the time I got promoted to sergeant, I had no
16   --
17   Q   You weren't in the jail?
18   A   Yeah, I had no affiliation.
19   Q   That helps.  So in 2010, the sergeant position
20   is something you had to apply for, I think; right?
21   A   Yes.
22   Q   And you were promoted to sergeant sometime in
23   2010.  And then tell me how your job responsibilities
24   changed.

Page 12

1    A   Then the next step would be in 2010, I was
2    promoted to sergeant.  And that's my current position.
3    Q   I'll try to go back and go through each
4    position a little bit here.  As a corrections officer, did
5    you work in the Montgomery County Jail for about four
6    years, '95 to '99?
7    A   Yeah.  Three, three and a half or so.
8    Q   Okay.
9    A   Yeah.
10   Q   And then you went to the police academy and
11   became deputized; correct?
12   A   That's correct.
13   Q   And once you became a deputy in '99, where were
14   you working?
15   A   I was assigned to a division in Harrison
16   Township, Ohio.
17   Q   Patrol?
18   A   Patrol, yes.
19   Q   Okay.
20   A   Road patrol.
21   Q   How many years were you on road patrol?
22   A   I was on -- until I got promoted to detective.
23   Q   '05, '06, around there?
24   A   Yeah.

Page 11

1    A   As part of my promotion, I was assigned back to
2    the Jail Division, and then just worked as either -- I
3    held basically three different positions within the jail.
4    Q   Tell me about those.
5    A   It was -- You are a booking sergeant, a housing
6    sergeant, and then I was -- I held a position over
7    transportation slash courts.
8    Q   Got it.
9    A   So we have a specific Transportation Division,
10   we have a specific Court Division, which blankets under
11   the Jail Division.  So I'm still under the Jail Division,
12   but I have specific responsibilities as it relates to --
13   or as it related to transportation and courts.
14   Q   Okay.
15   A   And then, you know, within that -- the booking
16   position and the housing position are directly related to
17   -- specifically to the jail.
18   Q   Okay.  Sergeant Lewis was here yesterday and he
19   helped me out and explained what the booking sergeant
20   position was.  So I have an understanding about that.  Can
21   you tell me a little bit about the housing sergeant
22   position?
23   A   The housing sergeant position is basically
24   anything that has to do with housing-related issues.

Page 13

1    There's several administrative duties, and then -- and of
2    like a physical security check, you know, an observation
3    of the inmates, which constitutes basically what would be
4    considered a walk-thru of the jail.
5        Q    Okay.
6        A    So any housing or anything that doesn't relate
7    specifically to the first floor.  The booking sergeant
8    deals with basically, you know, anything in and around the
9    first floor.  And I know there's like cells there, but,
10   you know, they -- that doesn't encompass the housing
11   sergeant.  Not to say we can't assist in any situation.
12   However, our responsibilities are everything basically
13   outside of the first floor.  Any housing unit, all the way
14   down to the ground floor which encompasses maintenance,
15   you know, the kitchen, laundry, any of those services,
16   those are -- you know, that is covered by the housing
17   sergeant.
18       So we deal on a day-to-day basis with any
19   housing issue and/or anything outside of the normal
20   booking sergeant's responsibilities.
21       Q    As the housing sergeant, are you supervising
22   the folks who are responsible for classification of
23   incoming detainees?
24       A    No.  That would be -- It's almost a

Page 14

1    co-responsibility, because they are responsible for
2    classifying the inmates to be housed.
3        Q    Who is?
4        A    The classification officer.
5        Q    All right.
6        A    So I may, you know, throughout the day, if
7    we're having, you know, an issue or if I will want to get
8    somebody particular reclassified or something to that
9    effect, I'm dealing with the classification officer.  But
10   as far as primary supervision at that point, it's the
11   booking sergeant.
12       Q    Got it.
13       A    And that's almost in relation to proximity.  In
14   the process of, you know, what encompasses the booking
15   sergeant, what transpires is basically the classification
16   officer, among several other duties, I mean, they're
17   classifying people that have initially came in.
18       Q    Right.
19       A    You know.  And then -- And then the
20   co-responsibility comes in where we have somebody that is
21   housed that is being reclassified or being moved for
22   whatever reason.  And so the classification is involved in
23   that, the officer, to assess, you know, to kind of go
24   through checks and balances to assure that they're being

Page 15

1    properly moved to another housing location that is
2    suitable for their classification.
3        Q    Okay, thank you.
4            I presume that to prepare for today's
5    deposition, did you review some documents?
6        A    I did.
7        Q    What did you look at, Sergeant?
8        A    My report, specifically.  Just reviewed my
9    report, I looked over some policies, and --
10       Q    When did you look over the policies?
11       A    Just going back and refreshing when I
12   discovered that, you know, there was a deposition
13   assigned.  So --
14       Q    Okay.
15       A    Because I had been -- I had been reassigned as
16   a sergeant, I'm not currently in the jail.
17       Q    I should have asked you that.
18       A    Yes.
19       Q    Where are you now and when did you stop working
20   at the jail?
21       A    That would -- I'm horrible with dates.
22       Q    You're doing pretty good.
23       A    June.  June of this year.
24       Q    June?

Page 16

1        A    Yes.
2        Q    And where are you assigned now?
3        A    I'm assigned to a -- it's a Bulk Cash Smuggling
4    Task Force.
5        Q    Sounds good.
6        A    Yeah.  You can throw Miami Valley in front of
7    it, and -- but -- it's an addiction task force ran by the
8    Ohio Organized Crime Unit supported by Homeland Security.
9        Q    You told me you looked at some policies when
10   you learned you would be deposed.  Give me a timeframe.
11   Was that in the last month, in the last 24 hours?
12       A    It would be the last month up to and 24 hours.
13       Q    Did you review any policies this morning?
14       A    I did not.
15       Q    Did you review any policies last night?
16       A    Briefly.
17       Q    What policies did you look at last night?
18       A    Use of force.  It would be the General Orders
19   Manual Use of Force, GOM 1.1.3.  And then it would be the
20   jail manual, use of force policy.  And then to clarify,
21   we're talking last night?
22       Q    Yeah.
23       A    Yeah, that -- and then, I'm sorry, it's -- it's
24   different within the jail manual.  Restraint policy.

Page 17

5 (Pages 14 to 17)

1    Q   What time did you look at the restraint policy
2  last night?
3    A   Nine, sometime after nine.
4    Q   Did you look at that restraint policy as a
5  result of what took place in the depositions yesterday?
6       MR. PREGON:  Objection.  And I'll tell him not
7  to answer.  If I asked him to do it, I'm not going to let
8  him talk about that.
9  BY MR. DICELLO:
10   Q   And that's important.  You know, you're not --
11  you have to be conscientious not to disclose to me
12  anything you and your lawyers talked about.  So both of
13  you guys have to make sure not to do that.  And I'll try
14  not to invade that privilege.
15       Prior to last night, had you reviewed the
16  restraint policy after this case was filed?
17   A   Yes.
18   Q   And that's something you did on your own?
19   A   That is correct.
20   Q   So you've talked about some policies, the
21  narrative report.  Did you look at the video at all to
22  prepare for today's deposition?
23   A   I had an opportunity to review the video, yes.
24   Q   Sometimes when I get to ask people questions

Page 18

1    Q   Do you remember having any -- Did you work
2  Friday, May 18th, 2012 if you remember?
3    A   I do not know.
4    Q   Okay.
5    A   To clarify, I don't know my particular schedule
6  in and around that day.
7    Q   Okay.
8    A   And so -- And then I don't -- Also to clarify,
9  that there was a time where I was assigned to what's
10  called a relief, so I do three days as booking and three
11  days as housing.  Because I was on a six and three
12  rotation.  So I worked six days and I'm off three days.
13  So we're on a constant rotating schedule.
14   Q   Okay.
15   A   So I don't know if I was assigned as a relief
16  sergeant at that time or I was specifically housing.  And
17  I don't know, you know, to clarify, I didn't -- I don't
18  know my work schedule.
19   Q   Okay.
20   A   If you ask additional questions.
21   Q   That's fine.  What I'm trying to get at is when
22  you encountered Mr. Richardson, did you in your own mind
23  say, oh, I know this guy, or was it just another inmate
24  that you hadn't encountered?

Page 20

1  about things that happened a few years ago, some people
2  say, you know, I really only remember this after looking
3  at my paperwork.  And other people say I can see it in my
4  own mind's eye.  Independent of looking at the paperwork
5  and the video, do you have an independent memory of the
6  incident involving Mr. Richardson?
7    A   I do.
8    Q   Prior to May 19th, 2012, which I think we've
9  agreed was a Saturday, that was the date of the incident,
10  is that consistent with your recollection?
11   A   I know the date, but I don't know the day.
12   Q   Okay.  Well, assuming we're right, it was a
13  Saturday, all right, that --
14       MR. PREGON:  It says it in the narrative, too.
15  BY MR. DICELLO:
16   Q   That may be one thing Jamey and I agree on in
17  the case.
18   Q   Okay.
19   Q   So prior to that day, May 19th, 2012, do you
20  know if you had ever encountered Mr. Richardson before?
21   A   I do not know.
22   Q   When you encountered him on that day, did you
23  recognize him at all?
24   A   No, I did not.

Page 19

1    A   It was just another inmate.
2    Q   What shift were you working on May 19th, 2012,
3  or watch?
4    A   That would be what would be considered days or
5  second watch.
6    Q   And remind me, folks have explained this to me,
7  but while we have you here just remind me what time you
8  would clock in and what time you would clock out.
9    A   The timeframe for me to work that day would be
10  7:15 or 07:15 hours to 3:45 p.m. or 15:45 hours.
11   Q   On May 19th, 2012, you stayed later than
12  3:45 p.m. because of this incident, I believe; correct?
13   A   That's correct.
14   Q   So we can feel free to use your narrative if
15  you'd like, but I also am interested in what maybe you
16  remember independent of the narrative.  And you have it in
17  front of you.  If you have to go back to it, fine.  But to
18  the extent you can remember, I'm interested in that as
19  well.  Do you remember how it was that you became aware of
20  a situation involving Mr. Richardson in the D Pod?
21   A   It would have been a radio call for officers
22  assistance referencing a medical condition.  And I don't
23  know -- I don't know if that call came from the officer
24  assigned to that housing location or if it came from, per

Page 21

6 (Pages 18 to 21)

1   se, like security control.
2       Q   But it was some type of medical issue was the
3   reason for the call?
4       A   That was the reason for the call, yes.
5       Q   So do you remember where you were when you got
6   that over the radio?
7       A   I do not.
8       Q   Did you respond immediately?
9       A   I don't know if I responded immediately. Just
10  from the timeframe from when I arrived in succession to,
11  you know, how many people were there before me, I would
12  say it would have been almost an immediate response, from
13  where I was at within the facility.
14      Q   Did you respond alone or were there other
15  officers with you if you remember?
16      A   I do not recall.
17      Q   Can you tell me what you recall seeing when you
18  arrived?
19      A   Into the housing unit?
20      Q   Sure. Take me through it. Because I know
21  you've got to go upstairs and then go to the cell.
22      A   Well, I don't know, because if -- if I was in
23  the housing sergeant's office, which I don't know if I
24  responded from there, it's lateral basically. So I come

Page 22

1   out of the office and I'm, you know, 50, 60 feet from the
2   primary vestibule door to Pod D. There's Pod C and Pod D,
3   so you walk into a -- it's a secondary open area prior to
4   going into the actual housing unit. So if I would have
5   responded from there, it would have been just a direct
6   response, walk directly, you know, down the hallway and
7   into the pod.
8           At that point, from recollection, I come into
9   the housing unit and I know the number, you know, at some
10  point I believe that I received, you know, it was in cell
11  544. So from working in the jail as a corrections
12  officer, they're specifically numbered for a reason.
13  There's a succession of numbers between the pods in
14  general. So you kind of have or you already know where
15  that cell is at. So when I know -- I knew when walking
16  into the pod that it would be up to, you know, I couldn't
17  pinpoint, but it would be up to, you know, my right.
18      Q   Okay.
19      A   Coming in. There's two sets of stairwells, you
20  know, that lead to the second floor of the pod from inside
21  the pod itself. So I will know there's one to the left
22  and there's one to the right, so, you know, depending on
23  where the cell is at, which was kind of in the middle of
24  the pod, you know, I just responded directly to the

Page 23

1   stairwell closest to the cell.
2       Q   So tell me what you recall seeing as you got up
3   to that second floor.
4       A   As I'm coming up to the second floor, just
5   there's no -- just a quick assessment of what the
6   surroundings are, what I'm walking into, you know, the pod
7   appeared to be locked down versus -- Do I need to clarify
8   that?
9       Q   No.
10      A   The pod appeared to be locked down, there's no
11  inmates out.
12      Q   Yep.
13      A   So as I respond up, I have a recollection of
14  Officer Benjamin, Tonya Benjamin was the corrections
15  officer, she was there. I can't specifically say that I
16  knew she was assigned to that housing unit. At this
17  point, yes, because, you know, it's through -- you know, I
18  get a lineup, basically, so I know who is assigned where.
19      Q   Okay.
20      A   So she's standing at the door. And just part
21  of our policy, she's waiting for additional units to
22  respond to actually open the door before exposing herself
23  or anybody else to, you know, what was transpiring.
24      Q   So let me make sure. When you got onto the

Page 24

1   second floor, the door to cell 544 was still closed?
2       A   From my recollection, yes.
3       Q   I'm going to -- Let's stop there and I want to
4   ask you some other questions about in terms of the
5   personal gear that you or a CO has on them when they're on
6   the housing units. Is it different between a sergeant and
7   a corrections officer?
8       A   It is.
9       Q   So let's start with the corrections officer.
10  Those folks have handcuffs on them?
11      A   They can, yes. Not all. They're not assigned
12  to them and not all corrections officers carry handcuffs
13  on their person.
14      Q   What other kind of equipment are they
15  carrying? I know they have a radio. Do they have some
16  kind of OC spray or something like that?
17      A   No.
18      Q   No spray in the jail?
19      A   No spray.
20      Q   Anything -- Go ahead.
21      A   For a corrections officer.
22      Q   Corrections officers don't?
23      A   Right.
24      Q   What kind of equipment are corrections officers

Page 25

1  issued?

2      A   They're issued a radio holder, a duty belt that

3  just consists of a belt, you know, and then outside of

4  that, a set of keys.

5      Q   Do any of them carry --

6      A   And a uniform.

7      Q   Do any of them carry tasers?

8      A   No.

9      Q   And none of them carry any kind of OC spray or

10  anything like that?

11      A   No.

12      Q   Now, for the sergeants.  How is it different in

13  terms of the gear that the sergeants carry?

14      A   The sergeants carry or can carry OC spray and a

15  taser.

16      Q   And cuffs?

17      A   And cuffs.

18      Q   On May 19th, 2012, do you remember which of

19  those items you had on your person?

20      A   It would be all three.

21      Q   So on May 19th, 2012, just for the record, you

22  were carrying -- when you responded, you were carrying --

23  you had a taser?

24      A   I had a taser.

1      A   So because from the pool of tasers that the

2  jail has, you know, you have the transportation deputies

3  that they pull from that cache, basically.  And then so

4  each day you come in -- directly related to taser.  You

5  come in, there's a book, and you -- you grab a particular

6  taser, test fire it, make sure -- or test it.

7      Q   Spark test it?

8      A   Yeah, spark test it, not fire it, but --

9      Q   Yeah.

10      A   And then you sign it out to yourself.  And

11  then, you know, at the end of the day you replace it back

12  and then you sign it back out.

13          So in relation to -- As it relates to Sergeant

14  Lewis, I don't know -- we all carry and we have enough OC

15  spray that we can carry it individually.  Now, that's a

16  choice per sergeant.  The sergeant can not carry a taser,

17  the sergeant can not carry OC spray, and they can not

18  carry a cuff on their person.

19      Q   If they want?

20      A   Yeah, if they want.  They usually do.  A lot of

21  sergeants, you know, they just have it sitting in

22  proximity.  So in response, they grab and go.  As it

23  relates to myself, I carry it on my person at all times.

24      Q   The taser?

1      Q   And you had OC spray?

2      A   I did.

3      Q   Is that what you guys use, is it OC?

4      A   It's OC.

5      Q   So you had OC spray and you had how many sets

6  of cuffs on you?

7      A   One set.

8      Q   One set.  Sergeant Lewis also responded

9  eventually.  Do you recall that?

10      A   I do.

11      Q   Do you recall what Sergeant Lewis carried in

12  terms of taser, OC, cuffs?

13      A   I do not.

14      Q   Was it typical for the sergeants that you

15  worked with to carry OC and a taser?

16      A   Yes.

17      Q   I should have asked Sergeant Lewis that.  But

18  would your expectation be that Sergeant Lewis on May 19th,

19  2012 also had a taser and OC on his duty belt?

20      A   It's mere speculation, just to make sure that's

21  clarified.  But tasers are assigned.  So -- as is OC

22  spray.  But there's not enough tasers for each sergeant to

23  have one individually.

24      Q   Okay.

1      A   The spray, cuffs, and taser.

2      Q   Okay.

3      A   And the taser, when applicable, when I can get

4  it assigned to me or when I can assign it out to myself.

5  As far as Sergeant Lewis, mere speculation, because of the

6  timeframe from which this event occurred, around shift

7  change --

8      Q   Yep.

9      A   -- I don't know if he -- You know, like I said,

10  I was -- I wasn't around him or don't recall being around

11  him to know that he had an opportunity to have a taser

12  issued out to him.

13      Q   Okay.

14      A   Or self issued to himself.

15      Q   Okay.

16      A   And then from just working around him or with

17  him, I believe he carried OC spray on his person at all

18  times.

19      Q   Thank you.  Let's deal with this right now.  At

20  no time on May 19th, 2012, you did not deploy your taser

21  against Mr. Richardson; correct?

22      A   That is correct.

23      Q   And the reason you didn't deploy a taser

24  against him is because it wouldn't have been a reasonable

**Page 30**

1  use of force; correct?
2      MR. PREGON:  Objection.
3      Go ahead.
4      A  I believe it didn't -- it didn't meet the
5  criteria for me to deploy the taser.
6  BY MR. DICELLO:
7      Q  So let me break that down.  It didn't meet the
8  criteria, whatever Mr. Richardson's actions were, it
9  didn't rise to the level that you felt tasing him was
10  appropriate; correct?
11      A  That would be correct.
12      Q  All right.  Before I went on that tangent, you
13  were at the top of the stairs and the door was closed.  Do
14  you remember who else was there when you got to the top of
15  the stairs and you could see Officer Benjamin by the door
16  of cell 544?
17      A  A direct recollection would be Officer Dustin
18  Johnson.
19      Q  Officer Johnson sat where you are yesterday and
20  he said he had a trainee with him, Officer Henning.  Do
21  you remember Henning?
22      A  I do remember Henning.  But as far as where he
23  was at and where he was with us in response to, I can't --
24  you know, I can't say for 100 percent that he was like

**Page 31**

1  directly behind me or directly in front of me.  I don't
2  have that recollection.  I do -- My -- My complete recall
3  is Officer Johnson was in proximity to me.
4      Q  Got it.
5      MR. DICELLO:  Can we go off the record real
6  quick?
7      (Discussion held off the record.)
8  BY MR. DICELLO:
9      Q  Your height and weight?
10      A  I'm approximately 178, six foot.  I'm
11  shrinking.
12      MR. PREGON:  Me, too.
13  BY MR. DICELLO:
14      Q  Was that your approximate weight back in May of
15  2012, 180 pound-ish?
16      A  Yeah, give or take two pounds or --
17      Q  So prior to the door to 544 being opened, if I
18  understand correctly, you, Officer Johnson, Officer
19  Henning, and Officer Benjamin were in the immediate
20  vicinity of that door?
21      A  Correct.
22      Q  So what happened next?
23      A  At that point, upon responding to the cell, she
24  opened the door, and then that's when Officer Johnson made

**Page 32**

1  entry before me.  And then just, again, according to
2  assessment of what's transpiring, what am I seeing, I'm
3  gathering intel just visually --
4      Q  Okay.
5      A  -- in relation to the information provided over
6  the radio what we were responding to, some sort of medical
7  emergency.
8      Q  When you entered the cell, Mr. Richardson was
9  sitting on the floor; correct?
10      A  That is correct.
11      Q  His roommate, cellmate, Marcus Maxwell,
12  appeared to be trying to provide some assistance to
13  Mr. Richardson; correct?
14      A  Yes.
15      Q  When you entered cell 544, you could see that
16  Mr. Richardson had some blood and saliva coming out of his
17  mouth?
18      A  Not immediately.
19      Q  You didn't notice that immediately?
20      A  No.
21      Q  When you entered the cell, Mr. Richardson was
22  sitting on the floor and he was facing the outside wall
23  near the door; is that correct?
24      A  Yes.

**Page 33**

1      Q  Okay.
2      A  That's -- The outside -- Yes.
3      Q  Explain the outside wall to me.
4      A  Outside or opposite wall, I would say.
5      Q  Opposite?
6      A  Can I put the cell in perspective --
7      Q  Please.
8      A  -- as far as a rectangle?
9      Q  Yeah.
10      A  So he's at one side of a long end of the
11  rectangle facing directly across at the other long side.
12      Q  And the door would be to his left as he's
13  sitting on the floor?
14      A  Door would be to his left.
15      Q  Got it.  Okay.
16      A  With his back against the wall.  I mean, he's
17  not sitting in the middle of the cell, he's, you know,
18  sitting against the wall.
19      Q  Understood.
20         When you entered the cell, Mr. Richardson was
21  attempting to stand up or roll forward; correct?
22      A  That is correct.
23      Q  Mr. Richardson appeared disoriented when you
24  walked in; true?

**Page 34**

1  A  Yes. Assessing what was going on, yes. I
2  would say, again, I started with he was in a state of
3  panic, you know, just -- and then, you know, and then
4  grabbing all the additional information, you know, again,
5  this is, you know, within seconds of getting in there and
6  gathering what is transpiring. You know, that was my
7  recollection.
8  Q  What about his -- It's a good description. But
9  what about his demeanor or appearance caused you to
10  believe he was in a state of panic?
11  A  Just everything I coupled with it. His look,
12  basically. When you take in -- He had -- You know, in
13  dealing with him and looking at him, I mean, he's looking
14  at you, but he isn't.
15  Q  Yeah.
16  A  You know, it's almost like he's looking at you,
17  but it's not receptive to him that you're even standing
18  there.
19  Q  Okay.
20  A  And then just his -- his physical demeanor, his
21  actions and motions.
22  Q  His physical demeanor while he was still in the
23  cell was lethargic; correct?
24  A  Yeah. And I base that off of his -- his

**Page 35**

1  movements at that point.
2  Q  Uncoordinated?
3  A  To an extent, yes. When we came in and we
4  started addressing him, I do recall like, you know, it's
5  like, again, he's starting to -- you know, he's motioning
6  and he's trying to get up. So you know, it's like, "No,
7  stay down, stay down," you know, give him verbal commands
8  to stay down. But I do have a complete recollection of
9  the fact that he -- he kind of, you know -- you know, I
10  had my hand on like his shoulder, and he's trying to like
11  wave me off. And it's, you know, it's -- it's very kind
12  of slow and just uncontrolled, you know. It's not very
13  specific or direct.
14  Q  Right. And you described him at that point in
15  time as being unbalanced?
16  A  That would be the unbalanced.
17  Q  Yeah.
18  A  Just, you know, just his movements.
19  Q  Okay. Why did you want him to stay on the
20  floor?
21  A  Well, one, if he's in that state, and he's
22  having a medical condition, there's no need for him to,
23  one, stand up, which creates a bigger risk. And again,
24  the assessment of the whole situation, that is, you know,

**Page 36**

1  one, we're responding -- you know, taking all the intel in
2  and gathering and assessing as I'm going along, you know,
3  he has -- responding to what is perceived to be a medical
4  condition. I'm getting, you know, that he's -- you know,
5  he's not responsive, he's disoriented, there's an
6  appearance of a medical issue.
7  Q  Yep.
8  A  You know, I have no medical training or
9  background to clarify.
10  Q  Yep.
11  A  But just experience, knowledge, you know,
12  assessing, putting it together. And then again, not to
13  have him stand up, if he's in that condition, again, if he
14  stands up, just hypothetically, you know, then he can fall
15  down.
16  Q  Okay.
17  A  So you know, keep him on the ground, closest to
18  the ground, minimize injury to that extent, an overall
19  thought process of security and safety of the facility.
20  Q  You said that he appeared to have some kind of
21  unknown medical condition. Assuming that he was in the
22  throws of some type of medical episode, whether it be a
23  seizure or a heart attack or a stroke, something like
24  that, do you agree that putting his body under additional

**Page 37**

1  stress is something you try to avoid doing?
2  A  I would not agree to that.
3  Q  So putting his body under additional stress,
4  even if he's in the throws of a medical emergency, is
5  something that you think would be okay to do?
6  A  As it relates to my specific actions to the --
7  to the situation?
8  Q  Yeah.
9  A  I don't agree.
10  Q  So I think what you're telling me is from your
11  perspective as a corrections officer, you would be willing
12  to put his body under additional stress, physical,
13  emotional, even if he's in the throws of a medical
14  emergency; correct?
15  A  Yes. And let me -- let me blanket.
16  Q  Was that a yes?
17  A  I'm sorry. Can you re-ask the question? I
18  apologize.
19  Q  That's okay. I'm getting this concept you've
20  entered this cell and you see this guy, he's on the floor,
21  you're responding to a medical emergency, he doesn't look
22  good; right?
23  A  He's in a situation. I don't say "look good."
24  You know, that's --

**Page 38**

1  Q  You don't know if he's having a seizure or a
2  heart attack or a stroke, you just don't know; right?
3  A  I don't know.
4  Q  And what I'm asking you is:  You're telling me
5  that you would still be willing to put him under
6  additional physical stress even though he might be in the
7  throws of a medical emergency?
8  A  Yes.
9  Q  Okay.
10  A  Can I make a clarification as far as a medical
11  condition?
12  Q  Sure.
13  A  As far as medical condition and articulation to
14  my thought process, it would be -- it's not the perceptual
15  like a seizure, you know, heart condition, this, that.
16  That can encompass a psychological situation.  It can also
17  encompass a drug-induced situation.  So you know, just to
18  clarify that.  Again, that's -- that's everything that I
19  -- you know, I have to take in or take into consideration
20  when putting myself and officers in positions.
21  Q  So let me follow up on that.  I mean, you know
22  based on your training that inmates who are in the throws
23  of a psychiatric emergency or a medical emergency or a
24  drug-induced emergency are at a higher risk of injury and

**Page 39**

1  death.  You do know that; right?
2  MR. PREGON:  Objection.
3  Go ahead.
4  A  To an extent, yes.  There is --
5  BY MR. DICELLO:
6  Q  It's a possibility?
7  A  There is a possibility.
8  Q  Okay.
9  A  I'll agree with that.
10  Q  And so that is something that you do have to
11  have in your mind, that this particular inmate, given his
12  unknown medical or psychological or drug-induced
13  condition, could be at an increased risk of injury or
14  harm; correct?
15  A  It is a possibility.
16  Q  So you notice his demeanor is lethargic and
17  unbalanced, and you also notice that he is not appearing
18  to comprehend your verbal commands; true?
19  A  That is correct, yes.
20  Q  So I think you told him to sit down, to stay
21  down, and he was trying to get up.  That is what you
22  perceived; correct?
23  A  Yes.
24  Q  And whether or not he was intentionally not

**Page 40**

1  following your commands, you couldn't tell because it
2  didn't appear that he was really understanding what was
3  going on; is that a fair way to describe it?
4  A  That would be a fair way to describe it.
5  Q  All right.  And then you say Richardson, I'm
6  going by your narrative report, Officer -- Sergeant, you
7  said, "Richardson turned his head toward me and I could
8  see that he had blood and saliva coming from his mouth."
9  Was this while he was still seated on the ground?
10  A  Yes.
11  Q  You say "blood and saliva."  So you saw both?
12  A  Yes.
13  Q  All right.
14  A  Perceptually.  Just be the combination of, you
15  know, just blended in.
16  Q  Yeah.
17  A  You know, just --
18  Q  Was it running down his chin or --
19  A  It would be off to -- on his lip or off -- down
20  his lip to an extent.
21  Q  Was he saying anything while he was still
22  sitting on the floor?
23  A  No.
24  Q  Was he making any noises?

**Page 41**

1  A  Yes.  It was just like a grunting, like a
2  grunting whining sound.
3  Q  And I'm not going to ask you to try to recreate
4  it.  I don't know how she would write that down.
5  A  Yeah, I don't know how long she would write
6  that down, yeah.
7  Q  Did he appear to be in pain?
8  A  No.
9  Q  How was his breathing?  Was it labored?  Could
10  you tell?
11  A  Accelerated.
12  Q  So while he was sitting, he was grunting and
13  his breathing was rapid?
14  A  Rapid.
15  Q  You then say in your narrative, and I think
16  you've described this for us today, but you say, "Inmate
17  Richardson had a dazed/unfocused expression on his face
18  and didn't appear to be comprehending our verbal
19  direction"; correct?
20  A  That is correct.
21  Q  And additionally, he didn't appear to you to be
22  comprehending the events going on around him; correct?
23  A  That's correct.
24  Q  And based on your experience, he was in the

1    throws of some unknown medical issue; correct?

2        A   That is correct.

3        Q   So when you have someone like that, and

4    officers go hands-on with an inmate like that, would you

5    expect potentially some resistance from someone who

6    doesn't understand what's happening?

7        A   Yes.  Or not -- I wouldn't expect or you would

8    make an assumption that it could go that direction.

9        Q   So what I'm getting at is corrections officers

10   have to expect that that could happen, that when you go

11   hands-on with somebody who is in the throws of a medical

12   episode, who doesn't understand what is going on around

13   him, that that person may react in what is perceived to be

14   a combative or resistive way; correct?

15       MR. PREGON:  Objection.

16       A   Not a combative or -- Combative or resistive

17   way would be their action.  To clarify.  I didn't

18   completely understand.

19   BY MR. DICELLO:

20       Q   Yeah, let me repeat the question.  Because

21   you're encountering an inmate who is in the throws of some

22   potential medical episode, and it appears to you, the

23   corrections officer, that he does not comprehend what's

24   going on around him, in those circumstances a corrections

Page  42

1    officer has to expect or be prepared for the inmate to

2    become resistive when officers go hands-on; correct?

3        MR. PREGON:  Objection.

4        A   I would -- I would agree to that.

5    BY MR. DICELLO:

6        Q   And so corrections officers have to be trained

7    in how to handle those situations where members of the

8    public who are detained at the jail, temporarily, are in

9    the throws of a medical episode, might become resistive

10   when officers go hands-on?  They have to be trained in

11   those situations; correct?

12       A   That would be -- Is that a yes or a no?

13       Q   I'm hoping.

14       A   I don't know if that could be a yes or a no

15   question.

16       Q   So you can't answer yes, that officers should

17   be trained to encounter those situations?

18       A   Yes, the officers should be trained to, you

19   know, be able to respond to something to that effect, yes,

20   sir.

21       Q   Because I've deposed some other corrections

22   officers, and one of them, I can't remember who right now,

23   said, you know, we respond to medical calls on a weekly

24   basis at a minimum.  That's true; correct?

Page  43

1        A   Yes.  More so than that.

2        Q   So responding to medical calls or medical

3    emergencies is very common at the Montgomery County Jail

4    for corrections officers; true?

5        A   Yes.

6        Q   So corrections officers should be trained in

7    how to handle someone who is in the throws of a medical

8    emergency who may become resistive when you go hands-on;

9    correct?

10       A   Yes.

11       Q   And they should be trained in ways that

12   minimize the risk of injury and death to the inmate who is

13   in the throws of that medical episode; correct?

14       A   Yeah.  And that would be encompassed under just

15   any contact.  I mean, you know, in addition to the medical

16   emergency.  It's just, you know, the defensive tactics

17   that are taught.  You know, it's a -- it's a large blanket

18   because, you know, there isn't enough, you know, ink and

19   paper to lay out every single possible scenario when

20   dealing with a human being in those instances.

21       Q   Okay.

22       A   So -- There's training that gives parameters

23   and understanding on how to deal with a situation they

24   perceive.

Page  44

1        Q   And that should include a situation where an

2    inmate is in the throws of a medical episode and may

3    become resistant; correct?

4        A   That would be correct.

5        Q   And you say it's encompassed within the

6    defensive tactics training.  But we do agree that inmates

7    who are in the throws of a medical episode are at a higher

8    risk of injury and death; correct?  Potentially.

9        A   I would agree.

10       Q   So the door is opened and then, according to

11   your narrative, you and Officer Johnson grab Inmate

12   Richardson; correct?

13       A   Grab -- Yes, we make contact with him.  Not

14   necessarily grab him at that point.

15       Q   Well, you used the word "grab."

16       A   Oh.  I would say at that point --

17       Q   "Officer Johnson and I grabbed Inmate

18   Richardson"; right?

19       A   Okay.  Yeah.  Yes.

20       Q   Okay.  So the first thing you and Officer

21   Johnson did was, once you went hands-on, was to grab him;

22   correct?

23       A   Yes.

24       Q   Where did you grab him?

Page  45

12  (Pages  42 to 45)

1      A   I specifically -- Well, he had an arm out,
2  reached out to me, so take control of the arm, and then it
3  would be a hand on his shoulder to -- at some point. I
4  don't necessarily know if -- I may have -- I got ahold of
5  his shirt just, you know, for, you know, a control issue,
6  but I don't know, and/or just place my hand on his
7  shoulder.
8      Q   We don't have a videographer here.  You're
9  waving your left arm around.  Do you remember
10  Mr. Richardson reaching out with his left arm and you
11  grabbing his left arm?
12      A   Yes.
13      Q   That's your best memory?
14      A   That's my best memory.
15      Q   And where did Officer Johnson grab him?
16      A   I believe on his right side.
17      Q   And you say this was to control
18  Mr. Richardson's movement to prevent Mr. Richardson from
19  injuring himself; correct?
20      A   Yes.
21      Q   So then if I understand your narrative, you and
22  Officer Johnson, after grabbing Inmate Richardson, pulled
23  him out of the cell onto the walkway; correct?
24      A   Yes.

Page 46

1      Q   And --
2      A   In a sequence of events, because of where we
3  were at.  But just to clarify, going, you know, off the --
4  at that point we had him, and because the environment from
5  which we were operating in, in the confines of the cell, I
6  made the choice to pull him out into a bigger open area.
7      Q   So somebody yesterday told me that one of the
8  risks of trying to control an inmate outside the cell is
9  you're in close proximity to a railing that goes over an
10  edge down to the first floor; correct?
11      A   There is a railing, yeah, that keeps you from
12  going to the first floor, yes.
13      Q   So once you pulled him out of the cell, how far
14  from that railing were you?
15      A   Two to three feet.  I don't know the -- maybe
16  the whole walkway up there is six to seven feet, roughly.
17      Q   And then what are the dimensions of the cell
18  approximately?  I'm not going to hold you to it.
19      A   Maybe eight-by-twelve.  Maybe a little smaller.
20      Q   And so your thought process was it's too --
21  this is too confined and closed a space, I want to get
22  Mr. Richardson out into a larger space out on the walkway?
23      A   A larger and safer space.
24      Q   Tell me how it's safer.

Page 47

1      A   Can I go --
2      Q   Sure.
3      A   Let me go back to the dimension.  Eight to
4  twelve is wall to wall, or wall dimensions.  That doesn't
5  encompass the, you know, the concrete and steel bench or
6  bed that's within the cell, it doesn't also encompass the,
7  you know, the concrete and wood table/desk that's in
8  there, a chair, a stainless steel toilet that protrudes
9  from the wall.  So to move forward a little bit to your
10  question, you know, when you have nothing but concrete,
11  steel that has sharp edges, and hard surfaces, you know,
12  and to move -- and again, there's an additional inmate,
13  you know, I have to take into account that I have an
14  inmate, a secondary inmate that's in that cell with us.
15  So again, to create a safer position for us, to move him
16  out into the walkway to an extent.  And from my
17  recollection, he wasn't all the way out onto the walkway.
18  There was still a portion, like his legs or something,
19  that were still somewhat in the cell.
20      Q   So how did you -- when you say you and Officer
21  Johnson pulled him, do you remember how it was that you
22  were pulling him out of the cell?
23      A   Well, he -- again, you know, he was naturally
24  trying to stand up or roll forward.

Page 48

1      Q   Yeah.
2      A   So we just kind of went with his motion as
3  well.  He was going forward.  So you know, my
4  recollection, he just rolled forward and we, you know,
5  basically grabbed his arm and slid him out into the -- or
6  onto the walkway.
7      Q   Did you and Officer Johnson have any difficulty
8  in doing that, in repositioning Mr. Richardson?
9      A   Not that I recall.
10      Q   All right.  So once you got him out of the
11  cell, he was positioned on his belly facedown on the
12  ground; correct?
13      A   He was facedown, yes.
14      Q   And then you and Officer Johnson tried to cuff
15  his hands behind his back; correct?
16      A   Not initially.
17      Q   So what happened once you got him out of the
18  cell and he was on his belly?
19      A   At that point, again, during this whole time,
20  we're trying to -- to again give him verbal direction, try
21  to get -- you know, elicit a response from him and also,
22  you know, try to get something, some verbal notification
23  of what's transpiring with him, you know.  You know, if he
24  said "my chest" or, you know, "my leg," or something, that

Page 49

13  (Pages 46 to 49)

1    would give us some kind of indication of what was
2    transpiring with him. You know, we were trying to elicit
3    a response from him, you know, give him verbal direction,
4    "stay on the ground, stay on the ground," you know, "sir,
5    what is wrong with you," you know, "what is going on"?
6    And you know, trying to elicit that information as well to
7    help us assess what we are dealing with.
8    **Q. Okay.**
9    A And so that is going on. So when we got him
10   out of the cell, again, at that point he's trying to --
11   you know, he's drawing his arms into -- under his body,
12   obviously, in a natural position to lift himself up,
13   because he's still trying to stand up at this point. And
14   again, you know, not knowing exactly what is going on with
15   him and, you know, one, if he gets to -- gets to his
16   knees, gets to his feet, you know, just we're losing a
17   control issue and creating a safety issue for everybody.
18   That's when I made the determination to get him cuffed.
19   **Q. Okay.**
20   A To gain more control over him. Because he was
21   a big individual.
22   **Q. Yeah.**
23   A He was certainly larger than I was. And you
24   know, strength-wise, you know, you have to make those

Page 50

1    assessments as well. Size, you know, perceptually, you
2    know, he's going to have some strength to him, you know,
3    just from experience.
4    **Q. So let me break that down a little bit. I**
5   **mean, there was another inmate in the cell who was on his**
6   **feet; right?**
7    A Right.
8    **Q. And you didn't have to put him on the ground to**
9   **maintain control over him; right?**
10   A There wasn't a perceptual need to --
11   **Q. Okay.**
12   A -- at that -- at that particular point.
13   **Q. So what about Mr. Richardson trying to get to**
14   **his feet, why wouldn't you let him up to his feet?**
15   A Again, we don't know his condition, what is
16   actually going on with him. So --
17   **Q. You assume it's some kind of medical condition?**
18   A In relation to, you know, a series of different
19   things. So I know that I wrote that he was having a
20   medical condition. But to clarify, what encompasses a
21   medical condition to me is a broad scope of things. So
22   it's a risk management situation. I have to -- I have to
23   maintain -- Because he's in the facility of the Montgomery
24   County Jail, it's our responsibility for his safety and

Page 51

1    ours. And I have to assess the safety of the facility as
2    a whole.
3    So again, we have to maintain a measure of
4    control over him to make sure, one, he doesn't injure
5    himself more or he gets in a position that creates a
6    situation for his safety and ours. Again, naturally, and
7    traditionally, you know, from training and experience, you
8    have more control over a person when they're on the ground
9    --
10   **Q. Okay.**
11   A -- and you're -- you're standing and they're on
12   the ground.
13   **Q. So then you just told me you made a decision to**
14   **handcuff because he was trying to get off the ground?**
15   A Yes.
16   **Q. So you thought the safest thing for**
17   **Mr. Richardson would be to cuff his hands behind his back**
18   **and place him facedown on the ground?**
19   A Naturally, if we're going to place his hands
20   behind his back, he would have to be facedown on the
21   ground.
22   **Q. I understand that. My question is. You**
23   **thought the safest thing for Mr. Richardson at this point**
24   **in time was to cuff his hands behind his back and put him**

Page 52

1    **facedown on the ground; correct?**
2    A That's not correct.
3    **Q. So what was the safest thing for**
4    **Mr. Richardson?**
5    A Well, in succession to your question, it would
6    be he has to be facedown, which he was at that point. And
7    then he has to be facedown to handcuff him.
8    **Q. What I'm trying to get at is why are you**
9   **handcuffing this man who you think is having some kind of**
10   **medical emergency, he's disoriented, he's not**
11   **understanding what is going on around him? Why does he**
12   **need to be handcuffed?**
13   A Because -- To create a safer issue for himself
14   and us, to maintain control over him, a better control
15   over him.
16   **Q. And I think at this point in time, or close to**
17   **the time where you and Officer Johnson are trying to**
18   **handcuff him, Sergeant Lewis responds; is that consistent**
19   **with your recollection?**
20   A Yes.
21   **Q. And so how many folks assisted in handcuffing**
22   **Mr. Richardson? It was you, Officer Johnson, Officer**
23   **Lewis, and was Henning helping out?**
24   A Not that I recall.

Page 53

**14 (Pages 50 to 53)**

1    Q    So there was three of you that were cuffing him

2    up?

3    A    There was an additional officer, Officer

4    Stumpff.

5    Q    Stumpff, okay.

6    A    From my recollection.

7    Q    And Officer Johnson told me that it took you

8    guys less than a minute to get Mr. Richardson cuffed up.

9    Is that consistent with your recollection?

10   A    That would be consistent, yeah.

11   Q    And Sergeant Lewis said that between the time

12   he responded and started providing assistance and getting

13   Mr. Richardson cuffed was about 15 to 20 seconds.  Is that

14   consistent with your recollection?

15   A    From his response?

16   Q    Yeah.  From the time Lewis showed up and

17   Richardson was cuffed.

18   A    Maybe a little less than that.

19   Q    Okay.

20   A    Or I mean, in close proximity.

21   Q    So between the four of you, getting

22   Mr. Richardson cuffed was not a problem; agreed?

23   A    Agreed.

24   Q    So after Mr. Richardson was now handcuffed with

Page 54

1    his hands behind his back, he was placed facedown;

2    correct?

3    A    He was facedown to begin with.

4    Q    Facedown and then you cuffed his hands behind

5    his back and he remained facedown; true?

6    A    At that particular time after he was directly

7    cuffed, yes.

8    Q    You told us just now that Mr. Richardson was

9    pulling his arms up towards his body and he was trying to

10   push himself up, correct, when he first got out of the

11   cell?

12   A    Yes.

13   Q    And in your narrative, you say that he at that

14   point in time was thrashing around and kicking his legs.

15   Was he also doing that?

16   A    Can I defer to my report?

17   Q    Yeah.  Yeah.

18   A    Okay.

19   Q    Go ahead.

20   A    Yes.  Just to make sure that I'm in sequence as

21   far as any documentation, after he was handcuffed, that's

22   when, again, dealing with that direct incident, getting

23   him handcuffed, after that the fact is when I noticed

24   that's when he started, what I described as thrashing

Page 55

1    around and kicking his legs, yes.

2    Q    According to your narrative, he was kicking his

3    legs and thrashing around before you retrieved your

4    restraints.  The confusion I'm having is how is he trying

5    to get up and stand up if he was kicking his legs and

6    thrashing around?

7    A    If you want to -- In the sequence of the

8    events, I would say at the point that he's trying to bring

9    his arms in and lift up, I -- I can't say, you know, in

10   the sequence of events that's what was transpiring.  He

11   was kicking his legs at one point, and then, you know,

12   trying to draw himself in and stand up.  Can I say that he

13   was kicking his legs at the time he was trying to push

14   himself up?  I don't know.  But as far as a sequence of

15   events, you know, from my recollection and documented, you

16   know, that up until that point he was -- he was kicking

17   his legs and -- and then trying to push himself up.

18   Q    And during this time after you had grabbed him

19   and pulled him out of his cell and he was on his -- he was

20   lying facedown, as your narrative indicates,

21   Mr. Richardson was also verbally grunting and breathing

22   heavily; correct?

23   A    Yes.  It was the same -- the same grunting, you

24   know, as -- as he was in the -- when we first encountered

Page 56

1    him.

2    Q    And during this time, Mr. Richardson's

3    responses to your verbal directions and questions were

4    incomprehensible; correct?

5    A    Yes.

6    Q    Did you get the sense that he was trying to say

7    something and it was just garbled and incomprehensible?

8    A    No.

9    Q    This was just kind of grunting and --

10   A    Yeah, just -- you know, it wasn't -- yeah,

11   there wasn't -- to say that he was actually trying to

12   respond to us, I would say no.

13   Q    All right.  You said earlier that you were

14   trying to elicit information from him and, you know, for

15   example if he said, "Oh, I'm having chest pain," that

16   would have given you some information.  If Mr. Richardson

17   said during this episode, "Oh, I'm having chest pain,"

18   would you guys have done anything differently?

19   A    Perhaps.

20   Q    What would you have done?

21   A    It would have gave us an indication that, you

22   know, that he was having a problem with his chest, and

23   then it would have given us more indication that maybe,

24   you know, I can't -- you know, based on his actions,

Page 57

1  again, you know, I don't know if I would have changed the
2  situation and/or I would have continued with that course
3  of action that I took initially, and then I would have had
4  information to give to medical personnel when they
5  responded.
6      Q   Would you have cuffed his hands behind his back
7  if he announced he was having chest pain?
8      A   Again, that's -- that's a hypothetical question
9  I really can't answer, because that wasn't what was
10  transpiring.
11      Q   Would you have cuffed his hands behind his back
12  and put him facedown if he announced to you that he was
13  having chest pain?
14      MR. PREGON:  Same objection.  Or objection.
15      A   The course of action that I took, even if I --
16  you know, again, coupled with everything that was
17  transpiring, and at one point if he mentioned that, you
18  know, my chest hurt or made an indication of that, it
19  would have still been the course of action and then follow
20  up to what transpired, you know, I would have put him in
21  the same position I did after the fact.
22      Q   Did you have any concern that Mr. Richardson
23  had suffered a seizure once you observed the blood and
24  once you saw his behavior, once you pulled him out of the

Page 58

1  cell?  Did that cross your mind, or no?
2      A   It may have.
3      Q   Okay.
4      A   Just to -- You know, going back through a
5  series of, you know, medical incidents you respond to, you
6  try to put some relation to what's transpiring.  It may
7  have crossed my mind.  I don't have a direct recollection
8  of it.
9      Q   Do you remember having any concern that
10  Mr. Richardson might be having a heart attack?  Did that
11  cross your mind at all?
12      A   It did not.
13      Q   And then you indicate Medic Stockhauser
14  responded.  Do you remember that?
15      A   I do.
16      Q   And Medic Stockhauser was attempting to put an
17  oxygen mask on Mr. Richardson; correct?
18      A   That is correct.
19      Q   Based on him grunting, what you observed of
20  him, his rapid breathing, and now seeing a medical person
21  trying to administer Mr. Richardson oxygen, did you have a
22  natural concern that there might be an issue with his
23  breathing?
24      A   No.

Page 59

1      Q   Why not?
2      A   It's kind of a common response, oxygen is.
3  From my experience, you know, dealing with medical
4  response to things, they commonly put oxygen on them
5  because, I mean, 100 percent oxygen kind of assists with
6  several different issues.  So you know, when they're
7  actively breathing and it doesn't appear to be labored,
8  just rapid or accelerated, we're not leading to believe he
9  was having some kind of breathing problem because he was
10  putting an oxygen mask on him.
11      Q   So based on his positioning, based on the
12  totality of the circumstances that we've talked about thus
13  far, you had no concern about Mr. Richardson's ability to
14  breathe; true?
15      A   That is true.
16      Q   So that's not something that you were
17  considering as you were addressing the situation; correct?
18      A   That is correct.  Something we didn't talk
19  about is that he was not facedown the whole time.
20      Q   We'll get to that.
21      And then when Medic Stockhauser responded,
22  Mr. Richardson kept yelling, "Get off me, I need out, get
23  me out of here."  Do you remember hearing him say that?
24      A   At that point, yes, when he was trying to put

Page 60

1  the oxygen mask on him.  That's the only time that he
2  actually spoke, I mean, per se.  And when he said -- when
3  he -- you know, he was making a head gesture that, you
4  know, he was trying to not allow the mask to be put on his
5  face.  And then -- And then that's when he said, you know,
6  "Get that off me," and then started to say that, you know,
7  "I need out of here, I need to get out of here," you know,
8  to that extent.  But that wasn't -- you know, that verbal
9  dialogue was -- it didn't continue after that.  It was --
10  It was like short and brief, you know.
11      Q   Well, Medic Stockhauser filled out a narrative
12  where he said that Mr. Richardson kept yelling, "I want
13  loose" and "Get out of here."  Did he keep yelling that or
14  not?
15      A   He did, like I said, for a short period of
16  time.  It didn't -- You know, when it started, it didn't
17  continue throughout the whole time that Medic Stockhauser
18  was giving him medical care.  Like I said, you know, he
19  started saying that, he repeated it.  You know, I can't --
20  I don't recall the amount of times that he repeated it or
21  repeated, you know, statements related to that.  But it
22  was -- you know, it was a short period of time.
23      Q   After Mr. Richardson was secured in the hand
24  restraints, you say he was actively thrashing around and

Page 61

16 (Pages 58 to 61)

1    grunting; correct?

2        A    Yes.

3        Q    He was struggling; true?

4        A    He was struggling.

5        Q    And so Officer Johnson, Henning, and Stumpff

6    continued to hold him down; correct?

7        A    Restrain him, yes.

8        Q    Yeah.

9        A    I wouldn't necessarily hold him down or

10   restrain him from his movements.

11       Q    You told us he was trying to get up; correct?

12       A    I told you that when -- before we handcuffed

13   him, yes.

14       Q    So as soon as he was pulled out of the cell and

15   he was put on the ground, the first thing Mr. Richardson

16   tried to do was get up; correct?

17       A    Yes.

18       Q    And that's one of the reasons that you put the

19   handcuffs on him, so he couldn't get up?

20       A    We have more control over him.  Not to say that

21   he didn't, you know -- At that point, you know, from my

22   recall, he didn't try to get up anymore from there.

23       Q    I thought you just told me that you didn't want

24   him standing up and that's one of the reasons you put the

Page 62

1    handcuffs on him, because if he stood up, he could fall

2    down and hurt himself; right?  We went through that?

3        A    We did go through that.

4        Q    And one of the reasons you put the cuffs on him

5    was to prevent him from getting up; correct?

6        A    That's correct.

7        Q    Because you witnessed him try to get up; true?

8        A    That is true.

9        Q    And then with his hands cuffed behind his back,

10   three officers controlled him from moving around and

11   restrained him; correct?

12       A    Yes.

13       Q    Those officers were preventing Mr. Richardson

14   from getting up; yes?

15       A    Amongst other things, yes.

16       Q    They were holding him down on the ground; true?

17       A    They were holding him so he couldn't get up.

18       Q    Okay.

19       A    I mean, yeah, it's playing words, semantics.

20       Q    So then at some point, because this was a shift

21   change, you ordered Officer Johnson and Henning to be

22   relieved by officers who were coming in on the next shift;

23   correct?

24       A    That's correct.

Page 63

1        Q    So Officer Henning and Johnson were replaced

2    by -- Help me out who the folks were.  Was it --

3        A    I do recall an Officer Marshall.

4        Q    Marshall.

5        A    And Officer Mayes.

6        Q    I think Mayes ultimately relived Medic

7    Stockhauser near the head?

8        A    Yes.

9        Q    So Marshall was coming on and he relieved

10   Officer Johnson.  And Officer Stumpff was still involved;

11   correct?

12       A    That's correct.

13       Q    Officers, after you had them swap out, officers

14   continued to hold Mr. Richardson's legs and both arms;

15   correct?

16       A    Are you reading directly from the report?

17       Q    Yeah.  "Officers continued to hold

18   Mr. Richardson's legs and both arms"; true?

19       A    Yes.

20       Q    And at some point, one of the officers, I think

21   it was Dustin Johnson, was straddling him, Mr. Richardson;

22   true?

23       A    I don't have any recollection of that.

24       Q    You don't remember that?

Page 64

1        A    I don't.

2        Q    What I mean "straddling," I mean the officer

3    was on his knees and he was straddling Mr. Richardson's

4    hip/thigh area.  Do you remember that?

5        A    Over top of him?  I do not.

6        Q    And then at this point in time, after the

7    officers were switched, is that when you and Sergeant

8    Lewis decided to use two sets of cuffs?

9        A    Yeah.  During a course of time, like I

10   documented, that -- No.  Initially, because of his size --

11       Q    Initially there were two sets and then you guys

12   moved to leg shackles?

13       A    Yes.

14       Q    Got it.

15       A    Okay.

16       Q    So you say here, I'm trying to go through

17   chronologically, after the officers were swapped out, I

18   think you say Mr. Richardson continued actively thrashing

19   around?

20       A    Yes.

21       Q    And so he continued to struggle; correct?

22       A    Yes.

23       Q    This is a struggle that is now lasting over ten

24   minutes; true?

Page 65

17 (Pages 62 to 65)

1    MR. PREGON: Objection.
2    A    I mean, I can't -- To put a timeframe on it, it
3 was a period of time. Whether -- I don't know whether it
4 was ten minutes or not.
5 BY MR. DICELLO:
6    Q    Let me try it this way. We know on the video
7 when Dusty Johnson got relieved.
8    A    Okay.
9    Q    Okay? And I think you told me while Dustin
10 Johnson was still there, he was actively thrashing around
11 and grunting; correct?
12    A    Uh-huh.
13    Q    Yes? You just have to say yes.
14    A    Yes.
15    Q    I told you I'd remind you.
16    A    I apologize.
17    Q    And then the officers were switched out and the
18 new officers came on. So we know when that happened on
19 the video; correct?
20    A    That would be, yeah correct.
21    Q    And after the new officers came in, you say
22 Mr. Richardson, he was still actively thrashing around;
23 correct?
24    A    Yes.

Page 66

1    Q    So we can look at the video and look at the
2 time. But whatever that time is, when the new officers
3 come in and they're still holding him, this struggle is
4 going on, if it's around ten minutes, it's been a
5 ten-minute struggle at that point; correct?
6    A    Yes.
7    Q    I want to take a break from the chronology for
8 a minute and kind of ask you about some of the things that
9 you knew. What you knew, what you did.
10    MR. PREGON: We're at an hour and a half. Do
11 you want to take a quick restroom break?
12    MR. DICELLO: Yeah, that's fine.
13    MR. PREGON: If you're switching gears, that's
14 a good --
15    MR. DICELLO: Yeah, that's fine.
16    (Discussion held off the record.)
17 BY MR. DICELLO:
18    Q    Sergeant, we're back from a short break. I
19 want to focus as of the time Mr. Richardson was handcuffed
20 with his hands behind his back and there were three to
21 four officers controlling his movement. I want to ask a
22 couple questions. As of that time, you knew that
23 Mr. Richardson was not armed; correct?
24    A    That's correct.

Page 67

1    Q    And he was handcuffed; true?
2    A    He was handcuffed.
3    Q    You had some concern that he was having some
4 unknown medical emergency; correct?
5    A    That is correct.
6    Q    You knew he was overweight; true?
7    A    Nick, can I go back to the question about being
8 armed?
9    Q    Sure.
10    A    Can I clarify that?
11    Q    Yeah.
12    A    As far as being armed? I'd like to change that
13 to no, because I didn't necessary pat him down, you know,
14 at the time. Not to say that he couldn't have had some
15 form of weapon.
16    Q    Did you instruct any of the other officers to
17 pat him down to confirm he did not have a weapon?
18    A    No, I did not.
19    Q    So fair to say that wasn't a concern of yours,
20 that Mr. Richardson was armed, otherwise you would have
21 instructed somebody to check him for a weapon; correct?
22    A    That would be correct, yes.
23    Q    Now, you knew that Mr. Richardson was
24 overweight; correct?

Page 68

1    A    No.
2    Q    Did you --
3    A    I didn't know that.
4    Q    Did you consider whether or not Mr. Richardson
5 was obese?
6    A    No.
7    Q    So in the decisions you were making about how
8 to position him, how to handcuff him, you were not
9 considering whether or not he was obese; correct?
10    A    That would be -- That would be an
11 interpretation of what obesity would be, you know, and I
12 would have to clarify that. So --
13    Q    Well, you're supposed to consider whether
14 someone is obese when you're positioning them in
15 handcuffs; correct? Or are you not?
16    A    It would be a consideration.
17    Q    So was it a consideration in your mind on May
18 19th, 2012?
19    A    That he was obese?
20    Q    Yes.
21    A    No.
22    Q    You knew that Mr. Richardson was trying to get
23 off of his belly; correct?
24    A    Throughout a portion of the incident, yes.

Page 69

18 (Pages 66 to 69)

1     Q   You knew that Mr. Richardson was disoriented;
2  correct?
3     A   Yes.
4     Q   You knew that he needed medical attention;
5  true?
6        MR. PREGON:  Objection.
7     A   I don't know that he needed medical attention.
8  BY MR. DICELLO:
9     Q   Okay.
10    A   That is, you know, a medical emergency.  I
11  can't say, you know, what was going on with him, you know.
12  I can't say definitively, you know, he needed medical
13  attention.
14    Q   The goal was to get him medical attention
15  though; correct?
16    A   It was a portion of the response, yes.
17    Q   Mr. Richardson never hurt anyone; correct?
18    A   Not to my recollection.
19    Q   So to your recollection, Mr. Richardson never
20  hurt anyone; correct?
21    A   That would be correct.
22    Q   Mr. Richardson never tried to hurt anyone;
23  correct?
24    A   Not intentionally, no.

**Page 70**

1  you found him; correct?
2     A   He was sitting upright on the ground, yes.
3     Q   Did you have an understanding that
4  Mr. Richardson had collapsed?
5     A   I did not have an understanding of that, no.
6     Q   Were you considering maybe that's how
7  Mr. Richardson wound up on the ground?
8     A   It may have been a consideration, but I don't
9  have an exact recall of that.
10    Q   As of the time you encountered Mr. Richardson,
11  and I've asked a lot of folks this question,
12  Mr. Richardson hadn't violated any jail rules; correct?
13    A   Not that I was aware of.
14    Q   And Mr. Richardson hadn't committed nor was he
15  in the commission of any crime; correct?
16    A   That is correct.
17    Q   Once Mr. Richardson was handcuffed and being
18  controlled, his movements being controlled by three to
19  four corrections officers, Mr. Richardson posed no threat
20  to you, did he?
21    A   Me personally?
22    Q   Yeah.
23    A   Not my person, no.
24    Q   And Mr. Richardson, once his movements were

**Page 72**

1     Q   He didn't hurt anybody unintentionally, did he?
2     A   He did not.
3     Q   Did he ever try to assault anyone?
4     A   Not during the incident.
5     Q   Did Mr. Richardson ever try to assault anyone
6  ever that you know of?
7        MR. PREGON:  Objection.
8     A   I do not know.
9  BY MR. DICELLO:
10    Q   Mr. Richardson was not being violent, was he?
11       MR. PREGON:  Objection.
12    A   I mean, violent towards a particular person?  I
13  mean, violence is -- that's kind of open-ended.  You have
14  to narrow it down for me.
15  BY MR. DICELLO:
16    Q   I'm asking you.  I know you've encountered
17  violence in the jail before.  So I'm asking you as the
18  sergeant.  Mr. Richardson was not being violent; correct?
19    A   At the time -- At the time of dealing with him,
20  he was not violent towards that.
21    Q   You knew Mr. Richardson was bleeding from his
22  mouth; correct?
23    A   Yes.
24    Q   You knew Mr. Richardson was on the ground when

**Page 71**

1  being controlled by corrections officers, Mr. Richardson
2  didn't pose a threat to anyone, did he?
3        MR. PREGON:  Objection.
4     A   I don't agree with that.
5  BY MR. DICELLO:
6     Q   Who was he threatening and how was he
7  threatening that person?
8     A   At the point, again, we're dealing with an
9  unknown situation.  You know, we're trying to assess and
10  determine what we actually have to interpret what may
11  transpire.  Again, if he chose to use a word you
12  suggested, violent, to violently start thrashing around to
13  the point where we have him held or a measure of restraint
14  which can be determined, you know, that can be measured.
15  Would you agree?  We can measure restraint.
16    Q   Okay.
17    A   So we have a -- say a low restraint or a hold,
18  and then he becomes violent, you know, just because he's
19  handcuffed doesn't mean he can't pose a risk to staff.
20    Q   You told me he didn't become violent; correct?
21    A   He didn't during the incident, yes.
22    Q   So I'm not asking what he could have or might
23  have or possibly under some circumstances later would have
24  done, okay?  I'm asking, and I think you understand, as a

**Page 73**

**19 (Pages 70 to 73)**

1  police officer, you have to look at what's objectively
2  reasonable, right, what kind of threats are you perceiving
3  at the time; correct?
4      A   In addition to, yes.  That is part of an
5  overall assessment.  But you can't take away what -- You
6  know, I can't negate, just because it didn't happen after
7  the fact, that I know it didn't happen during the
8  incident, I can't rule out that it couldn't happen.
9      Q   Okay.  Inmate Maxwell could have attacked you;
10  true?
11      A   That is a concern, yes.
12      Q   Any inmate at any time could attack you; right?
13      A   Any person.
14      Q   Anything is possible; right?
15      A   Anything is possible, yes.
16      Q   But just because anything is possible, that
17  doesn't justify putting everyone you encounter in
18  restraints; true?
19      A   That would be true.
20      Q   So I'm interested in what threats he posed, not
21  what potential threats he might have posed if something
22  else happened.
23      So once he's -- once his movements were being
24  controlled by the officers, he didn't pose any threat to

Page 74

1  you, you've told us that.  My next question is:  Once his
2  movements were being controlled by these three to four
3  officers, he posed no threat to anyone; correct?
4      MR. PREGON:  Objection.
5      A   No.
6  BY MR. DICELLO:
7      Q   Okay.
8      A   That's not correct.
9      Q   So how did he threaten these people?
10      A   You want to keep taking out the fact of what
11  could happen.
12      Q   What threat did happen?  That's what I'm
13  asking.  I'm not asking what threat he might have posed.
14  What threat happened?
15      A   We have the privilege, sir, knowing that after
16  the fact.  But I can't not take into account what might
17  happen.
18      Q   The same is true of Inmate Maxwell, and he
19  wasn't in restraints.
20      A   Yes.  But again, with the explanation of what
21  is transpiring, what are we assessing from the situation.
22  I notated that I had him removed from the cell or I don't
23  -- You know, let me scratch that.  At some point in time,
24  I don't know if I have direct recall of removing him from

Page 75

1  the cell.  But again, he was removed from the cell because
2  of that, to remove the fact that, you know, he's an
3  unknown, we don't know his true involvement in the whole
4  situation, so we remove that element of risk.
5      Q   Maxwell, you're talking?
6      A   Maxwell, yes.  We're removing that element of
7  risk.  And then I have to act on the, you know, the fact
8  and circumstances of what I'm perceiving, and I can't
9  take out the fact of what may happen.  I have to leave
10  that in there.
11      Q   So what threat did Mr. Richardson pose and who
12  was threatened?
13      A   Because he was still, you know, still actively
14  moving around and being held, there's a point in time
15  where, you know, and I'm going off knowledge and
16  experience, where I've seen, you know, a person that is
17  going through a crisis, of whatever sorts, okay?  When you
18  -- For the extent of safety of the facility and the
19  officers, when you put restraint on them, they be -- can
20  become violent.  So again, because he didn't pose an
21  immediate threat on staff, you know, other than we were
22  just at that point, it was a safety issue on his part,
23  holding him so he doesn't, you know, start thrashing
24  around to the point where now he is banging his head or,

Page 76

1  okay, just because we've got him handcuffed it's over and
2  done with, we can just walk away.  That is not the case,
3  okay, he's handcuffed, let's let him stand up, and he
4  passes out and he falls down, hits his head on the
5  railing, hits his head on the floor.  Again, as I've
6  discussed, there's no soft edges in jail.
7      Q   Okay.
8      A   You know, everything is hard, concrete, steel,
9  so on and so forth.
10      Q   Which I'm trying to stay on point here.  I'm
11  trying to get an answer to the question of what threat did
12  Mr. Richardson pose once he was handcuffed on the ground
13  with three to four officers controlling his movements?
14      MR. PREGON:  Objection.
15  BY MR. DICELLO:
16      Q   I haven't heard what threat he posed to anyone
17  yet.
18      MR. PREGON:  I think he's answered the
19  question.
20      MR. DICELLO:  I haven't heard it yet.
21  BY MR. DICELLO:
22      Q   What threat?
23      A   There was no immediate threat.
24      Q   All right.

Page 77

1     A    At that time.

2     Q    So there was a decision at some point to get

3 the emergency restraint chair; is that correct?

4     A    That is correct.

5     Q    Who made that decision?

6     A    That was my decision.

7     Q    And why was it your decision to get the

8 emergency restraint chair?

9     A    It was an ongoing event, medical was still

10 dealing with him, and going to deal with him. And again,

11 forward thinking, continuing to assess the situation that,

12 being on the second level of the pod and him receiving

13 medical care, that was going to have to change. So again,

14 being on the second floor, and how are we going to get him

15 safely down to the first level and, you know, perceivably

16 down to medical. What would be the safest way to do that?

17 You know, in the event -- You know, again, he's still

18 actively moving around, we're trying to control him, so

19 what would be the safest way to move him from the second

20 floor when you have a fixed -- when you have a fixed

21 object, you know, that we could have officers easily carry

22 down a set of steps versus a manipulatable, you know, body

23 or, you know, a structure. I mean, we can carry -- You

24 know, we can carry a, you know, a hundred pound box with,

Page 78

1     A    Other than after -- after medical had been

2 assessing him.

3     Q    All right.

4     A    And you know, decisions were being made on our

5 part, which I wasn't privy to all the medical decisions,

6 you know, that's -- that -- you know, you'd have to ask

7 them. But again, just knowing that they're still

8 continuing to -- to treat him and not call in outside

9 resources. So how can we safely remove him from, you

10 know, our current state and get him down one and move him

11 to medical where they have, you know, additional

12 resources.

13     Q    The safer position for Mr. Richardson would

14 have been to get him in the restraint chair as opposed to

15 leaving him up there on the floor; is that the decision

16 you made?

17     A    That would be -- That would be correct, yes.

18     Q    All right. So how long -- What is your

19 expectation -- And it's called the emergency restraint

20 chair; right?

21     A    It is.

22     Q    Because it's used in emergency situations?

23     A    It is.

24     Q    And so what's your expectation once you call

Page 80

1 you know, edges easily. But, you know, you take a hundred

2 pound object that his different edges and whatever, it

3 gets hard to carry and move. So it just creates a big

4 safety risk. So secure him in the restraint chair and

5 then we have a hard object that he's fixed to. We don't

6 have a body -- or what would be considered like a hard

7 board or a body board, you know, that's commonly used by

8 medical personnel.

9     Q    Backboard?

10     A    A backboard, you know, to strap him to.

11     Q    Why don't you guys have one of those?

12     A    Sir, that's up to medical staffing, NaphCare.

13 I don't know.

14     Q    Okay.

15     A    I don't know why we don't have one. But again,

16 I'm just thinking how can we safely, you know, move him

17 down.

18     Q    Let me ask a question: Have you over the

19 course of your career used backboards to strap people to

20 to transport them?

21     A    I have not.

22     Q    Can you tell me at what point in time you

23 remember ordering the restraint chair to be brought to the

24 pod?

Page 79

1 for the emergency restraint chair to respond to an

2 emergency? How long do you expect that that takes to get

3 the chair to the emergency?

4     A    It's a running expectation. And that's, you

5 know, available personnel, your --

6     Q    There's got to be some expectation in your mind

7 that we should be able to get a restraint here within,

8 what is it?

9     A    Five to ten minutes.

10     Q    Did the restraint chair get there within five

11 to ten minutes?

12     A    I do not know.

13     Q    Why wasn't Mr. Richardson put in the restraint

14 chair according to your plan?

15     A    Because of the -- after the fact that -- From

16 my recollection, it would be because it had not -- it had

17 not responded yet, and they administered -- when they

18 administered the medication, and then it -- and then he

19 had a, you know, his medical condition progressed into the

20 fact that we had to provide CPR to him.

21     Q    Do you know how long the chair was sitting

22 downstairs waiting for Mr. Richardson?

23     A    I do not.

24     Q    Why wasn't Mr. Richardson put in it as soon as

Page 81

21 (Pages 78 to 81)

1  the chair got there?

2      A   Because we actively resolved the immediate

3  problem and --

4      Q   What was that?

5      A   Getting him safely secured and then medical

6  responded to assess him.

7      Q   Well, he was safely secured pretty quickly,

8  wasn't he?

9      A   He was.

10     Q   All right.  So that issue, to the extent that

11 your guys were able to control his movements, was resolved

12 within a minute or two; right?

13     A   Right.

14     Q   But the restraint chair was ordered after your

15 guys were able to secure him; correct?

16     A   Yes.

17     Q   Okay.  So why wasn't Mr. Richardson put in the

18 restraint chair when it got there as an emergency

19 precaution?

20     A   Because it's not normally used for that.

21     Q   So why did you order it?

22     A   Because as the situation progressed, time-wise,

23 like I said, we don't have a backboard, and how -- how --

24 what's the safest way -- and that's just me, you know,

Page 82

1  it's a thinking out of the box situation.  What do we

2  have, what's our resources available to us where we could

3  secure somebody to a fixed object and safely get them

4  downstairs and move them to better resources.

5      Q   And I appreciate that thought process.  We've

6  been through that.  I'm trying to figure out why once the

7  restraint chair was brought, pursuant to your order, why

8  Mr. Richardson wasn't then put into the restraint chair?

9      A   Because prior to it responding -- or getting up

10 to the housing location, he had, you know, his medical

11 condition where he needed CPR.

12     Q   So you don't think the restraint chair was

13 there prior to Mr. Richardson stopping breathing; is that

14 your understanding?

15     A   That is my recollection, yes.

16     Q   If the restraint chair was there before

17 Mr. Richardson stopped breathing, he should have been put

18 in it; correct?

19     A   He -- You know, based on once it got there and

20 we got it in position, if, you know, we felt that, again,

21 you know, medically, if he was able to be put in it, then

22 he would have been put in it, yes.

23     Q   I want to ask you some kind of general rules,

24 Sergeant, and see if you agree or disagree.  Corrections

Page 83

1  officers at the Montgomery County Jail, at any jail, must

2  never apply restraints -- when I use the word

3  "restraints," I'm including handcuffs and leg shackles and

4  all that kind of thing, understood?

5      A   Understood.

6      Q   So corrections officers at a jail in a

7  community must never apply restraints in ways that my

8  restrict breathing; true?

9      A   You said for every jail.  You know, I can only

10 account for the Montgomery County Jail.  And yes.

11     Q   Okay.

12     A   If we know that there's knowledge that it will

13 restrict breathing --

14     Q   Well, let me restate it.  Corrections officers

15 at the Montgomery County Jail must never apply restraints

16 or handcuffs in ways that may restrict breathing; correct?

17     A   I can't say correct --

18     Q   Okay.

19     A   -- 100 percent.  I'd have to look at -- If

20 you're referring to our direct policy, I'd have to defer

21 to that.

22     Q   Well, I'm reading it word-for-word.  Do you

23 agree with it or not?

24     A   Our policy?

Page 84

1      Q   The rule I just announced, that corrections

2  officers at the Montgomery County Jail must never apply

3  restraints in ways that may restrict breathing.

4          MR. PREGON:  You're not reading it

5  word-for-word.

6      A   Yeah.

7          MR. DICELLO:  I think I am.

8          MR. PREGON:  I'm looking at it.

9      A   If you're referring to our policy, can I review

10 that so I know what I'm answering?

11 BY MR. DICELLO:

12     Q   You weren't reading the policies when

13 Mr. Richardson was being restrained, were you?

14     A   I was not.

15     Q   Then so policies are great to have written

16 down, but they need to be ingrained and they need to be

17 implemented in the midst of fastly-evolving situations;

18 correct?

19     A   That is correct.

20     Q   Right.  So I'm interested in now, and we can

21 look at the policy, but right now I'm interested in your

22 answer.  What's your understanding as a sergeant

23 supervising men and women who are restraining members of

24 the public in your jail?  My question is: Corrections

Page 85

22  (Pages 82 to 85)

1     officers at the Montgomery County Jail must never apply
2     handcuffs or restraints in ways that may restrict
3     breathing; is that true or not true?
4        A  That would be true.
5        Q  Okay. Corrections officers at the Montgomery
6     County Jail must only use force that is reasonable;
7     agreed?
8        A  That would be agreed.
9        Q  Corrections officers must only use force that
10    is reasonably necessary under the totality of the
11    circumstances; true?
12        MR. PREGON: Objection.
13        Go ahead.
14        A  That would be to an extent of that, true, yes.
15    BY MR. DICELLO:
16        Q  To what extent is that not true?
17        A  Let me rephrase. Let's make it true --
18        Q  Okay.
19        A  -- for the sake. I apologize.
20        Q  That's okay.
21        Force that is unreasonable is excessive force;
22    true?
23        MR. PREGON: Objection.
24        Go ahead.

Page 86

1        A  No, that's not true.
2    BY MR. DICELLO:
3        Q  So there are times -- your understanding is
4    there are times when corrections officers can use force
5    that is not reasonable but it's not excessive; right?
6        A  That is true.
7        Q  Force that is unnecessary is excessive?
8        MR. PREGON: Objection.
9        Go ahead.
10       A  No, that's not true.
11    BY MR. DICELLO:
12       Q  So there are times based on your understanding
13    that corrections officers can use force against the
14    members of the public that isn't necessary, but it's not
15    excessive; correct? I think that's what you just told me.
16       A  When you defer to -- I mean members of the
17    public, you know.
18       Q  Well, that's who you're dealing with in the
19    jail, aren't you?
20       A  They're -- They're incarcerated inmates. It's
21    not, you know --
22       Q  They're not incarcerated. They're detained
23    temporarily; right? You know the difference, don't you?
24       A  Can you reask the question?

Page 87

1        Q  Yeah. First of all, folks that are detained at
2    the county jail, they're husbands and wives and grandpas
3    and grandmas and kids and nephews and uncles, they're
4    members of the public; correct?
5       A  They are members of the public, yes.
6       Q  I think what you're telling me, because I just
7    said using unnecessary force against a member of the
8    public in a jail is excessive force, and you said "I
9    disagree with that." My follow-up question is: You're
10    telling me your testimony in this case is that corrections
11    officers can use unnecessary force against members of the
12    public in the county jail and it's not excessive force;
13    correct?
14       A  Yes.
15       Q  Got it.
16       Placing members of the community who are in
17    handcuffs behind their back in a prone position is never
18    an acceptable practice; agreed?
19       MR. PREGON: Objection.
20       Go ahead.
21       A  It's -- Obviously, again, like I explained, you
22    have to have them facedown to put handcuffs on their back.
23    It would be the interpretation of prone. Nose down,
24    shoulders down. Again, you have to have them facedown for

Page 88

1    a period of time to place -- place them in restraints. To
2    hold them there or maintain that for an extended period of
3    time or with force is -- would be a policy issue.
4       Q  So putting members of the community who are in
5    restraints with their hands cuffed behind their back
6    forcefully in prone positions for an extended period of
7    time is an unacceptable practice; correct?
8       A  It would be, yes.
9       Q  It's prohibited, isn't it?
10       MR. PREGON: Objection.
11       Go ahead.
12       A  It would be -- As far as -- I'm trying to think
13    of a different word to -- I mean, as far as prohibited.
14    But it's -- it states in policy that, you know, it's not
15    to be used.
16    BY MR. DICELLO:
17       Q  Well, it states it's prohibited, doesn't it,
18    the policy?
19       A  Again, to know policy word-for-word, I'd have
20    to refer to that. But we can go with prohibited.
21       Q  So let me get the answer in a question-answer
22    format. Placing members of the community who have their
23    hands cuffed behind their back in a prone position by
24    force for an extended period of time is prohibited; true?

Page 89

1      A   And that would be in conjunction to -- That is
2  a portion of the policy, and from my interpretation of
3  that, that would be in conjunction to what would be
4  considered a measure of restraints and in conjunction with
5  what would be something referred to as hog-tying, where
6  you're using a measure of restraints where you have their
7  hands and their legs restrained and they're in a prone
8  position.  You know, as far as my understanding of the
9  policy, the back portion of what you're reading me would
10  be in conjunction with that.
11      Q   Mr. Richardson's arms and legs were restrained;
12  correct?
13      A   They were.
14      Q   Let me get back to my question.  Placing
15  members of the community who have their hands cuffed
16  behind their back forcefully in a prone position for an
17  extended period of time is prohibited at the jail; agree
18  or disagree?
19      A   Again, there's -- there's more to what you're
20  -- it's more to the policy than that, my interpretation of
21  that.  But for long periods of time, yes, it is
22  prohibited.
23      Q   So what's a long period of time?
24      A   That's left up to interpretation.  Based on

Page 90

1  what's transpiring at the time.
2      Q   What's your interpretation?
3      A   It's -- It's situational.  You know, it's -- if
4  you had an ongoing -- you know, that's why it doesn't give
5  a time, because it's situational.  It's an assessment on
6  what you're dealing with at that time.  And then, again,
7  to refer to, you know, what's objectionably reasonable.
8      Q   I have a definition of prone restraint here
9  that I've been asking folks about.  And you have to bear
10  with me, because it's pretty wordy, okay?  Prone restraint
11  means all items or measures to limit or control the
12  movement or normal functioning of any portion or all of an
13  individual's body while the individual is in a facedown
14  position for an extended period of time.  Do you agree
15  with that definition of prone restraint?
16      MR. PREGON:  Objection.
17      Go ahead.
18      A   Can you read it to me one more time, please?
19  BY MR. DICELLO:
20      Q   I can.  All items or measures used to limit or
21  control the movement or normal functioning of any portion
22  or all of an individual's body while the individual is in
23  a facedown position for an extended period of time.  Do
24  you agree with that definition of prone restraint?

Page 91

1      MR. PREGON:  Objection.
2      Go ahead.
3      A   Yes.
4  BY MR. DICELLO:
5      Q   Prone restraint includes physical or mechanical
6  restraints; correct?
7      MR. PREGON:  Objection.
8      Go ahead.
9      A   Not correct.
10  BY MR. DICELLO:
11      Q   What's wrong about that statement?
12      A   Well, I mean, it's -- Again, it's -- it's
13  working off of -- excuse me -- As it relates to my
14  knowledge of the policy, it relates to mechanical
15  restraints.
16      Q   Have you been trained or are you aware of a
17  general rule in your field, Sergeant, that advises that an
18  inmate or a detainee or somebody in custody is at an
19  elevated risk of sudden death after a struggle that lasts
20  three minutes?
21      MR. PREGON:  Objection.
22      Go ahead.
23      A   As far as the timeframe, no.  As far as, you
24  know, three minutes.  As far as a struggle, yes.

Page 92

1  BY MR. DICELLO:
2      Q   So what's your understanding of how long the
3  struggle has to last until somebody is at an elevated risk
4  of sudden death?
5      A   That would be, again, taking into account of --
6  I mean, you don't know a person's true physical condition,
7  you know, their health prior to dealing with them.  So it
8  could be -- it could be, you know, a matter of seconds or
9  it could be a matter of minutes.
10      Q   So it sounds like you would want to error on
11  the side of caution; right?
12      MR. PREGON:  Objection.
13      A   Ideally, that's the ultimate result, you know,
14  you always want to, you know, the least amount.
15  BY MR. DICELLO:
16      Q   So given that you're aware of this concept that
17  people are at elevated risks of sudden death after
18  struggling with corrections officers and the time period
19  at which point in time that risk elevates is unknown, I
20  presume you want to error on the side of a shorter time
21  period; right?
22      A   Yes.
23      MR. PREGON:  Objection.
24  BY MR. DICELLO:

Page 93

24 (Pages 90 to 93)

1    Q   Corrections officers must never restrain
2    members of the public in ways that pose an unnecessary
3    risk of death. Do you agree with that?
4        A   I'd agree with that.
5        Q   And when faced with two or more ways to
6    restrain a member of the public under the circumstances,
7    corrections officers must choose the safer way; agreed?
8        A   In light of what's transpiring, it may be
9    anyway. You know, there's that -- You know, again, you
10   can't take into account, I mean, you have a fixed object,
11   it's not moving, that's one thing. But you know --
12       Q   I understand. I think the question
13   contemplates that when it says "faced with two or more
14   ways to restrain someone." Let me try it this way: Faced
15   with two or more reasonable ways to restrain someone, the
16   officers must choose the safer way?
17       A   Perceptually, yes.
18       Q   Are you aware of research in your field that
19   has shown that the prone restraint is a hazardous and
20   potentially lethal restraint position?
21       A   As it relates to, again, the -- with the use of
22   mechanical restraints and, like I referred to, hog-tying.
23   That's the common term used where, you know, you're
24   coupling hand restraints behind the back to leg shackles.

Page 94

1    And then you're coupling them together.
2        Q   So you're aware of literature that says
3    hog-tying can kill people; correct?
4        A   It elevates the risk of death, yes.
5        Q   Are you aware of research that shows that the
6    prone restraint without hog-tying, just the prone
7    restraint, is a hazardous and potentially lethal restraint
8    position?
9        A   Not direct information, no.
10       Q   Are you aware of any indirect information in
11   your field that has demonstrated that the prone restraint
12   is a hazardous and potentially lethal position?
13       A   Yes.
14       Q   And so what information are you aware of?
15       A   It was just -- just common knowledge or -- or
16   putting information together. Like if, you know, like
17   hog-tying or being in a prone position, it does -- Let me
18   -- If I can go back to your -- the first question. Having
19   knowledge that a prone position can create, yes. And
20   then, you know, just through not direct literature that
21   I've read, but, you know, training and knowledge that's
22   been provided to me.
23       Q   So based on the training and knowledge that's
24   been provided to you as of May 19th, 2012, you knew that

Page 95

1    the prone restraint was a hazardous and potentially lethal
2    restraint position; correct?
3        A   Yes.
4        Q   And when we're talking about mechanical
5    restraints, Mr. Richardson was restrained with mechanical
6    restraints; correct?
7        A   He was.
8        Q   He was also restrained with physical
9    restraints; true?
10       A   That is true.
11       Q   Do you know whether or not the use of prone
12   restraint is prohibited in the State of Ohio?
13       A   I do not.
14       Q   Do you think that the use of a prone restraint
15   is permitted in the State of Ohio?
16       A   Yes. Again, as it relates to actually
17   physically getting somebody handcuffed or put in
18   mechanical restraints, there's a measure of time where a
19   subject does have to be prone. So -- And again -- I'm
20   sorry.
21       Q   That's okay. I think you're referring to a
22   concept, if you've ever heard of it, called transitional
23   hold. Have you ever heard of that concept?
24       A   I have not.

Page 96

1        Q   Has anyone ever shared with you an executive
2    order from the governor from the State of Ohio that dates
3    back to 2009 and continues to be in force today that bans
4    the use of prone restraint in the State of Ohio?
5        A   I'm not aware.
6        Q   Is that something that you think as a sergeant
7    who is working in the jail in the State of Ohio that
8    houses up to a thousand people in the community that you
9    should be aware of?
10       MR. PREGON: Objection.
11       A   Does that -- Does that directly relate to law
12   enforcement and/or corrections or jail facilities?
13   BY MR. DICELLO:
14       Q   It relates to the Ohio Department of Mental
15   Retardation and Developmental Disabilities, the Ohio
16   Department of Mental Health, the Ohio Department of
17   Alcohol and Drug Addiction Services, the Ohio Department
18   of Youth Services, the Ohio Department of Education, the
19   Ohio Department of Job and Family Services, the Ohio
20   Department of Health, the Ohio Department of Aging, the
21   Ohio Department of Commerce, the Ohio Department of
22   Natural Resources, the Ohio Department of Public Safety,
23   the Ohio Department of Rehabilitation and Correction, the
24   Ohio Department of Veteran Services, and the Ohio Board of

Page 97

25 (Pages 94 to 97)

Page 98

1 Regents. Do you think that an order from the governor
2 that addresses prone restraint that applies to all of
3 those state agencies, including the Department of
4 Rehabilitation and Correction, is something that you as a
5 sergeant at a jail in our community should be aware of?
6 MR. PREGON: Objection.
7 A Yeah, if there was such a -- you know, where
8 you actually have the order.
9 BY MR. DICELLO:
10 Q I mean, I'm showing you this order. This is
11 the first time you have ever seen it; right?
12 A That's correct.
13 Q And I'm the first person that's ever made you
14 aware of this order?
15 A That is correct.
16 Q Again, given your position where you're
17 supervising corrections officers who are putting people in
18 restraints on a day-to-day basis, do you think that this
19 is an order you should have been made aware of?
20 MR. PREGON: Objection.
21 A If it -- You know, not necessarily the
22 actual -- you know, it's executive order 2009 what, is
23 that, 13 Sam?
24 Q Yeah.

Page 99

1 A 13 S as in Sam?
2 Q Yeah.
3 A Now, there may be portions of that, policy is
4 derived from -- that, you know, again, in relation to the
5 prone position.
6 Q This includes -- I mean under the title, this
7 includes a ban on prone restraints; right?
8 MR. PREGON: Objection.
9 A I didn't, you know, I haven't had a chance to
10 --
11 BY MR. DICELLO:
12 Q Look at the title of it. Does it say
13 "including a ban on prone restraints"?
14 A It does notate that.
15 Q And the policies that we've been talking about
16 that are written down, you know, the policies that are
17 written down in the jail manual for Montgomery County,
18 those are consistent, those ban prone restraint, too,
19 because they say they're prohibited; correct?
20 MR. PREGON: Objection.
21 A Yes.
22 BY MR. DICELLO:
23 Q So the policies that are written down for the
24 jail and the order from the governor, those are consistent

Page 100

1 in that regard; correct?
2 MR. PREGON: Objection. He hasn't read the
3 order.
4 A I do not know if they're consistent.
5 BY MR. DICELLO:
6 Q To the extent that they both ban prone
7 restraint, they would be; true?
8 MR. PREGON: Objection.
9 A It's prohibited. Ban and prohibited can
10 perceptually be --
11 Q Synonymous?
12 A Could be different.
13 Q Are you familiar with a general rule in
14 corrections or law enforcement that as soon as a suspect
15 or subject is handcuffed in the prone position that they
16 are to be taken off of his or her stomach as soon as
17 possible?
18 A Yes.
19 Q And why is that the rule?
20 A I wouldn't say a blanket rule, but as far as
21 Montgomery County Sheriff's Office, because of, again,
22 information that's been provided through training, is --
23 would be considered -- or what I understand to be,
24 positional asphyxia or something to that effect, that,

Page 101

1 again, you know, in light of, you know, an arrest, a
2 detention, something to that effect, there is a -- you
3 know, research has provided that there is an elevated
4 hazard or risk. And so, you know, when feasible or safe
5 to do so, as soon as possible, you know, to put them in a
6 position where they're not in a prone position or
7 facedown.
8 Q And that's the job of corrections officers to
9 follow that rule; correct?
10 A Yes.
11 Q And more globally, it's the job of the
12 Montgomery County Sheriff's Office to make sure that rule
13 is followed; correct?
14 A Yes.
15 Q What's your understanding of what positional
16 asphyxia is?
17 A Again, it would be in relation to a prone
18 facedown position, you know, with restraint and additional
19 leg restraint, you know, a combination of the both, you
20 know. And again, with a measure of force, because
21 generally, if you're in a position where you have to put
22 somebody in that particular state, if you ever had to do
23 so, there would be an elevated risk as far as safety
24 because that -- there would be additional -- they would be

1  violent and combative.  And so if you're going to that
2  extent, there would be additional pressure where you would
3  be, you know, again, holding them down and restraining
4  them as a whole, not necessarily just, you know, from
5  moving from side-to-side, but you would be holding them
6  down to restrict their movement.  So again, to not put
7  themselves or put that person in that position, you know,
8  they avoid hog-tying them.
9      Q   What is -- I appreciate you telling me about
10  the positioning and the risk and all that.  What is
11  positional asphyxia, if you know?
12      A   I don't know a true definition of it other
13  than, you know, being in a prone position, you know, with
14  pressure on top of the person would create a risk, you
15  know, or a hazard, you know, a medical condition.
16      Q   Do you know what asphyxiation is?
17      A   Not a true definition of it, other than --
18      Q   What's your understanding of what asphyxiation
19  is?
20      A   It would be in relation to breathing, you know,
21  it would be a restriction of breathing.
22      Q   Can people die from positional asphyxiation as
23  far as you understand?
24          MR. PREGON:  Objection.

Page 102

1      A   They can.
2  BY MR. DICELLO:
3      Q   I know you're not a medical person, but do you
4  understand how it is that positioning somebody in a prone
5  restraint causes asphyxiation?
6      A   I do not.
7      Q   Have you been trained on what the risk factors
8  are for positional asphyxiation, meaning what's going to
9  put a person at a higher risk of dying from positional
10  asphyxiation?  Have you received training in that?
11      A   Other than just the position itself.
12      Q   Okay.
13      A   And then --
14      Q   So are you aware of any other risk factors
15  other than the position itself that places an individual
16  at an increased risk of death from positional asphyxia?
17      A   No.
18      Q   When you were responding to Mr. Richardson, did
19  you know whether or not he had a history of hypertension?
20      A   No, I knew nothing about the individual.
21      Q   Did you know whether or not he had a history of
22  high blood pressure?
23      A   I did not.
24      Q   At any point in time during this encounter --

Page 103

1  And I think the video shows it's about 22 minutes long
2  before Mr. Richardson is found to not be breathing.  Is
3  that consistent with your review of the video?
4      A   In close proximity, yes.
5      Q   So at any point in time during this 22-minute
6  episode, did you instruct any corrections officers to sit
7  Mr. Richardson up?
8      A   In a seated position?
9      Q   Yes.
10      A   No, I did not.
11      Q   Did you instruct any corrections officers to
12  roll Mr. Richardson onto his back?
13      A   Not onto his back.
14      Q   And you didn't instruct any corrections
15  officers to stand Mr. Richardson up; correct?
16      A   That is correct.
17      Q   The first time you instructed any corrections
18  officers to roll Mr. Richardson onto his back was after he
19  stopped breathing; correct?
20      A   I didn't instruct any officers to roll him onto
21  his back.
22      Q   Officers rolled Mr. Richardson over onto his
23  back once they realized he had stopped breathing; correct?
24      A   That is correct.

Page 104

1      Q   And they rolled him onto his back to try to
2  give him the medical care he needed at that point; right?
3      A   Yes.
4      Q   Because that kind of care that he needed at
5  that point couldn't be administered with him lying on his
6  stomach; correct?
7      A   That would be correct.  We -- I mean --
8      Q   Why wasn't Mr. Richardson rolled onto his back
9  at any point in time during this 22-minute struggle?
10      A   Because then -- I don't know.  He was rolled
11  onto his side, which is part of the training.  You know,
12  at some point, you know, he was -- you know, he was,
13  again, he was handcuffed, and then, you know, at the point
14  where he could be safely, you know, restrained, you know,
15  I had him rolled onto his side, which, you know, based on
16  our training and understanding of, you know, again, we
17  just -- I think we went through the whole protocol of, you
18  know, prone, that, you know, it's in a safer position for
19  him to be on his side.
20      Q   It is.  And I think we can look at the video if
21  we need to, Sergeant.  But there are times Mr. Richardson
22  is on his side, there are times that he's on his belly;
23  correct?
24      A   That is correct.

Page 105

1    Q   So why wasn't Mr. Richardson rolled onto his
2  back if you know that the prone position increases the
3  risk of death?
4         MR. PREGON:  Objection.
5         Go ahead.
6    A   Because he wasn't.  I don't know.  I didn't
7  give that instruction.  I can't -- You know, I can't
8  recall why I did not.
9  BY MR. DICELLO:
10   Q   Okay.
11   A   And it's not -- I mean, it's not necessarily,
12  you know, my complete decision, you know.  There's --
13  Corrections officers are independent thinkers as well.  So
14  I'm not, you know, in total control and I don't instruct,
15  you know, each movement.
16   Q   Some of these narrative reports will actually
17  identify when they were put into the computer.  Like it
18  has a time reported on them.
19   A   Okay.
20   Q   And I was asking some other corrections
21  officers here, and they were saying, "Yeah, that would be
22  the time I basically finished typing this into the
23  computer."  But when I look at yours, when I look at your
24  statement, your narrative, Sergeant Jackson, I don't see a

Page 106

1  time.  I see a reported time of 15:48, but I think that
2  goes back to the time of the incident; correct?
3    A   That would be an approximate time of, you know,
4  when the initially report was generated.
5    Q   Right.  So I'm trying to get an understanding
6  of when did you type this narrative up?
7    A   It was the following day.
8    Q   All right.  And why isn't that documented, when
9  you did this?
10   A   I don't know the particulars of the IT
11  situation as far as the reporting.  I apologize.
12   Q   That's okay.
13        MR. PREGON:  Just so the record is clear, the
14  other statement I referred to on MC 1281?
15        MR. DICELLO:  Yeah.
16        MR. PREGON:  That one was time stamped.
17        MR. DICELLO:  Okay.  So there is a difference
18  in the formatting of these.  Thanks for bringing that up.
19  BY MR. DICELLO:
20   Q   Let's look at MC 1281.  Are you there?
21   A   Yeah.
22   Q   It looks like this one is a little bit
23  different format than the other one.  Are you officer 266?
24   A   Yes, I am.

Page 107

1    Q   So it does indicate that the date reported was
2  May 20th, 2012 at 9:17 a.m.  Is that consistent with your
3  recollection of when you typed this up?
4    A   That would be, yes, the next morning hours,
5  yes.
6    Q   Why didn't you type this up the same day that
7  the event occurred?
8    A   I departed the jail shortly after Dayton Fire
9  responded to the jail.  I had to respond to another
10  critical incident.
11   Q   SWAT team?
12   A   Correct.
13   Q   I think Dusty Johnson told us that he saw you
14  heading off to a SWAT call; is that right?
15   A   That is correct.
16   Q   Placing someone in restraints and holding them
17  down on the ground is a use of force; true?
18   A   There's a measure of force used.  But as far as
19  use of force, you have to clarify.
20   Q   What I'm trying to figure out is we have a
21  situation here where you've told us today that
22  Mr. Richardson was placed on the ground, four officers
23  participated in handcuffing him, because he was resisting;
24  correct?  That part is correct?

Page 108

1    A   Yeah.  He was technically on the ground.  But
2  as far as placing him there, you know -- I mean, not from
3  -- you know, he was rolled over and on the ground.
4    Q   I think you've told us that officers were
5  holding his arms and legs to prevent him from moving;
6  correct?
7    A   Yes.
8    Q   Handcuffs were put on Mr. Richardson to prevent
9  him from getting up, in part; correct?
10   A   That is correct.
11   Q   One officer testified here yesterday that he
12  was actually straddling Mr. Richardson to prevent him from
13  moving, okay?
14   A   (Nods head.)
15   Q   And during this time, 22 minutes later, while
16  the officers were doing these things, Mr. Richardson died;
17  correct?
18        MR. PREGON:  Objection.
19        Go ahead.
20   A   He did pass away, yes.
21  BY MR. DICELLO:
22   Q   He stopped breathing while the officers still
23  had their hands on him; correct?
24   A   Yes.

Page 109

28 (Pages 106 to 109)

1    Q   Are you telling me that nothing any of the
2 corrections officers did on that day rose to the level of
3 a use of force against Mr. Richardson?
4    A   As it relates to policy and a submission of a
5 Use of Force Report, in addition to a standard Incident
6 Report that documents their actions, it did not.
7    Q   Why not?
8    A   Because of actions on both parties.  Again, the
9 level of -- Excuse me.  The level of his actions and our
10 actions -- Again, if you, you know, within our policy.
11 Again, it doesn't -- it doesn't notate, you know, and it
12 can't, because all the situations, it will say, you know,
13 your actions are this, and to do that, you know, but it
14 doesn't notate, you know, if he's doing this you will --
15 your action will be this, you know.  And if he's doing
16 this, then your action will be this.  So there's a measure
17 of discretion that's utilized in regards to the policy
18 because of that.  And so, you know, commonly, in the
19 events that took place, it didn't rise to the level of an
20 actual Use of Force Report coupling the standard Incident
21 Report.
22    Q   Doesn't the policy read, "After an employee
23 uses any type of force, he," should say he or she,
24 "completes a Use of Force Report and submits it to his

Page 110

supervisor before the end of his watch.  This requirement
2 applies to all situations where an employee uses force
3 despite the type of force and regardless of whether any
4 injury is apparent."  Isn't that the policy on Use of
5 Force Reports?
6    A   It is.  But to --
7    Q   So where's the discretion in there that you're
8 talking about?  I'm looking at -- this is Montgomery
9 County Sheriff's Office, these are the General Orders that
10 I saw, and I'm looking at the use of force portion that
11 says written reports.  And I just read section two.  Just
12 read that for me.  Does that have anything about
13 discretion of when to fill out a report or when not to?
14    A   Are you asking me to read it aloud?
15    Q   No, I just read it aloud.  You can read it
16 aloud again if you want.  But this section here, J-2,
17 doesn't say anything about discretion on when to fill out
18 a Use of Force Report, does it?
19    A   It does not.
20    Q   And in fact the policy, the written policy, the
21 one that's written down, actually says no matter what kind
22 of force is used, you have to fill out a Use of Force
23 Report; correct?
24    A   It does note that.

Page 111

1    Q   And the policy that's written down, not
2 necessarily what is done, but the policy that's written
3 down says it doesn't matter if the suspect was injured or
4 not, you still have to fill out a Use of Force Report;
5 correct?
6    A   It does note that, yes.
7    Q   And the policy says that the employee is
8 supposed to fill out that Use of Force Report before the
9 end of his watch; correct?
10    A   That is correct.
11    Q   None of those things were done in this case;
12 correct?
13    A   As it relates to me, it was not.  It does also
14 state in policy that it is a guideline, you know, so as
15 far as where the discretion applies.
16    Q   Were you ever interviewed by any investigators?
17    A   I was not.
18    Q   Do you know who investigated this death?
19    A   I do not.  As far as investigation, can you
20 clarify that?
21    Q   Didn't somebody investigate how and why a
22 28-year-old kid died in the jail?
23    A   There would be -- There would be a criminal
24 investigation and an administrative review by our Internal

Page 112

Affairs Division.  So two separate investigations.
2    Q   Have you seen the criminal investigation?
3    A   I have not.
4    Q   I haven't seen it, either.  Do you know who was
5 responsible for the criminal investigation?
6    A   I do not.
7    Q   You took no part in it; correct?
8    A   I took no part in it, yes.
9    Q   And to the extent there was any criminal
10 investigation, you were not even interviewed; correct?
11    A   Yeah.  Well, can I go back to taking part in
12 the investigation?  I did submit a report, which could be
13 part of an investigation.
14    Q   Sure.  To the extent there was any criminal
15 investigation, nobody ever interviewed you; correct?
16    A   No.
17    Q   Yes, that's correct?
18    A   That is correct.
19    Q   All right.  Sometimes we do no no, and then we
20 read it later and we don't know what we're saying.
21    A   Yes.
22    Q   Did you interview anybody in connection with
23 this young man's death?
24    A   I did not.

Page 113

29 (Pages 110 to 113)

1    Q   Were you present when Mr. Richardson was
2    declared deceased?
3    A   I --
4    Q   Looking at your narrative --
5    A   I'd have to --
6    Q   I know I'm testing you. Looking at your
7    narrative, you say, "A short time later, Inmate Richardson
8    was pronounced deceased by the Dayton Fire Department and
9    Dr. Ellis." Does that refresh your recollection that you
10   were present when that happened?
11   A   It doesn't. Other than it may have been I had
12   knowledge of it and documented it.
13   Q   Okay.
14   A   Because if you look, it's kind of a general
15   documentation --
16   Q   Yep.
17   A   -- of, you know, just proceedings that took
18   place. So I do not recall if I was specifically there.
19   Because under my recollection, shortly after, I escorted
20   Dayton Fire medics personnel up to the housing location, I
21   know I departed shortly after. So I don't know how long I
22   -- scratch that. I do. Based on my report, I know that,
23   again, I instructed -- I do recall instructing Officer
24   Beach to stay with the body. So I believe I was there.

Page 114

1    something heart related. I can't say, you know, that it
2    was a heart attack or -- It was heart related.
3    Q   Did they tell you how the heart attack
4    occurred?
5    A   No.
6    Q   This -- I'm looking at a Risk Management Review
7    Report. It starts at MC 1718. Have you ever seen that?
8    A   I have not.
9    Q   It's completed, it's signed off on by someone
10   by the name of Sergeant Tom Flanders. Do you see that?
11   A   Yes, sir.
12   Q   Sergeant Flanders later became Captain
13   Flanders; correct?
14   A   That is correct.
15   Q   Captain Flanders has been fired; correct?
16   MR. PREGON:  Objection.
17   A   He no longer works for the sheriff's office.
18   BY MR. DICELLO:
19   Q   Captain Flanders was dismissed from working
20   from the sheriff's office in part because he took part in
21   racist text messages that went back and forth between
22   another sheriff's employee and himself; correct?
23   MR. PREGON:  Objection.
24   And, Nick, if you give me a continuing on this

Page 116

1    Q   Did you ever review a Risk Management Review
2    Report into the death of this young man?
3    A   I did not.
4    Q   Is that something that you typically wouldn't
5    review after you have witnessed and kind of presided over
6    a situation where someone died while in the custody of the
7    corrections officers?
8    A   It would be -- No, it wouldn't be typical that
9    I review it.
10   Q   So they don't typically -- When I say "they,"
11   I'm talking about the --
12   A   Who submits the reports?
13   Q   I'm talking about the sheriff's office, the
14   "they," okay? They don't give you these reports, do they?
15   A   No. Like, Hey, this is just a copy of the, you
16   know, just for your review, no.
17   Q   Did anyone ever come by and notify you to say,
18   we figured out how this happened or why it happened?
19   A   After the fact, yes.
20   Q   Who did that?
21   A   I don't recall. It may have been -- may have
22   been the captain, may have been another sergeant.
23   Q   What did that person tell you?
24   A   That he ultimately died of a heart attack or

Page 115

1    line of questioning, I'll stop interrupting.
2    MR. DICELLO:  Sure.
3    BY MR. DICELLO:
4    Q   Right?
5    A   Can you repeat the question, please?
6    Q   Sergeant Flanders who later became a captain
7    within the Jail Division was terminated from his position
8    of employment at the Montgomery County Sheriff's Office
9    for taking part in racist text messages exchanged between
10   himself and another member of the sheriff's office;
11   correct?
12   A   No. I can't say that that would be correct,
13   because I don't know if that was the actual reasoning for
14   his termination. I will say that he was involved in an
15   investigation. But I can't say that is why specifically
16   he was terminated.
17   Q   Do you agree that racism demonstrates a bias
18   against certain kinds of people?
19   MR. PREGON:  Objection.
20   Go ahead.
21   A   Yes. That was a general question, not directly
22   related to a particular person?
23   BY MR. DICELLO:
24   Q   It was.

Page 117

30 (Pages 114 to 117)

Page 118

1    A  Okay.

2    Q  And I understand it was a general answer.

3       Did you review -- At any point in time after

4 Mr. Richardson's death but before the lawsuit was filed,

5 did you review this incident report?

6    A  Other than my initially completing the report

7 to ensure that, you know, it's what I perceived to be

8 correct and accurate. After the fact, no.

9    Q  So if I understand your answer, you reviewed

10 your narrative statement, but after the fact, after

11 Mr. Richardson died, you didn't review the entire incident

12 report; correct?

13    A  I have no recollection of like the entire,

14 because through points in time, going through --

15 ultimately we, as sergeants, have to sign off on, you

16 know, all reports. So I may have been tasked, I don't

17 know how much that Sergeant Lewis did, but I may have been

18 tasked with going through and reading back through

19 people's reports and, you know, some -- some corrective

20 errors, you know, you know, spelling errors, you know, a

21 comma here, things like that. But I'm sure at some point,

22 I have no recollection of it, but just because I -- you

23 know, I was involved in the incident, that I read every

24 single report.

Page 119

1    Q  That's exactly what I was looking for.

2       Did you recommend or suggest any retraining for

3 any of the corrections officers that were involved in

4 Mr. Richardson's death?

5    A  I did not.

6    Q  As far as you understood, the practices,

7 customs, the procedures that you all were following in the

8 jail, everything that all the corrections officers did in

9 connection with Mr. Richardson was in accordance with

10 those customs and practices at the jail; correct?

11    A  In addition to policy, yes.

12    Q  Have you had any discussions with Sergeant

13 Lewis or any of the other corrections officers who were

14 involved in this incident about what happened at any point

15 in time?

16    A  After the fact, yes.

17    Q  Can you tell me what conversations you had and

18 what you remember about those?

19    A  I have no recollection of the actual content of

20 the conversation. Do you want a general answer? I mean,

21 I can --

22    Q  Sure.

23    A  Just, you know, it would be more so of, you

24 know, following up to make sure they're okay, you know, as

Page 120

1 far as their mental health in relation to a critical

2 incident, which, you know, it's just being a supervisor.

3 And then just general -- just general conversation of how

4 it played out, you know, just the chronicle order of

5 things, just general conversations.

6    Q  Okay.

7    A  Who that was with and when it was, you know --

8    Q  I'm coming to the end here, Sergeant. I

9 appreciate your patience. This is my only chance to ask

10 you questions before trial, so I apologize if it's taking

11 me longer than you had expected.

12       Do you agree that the sheriff's office is

13 obligated or it's the sheriff's office's job to train and

14 instruct corrections officers in how to restrain people in

15 a way that doesn't put them at an unnecessary risk of

16 death?

17    A  Yes, I agree.

18    Q  Do you agree that the sheriff's office is

19 required to instruct and train its corrections officers on

20 the dangers of the positional asphyxia?

21    A  I agree.

22    Q  Do you agree that the sheriff's office,

23 Montgomery County Sheriff's Office, is required to train

24 and instruct its corrections officers on what positional

Page 121

1 asphyxia is?

2    A  Yes.

3    Q  Do you agree that the Montgomery County

4 Sheriff's Office is required to instruct and train its

5 corrections officers about who is at risk of dying from

6 positional asphyxia?

7    A  I agree.

8    Q  And same question. Do you agree that the

9 Montgomery County Sheriff's Office is required to train

10 and instruct corrections officers on what must be done to

11 minimize the risk of death to -- as a result of positional

12 asphyxia?

13    A  I agree.

14    Q  Did you become aware at some point in time that

15 marijuana was found in Mr. Richardson's system?

16    A  I did.

17    Q  And did anyone ever inform you that based on

18 the toxicology results, at least the coroner or somebody

19 at the coroner's office was of the opinion that

20 Mr. Richardson had ingested marijuana within six or so

21 hours of his death?

22    A  I did not know that.

23    Q  Assuming that's what the records will show, do

24 you understand how it is that Mr. Richardson was consuming

1  marijuana while he was detained at the Montgomery County
2  Jail?
3     A  I do understand that.
4     Q  Give me some insight into that.
5     A  Just because it's a jail doesn't mean that --
6  you know, there's many ways to, I would say, just in
7  simplest terms, smuggle drugs and narcotics into the
8  facility.  And it is a common and ongoing problem in any
9  jail facility.  And so it wouldn't be -- it wouldn't be
10  surprising or uncommon that he had had an opportunity to
11  ingest marijuana while incarcerated.  Or while in jail,
12  let me clarify that.
13     Q  Given that it's an ongoing problem and
14  challenge that you folks face, when you responded and
15  observed Mr. Richardson's incoherent behavior, did you
16  then have to consider that maybe he had ingested illicit
17  drugs or contraband?
18     A  It was a thought process, yes.
19     Q  I'm just going to review my notes real quickly.
20  I think I'm done.
21         (Pause in proceedings.)
22  BY MR. DICELLO:
23     Q  I should have asked you about this one, too.  I
24  showed you the use of force policy under the General

Page 122

1  of Force Report is forwarded to the jail administrator via
2  the chain of command"; correct?
3     A  That is correct.
4     Q  "This requirement," I think it's referring to
5  the Use of Force Report and incident report.  "This
6  requirement applies to all situations where an employee
7  uses force despite the type of force and regardless
8  whether an injury is apparent"; correct?
9     A  That is correct.
10     Q  The only documentation we have in this case is
11  an incident report; correct?
12     A  Yes.
13     Q  There are no Use of Force Reports; true?
14     A  No, because it wasn't deemed that a Use of
15  Force Report needed to be submitted.  And that's what that
16  is in direct relation to.
17     Q  Doesn't this say after any type of force is
18  used a Use of Force Report has to be completed?
19     A  Yeah, that's deemed a use of force.
20     Q  So you're telling me that the interaction that
21  Mr. Richardson had with these officers in connection with
22  which he died was not a use of force?
23     A  It was not considered a use of force.
24     Q  Okay.  Thanks.

Page 124

1  Order.  Do you remember we looked at that with respect to
2  completing reports?  Use of Force Reports?
3     A  Is that what you read to me?
4     Q  Yeah.
5     A  Okay.
6     Q  I want to now show you what is MC 2986 and MC
7  2987, Sergeant.  And this is the use of force policy from
8  the jail manual.
9     A  Jail manual.
10     Q  Correct?  And it was revised prior to
11  Mr. Richardson's death; correct?
12     A  That is correct.
13     Q  So it's my understanding, when I requested
14  these policies, that the lawyers were kind enough to give
15  me a copy that was in place as of the time of
16  Mr. Richardson's death.  And does it appear that's the
17  case to you by looking at revision date on this manual?
18     A  That would be correct.
19     Q  And then under use of force, section B-6, it
20  says, "After an employee uses any type of force, he
21  completes a Use of Force Report and submits it to his
22  supervisor before the end of the watch"; correct?
23     A  That is correct.
24     Q  And then it says, "The incident report and Use

Page 123

1     A  All right.
2     Q  I appreciate your time.
3         MR. PREGON:  We'll read.
4              - - -
5         (Signature not waived.)
6              - - -
7         And, thereupon, the deposition was concluded at
8  10:53 a.m.
9              - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 125

1             December 4, 2015

2   Dear Mr. Jackson,

3      You have chosen to read and sign your transcript.
Please do not mark on the transcript. Any

4   corrections/changes you may desire to make in your
testimony should be typewritten or printed on the errata

5   sheet at the end of testimony, giving the page number,
line number and desired correction/change. After you have

6   read the transcript, sign your name on the correction
sheet and where indicated at the close of testimony before

7   a notary public.

8      The Rules of Civil Procedure allow thirty days for
you to read and sign. Please return the signature page

9   and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
Dublin, Ohio 43017 within that time. Failure to do so in

10  the allotted time will result in your transcript being
used as though read and signed by you.

11

12            Sincerely,

               _____

13           Whitney Layne
             Professional Reporter

14  Cc:

15  Nick DiCello
     Carrie Starts

16  Jamey Pregon

17

18

19

20

21

22

23

24

                                    Page 126

---

1   State of _____

2   County of _____

3      I, TED JACKSON, do hereby certify that I have

4   read the foregoing transcript of my deposition given on

5   November 18, 2015: that together with the correction page

6   attached hereto noting changes in form or substance, if

7   any, it is true and correct.

8            _____

9            TED JACKSON

10      I do hereby certify that the foregoing transcript

11  of the deposition of TED JACKSON was submitted to the

12  witness for reading and signing: that after he had stated

13  to the undersigned Notary Public that he had read and

14  examined his deposition, he signed the same in my presence

15  on the _____ day of _____, 2015.

16          _____

17          Notary Public

18  My Commission Expires on _____

19          - - -

20

21

22

23

24

                                    Page 127

Page 127

1    State of OHIO

2    County of Montgomery

3        I, TED JACKSON, do hereby certify that I have

4    read the foregoing transcript of my deposition given on

5    November 18, 2015; that together with the correction page

6    attached hereto noting changes in form or substance, if

7    any, it is true and correct.

8

9                              TED JACKSON

10       I do hereby certify that the foregoing transcript

11   of the deposition of TED JACKSON was submitted to the

12   witness for reading and signing; that after he had stated

13   to the undersigned Notary Public that he had read and

14   examined his deposition, he signed the same in my presence

15   on the 9th day of December, 2015.

16

17                              Notary Public

18   My Commission Expires on

19                              TINA C. SABO
                                Notary Public, State of Ohio
                                My Comm. Expires April 27, 2016

20

21

22

23

24

Page 128

1    TO THE  REPORTER:

2    I have read the entire transcript of my deposition taken

3    on the 18 day of November, 2015, or the same has been

4    read to me.  I request that the following changes be

5    entered upon the record for the reasons indicated.

6

7    Page    Line    Correction and reason therefore

8    No CHANGES / CORRECTIONS _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   Date 12/8/15 ___ Signature SGT. _____ #266

24

Page 129

1                          CERTIFICATE

2     State of Ohio        :

3     County of Franklin:

4

5          I, Whitney Layne, Notary Public in and for the

6     State of Ohio, duly commissioned and qualified, certify

7     that the within named TED JACKSON was by me duly sworn to

8     testify to the whole truth in the cause aforesaid; that

9     the testimony was taken down by me in stenotype in the

10    presence of said witness; afterwards transcribed upon a

11    computer; that the foregoing is a true and correct

12    transcript of the testimony given by said witness taken at

13    the time and place in the foregoing caption specified.

14

15         IN WITNESS WHEREOF, I have set my hand and

16    affixed my seal of office at Dublin, Ohio, on this 4th day

17    of Decemer, 2015.

18                              _Whitney Layne_____

19                              Whitney Layne, Notary Public

20                              In and for the State of Ohio

21    My Commission expires May 4, 2020

22

23

24

**A**

**a.m** 1:17 3:2 108:2
  125:8
**ability** 60:13
**able** 43:19 81:7
  82:11,15 83:21
**academy** 10:14
  11:10
**accelerated** 41:11
  60:8
**acceptable** 88:18
**accident** 6:12
**account** 48:13 75:16
  84:10 93:5 94:10
**accuracy** 9:11
**accurate** 118:8
**achieved** 10:8
**act** 76:7
**action** 42:17 58:3
  58:15,19 110:15
  110:16
**actions** 30:8 34:21
  37:6 57:24 110:6
  110:8,9,10,13
**actively** 60:7 61:24
  65:18 66:10,22
  76:13 78:18 82:2
**actual** 23:4 98:22
  110:20 117:13
  119:19
**addiction** 17:7
  97:17
**addition** 44:15 74:4
  110:5 119:11
**additional** 20:20
  24:21 34:4 36:24
  37:3,12 38:6
  48:12 54:3 80:11
  101:18,24 102:2
**additionally** 41:21
**addresses** 98:2
**addressing** 35:4
  60:17
**administer** 59:21
**administered** 81:17
  81:18 105:5
**administrative** 14:1
  112:24
**administrator** 1:4
  124:1
**advises** 92:17
**Affairs** 113:1
**affiliation** 12:18
**affixed** 129:16
**aforesaid** 129:8
**agencies** 98:3
**Aging** 97:20
**ago** 9:15 19:1
**agree** 19:16 36:24
  37:2,9 39:9 43:4

45:6,9 73:4,15
  83:24 84:23 90:17
  91:14,24 94:3,4
  117:17 120:12,17
  120:18,21,22
  121:3,7,8,13
**agreed** 19:9 54:22
  54:23 86:7,8
  88:18 94:7
**ahead** 25:20 30:3
  39:3 55:19 86:13
  86:24 87:9 88:20
  89:11 91:17 92:2
  92:8,22 106:5
  109:19 117:20
**ahold** 46:4
**al** 1:9
**Alcohol** 97:17
**allotted** 126:10
**allow** 61:4 126:8
**aloud** 111:14,15,16
**amount** 61:20 93:14
**and/or** 14:19 46:6
  58:2 97:12
**Andrew** 1:5
**ANNE** 2:17
**announced** 58:7,12
  85:1
**answer** 8:13,19 9:1
  9:19 18:7 43:16
  58:9 77:11 85:22
  89:21 118:2,9
  119:20
**answered** 77:18
**answering** 85:10
**answers** 8:9 9:11
**anybody** 24:23 71:1
  113:22
**anymore** 62:22
**anyway** 94:9
**apologize** 37:18
  66:16 86:19
  107:11 120:10
**apparent** 111:4
  124:8
**appear** 40:2 41:7,18
  41:21 60:7 123:16
**appearance** 34:9
  36:6
**APPEARANCES**
  2:1
**appeared** 24:7,10
  32:12 33:23 36:20
**appearing** 39:17
**appears** 42:22
**applicable** 1:15 3:6
  29:3
**applies** 98:2 111:2
  112:15 124:6
**apply** 12:20 84:2,7
  84:15 85:2 86:1

**appreciate** 83:5
  102:9 120:9 125:2
**appropriate** 30:10
**approximate** 31:14
  107:3
**approximately**
  31:10 47:18
**area** 23:3 47:6 65:4
**arm** 46:1,2,9,10,11
  49:5
**armed** 67:23 68:8
  68:12,20
**arms** 50:11 55:9
  56:9 64:14,18
  90:11 109:5
**arrest** 101:1
**arrived** 22:10,18
**articulation** 38:13
**asked** 16:17 18:7
  27:17 72:11
  122:23
**asking** 38:4 71:16
  71:17 73:22,24
  75:13,13 91:9
  106:20 111:14
**asphyxia** 100:24
  101:16 102:11
  103:16 120:20
  121:1,6,12
**asphyxiation**
  102:16,18,22
  103:5,8,10
**assault** 71:3,5
**assess** 15:23 50:7
  52:1 73:9 78:11
  82:6
**assessing** 34:1 36:2
  36:12 75:21 80:2
**assessment** 24:5
  32:2 35:24 74:5
  91:5
**assessments** 51:1
**assign** 29:4
**assigned** 11:15 13:1
  16:13 17:2,3 20:9
  20:15 21:24 24:16
  24:18 25:11 27:21
  29:4
**assist** 14:11
**assistance** 21:22
  32:12 54:12
**ASSISTANT** 2:17
**assisted** 53:21
**assists** 60:5
**ASSOCIATES** 1:21
**assume** 7:20 8:20
  51:17
**assuming** 19:12
  36:21 121:23
**assumption** 42:8
**assure** 15:24

**attached** 127:6
**attack** 36:23 38:2
  59:10 74:12
  115:24 116:2,3
**attacked** 74:9
**attempting** 33:21
  59:16
**attention** 70:4,7,13
  70:14
**ATTORNEY** 2:17
**available** 81:5 83:2
**Avenue** 1:16 2:3,7
**avoid** 37:1 102:8
**aware** 21:19 72:13
  92:16 93:16 94:18
  95:2,5,10,14 97:5
  97:9 98:5,14,19
  103:14 121:14

**B**

**B-6** 123:19
**back** 5:17 11:3 13:1
  16:11 21:17 28:11
  28:12 31:14 33:16
  48:3 49:15 52:17
  52:20,24 55:1,5
  58:6,11 59:4 63:9
  67:18,20 68:7
  88:17,22 89:5,23
  90:9,14,16 94:24
  95:18 97:3 104:12
  104:13,18,21,23
  105:1,8 106:2
  107:2 113:11
  116:21 118:18
**backboard** 79:9,10
  82:23
**backboards** 79:19
**background** 36:9
**balances** 15:24
**ban** 99:7,13,18
  100:6,9
**banging** 76:24
**bans** 97:3
**base** 34:24
**based** 38:22 41:24
  57:24 59:19 60:11
  60:11 83:19 87:12
  90:24 95:23
  105:15 114:22
  121:17
**basic** 8:3
**basically** 13:3,23
  14:3,8,12 15:15
  22:24 24:18 28:3
  34:12 49:5 106:22
**basis** 14:18 43:24
  98:18
**Beach** 114:24
**bear** 91:9
**bed** 48:6

**behalf** 2:5,9,13,19
**behavior** 58:24
  122:15
**believe** 21:12 23:10
  29:17 30:4 34:10
  46:16 60:8 114:24
**belly** 49:11,18 69:23
  105:22
**belt** 26:2,3 27:19
**bench** 48:5
**Benjamin** 24:14,14
  30:15 31:19
**best** 46:13,14
**better** 53:14 83:4
**Beyoglides** 1:4
**bias** 117:17
**big** 50:21 79:3
**bigger** 35:23 47:6
**bit** 10:6 11:4 13:21
  48:9 51:4 107:22
**blanket** 37:15 44:17
  100:20
**blankets** 13:10
**bleeding** 71:21
**blended** 40:15
**blood** 32:16 40:8,11
  58:23 103:22
**board** 79:7,7 97:24
**body** 36:24 37:3,12
  50:11 55:9 78:22
  79:6,7 91:13,22
  114:24
**Boehringer** 2:14
**book** 28:5
**booking** 13:5,15,19
  14:7,20 15:11,14
  20:10
**box** 78:24 83:1
**break** 8:22 9:2 30:7
  51:4 67:7,11,18
**breathe** 60:14
**breathing** 41:9,13
  56:21 59:20,23
  60:7,9 83:13,17
  84:8,13,16 85:3
  86:3 102:20,21
  104:2,19,23
  109:22
**Brenda** 2:15
**brief** 61:10
**Briefly** 17:16
**bring** 56:8
**bringing** 107:18
**broad** 51:21
**brought** 79:23 83:7
**Bulk** 17:3

**C**

**C** 23:2
**cache** 28:3
**call** 21:21,23 22:3,4

80:8,24 108:14
**called** 1:14 3:5 12:5
20:10 80:19 96:22
**calls** 43:23 44:2
**captain** 115:22
116:12,15,19
117:6
**caption** 129:13
**care** 61:18 78:13
105:2,4
**career** 79:19
**Carrie** 2:10 126:15
**carried** 27:11 29:17
**carry** 25:12 26:5,7,9
26:13,14,14 27:15
28:14,15,16,17,18
28:23 78:21,23,24
79:3
**carrying** 25:15
26:22,22
**case** 1:7 6:11,14,21
7:16 18:16 19:17
77:2 88:10 112:11
123:17 124:10
**Cash** 17:3
**cause** 129:8
**caused** 34:9
**causes** 103:5
**caution** 93:11
**Cc** 126:14
**cell** 22:21 23:10,15
23:23 24:1 25:1
30:16 31:23 32:8
32:15,21 33:6,17
33:20 34:23 37:20
46:23 47:5,8,13
47:17 48:6,14,19
48:22 49:11,18
50:10 51:5 55:11
56:19 59:1 62:14
75:22 76:1,1
**cellmate** 32:11
**cells** 14:9
**certain** 117:18
**certainly** 50:23
**CERTIFICATE**
129:1
**certified** 5:3
**certify** 127:3,10
129:6
**chain** 124:2
**chair** 48:8 78:3,8
79:4,23 80:14,20
81:1,3,10,14,21
82:1,14,18 83:7,8
83:12,16
**challenge** 122:14
**chance** 5:12 99:9
120:9
**change** 29:7 63:21
68:12 78:13

**changed** 12:3,24
58:1
**changes** 127:6
128:4
**character** 3:8
**check** 14:2 68:21
**checks** 15:24
**chest** 49:24 57:15
57:17,22 58:7,13
58:18
**chin** 40:18
**choice** 28:16 47:6
**choose** 94:7,16
**chose** 73:11
**chosen** 126:3
**chronicle** 120:4
**chronologically**
65:17
**chronology** 67:7
**Cincinnati** 2:12
**circumstances**
42:24 60:12 73:23
76:8 86:11 94:6
**civil** 1:15 3:6 6:3,11
126:8
**claim** 6:5
**clarification** 38:10
**clarified** 27:21
**clarify** 17:20 20:5,8
20:17 24:7 36:9
38:18 42:17 47:3
51:20 68:10 69:12
108:19 112:20
122:12
**classification** 14:22
15:4,9,15,22 16:2
**classifying** 15:2,17
**clear** 107:13
**Cleveland** 2:4
**clock** 21:8,8
**close** 47:9 53:16
54:20 104:4 126:6
**closed** 25:1 30:13
47:21
**closest** 24:1 36:17
**co-responsibility**
15:1,20
**collapsed** 72:4
**combative** 42:14,16
42:16 102:1
**combination** 40:14
101:19
**come** 9:20 22:24
23:8 28:4,5 67:3
115:17
**comes** 15:20
**coming** 23:19 24:4
32:16 40:8 63:22
64:9 120:8
**comma** 118:21
**command** 124:2

**commands** 35:7
39:18 40:1
**Commerce** 97:21
**commission** 72:15
127:18 129:21
**commissioned**
129:6
**committed** 72:14
**common** 44:3 60:2
94:23 95:15 122:8
**commonly** 60:4
79:7 110:18
**community** 84:7
88:16 89:4,22
90:15 97:8 98:5
**companies** 7:1
**company** 7:4,10
**complete** 31:2 35:8
106:12
**completed** 116:9
124:18
**completely** 42:18
**completes** 110:24
123:21
**completing** 118:6
123:2
**comprehend** 39:18
42:23
**comprehending**
41:18,22
**computer** 106:17,23
129:11
**concept** 37:19 93:16
96:22,23
**concern** 58:22 59:9
59:22 60:13 68:3
68:19 74:11
**concluded** 125:7
**concrete** 48:5,7,10
77:8
**condition** 21:22
35:22 36:4,13,21
38:11,13,15 39:13
51:15,17,20,21
81:19 83:11 93:6
102:15
**confined** 47:21
**confines** 47:5
**confirm** 68:17
**confusion** 56:4
**conjunction** 6:24
7:1 90:1,3,4,10
**connection** 5:19 6:3
7:20 9:12 113:22
119:9 124:21
**conscientious** 18:11
**consider** 69:4,13
122:16
**consideration** 38:19
69:16,17 72:8
**considered** 14:4

21:4 79:6 90:4
100:23 124:23
**considering** 60:17
69:9 72:6
**consistent** 19:10
53:18 54:9,10,14
99:18,24 100:4
104:3 108:2
**consists** 26:3
**constant** 20:13
**constitutes** 14:3
**consuming** 121:24
**contact** 44:15 45:13
**contemplates** 94:13
**content** 119:19
**continue** 61:9,17
**continued** 58:2 62:6
64:14,17 65:18,21
**continues** 97:3
**continuing** 78:11
80:8 116:24
**contraband** 122:17
**control** 22:1 46:2,5
46:17 47:8 50:17
50:20 51:9 52:4,8
53:14,14 62:20
78:18 82:11 91:11
91:21 106:14
**controlled** 63:10
72:18,18 73:1
74:24 75:2
**controlling** 67:21
77:13
**conversation**
119:20 120:3
**conversations**
119:17 120:5
**Cooperstone** 1:21
126:9
**copy** 115:15 123:15
**coroner** 121:18
**coroner's** 121:19
**correct** 5:14 9:8,9
10:2,3 11:11,12
12:14 18:19 21:12
21:13 29:21,22
30:1,10,11 31:21
32:9,10,13,23
33:21,22 34:23
37:14 39:14,19,22
41:19,20,22,23
42:1,2,14 43:2,11
43:24 44:9,13
45:3,4,8,12,22
46:19,23 47:10
49:12,15 53:1,2
55:2,10 56:22
57:4 59:17,18
60:17,18 62:1,6
62:11,16 63:5,6
63:11,23,24 64:11

64:12,15 65:21
66:11,19,20,23
67:5,23,24 68:4,5
68:21,22,24 69:9
69:15,23 70:2,15
70:17,20,21,23
71:18,22 72:1,12
72:15,16 73:20
74:3 75:3,8 78:3,4
80:17 82:15 83:18
84:16,17 85:18,19
87:15 88:4,13
89:7 90:12 92:6,9
95:3 96:2,6 98:12
98:15 99:19 100:1
101:9,13 104:15
104:16,19,23,24
105:6,7,23,24
107:2 108:12,15
108:24,24 109:6,9
109:10,17,23
111:23 112:5,9,10
112:12 113:7,10
116:13,14,15,22
117:11,12 118:8
118:12 119:10
123:10,11,12,18
123:22,23 124:2,3
124:8,9,11 127:7
129:11
**correction** 97:23
98:4 126:6 127:5
128:7
**correction/change**
126:5
**corrections** 10:11
11:4 23:11 24:14
25:7,9,12,21,22
25:24 37:11 42:9
42:23,24 43:6,21
44:4,6 72:19 73:1
83:24 84:6,14
85:1,24 86:5,9
87:4,13 88:10
93:18 94:1,7
97:12 98:17
100:14 101:8
104:6,11,14,17
106:13,20 110:2
115:7 119:3,8,13
120:14,19,24
121:5,10
**corrections/chang...**
126:4
**corrective** 118:19
**correctly** 31:18
**counsel** 3:4
**county** 1:8 2:20
5:17,20 6:6 10:2
11:5 12:6 44:3

51:24 84:1,10,15
85:2 86:1,6 88:2
88:12 99:17
100:21 101:12
111:9 117:8
120:23 121:3,9
122:1 127:2 129:3
**couple** 8:4 67:22
**coupled** 34:11 58:16
**coupling** 94:24 95:1
110:20
**course** 58:2,15,19
65:9 79:19
**court** 1:1 5:9 7:14
7:21 9:7 13:10
**courts** 13:7,13
**coverage** 7:11
**covered** 14:16
**CPR** 81:20 83:11
**create** 48:15 53:13
95:19 102:14
**creates** 35:23 52:5
79:3
**creating** 50:17
**crime** 12:5 17:8
72:15
**crimes** 12:12
**criminal** 112:23
113:2,5,9,14
**crisis** 76:17
**criteria** 30:5,8
**critical** 108:10
120:1
**cross** 59:1,11
**CROSS-EXAMI...**
5:4
**crossed** 59:7
**cuff** 28:18 49:14
52:17,24
**cuffed** 50:18 54:8
54:13,17,22 55:4
55:7 58:6,11 63:9
89:5,23 90:15
**cuffing** 54:1
**cuffs** 26:16,17 27:6
27:12 29:1 63:4
65:8
**current** 11:2 80:10
**currently** 10:1
16:16
**custody** 92:18 115:6
**customs** 119:7,10

**D**

**D** 21:20 23:2,2
**dangers** 120:20
**date** 9:22 19:9,11
108:1 123:17
128:23
**dates** 12:1 16:21
97:2

**day** 15:6 19:11,19
19:22 20:6 21:9
28:4,11 107:7
108:6 110:2
127:15 128:3
129:16
**day-to-day** 14:18
98:18
**days** 20:10,11,12,12
21:4 126:8
**Dayton** 1:16 2:8,19
108:8 114:8,20
**dazed/unfocused**
41:17
**deal** 14:18 29:19
44:23 78:10
**dealing** 15:9 34:13
44:20 50:7 55:22
60:3 71:19 73:8
78:10 87:18 91:6
93:7
**deals** 14:8
**Dear** 126:2
**death** 39:1 44:12
45:8 92:19 93:4
93:17 94:3 95:4
103:16 106:3
112:18 113:23
115:2 118:4 119:4
120:16 121:11,21
123:11,16
**deceased** 1:5 114:2
114:8
**December** 126:1
**Decemer** 129:17
**decided** 65:8
**decision** 52:13 78:2
78:5,6,7 80:15
106:12
**decisions** 69:7 80:4
80:5
**declared** 114:2
**deemed** 124:14,19
**defendant** 1:14 2:19
3:5 6:14,19
**Defendants** 1:9 2:9
2:13
**defensive** 44:16
45:6
**defer** 55:16 84:20
87:16
**definition** 91:8,15
91:24 102:12,17
**definitively** 70:12
**demeanor** 34:9,20
34:22 39:16
**demonstrated**
95:11
**demonstrates**
117:17
**departed** 108:8

114:21
**Department** 97:14
97:16,16,17,18,19
97:20,20,21,21,22
97:23,24 98:3
114:8
**depending** 23:22
**deploy** 29:20,23
30:5
**deposed** 5:22 17:10
43:21
**deposes** 5:3
**deposition** 1:14 3:5
3:6 5:13,18 6:1
8:4 9:18 16:5,12
18:22 125:7 127:4
127:11,14 128:2
**depositions** 18:5
**deputies** 5:20 28:2
**deputized** 11:11
**deputy** 10:14 11:13
12:15
**derived** 99:4
**describe** 40:3,4
**described** 35:14
41:16 55:24
**description** 34:8
**desire** 126:4
**desired** 126:5
**despite** 111:3 124:7
**detained** 43:8 87:22
88:1 122:1
**detainee** 6:6 92:18
**detainees** 14:23
**detective** 10:15
11:22 12:2,9
**detective's** 10:21
12:4
**detention** 101:2
**determination**
50:18
**determine** 73:10
**determined** 73:14
**Developmental**
97:15
**dialogue** 61:9
**DiCello** 2:2 4:4 5:5
5:11 18:9 19:15
30:6 31:5,8,13
39:5 42:19 43:5
66:5 67:12,15,17
70:8 71:9,15 73:5
75:6 77:15,20,21
85:7,11 86:15
87:2,11 89:16
91:19 92:4,10
93:1,15,24 97:13
98:9 99:11,22
100:5 103:2 106:9
107:15,17,19
109:21 116:18

117:2,3,23 122:22
126:15
**die** 102:22
**died** 109:16 112:22
115:6,24 118:11
124:22
**difference** 87:23
107:17
**different** 9:22 13:3
17:24 25:6 26:12
51:18 60:6 79:2
89:13 100:12
107:23
**differently** 9:22
57:18
**difficulty** 49:7
**dimension** 48:3
**dimensions** 47:17
48:4
**Dinkler** 1:16 2:7
**direct** 23:5 30:17
35:13 55:22 59:7
75:24 84:20 95:9
95:20 124:16
**direction** 41:19 42:8
49:20 50:3
**directions** 57:3
**directly** 13:16 23:6
23:24 28:4 31:1,1
33:11 55:6 64:16
97:11 117:21
**Disabilities** 97:15
**disagree** 83:24 88:9
90:18
**disclose** 18:11
**discovered** 16:12
**discretion** 110:17
111:7,13,17
112:15
**discussed** 77:6
**Discussion** 31:7
67:16
**discussions** 119:12
**dismissed** 116:19
**disoriented** 33:23
36:5 53:10 70:1
**DISTRICT** 1:1,1
**division** 1:2 11:15
13:2,9,10,11,11
113:1 117:7
**documentation**
55:21 114:15
124:10
**documented** 56:15
65:10 107:8
114:12
**documents** 16:5
110:6
**doing** 16:22 37:1
49:8 55:15 109:16
110:14,15

**door** 23:2 24:20,22
25:1 30:13,15
31:17,20,24 32:23
33:12,14 45:10
**downstairs** 81:22
83:4
**Dr** 114:9
**draw** 56:12
**drawing** 50:11
**Drive** 1:21 126:9
**Drug** 97:17
**drug-induced** 38:17
38:24 39:12
**drugs** 122:7,17
**Dublin** 1:22 126:9
129:16
**duly** 5:2 129:6,7
**Dustin** 30:17 64:21
66:9
**Dusty** 66:7 108:13
**duties** 7:21 10:21
14:1 15:16
**duty** 26:2 27:19
**dying** 103:9 121:5

**E**

**earlier** 9:18 57:13
**easily** 78:21 79:1
**edge** 47:10
**edges** 48:11 77:6
79:1,2
**Education** 97:18
**effect** 15:9 43:19
100:24 101:2
**Eight** 48:3
**eight-by-twelve**
47:19
**either** 13:2 113:4
**element** 76:4,6
**elevated** 92:19 93:3
93:17 101:3,23
**elevates** 93:19 95:4
**elicit** 49:21 50:2,6
57:14
**Ellis** 2:15 114:9
**emergencies** 44:3
**emergency** 32:7
37:4,14,21 38:7
38:23,23,24 44:8
44:16 53:10 68:4
70:10 78:3,8
80:19,22 81:1,2,3
82:18
**emotional** 37:13
**employee** 110:22
111:2 112:7
116:22 123:20
124:6
**employment** 10:7
117:8
**encompass** 14:10

38:16,17 48:5,6
**encompassed** 44:14
45:5
**encompasses** 14:14
15:14 51:20
**encounter** 43:17
74:17 103:24
**encountered** 19:20
19:22 20:22,24
56:24 71:16 72:10
**encountering** 42:21
**enforcement** 97:12
100:14
**ensure** 118:7
**entered** 32:8,15,21
33:20 37:20 128:5
**entire** 118:11,13
128:2
**entry** 32:1
**environment** 47:4
**episode** 36:22 42:12
42:22 43:9 44:13
45:2,7 57:17
104:6
**equipment** 25:14,24
**errata** 126:4,9
**error** 93:10,20
**errors** 118:20,20
**escorted** 114:19
**ESQUIRE** 2:2,6,10
2:17
**estate** 1:5 5:16
**et** 1:9
**event** 29:6 78:9,17
108:7
**events** 41:22 47:2
56:8,10,15 110:19
**eventually** 27:9
**everybody** 50:17
**exact** 72:9
**exactly** 6:2 50:14
119:1
**EXAMINATION**
4:1
**examined** 127:14
**example** 57:15
**excess** 8:2
**excessive** 86:21 87:5
87:7,15 88:8,12
**exchanged** 117:9
**excuse** 92:13 110:9
**executive** 97:1
98:22
**expect** 42:5,7,10
43:1 81:2
**expectation** 27:18
80:19,24 81:4,6
**expected** 120:11
**experience** 36:11
41:24 51:3 52:7
60:3 76:16

**expires** 127:18
129:21
**Explain** 33:3
**explained** 13:19
21:6 88:21
**explanation** 75:20
**exposing** 24:22
**expression** 41:17
**extended** 89:2,6,24
90:17 91:14,23
**extent** 21:18 35:3
36:18 39:4 40:20
48:16 61:8 76:18
82:10 86:14,16
100:6 102:2 113:9
113:14
**eye** 19:4

_____
**F**
_____

**face** 41:17 61:5
122:14
**faced** 94:5,13,14
**facedown** 49:11,13
52:18,20 53:1,6,7
55:1,3,4,5 56:20
58:12 60:19 88:22
88:24 91:13,23
101:7,18
**facilities** 97:12
**facility** 22:13 36:19
51:23 52:1 76:18
122:8,9
**facing** 32:22 33:11
**fact** 35:9 55:23
58:21 74:7 75:10
75:16 76:2,7,9
81:15,20 111:20
115:19 118:8,10
119:16
**factors** 103:7,14
**Failure** 126:9
**fair** 6:22,24 40:3,4
68:19
**fall** 36:14 63:1
**falls** 77:4
**familiar** 100:13
**family** 5:16 97:19
**far** 1:16 2:7 15:10
29:5 30:22 33:8
38:10,13 47:13
55:21 56:14 60:13
68:12 89:12,13
90:8 92:23,23,24
100:20 101:23
102:23 107:11
108:18 109:2
112:15,19 119:6
120:1
**fastly-evolving**
85:17
**feasible** 101:4

**feel** 21:14
**feet** 23:1 47:15,16
50:16 51:6,14,14
**Felicia** 2:13
**felt** 30:9 83:20
**field** 92:17 94:18
95:11
**figure** 83:6 108:20
**figured** 115:18
**filed** 5:19 18:16
118:4
**fill** 111:13,17,22
112:4,8
**filled** 61:11
**fine** 20:21 21:17
67:12,15
**finished** 106:22
**fire** 28:6,8 108:8
114:8,20
**fired** 116:15
**firm** 1:16
**first** 5:2 14:7,9,13
45:20 47:10,12
55:10 56:24 62:15
78:15 88:1 95:18
98:11,13 104:17
**five** 81:9,10
**fixed** 78:20,20 79:5
83:3 94:10
**Flanders** 116:10,12
116:13,15,19
117:6
**floor** 2:18 14:7,9,13
14:14 23:20 24:3
24:4 25:1 32:9,22
33:13 35:20 37:20
40:22 47:10,12
77:5 78:14,20
80:15
**focus** 67:19
**folks** 14:22 21:6
25:10 53:21 64:2
72:11 88:1 91:9
122:14
**follow** 38:21 58:19
101:9
**follow-up** 88:9
**followed** 101:13
**following** 40:1
107:7 119:7,24
128:4
**follows** 5:3
**foot** 31:10
**force** 17:4,7,18,19
17:20 30:1 86:6,9
86:21,21 87:4,7
87:13 88:7,8,11
88:12 89:3,24
97:3 101:20
108:17,18,19
110:3,5,20,23,24

111:2,3,5,10,18
111:22,22 112:4,8
122:24 123:2,7,19
123:20,21 124:1,5
124:7,7,13,15,17
124:18,19,22,23
**forcefully** 89:6
90:16
**foregoing** 127:4,10
129:11,13
**form** 68:15 127:6
107:23
**format** 89:22
107:23
**formatting** 107:18
**forth** 77:9 116:21
**forward** 33:21 48:9
48:24 49:3,4
78:11
**forwarded** 124:1
**Foster** 2:13
**found** 72:1 104:2
121:15
**four** 11:5 54:21
67:21 72:19 75:2
77:13 108:22
**Franklin** 129:3
**free** 21:14
**Friday** 20:2
**front** 9:7 17:6 21:17
31:1
**functioning** 91:12
91:21

_____
**G**
_____

**G** 1:4
**gain** 50:20
**garbled** 57:7
**Garrett** 2:15
**gathering** 32:3 34:6
36:2
**gear** 25:5 26:13
**gears** 67:13
**general** 17:18 23:14
83:23 92:17
100:13 111:9
114:14 117:21
118:2 119:20
120:3,3,5 122:24
**generally** 101:21
**generated** 107:4
**gesture** 61:3
**getting** 34:5 36:4
37:19 42:9 54:12
54:21 55:22 63:5
63:14 82:5 83:9
96:17 109:9
**give** 9:11 17:10
31:16 35:7 49:20
50:1,3 58:4 91:4
105:2 106:7
115:14 116:24

122:4 123:14
**given** 8:18 39:11
57:16,23 93:16
98:16 122:13
127:4 129:12
**gives** 44:22
**giving** 61:18 126:5
**globally** 101:11
**go** 6:21 11:3,3 15:23
21:17 22:21,21
25:20 28:22 30:3
31:5 39:3 42:4,8
42:10 43:2,10
44:8 48:1,3 55:19
63:3 65:16 68:7
86:13,24 87:9
88:20 89:11,20
91:17 92:2,8,22
95:18 106:5
109:19 113:11
117:20
**goal** 70:14
**goes** 47:9 107:2
**going** 8:19 9:10
16:11 18:7 23:4
25:3 34:1 36:2
40:3,6 41:3,22
42:12,24 47:3,12
47:18 49:3 50:5,9
50:14 51:2,16
52:19 53:11 59:4
67:4 70:11 76:15
76:17 78:10,13,14
102:1 103:8
118:14,18 122:19
**GOM** 17:19
**good** 5:6,7 16:22
17:5 34:8 37:22
37:23 67:14
**governor** 97:2 98:1
99:24
**grab** 28:5,22 45:11
45:13,14,15,21,24
46:15
**grabbed** 45:17 49:5
56:18
**grabbing** 34:4
46:11,22
**grandmas** 88:3
**grandpas** 88:2
**great** 85:15
**ground** 14:14 36:17
36:18 40:9 49:12
50:4,4 51:8 52:8
52:12,14,18,21
53:1 62:15 63:16
71:24 72:2,7
77:12 108:17,22
109:1,3
**grunting** 41:1,2,12
56:21,23 57:9

59:19 62:1 66:11
**guideline** 112:14
**guy** 20:23 37:20
**guy's** 9:20
**guys** 18:13 27:3
54:8 57:18 65:11
79:11 82:11,15

_____
**H**
**half** 11:7 67:10
**hallway** 23:6
**hand** 35:10 46:3,6
61:23 94:24
129:15
**handcuff** 52:14 53:7
53:18 69:8
**handcuffed** 53:12
54:24 55:21,23
62:12 67:19 68:1
68:2 72:17 73:19
77:1,3,12 96:17
100:15 105:13
**handcuffing** 53:9
53:21 108:23
**handcuffs** 25:10,12
62:19 63:1 69:15
84:3,16 86:2
88:17,22 109:8
**handle** 43:7 44:7
**hands** 49:15 52:17
52:19,24 55:1,4
58:6,11 63:9
67:20 89:5,23
90:7,15 109:23
**hands-on** 42:4,11
43:2,10 44:8
45:21
**happen** 8:15 42:10
74:6,7,8 75:11,12
75:17 76:9
**happened** 9:15,22
12:12 19:1 31:22
49:17 66:18 74:22
75:14 114:10
115:18,18 119:14
**happening** 42:6
**happens** 9:18
**hard** 48:11 77:8
79:3,5,6
**harm** 39:14
**Harrison** 11:15
**Harry** 1:4
**hazard** 101:4
102:15
**hazardous** 94:19
95:7,12 96:1
**head** 40:7 61:3 64:7
76:24 77:4,5
109:14
**heading** 108:14
**health** 93:7 97:16

97:20 120:1
**heard** 77:16,20
96:22,23
**hearing** 60:23
**heart** 36:23 38:2,15
59:10 115:24
116:1,2,2,3
**heavily** 56:22
**height** 31:9
**held** 13:3,6 31:7
67:16 73:13 76:14
**help** 50:7 64:2
**helped** 13:19
**helping** 53:23
**helps** 12:19
**Henning** 30:20,21
30:22 31:19 53:23
62:5 63:21 64:1
**hereinafter** 5:2
**hereto** 127:6
**Hey** 9:2 115:15
**high** 103:22
**higher** 38:24 45:7
103:9
**Hills** 1:16 2:7
**hip/thigh** 65:4
**history** 10:7 103:19
103:21
**hits** 77:4,5
**hog-tying** 90:5
94:22 95:3,6,17
102:8
**hold** 12:1 47:18
62:6,9 64:14,17
73:17 89:2 96:23
**holder** 26:2
**holding** 63:16,17
67:3 76:23 102:3
102:5 108:16
109:5
**Homeland** 17:8
**hoping** 43:13
**horrible** 16:21
**hour** 67:10
**hours** 17:11,12
21:10,10 108:4
121:21
**housed** 15:2,21
**houses** 97:8
**housing** 13:5,16,21
13:23 14:6,10,13
14:16,19,21 16:1
20:11,16 21:24
22:19,23 23:4,9
24:16 25:6 83:10
114:20
**housing-related**
13:24
**huh-uhs** 8:10
**human** 9:16 44:20
**hundred** 8:2 10:19

78:24 79:1
**hurt** 58:18 63:2
70:17,20,22 71:1
**husbands** 88:2
**hypertension**
103:19
**hypothetical** 58:8
**hypothetically**
36:14

_____
**I**
**Ideally** 93:13
**identify** 106:17
**illicit** 122:16
**immediate** 22:12
31:19 76:21 77:23
82:2
**immediately** 22:8,9
32:18,19
**implemented** 85:17
**important** 8:6 18:10
**incarcerated** 87:20
87:22 122:11
**incident** 19:6,9
21:12 55:22 69:24
71:4 73:21 74:8
107:2 108:10
110:5,20 118:5,11
118:23 119:14
120:2 123:24
124:5,11
**incidents** 59:5
**include** 45:1
**includes** 92:5 99:6,7
**including** 84:3 98:3
99:13
**incoherent** 122:15
**incoming** 14:23
**incomprehensible**
57:4,7
**increased** 39:13
103:16
**increases** 106:2
**independent** 19:4,5
21:16 106:13
**INDEX** 4:1
**indicate** 59:13
108:1
**indicated** 126:6
128:5
**indicates** 56:20
**indication** 50:1
57:21,23 58:18
**indirect** 95:10
**individual** 50:21
91:13,22 103:15
103:20
**individual's** 91:13
91:22
**individually** 27:23
28:15

**inform** 121:17
**information** 32:5
34:4 50:6 57:14
57:16 58:4 95:9
95:10,14,16
100:22
**ingest** 122:11
**ingested** 121:20
122:16
**ingrained** 85:16
**initially** 15:17 49:16
58:3 65:10,11
107:4 118:6
**injure** 52:4
**injured** 112:3
**injuring** 46:19
**injury** 36:18 38:24
39:13 44:12 45:8
111:4 124:8
**ink** 44:18
**inmate** 6:6 20:23
21:1 39:11 41:16
42:4,21 43:1
44:12 45:2,11,17
46:22 47:8 48:12
48:14,14 51:5
74:9,12 75:18
92:18 114:7
**inmates** 14:3 15:2
24:11 38:22 45:6
87:20
**inside** 23:20
**insight** 122:4
**instances** 44:20
**instruct** 68:16 104:6
104:11,14,20
106:14 120:14,19
120:24 121:4,10
**instructed** 68:21
104:17 114:23
**instructing** 114:23
**instruction** 106:7
**insurance** 7:1,4,10
**intel** 32:3 36:1
**intentionally** 39:24
70:24
**interaction** 124:20
**interested** 21:15,18
74:20 85:20,21
**Internal** 112:24
**interpret** 73:10
**interpretation**
69:11 88:23 90:2
90:20,24 91:2
**interrupting** 117:1
**interview** 113:22
**interviewed** 112:16
113:10,15
**invade** 18:14
**investigate** 112:21
**investigated** 112:18

**investigating** 12:12
**investigation**
112:19,24 113:2,5
113:10,12,13,15
117:15
**investigations** 113:1
**investigators**
112:16
**involve** 6:5
**involved** 7:12 15:22
64:10 117:14
118:23 119:3,14
**involvement** 76:3
**involving** 19:6
21:20
**issue** 14:19 15:7
22:2 36:6 42:1
46:5 50:17,17
53:13 59:22 76:22
82:10 89:3
**issued** 26:1,2 29:12
29:14
**issues** 7:11 13:24
60:6
**items** 26:19 91:11
91:20

_____
**J**
**J-2** 111:16
**J-A-C-K-S-O-N**
5:10
**Jackson** 1:14 3:5
4:2 5:1,10,11
106:24 126:2
127:3,9,11 129:7
**JAGIELSKI** 2:17
**jail** 5:17 11:5 12:8
12:13,17 13:2,3
13:11,11,17 14:4
16:16,20 17:20,24
23:11 25:18 28:2
43:8 44:3 51:24
71:17 72:12 77:6
84:1,1,6,9,10,15
85:2,24 86:1,6
87:19 88:2,8,12
90:17 97:7,12
98:5 99:17,24
108:8,9 112:22
117:7 119:8,10
122:2,5,9,11
123:8,9 124:1
**Jamey** 2:6 19:16
126:16
**job** 12:3,23 97:19
101:8,11 120:13
**jogged** 9:16
**Johnson** 30:18,19
31:3,18,24 45:11
45:17,21 46:15,22
48:21 49:7,14

53:17,22 54:7
62:5 63:21 64:1
64:10,21 66:7,10
108:13
**Jon** 2:14
**Jr** 1:4
**June** 16:23,23,24
**jury** 9:8
**justify** 74:17

**K**

**keep** 36:17 61:13
75:10
**keeps** 47:11
**kept** 60:22 61:12
**keys** 26:4
**kicking** 55:14 56:1
56:2,5,11,13,16
**kid** 112:22
**kids** 88:3
**kill** 95:3
**kind** 6:11 7:8 8:11
9:6 10:9 15:23
23:14,23 25:14,16
25:24 26:9 35:9
35:11 36:20 49:2
50:1 51:17 53:9
57:9 60:2,5,9 67:8
71:13 74:2 83:23
84:4 105:4 111:21
114:14 115:5
123:14
**kinds** 117:18
**kitchen** 14:15
**knees** 50:16 65:3
**knew** 23:15 24:16
67:9,9,22 68:6,23
69:22 70:1,4
71:21,24 95:24
103:20
**know** 6:21 7:6,10
10:20 12:7,11
13:15 14:2,8,9,10
14:15,16 15:6,7
15:14,19,23 16:12
18:10 19:2,11,11
19:20,21 20:3,5
20:15,17,17,18,23
21:23,23 22:9,11
22:20,22,23 23:1
23:6,9,9,10,14,15
23:16,17,20,21,22
23:24 24:6,17,17
24:18,23 25:15
26:3 28:2,11,14
28:21 29:9,9,11
30:24 33:17 34:3
34:3,4,5,6,12,16
35:4,5,6,7,9,9,11
35:12,18,24 36:1
36:2,4,4,8,11,14

36:17 37:24 38:1
38:2,3,15,17,19
38:21 39:1 40:15
40:17 41:4,5
43:14,19,23 44:15
44:16,17,18,18
46:4,5,5,6 47:3,15
48:5,7,10,11,13
48:23 49:3,4,21
49:22,23,23,24
50:2,3,4,5,6,11,14
50:15,16,24,24
51:1,2,2,15,18,19
52:7 56:9,11,14
56:15,16,24 57:10
57:14,22,24,24
58:1,1,16,18,20
59:4,5 60:3,6 61:3
61:4,5,6,7,8,10,16
61:18,19,21,22
62:21,21 66:3,6
66:18 68:13 69:3
69:11 70:7,10,11
70:11,12 71:6,8
71:16 73:9,14,18
74:6,7 75:23,24
76:2,3,7,13,15,16
76:21,23 77:8
78:15,17,17,21,22
78:23,24,24 79:1
79:1,7,10,13,15
79:16 80:4,6,6,10
80:11 81:5,12,19
81:21 82:24 83:10
83:19,20,21 84:9
84:12 85:10 87:17
87:21,23 89:14,19
90:8 91:3,4,7
92:24 93:6,7,8,13
93:14 94:9,9,11
94:23 95:16,20,21
96:11 98:7,21,22
99:4,9,16 100:4
101:1,1,3,4,5,18
101:19,20 102:3,4
102:7,11,12,13,13
102:15,15,16,20
103:3,19,21
105:10,11,12,12
105:13,14,14,15
105:16,18,18
106:2,6,7,12,12
106:14,15 107:3
107:10 109:2,3
110:10,11,12,13
110:14,15,18
112:14,18 113:4
113:20 114:6,17
114:21,21,22
115:16 116:1
117:13 118:7,16

118:17,19,20,20
118:20,23 119:23
119:24,24 120:2,4
120:7 121:22
122:6
**knowing** 50:14
75:15 80:7
**knowledge** 36:11
76:15 84:12 92:14
95:15,19,21,23
114:12
**Krisandra** 2:14

**L**

**L** 5:10
**labored** 41:9 60:7
**Lakeside** 2:3
**large** 44:17
**larger** 47:22,23
50:23
**lasting** 65:23
**lasts** 92:19
**lateral** 22:24
**laundry** 14:15
**law** 1:16 9:7 97:11
100:14
**lawsuit** 5:19 6:3,8
6:10 9:12 118:4
**lawyers** 18:12
123:14
**lay** 44:19
**Layne** 1:15,21 3:6
126:9,13 129:5,19
**lead** 23:20
**leading** 60:8
**learned** 17:10
**leave** 76:9
**leaving** 80:15
**left** 23:21 33:12,14
46:9,10,11 90:24
**leg** 49:24 65:12 84:3
94:24 101:19
**legs** 48:18 55:14
56:1,3,5,11,13,17
64:14,18 90:7,11
109:5
**let's** 9:2 25:3,9
29:19 77:3 86:17
107:20
**lethal** 94:20 95:7,12
96:1
**lethargic** 34:23
39:16
**level** 30:9 78:12,15
110:2,9,9,19
**Lewis** 13:18 27:8,11
27:17,18 28:14
29:5 53:18,23
54:11,16 65:8
118:17 119:13
**LIBER** 2:3

**lift** 50:12 56:9
**light** 94:8 101:1
**limit** 91:11,20
**line** 117:1 126:5
128:7
**lineup** 24:18
**lip** 40:19,20
**literature** 95:2,20
**little** 9:22 10:5,6
11:4 13:21 47:19
48:9 51:4 54:18
107:22
**location** 16:1 21:24
83:10 114:20
**locked** 24:7,10
**long** 8:24 10:4
33:10,11 41:5
80:18 81:2,21
90:21,23 93:2
104:1 114:21
**longer** 116:17
120:11
**look** 16:7,10 17:17
18:1,4,21 34:11
37:21,23 67:1,1
74:1 84:19 85:21
99:12 105:20
106:23,23 107:20
114:14
**looked** 16:9 17:9
123:1
**looking** 19:2,4
34:13,13,16 85:8
111:8,10 114:4,6
116:6 119:1
123:17
**looks** 107:22
**loose** 61:13
**losing** 50:16
**lot** 28:20 72:11
**low** 73:17
**LPA** 2:11
**lying** 56:20 105:5

**M**

**M** 2:17
**M.D** 2:15
**maintain** 51:9,23
52:3 53:14 89:2
**maintenance** 14:14
**making** 40:24 61:3
69:7
**man** 53:9 115:2
**man's** 113:23
**management** 51:22
115:1 116:6
**manipulatable**
78:22
**manual** 17:19,20,24
99:17 123:8,9,17
**Marcus** 32:11

**marijuana** 121:15
121:20 122:1,11
**mark** 126:3
**Marshall** 64:3,4,9
**mask** 59:17 60:10
61:1,4
**matter** 93:8,9
111:21 112:3
**Maxwell** 32:11 74:9
75:18 76:5,6
**Mayes** 64:5,6
**MC** 107:14,20
116:7 123:6,6
**mean** 15:16 33:16
34:13 38:21 44:15
51:5 54:20 60:5
61:2 63:19 65:2,2
66:2 71:12,13
73:19 78:23 87:16
89:13 92:12 93:6
94:10 98:10 99:6
105:7 106:11
109:2 119:20
122:5
**meaning** 103:8
**means** 91:11
**measure** 52:3 73:13
73:15 90:4,6
96:18 101:20
108:18 110:16
**measured** 73:14
**measures** 91:11,20
**mechanical** 92:5,14
94:22 96:4,5,18
**Medic** 2:14 59:13
59:16 60:21 61:11
61:17 64:6
**medical** 21:22 22:2
32:6 35:22 36:3,6
36:8,21,22 37:4
37:13,21 38:7,10
38:13,23 39:12
42:1,11,22 43:9
43:23 44:2,2,7,13
44:15 45:2,7
51:17,20,21 53:10
58:4 59:5,20 60:3
61:18 68:4 70:4,7
70:10,12,14 78:9
78:13,16 79:8,12
80:1,5,11 81:19
82:5 83:10 102:15
103:3 105:2
**medically** 83:21
**medication** 81:18
**medics** 114:20
**meet** 5:12 30:4,7
**member** 88:7 94:6
117:10
**members** 43:7
85:23 87:14,16

**N**

name 5:8,9,11 9:21
116:10 126:6
named 6:14 129:7
NaphCare 2:13
79:12
narcotics 122:7
narrative 18:21
19:14 21:14,16
40:6 41:15 45:11
46:21 55:13 56:2
56:20 61:11
106:16,24 107:6
114:4,7 118:10
narrow 71:14
natural 50:12 59:22
97:22
naturally 48:23
52:6,19
nature 9:16
near 32:23 64:7
necessarily 45:14
46:4 62:9 98:21
102:4 106:11
112:2
necessary 68:13
86:10 87:14
need 24:7 35:22
51:10 53:12 60:22
61:7,7 85:16,16
105:21
needed 70:4,7,12
83:11 105:2,4
124:15
negate 74:6
nephews 88:3
never 70:17,19,22
84:2,7,15 85:2
86:1 88:17 94:1
new 66:18,21 67:2
NICHOLAS 2:2
Nick 5:11 9:2,20
68:7 116:24
126:15
night 17:15,17,21
18:2,15
nine 18:3,3
nods 8:10 109:14
noises 40:24
normal 14:19 91:12
91:21
normally 82:20
Nose 88:23
notary 1:15 3:6,7,8
126:7 127:13,17
129:5,19
notate 99:14 110:11
110:14
notated 75:22
note 111:24 112:6

notes 3:7 122:19
notice 32:19 39:16
39:17
noticed 55:23
notification 49:22
notify 115:17
noting 127:6
November 1:16 3:1
127:5
number 5:20 23:9
126:5,5
numbered 23:12
numbers 23:13
Nurse 2:13,14,14

**O**

oath 9:4,6
obese 69:5,9,14,19
obesity 69:11
object 78:21 79:2,5
83:3 94:10
objection 18:6 30:2
39:2 42:15 43:3
58:14,14 66:1
70:6 71:7,11 73:3
75:4 77:14 86:12
86:23 87:8 88:19
89:10 91:16 92:1
92:7,21 93:12,23
97:10 98:6,20
99:8,20 100:2,8
102:24 106:4
109:18 116:16,23
117:19
objectionably 91:7
objectively 74:1
obligated 120:13
observation 14:2
observed 58:23
59:19 122:15
obviously 50:12
88:21
OC 25:16 26:9,14
27:1,3,4,5,12,15
27:19,21 28:14,17
29:17
occurred 29:6 108:7
116:4
October 10:10
office 2:20 7:1 10:2
10:11 12:6 22:23
23:1 100:21
101:12 111:9
115:13 116:17,20
117:8,10 120:12
120:18,22,23
121:4,9,19 129:16
office's 120:13
officer 10:11 11:4
15:4,9,16,23
21:23 23:12 24:14

24:15 25:7,9,21
30:15,17,19,20
31:3,18,18,19,24
37:11 40:6 42:23
43:1 45:11,17,20
46:15,22 48:20
49:7,14 53:17,22
53:22 54:3,3,7
62:5 63:21 64:1,3
64:5,10,10 65:2
74:1 107:23
109:11 114:23
officers 21:21 22:15
25:12,22,24 38:20
42:4,9 43:2,6,10
43:16,18,22 44:4
44:6 63:10,13,22
64:13,13,17,20
65:7,17 66:17,18
66:21 67:2,21
68:16 72:19 73:1
74:24 75:3 76:19
77:13 78:21 84:1
84:6,14 85:2 86:1
86:5,9 87:4,13
88:11 93:18 94:1
94:7,16 98:17
101:8 104:6,11,15
104:18,20,22
106:13,21 108:22
109:4,16,22 110:2
115:7 119:3,8,13
120:14,19,24
121:5,10 124:21
official 3:8 7:21
oh 9:20 20:23 45:16
57:15,17
Ohio 1:1,15,16,22
2:4,8,12,19 11:16
17:8 96:12,15
97:2,4,7,14,15,16
97:17,18,19,19,20
97:21,21,22,23,24
97:24 126:9 129:2
129:6,16,20
okay 6:20 8:7,16,17
9:2,3,23,24 10:12
10:18,23 11:8,19
13:14,18 14:5
16:3,14 19:12,18
20:4,7,14,19
23:18 24:19 27:24
29:2,13,15 32:4
33:1,15 34:19
35:19 36:16 37:5
37:19 38:9 39:8
44:21 45:19,20
50:8,19 51:11
52:10 54:5,19
55:18 59:3 63:18
65:15 66:8,9 70:9

73:16,24 74:9
75:7 76:17 77:1,3
77:7 79:14 82:17
84:11,18 86:5,18
86:20 91:10 96:21
103:12 106:10,19
107:12,17 109:13
114:13 115:14
118:1 119:24
120:6 123:5
124:24
once 11:13 45:21
47:13 49:10,17
58:23,24,24 72:17
72:24 74:23,23
75:1 77:12 80:24
83:6,19 104:23
ongoing 78:9 91:4
122:8,13
open 23:3 24:22
47:6
open-ended 71:13
opened 31:17,24
45:10
operating 47:5
opinion 121:19
opportunity 9:19,23
18:23 29:11
122:10
opposed 80:14
opposite 33:4,5
order 82:21 83:7
97:2 98:1,8,10,14
98:19,22 99:24
100:3 120:4 123:1
ordered 63:21
82:14
ordering 79:23
Orders 17:18 111:9
Organized 12:5
17:8
outside 12:13 14:13
14:19 26:3 32:22
33:2,3,4 47:8 80:8
overall 36:18 74:5
overweight 68:6,24
oxygen 59:17,21
60:2,4,5,10 61:1

**P**

p.m 21:10,12
page 4:4 126:5,8
127:5 128:7
pain 41:7 57:15,17
58:7,13
panic 34:3,10
paper 44:19
paperwork 19:3,4
parameters 44:22
part 6:24 13:1
24:20 74:4 76:22

**N**

88:4,5,11,16 89:4
89:22 90:15 94:2
memory 9:16 19:5
46:13,14
men 85:23
mental 97:14,16
120:1
mentioned 58:17
mere 27:20 29:5
messages 116:21
117:9
Miami 17:6
middle 23:23 33:17
midst 85:17
Miles 2:14
mind 20:22 39:11
59:1,7,11 69:17
81:6
mind's 19:4
minimize 36:18
44:12 121:11
minimum 43:24
minute 54:8 67:8
82:12
minutes 65:24 66:4
67:4 81:9,11
92:20,24 93:9
104:1 109:15
Montgomery 2:20
5:17 10:2 11:5
12:6 44:3 51:23
84:1,10,15 85:2
86:1,5 99:17
100:21 101:12
111:8 117:8
120:23 121:3,9
122:1
month 17:11,12
morning 5:6,7
17:13 108:4
motion 49:2
motioning 35:5
motions 34:21
mouth 32:17 40:8
71:22
move 48:9,12,15
78:19 79:3,16
80:10 83:4
moved 15:21 16:1
65:12
movement 46:18
67:21 91:12,21
102:6 106:15
movements 35:1,18
62:10 72:18,24
74:23 75:2 77:13
82:11
moving 63:10 76:14
78:18 94:11 102:5
109:5,13

80:5 105:11
108:24 109:9
113:7,8,11,13
116:20,20 117:9
**participated** 108:23
**particular** 15:8 20:5
28:5 39:11 51:12
55:6 71:12 101:22
117:22
**particulars** 107:10
**parties** 3:5 110:8
**party** 6:8,10
**pass** 109:20
**passed** 5:16
**passes** 77:4
**pat** 68:13,17
**patience** 120:9
**patrol** 11:17,18,20
11:21 12:11
**Pause** 122:21
**pending** 9:1
**people** 15:17 18:24
19:1,3 22:11 75:9
79:19 93:17 95:3
97:8 98:17 102:22
117:18 120:14
**people's** 118:19
**perceivably** 78:15
**perceive** 44:24
**perceived** 36:3
39:22 42:13 118:7
**perceiving** 74:2
76:8
**percent** 10:19 30:24
60:5 84:19
**perceptual** 38:14
51:10
**perceptually** 40:14
51:1 94:17 100:10
**period** 61:15,22
66:3 89:1,2,6,24
90:17,23 91:14,23
93:18,21
**periods** 90:21
**permitted** 96:15
**person** 25:13 26:19
28:18,23 29:17
42:13 52:8 59:20
71:12 72:23 73:7
74:13 76:16 98:13
102:7,14 103:3,9
115:23 117:22
**person's** 93:6
**personal** 25:5
**personally** 72:21
**personnel** 58:4 79:8
81:5 114:20
**perspective** 7:19
33:6 37:11
**Phil** 1:8
**physical** 14:2 34:20

34:22 37:12 38:6
92:5 93:6 96:8
**physically** 96:17
**pinpoint** 23:17
**place** 18:5 46:6
52:18,19 89:1,1
110:19 114:18
123:15 129:13
**placed** 55:1 108:22
**places** 103:15
**placing** 88:16 89:22
90:14 108:16
109:2
**plaintiff** 1:6,14 2:5
3:5 6:15 7:10
**plan** 81:14
**played** 120:4
**playing** 63:19
**please** 5:8 9:1 33:7
91:18 117:5 126:3
126:8
**Plummer/Montgo...**
1:8
**pod** 21:20 23:2,2,2
23:7,16,20,21,24
24:6,10 78:12
79:24
**pods** 23:13
**point** 7:9 15:10 23:8
23:10 24:17 31:23
35:1,14 45:14,16
46:3 47:4 49:19
50:10,13 51:12
52:23 53:6,16
55:14 56:8,11,16
58:17 60:24 62:21
63:20 64:20 65:6
67:5 73:8,13
75:23 76:14,22,24
77:10 78:2 79:22
93:19 103:24
104:5 105:2,5,9
105:12,13 118:3
118:21 119:14
121:14
**points** 118:14
**police** 10:13 11:10
74:1
**policies** 16:9,10
17:9,13,15,17
18:20 85:12,15
99:15,16,23
123:14
**policy** 17:20,24 18:1
18:4,16 24:21
84:20,24 85:9,21
89:3,14,18,19
90:2,9,20 92:14
99:3 110:4,10,17
110:22 111:4,20
111:20 112:1,2,7

112:14 119:11
122:24 123:7
**pool** 28:1
**portion** 6:23 7:3
48:18 69:24 70:16
90:2,9 91:12,21
111:10
**portions** 99:3
**pose** 73:2,19 74:24
76:11,20 77:12
94:2
**posed** 72:19 74:20
74:21 75:3,13
77:16
**position** 10:21 11:2
11:4 12:2,4,19
13:6,16,16,20,22
13:23 48:15 50:12
52:5 58:21 69:8
80:13 83:20 88:17
89:23 90:8,16
91:14,23 94:20
95:8,12,17,19
96:2 98:16 99:5
100:15 101:6,6,18
101:21 102:7,13
103:11,15 104:8
105:18 106:2
117:7
**positional** 100:24
101:15 102:11,22
103:8,9,16 120:20
120:24 121:6,11
**positioned** 49:11
**positioning** 60:11
69:14 102:10
103:4
**positions** 13:3 38:20
89:6
**possibility** 39:6,7,15
**possible** 44:19
74:14,15,16
100:17 101:5
**possibly** 6:2 73:23
**potential** 42:22
74:21
**potentially** 42:5
45:8 94:20 95:7
95:12 96:1
**pound** 78:24 79:2
**pound-ish** 31:15
**pounds** 31:16
**practice** 88:18 89:7
**practices** 119:6,10
**precaution** 82:19
**Pregon** 1:16 2:6,7
18:6 19:14 30:2
31:12 39:2 42:15
43:3 58:14 66:1
67:10,13 70:6
71:7,11 73:3 75:4

77:14,18 85:4,8
86:12,23 87:8
88:19 89:10 91:16
92:1,7,21 93:12
93:23 97:10 98:6
98:20 99:8,20
100:2,8 102:24
106:4 107:13,16
109:18 116:16,23
117:19 125:3
126:16
**prepare** 16:4 18:22
**prepared** 43:1
**presence** 3:7 127:14
129:10
**present** 114:1,10
**presided** 115:5
**pressure** 102:2,14
103:22
**presume** 16:4 93:20
**pretty** 16:22 82:7
91:10
**prevent** 46:18 63:5
109:5,8,12
**preventing** 63:13
**primary** 15:10 23:2
**printed** 126:4
**prior** 18:15 19:8,19
23:3 31:17 83:9
83:13 93:7 123:10
**privilege** 18:14
75:15
**privy** 80:5
**probably** 5:15 7:11
8:2,3
**problem** 54:22
57:22 60:9 82:3
122:8,13
**Procedure** 1:15 3:6
126:8
**procedures** 119:7
**proceedings** 114:17
122:21
**process** 15:14 36:19
38:14 47:20 83:5
122:18
**Professional** 126:13
**progressed** 81:19
82:22
**prohibited** 89:9,13
89:17,20,24 90:17
90:22 96:12 99:19
100:9,9
**promoted** 10:14,15
11:2,22 12:4,14
12:15,22
**promotion** 12:2
13:1
**prone** 88:17,23 89:6
89:23 90:7,16
91:8,10,15,24

92:5 94:19 95:6,6
95:11,17,19 96:1
96:11,14,19 97:4
98:2 99:5,7,13,18
100:6,15 101:6,17
102:13 103:4
105:18 106:2
**pronounced** 114:8
**proof** 3:8
**properly** 10:1
**PROSECUTING**
2:17
**protocol** 105:17
**protrudes** 44:8
**provide** 32:12 81:20
**provided** 32:5 95:22
95:24 100:22
101:3
**providing** 54:12
**proximity** 15:13
28:22 31:3 47:9
54:20 104:4
**psychiatric** 38:23
**psychological** 38:16
39:12
**public** 1:15 43:8
85:24 87:14,17
88:4,5,8,12 94:2,6
97:22 126:7
127:13,17 129:5
129:19
**pull** 28:3 47:6
**pulled** 46:22 47:13
48:21 56:19 58:24
62:14
**pulling** 48:22 55:9
**pursuant** 83:7
**pursuit** 6:13
**push** 55:10 56:13,17
**put** 8:4 33:6 37:12
38:5 51:8 52:24
58:12,20 59:6,16
60:4,24 61:4
62:15,18,24 63:4
66:2 76:19 81:13
81:24 82:17 83:8
83:17,21,22 88:22
96:17 101:5,21
102:6,7 103:9
106:17 109:8
120:15
**putting** 36:12,24
37:3 38:20 60:10
74:17 89:4 95:16
98:17

_____

**Q**

_____

**qualification** 3:8
**qualified** 129:6
**question** 8:14,19,20
9:1,1 37:17 42:20

43:15 48:10 52:22
53:5 58:8 68:7
72:11 75:1 77:11
77:19 79:18 85:24
87:24 88:9 90:14
94:12 95:18 117:5
117:21 121:8
**question-answer**
89:21
**questioning** 117:1
**questions** 8:13
18:24 20:20 25:4
57:3 67:22 120:10
**quick** 8:23 24:5
31:6 67:11
**quickly** 82:7 122:19

**R**

**racism** 117:17
**racist** 116:21 117:9
**radio** 21:21 22:6
25:15 26:2 32:6
**railing** 47:9,11,14
77:5
**ran** 17:7
**rank** 10:14
**ranks** 10:8
**rapid** 41:13,14
59:20 60:8
**re-ask** 37:17
**reached** 46:2
**reaching** 46:10
**react** 42:13
**read** 91:18 95:21
100:2 110:22
111:11,12,14,15
111:15 113:20
118:23 123:3
125:3 126:3,6,8
126:10 127:4,13
128:2,4
**reading** 64:16 84:22
85:4,12 90:9
118:18 127:12
**real** 31:5 122:19
**realize** 5:15
**realized** 104:23
**really** 19:2 40:2
58:9
**reask** 87:24
**reason** 8:23 15:22
22:3,4 23:12
29:23 128:7
**reasonable** 29:24
74:2 86:6 87:5
91:7 94:15
**reasonably** 86:10
**reasoning** 117:13
**reasons** 62:18,24
63:4 128:5
**reassigned** 16:15

**recall** 22:16,17 24:2
27:9,11 29:10
31:2 35:4 49:9
53:24 61:20 62:22
64:3 72:9 75:24
106:8 114:18,23
115:21
**received** 23:10
103:10
**receiving** 78:12
**receptive** 34:17
**reclassified** 15:8,21
**recognize** 19:23
**recollection** 19:10
23:8 24:13 25:2
30:17 31:2 34:7
35:8 48:17 49:4
53:19 54:6,9,14
56:15 59:7 64:23
70:18,19 81:16
83:15 108:3 114:9
114:19 118:13,22
119:19
**recommend** 119:2
**record** 5:8,12 8:5,19
26:21 31:5,7
67:16 107:13
128:5
**records** 121:23
**recreate** 41:3
**rectangle** 33:8,11
**reduced** 3:7
**refer** 89:20 91:7
**referencing** 21:22
**referred** 90:5 94:22
107:14
**referring** 84:20
85:9 96:21 124:4
**refiled** 7:9
**refresh** 114:9
**refreshing** 16:11
**regard** 100:1
**regardless** 111:3
124:7
**regards** 110:17
**Regents** 98:1
**Rehabilitation**
97:23 98:4
**relate** 14:6 97:11
**related** 13:13,16
28:4 61:21 116:1
116:2 117:22
**relates** 13:12 28:13
28:23 37:6 92:13
92:14 94:21 96:16
97:14 110:4
112:13
**relation** 6:12,13
15:13 28:13 32:5
51:18 59:6 99:4
101:17 102:20

120:1 124:16
**released** 7:8
**relief** 20:10,15
**relieved** 63:22 64:9
66:7
**relived** 64:6
**relying** 9:10
**remained** 55:5
**remember** 9:20
10:16 19:2 20:1,2
21:16,18,19 22:5
22:15 26:18 30:14
30:21,22 43:22
46:9 48:21 59:9
59:14 60:23 64:24
65:4 79:23 119:18
123:1
**remembered** 9:21
**remind** 21:6,7
66:15
**REMINGER** 2:11
**remove** 76:2,4 80:9
**removed** 75:22 76:1
**removing** 75:24
76:6
**repeat** 42:20 117:5
**repeated** 61:19,20
61:21
**rephrase** 86:17
**replace** 28:11
**replaced** 64:1
**report** 16:8,9 18:21
40:6 55:16 64:16
107:4 110:5,6,20
110:21,24 111:13
111:18,23 112:4,8
113:12 114:22
115:2 116:7 118:5
118:6,12,24
123:21,24 124:1,5
124:5,11,15,18
**reported** 106:18
107:1 108:1
**reporter** 5:9 126:13
128:1
**reporting** 107:11
**reports** 106:16
111:5,11 115:12
115:14 118:16,19
123:2,2 124:13
**repositioning** 49:8
**represent** 5:15
**request** 128:4
**requested** 123:13
**required** 120:19,23
121:4,9
**requirement** 111:1
124:4,6
**research** 94:18 95:5
101:3
**resistance** 42:5

**resistant** 45:3
**resisting** 108:23
**resistive** 42:14,16
43:2,9 44:8
**resolved** 6:22 82:2
82:11
**resources** 80:9,12
83:2,4 97:22
**respect** 123:1
**respective** 3:5
**respond** 22:8,14
24:13,22 43:19,23
57:12 59:5 81:1
108:9
**responded** 22:9,24
23:5,24 26:22
27:8 54:12 58:5
59:14 60:21 81:17
82:6 108:9 122:14
**responding** 31:23
32:6 36:1,3 37:21
44:2 83:9 103:18
**responds** 53:18
**response** 22:12 23:6
28:22 30:23 49:21
50:3 54:15 60:2,4
70:16
**responses** 57:3
**responsibilities**
12:23 13:12 14:12
14:20
**responsibility** 51:24
15:1 113:5
**responsive** 36:5
**restate** 84:14
**restrain** 62:7,10
94:1,6,14,15
120:14
**restrained** 63:11
85:13 90:7,11
96:5,8 105:14
**restraining** 85:23
102:3
**restraint** 17:24 18:1
18:4,16 73:13,15
73:17 76:19 78:3
78:8 79:4,23
80:14,19 81:1,7
81:10,13 82:14,18
83:7,8,12,16 91:8
91:10,15,24 92:5
94:19,20 95:6,7,7
95:11 96:1,2,12
96:14 97:4 98:2
99:18 100:7
101:18,19 103:5
**restraints** 56:4
61:24 74:18 75:19
84:2,3,7,15 85:3
86:2 89:1,5 90:4,6

92:6,15 94:22,24
96:5,6,9,18 98:18
99:7,13 108:16
**restrict** 84:8,13,16
85:3 86:2 102:6
**restriction** 102:21
**restroom** 67:11
**result** 18:5 93:13
121:11 126:10
**results** 121:18
**Retardation** 97:15
**retraining** 119:2
**retrieved** 56:3
**return** 126:8
**review** 16:5 17:13
17:15 18:23 85:9
104:3 112:24
115:1,1,5,9,16
116:6 118:3,5,11
122:19
**reviewed** 16:8 18:15
118:9
**revised** 123:10
**revision** 123:17
**revisit** 9:19
**Richardson** 1:5
5:16 19:6,20
20:22 21:20 29:21
32:8,13,16,21
33:20,23 40:5,7
41:17 45:12,18
46:10,18,22 47:22
49:8 51:13 52:17
52:23 53:4,22
54:8,13,17,22,24
55:8 56:21 57:16
58:22 59:10,17,21
60:22 61:12,23
62:15 63:13 64:21
65:18 66:22 67:19
67:23 68:20,23
69:4,22 70:1,17
70:19,22 71:5,10
71:18,21,24 72:4
72:7,10,12,14,17
72:19,24 73:1
76:11 77:12 80:13
81:13,22,24 82:17
83:8,13,17 85:13
96:5 103:18 104:2
104:7,12,15,18,22
105:8,21 106:1
108:22 109:8,12
109:16 110:3
114:1,7 118:11
119:9 121:20,24
124:21
**Richardson's** 30:8
46:18 57:2 60:13
64:14,18 65:3
90:11 118:4 119:4

121:15 122:15
123:11,16
**right** 7:11,16 12:11
12:20 15:5,18
19:12,13 23:17,22
25:23 29:19 30:12
35:14 37:22 38:2
39:1 40:5,13
43:22 45:18 46:16
49:10 51:6,7,9
57:13 63:2 74:2
74:12,14 77:24
80:3,18,20 82:10
82:12,13 85:20,21
87:5,23 93:11,21
98:11 99:7 105:2
107:5,8 108:14
113:19 117:4
125:1
**rise** 30:9 110:19
**risk** 35:23 38:24
39:13 44:12 45:8
51:22 73:19 76:4
76:7 79:4 92:19
93:3,19 94:3 95:4
101:4,23 102:10
102:14 103:7,9,14
103:16 106:3
115:1 116:6
120:15 121:5,11
**risks** 47:8 93:17
**road** 11:20,21 12:11
**Robert** 1:5 5:16
**roll** 33:21 48:24
104:12,18,20
105:1,8,10,15
106:1 109:3
**roommate** 32:11
**rose** 110:2
**rotating** 20:13
**rotation** 20:12
**roughly** 47:16
**rule** 74:8 85:1 92:17
100:13,19,20
101:9,12
**rules** 1:15 3:6 8:4
72:12 83:23 126:8
**running** 40:18 81:4

**S**

**S** 99:1
**safe** 101:4
**safely** 78:15 79:16
80:9 82:5,7 83:3
105:14
**safer** 47:23,24
48:15 53:13 80:13
94:7,16 105:18
**safest** 52:16,23 53:3
78:16,19 82:24

**safety** 36:19 50:17
51:24 52:1,6
76:18,22 79:4
97:22 101:23
**sake** 86:19
**saliva** 32:16 40:8,11
**Sam** 98:23 99:1
**sat** 5:24 30:19
**Saturday** 19:9,13
**saw** 40:11 58:24
108:13 111:10
**saying** 40:21 61:19
106:21 113:20
**says** 5:3 19:14 94:13
95:2 111:11,21
112:3,7 123:20,24
**scenario** 44:19
**schedule** 20:5,13,18
**scope** 51:21
**scratch** 75:23
114:22
**se** 22:1 61:2
**seal** 129:16
**seated** 40:9 104:8
**second** 21:5 23:20
24:3,4 25:1 78:12
78:14,19
**secondary** 23:3
48:14
**seconds** 34:5 54:13
93:8
**section** 111:11,16
123:19
**secure** 79:4 82:15
83:3
**secured** 61:23 82:5
82:7
**security** 14:2 17:8
22:1 36:19
**see** 19:3 30:15 32:15
37:20 40:8 83:24
106:24 107:1
116:10
**seeing** 22:17 24:2
32:2 59:20
**seen** 76:16 98:11
113:2,4 116:7
**seizure** 36:23 38:1
38:15 58:23
**self** 29:14
**semantics** 63:19
**sense** 7:7 57:6
**separate** 113:1
**sequence** 47:2 55:20
56:7,10,14
**sergeant** 5:11 10:1
11:2 12:15,19,22
13:5,6,18,19,21
13:23 14:7,11,17
14:21 15:11,15
16:7,16 20:16

25:6 27:8,11,17
27:18,22 28:13,16
28:16,17 29:5
40:6 53:18 54:11
65:7 67:18 71:18
83:24 85:22 92:17
97:6 98:5 105:21
106:24 115:22
116:10,12 117:6
118:17 119:12
120:8 123:7
**sergeant's** 14:20
22:23
**sergeants** 26:12,13
26:14 27:14 28:21
118:15
**series** 51:18 59:5
**services** 14:15 97:17
97:18,19,24
**Session** 3:1
**set** 26:4 27:7,8
78:22 129:15
**sets** 23:19 27:5 65:8
65:11
**seven** 47:16
**shackles** 65:12 84:3
94:24
**shared** 97:1
**sharp** 48:11
**sheet** 126:5,6,9
**sheriff** 1:9 2:9 5:20
6:6 10:4,7
**sheriff's** 2:20 5:20
6:24 10:2,11 12:6
100:21 101:12
111:9 115:13
116:17,20,22
117:8,10 120:12
120:13,18,22,23
121:4,9
**SHIBLEY** 2:3
**shift** 21:2 29:6
63:20,22
**shirt** 46:5
**short** 61:10,15,22
67:18 114:7
**shorter** 93:20
**shortly** 108:8
114:19,21
**shoulder** 35:10 46:3
46:7
**shoulders** 88:24
**show** 121:23 123:6
**showed** 54:16
122:24
**showing** 98:10
**shown** 94:19
**shows** 95:5 104:1
**shrinking** 31:11
**shrugs** 8:10
**side** 33:10,11 46:16

93:11,20 105:11
105:15,19,22
**side-to-side** 102:5
**sign** 28:10,12
118:15 126:3,6,8
**signature** 125:5
126:8 128:23
**signed** 116:9 126:10
127:14
**signing** 127:12
**simplest** 122:7
**Sincerely** 126:12
**single** 44:19 118:24
**sir** 43:20 50:4 75:15
79:12 116:11
**sit** 39:20 104:6
**sitting** 28:21 32:9
32:22 33:13,17,18
40:22 41:12 72:2
81:21
**situation** 14:11
21:20 35:24 37:7
37:23 38:16,17
44:23 45:1 51:22
52:6 58:2 60:17
73:9 75:21 76:4
78:11 82:22 83:1
107:11 108:21
115:6
**situational** 91:3,5
**situations** 43:7,11
43:17 80:22 85:17
110:12 111:2
124:6
**six** 20:11,12 31:10
47:16 121:20
**size** 51:1 65:10
**slash** 13:7
**slid** 49:5
**slow** 35:12
**smaller** 47:19
**smuggle** 122:7
**Smuggling** 17:3
**soft** 77:6
**somebody** 15:8,20
42:11 47:7 68:21
83:3 92:18 93:3
96:17 101:22
103:4 112:21
121:18
**somewhat** 48:19
**soon** 62:14 81:24
100:14,16 101:5
**sorry** 17:23 37:17
96:20
**sort** 32:6
**sorts** 76:17
**sound** 41:2
**sounds** 17:5 93:10
**SOUTHERN** 1:1
**space** 47:21,22,23

**SPANGENBERG**
2:3
**spark** 28:7,8
**speak** 8:7
**Special** 1:4
**specific** 13:9,10,12
35:13 37:6
**specifically** 12:1
13:17 14:7 16:8
20:16 23:12 24:15
46:1 114:18
117:15
**specified** 129:13
**speculation** 27:20
29:5
**spell** 5:9
**spelling** 118:20
**spoke** 61:2
**spray** 25:16,18,19
26:9,14 27:1,5,22
28:15,17 29:1,17
**Sr** 1:5
**staff** 73:19 76:21
**staffing** 79:12
**stainless** 48:8
**stairs** 30:13,15
**stairwell** 24:1
**stairwells** 23:19
**stamped** 107:16
**stand** 33:21 35:23
36:13 48:24 50:13
56:5,12 77:3
104:15
**standard** 110:5,20
**standing** 24:20
34:17 52:11 62:24
**stands** 36:14
**start** 25:9 73:12
76:23
**started** 10:7,10 34:2
35:4 54:12 55:24
61:6,16,19
**starting** 35:5
**starts** 2:10 116:7
126:15
**state** 1:15 5:8 34:2
34:10 35:21 80:10
96:12,15 97:2,4,7
98:3 101:22
112:14 127:1
129:2,6,20
**stated** 127:12
**statement** 92:11
106:24 107:14
118:10
**statements** 61:21
**states** 1:1 89:14,17
**stay** 35:7,7,8,19
39:20 50:4,4
77:10 114:24
**stayed** 21:11

**steel** 48:5,8,11 77:8
**stenotype** 129:9
**stenotypy** 3:7
**step** 11:1
**steps** 78:22
**Steven** 2:14
**stipulated** 3:4
**STIPULATIONS**
 3:3
**Stockhauser** 2:14
 59:13,16 60:21
 61:11,17 64:7
**stomach** 100:16
 105:6
**stood** 63:1
**stop** 16:19 25:3
 117:1
**stopped** 83:17
 104:19,23 109:22
**stopping** 83:13
**straddling** 64:21
 65:2,3 109:12
**strap** 79:10,19
**Street** 2:11,18
**strength** 51:2
**strength-wise** 50:24
**stress** 37:1,3,12
 38:6
**stroke** 36:23 38:2
**structure** 78:23
**struggle** 65:21,23
 67:3,5 92:19,24
 93:3 105:9
**struggling** 62:3,4
 93:18
**Stumpff** 54:4,5 62:5
 64:10
**subject** 96:19
 100:15
**submission** 110:4
**submit** 113:12
**submits** 110:24
 115:12 123:21
**submitted** 124:15
 127:11
**substance** 127:6
**succession** 22:10
 23:13 53:5
**sudden** 92:19 93:4
 93:17
**sued** 6:17,18
**suffered** 58:23
**suggest** 119:2
**suggested** 73:12
**suing** 6:17
**suitable** 16:2
**Suite** 1:16 2:4,8,12
**supervising** 14:21
 85:23 98:17
**supervision** 15:10
**supervisor** 111:1

120:2 123:22
**supported** 17:8
**supposed** 69:13
 112:8
**sure** 6:2 10:19
 18:13 22:20 24:24
 27:20 28:6 38:12
 48:2 52:4 55:20
 68:9 101:12
 113:14 117:2
 118:21 119:22,24
**surfaces** 48:11
**surprising** 122:10
**surroundings** 24:6
**suspect** 100:14
 112:3
**swap** 64:13
**swapped** 65:17
**SWAT** 108:11,14
**switched** 65:7 66:17
**switching** 67:13
**sworn** 5:2 129:7
**Synonymous**
 100:11
**system** 121:15

---

**T**

**table/desk** 48:7
**tactics** 44:16 45:6
**take** 8:22,24 9:2,19
 9:22 22:20 31:16
 34:12 38:19,19
 46:2 48:13 67:7
 67:11 74:5 75:16
 76:9 79:1 94:10
**taken** 1:15 3:6 5:13
 5:18 9:7 100:16
 128:2 129:9,12
**takes** 81:2
**talk** 18:8 60:18
**talked** 18:12,20
 60:12
**talking** 9:15,17
 17:21 76:5 96:4
 99:15 111:8
 115:11,13
**tangent** 50:12
**taser** 26:15,23,24
 27:12,15,19 28:4
 28:6,16,24 29:1,3
 29:11,20,23 30:5
**tasers** 26:7 27:21,22
 28:1
**tasing** 30:9
**task** 17:4,7
**tasked** 118:16,18
**taught** 44:17
**team** 108:11
**technically** 109:1
**Ted** 1:14 3:5 4:2 5:1
 5:10 127:3,9,11

129:7
**tell** 7:20 8:15 10:6
 10:24 12:2,23
 13:4,21 18:6
 22:17 24:2 40:1
 41:10 47:24 79:22
 115:23 116:3
 119:17
**telling** 37:10 38:4
 88:6,10 102:9
 110:1 124:20
**temporarily** 43:8
 87:23
**ten** 65:23 66:4 67:4
 81:9,11
**ten-minute** 67:5
**term** 94:23
**terminated** 117:7
 117:16
**termination** 117:14
**terms** 25:4 26:13
 27:12 122:7
**test** 28:6,6,7,8
**testified** 7:21
 109:11
**testify** 7:14 129:8
**testimony** 88:10
 126:4,5,6 129:9
 129:12
**testing** 114:6
**text** 116:21 117:9
**thank** 16:3 29:19
**Thanks** 107:18
 124:24
**thing** 8:11 9:14 10:9
 19:16 45:20 52:16
 52:23 53:3 62:15
 84:4 94:11
**things** 8:23 9:15
 19:1 51:19,21
 60:4 63:15 67:8
 109:16 112:11
 118:21 120:5
**think** 7:24 8:3 12:20
 19:8 37:5,10
 39:20 41:15 53:9
 53:16 64:6,20
 65:18 66:9 73:24
 77:18 83:12 85:7
 87:15 88:6 89:12
 94:12 96:14,21
 97:6 98:1,18
 104:1 105:17,20
 107:1 108:13
 109:4 122:20
 124:4
**thinkers** 106:13
**thinking** 78:11
 79:16 83:1
**Third** 2:18
**thirty** 126:8

**thought** 36:19 38:14
 47:20 52:16,23
 62:23 83:5 122:18
**thousand** 97:8
**thrashing** 55:14,24
 56:3,6 61:24
 65:18 66:10,22
 73:12 76:23
**threat** 72:19 73:2
 74:24 75:3,12,13
 75:14 76:11,21
 77:11,16,22,23
**threaten** 75:9
**threatened** 76:12
**threatening** 73:6,7
**threats** 74:2,20,21
**three** 11:7,7 13:3
 20:10,10,11,12
 26:20 47:15 54:1
 63:10 67:20 72:18
 75:2 77:13 92:20
 92:24
**throw** 17:6
**throws** 36:22 37:4
 37:13 38:7,22
 42:1,11,21 43:9
 44:7,13 45:2,7
**time** 3:6 5:24 8:22
 8:24 12:9,14,15
 18:1 20:9,16 21:7
 21:8 29:20 35:15
 49:19 52:24 53:16
 53:17 54:11,16
 55:6,14 56:13,18
 57:2 60:19 61:1
 61:16,17,22 65:6
 65:9 66:3 67:2,2
 67:19,22 68:14
 71:19,19 72:10
 74:3,12 75:23
 76:14 78:1 79:22
 89:1,3,7,24 90:17
 90:21,23 91:1,5,6
 91:14,18,23 93:18
 93:19,20 96:18
 98:11 103:24
 104:5,17 105:9
 106:18,22 107:1,1
 107:2,3,16 109:15
 114:7 118:3,14
 119:15 121:14
 123:15 125:2
 126:9,10 129:13
**time-wise** 82:22
**timeframe** 17:10
 21:9 22:10 29:6
 66:2 92:23
**times** 7:24 28:23
 29:18 61:20 87:3
 87:4,12 105:21,22
**title** 99:6,12

**today** 5:13 8:14 9:4
 9:11,23 41:16
 97:3 108:21
**today's** 16:4 18:22
**toilet** 48:8
**told** 17:9 39:20 47:7
 52:13 54:7 55:8
 62:11,12,23 66:9
 66:15 73:20 75:1
 87:15 108:13,21
 109:4
**Tom** 116:10
**Tonya** 24:14
**top** 30:13,14 65:5
 102:14
**topic** 9:17
**total** 106:14
**totality** 60:12 86:10
**Township** 11:16
**toxicology** 121:18
**traditionally** 52:7
**traffic** 6:12
**train** 120:13,19,23
 121:4,9
**trained** 43:6,10,17
 43:18 44:6,11
 92:16 103:7
**trainee** 30:20
**training** 34:6 38:22
 44:22 45:6 52:7
 95:21,23 100:22
 103:10 105:11,16
**transcribed** 3:7
 129:10
**transcript** 126:3,3,6
 126:10 127:4,10
 128:2 129:12
**transitional** 96:22
**transpire** 73:11
**transpired** 58:20
**transpires** 15:15
**transpiring** 24:23
 32:2 34:6 49:23
 50:2 56:10 58:10
 58:17 59:6 75:21
 91:1 94:8
**transport** 79:20
**transportation** 13:7
 13:9,13 28:2
**treat** 80:8
**trial** 6:21,22 7:3
 120:10
**tried** 49:14 62:16
 70:22
**true** 33:24 39:18
 43:24 44:4 55:5
 60:14,15 62:3
 63:7,8,16 64:18
 64:22 65:24 68:1
 68:6 70:5 74:10
 74:18,19 75:18

76:3 84:8 86:3,3,4
86:11,14,16,17,22
87:1,6,10 89:24
93:6 96:9,10
100:7 102:12,17
108:17 124:13
127:7 129:11
**truth** 129:8
**try** 11:3 18:13 37:1
41:3 49:20,22
59:6 62:22 63:7
66:6 71:3,5 94:14
105:1
**trying** 20:21 32:12
35:6,10 39:21
47:8 48:24 49:20
50:2,6,10,13
51:13 52:14 53:8
53:17 55:9 56:4,8
56:12,13,17 57:6
57:11,14 59:21
60:24 61:4 62:11
65:16 69:22 73:9
77:10,11 78:18
83:6 89:12 107:5
108:20
**turned** 40:7
**twelve** 48:4
**two** 23:19 31:16
47:15 65:8,11
82:12 94:5,13,15
111:11 113:1
**type** 22:2 36:22
107:6 108:6
110:23 111:3
123:20 124:7,17
**typed** 108:3
**typewritten** 126:4
**typical** 27:14 115:8
**typically** 115:4,10
**typing** 106:22

**U**

**Uh-huh** 66:12
**uh-huhs** 8:10
**ultimate** 93:13
**ultimately** 64:6
115:24 118:15
**unacceptable** 89:7
**unbalanced** 35:15
35:16 39:17
**uncles** 88:3
**uncommon** 9:14,16
122:10
**uncontrolled** 35:12
**Uncoordinated**
35:2
**undersigned** 127:13
**understand** 5:12,18
5:21 7:5 8:3,12,14
8:15 9:4,5,6,9,10

31:18 42:6,12,18
46:21 52:22 73:24
94:12 100:23
102:23 103:4
118:2,9 121:24
122:3
**understanding** 8:5
8:18 13:20 40:2
44:23 53:11 72:3
72:5 83:14 85:22
87:3,12 90:8 93:2
101:15 102:18
105:16 107:5
123:13
**understood** 7:18
8:20 33:19 84:4,5
119:6
**uniform** 26:6
**unintentionally**
71:1
**unit** 12:5 14:13 17:8
22:19 23:4,9
24:16
**UNITED** 1:1
**units** 24:21 25:6
**unknown** 36:21
39:12 42:1 68:4
73:9 76:3 93:19
**unnecessary** 87:7
88:7,11 94:2
120:15
**unreasonable** 86:21
**upright** 72:2
**upstairs** 22:21
**use** 17:18,19,20
21:14 27:3 30:1
65:8 73:11 84:2
86:6,9 87:4,13
88:11 94:21 96:11
96:14 97:4 108:17
108:19 110:3,5,20
110:24 111:4,10
111:18,22 112:4,8
122:24 123:2,7,19
123:21,24 124:5
124:13,14,18,19
124:22,23
**uses** 110:23 111:2
123:20 124:7
**usually** 38:20
**utilized** 110:17

**V**

**Valley** 17:6
**verbal** 8:9 35:7
39:18 41:18 49:20
49:22 50:3 57:3
61:8
**verbally** 56:21
**versus** 24:7 78:22
**vestibule** 23:2

**Veteran** 97:24
**vicinity** 31:20
**video** 18:21,23 19:5
66:6,19 67:1
104:1,3 105:20
**videographer** 46:8
**Vine** 2:11
**violated** 72:12
**violence** 71:13,17
**violent** 71:10,12,18
71:20 73:12,18,20
76:20 102:1
**violently** 73:12
**visually** 32:3
**vs** 1:7

**W**

**waiting** 24:21 81:22
**waived** 3:8 125:5
**walk** 23:3,6 77:2
**walk-thru** 14:4
**walked** 33:24
**walking** 23:15 24:6
**walkway** 46:23
47:16,22 48:16,17
49:6
**wall** 32:22 33:3,4,16
33:18 48:4,4,4,9
**want** 8:13,15,22
9:18 10:20 12:6
15:7 25:3 28:19
28:20 35:19 47:21
56:7 61:12 62:23
67:7,11,19,21
75:10 83:23 93:10
93:14,20 111:16
119:20 123:6
**wasn't** 29:10 48:17
51:10 57:10,11
58:9 61:8 68:19
75:19 80:5 81:13
81:24 82:8,17
83:8 105:8 106:1
106:6 124:14
**watch** 11:5 111:1
112:9 123:22
**wave** 35:11
**waving** 46:9
**way** 14:13 40:3,4
42:14,17 48:17
66:6 78:16,19
82:24 94:7,14,16
120:15
**ways** 44:11 84:7,16
85:3 86:2 94:2,5
94:14,15 122:6
**We'll** 60:20 125:3
**we're** 9:14 15:7
17:21 19:12 20:13
36:1 49:20 50:16
52:19 60:8 67:10

67:18 73:8,9 76:6
78:18 96:4 113:20
**we've** 5:12 19:8
60:12 77:1 83:5
99:15
**weapon** 68:15,17,21
**Wednesday** 3:1
**weekly** 43:23
**weight** 31:9,14
**went** 10:13 11:10
30:12 45:21 49:2
63:2 105:17
116:21
**weren't** 12:17 85:12
**West** 2:18
**WESTERN** 1:2
**WHEREOF** 129:15
**whining** 41:2
**Whitney** 1:15 3:6
8:5 126:9,13
129:5,19
**willing** 37:11 38:5
**witness** 3:8 6:9 7:4
7:9,17 127:12
129:10,12,15
**witnessed** 63:7
115:5
**wives** 88:2
**women** 85:23
**wood** 48:7
**word** 12:12 45:15
73:11 84:2 89:13
**word-for-word**
84:22 85:5 89:19
**words** 8:9 63:19
**wordy** 91:10
**work** 11:5 20:1,18
21:9
**worked** 10:8 13:2
20:12 27:15
**working** 11:14 12:8
16:19 21:2 23:11
29:16 92:13 97:7
116:19
**works** 116:17
**wouldn't** 29:24 42:7
51:14 62:9 100:20
115:4,8 122:9,9
**wound** 72:7
**write** 41:4,5
**writing** 3:7
**written** 85:15 99:16
99:17,23 111:11
111:20,21 112:1,2
**wrong** 50:5 92:11
**wrote** 51:19

**X**

**Y**

**yeah** 7:2,17 11:7,9

11:24 12:18 17:6
17:22,23 28:8,9
28:20 31:16 33:9
34:15,24 35:17
37:8 40:16 41:5,6
42:20 44:14 45:19
47:11 49:1 50:22
54:10,16 55:17,17
57:10,10 62:8
63:19 64:17 65:9
66:20 67:12,15
68:11 72:22 85:6
88:1 98:7,24 99:2
106:21 107:15,21
109:1 113:11
123:4 124:19
**year** 10:16 16:23
**years** 9:15 10:5 11:6
11:21 19:1
**yelling** 60:22 61:12
61:13
**Yep** 24:12 29:8 36:7
36:10 114:16
**yesterday** 13:18
18:5 30:19 47:7
109:11
**young** 113:23 115:2
**Youth** 97:18

**Z**

**0**

**05** 11:23
**06** 11:23
**07:15** 21:10

**1**

**1.1.3** 17:19
**10:53** 125:8
**100** 30:24 60:5
84:19
**1001** 2:3
**117** 1:16
**123** 2:8
**1281** 107:14,20
**13** 98:23 99:1
**15** 54:13
**15:45** 21:10
**15:48** 107:1
**1700** 2:4,12
**1718** 116:7
**178** 31:10
**18** 1:16 3:1 127:5
**180** 31:15
**18th** 20:2
**19th** 19:8,19 21:2
21:11 26:18,21
27:18 29:20 69:18
95:24

**2**

**20** 10:5 54:13 128:3    **99** 10:13 11:6,13
**2002** 6:2
**2005** 10:17
**2006** 10:17
**2009** 97:3 98:22
**2010** 11:1 12:19,23
**2012** 5:17 19:8,19
  20:2 21:2,11
  26:18,21 27:19
  29:20 31:15 69:18
  95:24 108:2
**2015** 1:16 3:1 126:1
  127:5,15 129:17
**2020** 129:21
**20th** 108:2
**22** 104:1 109:15
**22-minute** 104:5
  105:9
**24** 17:11,12
**266** 107:23
**28-year-old** 112:22
**2986** 123:6
**2987** 123:7

**3**

**3:14-CV-00158** 1:7
**3:45** 21:10,12
**301** 2:18
**30th** 10:10

**4**

**4** 126:1 129:21
**43017** 1:22 126:9
**44114** 2:4
**45202** 2:12
**45422** 2:19
**45429** 1:16 2:8
**4th** 2:18 129:16

**5**

**5** 4:4
**50** 23:1
**525** 2:11
**5335** 1:16 2:7
**544** 23:11 25:1
  30:16 31:17 32:15

**6**

**60** 23:1
**614-309-1669** 1:22
**6723** 1:21 126:9

**7**

**7:15** 21:10

**8**

**8:00** 1:17 3:2

**9**

**9:17** 108:2
**95** 10:10 11:6