UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -

Harry G. Beyoglides, Jr.,
Special Administrator of the
Estate of Robert Andrew
Richardson, Sr., Deceased,
    Plaintiff,

    vs.                       Case No. 3:14-CV-00158

Phil Plummer/Montgomery County
Sheriff, et al.,
    Defendants

- - -

DEPOSITION OF DUSTIN JOHNSON
the Defendant herein, called by the Plaintiff under the
applicable Rules of Civil Procedure, taken before me,
Whitney Layne, a Notary Public for the State of Ohio, at
the law firm of Dinkler & Pregon, 5335 Far Hills Avenue,
Suite 117, Dayton, Ohio 45429 on November 17, 2015 at
8:00 a.m.

LAYNE & ASSOCIATES
6723 COOPERSTONE DRIVE
DUBLIN, OHIO  43017
614-309-1669

APPEARANCES

NICHOLAS DICELLO, ESQUIRE
SPANGENBERG, SHIBLEY & LIBER
1001 Lakeside Avenue
Suite 1700
Cleveland, Ohio 44114
    on behalf of the Plaintiff

JAMEY PREGON, ESQUIRE
DINKLER & PREGON
5335 Far Hills Avenue
Suite 123
Dayton, Ohio 45429
    on behalf of the Sheriff Defendants

CARRIE STARTS, ESQUIRE
REMINGER CO., LPA
525 Vine Street
Suite 1700
Cincinnati, Ohio 45202
    on behalf of the Defendants
    NaphCare, Inc., Nurse Felicia Foster,
    Nurse Jon Boehringer, Nurse Krisandra
    Miles, Medic Steven Stockhauser,
    and Brenda Garrett Ellis, M.D.

ANNE M. JAGIELSKI, ESQUIRE
ASSISTANT PROSECUTING ATTORNEY
301 West Third Street
4th Floor
Dayton, Ohio 45422
    on behalf of the Defendant
    Montgomery County Sheriff's Office

Page 2

---

EXAMINATION INDEX

DUSTIN JOHNSON

BY MR. DICELLO.............................Page 5

EXHIBIT INDEX
Exhibit                         Marked

1.........................................Page 43

Page 4

---

November 17, 2015
Tuesday Session
8:00 a.m.
- - -
STIPULATIONS

It is stipulated by and among counsel for the respective parties that the deposition of DUSTIN JOHNSON, the Defendant herein, called by the Plaintiff under the applicable Rules of Civil Procedure, may be taken at this time by the notary Whitney Layne; that said deposition may be reduced to writing in stenotypy by the notary, whose notes thereafter may be transcribed out of the presence of the witness; and that the proof of the official character and qualification of the notary is waived.

Page 3

---

DUSTIN JOHNSON

Being first duly sworn, as hereinafter
certified, deposes and says as follows:
CROSS-EXAMINTION
BY MR. DICELLO:
    Q    Good morning. Can you please state your name
for the court reporter and spell your last name?
    A    Dustin Johnson, J-O-H-N-S-O-N.
    Q    You're a corrections officer with the
Montgomery County?
    A    Yes, I am.
    Q    And do you go by Deputy or do you go by
Corrections Officer?
    A    Corrections officer.
    Q    All right. Corrections Officer Johnson --
    A    Yes, sir.
    Q    -- my name is Nick DiCello. We had a chance to
meet briefly off the record. You understand you're here
to have your deposition taken today?
    A    Yes.
    Q    I represent the family of Robert Richardson,
who passed away back in 2012 in the Montgomery County
Jail. Do you understand you're here today to have your
deposition taken in connection with a lawsuit that's been

Page 5

**Page 6**

1    filed surrounding that death?

2    A  Yes, I do.

3    Q  Have you ever been deposed before?

4    A  Yes, I have.

5    Q  How many times?

6    A  Just once.

7    Q  When was that?

8    A  I would say probably maybe three or four years

9  ago.  Actually, probably five now.

10    Q  Was it in connection with a civil case kind of

11  like this one?

12    A  Yes.

13    Q  Did it involve a situation that occurred at the

14  jail?

15    A  Yes, it did.

16    Q  Do you know if you were named as a defendant in

17  that case?

18    A  I was.

19    Q  Do you remember the name of the plaintiff?

20    A  It was Louis Al -- Louis --

21    Q  I'm sorry?

22    A  Louis Aldini.

23    Q  Did you ever testify in court in that case?

24    A  No.

Page 6

**Page 7**

1    Q  Was Mr. Aldini alleging some type of excessive

2  force?

3    A  Yes.

4    Q  Did it involve an in-custody death or is

5  Mr. Aldini still alive?

6    A  He's still alive.

7    Q  Do you know what the outcome of the case was?

8    A  Not exactly.  I knew that they settled outside

9  of court is what I was told.

10    Q  All right.  So you've been through this once

11  before.  And I'm sure your counsel has explained how it

12  goes.  But just so we have an understanding, I'll ask the

13  questions, you'll provide the answers.  Understood?

14    A  Yes.

15    Q  You've done a nice job until now.  We have to

16  wait for each other to stop talking so Whitney can take

17  down everything we're saying.  She's making a record,

18  okay?

19    A  Yes.

20    Q  You've also done a nice job up until now, but

21  your answers have to be audible; yes, no, or words, as

22  opposed to uh-huhs or huh-uhs.  Those kinds of things are

23  hard for the record, okay?

24    A  Yes.

Page 7

**Page 8**

1    Q  So one of us in the room might remind you of

2  that from time to time.  It's not to be rude.  It's just

3  to try to make sure we have a clear record.  Fair?

4    A  I understand.

5    Q  If I ask you a question you don't understand, I

6  want you to tell me that.  Will you do that?

7    A  Yes.

8    Q  Given that agreement we have, if you answer a

9  question that I've asked, I'm going to assume you

10  understood it.  Is that fair?

11    A  Yes.

12    Q  Not uncommon in these things, Officer Johnson,

13  that your memory might get jogged 15 minutes after I asked

14  a question, you know, you might remember something about

15  an answer you gave that's not right and you want to

16  correct it.  I want you to take the opportunity during

17  today's deposition to revisit any question that I've asked

18  or answer that you've given, okay?

19    A  Yes.

20    Q  You understand that you're under oath?

21    A  I do.

22    Q  You understand that the oath you're under today

23  is the same kind of oath you'd be under at a trial when

24  you're testifying in front of a jury.  You understand

Page 8

**Page 9**

1  that?

2    A  Yes, sir.

3    Q  And you understand that I'll be relying on your

4  answers today in connection with this matter?

5    A  I understand.

6    Q  What if anything did you do to prepare for

7  today's deposition?

8    MR. PREGON:  And I'll object to the extent it

9  calls for attorney/client privilege.  I assume you're

10  asking for things he did outside of talking to me or

11  counsel?

12  BY MR. DICELLO:

13    Q  Did you talk with counsel?

14    A  Yes.

15    Q  Don't tell me anything you talked with him

16  about, all right?

17    A  Okay.

18    Q  But did you do anything other than talk with

19  your lawyers to prepare for the deposition today?

20    A  I've reviewed my incident report from the jail

21  that I completed.

22    Q  Did you -- When is the last time you reviewed

23  the incident report?

24    A  Just before I walked in.  I re-read my

Page 9

**Page 10**

1  narrative.
2  Q  Your narrative?
3  A  Yes, sir.
4  Q  What about the video?  Have you ever seen the
5  video that captures portions of the incident?
6  A  Yes, I have.
7  Q  When is the last time you reviewed that video?
8  A  Probably last week.
9  Q  Last week?
10  A  Yes.
11  Q  Other than the incident report and portions of
12  the video, did you review anything else to help you
13  prepare for today's deposition?
14  A  No, sir.
15  Q  Other than speaking with counsel, did you talk
16  with anybody else to prepare for today's deposition?  I'm
17  not interested in scheduling and that kind of thing.
18  A  No, sir.
19  Q  Do you remember the incident?
20  A  Yes.
21  Q  Do you remember Robert Richardson?
22  A  Just from the incident, yes.
23  Q  What does he look like?  Do you remember what
24  he looked like?

**Page 11**

1  A  He was a larger black male.
2  Q  When you say "larger," that can mean different
3  things to different people.  So what do you mean?
4  A  He was very tall and --
5  Q  Very tall?
6  A  -- and I would consider overweight.
7  Q  How tall do you remember he was?
8  A  I would just guess around maybe six-one,
9  six-two.  He was on the ground when I observed him.
10  Q  What's your date of birth?
11  A  It's --
12  MR. PREGON:  I'm going to object to personal
13  questions.  If you want his date of birth, we can give
14  that to you off the record.
15  MR. DICELLO:  Okay.  Let's go off the record.
16  (Discussion held off the record.)
17  BY MR. DICELLO:
18  Q  And your height and weight?
19  A  It is five-six, approximately 270 pounds.
20  Q  Was that about your -- Obviously your height
21  was the same.  But was that about your same weight back in
22  May of 2012?
23  A  No, sir.
24  Q  Okay.  Can you -- This is the personal question

**Page 12**

1  part.
2  A  Yeah, it's been a long year.
3  Q  I apologize for asking.  But I think you
4  understand, given the nature of the circumstances,
5  people's heights and weights I think are relevant.  So how
6  much were you weighing back in 2012?
7  A  I was probably about 205, 210.
8  Q  And how old were you back in 2012?
9  A  Got to do some math.
10  Q  Yeah, I was going to let you do that.
11  A  26 years old, I guess.
12  Q  All right.  I do want to ask a little bit of
13  background.  Well, actually before we do that, you've told
14  me you remember Mr. Richardson being about six-one,
15  six-two, I think the terms you used is very tall, and he
16  was overweight.  How much do you think he weighed?
17  A  I'd say close to 350 pounds.
18  Q  Did you ever talk with him?
19  A  Not that I recall.
20  Q  Had you ever met Robert Richardson before this
21  incident?
22  A  Not that I recall.
23  Q  Anything else you remember about him?  Did he
24  have facial hair; do you know?

**Page 13**

1  A  I don't remember.
2  Q  Did he have long hair, short hair?  Was he
3  bald?  Do you remember that?
4  A  He was shorter hair.
5  Q  Tattoos, anything like that that you remember?
6  A  Not that I remember.
7  Q  Do you remember him saying anything during that
8  interaction you had with him?
9  A  No.
10  Q  I do want to get a little bit of background
11  information from you, Officer Johnson.  Can you tell me
12  where you -- Are you from this local area?
13  A  Yes, sir.
14  Q  And maybe, I don't want to get too much into
15  your background, but when did you graduate high school?
16  A  2003.
17  Q  Any formal education after high school?
18  A  Just with the sheriff's office.  I've been
19  through the basic corrections academy.
20  Q  Tell me a little bit about your experience with
21  the corrections academy and the sheriff's office.
22  A  As far as like when I was hired in?
23  Q  Sure.  Tell me when you started and how you
24  ended up where you are now.

1  A  Okay. I was hired in in 2004 at the end of
2  June. So coming up on 12 years.
3  Q  Okay.
4  A  When we were hired in, we would be put into our
5  orientation, which lasts a week. From there, we are
6  assigned to the jail with an FTO, field training officer.
7  Q  Uh-huh.
8  A  And then upon completion of your field training
9  officer, within your first year we'll go to the basic
10  corrections academy at Sinclair. It lasted about 30 days.
11  So a month of training. We go over everything in the
12  academy there as far as defensive tactics, medical
13  procedures, first aid, CPR. And from there, I go back
14  into the jail after the completion of that, we take the
15  state certified test, and then we're off of our probation
16  period at the end of the year. At the end of the year, it
17  starts each year after we have to go to our training
18  center and be recertified with our training.
19  Q  Is that at Sinclair?
20  A  It's at our training facility.
21  Q  And where is that?
22  A  It's off of Stop 8.
23  Q  When did you come off your probationary period?
24  Would that have been 2005?

Page 14

1  A  2005.
2  Q  So when -- as of coming off your probationary
3  period in 2005, what was your title?
4  A  Corrections officer.
5  Q  And what's your current title or rank?
6  A  I'm a corrections officer. I'm also a field
7  training officer.
8  Q  When did you become an FTO?
9  A  Probably five years ago.
10  Q  So you've been employed with the sheriff's
11  office from 2004 all the way through today?
12  A  Yes.
13  Q  Any other meaningful employment other than
14  working for the sheriff's office?
15  A  No, sir.
16  Q  Why did you become a corrections officer?
17  A  To get my foot in the door into law
18  enforcement, to help people.
19  Q  I want to ask some questions about some of the
20  training you've received. You alluded to some of it and
21  you did mention some medical training, and I'll follow up
22  on that in a little bit as well.
23  A  Yes.
24  Q  Have you received any training in prone

Page 15

1  positioning?
2  A  Yes.
3  Q  Can you tell me what it is you've received,
4  when you learned about this? What's your understanding --
5  Let me start off this way and work into it. What's your
6  understanding of prone restraint? What does that mean to
7  you?
8  A  Prone restraint would be having the inmate
9  ideally on his stomach area, staying away from his head
10  area, his back area, we're securing the limbs, normally
11  there's sufficient enough officers that each officer
12  ideally has a limb to secure to take away movement to
13  prevent harm to himself or to us officers.
14  Q  Prone positioning, you understand, is facedown
15  on the belly?
16  A  Yes.
17  Q  And tell me, I interrupted you, you were going
18  to tell me the training that you had when it comes to
19  prone positioning or prone restraint. So tell me about
20  that.
21  A  I'm sorry. I didn't understand your question.
22  Q  Yeah. What kind of training have you received
23  about prone positioning or prone restraint?
24  A  Annually, we go over defensive tactics, and

Page 16

1  that would be included in our defensive tactics, and also
2  in the basic corrections academy we learn how to properly
3  prone inmates.
4  Q  And what is that? I think you've told me where
5  you learned this. But I'm actually asking substantively.
6  What is the training you've received about when prone
7  restraint is appropriate, when it's not appropriate, is it
8  ever appropriate, those kinds of questions.
9  A  We secure them in the prone position, you know,
10  for handcuffing, any time to prevent injury to the inmate
11  or to us.
12  Q  Anything else that you've learned about prone
13  positioning or prone restraint?
14  A  No.
15  Q  Any training in terms of how long someone can
16  be kept in the prone position?
17  A  No.
18  Q  So let's go back to May of 2012. It's been
19  awhile ago now.
20  A  Yes.
21  Q  What shift were you working? Do they call them
22  shifts?
23  A  Yes.
24  Q  What shift were you working at the jail.

Page 17

5 (Pages 14 to 17)

1    A  Oh.  We also call them watches.

2    Q  Watches, thank you.

3    A  First -- I'm sorry, second watch, which would

4    be considered first shift.

5    Q  Well, that's confusing.

6    A  Yes.

7    Q  Second watch first shift, what are those hours?

8    A  7:30 to 3:30.

9    Q  7:30 a.m.?

10   A  Yes, sir.

11   Q  To 3:30 p.m.?

12   A  Yes, sir.

13   Q  And as of the date that this happened, I

14   believe it was May 19th, 2012, is that your recollection?

15   A  Yes.

16   Q  A Saturday?

17   A  I'd have to check my report.  Yes, it was

18   Saturday.

19   Q  Is the jail busier on the weekends?

20   A  No.

21   Q  No?  Okay.  Some places in the country jails

22   get pretty busy on the weekends.

23   A  Depends.  Like the housing units itself are

24   not.  Our first floor area is usually busier.  This was up

Page 18

---

1    in housing, the place of the incident.

2    Q  So on Saturday, May 19th, 2012, where were you

3    assigned inside the jail for second watch first shift?

4    A  Prints and photo officer.

5    Q  And describe for me what that position entails.

6    What responsibilities are there?

7    A  I'm in charge of taking mug shots and

8    fingerprinting the new arrivals that are coming into the

9    jail.  It's part of our booking process.

10   Q  So where are you typically stationed?

11   A  The first floor.

12   Q  First floor?

13   A  Yes.

14   Q  So is it fair to say that you're kind of part

15   of the intake team --

16   A  Yes.

17   Q  -- that's handling the processing of new

18   detainees?

19   A  Yes, sir.

20   Q  Do you refer to all the folks at the jail as

21   prisoners or inmates?

22   A  Inmates.

23   Q  Inmates, okay.

24       MR. PREGON:  All of them who are in housing or

Page 19

---

1    down in booking?

2       MR. DICELLO:  Yeah, that's what I'm asking.

3    BY MR. DICELLO:

4    Q  The folks down in booking, you still call them

5    inmates?

6    A  Yes.

7    Q  And once they're classified and put into a

8    housing area, you call them inmate?

9    A  Yes.

10   Q  And when you refer to an inmate, do you call

11   them Inmate Richardson?

12   A  Yes.

13   Q  You don't use any first names?

14   A  Very rarely we use first names.  Possibly just

15   the last name.  But it's Inmate Richardson or

16   Mr. Richardson.

17   Q  Prior to Robert being detained at the jail this

18   weekend that we're talking about back in May of 2012, had

19   you ever had any interaction with him at the jail?

20   A  Not that I can recall.

21   Q  Were you involved in his booking process at

22   all, if you know?

23   A  Not that I recall.

24   Q  Now, Mr. Richardson was housed on what floor?

Page 20

---

1    A  It's fourth floor of the new side area, which

2    the housing unit itself is called Delta Pod.

3    Q  Delta Pod.  And you said that's on the fourth

4    floor?

5    A  Yes, sir.

6    Q  In a typical shift, if there is such a thing,

7    or a typical watch, as the prints and photos officer do

8    you spend most of your time on the first floor, I presume?

9    A  Yes, I do.

10   Q  So can you tell me, and you can reference your

11   report, Officer, but tell me how it is that you came to

12   find yourself on the fourth floor of the Delta Pod on May

13   19th, 2012.

14   A  Yes, sir.  It was the end of our shift.  It was

15   close to the end of it.  I was -- Corrections Officer

16   Henning, it was his first day on his FTO period, he was

17   assigned to me, and it came out on the radio there was a

18   medical issue in Delta Pod.  So due to the lack of time

19   of, you know, officers being available because of our roll

20   call for next shift, I informed Officer Henning that we

21   were going to respond to the pod, because, you know, for

22   more officers to respond, we were available, so we went

23   there to assist.

24   Q  Explain that a little bit for me.  I don't want

Page 21

6  (Pages 18 to 21)

1    to put words in your mouth, but I think you said due to
2    the unavailability of some officers because there was roll
3    call?
4      A   Yes.
5      Q   Explain what was happening such that there
6    wasn't enough officers to respond.
7      A   We're in the middle of a shift change during
8    this current time. Officers from the housing area come
9    down and turn in, you know, mail, the keys they were
10    assigned, the radios they were assigned, and the new
11    officers coming on are retrieving those items. We receive
12    a roll call that lasts approximately ten minutes, and from
13    that point you'll go to your assigned area. So because
14    that was happening, I understood the time of day, so you
15    know, any incident we try to get as many officers there.
16    So we're available through shift change. So me and my
17    trainee responded to the area to assist.
18      Q   Who was the trainee that you had with you that
19    day?
20      A   It was Corrections Officer Henning.
21      Q   Henning?
22      A   Yes.
23      Q   So he was still in his probationary period?
24      A   It was his first day in the jail, yes.

Page 22

1      Q   First day in the jail?
2      A   Yes.
3      Q   So he had gone through the academy and the
4    training and this was his first day at the jail, or he
5    hadn't gone through that yet?
6      A   He had not gone through the corrections
7    academy. He would have served his orientation prior to
8    being assigned with me.
9      Q   Do you know how old Officer Henning was at that
10    time?
11      A   I do not, sir.
12      Q   Younger than you, you think, or is this
13    somebody entering corrections at an older age?
14      A   I would say a few years younger than me, yes.
15      Q   How is it that you became aware of this request
16    for assistance because of a medical situation? Was it
17    broadcast over a radio?
18      A   It would have been broadcast on the radio. I
19    don't recall if it was the housing officer or our security
20    control officer that called it down.
21      Q   And is it a code that's called out that you
22    interpret as a medical situation, or do they say "we have
23    a medical issue"?
24      A   Yes, we don't use codes anymore. It was just a

Page 23

1    medical issue.
2      Q   And you don't remember who broadcast that out?
3      A   I do not, sir.
4      Q   Is that something that happens with any kind of
5    regularity at the jail, where people are broadcasting
6    assistance, requesting assistance because of medical
7    issues?
8      MR. PREGON: Objection.
9    BY MR. DICELLO:
10      Q   Go ahead.
11      A   Multiple times a day, sir.
12      Q   Multiple times a day. Among the issues that
13    you guys are dealing with in terms of medical issues that
14    you're responding to, can you tell me some of the things
15    that you guys get called to respond to?
16      A   Any possible medical issue that you can think
17    of we're typically called, whether it be seizures, chest,
18    you know, problems, chest pains, low blood sugar, high
19    blood sugar.
20      Q   Okay.
21      A   Various.
22      Q   In terms of seizures, how often do you think
23    you get called to respond to people who are having or
24    thought to may be having a seizure?

Page 24

1      A   It varies. I would say I respond to those at
2    least weekly.
3      Q   So at least once a week you respond to a
4    seizure call?
5      A   Yes, sir.
6      Q   Sometimes more than that?
7      A   Yes.
8      Q   You told me you had some medical training. I
9    want to break that down a little bit. I think you
10    mentioned that you're trained in first aid and CPR;
11    correct?
12      A   Yes.
13      Q   Are you also trained to recognize medical or
14    mental health conditions in members of the community who
15    are detained in the jail?
16      A   Yes.
17      Q   Tell me a little bit about that training.
18      A   Each year in our annual training, we go over it
19    and we have a mental health process that we go through.
20    Our Samaritan Behavioral Health therapist, they provide us
21    with monthly training. I've went through crisis
22    intervention training, the CIT class. I've -- Other than
23    that, just on-the-job training.
24      Q   So tell me, have you been trained to recognize

Page 25

7 (Pages 22 to 25)

1  the signs and symptoms of somebody who is having a
2  seizure?
3      A  Yes.
4      Q  Can you tell me -- I know you're not a doctor
5  or a licensed medical professional.  But as a corrections
6  officer who responds to seizure calls on a weekly basis,
7  what kind of signs and symptoms have you been trained to
8  recognize for people who are having seizures?
9      A  The obvious one of them being unconscious,
10 oftentimes they'll be shaking, sometimes they are still --
11 our number one goal is to prevent injury to themselves, so
12 we're going to secure the head, make sure it's not
13 striking anything.  We're going to, you know, brace them
14 in a way, typically on their side, to a recovery position,
15 to prevent injury to themself.
16     Q  Bloody sputum or saliva in the mouth, is that
17 something you see in people that have seizures, or no?
18     A  Sometimes, yes.  They can bite their tongue,
19 the inside of their lips.
20     Q  How about disorientation?  Is that something
21 you see in people who are having seizures or coming out of
22 a seizure?
23     A  Yes.
24     Q  And I think you've told me, but let me ask you:

Page 26

1  on the housing unit, you know, they call for help up
2  there, one guy is laying on the ground, I respond, they
3  can attack us.  So we're trained, you know, to secure the
4  scene first of all.  Once we secure the scene, then we're
5  kind of looking for physical danger cues from the inmates
6  to see what exactly is happening.  So we're evaluating the
7  incident itself.
8      Q  Did there come a point in time after you
9  encountered this situation where you had satisfied
10 yourself that Mr. Richardson did not have a weapon on him?
11     A  It wasn't an exact time of that, but I
12 understood by his behavior that he was, you know -- he
13 wasn't necessarily a -- going to assault me intentionally.
14     Q  When was it you came to that realization, that
15 Mr. Richardson wasn't going to assault you?
16     A  Once we had him secured in the handcuffs.
17     Q  And I apologize if I asked the question, I'm
18 not sure I got an answer.  Once you had him secured in
19 handcuffs, were you satisfied that he was unarmed?
20     A  He was secured.  I did not pat him down for a
21 weapon.  But he was secured in handcuffs.  And due to the
22 officers that were there, we had sufficient staffing that
23 I wasn't concerned for my safety at that point.
24     Q  Based on your observations of Mr. Richardson,

Page 28

1  Are you telling me that the goal of the corrections
2  officers when they respond to somebody who is having a
3  seizure is the safety of the patient or the inmate?
4      A  Yes.
5      Q  I'm going to go through your statement and ask
6  exactly what you saw, when you saw it, and we'll do all
7  that, Officer, but I want to go through a couple of things
8  first.  You knew that Robert Richardson was unarmed;
9  correct?
10     MR. PREGON:  Objection.
11     A  I would assume so.  But there are weapons of
12 opportunity inside the facility.
13 BY MR. DICELLO:
14     Q  You had no reason to believe at the time you
15 encountered Mr. Richardson that he was armed with a
16 weapon; correct?
17     MR. PREGON:  Objection.
18     Go ahead.
19     A  We're again trained to, you know, expect the
20 worst, hope for the best.  In that scenario, my past
21 training, sometimes it's been used in past for inmates to
22 get us to respond to a certain part of a jail, something
23 happened in a different part of the jail, or it can be
24 used as a ploy for us to be assaulted.  If I'm by myself

Page 27

1  did you understand he was having some type of medical
2  episode?
3      A  That's what it appeared, yes.
4      Q  You knew that he was obese; correct?
5      A  I observed that, yes.
6      Q  Mr. Richardson was asking to be let up;
7  correct?
8      A  I don't recall him saying anything.
9      Q  Do you recall Mr. Richardson saying he was
10 having trouble breathing?
11     A  No.
12     Q  Do you recall him saying, "I've got to get out
13 of here"?
14     A  I don't recall him saying anything.
15     Q  Did he appear disoriented to you?
16     A  Very much so.
17     Q  Did you understand that he was in need of
18 medical attention?
19     A  Yes.
20     Q  Did you see that he was bleeding from his
21 mouth?
22     A  I did observe that.
23     Q  When you first arrived, he was already on the
24 ground; correct?

Page 29

8 (Pages 26 to 29)

Page 30

```
 1    A  Yes.
 2    Q  He never tried to assault you; correct?
 3    A  No.
 4    Q  You sustained no injuries; correct?
 5    A  Correct.
 6    Q  He never verbally threatened you; correct?
 7    A  No.
 8    Q  He never verbally threatened anyone as far as
 9  you observed; correct?
10    A  Correct.
11    Q  And as far as you observed, Mr. Richardson
12  never hurt anyone; true?
13    A  This is true.
14    Q  As far as you observed, did Mr. Richardson try
15  to assault anyone?
16    A  No.
17    Q  This happened on Saturday.  Did you work the
18  day before?  Did you work Friday?
19    A  No, sir.
20    Q  Friday was your day off?
21    A  Yes.
22    Q  As of the time that you encountered
23  Mr. Richardson, you were unaware of any crime he had
24  committed; correct?
```

Page 31

```
 1    A  Correct.
 2    Q  At the time you encountered Mr. Richardson, he
 3  hadn't violated any jail rules, had he?
 4    A  I was unaware of that if he had or hadn't.  It
 5  was, to my -- to my knowledge, my first dealing with him.
 6    Q  As far as you knew, you were unaware of any
 7  jail rules that he had violated; correct?
 8    A  Correct.
 9    Q  Do you understand Mr. Richardson, based on the
10  circumstances, to be at high risk of positional
11  asphyxiation?
12    MR. PREGON:  Objection.
13    A  No, he was in prone position.  There was no
14  officers around his neck or his upper back area to cause
15  that pressure.
16  BY MR. DICELLO:
17    Q  Do you know what positional asphyxiation is?  I
18  know you're not a medical doctor or anything.  I'm not
19  asking for a medical definition.  But do you know what the
20  concept of positional asphyxiation is?
21    A  Yes.
22    Q  And from a corrections officer's perspective,
23  what is that?
24    A  Enabling his airway for him to breathe.
```

Page 32

```
 1    Q  Do you know what some of the risk factors are
 2  for folks that suffer from positional asphyxia?
 3    A  Yes.
 4    Q  Can you list them for me?
 5    A  I would say loss of consciousness and
 6  ultimately death.
 7    Q  But are some people -- what I'm trying to get
 8  at are are some people more susceptible to dying from
 9  positional asphyxiation as compared to others?
10    MR. PREGON:  Objection.
11    A  I don't know that.  To me, it's just their
12  positioning.
13  BY MR. DICELLO:
14    Q  So whether or not someone is obese, do you know
15  if that has any bearing on whether or not somebody is more
16  susceptible to die from positional asphyxia versus less
17  susceptible?
18    MR. PREGON:  Objection.
19    A  I wouldn't -- I wouldn't know that answer.
20  BY MR. DICELLO:
21    Q  I should have told you at the beginning,
22  Officer.  If you don't know an answer, that's perfectly
23  fine.
24    A  Okay.
```

Page 33

```
 1    A  I don't know or I don't remember.
 2    A  Okay.
 3    Q  I just treat everybody as the same.
 4    A  Sure.
 5    Q  What about preexisting heart disease?  Do you
 6  know if that's a risk factor for positional asphyxiation?
 7    MR. PREGON:  Objection.
 8    Go ahead.
 9    A  I do not know.
10  BY MR. DICELLO:
11    Q  Physical struggle?  Do you know if that puts
12  somebody at high risk for positional asphyxia?
13    MR. PREGON:  Objection.
14    Go ahead.
15    A  I would say increase it, just because their
16  heart rate would be faster.
17  BY MR. DICELLO:
18    Q  What about the use of rear handcuffing while
19  someone is in a prone position?  Do you know if that
20  increases the risk of positional asphyxiation?
21    MR. PREGON:  Objection.
22    Go ahead.
23    A  I do not know.
24  BY MR. DICELLO:
```

9 (Pages 30 to 33)

1    Q   What about foam or mucus coming from the nose
2    or mouth?  Do you know if that's a sign of positional
3    asphyxiation?
4        MR. PREGON:  Objection.
5        Go ahead.
6    A   I do not know.
7    BY MR. DICELLO:
8    Q   Somebody saying they can't breathe, verbal
9    complaints of being unable to breathe.  Do you know if
10   that's a sign or symptom of potential positional
11   asphyxiation?
12       MR. PREGON:  Objection.
13       Go ahead.
14   A   It would be a sign, because they're saying they
15   can't breathe.  But as far as their, you know, discomfort,
16   I would assume, yes, and then we would readjust to better
17   let them breathe.  But --
18   BY MR. DICELLO:
19   Q   Drug use?  Do you know if that increases the
20   risk of positional asphyxiation?
21       MR. PREGON:  Objection.
22       Go ahead.
23   A   I do not know.
24   BY MR. DICELLO:

Page 34

1    agreed?
2        MR. PREGON:  Objection.
3    A   I would disagree.
4    BY MR. DICELLO:
5    Q   So you think there are times you can use more
6    force than is necessary but it's not excessive?
7    A   Yes.
8        MR. PREGON:  Objection.
9    BY MR. DICELLO:
10   Q   What situations are those that you can use more
11   force than is necessary?
12   A   Well, if I'm not getting struck, but he's
13   trying to strike me, you know, I haven't gotten struck
14   yet, but I can then strike that person to prevent him from
15   striking me.
16   Q   Okay.
17   A   So there has been no -- he hasn't actually
18   assaulted me, I've prevented the assault.
19   Q   So in that situation you would strike to
20   prevent being struck?
21   A   Yes.
22   Q   And you think that is a situation where it's
23   more force than is necessary?
24       MR. PREGON:  Objection.

Page 36

1    Q   So it sounds to me like you hadn't had training
2    in the risk factors that can predispose somebody to
3    positional asphyxiation; fair?
4    A   We've had training to the -- in the recovery
5    position to prevent asphyxiation.  But I don't know the
6    risk factors.  Because ideally, we've prevented them from
7    that.  So I've never had an issue with it.
8    Q   I want to ask kind of some general concepts and
9    rules and see if you agree, disagree, or don't know, okay?
10   A   Yes.
11   Q   Corrections officers must never apply
12   restraints in ways that may restrict someone's breathing;
13   agreed?
14   A   I would agree.
15   Q   Corrections officers must only use that level
16   of force that is reasonable and necessary; agreed?
17       MR. PREGON:  Objection.
18       Go ahead.
19   A   Agreed.
20   BY MR. DICELLO:
21   Q   Unnecessary force is excessive force; true?
22       MR. PREGON:  Objection.
23   A   I'm sorry.  Could you ask the question?
24   Q   Sure.  Unnecessary force is excessive force;

Page 35

1        Go ahead.
2    A   It was necessary to prevent it.
3    BY MR. DICELLO:
4    Q   Right.  So my question is a little different.
5    And I think your example is saying, well, I need to strike
6    that person to prevent being struck; right?
7    A   Yes.
8    Q   I would describe that situation as necessary
9    force.  Would you agree?
10   A   Depends on who you would ask.
11   Q   I'm asking you.
12   A   I would say yes.
13   Q   So with that kind of understanding, do you
14   agree that unnecessary force, force that is not necessary
15   under the circumstances, is excessive?
16       MR. PREGON:  Objection.
17       Go ahead.
18   A   I'm sorry, could you ask this one more time?
19   BY MR. DICELLO:
20   Q   Yeah, that's okay.  Unnecessary force, in other
21   words force that is not necessary, is excessive force?
22       MR. PREGON:  Objection.
23   A   That would be true.
24   BY MR. DICELLO:

Page 37

10 (Pages 34 to 37)

1    Q   Placing members of our community who are in
2    restraints in a prone position is never an acceptable
3    practice, is it?
4        MR. PREGON:  Objection.
5        A   I'm sorry, could you -- could you ask the
6    question?
7    BY MR. DICELLO:
8        Q   That's okay.  I can repeat this as many times
9    as you want.
10       Placing members of our community who are in
11   restraints -- when I say "restraints," I mean handcuffs.
12       A   Yes.
13       Q   So placing members of the community who are in
14   handcuffs, their hands cuffed behind their back, in a
15   prone position, is never an acceptable practice, is it?
16       MR. PREGON:  Objection.
17       A   It is.  It's a common practice, I would say.
18   BY MR. DICELLO:
19       Q   Common at the jail?
20       MR. PREGON:  Objection.
21       A   Yes.
22   BY MR. DICELLO:
23       Q   It is prohibited; agreed?
24       MR. PREGON:  Objection.

Page 38

1        A   No.
2    BY MR. DICELLO:
3        Q   Your understanding of the policies, the rules,
4    the laws, whatever applies to you folks in the jail, is
5    that positioning a member of our community in a prone
6    position with their hands cuffed behind their back is
7    permitted; correct?
8        A   Yes, for a short time.
9        Q   And it's common; true?
10       MR. PREGON:  Objection.
11       A   Until the incident is over, yes.
12   BY MR. DICELLO:
13       Q   I've got a definition of prone restraint here
14   that I have to read to you and see if you agree.  I'm
15   going to take it slow, because it's kind of a convoluted
16   definition.
17       MR. PREGON:  Objection.
18   BY MR. DICELLO:
19       Q   But sometimes this happens when you have to ask
20   these questions.  Do you understand that prone restraint
21   means all items or measures used to limit or control the
22   movement or normal functioning of any portion or all of an
23   individual's body while the individual is in a facedown
24   position for an extended period of time?  Do you agree

Page 39

1    with that definition of prone restraint?
2        MR. PREGON:  Objection.
3        A   Could you read it one more time?
4    BY MR. DICELLO:
5        Q   Yeah.  Prone restraint --
6        A   Yes.
7        Q   -- is all items or measures used to limit or
8    control the movement or normal functioning of any portion
9    or all of an individual's body while the individual is in
10   a facedown position for an extended period of time?
11       A   Okay.
12       MR. PREGON:  Objection.
13   BY MR. DICELLO:
14       Q   Do you agree with that definition of prone
15   restraint?
16       A   Yes.
17       Q   Do you know what a transitional hold is?  Have
18   you ever heard that term?
19       A   No, sir.
20       Q   Have you ever received any training on a
21   transitional hold?
22       A   Not in that terminology, no.
23       Q   Have you ever heard of a -- When you're talking
24   about restraint or struggling with a member of the

Page 40

1    community who is detained at the county jail, have you
2    ever heard of something called the three-minute rule?
3        A   No, sir.
4        Q   I'll state it without using that title, but
5    have you ever heard that a member of our community who is
6    detained at the Montgomery County Jail is at an elevated
7    risk of sudden death after struggling with corrections
8    officers for at least three minutes?
9        MR. PREGON:  Objection.
10       A   No, sir.
11   BY MR. DICELLO:
12       Q   Never heard about that?
13       A   No, sir.
14       Q   Do you agree that corrections officers must
15   never restrain people in ways that pose an unnecessary
16   risk of death?
17       MR. PREGON:  Objection.
18       A   Yes, sir.
19   BY MR. DICELLO:
20       Q   And that's one of the jobs of the corrections
21   officer, is to avoid restraining people in ways that pose
22   an unnecessary risk of death; agreed?
23       A   Yes.
24       Q   Faced with two or more ways to restrain a

Page 41

11  (Pages 38 to 41)

1    member of the community who finds him or herself detained
2    at the Montgomery County Jail, the corrections officer
3    must choose the safer way; agreed?
4         A    Yes.  Typically, that's going to be decided by
5    our supervisors at that point.
6         Q    Are you aware of any research or literature in
7    your field that finds that prone restraint is a hazardous
8    and potentially lethal position?
9         A    No.
10        Q    Has anyone ever told you that the use of prone
11   restraint is prohibited in the state of Ohio?
12        A    No.
13        Q    Have you ever reviewed any executive orders by
14   the governors, past couple of governors in the state of
15   Ohio that say the use of prone restraint is prohibited in
16   this state?
17        A    No.  The only thing I can recall is they term
18   it as hog-tying, where they -- they're handcuffed in some
19   sort of leg restraints.  Apparently, years ago they would
20   use that to tie to where they're behind their backs and
21   the leg restraints and the arched back.  And that would be
22   called hog-tying.
23        Q    You guys aren't doing that?
24        A    Correct.

Page 42

1         Q    Do you know why that was outlawed?
2         A    Because of, I would say, injury and death for
3    as -- asphyxiation.
4         Q    I'll struggle with that, too.
5         A    Yes, sir.
6         Q    As a rule, as soon as someone is handcuffed, to
7    protect that person's safety you need to get him or her
8    off of his or her stomach; agreed?
9         A    It depends on the scenario.  Typically, yeah,
10   we're going to put them in the recovery position,
11   depending on, you know, their actions.
12        Q    Your report doesn't have any numbers at the
13   very bottom, does it, any MC numbers?
14        A    No, sir.
15        Q    That's okay.
16        A    It says eight of 14.
17        MR. PREGON:  I've got one that has numbers, if
18   you want.
19        (Exhibit No. 1 marked for identification.)
20   BY MR. DICELLO:
21        Q    Officer Johnson, I'm handing you what's been
22   marked as Plaintiff's Exhibit 1.  And I want to direct
23   your attention to the bottom.  There's these Bates stamp
24   numbers, MC 1282.  Do you recognize MC 1282 of Exhibit 1

Page 43

1    as your narrative statement?
2         A    Yeah.  This is the beginning part of it, yes.
3         Q    Let me ask you some questions about how and
4    when this is filled out.  It looks like the date reported
5    is May 20th, 2012 at 8:30 in the morning; correct?
6         A    Yes.
7         Q    So is this something you would have filled out
8    on a computer the following day when you got into work?
9         A    Yes.
10        MR. PREGON:  Just so we're clear, there's one
11   that's above and one below.  Which one are we talking
12   about?
13        MR. DICELLO:  His narrative statement.
14        MR. PREGON:  So is the top one yours or is it
15   the bottom?
16        THE WITNESS:  The bottom.  Or I'm sorry --
17        MR. PREGON:  There's one after it, too.
18        THE WITNESS:  The top.
19        MR. PREGON:  It's the top?
20        THE WITNESS:  Yeah.
21   BY MR. DICELLO:
22        Q    You're officer 746?
23        A    Yes, sir.
24        Q    So you filled out this report on May 20th, 2012

Page 44

1    at 8:34 approximately in the morning; correct?
2         A    Yes.
3         Q    Did you type this into a computer?
4         A    Yes.
5         Q    Where is that computer located?
6         A    It would depend on my assignment the following
7    day.  We have -- We have approximately 80 of these
8    computers.  So just depending on what terminal I was at.
9         Q    Officer Johnson, you used force against Robert
10   Richardson; correct?
11        A    No.
12        Q    You didn't use any force against him?
13        A    No.
14        Q    So you didn't touch him?
15        A    I touched him, but I didn't use force.
16        Q    You restrained him; true?
17        A    I secured him in handcuffs.
18        Q    That's not -- You don't consider that a use of
19   force?
20        A    No.
21        Q    So I presume then you didn't fill out any Use
22   of Force Reports; correct?
23        A    Not that I recall.
24        Q    Based on what you saw, and we'll get to it,

Page 45

12 (Pages 42 to 45)

1  okay, but based on what you saw, nobody used any force
2  against him; correct?
3       MR. PREGON:  Objection.
4     A   Correct.
5  BY MR. DICELLO:
6     Q   So nobody filled out any Use of Force Reports;
7  true?
8     A   Not that I recall.
9     Q   So from your perspective, the incident
10  involving Robert Richardson did not involve any use of
11  force; true?
12       MR. PREGON:  Objection.
13     A   None that I would -- seen.
14  BY MR. DICELLO:
15     Q   Yes, that's correct, it didn't involve any use
16  of force?
17     A   None that I had seen, correct.
18     Q   So I was asking you where you filled this out,
19  it's on a computer, depending on where you were assigned
20  the following day; correct?
21     A   Yes.
22     Q   Now, walk me through it.  When you get into the
23  computer, do you sign in?
24     A   Yes.  We sign in our domain user, which opens

Page 46

1  up the computer, and then we have our Tiburon system,
2  which is a separate log-in, and we'll log in on Tiburon,
3  and I will complete my narrative to this report.
4     Q   Is what we're looking at here what you see on
5  the screen when you type it into this box?
6     A   Yes.
7     Q   Now, when you log into Tiburon and you go to
8  fill out an incident report, are you able to see these
9  other narrative statements that are filled out by folks,
10  assuming they were filled out before you logged on?
11     A   Yes.
12     Q   Who ordered you or who instructed you, if
13  anyone, to fill out this narrative report?
14     A   I don't specifically recall being ordered to.
15  It would have just been --
16     Q   Part of the protocol?
17     A   It's common practice of me being involved in an
18  incident, I would do an incident report.
19     Q   Let me ask:  Why didn't you fill out an
20  incident report immediately after or shortly after the
21  incident actually occurred?
22     A   My time of the end of my watch was 3:30.  So
23  due to the timing of it, versus, you know, getting into
24  overtime, I would just come in and complete the report the

Page 47

1  following day while I was assigned on duty.
2     Q   Did you speak with any other corrections
3  officers between the time you ended your encounter with
4  Mr. Richardson and the time you started filling out this
5  report?
6     A   Not that I specifically recall.
7     Q   And when you logged in to fill out your
8  narrative report, did you read the other narratives that
9  had already been put into the computer?
10     A   Not that I recall.
11     Q   You had access to them, though?
12     A   Yes.
13     Q   So let's go through the narrative just a little
14  bit.  And a lot of this is repetitive, I apologize.  But
15  it indicates that at approximately 15:22, so that's 3:22
16  in the afternoon for those of us who don't use military
17  time as often as you probably do; correct?
18     A   Yes, sir.
19     Q   That's right around shift change; correct?
20     A   Correct.
21     Q   You responded to D Pod for an unknown medical
22  condition in cell number 544.  And that's all true;
23  correct?
24     A   Yes.

Page 48

1     Q   So it sounds to me like you have a memory
2  independent from just reading this narrative.  Is that
3  true?
4     A   Yes.
5     Q   Let's try to go through your independent memory
6  first and then we can look at the narrative report to help
7  us out.
8     A   I understand.
9     Q   But in your own mind's eye, can you tell me
10  what you recall seeing as you entered into the D Pod?
11     A   Initially, I -- as I entered, I automatically
12  observed a large black male, which ended up being
13  Mr. Richardson, I observed his panic and his disoriented
14  look in his eyes.  Then I was examining the room to secure
15  the scene, and I observed his inmate, his cellmate,
16  standing above him, and he was also -- you know, you can
17  tell the concern on his face.
18     Q   Let me stop.  I want to break it down.  You
19  said the panic and disoriented look in his eyes.  I know
20  that can be a hard thing to describe.  But what is it
21  about his expression or demeanor, that is Mr. Richardson,
22  that caused you to conclude he was panicked and
23  disoriented?
24     A   I would say his aggressive movement, he was

Page 49

Page 50

1    very tense and moving erratically to where you could tell
2    he didn't know what was going on.  Initially I was, you
3    know, wondering if, you know, there was some kind of
4    physical altercation and his cellmate had hit him.  But
5    after observing his cellmate, you could tell he was
6    concerned for Mr. Richardson.
7        Q   And when you first -- what you just described
8    you first observed, what was Mr. Richardson's position?
9        A   He was sitting in a position on his buttocks
10   and he was kind of facing out towards the cell, and his
11   cellmate was kind of standing above him kind of behind
12   him.
13       Q   Were there any other corrections officers on
14   scene when you responded?
15       A   There was Corrections Officer Benjamin was
16   there, and my field training --
17       Q   Henning was with you?
18       A   Henning was behind me.
19       Q   Tell me where Officer Benjamin was and what you
20   noticed she was doing.
21       A   My memory, the door swings out this way.
22       Q   From cell 544?
23       A   Yes.  So she was standing at the door with the
24   door open.

Page 51

1        Q   All right.  When you first got there --
2        A   To my left.
3        Q   Thank you.
4            When you first got there, was anybody saying
5    anything?
6        A   Not that I can recall.
7        Q   Okay.  Did you say anything when you first
8    arrived?
9        A   Not that I can recall.
10       Q   Okay, I interrupted you.  Why don't you tell in
11   your own mind's eye, again, what do you recall happening
12   next?
13       A   Short time after that I respond, Sergeant
14   Jackson was there, so I now remember him being there at
15   this time.  And you can tell, you know, we're trying to
16   ask him, you know, "Hey, what's going on," you know, "Are
17   you all right, man"?  He has no verbal response that I can
18   recall.  So you can tell he's trying to like get up and
19   move out.  And due to his large nature, it was like, oh,
20   well, we don't want this guy to get up not knowing what's
21   going on.  He was showing symptoms at this time to me that
22   he could possibly be having a seizure.  So my concern was
23   him getting up, moving, causing more injury to himself.
24   So we were trying to keep him down on the ground, you

Page 52

1    know, until medical can respond and medically assess him.
2        Q   So how did you -- and I'm presuming it was you
3    and Sergeant Jackson that did that?
4        A   Did --
5        Q   Secured him.  I'm going to ask you how you went
6    about doing that.  But it was the two of you that decided
7    to secure him?
8        A   Initially, I just recall trying verbally, you
9    know, keep him down, "Hey, man, sit back there, lean
10   against the wall."  The wall was behind him and we were
11   trying to lean him against the call.  The closer we got,
12   you could tell there was almost a fear of us, where his
13   movements were becoming more aggressive.  So we went ahead
14   and applied the hand restraints.
15       Q   So how did you and Sergeant Jackson, what did
16   you all do?  He was sitting on the ground?
17       A   Yeah, he was still sitting kind of back and he
18   was kind of moving around, so I secured his, I believe it
19   was his left arm, and then we -- Sergeant Jackson, as I,
20   you know, held it there, he applied the hand restraints.
21       Q   Did you pull Mr. Richardson out of the cell to
22   do this or was this all done in the cell?
23       A   I believe in the doorway of the cell is where
24   we were handcuffing him.

Page 53

1        Q   So how long did it take you and Sergeant
2    Jackson to handcuff -- I presume you're cuffing
3    Mr. Richardson's hands behind his back?
4        A   Yes.
5        Q   How long did that take?
6        A   It was a little longer than normal.  He -- Due
7    to his wide frame, we applied a second pair of handcuffs.
8    And so you handcuff the handcuff.
9        Q   Yep.
10       A   And each arm goes in.  So we secured him in
11   handcuffs.  I would say less than a minute he was placed
12   in the handcuffs.
13       Q   What was his position once he was handcuffed,
14   once you and Sergeant Jackson put on the two sets of
15   handcuffs?
16       A   He was -- Initially as we're placing him in
17   handcuffs, he's on his stomach area.  And then he would
18   have been placed on his side, like in the recovery
19   position.  And then I just straddled his lower body and
20   like his leg area, and then Sergeant Jackson was up by
21   his -- like behind his back, had him on his side, I
22   believe he was on his left side.
23       Q   When you said "straddled his lower body" area,
24   tell me how you were positioned, you know, where -- When

1  you say "straddled," I presume you had -- you're on your
2  knees?
3      A   Yes.
4      Q   And your right knee was on the right side of
5  his body on the floor?
6      A   Well, he's laying on his side, so his legs
7  would have been in between mine, and I would be on his
8  lower portion of his legs.
9      Q   Whereabouts on his legs were you straddling?
10     A   I would say his thigh area.
11     Q   Okay.  And then Sergeant Jackson, you said,
12  went up kind of on his -- on Mr. Richardson's side of his
13  body?
14     A   Yeah.  He's behind him and securing him, you
15  know, from -- just with his body where the inmate is kind
16  of laying on his -- his like side area.
17     Q   Right side?
18     A   His left side.
19     Q   So Mr. Richardson was laying on his left side?
20     A   To my --
21     Q   Is that what you remember?
22     A   Yes.
23     Q   And so Sergeant Jackson was then behind him?
24     A   Yes.

Page 54

1  intentionally, like "Oh, there's an officer, I'm going to
2  swing at him," it's just the fear that his body didn't
3  know what was going on.
4      Q   Once you had his hands cuffed behind his back,
5  did that abate or eliminate the concern you had for an
6  unintentional attack?
7      A   It greatly decreased it.  But they can still
8  assault us, so --
9          MR. PREGON:  Can we do a comfort break at nine?
10         MR. DICELLO:  Yeah.
11         MR. PREGON:  Yeah.  Just give you a heads up.
12         MR. DICELLO:  Sure.
13  BY MR. DICELLO:
14     Q   Your statement indicates that you straddled his
15  lower hips.  Is that probably more accurate maybe than his
16  thigh area?
17     A   It just depends.  I don't specifically recall.
18     Q   You filled this out within 24 hours of the
19  incident occurring?
20     A   Yes.
21     Q   Is it fair to say, Officer, that your memory
22  back a day after the incident is probably better than your
23  memory today?
24     A   Yeah.  I mean, it's kind of the same area;

Page 56

1      Q   So Sergeant Jackson would have been on your
2  left?
3      A   Kind of in front of me and to my left, yes.
4      Q   All right.  What was Mr. Richardson doing
5  during this time once you have him handcuffed and you're
6  straddling his lower body and Sergeant Jackson is then
7  behind his back?
8      A   Oh, he's still showing signs of being
9  disoriented.  I remember asking repeated questions with
10  receiving no response back.  He wasn't telling us
11  anything.
12     Q   Your statement says that you "feared an
13  unintentional attack on staff" at the very bottom of the
14  first page, eight of 14.
15     A   Yes.
16     Q   What is an unintentional attack on a staff
17  member?
18     A   I've had dealings with inmates in the past that
19  have come out with seizures and had a violent episode
20  where they're in a panic, they don't know what's
21  happening, so they're swinging punches.  Always seem to be
22  the larger guys that we have this problem with.  So yeah,
23  my initial, you know, worry was, "Man, this guy is going
24  to end up swinging at us."  I can tell he wasn't

Page 55

1  hips, thighs.
2      Q   Okay.  All right.  Why don't we take a break.
3          (Discussion held off the record.)
4  BY MR. DICELLO:
5      Q   We're back from a short break, Officer Johnson.
6  Did you have any understanding as to what, if any, medical
7  conditions Robert Richardson had at the time you
8  encountered him?
9          MR. PREGON:  In general, you're saying?
10         MR. DICELLO:  Yeah.
11  BY MR. DICELLO:
12     Q   Anything that was on file at the jail?
13     A   No.
14     Q   Is that information you have access to, or no?
15     A   No.  Typically, with the HIPAA violations and
16  everything, we don't have direct access to that.
17  Something like a seizure, there might be a notation in the
18  screen that a field officer, you know, information to
19  respond to.  But as far as his medical history, no, I
20  don't have access to that.
21     Q   When you say "notation in the screen," what
22  screen are you talking about?
23     A   We have a hazards screen that we can indicate,
24  you know, whether they're suicidal, whether they're an

Page 57

**Page 58**

1    escape hazard, you know, whether there's a medical
2    condition hazard, whether it's blood sugar, dementia or,
3    you know, seizures would be one that sometimes are
4    indicated on that screen.
5        Q    And how does the corrections officer go about
6    accessing the hazards screen?
7        A    Through our Tiburon system, we have a
8    corrections file that is basically the inmate's, you know,
9    file.  And they have different, you know, you know,
10   information that is entered for that particular inmate.
11       Q    Would something like heart disease be on that?
12   Have you ever seen heart disease on that screen?
13       A    I have not.  Typically, that would be kept in
14   our NaphCare's computers.
15       Q    What about hypertension or high blood pressure?
16       A    High blood pressure perhaps could be in there,
17   such as a narrative.  We have like a hazards screen, and
18   then another screen is a -- is a management screen where
19   we would type in narratives for that sort of thing.
20       Q    Can I get an understanding as to what the chain
21   of command was on June 19th, 2012 during your shift?  Do
22   you remember what it was?
23       A    Yes.  It would be, you know, corrections
24   officers, then it would be our direct supervisors of

**Page 59**

1    sergeants, and then it would be Captain Crosby or Captain
2    Flanders, one or the other.
3        Q    So we know it was Captain Flanders or Captain
4    Crosby on first shift second watch on May 19th, 2012.  Do
5    you remember who the sergeants were on that shift?
6        A    I remember Sergeant Jackson being my direct
7    supervisor.
8        Q    Okay.
9        A    I'm unaware if he was assigned -- we have a
10   booking sergeant, which handles first floor, and we have a
11   housing sergeant that would be assigned to the upstairs
12   housing portion of the jail.  I don't recall right off.
13   I'm sure his narrative would include where he was assigned
14   that day.
15           MR. PREGON:  Do you have a project sergeant,
16   too?
17       A    We do have detail sergeants.  I'm unaware of --
18   Those change from day-to-day.
19   BY MR. DICELLO:
20       Q    NaphCare produced some documents in this case,
21   and one of the statements in one of the reports filled out
22   by some of the medical personnel is that the patient was
23   being held down in a prone position by several
24   correctional officers.  That's true; correct?

**Page 60**

1           MR. PREGON:  Objection.
2        A    No, I wouldn't say it's true.  We weren't
3    holding him down by any means.  We were more or less
4    pinning him in.  And in my current time, when I was there,
5    there was maybe three of us that were there.
6    BY MR. DICELLO:
7        Q    So for the time you were there, it's your
8    testimony that Mr. Richardson wasn't being held down?
9           MR. PREGON:  Objection.
10       A    I would say he was being secured.  Held down
11   would be like physically holding him down and not letting
12   him move.  We were basically positioned to prevent his
13   movements.  It wasn't like we were on top of him or, you
14   know, securing him down.  We were -- Like I was straddling
15   him, but he still had free movement underneath me in that
16   small area.
17   BY MR. DICELLO:
18       Q    Okay.
19       A    Being held down, to me, is like us piling on
20   top of him.  So --
21       Q    I understand you were -- Sergeant Jackson
22   ordered other oncoming staff members to replace you and
23   then you left for the day; correct?
24       A    Yes.

**Page 61**

1        Q    In your own mind, do you remember how long it
2    was that -- from the time that you handcuffed Robert
3    Richardson to the point where Sergeant Jackson relieved
4    you?
5        A    I would say a few minutes.  It wasn't very
6    long.
7        Q    "A few" means different things to different
8    people, I've learned.  Some people say two or three, other
9    people think it's ten or 15.
10       A    I would say no more than five.
11       Q    No more than five.  So during the approximate,
12   and I understand it's approximately, and we have a video,
13   I want to show it to you, that identifies some people, but
14   during the approximately five minutes that you recall you
15   were straddling Mr. Richardson, who else was assisting
16   during that time?
17       A    I specifically remember Sergeant Jackson.
18       Q    Anyone else?
19       A    I believe Officer Stumpff come in at one point.
20       Q    Where did Officer Stumpff position himself?
21       A    I think he was to my left, I believe, maybe to
22   my right.  I can't specifically recall.  I think he was
23   still to my left.  I think him and Sergeant Jackson might
24   have both been to my left.

Page 62

1    Q   What were they doing?
2    A   They were trying to, you know, ask him
3    questions, get him to, you know, respond, get some kind
4    of, you know, grasp of what his medical issue was. They
5    were just kind of stationed, just kind of pinning him in
6    behind me.
7    Q   Do you remember a Medic Stockhauser there
8    during the time you were there, or no?
9    A   I don't specifically remember, no.
10   Q   Okay.
11   A   My trainee I believe was still behind me.
12   Q   Henning?
13   A   Yes.
14   Q   We're going to have to share my iPad a little
15   bit here.
16   A   All right.
17   Q   Because I do want to try to have you maybe
18   identify some folks, and I can identify the time for the
19   record. That might help us.
20       (Discussion held off the record.)
21   BY MR. DICELLO:
22   Q   So maybe we can share this. Just showing you,
23   this is what's titled the Richardson MPG, and we're at
24   ten, 11, 12 seconds. Does this appear to be cell 544?

Page 63

1    A   Yes.
2    Q   And now we're at 16 seconds into the video.
3    Does that look to be Mr. Richardson's cellmate?
4    A   Yes.
5    Q   I'm going to back it up again. And I think
6    what happens in this video is it kind of takes pictures
7    second by second, so it's frame by frame. Have you seen
8    this video before?
9    A   Yes.
10   Q   And is that your understanding of how the video
11   plays?
12   A   Yes.
13   Q   It's kind of --
14   A   Delayed.
15   Q   Yeah. So I want to try to have you stop me
16   when you first see yourself.
17   A   Okay.
18       Right there.
19   Q   So at six seconds, that's your back to us?
20   A   Yes.
21   Q   And is that Officer Benjamin?
22   A   It is.
23   Q   So it looks like you were the first person into
24   the cell?

Page 64

1    A   Yes.
2    Q   All right. And you've told us what you saw at
3    this point in time?
4    A   Yes.
5    Q   Now, we see somebody at nine seconds who is
6    coming in from the right side of the screen. Is that
7    Sergeant Jackson?
8    A   No, this is Sergeant Jackson behind me.
9    Q   Oh, okay. So now the person's back to us is
10   Sergeant Jackson and you're inside?
11   A   Yes, sir.
12   Q   Do you know who this person is on the
13   right-hand side?
14   A   That is my trainee, Officer Henning.
15   Q   That's Henning? Okay. And then Benjamin?
16   A   Yes.
17   Q   So we've just watched from about 16 seconds up
18   to 43 seconds. And then do you know what's going on at
19   this point in time?
20   A   Well, he's being handcuffed.
21   Q   Still cuffing him?
22   A   I can't tell if he's handcuffed or not.
23   Q   It looks to me like several more officers have
24   responded; is that accurate?

Page 65

1    A   Yes.
2    Q   I think you told me earlier, but you folks had
3    enough corrections officers to deal with Mr. Richardson;
4    correct?
5    A   Yes.
6    Q   You outnumbered him seven to one or something
7    like that; right?
8    A   Yes.
9    Q   Fair to say at 1:01 Mr. Richardson is facedown?
10   A   Yes. It appears he's handcuffed.
11   Q   1:21, fair to say he's still facedown on the
12   ground?
13   A   He's kind of in the recovery position there.
14   His body is angled, like I'm behind him.
15   Q   Angled?
16   A   Angled.
17   Q   So he's on his right side?
18   A   Yes.
19   Q   So it looks to be a lot of corrections
20   officers. What are they all doing; do you know?
21   A   I remember them asking questions. It looks
22   like now the medic is providing, you know, his medical
23   evaluation to the inmate. I'm still down at the other
24   end.

1    Q   Who is this; do you know?
2    A   That's Sergeant Lewis.
3    Q   And this is the medic?
4    A   The medic is in front of this guy with the
5    blue.
6    Q   And that's Medic Stockhauser?
7    A   Yes.
8    Q   Just try to get some of the glare off of this.
9        MR. PREGON:  Do you want me to shut the light
10   off?
11       MR. DICELLO:  It might help.
12           (Turns light off.)
13   BY MR. DICELLO:
14   Q   Does that help you?
15   A   Yeah.
16   Q   Okay.
17       MR. PREGON:  It's a lot better.
18   BY MR. DICELLO:
19   Q   So I'm just going to pause it at 2:23.  Is this
20   what you're describing as the recovery position where
21   Mr. Richardson's hands are cuffed behind his back and he
22   looks to be kind of laying on his right side?
23   A   Yes.
24   Q   So as you were straddling his hip/lower thigh

Page 66

1        MR. PREGON:  Objection.
2    A   I can't see that in the video.
3    BY MR. DICELLO:
4    Q   I mean, he's not standing up, is he?
5    A   No.
6    Q   So he's squatting down behind you?
7    A   I have no idea.
8    Q   So how many officers are squatting around
9    Mr. Richardson right now?
10   A   It appears to be four.
11       MR. PREGON:  At the 2:44 mark?
12       MR. DICELLO:  Yeah.  Thank you.
13   BY MR. DICELLO:
14   Q   Do you ever remember the medic trying to give
15   oxygen to Mr. Richardson?
16   A   Yes.
17   Q   What's your understanding of why they were
18   trying to give him oxygen?
19   A   I do not know.
20   Q   So let me just ask you:  3:41, why aren't you
21   letting Mr. Richardson up?
22       MR. PREGON:  Objection.
23   A   I mean, he's -- he's still being medically
24   evaluated at that point.

Page 68

1    area, was he laying on his right leg or were both his legs
2    still on the ground?  Does that make sense?
3    A   To my memory, he's -- you know, his right leg
4    is on the ground and then his left leg would have been on
5    top of it.
6    Q   All right.  What I want to do is maybe try to
7    identify when it is that you leave.
8    A   I understand.
9    Q   So it looks like that -- that's you back there,
10   just to orient myself?
11   A   Yeah.  I'm here.  This is Officer Henning
12   behind me.
13   Q   Who is that, the head that's right in front of
14   your face?
15   A   This here?
16   Q   No, it looks like there's a head right there.
17   A   It goes Marshall, me, then this in the back is
18   Officer Henning.
19   Q   So that's Henning behind you?
20   A   Yes.
21   Q   So what's Henning doing behind you?
22   A   You know, he's just behind me.
23   Q   He looks to be straddling or sitting on the
24   legs as well, doesn't he?

Page 67

1    BY MR. DICELLO:
2    Q   Why don't you get him on to his feet or sit him
3    down?
4    A   It would be decided by the sergeant and the
5    medical staff at that point.  I'm just securing,
6    preventing his movements to -- I remember him refusing,
7    like trying to refuse medical as far as like moving his
8    head and making it difficult for Medic Stockhauser to
9    apply the oxygen mask.  So he's still showing signs of
10   that being disoriented.
11   Q   So why -- I think if I heard your answer, it
12   was you were basically following the orders of the
13   sergeant and the medical staff to keep him on the ground
14   at this point?
15   A   It was -- I think it was just a, you know,
16   based on his actions, that he can't -- you know, he's just
17   not oriented to be like, "Hey, stand up for me."  We had
18   already tried that.  And because he was disoriented, we
19   were unable just to stand him up.  It wasn't like he got
20   the oxygen mask and he was automatically better.  He was
21   still obviously in medical distress.  So he was unable to
22   stand at that point.
23       MR. PREGON:  Listen to his question.  He asked
24   if you were responding to what Sergeant Jackson and the

Page 69

18 (Pages 66 to 69)

1  medical staff were telling you to do.

2  BY MR. DICELLO:

3      Q   Well, I appreciate the answer. I'll ask you

4  another question. Did you ever try to sit him up and let

5  him sit on the ground?

6      A   No.

7      Q   And after you put him on his belly or the

8  recovery position, did you ever try to stand him up on his

9  feet?

10     A   No. He was receiving his medical evaluation at

11 that point.

12     Q   Well -- Okay. So we're now approaching four

13 minutes. Why is he handcuffed?

14     A   Because he's still disoriented, still showing

15 signs -- the same signs why he was initially handcuffed.

16     Q   Which is because he's having a medical episode?

17     A   Disorientation and his aggressive movements

18 where he's still in a panic.

19     Q   We're now at 4:33. I'm asking you, Officer

20 Johnson, but he -- does Mr. Richardson still appear to be

21 laying on his right side, or does he appear to be laying

22 more on his stomach?

23     A   He's still kind of on his right side.

24     Q   Would you say that's a recovery position?

Page 70

1      A   It's an attempted recovery position. It looks

2  like he's folding over to his left.

3      Q   And you're still involved; right? You're still

4  here?

5      A   Yes.

6      Q   At 4:39, 4:40, you're still in the same

7  position you've described for us?

8      A   Yes.

9      Q   All right.

10     A   I don't know if I'm behind him or if I'm still

11 straddling him, but I'm still down there at his leg area.

12     Q   I know this is a little tedious, but we've got

13 to -- this is my one chance to ask you questions before

14 trial. So I want to give you the benefit of seeing the

15 video.

16     A   I understand.

17     Q   So it looks like, I mean I'm counting one, two,

18 three, four hands, maybe five hands that you can see on

19 Mr. Richardson's head or back area; agreed?

20         MR. PREGON:  At 5:26?

21 BY MR. DICELLO:

22     Q   Yes. At 5:26.

23     A   Yes.

24     Q   What are people -- Did you have your hands on

Page 71

1  him?

2      A   I don't recall.

3      Q   Okay.

4      A   I would assume that I'm still behind him

5  bracing him, yes.

6      Q   What is your understanding of what these

7  officers are doing with their hands on Mr. Richardson's

8  back?

9      A   Probably keeping him in that recovery position

10 versus laying forward on his stomach.

11     Q   So they're restraining him?

12         MR. PREGON:  Objection.

13     A   I would say still securing him.

14 BY MR. DICELLO:

15     Q   What's the difference between securing and

16 restraining?

17     A   Restraining is to, you know, to unable any

18 movement. Securing is to still give them that leeway to

19 move, you know, but not completely free.

20     Q   And it took four officers to secure his

21 movement?

22     A   Yeah.

23     Q   You're still there at 5:48?

24     A   Yes.

Page 72

1      Q   Okay. Who is this gentleman in the front

2  again?

3      A   I believe that's Officer Marshall.

4      Q   Do you remember Officer Marshall's knee being

5  on Mr. Richardson's back?

6         MR. PREGON:  Objection.

7      A   No.

8  BY MR. DICELLO:

9      Q   Does it appear that his knee is on his back

10 there?

11         MR. PREGON:  Objection.

12     A   No. It appears it's behind him and he's --

13 Mr. Richardson is kind of leaning back into him. He's not

14 on top of him applying his body weight. It looks like his

15 body weight is still on his left leg.

16         MR. PREGON:  Can we get the time of that on the

17 video?

18         MR. DICELLO:  Yeah, it was shortly before the

19 six-minute mark.

20         MR. PREGON:  Gotcha.

21 BY MR. DICELLO:

22     Q   So we're now approaching six and a half

23 minutes. And are your answers still the same as to the

24 reason why you're not letting Mr. Richardson up?

Page 73

1    A   Yes.

2    Q   And still the same answers for why you're not

3  trying to maybe sit him on his butt?

4    A   Yes.

5    Q   We're at 6:47.  Are you still describing that

6  as the recovery position?

7    A   Yes.

8    Q   Did you ever have any concerns that

9  Mr. Richardson was suffering a heart attack?

10    A   No.

11    Q   Have you seen people suffer heart attacks in

12  the jail?

13    A   Yes.

14    Q   Did the medic ever say, "I think he had a heart

15  attack"?

16    A   I don't recall any conversation with the medic.

17    Q   All right.

18    A   I was at the other end.  I'm standing up, so --

19    Q   Okay.  Now, you're standing up.  At 7:06.  Is

20  that you pointing your finger?

21    A   Yes.

22    Q   So has somebody replaced your position?

23    A   It appears Officer Henning is behind me.

24    Q   Do you think that Officer Henning has now

Page 74

1  replaced your position straddling Mr. Richardson?

2    MR. PREGON:  Objection.

3    A   I'm unable to tell.

4  BY MR. DICELLO:

5    Q   Did someone replace your position there?

6    A   I believe Officer Beach is coming in to replace

7  my position.

8    Q   So maybe I should stop it at 7:08.  Which one

9  is Officer Beach?

10    A   He's not in the frame yet.

11    Q   Not there?  So now we're at 7:29.  Is this you

12  here?

13    A   Yes.

14    Q   7:37.  Fair to say you're now no longer in the

15  frame?

16    A   Correct.

17    Q   And do you remember sticking around for awhile

18  or did you leave?

19    A   I believe I left.

20    Q   Okay.  Can you maybe try to help me out who is

21  still here as of the time 7:37 that you've now left the

22  frame?

23    A   That's Sergeant Jackson, Sergeant Lewis, this

24  is Marshall, I don't know if this is still Henning or not,

Page 75

1  I think there's another figure back here, this is Officer

2  Stumpff, Medic Stockhauser, and this is Officer Mayes.

3    Q   Who did you say this was up here?  I'm sorry.

4    A   I believe that's Officer Marshall.

5    Q   And this is?

6    A   Officer Mayes.

7    Q   Officer Mayes.  So your approximation of about

8  five minutes in terms of once Mr. Richardson was on the

9  ground is -- looks to be pretty accurate; agreed?

10    A   Yes.

11    Q   Okay, thank you.

12    MR. DICELLO:  Thanks for the lights.

13  BY MR. DICELLO:

14    Q   Officer Johnson, were you ever interviewed by

15  any investigators in connection with this incident?

16    A   No, sir.

17    Q   When did you learn that Mr. Richardson died?

18    A   After the incident, I was off duty, and I

19  responded to the locker room, my after work routine of

20  getting dressed in my gym clothes, and then we have a gym

21  there in the basement of the jail.  I worked out, and then

22  in the middle of my workout, Sergeant Jackson came running

23  through, and he was in a hurry.  He was -- received a SWAT

24  call out, he's part of the SWAT team, so he was changing,

Page 76

1  getting ready for his -- changing uniforms into a SWAT

2  uniform, and he said, "Dude, you're not going to believe

3  this, you know, that inmate has passed."  I was like

4  "What"?  And I was blown away it happened, because when I

5  left, you know, everything was fine.  And he said, "Yeah."

6  I was like, "No kidding."  And so he continued to get

7  ready for SWAT stuff and I actually had to run back in

8  jail and grab his lunch bag from his office, brought it

9  down to him, and he left.

10    Q   I don't want to know if this is something you

11  learned through lawyers or talked about through lawyers,

12  you have to make sure you don't talk about it, but when

13  did you learn how Mr. Richardson died?

14    A   I don't specifically remember hearing how other

15  than with the --

16    Q   Through the case?

17    A   Yes.

18    Q   Did you ever undergo any additional training as

19  a result of this incident that you know of?

20    A   No.

21    Q   As far as you understand, in connection with

22  your involvement in this incident, the policies and

23  procedures that are in place at the Montgomery County Jail

24  were followed; correct?

Page 77

20  (Pages 74 to 77)

1    A  Yes.

2    Q  I want to revisit an answer you gave earlier.

3  And I think you said that putting inmates on their bellies

4  and cuffing them behind their back is pretty common?

5    A  Yes.

6    Q  This incident, the video will show, was about

7  22 minutes of Mr. Richardson being on his belly or what

8  you've described as a recovery position with officers

9  surrounding him.

10    A  Yes.

11    Q  Can you recall any situation where you were

12  involved where a detainee at the jail was held on the

13  ground for that length of time?

14    MR. PREGON:  Objection.

15    Go ahead.

16    A  I don't specifically recall any incidents.  It

17  wasn't appearing to me to be any different than any of the

18  other incidents.  You know, when these things happen, you

19  know, minutes seem like hours.  So you know, it wasn't

20  like, you know, it hit me like, "Man, this guy has been

21  here for an excessive amount of time."  It was just common

22  standard medical issue.

23  BY MR. DICELLO:

24    Q  And during the time you were there, no

Page 78

1  supervising corrections officer instructed anybody to get

2  Mr. Richardson on to his feet; correct?

3    A  Correct.

4    Q  And no supervising correction officer

5  instructed anybody to roll him over on to his back;

6  correct?

7    A  Not that I recall, correct.

8    Q  And you don't recall any instructions from any

9  supervising corrections officer to sit Mr. Richardson up

10  once he was cuffed up; correct?

11    A  Correct.

12    Q  And same questions, but now any instructions

13  from any medical personnel.  You don't recall any medical

14  personnel ever telling you get the inmate off his stomach,

15  roll him on his back, sit him up, or stand him up;

16  correct?

17    A  Correct.

18    Q  As far as you could tell, did Mr. Richardson

19  injure himself in any way?

20    A  Just from prior to me getting there, I observed

21  the blood area coming from his mouth.  So I don't know how

22  that happened.  But he was bleeding from his mouth.

23    Q  How long have you worked with Sergeant Lewis?

24    A  He's always been on a different shift than I.

Page 79

1    Q  Okay.

2    A  So there wasn't much work, you know, me

3  directly under him.  I believe when he was initially

4  trained, he might have been on days.  And I think they're

5  FTO, I'm not sure, but I believe it's 30 days, also, and I

6  think he was trained on days.  So that would have been my

7  most interaction with him.

8    Q  What about a Detective Michael Sollenberger?

9  Did you ever work with him?

10    A  No, sir.  I sat maybe on an IA investigation as

11  a union rep might have been my only encounter with that

12  detective.

13    Q  And what was his role in that circumstance and

14  what was your role?

15    A  He was the investigating officer as a detective

16  in our IA unit.

17    Q  Internal affairs?

18    A  Yes, sir.  And I was in there as a rep for the

19  person that was being interviewed.

20    Q  The person that was being interviewed was a

21  fellow corrections officer?

22    A  Yes.

23    Q  And was that in connection with an

24  investigation where there was some allegation by someone

Page 80

1  that a fellow officer had broke the rules?

2    A  I would assume.  I don't even specifically

3  recall.

4    Q  Is it your understanding that Detective

5  Sollenberger was given the responsibility to investigate

6  fellow officers to make sure they were following the

7  rules?

8    A  Yes.

9    Q  That's all the questions I have for you.  Some

10  other people might have some more.  Thanks.

11    MR. PREGON:  Anything?

12    MS. STARTS:  No.

13    MR. PREGON:  You have the right to review the

14  transcript when it's ordered and transcribed.

15    And I would say we'll read.  We won't waive

16  that right.

17    - - -

18    (Signature not waived.)

19    - - -

20    And, thereupon, the deposition was concluded at

21  9:46 a.m.

22    - - -

23

24

Page 81

21 (Pages 78 to 81)

```
1                    December 3, 2015
2    Dear Mr. Johnson,
3        You have chosen to read and sign your transcript.
     Please do not mark on the transcript.  Any
4    corrections/changes you may desire to make in your
     testimony should be typewritten or printed on the errata
5    sheet at the end of testimony, giving the page number,
     line number and desired correction/change.  After you have
6    read the transcript, sign your name on the correction
     sheet and where indicated at the close of testimony before
7    a notary public.
8        The Rules of Civil Procedure allow thirty days for
     you to read and sign.  Please return the signature page
9    and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
     Dublin, Ohio 43017 within that time.  Failure to do so in
10   the allotted time will result in your transcript being
     used as though read and signed by you.
11
12                   Sincerely,
                     _____
13                   Whitney Layne
                     Professional Reporter
14
     Cc:
15   Nick DiCello
     Carrie Starts
16   Jamey Pregon
17
18
19
20
21
22
23
24
                                        Page  82
```

```
1    State of _____
2    County of _____
3        I, DUSTIN JOHNSON, do hereby certify that I have
4    read the foregoing transcript of my deposition given on
5    November 17, 2015: that together with the correction page
6    attached hereto noting changes in form or substance, if
7    any, it is true and correct.
8                    _____
9                    DUSTIN JOHNSON
10       I do hereby certify that the foregoing transcript
11   of the deposition of DUSTIN JOHNSON was submitted to the
12   witness for reading and signing: that after he had stated
13   to the undersigned Notary Public that he had read and
14   examined his deposition, he signed the same in my presence
15   on the ____ day of _____, 2015.
16                    _____
17                    Notary Public
18   My Commission Expires on _____
19                    - - -
20
21
22
23
24
                                        Page  83
```

Page 83

1   State of _Ohio_

2   County of _Montgomery_

3       I, DUSTIN JOHNSON, do hereby certify that I have

4   read the foregoing transcript of my deposition given on

5   November 17, 2015; that together with the correction page

6   attached hereto noting changes in form or substance, if

7   any, it is true and correct.

8

9                           DUSTIN JOHNSON

10      I do hereby certify that the foregoing transcript

11  of the deposition of DUSTIN JOHNSON was submitted to the

12  witness for reading and signing; that after he had stated

13  to the undersigned Notary Public that he had read and

14  examined his deposition, he signed the same in my presence

15  on the _14_ day of _December_, 2015.

16

17                           Notary Public

18  My Commission Expires on _12·10·17_

19                  - - -

20

21

22

23

24

1    TO THE  REPORTER:

2    I have read the entire transcript of my deposition taken

3    on the 17th day of Nov, 2015, or the same has been

4    read to me.  I request that the following changes be

5    entered upon the record for the reasons indicated.

6

7    Page    Line    Correction and reason therefore

8    NO CHANGES
     _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   Date 12-14-15  Signature C/o _____

24

Page 84

1                    CERTIFICATE

2   State of Ohio      :

3   County of Franklin:

4

5        I, Whitney Layne, Notary Public in and for the

6   State of Ohio, duly commissioned and qualified, certify

7   that the within named DUSTIN JOHNSON was by me duly sworn

8   to testify to the whole truth in the cause aforesaid; that

9   the testimony was taken down by me in stenotype in the

10  presence of said witness; afterwards transcribed upon a

11  computer; that the foregoing is a true and correct

12  transcript of the testimony given by said witness taken at

13  the time and place in the foregoing caption specified.

14

15       IN WITNESS WHEREOF, I have set my hand and

16  affixed my seal of office at Dublin, Ohio, on this 3rd day

17  of Decemer, 2015.

18                              *Whitney Layne*

19                         Whitney Layne, Notary Public

20                         In and for the State of Ohio

21  My Commission expires May 4, 2020

22

23

24

**A**

a.m 1:16 3:2 18:9 81:21
abate 56:5
able 47:8
academy 13:19,21 14:10,12 17:2 23:3,7
acceptable 38:2,15
access 48:11 57:14 57:16,20
accessing 58:6
accurate 56:15 64:24 76:9
actions 43:11 69:16
additional 77:18
Administrator 1:4
affairs 80:17
affixed 85:16
aforesaid 85:8
afternoon 48:16
age 23:13
aggressive 49:24 52:13 70:17
ago 6:9 15:9 17:19 42:19
agree 35:9,14 37:9 37:14 39:14,24 40:14 41:14
agreed 35:13,16,19 36:1 38:23 41:22 42:3 43:8 71:19 76:9
agreement 8:8
ahead 24:10 27:18 33:8,14,22 34:5 34:13,22 35:18 37:1,17 52:13 78:15
aid 14:13 25:10
airway 31:24
al 1:8 6:20
Aldini 6:22 7:1,5
alive 7:5,6
allegation 80:24
alleging 7:1
allotted 82:10
allow 82:8
alluded 15:20
altercation 50:4
amount 78:21
Andrew 1:5
angled 65:14,15,16
ANNE 2:16
annual 25:18
Annually 16:24
answer 8:8,15,18 28:18 32:19,22 69:11 70:3 78:2
answers 7:13,21 9:4

73:23 74:2
anybody 10:16 51:4 79:1,5
anymore 23:24
apologize 12:3 28:17 48:14
Apparently 42:19
appear 29:15 62:24 70:20,21 73:9
APPEARANCES 2:1
appeared 29:3
appearing 78:17
appears 65:10 68:10 73:12 74:23
applicable 11:4 3:6
applied 52:14,20 53:7
applies 39:4
apply 35:11 69:9
applying 73:14
appreciate 70:3
approaching 70:12 73:22
appropriate 17:7,7 17:8
approximate 61:11
approximately 11:19 22:12 45:1 45:7 48:15 61:12 61:14
approximation 76:7
arched 42:21
area 13:12 16:9,10 16:10 18:24 20:8 21:1 22:8,13,17 31:14 53:17,20,23 54:10,16 56:16,24 60:16 67:1 71:11 71:19 79:21
arm 52:19 53:10
armed 27:15
arrivals 19:8
arrived 29:23 51:8
asked 8:9,13,17 28:17 69:23
asking 9:10 12:3 17:5 20:2 29:6 31:19 37:11 46:18 55:9 65:21 70:19
asphyxia 32:2,16 33:12
asphyxiation 31:11 31:17,20 32:9 33:6,20 34:3,11 34:20 35:3,5 43:3
assault 28:13,15 30:2,15 36:18 56:8
assaulted 27:24 36:18

assess 52:1
assigned 14:6 19:3 21:17 22:10,10,13 23:8 46:19 48:1 59:9,11,13
assignment 45:6
assist 21:23 22:17
assistance 23:16 24:6,6
ASSISTANT 2:17
assisting 61:15
ASSOCIATES 1:20
assume 8:9 9:9 27:11 34:16 72:4 81:2
assuming 47:10
attached 83:6
attack 28:3 55:13 55:16 56:6 74:9 74:15
attacks 74:11
attempted 71:1
attention 29:18 43:23
ATTORNEY 2:17
attorney/client 9:9
audible 7:21
automatically 49:11 69:20
available 21:19,22 22:16
Avenue 1:15 2:3,7
avoid 41:21
aware 23:15 42:6
awhile 17:19 75:17

**B**

back 5:22 11:21 12:6,8 14:13 16:10 17:18 20:18 31:14 38:14 39:6 42:21 52:9,17 53:3,21 55:7,10 56:4,22 57:5 63:5 63:19 64:9 66:21 67:9,17 71:19 72:8 73:5,9,13 76:1 77:7 78:4 79:5,15
background 12:13 13:10,15
backs 42:20
bag 77:8
bald 13:3
based 28:24 31:9 45:24 46:1 69:16
basement 76:21
basic 13:19 14:9 17:2
basically 58:8 60:12 69:12

basis 26:6
Bates 43:23
Beach 75:6,9
bearing 32:15
becoming 52:13
beginning 32:21 44:2
behalf 2:5,9,13,19
behavior 28:12
Behavioral 25:20
believe 18:14 27:14 52:18,23 53:22 61:19,21 62:11 73:3 75:6,19 76:4 77:2 80:3,5
bellies 78:3
belly 16:15 70:7 78:7
benefit 71:14
Benjamin 50:15,19 63:21 64:15
best 27:20
better 34:16 56:22 66:17 69:20
Beyoglides 1:4
birth 11:10,13
bit 12:12 13:10,20 15:22 21:24 25:9 25:17 48:14 62:15
bite 26:18
black 11:1 49:12
bleeding 29:20 79:22
blood 24:18,19 58:2 58:15,16 79:21
Bloody 26:16
blown 77:4
blue 66:5
body 39:23 40:9 53:19,23 54:5,13 54:15 55:6 56:2 65:14 73:14,15
Boehringer 2:14
booking 19:9 20:1,4 20:21 59:10
bottom 43:13,23 44:15,16 55:13
box 47:5
brace 26:13
bracing 72:5
break 25:9 49:18 56:9 57:2,5
breathe 31:24 34:8 34:9,15,17
breathing 29:10 35:12
Brenda 2:15
briefly 54:18
broadcast 23:17,18 24:2
broadcasting 24:5

broke 81:1
brought 77:8
busier 18:19,24
busy 18:22
butt 74:3
buttocks 50:9

**C**

call 17:21 18:1 20:4 20:8,10 21:20 22:3,12 25:4 28:1 52:11 76:24
called 1:14 3:5 21:2 23:20,21 24:15,17 24:23 41:2 42:22
calls 9:9 26:6
Captain 59:1,1,3,3
caption 85:13
captures 10:5
Carrie 2:10 82:15
case 1:7 6:10,17,23 7:7 59:20 77:16
cause 31:14 85:8
caused 49:22
causing 51:23
Cc 82:14
cell 48:22 50:10,22 52:21,22,23 62:24 63:24
cellmate 49:15 50:4 50:5,11 63:3
center 14:18
certain 27:22
CERTIFICATE 85:1
certified 5:3 14:15
certify 83:3,10 85:6
chain 58:20
chance 5:17 71:13
change 22:7,16 48:19 59:18
changes 83:6 84:4
changing 76:24 77:1
character 3:8
charge 19:7
check 18:17
chest 24:17,18
choose 42:3
chosen 82:3
Cincinnati 2:12
circumstance 80:13
circumstances 12:4 31:10 37:15
CIT 25:22
civil 1:14 3:6 6:10 82:8
class 25:22
classified 20:7
clear 8:3 44:10
Cleveland 2:4

**close** 12:17 21:15 82:6
**closer** 52:11
**clothes** 76:20
**code** 23:21
**codes** 23:24
**come** 14:23 22:8 28:8 47:24 55:19 61:19
**comes** 16:18
**comfort** 56:9
**coming** 14:2 15:2 19:8 22:11 26:21 34:1 64:6 75:6 79:21
**command** 58:21
**Commission** 83:18 85:21
**commissioned** 85:6
**committed** 30:24
**common** 38:17,19 39:9 47:17 78:4 78:21
**community** 25:14 38:1,10,13 39:5 41:1,5 42:1
**compared** 32:9
**complaints** 34:9
**complete** 47:3,24
**completed** 9:21
**completely** 72:19
**completion** 14:8,14
**computer** 44:8 45:3 45:5 46:19,23 47:1 48:9 85:11
**computers** 45:8 58:14
**concept** 31:20
**concepts** 35:8
**concern** 49:17 51:22 56:5
**concerned** 28:23 50:6
**concerns** 74:8
**conclude** 49:22
**concluded** 81:20
**condition** 48:22 58:2
**conditions** 25:14 57:7
**confusing** 18:5
**connection** 5:24 6:10 9:4 76:15 77:21 80:23
**consciousness** 32:5
**consider** 11:6 45:18
**considered** 18:4
**continued** 77:6
**control** 23:20 39:21 40:8
**conversation** 74:16

**convoluted** 39:15
**Cooperstone** 1:21 82:9
**correct** 8:16 25:11 27:9,16 29:4,7,24 30:2,4,5,6,9,10,24 31:1,7,8 39:7 42:24 44:5 45:1 45:10,22 46:2,4 46:15,17,20 48:17 48:19,20,23 59:24 60:23 65:4 75:16 77:24 79:2,3,6,7 79:10,11,16,17 83:7 85:11
**correction** 79:4 82:6 83:5 84:7
**correction/change** 82:5
**correctional** 59:24
**corrections** 5:9,13 5:14,15 13:19,21 14:10 15:4,6,16 17:2 21:15 22:20 23:6,13 26:5 27:1 31:22 35:11,15 41:7,14,20 42:2 48:2 50:13,15 58:5,8,23 65:3,19 79:1,9 80:21
**corrections/chang...** 82:4
**counsel** 3:4 7:11 9:11,13 10:15
**counting** 71:17
**country** 18:21
**county** 1:8 2:19 5:10,22 41:1,6 42:2 77:23 83:2 85:3
**couple** 27:7 42:14
**court** 1:1 5:7 6:23 7:9
**CPR** 14:13 25:10
**crime** 30:23
**crisis** 25:21
**Crosby** 59:1,4
**CROSS-EXAMI...** 5:4
**cues** 28:5
**cuffed** 38:14 39:6 56:4 66:21 79:10
**cuffing** 53:2 64:21 78:4
**current** 15:5 22:8 60:4

**D**
**D** 48:21 49:10
**danger** 28:5
**date** 11:10,13 18:13

44:4 84:23
**day** 21:16 22:14,19 22:24 23:1,4 24:11,12 30:18,20 44:8 45:7 46:20 48:1 56:22 59:14 60:23 83:15 84:3 85:16
**day-to-day** 59:18
**days** 14:10 80:4,5,6 82:8
**Dayton** 1:16 2:8,18
**deal** 65:3
**dealing** 24:13 31:5
**dealings** 55:18
**Dear** 82:2
**death** 6:1 7:4 32:6 41:7,16,22 43:2
**Deceased** 1:5
**December** 82:1
**Decemer** 85:17
**decided** 42:4 52:6 69:4
**decreased** 56:7
**defendant** 1:14 2:19 3:5 6:16
**Defendants** 1:9 2:9 2:13
**defensive** 14:12 16:24 17:1
**definition** 31:19 39:13,16 40:1,14
**Delayed** 63:14
**Delta** 21:2,3,12,18
**demeanor** 49:21
**dementia** 58:2
**depend** 45:6
**depending** 43:11 45:8 46:19
**depends** 18:23 37:10 43:9 56:17
**deposed** 6:3
**deposes** 5:3
**deposition** 1:13 3:5 3:6 5:19,24 8:17 9:7,19 10:13,16 81:20 83:4,11,14 84:2
**Deputy** 5:12
**describe** 19:5 37:8 49:20
**described** 50:7 71:7 78:8
**describing** 66:20 74:5
**desire** 82:4
**desired** 82:5
**detail** 59:17
**detained** 20:17 25:15 41:1,6 42:1
**detainee** 78:12

**detainees** 19:18
**detective** 80:8,12,15 81:4
**DiCello** 2:2 4:4 5:5 5:17 9:12 11:15 11:17 20:2,3 24:9 27:13 31:16 32:13 32:20 33:10,17,24 34:7,18,24 35:20 36:4,9 37:3,19,24 38:7,18,22 39:2 39:12,18 40:4,13 41:11,19 43:20 44:13,21 46:5,14 56:10,12,13 57:4 57:10,11 59:19 60:6,17 62:21 66:11,13,18 68:3 68:12,13 69:1 70:2 71:21 72:14 73:8,18,21 75:4 76:12,13 78:23 82:15
**die** 32:16
**died** 76:17 77:13
**difference** 72:15
**different** 11:2,3 27:23 37:4 58:9 61:7,7 78:17 79:24
**difficult** 69:8
**Dinkler** 1:15 2:7
**direct** 43:22 57:16 58:24 59:6
**directly** 80:3
**disagree** 35:9 36:3
**discomfort** 34:15
**Discussion** 11:16 57:3 62:20
**disease** 33:5 58:11 58:12
**disorientation** 26:20 70:17
**disoriented** 29:15 49:13,19,23 55:9 69:10,18 70:14
**distress** 69:21
**DISTRICT** 1:1,1
**DIVISION** 1:2
**doctor** 26:4 31:18
**documents** 59:20
**doing** 42:23 50:20 52:6 55:4 62:1 65:20 67:21 72:7
**domain** 46:24
**door** 15:17 50:21,23 50:24
**doorway** 52:23
**dressed** 76:20
**Drive** 1:21 82:9
**Drug** 34:19

**Dublin** 1:21 82:9 85:16
**Dude** 77:2
**due** 21:18 22:1 28:21 47:23 51:19 53:6
**duly** 5:2 85:6,7
**Dustin** 1:13 3:5 4:2 5:1,8 83:3,9,11 85:7
**duty** 48:1 76:18
**dying** 32:8

**E**
**earlier** 65:2 78:2
**education** 13:17
**eight** 43:16 55:14
**elevated** 41:6
**eliminate** 56:5
**Ellis** 2:15
**employed** 15:10
**employment** 15:13
**Enabling** 31:24
**encounter** 48:3 80:11
**encountered** 27:15 28:9 30:22 31:2 57:8
**ended** 13:24 48:3 49:12
**enforcement** 15:18
**entails** 19:5
**entered** 49:10,11 58:10 84:5
**entering** 23:13
**entire** 84:2
**episode** 29:2 55:19 70:16
**errata** 82:4,9
**erratically** 50:1
**escape** 58:1
**ESQUIRE** 2:2,6,10 2:16
**Estate** 1:5
**et** 1:8
**evaluated** 68:24
**evaluating** 28:6
**evaluation** 65:23 70:10
**everybody** 33:3
**exact** 28:11
**exactly** 7:8 27:6 28:6
**EXAMINATION** 4:1
**examined** 83:14
**examining** 49:14
**example** 37:5
**excessive** 7:1 35:21 35:24 36:6 37:15 37:21 78:21

executive 42:13
Exhibit 4:6,6 43:19
  43:22,24
expect 27:19
experience 13:20
expires 83:18 85:21
Explain 21:24 22:5
explained 7:11
expression 49:21
extended 39:24
  40:10
extent 9:8
eye 49:9 51:11
eyes 49:14,19

**F**

face 49:17 67:14
Faced 41:24
facedown 16:14
  39:23 40:10 65:9
  65:11
facial 12:24
facility 14:20 27:12
facing 50:10
factor 33:6
factors 32:1 35:2,6
Failure 82:9
fair 8:3,10 19:14
  35:3 56:21 65:9
  65:11 75:14
family 5:21
far 1:15 2:7 13:22
  14:12 30:8,11,14
  31:6 34:15 57:19
  69:7 77:21 79:18
faster 33:16
fear 52:12 56:2
feared 55:12
feet 69:2 70:9 79:2
Felicia 2:13
fellow 80:21 81:1,6
field 14:6,8 15:6
  42:7 50:16 57:18
figure 76:1
file 57:12 58:8,9
filed 6:1
fill 45:21 47:8,13,19
  48:7
filled 44:4,7,24 46:6
  46:18 47:9,10
  56:18 59:21
filling 48:4
find 21:12
finds 42:1,7
fine 32:23 77:5
finger 74:20
fingerprinting 19:8
firm 1:15
first 5:2 14:9,13
  18:3,4,7,24 19:3
  19:11,12 20:13,14

21:8,16 22:24
  23:1,4 25:10 27:8
  28:4 29:23 31:5
  49:6 50:7,8 51:1,4
  51:7 55:14 59:4
  59:10 63:16,23
five 6:9 15:9 61:10
  61:11,14 71:18
  76:8
five-six 11:19
Flanders 59:2,3
floor 2:18 18:24
  19:11,12 20:24
  21:1,4,8,12 54:5
  59:10
foam 34:1
folding 71:2
folks 19:20 20:4
  32:2 39:4 47:9
  62:18 65:2
follow 15:21
followed 77:24
following 44:8 45:6
  46:20 48:1 69:12
  81:6 84:4
follows 5:3
foot 15:17
force 7:2 35:16,21
  35:21,24,24 36:6
  36:11,23 37:9,14
  37:14,20,21,21
  45:9,12,15,19,22
  46:1,6,11,16
foregoing 83:4,10
  85:11,13
form 83:6
formal 13:17
forward 72:10
Foster 2:13
four 6:8 68:10
  70:12 71:18 72:20
fourth 21:1,3,12
frame 53:7 63:7,7
  75:10,15,22
Franklin 85:3
free 60:15 72:19
Friday 30:18,20
front 8:24 55:3 66:4
  67:13 73:1
FTO 14:6 15:8
  21:16 80:5
functioning 39:22
  40:8

**G**

G 1:4
Garrett 2:15
general 35:8 57:9
gentleman 73:1
getting 36:12 47:23
  51:23 76:20 77:1

79:20
give 11:13 56:11
  68:14,18 71:14
  72:18
given 8:8,18 12:4
  81:5 83:4 85:12
giving 82:5
glare 66:8
go 5:12,12 11:15
  14:9,11,13,17
  16:24 17:18 22:13
  24:10 25:18,19
  27:5,7,18 33:8,14
  33:22 34:5,13,22
  35:18 37:1,17
  47:7 48:13 49:5
  58:5 78:15
goal 26:11 27:1
goes 7:12 53:10
  67:17
going 8:9 11:12
  12:10 16:17 21:21
  26:12,13 27:5
  28:13,15 39:15
  42:4 43:10 50:2
  51:16,21 52:5
  55:23 56:1,3
  62:14 63:5 64:18
  66:19 77:2
Good 5:6
Gotcha 73:20
gotten 36:13
governors 42:14,14
grab 77:8
graduate 13:15
grasp 62:4
greatly 56:7
ground 11:9 28:2
  29:24 51:24 52:16
  65:12 67:2,4
  69:13 70:5 76:9
  78:13
guess 11:8 12:11
guy 28:2 51:20
  55:23 66:4 78:20
guys 24:13,15 42:23
  55:22
gym 76:20,20

**H**

hair 12:24 13:2,2,4
half 73:22
hand 52:14,20
  85:15
handcuff 53:2,8,8
handcuffed 42:18
  43:6 53:13 55:5
  61:2 64:20,22
  65:10 70:13,15
handcuffing 17:10
  33:18 52:24

handcuffs 28:16,19
  28:21 38:11,14
  45:17 53:7,11,12
  53:15,17
handing 43:21
handles 59:10
handling 19:17
hands 38:14 39:6
  53:3 56:4 66:21
  71:18,18,24 72:7
happen 78:18
happened 18:13
  27:23 30:17 77:4
  79:22
happening 22:5,14
  28:6 51:11 55:21
happens 24:4 39:19
  63:6
hard 7:23 49:20
harm 16:13
Harry 1:4
hazard 58:1,2
hazardous 42:7
hazards 57:23 58:6
  58:17
head 16:9 26:12
  67:13,16 69:8
  71:19
heads 56:11
health 25:14,19,20
heard 40:18,23 41:2
  41:5,12 69:11
hearing 77:14
heart 33:5,16 58:11
  58:12 74:9,11,14
height 11:18,20
heights 12:5
held 11:16 52:20
  57:3 59:23 60:8
  60:10,19 62:20
  78:12
help 10:12 15:18
  28:1 49:6 62:19
  66:11,14 75:20
Henning 21:16,20
  22:20,21 23:9
  50:17,18 62:12
  64:14,15 67:11,18
  67:19,21 74:23,24
  75:24
hereinafter 5:2
hereto 83:6
Hey 51:16 52:9
  69:17
high 13:15,17 24:18
  31:10 33:12 58:15
  58:16
Hills 1:15 2:7
hip/lower 66:24
HIPAA 57:15
hips 56:15 57:1

hired 13:22 14:1,4
history 57:19
hit 50:4 78:20
hog-tying 42:18,22
hold 40:17,21
holding 60:3,11
hope 27:20
hours 18:7 56:18
  78:19
housed 20:24
housing 18:23 19:1
  19:24 20:8 21:2
  22:8 23:19 28:1
  59:11,12
huh-uhs 7:22
hurry 76:23
hurt 30:12
hypertension 58:15

**I**

IA 80:10,16
idea 68:7
ideally 16:9,12 35:6
identification 43:19
identifies 61:13
identify 62:18,18
  67:7
immediately 47:20
in-custody 7:4
incident 9:20,23
  10:5,11,19,22
  12:21 19:1 22:15
  28:7 39:11 46:9
  47:8,18,18,20,21
  56:19,22 76:15,18
  77:19,22 78:6
incidents 78:16,18
include 59:13
included 17:1
increase 33:15
increases 33:20
  34:19
independent 49:2,5
INDEX 4:1,6
indicate 57:23
indicated 58:4 82:6
  84:5
indicates 48:15
  56:14
individual 39:23
  40:9
individual's 39:23
  40:9
information 13:11
  57:14,18 58:10
informed 21:20
initial 55:23
initially 49:11 50:2
  52:8 53:16 70:15
  80:3
injure 79:19

injuries 30:4
injury 17:10 26:11
  26:15 43:2 51:23
inmate 16:8 17:10
  20:8,10,11,15
  27:3 49:15 54:15
  58:10 65:23 77:3
  79:14
inmate's 58:8
inmates 17:3 19:21
  19:22,23 20:5
  27:21 28:5 55:18
  78:3
inside 19:3 26:19
  27:12 64:10
instructed 47:12
  79:1,5
instructions 79:8,12
intake 19:15
intentionally 28:13
  56:1
interaction 13:8
  20:19 80:7
interested 10:17
Internal 80:17
interpret 23:22
interrupted 16:17
  51:10
intervention 25:22
interviewed 76:14
  80:19,20
investigate 81:5
investigating 80:15
investigation 80:10
  80:24
investigators 76:15
involve 6:13 7:4
  46:10,15
involved 20:21
  47:17 71:3 78:12
involvement 77:22
involving 46:10
iPad 62:14
issue 21:18 23:23
  24:1,16 35:7 62:4
  78:22
issues 24:7,12,13
items 22:11 39:21
  40:7

_____ J _____

J-O-H-N-S-O-N 5:8
Jackson 51:14 52:3
  52:15,19 53:2,14
  53:20 54:11,23
  55:1,6 59:6 60:21
  61:3,17,23 64:7,8
  64:10 69:24 75:23
  76:22
JAGIELSKI 2:16
jail 5:23 6:14 9:20

14:6,14 17:24
  18:19 19:3,9,20
  20:17,19 22:24
  23:1,4 24:5 25:15
  27:22,23 31:3,7
  38:19 39:4 41:1,6
  42:2 57:12 59:12
  74:12 76:21 77:8
  77:23 78:12
jails 18:21
Jamey 2:6 82:16
job 7:15,20
jobs 41:20
jogged 8:13
Johnson 1:13 3:5
  4:2 5:1,8,15 8:12
  13:11 43:21 45:9
  57:5 70:20 76:14
  82:2 83:3,9,11
  85:7
Jon 2:14
Jr 1:4
June 14:2 58:21
jury 8:24

_____ K _____

keep 51:24 52:9
  69:13
keeping 72:9
kept 17:16 58:13
keys 22:9
kidding 77:6
kind 6:10 8:23
  10:17 16:22 19:14
  24:4 26:7 28:5
  35:8 37:13 39:15
  50:3,10,11,11
  52:17,18 54:12,15
  55:3 56:24 62:3,5
  62:5 63:6,13
  65:13 66:22 70:23
  73:13
kinds 7:22 17:8
knee 54:4 73:4,9
knees 54:2
knew 7:8 27:8 29:4
  31:6
know 6:16 7:7 8:14
  12:24 17:9 20:22
  21:19,21 22:9,15
  23:9 24:18 26:4
  26:13 27:19 28:1
  28:3,12 31:17,18
  31:19 32:1,11,14
  32:19,22 33:1,6,9
  33:11,19,23 34:2
  34:6,9,15,19,23
  35:5,9 36:13
  40:17 43:1,11
  47:23 49:16,19
  50:2,3,3 51:15,16

51:16 52:1,9,20
  53:24 54:15 55:20
  55:23 56:3 57:18
  57:24 58:1,3,8,9,9
  58:23 59:3 60:14
  62:2,3,4 64:12,18
  65:20,22 66:1
  67:3,22 68:19
  69:15,16 71:10,12
  72:17,19 75:24
  77:3,5,10,19
  78:18,19,19,20
  79:21 80:2
knowing 51:20
knowledge 31:5
Krisandra 2:14

_____ L _____

lack 21:18
Lakeside 2:3
large 49:12 51:19
larger 11:1,2 55:22
lasted 14:10
lasts 14:5 22:12
law 1:15 15:17
laws 39:4
lawsuit 5:24
lawyers 9:19 77:11
  77:11
laying 28:2 54:6,16
  54:19 66:22 67:1
  70:21,21 72:10
Layne 1:15,20 3:6
  82:9,13 85:5,19
lean 52:9,11
leaning 73:13
learn 17:2 76:17
  77:13
learned 16:4 17:5
  17:12 61:8 77:11
leave 67:7 75:18
leeway 72:18
left 51:2 52:19
  53:22 54:18,19
  55:2,3 60:23
  61:21,23,24 67:4
  71:2 73:15 75:19
  75:21 77:5,9
leg 42:19,21 53:20
  67:1,3,4 71:11
  73:15
legs 54:6,8,9 67:1
  67:24
length 78:13
let's 11:15 17:18
  48:13 49:5
lethal 42:8
letting 60:11 68:21
  73:24
level 35:15
Lewis 66:2 75:23

79:23
LIBER 2:3
licensed 26:5
light 66:9,12
lights 76:12
limb 16:12
limbs 16:10
limit 39:21 40:7
line 82:5 84:7
lips 26:19
list 32:4
Listen 69:23
literature 42:6
little 12:12 13:10,20
  15:22 21:24 25:9
  25:17 37:4 48:13
  53:6 62:14 71:12
local 13:12
located 45:5
locker 76:19
log 47:2,7
log-in 47:2
logged 47:10 48:7
long 12:2 13:2
  17:15 53:1,5 61:1
  61:6 79:23
longer 53:6 75:14
look 10:23 49:6,14
  49:19 63:3
looked 10:24
looking 28:5 47:4
looks 44:4 63:23
  64:23 65:19,21
  66:22 67:9,16,23
  71:1,17 73:14
  76:9
loss 32:5
lot 48:14 65:19
  66:17
Louis 6:20,20,22
low 24:18
lower 53:19,23 54:8
  55:6 56:15
LPA 2:11
lunch 77:8

_____ M _____

M 2:16
M.D 2:15
mail 22:9
making 7:17 69:8
male 11:1 49:12
man 51:17 52:9
  55:23 78:20
management 58:18
mark 68:11 73:19
  82:3
marked 4:6 43:19
  43:22
Marshall 67:17
  73:3 75:24 76:4

Marshall's 73:4
mask 69:9,20
math 12:9
matter 9:4
Mayes 76:2,6,7
MC 43:13,24,24
mean 11:2,3 16:6
  38:11 56:24 68:4
  68:23 71:17
meaningful 15:13
means 39:21 60:3
  61:7
measures 39:21
  40:7
medic 2:14 62:7
  65:22 66:3,4,6
  68:14 69:8 74:14
  74:16 76:2
medical 14:12 15:21
  21:18 23:16,22,23
  24:1,6,13,16 25:8
  25:13 26:5 29:1
  29:18 31:18,19
  48:21 52:1 57:6
  57:19 58:1 59:22
  62:4 65:22 69:5,7
  69:13,21 70:1,10
  70:16 78:22 79:13
  79:13
medically 52:1
  68:23
meet 5:18
member 39:5 40:24
  41:5 42:1 55:17
members 25:14
  38:1,10,13 60:22
memory 8:13 49:1,5
  50:21 56:21,23
  67:3
mental 25:14,19
mention 15:21
mentioned 25:10
met 12:20
Michael 80:8
middle 22:7 76:22
Miles 2:14
military 48:16
mind 61:1
mind's 49:9 51:11
mine 54:7
minute 53:11
minutes 8:13 22:12
  41:8 61:5,14
  70:13 73:23 76:8
  78:7,19
Montgomery 2:19
  5:10,22 41:6 42:2
  77:23
month 14:11
monthly 25:21
morning 5:6 44:5

45:1
**mouth** 22:1 26:16
29:21 34:2 79:21
79:22
**move** 51:19 60:12
72:19
**movement** 16:12
39:22 40:8 49:24
60:15 72:18,21
**movements** 52:13
60:13 69:6 70:17
**moving** 50:1 51:23
52:18 69:7
**MPG** 62:23
**mucus** 34:1
**mug** 19:7
**Multiple** 24:11,12

**N**

**name** 5:6,7,17 6:19
20:15 82:6
**named** 6:16 85:7
**names** 20:13,14
**NaphCare** 2:13
59:20
**NaphCare's** 58:14
**narrative** 10:1,2
44:1,13 47:3,9,13
48:8,13 49:2,6
58:17 59:13
**narratives** 48:8
58:19
**nature** 12:4 51:19
**necessarily** 28:13
**necessary** 35:16
36:6,11,23 37:2,8
37:14,21
**neck** 31:14
**need** 29:17 37:5
43:7
**never** 30:2,6,8,12
35:7,11 38:2,15
41:12,15
**new** 19:8,17 21:1
22:10
**nice** 7:15,20
**NICHOLAS** 2:2
**Nick** 5:17 82:15
**nine** 56:9 64:5
**normal** 39:22 40:8
53:6
**normally** 16:10
**nose** 34:1
**notary** 1:15 3:6,7,8
82:7 83:13,17
85:5,19
**notation** 57:17,21
**notes** 3:7
**noticed** 50:20
**noting** 83:6
**November** 1:16 3:1

83:5
**number** 26:11
48:22 82:5,5
**numbers** 43:12,13
43:17,24
**Nurse** 2:13,14,14

**O**

**oath** 8:20,22,23
**obese** 29:4 32:14
**object** 9:8 11:12
**Objection** 24:8
27:10,17 31:12
32:10,18 33:7,13
33:21 34:4,12,21
35:17,22 36:2,8
36:24 37:16,22
38:4,16,20,24
39:10,17 40:2,12
41:9,17 46:3,12
60:1,9 68:1,22
72:12 73:6,11
75:2 78:14
**observations** 28:24
**observe** 29:22
**observed** 11:9 29:5
30:9,11,14 49:12
49:13,15 50:8
79:20
**observing** 50:5
**obvious** 26:9
**obviously** 11:20
69:21
**occurred** 6:13 47:21
**occurring** 56:19
**office** 2:19 13:18,21
15:11,14 77:8
85:16
**officer** 5:9,13,14,15
8:12 13:11 14:6,9
15:4,6,7,16 16:11
19:4 21:7,11,15
21:20 22:20 23:9
23:19,20 26:6
27:7 32:22 41:21
42:2 43:21 44:22
45:9 50:15,19
56:1,21 57:5,18
58:5 61:19,20
63:21 64:14 67:11
67:18 70:19 73:3
73:4 74:23,24
75:6,9 76:1,2,4,6
76:7,14 79:1,4,9
80:15,21 81:1
**officer's** 31:22
**officers** 16:11,13
21:19,22 22:2,6,8
22:11,15 27:2
28:22 31:14 35:11
35:15 41:8,14

48:3 50:13 58:24
59:24 64:23 65:3
65:20 68:8 72:7
72:20 78:8 81:6
**official** 3:8
**oftentimes** 26:10
**oh** 18:1 51:19 55:8
56:1 64:9
**Ohio** 1:1,15,16,21
2:4,8,12,18 42:11
42:15 82:9 85:2,6
85:16,20
**okay** 7:18,23 8:18
9:17 11:15,24
14:1,3 18:21
19:23 24:20 32:24
33:2 35:9 36:16
37:20 38:8 40:11
43:15 46:1 51:7
51:10 54:11 57:2
59:8 60:18 62:10
63:17 64:9,15
66:16 70:12 72:3
73:1 74:19 75:20
76:11 80:1
**old** 12:8,11 23:9
**older** 23:13
**on-the-job** 25:23
**once** 6:6 7:10 20:7
25:3 28:4,16,18
53:13,14 55:5
56:4 76:8 79:10
**oncoming** 60:22
**open** 50:24
**opens** 46:24
**opportunity** 8:16
27:12
**opposed** 7:22
**ordered** 47:12,14
60:22 81:14
**orders** 42:13 69:12
**orient** 67:10
**orientation** 14:5
23:7
**oriented** 69:17
**outcome** 7:7
**outlawed** 43:1
**outnumbered** 65:6
**outside** 7:8 9:10
**overtime** 47:24
**overweight** 11:6
12:16
**oxygen** 68:15,18
69:9,20

**P**

**p.m** 18:11
**page** 4:4,7 55:14
82:5,8 83:5 84:7
**pains** 24:18
**pair** 53:7

**panic** 49:13,19
55:20 70:18
**panicked** 49:22
**part** 12:1 19:9,14
27:22,23 44:2
47:16 76:24
**particular** 58:10
**parties** 3:5
**passed** 5:22 77:3
**pat** 28:20
**patient** 27:3 59:22
**pause** 66:19
**people** 11:3 15:18
24:5,23 26:8,17
26:21 32:7,8
41:15,21 61:8,8,9
61:13 71:24 74:11
81:10
**people's** 12:5
**perfectly** 32:22
**period** 14:16,23
15:3 21:16 22:23
39:24 40:10
**permitted** 39:7
**person** 36:14 37:6
63:23 64:12 80:19
80:20
**person's** 43:7 64:9
**personal** 11:12,24
**personnel** 59:22
79:13,14
**perspective** 31:22
46:9
**Phil** 1:8
**photo** 19:4
**photos** 21:7
**physical** 28:5 33:11
50:4
**physically** 60:11
**pictures** 63:6
**piling** 60:19
**pinning** 60:4 62:5
**place** 19:1 77:23
85:13
**placed** 53:11,18
**places** 18:21
**placing** 38:1,10,13
53:16
**plaintiff** 1:6,14 2:5
3:5 6:19
**Plaintiff's** 43:22
**plays** 63:11
**please** 5:6 82:3,8
**ploy** 27:24
**Plummer/Montgo...**
1:8
**pod** 21:2,3,12,18,21
48:21 49:10
**point** 22:13 28:8,23
42:5 61:3,19 64:3
64:19 68:24 69:5

69:14,22 70:11
**pointing** 74:20
**policies** 39:3 77:22
**portion** 39:22 40:8
54:8 59:12
**portions** 10:5,11
**pose** 41:15,21
**position** 17:9,16
19:5 26:14 31:13
33:19 35:5 38:2
38:15 39:6,24
40:10 42:8 43:10
50:8,9 53:13,19
59:23 61:20 65:13
66:20 70:8,24
71:1,7 72:9 74:6
74:22 75:1,5,7
78:8
**positional** 31:10,17
31:20 32:2,9,16
33:6,12,20 34:2
34:10,20 35:3
**positioned** 53:24
60:12
**positioning** 16:1,14
16:19,23 17:13
32:12 39:5
**possible** 24:16
**possibly** 20:14
51:22
**potential** 34:10
**potentially** 42:8
**pounds** 11:19 12:17
**practice** 38:3,15,17
47:17
**predispose** 35:2
**preexisting** 33:5
**Pregon** 1:15 2:6,7
9:8 11:12 19:24
24:8 27:10,17
31:12 32:10,18
33:7,13,21 34:4
34:12,21 35:17,22
36:2,8,24 37:16
37:22 38:4,16,20
38:24 39:10,17
40:2,12 41:9,17
43:17 44:10,14,17
44:19 46:3,12
56:9,11 57:9
59:15 60:1,9 66:9
66:17 68:1,11,22
69:23 71:20 72:12
73:6,11,16,20
75:2 78:14 81:11
81:13 82:16
**prepare** 9:6,19
10:13,16
**presence** 3:7 83:14
85:10
**pressure** 31:15

58:15,16
**presume** 21:8 45:21 53:2 54:1
**presuming** 52:2
**pretty** 18:22 76:9 78:4
**prevent** 16:13 17:10 26:11,15 35:5 36:14,20 37:2,6 60:12
**prevented** 35:6 36:18
**preventing** 69:6
**printed** 82:4
**prints** 19:4 21:7
**prior** 20:17 23:7 79:20
**prisoners** 19:21
**privilege** 9:9
**probably** 6:8,9 10:8 12:7 15:9 48:17 56:15,22 72:9
**probation** 14:15
**probationary** 14:23 15:2 22:23
**problem** 55:22
**problems** 24:18
**Procedure** 1:14 3:6 82:8
**procedures** 14:13 77:23
**process** 19:9 20:21 25:19
**processing** 19:17
**produced** 59:20
**professional** 26:5 82:13
**prohibited** 38:23 42:11,15
**project** 59:15
**prone** 15:24 16:6,8 16:14,19,19,23,23 17:3,6,9,12,13,16 31:13 33:19 38:2 38:15 39:5,13,20 40:1,5,14 42:7,10 42:15 59:23
**proof** 3:8
**properly** 17:2
**PROSECUTING** 2:17
**protect** 43:7
**protocol** 47:16
**provide** 7:13 25:20
**providing** 65:22
**public** 1:15 82:7 83:13,17 85:5,19
**pull** 52:21
**punches** 55:21
**put** 14:4 20:7 22:1 43:10 48:9 53:14

70:7
**puts** 33:11
**putting** 78:3

**Q**

**qualification** 3:8
**qualified** 85:6
**question** 8:5,9,14,17 11:24 16:21 28:17 35:23 37:4 38:6 69:23 70:4
**questions** 7:13 11:13 15:19 17:8 39:20 44:3 55:9 62:3 65:21 71:13 79:12 81:9

**R**

**radio** 21:17 23:17 23:18
**radios** 22:10
**rank** 15:5
**rarely** 20:14
**rate** 33:16
**re-read** 9:24
**read** 39:14 40:3 48:8 81:15 82:3,6 82:8,10 83:4,13 84:2,4
**reading** 49:2 83:12
**readjust** 34:16
**ready** 77:1,7
**realization** 28:14
**rear** 33:16
**reason** 27:14 73:24 84:7
**reasonable** 35:16
**reasons** 84:5
**recall** 12:19,22 20:20,23 23:19 29:8,9,12,14 42:17 45:23 46:8 47:14 48:6,10 49:10 51:6,9,11 51:18 52:8 56:17 59:12 61:14,22 72:2 74:16 78:11 78:16 79:7,8,13 81:3
**receive** 22:11
**received** 15:20,24 16:3,22 17:6 40:20 76:23
**receiving** 55:10 70:10
**recertified** 14:18
**recognize** 25:13,24 26:8 43:24
**recollection** 18:14
**record** 5:18 7:17,23 8:3 11:14,15,16

57:3 62:19,20 84:5
**recovery** 26:14 35:4 43:10 53:18 65:13 66:20 70:8,24 71:1 72:9 74:6 78:8
**reduced** 3:7
**refer** 19:20 20:10
**reference** 21:10
**refuse** 69:7
**refusing** 69:6
**regularity** 24:5
**relevant** 12:5
**relieved** 61:3
**relying** 9:3
**remember** 6:19 8:14 10:19,21,23 11:7 12:14,23 13:1,3,5,6,7 24:2 33:1 51:14 54:21 55:9 58:22 59:5,6 61:1,17 62:7,9 65:21 68:14 69:6 73:4 75:17 77:14
**remind** 8:1
**REMINGER** 2:11
**rep** 80:11,18
**repeat** 38:8
**repeated** 55:9
**repetitive** 48:14
**replace** 60:22 75:5 75:6
**replaced** 74:22 75:1
**report** 9:20,23 10:11 18:17 21:11 43:12 44:24 47:3 47:8,18,20,24 48:5,8 49:6
**reported** 44:4
**reporter** 5:7 82:13 84:1
**reports** 45:22 46:6 59:21
**represent** 5:21
**request** 23:15 84:4
**requesting** 24:6
**research** 42:6
**respective** 3:5
**respond** 21:21,22 22:6 24:15,23 25:1,3 27:2,22 28:2 51:13 52:1 57:19 62:3
**responded** 22:17 48:21 50:14 64:24 76:19
**responding** 24:14 69:24
**responds** 26:6
**response** 51:17

55:10
**responsibilities** 19:6
**responsibility** 81:5
**restrain** 41:15,24
**restrained** 45:16
**restraining** 41:21 72:11,16,17
**restraint** 16:6,8,19 16:23 17:7,13 39:13,20 40:1,5 40:15,24 42:7,11 42:15
**restraints** 35:12 38:2,11,11 42:19 42:21 52:14,20
**restrict** 35:12
**result** 77:19 82:10
**retrieving** 22:11
**return** 82:8
**review** 10:12 81:13
**reviewed** 9:20,22 10:7 42:13
**revisit** 8:17 78:2
**Richardson** 1:5 5:21 10:21 12:14 12:20 20:11,15,16 20:24 27:8,15 28:10,15,24 29:6 29:9 30:11,14,23 31:2,9 45:10 46:10 48:4 49:13 49:21 50:6 52:21 54:19 55:4 57:7 60:8 61:3,15 62:23 65:3,9 68:9 68:15,21 70:20 73:13,24 74:9 75:1 76:8,17 77:13 78:7 79:2,9 79:18
**Richardson's** 50:8 53:3 54:12 63:3 66:21 71:19 72:7 73:5
**right** 5:15 7:10 8:15 9:16 12:12 37:4,6 48:19 51:1,17 54:4,4,17 55:4 57:2 59:12 61:22 62:16 63:18 64:2 64:6 65:7,17 66:22 67:1,3,6,13 67:16 68:9 70:21 70:23 71:3,9 74:17 81:13,16
**right-hand** 64:13
**risk** 31:10 32:1 33:6 33:12,20 34:20 35:2,6 41:7,16,22
**Robert** 1:5 5:21

10:21 12:20 20:17 27:8 45:9 46:10 57:7 61:2
**role** 80:13,14
**roll** 21:19 22:2,12 79:5,15
**room** 8:1 49:14 76:19
**routine** 76:19
**rude** 8:2
**rule** 41:2 43:6
**rules** 1:14 3:6 31:3 31:7 35:9 39:3 81:1,7 82:8
**run** 77:7
**running** 76:22

**S**

**safer** 42:3
**safety** 27:3 28:23 43:7
**saliva** 26:16
**Samaritan** 25:20
**sat** 80:10
**satisfied** 28:9,19
**Saturday** 18:16,18 19:2 30:17
**saw** 27:6,6 45:24 46:1 64:2
**saying** 7:17 13:7 29:8,9,12,14 34:8 34:14 37:5 51:4 57:9
**says** 5:3 43:16 55:12
**scenario** 27:20 43:9
**scene** 28:4,4 49:15 50:14
**scheduling** 10:17
**school** 13:15,17
**screen** 47:5 57:18 57:21,22,23 58:4 58:6,12,17,18,18 64:6
**seal** 85:16
**second** 18:3,7 19:3 53:7 59:4 63:7,7
**seconds** 62:24 63:2 63:19 64:5,17,18
**secure** 16:12 17:9 26:12 28:3,4 49:14 52:7 72:20
**secured** 28:16,18,20 28:21 45:17 52:5 52:18 53:10 60:10
**securing** 16:10 54:14 60:14 69:5 72:13,15,18
**security** 23:19
**see** 26:17,21 28:6 29:20 35:9 39:14 47:4,8 63:16 64:5

68:2 71:18
**seeing** 49:10 71:14
**seen** 10:4 46:13,17
58:12 63:7 74:11
**seizure** 24:24 25:4
26:2,6,22 27:3
51:22 57:17
**seizures** 24:17,22
26:8,17,21 55:19
58:3
**sense** 67:2
**separate** 47:2
**sergeant** 51:13 52:3
52:15,19 53:1,14
53:20 54:11,23
55:1,6 59:6,10,11
59:15 60:21 61:3
61:17,23 64:7,8
64:10 66:2 69:4
69:13,24 75:23,23
76:22 79:23
**sergeants** 59:1,5,17
**served** 23:7
**Session** 3:1
**set** 85:15
**sets** 53:14
**settled** 7:8
**seven** 65:6
**shaking** 26:10
**share** 62:14,22
**sheet** 82:5,6,9
**Sheriff** 1:8 2:9
**sheriff's** 2:19 13:18
13:21 15:10,14
**SHIBLEY** 2:3
**shift** 17:21,24 18:4
18:7 19:3 21:6,14
21:20 22:7,16
48:19 58:21 59:4
59:5 79:24
**shifts** 17:22
**short** 13:2 39:8
51:13 57:5
**shorter** 13:4
**shortly** 47:20 73:18
**shots** 19:7
**show** 61:13 78:6
**showing** 51:21 55:8
62:22 69:7 70:14
**shut** 66:9
**side** 21:1 26:14
53:18,21,22 54:4
54:6,12,16,17,18
54:19 64:6,13
65:17 66:22 70:21
70:23
**sign** 34:2,10,14
46:23,24 82:3,6,8
**signature** 81:18
82:8 84:23
**signed** 82:10 83:14

**signing** 83:12
**signs** 26:1,7 55:8
69:9 70:15,15
**Sincerely** 82:12
**Sinclair** 14:10,19
**sir** 5:16 9:2 10:3,14
10:18 11:23 13:13
15:15 18:10,12
19:19 21:5,14
23:11 24:3,11
25:5 30:19 40:19
41:3,10,13,18
43:5,14 44:23
48:18 64:11 76:16
80:10,18
**sit** 52:9 69:2 70:4,5
74:3 79:9,15
**sitting** 50:9 52:16
52:17 67:23
**situation** 6:13 23:16
23:22 28:9 36:19
36:22 37:8 78:11
**situations** 36:10
**six** 63:19 73:22
**six-minute** 73:19
**six-one** 11:8 12:14
**six-two** 11:9 12:15
**slow** 39:15
**small** 60:16
**Sollenberger** 80:8
81:5
**somebody** 23:13
26:1 27:2 32:15
33:12 34:8 35:2
64:5 74:22
**someone's** 35:12
**soon** 43:6
**sorry** 6:21 16:21
18:3 35:23 37:18
38:5 44:16 76:3
**sort** 42:19 58:19
**sounds** 35:1 49:1
**SOUTHERN** 1:1
**SPANGENBERG**
2:3
**speak** 48:2
**speaking** 10:15
**Special** 1:4
**specifically** 47:14
48:6 56:17 61:17
61:22 62:9 77:14
78:16 81:2
**specified** 85:13
**spell** 5:7
**spend** 21:8
**sputum** 26:16
**squatting** 68:6,8
**Sr** 1:5
**staff** 55:13,16 60:22
69:5,13 70:1
**staffing** 28:22

**stamp** 43:23
**stand** 69:17,19,22
70:8 79:15
**standard** 78:22
**standing** 49:16
50:11,23 68:4
74:18,19
**start** 16:5
**started** 13:23 48:4
**starts** 2:10 14:17
81:12 82:15
**state** 1:15 5:6 14:15
41:4 42:11,14,16
83:1 85:2,6,20
**stated** 83:12
**statement** 27:5 44:1
44:13 47:13 55:12
56:14
**statements** 47:9
59:21
**STATES** 1:1
**stationed** 19:10
62:5
**staying** 16:9
**stenotype** 85:9
**stenotypy** 3:7
**Steven** 2:14
**sticking** 75:17
**stipulated** 3:4
**STIPULATIONS**
3:3
**Stockhauser** 2:14
62:7 66:6 69:8
76:2
**stomach** 16:9 43:8
53:17 70:22 72:10
79:14
**stop** 7:16 14:22
49:18 63:15 75:8
**straddled** 53:19,23
54:1 56:14
**straddling** 54:9
55:6 60:14 61:15
66:24 67:23 71:11
75:1
**Street** 2:11,17
**strike** 36:13,14,19
37:5
**striking** 26:13 36:15
**struck** 36:12,13,20
37:6
**struggle** 33:11 43:4
**struggling** 40:24
41:7
**stuff** 77:7
**Stumpff** 61:19,20
76:2
**submitted** 83:11
**substance** 83:6
**substantively** 17:5
**sudden** 41:7

**suffer** 32:2 74:11
**suffering** 74:9
**sufficient** 16:11
28:22
**sugar** 24:18,19 58:2
**suicidal** 57:24
**Suite** 1:16 2:4,8,12
**supervising** 79:1,4
79:9
**supervisor** 59:7
**supervisors** 42:5
58:24
**sure** 7:11 8:3 13:23
26:12 28:18 33:4
35:24 56:12 59:13
77:12 80:5 81:6
**surrounding** 6:1
78:9
**susceptible** 32:8,16
32:17
**sustained** 30:4
**SWAT** 76:23,24
77:1,7
**swing** 56:2
**swinging** 55:21,24
**swings** 50:21
**sworn** 5:2 85:7
**symptom** 34:10
**symptoms** 26:1,7
51:21
**system** 47:1 58:7

———————

| **T** |

**tactics** 14:12 16:24
17:1
**take** 7:16 8:16
14:14 16:12 39:15
53:1,5 57:2
**taken** 1:14 3:6 5:19
5:24 84:2 85:9,12
**takes** 63:6
**talk** 9:13,18 10:15
12:18 77:12
**talked** 9:15 77:11
**talking** 7:16 9:10
20:18 40:23 44:11
57:22
**tall** 11:4,5,7 12:15
**Tattoos** 13:5
**team** 19:15 76:24
**tedious** 71:12
**tell** 8:6 9:15 13:11
13:20,23 16:3,17
16:18,19 21:10,11
24:14 25:17,24
26:4 49:9,17 50:1
50:5,19 51:10,15
51:18 52:12 53:24
55:24 64:22 75:3
79:18
**telling** 27:1 55:10

70:1 79:14
**ten** 22:12 61:9
62:24
**tense** 50:1
**term** 40:18 42:17
**terminal** 45:8
**terminology** 40:22
**terms** 12:15 17:15
24:13,22 76:8
**test** 16:5
**testify** 6:23 85:8
**testifying** 8:24
**testimony** 60:8 82:4
82:5,6 85:9,12
**thank** 18:2 51:3
68:12 76:11
**Thanks** 76:12 81:10
**themself** 26:15
**therapist** 25:20
**thigh** 54:10 56:16
66:24
**thighs** 57:1
**thing** 10:17 21:6
42:17 49:20 58:19
**things** 7:22 8:12
9:10 11:3 24:14
27:7 61:7 78:18
**think** 12:3,5,15,16
17:4 22:1 23:12
24:16,22 25:9
26:24 36:5,22
37:5 61:9,21,22
69:11,15 74:14,24
76:1 78:3 80:4,6
**Third** 2:17
**thirty** 82:8
**thought** 24:24
**threatened** 30:6,8
**three** 6:8 41:8 60:5
61:8 71:18
**three-minute** 41:2
**Tiburon** 47:1,2,7
58:7
**tie** 42:20
**time** 3:6 8:2,2 9:22
10:7 17:10 21:8
21:18 22:8,14
23:10 27:14 28:8
28:11 30:22 31:2
37:18 39:8,24
40:3,10 47:22
48:3,4,17 51:13
51:15,21 55:5
57:7 60:4,7 61:2
61:16 62:8,18
64:3,19 73:16
75:21 78:13,21,24
82:9,10 85:13
**times** 6:5 24:11,12
36:5 38:8

timing 47:23
title 15:3,5 41:4
titled 62:23
today 5:19,23 8:22
  9:4,19 15:11
  56:23
today's 8:17 9:7
  10:13,16
told 7:9 12:13 17:4
  25:8 26:24 32:21
  42:10 64:2 65:2
tongue 26:18
top 44:14,18,19
  60:13,20 67:5
  73:14
touch 45:14
touched 45:15
trained 25:10,13,24
  26:7 27:19 28:3
  80:4,6
trainee 22:17,18
  62:11 64:14
training 14:6,8,11
  14:17,18,20 15:7
  15:20,21,24 16:18
  16:22 17:6,15
  23:4 25:8,17,18
  25:21,22,23 27:21
  35:1,4 40:20
  50:16 77:18
transcribed 3:7
  81:14 85:10
transcript 81:14
  82:3,3,6,10 83:4
  83:10 84:2 85:12
transitional 40:17
  40:21
treat 33:3
trial 8:23 71:14
tried 30:2 69:18
trouble 29:10
true 30:12,13 35:21
  37:23 39:9 45:16
  46:7,11 48:22
  49:3 59:24 60:2
  83:7 85:11
truth 85:8
try 8:3 22:15 30:14
  49:5 62:17 63:15
  66:8 67:6 70:4,8
  75:20
trying 32:7 36:13
  51:15,18,24 52:8
  52:11 62:2 68:14
  68:18 69:7 74:3
Tuesday 3:1
turn 22:9
Turns 66:12
two 41:24 52:6
  53:14 61:8 71:17
type 7:1 29:1 45:3

47:5 58:19
typewritten 82:4
typical 21:6,7
typically 19:10
  24:17 26:14 42:4
  43:9 57:15 58:13

U

Uh-huh 14:7
uh-huhs 7:22
ultimately 32:6
unable 34:9 69:19
  69:21 72:17 75:3
unarmed 27:8
  28:19
unavailability 22:2
unaware 30:23 31:4
  31:6 59:9,17
uncommon 8:12
unconscious 26:9
undergo 77:18
underneath 60:15
undersigned 83:13
understand 5:18,23
  8:4,5,20,22,24 9:3
  9:5 12:4 16:14,21
  29:1,17 31:9
  39:20 49:8 60:21
  61:12 67:8 71:16
  77:21
understanding 7:12
  16:4,6 37:13 39:3
  57:6 58:20 63:10
  68:17 72:6 81:4
understood 7:13
  8:10 22:14 28:12
uniform 77:2
uniforms 77:1
unintentional 55:13
  55:16 56:6
union 80:11
unit 21:2 28:1 80:16
UNITED 1:1
units 18:23
unknown 48:21
unnecessary 35:21
  35:24 37:14,20
  41:15,22
upper 31:14
upstairs 59:11
use 20:13,14 23:24
  33:18 34:19 35:15
  36:5,10 42:10,15
  42:20 45:12,15,18
  45:21 46:6,10,15
  48:16
user 46:24
usually 18:24

V

varies 25:1

Various 24:21
verbal 34:8 51:17
verbally 30:6,8 52:8
versus 32:16 47:23
  72:10
video 10:4,5,7,12
  61:12 63:2,6,8,10
  68:2 71:15 73:17
  78:6
Vine 2:11
violated 31:3,7
violations 57:15
violent 55:19
vs 1:7

W

wait 7:16
waive 81:15
waived 3:8 81:18
walk 46:22
walked 9:24
wall 52:10,10
want 8:6,15,16
  11:13 12:12 13:10
  13:14 15:19 21:24
  25:9 27:7 35:8
  38:9 43:18,22
  49:18 51:20 61:13
  62:17 63:15 66:9
  67:6 71:14 77:10
  78:2
wasn't 22:6 28:11
  28:13,15,23 55:10
  55:24 60:8,13
  61:5 69:19 78:17
  78:19 80:2
watch 18:3,7 19:3
  21:7 47:22 59:4
watched 64:17
watches 18:1,2
way 15:11 16:5
  26:14 42:3 50:21
  79:19
ways 35:12 41:15
  41:21,24
we'll 14:9 27:6
  45:24 47:2 81:15
we're 7:17 14:15
  16:10 20:18 22:7
  22:16 24:17 26:12
  26:13 27:19 28:3
  28:4,6 43:10
  44:10 47:4 51:15
  53:16 57:5 62:14
  62:23 63:2 70:12
  70:19 73:22 74:5
  75:11
we've 35:4,6 64:17
  71:12
weapon 27:16 28:10
  28:21

weapons 27:11
week 10:8,9 14:5
  25:3
weekend 20:18
weekends 18:19,22
weekly 25:2 26:6
weighed 12:16
weighing 12:6
weight 11:18,21
  73:14,15
weights 12:5
went 21:22 25:21
  52:5,13 54:12
weren't 60:2
West 2:17
WESTERN 1:2
Whereabouts 54:9
WHEREOF 85:15
Whitney 1:15 3:6
  7:16 82:9,13 85:5
  85:19
wide 53:7
witness 3:8 44:16
  44:18,20 83:12
  85:10,12,15
wondering 50:3
words 7:21 22:1
  37:21
work 16:5 30:17,18
  44:8 76:19 80:2,9
worked 76:21 79:23
working 15:14
  17:21,24
workout 76:22
worry 55:23
worst 27:20
wouldn't 32:19,19
  60:2
writing 3:7

X

Y

yeah 12:2,10 16:22
  20:2 37:20 40:5
  43:9 44:2,20
  52:17 54:14 55:22
  56:10,11,24 57:10
  63:15 66:15 67:11
  68:12 72:22 73:18
  77:5
year 12:2 14:9,16
  14:16,17 25:18
years 6:8 12:11 14:2
  15:9 23:14 42:19
Yep 53:9
younger 23:12,14

Z

0

1

1 4:7 43:19,22,24
1:01 65:9
1:21 65:11
1001 2:3
11 62:24
117 1:16
12 14:2 62:24
123 2:8
1282 43:24,24
14 43:16 55:14
15 8:13 61:9
15:22 48:15
16 63:2 64:17
17 1:16 3:1 83:5
1700 2:4,12
19th 18:14 19:2
  21:13 58:21 59:4

2

2:23 66:19
2:44 68:11
20 84:3
2003 13:16
2004 14:1 15:11
2005 14:24 15:1,3
2012 5:22 11:22
  12:6,8 17:18
  18:14 19:2 20:18
  21:13 44:5,24
  58:21 59:4
2015 1:16 3:1 82:1
  83:5,15 85:17
2020 85:21
205 12:7
20th 44:5,24
210 12:7
22 78:7
24 56:18
26 12:11
270 11:19

3

3 82:1
3:14-CV-00158 1:7
3:22 48:15
3:30 18:8,11 47:22
3:41 68:20
30 14:10 80:5
301 2:17
350 12:17
3rd 85:16

4

4 85:21
4:33 70:19
4:39 71:6
4:40 71:6
43 4:7 64:18
43017 1:21 82:9

**44114** 2:4
**45202** 2:12
**45422** 2:18
**45429** 1:16 2:8
**4th** 2:18

---
**5**
**5** 4:4
**5:26** 71:20,22
**5:48** 72:23
**525** 2:11
**5335** 1:15 2:7
**544** 48:22 50:22
    62:24

---
**6**
**6:47** 74:5
**614-309-1669** 1:22
**6723** 1:21 82:9

---
**7**
**7:06** 74:19
**7:08** 75:8
**7:29** 75:11
**7:30** 18:8,9
**7:37** 75:14,21
**746** 44:22

---
**8**
**8** 14:22
**8:00** 1:16 3:2
**8:30** 44:5
**8:34** 45:1
**80** 45:7

---
**9**
**9:46** 81:21