UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -

Harry G. Beyoglides, Jr.,
Special Administrator of the
Estate of Robert Andrew
Richardson, Sr., Deceased,
    Plaintiff,

    vs.                          Case No. 3:14-CV-00158


Phil Plummer/Montgomery County
Sheriff, et al.,
    Defendants


                    - - -




              DEPOSITION OF BRIAN LEWIS
the Defendant herein, called by the Plaintiff under the
applicable Rules of Civil Procedure, taken before me,
Whitney Layne, a Notary Public for the State of Ohio, at
the law firm of Dinkler & Pregon, 5335 Far Hills Avenue,
Suite 117, Dayton, Ohio 45429 on November 17, 2015 at
2:45 p.m.




              LAYNE & ASSOCIATES
              6723 COOPERSTONE DRIVE
              DUBLIN, OHIO  43017
              614-309-1669

APPEARANCES

NICHOLAS DICELLO, ESQUIRE
SPANGENBERG, SHIBLEY & LIBER
1001 Lakeside Avenue
Suite 1700
Cleveland, Ohio 44114
    on behalf of the Plaintiff

JAMEY PREGON, ESQUIRE
DINKLER & PREGON
5335 Far Hills Avenue
Suite 123
Dayton, Ohio 45429
    on behalf of the Sheriff Defendants

CARRIE STARTS, ESQUIRE
REMINGER CO., LPA
525 Vine Street
Suite 1700
Cincinnati, Ohio 45202
    on behalf of the Defendants
    NaphCare, Inc., Nurse Felicia Foster,
    Nurse Jon Boehringer, Nurse Krisandra
    Miles, Medic Steven Stockhauser,
    and Brenda Garrett Ellis, M.D.

ANNE M. JAGIELSKI, ESQUIRE
ASSISTANT PROSECUTING ATTORNEY
301 West Third Street
4th Floor
Dayton, Ohio 45422
    on behalf of the Defendant
    Montgomery County Sheriff's Office

Page 2

---

EXAMINATION INDEX

BRIAN LEWIS

BY MR. DICELLO...............................Page 5

Page 4

---

November 17, 2015
Tuesday Session
2:45 p.m.
- - -
STIPULATIONS

    It is stipulated by and among counsel for the respective parties that the deposition of BRIAN LEWIS, the Defendant herein, called by the Plaintiff under the applicable Rules of Civil Procedure, may be taken at this time by the notary Whitney Layne; that said deposition may be reduced to writing in stenotypy by the notary, whose notes thereafter may be transcribed out of the presence of the witness; and that the proof of the official character and qualification of the notary is waived.

Page 3

---

BRIAN LEWIS

Being first duly sworn, as hereinafter certified, deposes and says as follows:

CROSS-EXAMINTION

BY MR. DICELLO:

Q    Good afternoon, Sergeant. Can you please state your name for the court reporter?

A    Yeah. It's Brian M. Lewis. It's L-E-W-I-S.

Q    Sergeant, we've had a chance to meet off the record. My name is Nick DiCello. I'm here to take your deposition today in connection with a lawsuit that's been filed against yourself and others and the Montgomery County Sheriff's Office on behalf of Robert Richardson and his family members. Do you understand that?

A    Yes, sir.

Q    As you probably know, I represent Mr. Richardson's estate and his family. And I'm here to ask you questions in connection with that lawsuit.

A    Yes, sir.

Q    Do you understand?

A    Yes, sir.

Q    Whitney is taking everything we say down, so it's important that we not speak over one another, okay?

A    Yes, sir.

Page 5

1    Q    And it's important that you continue to give
2    audible responses; yes, no, or words, as opposed to shrugs
3    and uh-huhs and huh-uhs.  Somebody at the table may remind
4    you of that rule.  It's not to be rude, it's just to get a
5    good record, okay?
6    A    I understand.  Yep.
7    Q    Have you ever been deposed before?
8    A    I have not.
9    Q    So I'll ask the questions, you provide the
10   answers, okay?
11   A    Yes, sir.
12   Q    If you don't understand a question that I've
13   asked, I want you to tell me that, okay?
14   A    Yes, sir.
15   Q    Given that request and understanding, if you
16   answer a question that I've asked you, I'm going to assume
17   you understood it.  Is that fair?
18   A    That's fair.
19   Q    If you want to take a break at any time for any
20   reason, we can do that, or for no reason.  I would just
21   ask that if a question is pending, answer the question and
22   then say, "Hey, Nick, let's take a break."  Okay?
23   A    Yes, sir.
24   Q    Do you understand that you're under oath today?

Page 6

1    A    Yes, I have.
2    Q    Anything that I'm missing that you might have
3    reviewed?  For example, did you have any handwritten notes
4    or anything?
5    A    No, I did not.
6    Q    Did you review any e-mails or anything like
7    that?  I'm not interested in anything that has to do
8    between you and your lawyers.  But any e-mails or anything
9    like that that you looked at?
10   A    There are no e-mails with regards to this
11   incident, regarding as far as me.
12   Q    Did you speak with anybody other than your
13   lawyers to refresh your recollection about what happened
14   before you came in to give sworn testimony?
15   A    I did not.
16   Q    Is there any reason why you didn't speak to the
17   other officers that were involved?
18   A    The report pretty much speaks for my
19   interactions as far as with Mr. Richardson, so I didn't
20   feel the need.
21   Q    Let me ask a little bit of background.  It's
22   not to pry, I promise, even though it probably feels like
23   it is.
24   A    I'm not worried about it.

Page 8

1    A    I do.
2    Q    Do you understand that the oath you're under
3    today is the same kind of oath that you'll be under at
4    trial in front of the jury and the judge in this case?
5    A    Yes, sir.
6    Q    And do you understand that I'm going to be
7    relying on the accuracy of your answers today in
8    connection with this lawsuit?
9    A    Yes, sir.
10   Q    Sergeant, what did you do, if anything, to
11   prepare for the deposition today?
12   A    Read through my report.
13   Q    Any other documents that you looked at?
14   A    I glanced through the paperwork for the
15   lawsuit, went through some of my training, things like
16   that.
17   Q    Did you review the ISU report at all?
18   A    Yeah, oh, yeah.
19   Q    Okay.
20   A    I mean, I reviewed that several times
21   throughout.
22   Q    Did you review the video footage at all?
23   A    Of the jail incident?
24   Q    Yes.

Page 7

1    Q    All right.
2    A    Shoot.
3    Q    Are you from this area, Sergeant?
4    A    Yes, I am.
5         MR. DICELLO:  Off the record.
6         (Discussion held off the record.)
7    BY MR. DICELLO:
8    Q    How long have you been a corrections officer?
9    A    I've been a police officer almost 18 years now,
10   almost.  So 17, almost 17 -- about 17 and a half years.
11   Q    So when you say you've been a police officer,
12   is that in your mind different than a corrections officer?
13   A    Yeah.  I've never been a corrections officer.
14   I've always been a sworn police officer.
15   Q    So explain that to me, why it is that you were
16   working at the jail then.
17   A    Well, the way the Montgomery County Sheriff's
18   Office is designed, when you -- in some cases, some
19   personnel that come up through the ranks of the sheriff's
20   office start out as a civilian employee, whether it be a
21   dispatcher, or a corrections officer, or even maybe a
22   clerk within the sheriff's office, and then they decide to
23   take that step maybe and go through their OPOTA
24   certification, whether it be through a full-time police

Page 9

1  academy or part-time through Sinclair, and then they would
2  become the rank of deputy and work their way up as
3  sergeant.
4  In my case, I'm not a homegrown employee of the
5  sheriff's office. I came from an outside agency where I
6  had already been a sworn police officer, and then I was a
7  deputy, sworn in as a deputy with Montgomery County
8  Sheriff's Office, and then went through different
9  positions through the sheriff's office, detective, patrol,
10  and then took the sergeant's promotional exam.
11  When you take the sergeant's promotional exam,
12  you go to the slots that are available within the agency.
13  In some cases, if you're lucky, there will be a road
14  position. Those are very rare that those are open.
15  Usually, you have to wait until that seniority, kind of
16  pecking order, gets to you.
17  So in my case, I had the option to go to
18  wherever the opening was. I initially went to the
19  Regional Dispatch Center as a line supervisor working a
20  shift. And then I transferred to the Jail Division where
21  I had worked for -- not -- it wasn't a year. I was
22  assigned to the Jail Division for a year. And within that
23  year's timeframe, I was a sworn sergeant working assigned
24  to the Jail Division when this incident occurred.

Page 10

1  Q  Let me break that down a little bit and put a
2  time line on it.
3  A  If I need to slow down, please tell me. I talk
4  fast. I apologize.
5  Q  Yeah, thank you for that. We'll let you know.
6  Let me start this way. When did you graduate
7  high school?
8  A  1992.
9  Q  And did you go to college or did you go to
10  work?
11  A  I went to college for a very short period of
12  time at Sinclair Community College for criminal justice.
13  Q  When did you stop attending Sinclair?
14  A  I went to just -- It's either a quarter -- It
15  was at least a quarter, but I can't remember if I went a
16  second quarter or not.
17  Q  So sometime in 1992 or '93 you then entered the
18  workforce. What did you do?
19  A  I was a firefighter EMT.
20  Q  Where?
21  A  Several places. Butler Township Fire
22  Department, Harrison Township Fire Department, City of
23  Moraine Fire Department.
24  Q  How long did you do that, firefighter EMT?

Page 11

1  A  Over ten years.
2  Q  And then tell me what the next step was in your
3  career.
4  A  During that timeframe, I was working for
5  Moraine Fire Department. We worked 24-hour shifts there.
6  I had already tested for the City of Dayton Police
7  Department years prior to that. Received a phone call
8  basically asking me if I still wanted to be a police
9  officer, which started then the process of me going
10  through my final steps to become a police officer. And
11  then I graduated from the Dayton Police Academy July 3rd
12  of 19 -- 1998.
13  Q  How long did you work as a Dayton police
14  officer?
15  A  Just shy of seven years.
16  Q  So it was from 1998 to --
17  A  Yeah, until April -- late April of 2005.
18  Q  What happened in late April of '05?
19  A  Sheriff's office talked me into coming over to
20  the sheriff's office.
21  Q  So you went through whatever administrative
22  process you have to, I'm not all that interested in that,
23  but --
24  A  Yes, sir.

Page 12

1  Q  When did you first become assigned to the
2  Montgomery County Jail?
3  A  I got promoted in March of 2011. I believe I'm
4  correct on that date. And then I did approximately eight
5  months down at the Regional Dispatch Center as a shift
6  supervisor.
7  Q  Promoted to sergeant?
8  A  Yes, sir. And then sometime right around the
9  holidays, Christmastime, is when I transferred to the Jail
10  Division because there was an open position.
11  Q  So this would be around December of 2011?
12  A  Yes, sir.
13  Q  That was the first time that you started
14  working in the jail?
15  A  That is correct.
16  Q  Had you worked in any jails ever before this?
17  A  I had not.
18  Q  So as of the date of the incident, and we think
19  we've figured out that it was Saturday, May 19th, 2012, is
20  that consistent with your recollection --
21  A  Yes.
22  Q  -- and your review of the reports?
23  A  Yeah. I found one date error in there, but --
24  Q  Just jumped out at me.

Page 13

4 (Pages 10 to 13)

1     A  Yes.

2     **Q  Okay.**

3     A  I saw the 20th listed on there. Yep.

4     **Q  All right. So Saturday, May 19th, 2012, you**

5 **had been working in a jail for about six months; is that**

6 **fair?**

7     A  That's fair.

8     **Q  So let's -- Before we talk about the incident,**

9 **let's move past that. How -- Do you still work at the**

10 **jail?**

11     A  I do not.

12     **Q  When did you stop working at the jail?**

13     A  In -- Must be a holiday thing with me. Right

14 around the holidays of 2012, Christmastime, I came back to

15 the Dispatch Center as the administrative sergeant for the

16 Dispatch Center. In a nutshell, helping the captain run

17 the entire organization of the Dispatch Center.

18     **Q  So your jail experience here in Montgomery**

19 **County was about a year, from December of '11 to December**

20 **of '12?**

21     A  That is correct.

22     **Q  And that would also include your jail**

23 **experience over the course of your law enforcement career?**

24     A  Yes, sir.

1     **Q  What's your current position?**

2     A  Administrative sergeant at the Regional

3 Dispatch Center.

4     **Q  At the Dispatch Center?**

5     A  Yes, sir.

6     **Q  What were the circumstances surrounding you**

7 **leaving the assignment at the jail?**

8     A  Because the administrative sergeant position

9 had came open at the Dispatch Center. We dispatch for

10 nine fire departments and 16 law enforcement areas for the

11 Dispatch Center. I have a distinct knowledge of not only

12 the fire aspects, because we dispatch for fire departments

13 and police departments, so because of my background with

14 fire and EMS, and also with some of the agencies that we

15 actually interact with on a day-in-and-day-out basis, and

16 then also my experience with the Dayton Police Department,

17 I wanted to go back there, because that job is a customer

18 service type of position, a policy/procedure type of

19 position, where we interact with the mayor, the city

20 manager, police department's police chiefs, fire chiefs,

21 who govern the rules and regulations of our agency, that

22 Dispatch Center itself.

23     **Q  Okay.**

24     A  So because of that experience, I knew that I

1 would be better utilized with my background in that

2 position more than, for lack of a better word, jail

3 turning keys and helping supervisors there.

4     **Q  Okay. That makes sense.**

5     **So let's focus on your experience at the jail.**

6 **On Saturday, May 19th, 2012, it's my understanding you**

7 **were a booking sergeant?**

8     A  That's correct.

9     **Q  Can you tell me what a booking sergeant's job**

10 **responsibilities are?**

11     A  Yeah. It would be operations of the -- of the

12 jail, day-to-day operations of that shift, jail, incoming

13 and outgoing inmates, people that are just being processed

14 in on the floor. I also deal with -- deal with any

15 scheduling type of conflicts, issues, overtime. Pretty

16 much oversight of pretty much everything that is going on

17 there at that point.

18     **Q  And what watch were you working that day; do**

19 **you remember?**

20     A  On that day, I was working -- I worked a

21 16-hour shift that day. I believe I came in for a trade

22 earlier in the day on second watch, and then I went into

23 my normal watch on third watch, which would be that 15:00

24 hours -- 15:15 to 23:45 hours.

1     **Q  So tell me when was it you arrived at the jail**

2 **on the 19th and when did you leave?**

3     A  Well, I arrived prior to my shift. So I don't

4 know what time I arrived, whether it be 06:30. I always

5 arrive early for my shift, because there's pass-ons and

6 things like that that happen from the shift that you're

7 relieving, from their supervisors. So a guesstimation is

8 about 06:30 hours.

9     **Q  6:30 in the morning?**

10     A  Yeah, is when I arrived. And then I went home

11 from my shift probably somewhere at the end of the

12 conclusion of my shift, around 23:45 to midnight,

13 somewhere thereabout.

14     And I say that not knowing whether I, if we

15 have enough staffing, supervisors, I wouldn't be the only

16 supervisor working that shift. There could be upwards of

17 three supervisors working. And, I don't know, I didn't

18 check my records to see if I comp'd off early or

19 vacationed early or anything like that. But I could have.

20     **Q  Can you give me an idea as a booking sergeant**

21 **as to back in May of 2012 how many corrections officers**

22 **you were supervising? And if you want to break that down**

23 **into directly supervising, or indirectly, then let me**

24 **know.**

1      A   Probably working -- And this is just a guess.
2  I am a little rusty with the numbers there, and they have
3  changed a little bit since I've been gone.
4      Q   Sure.  Yeah.
5      A   Anywhere from 19 to probably about 25
6  corrections officers were working, somewhere thereabout.
7      Q   Reporting to you?
8      A   They're reporting to all of us, I mean, to
9  however many supervisors we have working.  There are
10 different situations that can be handled by a different
11 supervisor.  If there's a housing issue, there's a housing
12 sergeant working.  If it's a maintenance issue that needs
13 to be overseen by a supervisor, something approved, then
14 there's a detail sergeant if there's one working that
15 night.  So there are different things can be handled by
16 the other supervisors.  But they can come to any one of us
17 for any of those reasons.
18     Q   It's my understanding that Mr. Richardson,
19 Robert Richardson, was housed on the D Pod; is that right?
20     A   Yes, sir.
21     Q   And I had the opportunity to depose a couple of
22 your fellow officers earlier today, and one of them, I
23 can't remember who, explained to me that the D Pod, when
24 it comes to classification of detainees, D Pod has

Page 18

1  freedoms, yes.
2      Q   I guess what I'm getting at are the folks on D
3  Pod, according to some discretion, I presume, of the
4  classifications officer, are folks that are not thought to
5  be at high risk of being violent criminals; correct?
6      A   They're not -- They're not -- They're not as
7  likely to create problems for us.
8      Q   I didn't get your height and weight, Officer.
9  I've been asking everyone that.
10     A   I'm a very tall five-eight on the button.
11     Q   Okay.
12     A   And I weigh 175.
13     Q   Is that about your same weight back in May of
14 2012?
15     A   No, I was probably a lot skinnier then.
16         MR. PREGON:  That's the trend today.
17 BY MR. DICELLO:
18     Q   It's not that long ago, guys.
19     A   Yeah, well, a little bit of stress with how
20 many people I report to.  I add a little bit of weight
21 every now and then.
22     Q   Okay.
23     A   I was probably about 165 pounds then.  I went
24 through a little skinny -- little skinny period back then

Page 20

1  detainees who don't have violent criminal histories;
2  correct?
3      A   Well, our most -- I mean, I think it's all in
4  perspective.  I mean, I don't go through every jail jacket
5  of where everybody is housed when they're housed as a
6  classification.  Detail or the classification officer
7  oversees for people that are -- that are high risk, they
8  go to a different, to an old -- to the old side, to the Ad
9  Seg, but those are extremely high risk inmates.  To put a
10 blanket statement, I guess, saying that they're not
11 violent, I don't know that I can say 100 percent that
12 they've never had a violent assault incident.  Because you
13 can have an incident where you've had an assault, but over
14 a length of time you've shown good behavior.  Maybe you're
15 a repeat offender, let's say for example a petty theft,
16 you've been in and out of jail for petty theft type
17 incidents, and you had that one incident back in 1998
18 where you got into an altercation with another inmate.
19 You may be on restrictions for where you're housed at for
20 an amount of time to be determined by classification.  And
21 then you're -- And then once your behavior is shown to be
22 in all the other subsequent housings.  So that could
23 change and then put you into a -- what would be considered
24 a better housing type of situation where it gives you more

Page 19

1  where everybody was wondering if I was sick.
2      Q   Independent of your review of the records, do
3  you have a memory of this incident?
4      A   Yeah, fairly good.  Yeah, fairly good.
5      Q   Prior to May 19th, 2012, had you ever to your
6  knowledge encountered Robert Richardson --
7      A   No, huh-uh.
8      Q   -- in the jail or out of the jail?
9      A   No, I don't believe I had.
10     Q   As of the time that you responded to the call,
11 and we'll talk about that, did you know why Robert
12 Richardson was in jail?
13     A   I did not.
14     Q   Being that he was on D Pod when you responded,
15 did you have an understanding that he wasn't in the jail
16 as a result of a violent crime?
17     A   The pod assignment outside of B, Bravo Pod,
18 which was our inmate workers, doesn't distinguish anything
19 for me as far as whether a person could potentially be
20 violent.  I have to go into every situation, to every pod,
21 and assume that there could be that potential homicidal --
22 again, they're in pods, so they're less likely to cause
23 problems in all the pods, and Bravo Pod being the least
24 likely, because they're the workers in the jail, so they

Page 21

6 (Pages 18 to 21)

1 have the most freedom because they've passed those checks
2 and those processes to become those workers to have some
3 movement throughout the jail to be trusted. Delta Pod,
4 we've had, and I can't speak for necessary Delta Pod, and
5 it could have been Delta Pod, where we can put inmates
6 that have issues, because we can lock them down into that
7 pod by themselves, into that cell, and not house them with
8 a bunkee. And then when everybody has their recs and
9 things like that, what they would normally have, then we
10 can shut that pod down for that hour, let that person by
11 themselves, and still have better freedoms than they would
12 have maybe in the old side of the jail where that Ad Seg
13 area is where we have people in their yellow jumpsuits
14 and, you know, they're high risk and every movement is a
15 cuff movement and things of that nature.
16 **Q. Okay. So as of May of 2012, is it fair to say**
17 **that most of the corrections officers working at the jail**
18 **were white?**
19 A Yeah, that's a safe assumption.
20 **Q Were there any black corrections officers**
21 **working at the jail?**
22 A That day?
23 **Q Let's start in May of 2012.**
24 A Oh, yeah.

Page 22

1 **Q How many?**
2 A I have no idea. I mean --
3 **Q Let me ask this.**
4 A I can think of -- I mean, I can think of
5 several just right off the top of my head. But I have no
6 idea what the number is.
7 **Q Some people say "several" and they think ten,**
8 **20. Other people think two, three.**
9 A No, I think of several as less than ten right
10 now off the top of my head that I can think of. And some
11 of them didn't work for me, so I don't necessarily know
12 their names. We do -- We have a turnover, a high turnover
13 rate, because people get into that job and they want to
14 maybe be -- get into public service, whether it be in the
15 law enforcement end, fire. So there is a continual wheel
16 where they're -- we're hiring new people. So what it was
17 then to where it is now, I have no idea. But I would say
18 definitely when I say "several," I'm like seven to ten,
19 somewhere, that I can just think of off the top of my
20 head.
21 **Q Do you have any idea what the percentage would**
22 **be white corrections officers versus black corrections**
23 **officers back in May of 2012?**
24 A Well, if I was just going to do the round -- I

Page 23

1 don't even know how many corrections officers we have
2 assigned to the jail. Ten percent.
3 **Q Now, what percentage of the detainees at the**
4 **jail are black?**
5 A I have no idea. I've never done any studies to
6 even consider that, to think about that.
7 **Q Based on your experience, do you think it's**
8 **more than 50 percent?**
9 MR. PREGON: Objection.
10 A I really have no idea.
11 BY MR. DICELLO:
12 **Q Okay.**
13 A Yeah. I mean, there's --
14 **Q It's a lot more than ten percent, isn't it?**
15 A Oh, it's -- I don't know that it would be -- I
16 think you would be splitting hairs. Yeah, I don't know
17 that it's that different. I mean, I think perception
18 probably in society is that it's probably a lot different.
19 No different than the perception is that the Montgomery
20 County Jail is probably a small jail, but it houses almost
21 a thousand people. So you really don't realize how big it
22 is until you get into the inner workings of the jail. I
23 think that it is not as high as you would think it is.
24 But I couldn't put a number on it. I have no idea.

Page 24

1 **Q Let me maybe ask this: Do you think that the**
2 **population inside the Montgomery jail in terms of African**
3 **American, black, Asian, that kind of thing, is more**
4 **reflective of the population in the general community here**
5 **in this area?**
6 MR. PREGON: Objection.
7 Go ahead.
8 A I think it's a fluctuation. It's a day-to-day,
9 month-to-month, week-to-week fluctuation. Those numbers
10 are diverse and change. I mean, I patrolled west end
11 operations and east end operations where most people's
12 perception is west end is going to be your African
13 American black community and east is going to be your
14 white community. So what interactions of crimes, I don't
15 even know how you would put a number on that. I really
16 truly don't.
17 BY MR. DICELLO:
18 **Q As a police officer, you have taken an oath;**
19 **correct?**
20 A I have.
21 **Q Is there an oath that's given to folks that**
22 **become sworn deputies?**
23 A It's the same -- They take the same oath to be
24 a police officer. An oath for a deputy, that's just a

Page 25

7 (Pages 22 to 25)

1  term. We're deputies. We're still police officers in the
2  eyes of the state of Ohio. So it's the same oath.
3      Q   And when you took that oath, you swore to
4  protect the constitutional rights of the members of this
5  community; correct?
6      A   I did.
7      Q   What constitutional rights have you sworn to
8  uphold?
9          MR. PREGON:  Objection.
10     A   I don't have that oath memorized, other than
11  just the general common sense, you know, protect the
12  lives, the property, you know, of others, you know, and
13  you do that in a courteous, you know -- and those aren't
14  -- I know those aren't the words. But that's just common
15  sense.
16  BY MR. DICELLO:
17     Q   I'm not trying to ask word-for-word of the
18  oath, but it's my understanding that the oath says that
19  you will uphold and protect the Constitution of Ohio and
20  of the United States; correct?
21     A   Uh-huh.
22     Q   Yes?
23     A   Yes.
24     Q   You have to say yes.

Page  26

1          And you understand that when you took that oath
2  you were taking on a duty to protect people's
3  constitutional rights; correct?
4          MR. PREGON:  Objection.
5      A   Yes.
6  BY MR. DICELLO:
7      Q   And that includes people in the jail; right?
8      A   That's correct.
9      Q   And that includes Robert Richardson; correct?
10     A   Correct.
11     Q   So one of your jobs on May 19th, 2012 was to
12  protect all of Robert Richardson's constitutional rights;
13  true?
14     A   True.
15         MR. PREGON:  Objection.
16  BY MR. DICELLO:
17     Q   And I know you've said, yeah, I have to protect
18  property and the lives of people. But with respect to the
19  constitutional rights that Robert Richardson was entitled
20  to that it was your job to protect, can you name any of
21  those?
22         MR. PREGON:  Objection.
23     A   He is afforded all the same rights that anybody
24  is, whether he's an inmate or not. That doesn't change.

Page  27

1  So he's afforded -- other than the fact of freedom at that
2  point, is the big one that is missing, he has limited
3  freedoms inside of a correctional facility. But his --
4  his rights would be the same as mine.
5  BY MR. DICELLO:
6      Q   I'm not trying to be difficult, Sergeant. But
7  can you name what those constitutional rights are that he
8  had that you were sworn to uphold and protect?
9          MR. PREGON:  Objection.
10     A   I mean, if you're asking me freedom of speech
11  and all that, yeah, I don't -- I don't have everything, I
12  mean, memorized, the Constitution memorized. But it's
13  freedom of speech and things of that nature, if that's
14  what you're asking.
15  BY MR. DICELLO:
16     Q   He had a right to be free from excessive force?
17         MR. PREGON:  Objection.
18     A   Of course. Everybody does.
19  BY MR. DICELLO:
20     Q   He had a right to prompt and adequate medical
21  care?
22     A   Yes, he did.
23     Q   And while Mr. Richardson was detained at the
24  Montgomery County Jail, he was in the care, custody and

Page  28

1  control of the sheriff's office; true?
2      A   Yes.
3      Q   So back on May 19th, 2012, you've told us you
4  were a booking sergeant. You've explained that -- what
5  that involves to me. And I've reviewed your statement,
6  your narrative, and you should feel free to reference it
7  while we're going through this, Officer. But it's my
8  understanding that you responded to an unknown medical
9  emergency; is that correct?
10     A   Yes, sir.
11     Q   So whatever was broadcast over -- they were
12  hand-held radios; do I have that right?
13     A   Yeah, everybody has a -- has a portable, for
14  the jail, and then it's controlled by security control,
15  which is basically the dispatch center for the Montgomery
16  County Jail.
17     Q   So whatever it was that was broadcast across
18  the portable radios that you were responding to, you
19  understood it involved some kind of medical emergency;
20  correct?
21     A   Some kind of unknown medical, yes.
22     Q   Now, when you arrived, if I have it right, I'm
23  asking you, but when you arrived to cell 544 located on
24  the second level of the Delta Pod, Officer Dustin Johnson,

Page  29

8 (Pages 26 to 29)

1  Trainee Officer Henning, and Sergeant Jackson were already
2  on scene; is that correct?
3      A   That's correct.
4      Q   And you write in your report that they were
5  attempting to secure Inmate Robert Richardson in
6  handcuffs; is that your memory?
7      A   It is.
8      Q   What position was Mr. Richardson in when you
9  first responded and laid eyes on him?
10     A   Facedown.
11     Q   Outside of the cell?
12     A   Just outside of his doorway of 544.
13     Q   You responded to 544 with Officer Stumpff, or
14 did Officer Stumpff arrive when you arrived?
15     A   Yeah, we were right there together.  I don't
16 know whether he made it to the door before me or -- yeah.
17 I'm fairly certain he was coming through the door right
18 before me.
19     Q   All right.
20     A   To the pod.
21     Q   And then did you and Officer Stumpff assist in
22 handcuffing Mr. Richardson?
23     A   We did.
24     Q   Was Mr. Richardson being held on the ground

Page 30

1  level on Delta Pod, within 15 to 20 seconds we had him
2  secured.  Keep in mind they were already dealing with
3  Mr. Richardson before I had arrived on the scene.  So that
4  could very well be accurate.
5      Q   So in terms of getting Mr. Richardson secured
6  after you arrived, between you, Officer Stumpff, Officer
7  Henning, Sergeant Jackson, and Officer Johnson, you were
8  able to get him cuffed up within 15 to 20 seconds;
9  correct?
10     A   Once I arrived on the scene, approximately,
11 yes, sir.
12     Q   And you said, I think you just told me, that it
13 took about 15, 20 seconds for the five of you to get this
14 inmate secured; right?
15     A   From the time that I arrived at the upper
16 level, yes.
17     Q   All right.  I want to focus, try to take this
18 chronologically, but I will jump around a little bit.  But
19 as of the time you arrived and Mr. Richardson was now
20 cuffed, he was still facedown on the ground?
21     A   Yes.
22     Q   As of that time, you knew that Mr. Richardson
23 was unarmed; correct?
24     MR. PREGON:  Objection.

Page 32

1  while you cuffed him up?
2      A   He was facedown and they were getting his arms
3  behind his back trying to get the handcuffs on him.  And
4  we had to double up so we could extend our cuffs.  He's a
5  broad, broad individual.
6      Q   So what did you actually do when you say
7  "assist"?
8      A   Held his arms so they could get the cuffs
9  secured, locked.
10     Q   Was Mr. Richardson resisting being cuffed?
11     A   He was pulling away, I mean, for lack of a
12 better word, yep.
13     Q   Was Mr. Richardson saying anything at this time
14 when he's being cuffed up?
15     A   It was all unintelligible.  And then at some
16 point, I don't remember if it was when he was being
17 cuffed, saying "Get off me," or if it was after he was
18 cuffed, saying "Get off me."  But there was very little
19 that I could understand from Mr. Richardson.
20     Q   I deposed Officer Johnson, and he said that
21 with some assistance it took less than a minute to get
22 Mr. Richardson cuffed up.  Is that consistent with your
23 recollection?
24     A   From the time that I got to -- up to the upper

Page 31

1      A   I did not know that.
2  BY MR. DICELLO:
3      Q   Did you check him for weapons?
4      A   I don't know at what point if anybody did a
5  complete pat-down of him.  I did not.  They're kind of in
6  the backdrop ensuring everybody's doing what they need to
7  be doing; attending to Mr. Richardson, getting the
8  situation under control.  There are all kinds of different
9  things.  Is everybody locked down.  There are many
10 different duties that I'm overseeing at that point making
11 sure everybody is responsible for.  So whether they did a
12 quick cursory search of him, checking him, they may have.
13 I do not know that.
14     Q   Is that something you would expect a
15 corrections officer to do, would be to see if the inmate
16 had a weapon on him?
17     A   They could, based on what they're interaction
18 was, what their belief -- their belief could very well be
19 different from mine of what's going on.  Again, they were
20 having interactions with him prior to my arrival.  So what
21 they saw and what his interactions were before when they
22 opened that door where Mr. Richardson was housed would
23 have been unknown to me at that point.
24     Q   Did you ever instruct anyone, "search him for a

Page 33

1    weapon"?

2       A  I did not.

3       Q  If you were concerned that he had one, you

4    would have instructed somebody to do that, I presume?

5       A  Oh, yeah.

6       Q  So fair to say that you weren't concerned that

7    Mr. Richardson had a weapon on him?

8       A  No, I probably didn't -- I don't know whether

9    it crossed my mind or not, you know, trying to recollect

10   back to then.  But if I -- if I had felt -- reasonably

11   assumed anybody had a weapon, we would be -- I would be

12   verifying that they had already done that or telling them,

13   instructing them to do so.

14      Q  You and I are communicating well.  I'm not sure

15   that it picked up on the record there, so I'm going to

16   repeat the question.  Fair to say that you weren't

17   concerned, once Mr. Richardson was cuffed and facedown,

18   that he had a weapon on him; correct?

19      A  If I was concerned there was an officer safety

20   issue involving a weapon, I would have ensured that that

21   was handled.

22      Q  And as you sit here today, you don't remember

23   ever doing anything to make sure that you confirmed that;

24   correct?

Page 34

---

1      A  No.  In hindsight, I don't -- I don't think

2    that probably ever even came out of my -- I don't believe

3    so.

4      Q  You've told us that within 15 to 20 seconds of

5    you arriving, Mr. Richardson was handcuffed with his hands

6    behind his back; correct?

7      A  Yes, sir.

8      Q  You understood at that time that he was

9    suspected of having some kind of medical emergency; true?

10     A  Yeah.  We didn't know what was going on.  I

11   mean, that was information that was consistent with what

12   -- not only what we were responding to, but his cellmate,

13   and then also there was some blood coming out of

14   Mr. Richardson's mouth.  But again, we didn't -- we didn't

15   really know.  That's what we were trying to figure --

16   trying to figure out.

17      Q  You had reason to believe that Mr. Richardson

18   was in need of medical attention; correct?

19      MR. PREGON:  Objection.

20     A  Again, we didn't know -- we didn't know what he

21   needed.  But we had to -- we had to determine that for

22   sure.  And that was definitely number one as the

23   probability, because that's what was relayed to us.

24     BY MR. DICELLO:

Page 35

---

1      Q  I think you described Mr. Richardson as being

2    broad.  You knew as of the time that Mr. Richardson was

3    cuffed and lying on the ground that he was obese; correct?

4      A  I don't remember exactly what -- he was a large

5    man.  He was -- not -- I'm five-eight, so everybody is

6    large to me.  So he's -- he's -- he was tall.  I don't

7    remember how tall he was.  I knew he was a taller

8    individual.  Again, that's in perspective to my own

9    height.  What he exactly weighed, I'm sure he was well

10   over 200 pounds.  I don't remember exactly what weight.

11   But he was an individual where he was broad, and usually

12   that comes with size itself, to where if we're going to

13   have to use two sets of cuffs to expand that distance,

14   then you're a fairly large individual.  Whether obese or

15   not, I don't know.

16      Q  At some point while you were up there,

17   Mr. Richardson was asking to be let up; correct?

18      A  Said something to the effect of "Get off me,"

19   yeah, "Let me go go" or "Get off me."

20      Q  And he said "Let me up"; correct?

21      A  Yeah.  "Get off of me.  Let me up."  Yep.

22      Q  As of the time that you were up there when he

23   was lying facedown and he was cuffed behind his back, you

24   understood that Mr. Richardson was disoriented; correct?

Page 36

---

1      A  Again, I don't know what was going on with

2    Mr. Richardson.  But that's what we were trying to figure

3    out.  In order to do that, we had to control

4    Mr. Richardson, first, to be able to even assess what was

5    going on.  That was our -- that was my main focus, was we

6    have to figure out what's going on.  We can't do that

7    unless we have control of Mr. Richardson.

8      Q  I appreciate that.  I need to get an answer to

9    my question.  Was it your assessment that Mr. Richardson

10   was disoriented?

11     A  He was unintelligible.  So if -- if you're

12   saying that that's disoriented, then possibly, yes.  He

13   wasn't -- He wasn't acting right.  He wasn't speaking

14   properly.

15      Q  You said, I think, his tone and demeanor was

16   similar to that of an intoxicated subject; correct?

17     A  Yeah, because he was -- his words, they just

18   weren't intelligible.  Yeah.

19      Q  Did you consider that Mr. Richardson may have

20   suffered a seizure?

21     A  Yeah.  I mean, it can be -- I mean, that

22   behavior can be consistent with the after effects of a

23   seizure.  A person is not going to even be able to

24   communicate "Get off me" and things of that if they're in

Page 37

10  (Pages 34 to 37)

1 a full blown seizure. So the after effects of tired,
2 things of that nature, what would be considered the after
3 effects of a seizure, yes.
4 Q Did you consider that maybe Mr. Richardson was
5 under the influence of some type of intoxicating
6 substance?
7 A I did.
8 Q Did you ever see Mr. Richardson hurt anyone?
9 A I did not.
10 Q Did you ever see him try to hurt anyone?
11 A I did not.
12 Q Had Mr. Richardson committed any crime that you
13 were aware of when you responded?
14 A Not that I was aware of, no.
15 Q Had he violated any kind of jail rules or
16 anything that you were aware of?
17 A Not that I was aware of, no.
18 Q Had he ever tried to assault his cellmate?
19 A Not that was reported to me, no.
20 Q And you told me that you saw that he was
21 bleeding from the mouth?
22 A Yes, he was.
23 Q Did you think that might be consistent with him
24 biting his tongue during the seizure, or did that not

Page 38

1 cross your mind?
2 A No, I really had no idea. And at what point I
3 saw the blood, I don't even know at what point I saw that
4 initially cuffing him, assisting getting him cuffed. I do
5 distinctly remember the medics attending to some blood
6 coming out of his mouth, either dabbing it or -- while he
7 was messing with trying to put a mask on, a breathing
8 mask. So at some point I definitely noticed it.
9 Q Were you aware of any medical conditions that
10 Mr. Richardson had as of the time you responded to the
11 scene?
12 A No.
13 Q Did any medical person ever tell you that
14 Mr. Richardson had a history of heart disease?
15 A No.
16 Q Hypertension?
17 A No.
18 Q High blood pressure?
19 A No.
20 Q So what happened next? You've told us that you
21 assisted with getting these handcuffs on Mr. Richardson
22 and that he was outside of the cell, most of his body, and
23 that he's laying down on his stomach, and he's handcuffed
24 behind his back. What do you remember happening next?

Page 39

1 A Medical staff had arrived or was arriving,
2 which included nurses. Medic Stockhauser, I believe
3 Stockhauser is his last name, they were arriving and doing
4 what they do, they're medical -- with their medical
5 training. And then our corrections officers were also
6 assisting around, they had hands on his legs, things of
7 that nature. At some point, we were putting him up on his
8 side. Stockhauser, like I said, was trying to put a
9 breathing mask at some point on him. I had already -- And
10 I don't remember if we had already at that point, I wanted
11 to get leg restraints, because I knew they were a larger
12 spread, and so I wanted to get those double cuffs off and
13 move him to something that was more conducive to his size,
14 to his broadness. So that was -- transitioned at some
15 point. And then I also ordered for a restraint chair.
16 Again, we didn't know what was going on. But getting him
17 to a better position to where we can assess him was
18 really -- the only means was putting him into the
19 restraint chair, because he had already came out of that
20 cell into whatever the nature was to where officers had to
21 get him cuffed to even assess him.
22 So at that point, it was still maintaining
23 control of Mr. Richardson. And the best way to do that
24 would be the restraint chair to where we could do that.

Page 40

1 So that was ordered. I had ordered somebody to go get the
2 restraint chair.
3 Q Let me follow up on a couple of things. You
4 said that some shackles were swapped out for the
5 handcuffs?
6 A For the double cuffs, yes. We just used two
7 pairs of handcuffs, linked them, and then -- to get that
8 initial spread, to get him handcuffed initially. But the
9 leg shackles, where a -- because it's got a chain, a very
10 long chain, and so we went ahead and used those. Because
11 of his size, the leg shackles could still cinch up enough
12 to where you can't pull your arms out or anything like
13 that, so we can control you. So not only benefited what
14 we needed to do to assess him, but also to make him as
15 comfortable as possible, also.
16 Q Why did Mr. Richardson need to be in handcuffs
17 for 22 minutes until he died?
18 A Because of his interactions, his initial
19 interactions. We're on an upper level pod with railings.
20 And again, his interactions coming out of that pod, which
21 that would be something for those people to initially
22 obviously speak of, felt that control was needed and
23 necessitated, not only for his safety but the safety of
24 others. Mr. Richardson is a large individual. What his

Page 41

11 (Pages 38 to 41)

**Page 42**

1  exact weight is, I don't know.  But again, if you're
2  trying to control somebody on an upper pod level who is,
3  whether it be disoriented medically or not medically,
4  there's a lot of things that can go south very quickly, go
5  bad, going over the railing, for not only Mr. Richardson,
6  but also for the officers that are working.  So safety not
7  only for Mr. Richardson, and the staff, is of the utmost
8  importance.
9      So leaving him in that position while he's
10  still being maintained, assessed by medical staff and
11  corrections officers, was exactly the right decision to be
12  made until we could get that chair and function and get
13  him transitioned to that chair.
14  **Q  The other thing I want to follow up on, you**
15  **said that it was your understanding that whatever happened**
16  **when Mr. Richardson came out of that cell, the officers**
17  **responding felt they needed to cuff him up.  Did you**
18  **understand that Mr. Richardson never got off the ground?**
19  A  I don't know whether he was upright standing at
20  some point, I don't know.
21  **Q  All right.  So we'll leave that to those folks**
22  **that responded.**
23  A  I don't know.
24  **Q  So at this point, there's two sergeants there,**

**Page 43**

1  if I understand, Jackson and yourself; correct?
2  A  Yes.
3  **Q  And the both of you would be responsible for**
4  **directing the other officers?**
5  A  That's correct.
6  **Q  So I've seen the video, I've talked with some**
7  **of the other folks, but it appears that between three and**
8  **four officers at different times are on the ground around**
9  **Mr. Richardson holding him down; correct?**
10      MR. PREGON:  Objection.
11      Go ahead.
12  A  No.  I mean, I understand what you're saying.
13  I think initially holding him down when we got him
14  handcuffed, as when I arrived on the scene, that is, for
15  sure, we had to use a minimal amount of force to control
16  him.  But then his interactions mellowed out, and where he
17  was still breathing.  He wasn't communicating, but he was
18  breathing.
19      So because of his previous interactions, having
20  a hand on his shoulder or on his legs, I mean, he just
21  didn't -- and because he had previously tried to get up,
22  more of a safeguard for him, not only him, but also the
23  staff.
24  **Q  Well, he was trying to get up?**

**Page 44**

1  A  Yes, initially.  At some point.  At the
2  beginning.
3  **Q  Well, throughout the interaction.  I mean, he**
4  **was saying, kept saying, "Let me up.  I want out"?**
5  A  Not -- He didn't kept saying that.  He had
6  stated that.  How many times he stated that, and through
7  the duration, did that happen throughout the 22 minutes
8  prior to his death, no, that was not the case.
9  **Q  So you're telling me the officers weren't**
10  **holding him down?**
11  A  Not in -- I believe not, unless I'm
12  misinterpreting the sense of what you mean "holding him
13  down."
14  **Q  So if you didn't need to hold him down, why**
15  **didn't you let him up?**
16  A  Because he at that point already displayed some
17  type of unknown behavior that we had yet to assess.  We
18  had to control that area, control not only for the safety
19  of our officers but also for the safety of him.  And
20  because he's not able to communicate what is going on, we
21  have to do that in the most cautious and safe, I mean not
22  only for him, but for our staff.  And that is why.
23  **Q  So if he didn't need to be held down, how long**
24  **were you going to let him lay there before you got him up?**

**Page 45**

1  A  Until we could get him secured into that chair.
2  **Q  And if he didn't need to be held down, why**
3  **didn't you sit him up so he could sit down?**
4  A  We had medical staff right there.  If that was
5  something that would have been a concern where they felt
6  he needed to be in the upright position, we would have
7  done that at their direction.  But he was leaned -- I
8  mean, if you watch the video, which I've watched, he's
9  rolled to his side during the video, he's completely --
10  he's continually assessed.  The medical staff is there.
11  **Q  So the people that are describing him as**
12  **combative and resistive in here, that's not the way it**
13  **happened?**
14      MR. PREGON:  Objection.
15  A  During the beginning?
16  BY MR. DICELLO:
17  **Q  No, during the whole thing.  We just had**
18  **somebody sit where you are who didn't even show up until**
19  **ten minutes into this thing and he said everybody was**
20  **sweating because of the struggle.  Is that not how it went**
21  **down?**
22  A  From the very beginning.
23  **Q  Did he stop struggling after you put the cuffs**
24  **on him?**

12 (Pages 42 to 45)

1    A   No, not immediately.  Again, he stayed --
2  you're asking -- you -- your perception or your
3  interpretation of him being combative and resistant for 22
4  minutes --
5    Q   That's not my interpretation.
6    A   -- is not the case.  I don't believe anywhere
7  in there it says that he was combative for 22 minutes.
8    Q   So he wasn't resisting?
9    MR. PREGON:  Objection.
10   A   I believe in the report it says he was
11 combative.  For the length amount of time, that could be
12 perception based on everybody's individual account.  And
13 also, perception of combative could be different between
14 myself and for you.
15 BY MR. DICELLO:
16   Q   I guess until you sat down, I thought I
17 understood why Mr. Richardson was being restrained on the
18 ground.  But if I understand, your perception was he
19 didn't need to be restrained on the ground?
20   A   I never said that.
21   MR. PREGON:  Objection.
22   That's not what I said.
23 BY MR. DICELLO:
24   Q   All right.  Then you've got to help me out

1  here.
2    A   He had displayed behavior previous to him --
3    Q   And you don't know what that behavior was?
4    A   Was -- When I was there, he was clearly not
5  able to be cuffed, we had to double handcuff him, so I had
6  to assist with that.
7    Q   Okay.
8    A   So he had that behavior.  He did try to either
9  push up -- I don't recall that.  Was he frailing (sic) and
10 kicking throughout that up to 22 minutes?  I don't -- I
11 don't remember all that other than the fact that he was --
12 again, how many times did he say "Get off me, let me up,"
13 was it once, was it three times, did it stop after five
14 minutes?  I don't recall that.  Was he frailing (sic) and
15 kicking throughout that up to 22 minutes?  I don't -- I
16 don't recall that occurring.  And I think the video will
17 also support that, because you see the interactions
18 between the corrections officers, and not only myself and
19 Sergeant Jackson, we're not going to -- I'm not going to
20 be walking around Mr. Richardson and going into the cell
21 and checking the cell and things of that nature if during
22 that whole time he is combative.  Did he every now and
23 then nudge up or move?  Those would be the interactions
24 that would be described -- only known to those corrections
25 officers that actually had their hands on his legs, maybe

1  on his shoulder.  So that wouldn't be -- their assessment
2  of the situation could be completely different than my
3  assessment.  But we're not going to just because somebody
4  five minutes after we initially handcuffed them, not
5  knowing still what's going on, because it hasn't been able
6  to be communicated to us, going to suddenly just take them
7  out of handcuffs.  We will ease into that situation,
8  whether it is first get him into the restraint chair,
9  which is what we were going to do, be able to get him
10 assessed, hopefully at some point get him verbally
11 communicating, and determining by him speaking to us and
12 gaining information, then we could graduate to that
13 totally out of the restraint chair or handcuffs if it
14 progressed to that.
15   Q   It took 22 minutes for Mr. Richardson to die on
16 the floor there.  Do you understand that?
17   A   I do.
18   Q   And you're now telling me -- And I've got to
19 tell you, it's quite different than the testimony we've
20 heard today, okay?  Because you're now telling me that
21 he's not kicking his legs, he's not thrashing around.  So
22 --
23   A   I didn't say he's not.  I -- I said whether
24 he's doing that 22 minutes throughout the whole thing, my

1  interactions with him said that he was not doing that for
2  the entire 22 minutes.
3    Q   So here's my question:  If he wasn't combative
4  for the whole 22 minutes or he wasn't kicking or thrashing
5  his legs like you just said, then why didn't you get the
6  guy on his feet and get him assessed?
7    MR. PREGON:  Objection.
8    A   Because we have medical staff there.  And if
9  they felt he needed to be on his feet, then we would have
10 put him on his feet.
11 BY MR. DICELLO:
12   Q   So is that how it works at the jail, you just
13 keep people on their stomach with hands cuffed behind
14 their back until a medical person says, "Okay, this person
15 has to get on his feet now"?
16   MR. PREGON:  Objection.
17   A   No.  We assess every situation differently.
18 Mr. Richardson's situation could be different than a guy's
19 situation 30 minutes later.  No one incident is the same.
20 And --
21 BY MR. DICELLO:
22   Q   So why did this incident require this guy to be
23 on his belly for 22 minutes if he wasn't combative or
24 resisting during that time?

1    MR. PREGON: Objection.

2    A   Again, we were waiting to get him controlled

3  into the chair.

4  BY MR. DICELLO:

5    Q   I thought you said he was under control.

6    A   He was in handcuffs and he was under control

7  and being monitored.

8    Q   So why did you have to keep him in the position

9  he was in for 22 minutes if he was under control, he

10  wasn't being combative, and there was no need to have to

11  physically restrain him there?

12    A   Well, I guess then I don't -- that is still a

13  matter of perspective on what you believe would be the

14  proper care versus what I believe is the proper care. At

15  the end of the day, Mr. Richardson was controlled, put in

16  a comfortable position by not only extending his length

17  for his leg shackles, he was continually being monitored,

18  he was put on his side several times, he was provided a

19  breathing mask, and then monitored by not only the nurses,

20  the doctors, and the paramedics. I believe that we did

21  everything that is required of us medically to continually

22  monitor Mr. Richardson until we could get him transitioned

23  into that chair.

24    Q   Sergeant, I'm showing you at 18:47. Is this

Page 50

---

1  the comfortable position that you're alluding to that

2  Mr. Richardson was in? I just want to make sure. When

3  you say that he was in a comfortable position, are you

4  alluding to this position here?

5    MR. PREGON: Objection.

6    A   I don't know whether he was comfortable or

7  whether he wasn't. We weren't able to communicate with

8  him.

9  BY MR. DICELLO:

10    Q   Well, you described it as you put him in a

11  comfortable position.

12    A   The most comfortable position where he could be

13  medically assessed for the safety of him and not only us,

14  yes.

15    Q   When the medic was trying to administer oxygen

16  to Mr. Richardson, when you saw that happening, did you

17  think in your mind this guy might have some problems

18  breathing?

19    A   No. I mean, that's normal -- That would be

20  something that you would have to ask Stockhauser. He saw

21  something where he decided to put a mask, a breathing

22  mask, whether it was a nasal cannula, I don't recall

23  which, but to do something to that effect. But that would

24  be something that you would have to ask him.

Page 51

---

1    Q   I will ask him. But why wouldn't that give you

2  concern as a supervising sergeant that, well, somebody

3  with some medical training is trying to give oxygen to

4  this guy, maybe there's an issue with his ability to

5  breathe? You said there's common sense things that you're

6  obligated to protect people's rights about. Why didn't

7  that pop into your mind as a common sense thing?

8    A   I didn't -- Sorry.

9    Q   Go ahead.

10    A   I did not have any concerns about how he was

11  being medically treated by the medical staff or ourselves.

12  And I was comfortable with the way that the things were

13  being assessed.

14    Q   I appreciate that. My question is about you

15  see somebody now who is on the ground, they're having some

16  unknown medical emergency, they're handcuffed with their

17  hands behind their back, they appear disoriented,

18  intoxicated, they can't communicate, they're bleeding from

19  the mouth, and now somebody is trying to give them oxygen

20  with a mask. You had no concerns that there was any

21  problem with his breathing?

22    MR. PREGON: Objection.

23    A   I had no concerns with how he was assessing him

24  and giving him that oxygen, whether it be for breathing --

Page 52

---

1  whether Stockhauser's concern was breathing. Had

2  Stockhauser believed that his concern was breathing, and

3  it was positional, then I'm fairly confident that not only

4  the nursing staff, doctors, and Stockhauser would have

5  said we need to reposition him to handle that situation.

6  But that did not occur.

7  BY MR. DICELLO:

8    Q   Did you have any concerns at any point in time

9  that Mr. Richardson might not be able to breathe?

10    A   I did not. Not at that point, I did not.

11    Q   As a sergeant, you're responsible for knowing

12  what the rules of the jail are; correct?

13    A   Yes.

14    Q   And you're responsible for enforcing those

15  rules; correct?

16    A   I am.

17    Q   But also, it's also some other folks'

18  responsibilities to make sure that you're trained properly

19  so that you can oversee the implementation of those

20  policies and procedures; correct?

21    A   Yes, sir.

22    Q   Do you agree as a rule, Sergeant, that

23  corrections officers must never apply restraints in ways

24  that may restrict a member of the public's breathing?

Page 53

---

14 (Pages 50 to 53)

1       MR. PREGON:  Objection.
2       A   Well, of course, we don't want to purposefully
3   restrain somebody that is going to restrict their
4   breathing.  We're not trained to do that.
5   BY MR. DICELLO:
6       Q   So do you agree with the statement that a
7   corrections officer must never apply restraints in ways
8   that may restrict someone's breathing?
9       MR. PREGON:  Objection.
10      A   We are taught in defensive tactics, in worst
11  case scenarios, to essentially restrict somebody's
12  breathing temporarily.  I don't know if we're splitting
13  hairs or you're talking -- But that is more of a combative
14  last resort move that we are instructed on during our
15  defensive tactics.  If you're talking about for everyday
16  restraining, transportation of inmates that are going to
17  be handcuffed, then no, we're not -- we do not train to do
18  that.
19  BY MR. DICELLO:
20      Q   And I don't want to split hairs, I want to read
21  --
22      A   I guess I'm --
23      Q   I want to read directly from the use of
24  restraint policy in the jail.  Isn't that a good place to

Page 54

1   start?
2       A   Yes, you can start there.
3       Q   Staff members -- I presume that means
4   corrections officers; yes?
5       A   Well, staff members, it would be anybody that
6   is assigned to the Jail Division.  So corrections
7   officers, sergeants, I can't imagine any other reason why
8   medical staff would be doing some of the functions, but --
9       Q   Okay.  Well, there are situations where people
10  are put in medical restraints.  You're familiar with that,
11  or not?
12      A   Oh, yes.  I've done that myself, yes, sir.
13      Q   So staff members must never apply restraints in
14  ways that may restrict breathing.  Yes?  No?
15      A   Is that the entirety of the policy or is it
16  being, I guess for lack of better words -- I don't want to
17  use the word cherry picked, but --
18      Q   Go ahead.
19      A   Cherry picked through?  Because -- Can you read
20  that to me one more time?
21      Q   Yeah.
22      A   I'm sorry.
23      Q   I'm trying to exclude parts about blood
24  restrictions and physical pain, but I can read the whole

Page 55

1   thing in if you want.
2       A   Yes, please.
3       Q   So let's put in restricting people's blood
4   circulation and causing them physical pain, too.  "Staff
5   members must never place restraints around the neck of a
6   prisoner"; agreed?
7       A   Agreed.
8       Q   "Or apply restraints in ways that may inflict
9   physical pain"; agreed?
10      A   Agreed.
11      Q   "Or which may restrict blood circulation"?
12      A   Agreed.
13      Q   "And/or breathing"?
14      A   Agreed.
15      Q   Okay.  That's the rule; right?
16      A   Yes.
17      Q   Corrections officers or folks who are working
18  at the Montgomery County Jail are only permitted to use
19  force that's reasonable under the circumstances; agreed?
20      A   Correct.
21      Q   And that force has to be reasonably necessary;
22  correct?
23      A   That's correct.
24      Q   Unreasonable force is excessive force; true?

Page 56

1       MR. PREGON:  Objection.
2       A   Unreasonable force is excessive?  I don't know
3   that every situation would be excessive.  I mean, to a
4   degree.  When I think of the word "excessive," I'm
5   thinking of your worst case on camera stuff that you see
6   nationally with -- I can reflect back to when I was young
7   with the Rodney King, stuff like that.  But to a degree,
8   yes.  Uh-huh.
9   BY MR. DICELLO:
10      Q   Okay.
11      A   Yeah, I guess I'm not --
12      Q   I want to make sure I understand your answer.
13      A   I don't know -- I don't know that it's every --
14      Q   Are you telling us that there are times an
15  officer can use unreasonable force, but it's not
16  excessive?
17      A   Unreasonable?
18      Q   Yeah.
19      MR. PREGON:  Objection.
20      Go ahead.
21      A   No.  I mean, if it's unreasonable, completely
22  outside of the common conscious of a person, then I would
23  say that that would be excessive.
24  BY MR. DICELLO:

Page 57

15  (Pages 54 to 57)

Q   Force that is unnecessary is likewise
excessive; correct?
        MR. PREGON:  Objection.
    A   That is unnecessary.  If it's unnecessary, then
we should not be doing it, yes.
BY MR. DICELLO:
    Q   Placing members of the community -- And that's
who these folks in the jail are; correct?
    A   They're citizens.  No different.
    Q   Right.  Placing members of the community who
are in restraints -- and when I use the word "restraints,"
I mean that to include handcuffs, shackles --
    A   I understand, sir.
    Q   Okay.  So placing members of our community who
are in handcuffs in a prone position is never an
acceptable practice; agreed?
        MR. PREGON:  Objection.
    A   That's not -- That's not -- No, I do not agree.
BY MR. DICELLO:
    Q   That isn't the rule, is it?
    A   No, there's nothing in our training that says
we cannot have somebody in a prone position and
handcuffed.  There's nothing that says that.
    Q   Nothing that you're aware of?

Page 58

---

    A   There's nothing in our policies or training
through OPOTA and any type of state certification in the
state of Ohio for police law enforcement certification
that states that we cannot put somebody in a prone
position and handcuff them.  Nothing.
    Q   All right.  I presume there's also nothing in
the state of Ohio and all the things that you just listed
for me that says that placing members of the community who
are in restraints in prone position is prohibited;
correct?
    A   There is nothing --
        MR. PREGON:  Objection.
        Go ahead.
    A   There is nothing that's, again, that it's not
prohibited, there's no instruction out there in Ohio law
enforcement that says that is a restricted procedure as
far as putting somebody in a prone position and
handcuffing them.
BY MR. DICELLO:
    Q   And I want to put some contours on this concept
of prone restraint.  Is that a term you're familiar with?
    A   Yeah.  Well, prone is --
    Q   Facedown?
    A   -- is facedown.  There are several different

Page 59

---

ways.  I mean, people are -- Well, not several different
ways.  But in law enforcement, whether you're road patrol
operations or in a jail situation, there are times where
you can have a person for the term "prone them out,"
meaning they can be either compliant with your order by
getting down on their face, on their belly, hands
outstretched, that would be the common use of the word
"proning" that people are used to.  And that would be to
secure a person within restraints.  Or even not.  Just
because you prone somebody out doesn't mean you're going
to restrain them.  You could be going merely up there to
pat them down, make sure that they're safe for you to have
that interaction on that, maybe -- and I'll use an unknown
traffic stop, for example.  A guy was reaching, kind of
getting a little fidgety in the car before you approached,
so you could use that situation for something along those
lines.  And then the situation could either evolve to
cuffing or maybe not cuffing based on every scenario.
    Q   Doesn't the Montgomery County Jail manual
include the statement that I just read that you said isn't
written down anywhere?
        MR. PREGON:  Objection.
    A   The jail manual talks about proning and
hog-tying and things of that nature.  It doesn't talk

Page 60

---

about saying that we're permitted -- that we're completely
prohibited from proning to secure somebody.  It doesn't
say that.  That policy is relative to hog-tying, leg
restraints, things of that nature.
BY MR. DICELLO:
    Q   Well, let me read it into the record.
    A   Okay.
    Q   "When applying handcuffs, staff members must
never tie the handcuffs to leg or ankle restraints."
That's what you're talking about; right?
    A   Yes.
    Q   That's hog-tying; correct?
    A   That's correct.
    Q   "Hog-tying prisoners or placing prisoners who
are in restraints in prone or spread eagle positions are
never acceptable practices and are prohibited."  Are you
aware that that's what the policy reads?
    A   I'm aware of what the policy says.
    Q   That applies to beyond just hog-tying, doesn't
it?
    A   That's not my interpretation of that policy.
    Q   How do you interpret the word "or"?
    A   I interpret the policy as hog-tying a person
with their legs and their hands cuffed is how I interpret

Page 61

1  that policy.
2      Q   You think that's a -- how that reads in the
3  English language?
4      A   You asked me what my interpretation was of the
5  policy.
6      Q   Okay.
7      A   And that is my interpretation.
8      Q   Have you ever saw an executive order from the
9  governor that prevents people from putting people in prone
10  restraint?
11      A   That executive order is not something that is
12  forwarded to OPOTA teachings and trainings.  What we are
13  trained on is what's through our academy, through -- which
14  is certified by the State of Ohio through OPOTA.  There
15  are probably, I'm guessing, a lot of orders and
16  memorandums that are passed throughout agencies, whether
17  it be law enforcement agencies or state agencies, that
18  never make it to anywhere, whether it be our training
19  facilities.  And that order right there has never made it
20  to me.  I've never seen that before.  Nor have I heard of
21  it.
22      Q   You've never heard of Governor Strickland's
23  executive order 2009-13S "Establishing Restraint Policies
24  Including a Ban on Prone Restraints."  Is that your

Page 62

1  testimony?
2      A   That is my testimony.
3      Q   Are you aware that Governor Kasich has also
4  endorsed and continued this executive order, sir?
5      A   Again --
6      Q   The question is are you aware of whether
7  Govenor --
8      A   No.
9          MR. PREGON:  Objection.
10  BY MR. DICELLO:
11      Q   -- Kasich --
12      A   No.  I would have no -- I've never seen that
13  before.
14      Q   Are you aware that this executive order applies
15  to the Ohio Department of Rehabilitation and Correction?
16      A   No, I'm not.
17      Q   Have you ever seen the Ohio Department of
18  Rehabilitation and Correction's policies and procedures on
19  restraint?
20      A   The State of Ohio's policies and procedures?  I
21  have not.
22      Q   The State of Ohio and the Department of
23  Rehabilitation and Correction, they publish jail
24  standards, too, don't they?

Page 63

1          MR. PREGON:  Objection.
2      A   I'm sure they do.
3  BY MR. DICELLO:
4      Q   This policy that I just showed you, which is
5  the use of the restraints policy for the Montgomery County
6  Jail manual, this policy follows the executive order,
7  doesn't it?
8          MR. PREGON:  Objection.
9      A   I don't know that it does.  I've never seen
10  that policy.
11  BY MR. DICELLO:
12      Q   You've never seen the policy or you've never
13  seen the executive order?
14      A   The executive order.
15      Q   Okay.  Why do you think that is?
16          MR. PREGON:  Objection.
17      A   You know, there's a lot of ideas that people
18  have, whether it be through means of policing,
19  corrections, and they get put on paper.  Some get
20  implemented, and some don't.  Some get accepted into
21  practice by policies, procedures, and standards, some
22  don't.  Which ones do, which ones don't?  I couldn't put a
23  number on it.  All I know is that every situation is going
24  to be different.  And there are situations, and there will

Page 64

1  continue to be situations where we will have to prone
2  people out and restrain them.
3  BY MR. DICELLO:
4      Q   Did you ever review the Ohio Department of
5  Rehabilitation and Correction's policies on use of force
6  and prone restraint?
7      A   I have not.
8      Q   Those policies use the same language, the use
9  of prone restraint is prohibited.  Do you see that?
10      A   Again, these policies here, I follow -- I
11  utilize the jail manual and our policies and procedures
12  for the Montgomery County Sheriff's Office.
13      Q   Are the same.  Do you see that?
14      A   Okay.
15          MR. PREGON:  Objection.
16  BY MR. DICELLO:
17      Q   So I'm giving you now the Ohio Department of
18  Rehabilitation and Correction's policies on prone
19  restraint, and I'm having you look at your jail's policies
20  on prone restraint, and they both say that prone restraint
21  is prohibited; correct?
22          MR. PREGON:  Objection.
23      A   That's what they say.
24  BY MR. DICELLO:

Page 65

17 (Pages 62 to 65)

1     **Q**  Mr. Richardson was restrained in the prone
2 **position; true?**
3     A  He was facedown, belly down, yes, sir.
4     MR. PREGON: Objection.
5     A  But he was also on his side several times
6 throughout interactions and also being monitored by
7 medical staff and doctors.
8 BY MR. DICELLO:
9     **Q**  **Who was the doctor that was monitoring?**
10     A  Dr. Barbara Ellis.
11     **Q**  **When did she get there on the scene?**
12     A  I don't know what time she arrived on scene.
13     **Q**  **I think she got there to declare him dead.**
14     A  She was there prior to that.
15     **Q**  **A definition of prone restraint that I'm**
16 **getting from the State of Ohio, I want to see if you agree**
17 **with it. And this is a mouthful. So bear with me, okay?**
18 **I appreciate you bearing with me so far, okay?**
19     A  Yep. No worries.
20     **Q**  **Let me know when you want to take a break. Or**
21 **if you do.**
22     **Prone restraint. All items or measures used to**
23 **limit or control the movement or normal functioning of any**
24 **portion or all of an individual's body while the**

                               Page 66

1 **individual is in a facedown position for an extended**
2 **period of time. Do you agree that's what prone restraint**
3 **is?**
4     MR. PREGON: Objection.
5     Go ahead.
6     A  Can you read that to me one more time?
7 BY MR. DICELLO:
8     **Q**  **Yeah. You're not the first person that's asked**
9 **me to re-read it.**
10     A  I'm deaf in one ear, just for the record.
11     **Q**  **Yeah, okay. Then I'll yell at you, but don't**
12 **get mad at me for it.**
13     **Prone restraint. All items or measures used to**
14 **limit or control the movement or normal functioning of any**
15 **portion or all of an individual's body while the**
16 **individual is in a facedown position for an extended**
17 **period of time. Do you agree that's prone restraint?**
18     MR. PREGON: Objection.
19     A  If that's the definition, yes.
20 BY MR. DICELLO:
21     **Q**  **That's what happened to Mr. Richardson; true?**
22     A  Yes. He was in a prone position, yes, sir.
23     **Q**  **Have you ever been trained on the concept of**
24 **what a transitional hold is?**

                               Page 67

1     A  A transitional from -- Are you talking about a
2 restraint, like a physical restraint?
3     **Q**  **Yeah, when you're talking about situations**
4 **where you have to prone somebody out and put cuffs on**
5 **them, are you familiar with the concept of a transitional**
6 **hold to put somebody in those cuffs and then basically get**
7 **them off their belly as soon as possible?**
8     A  Yes. We've been trained to put them in an
9 upright position when feasible. It's not always feasible,
10 though.
11     **Q**  **Have you ever been trained on a concept that**
12 **has been explained to me by certain people in your field,**
13 **but these things go by different rules, as you know, but**
14 **the three-minute rule? And the concept is that an inmate**
15 **or a member of the public is at an elevated risk of sudden**
16 **death after struggling with corrections officers in a**
17 **prone position for as few as three minutes.**
18     A  We've been -- I mean, we've been through
19 instruction about positionals, where people are
20 restrained, things of that nature. Of course we've been
21 through that training through law enforcement as a whole.
22 Even outside of corrections. As far as the three minutes,
23 I don't recall what the timeframe is. But, yeah, that
24 would probably be -- I mean, that could be accurate. I

                               Page 68

1 don't -- Yeah, I don't recall a timeframe for it.
2     **Q**  **Is it your understanding, whether or not you**
3 **recall this timeframe, that after as short as three**
4 **minutes of struggling with corrections officers while**
5 **proned out and restrained that there's an increased risk**
6 **of sudden death for the inmate?**
7     MR. PREGON: Objection.
8     A  There's a -- There's an unknown risk to any
9 person who is struggling. There's all kind of factors
10 that are -- and whether it be prone, health, whatever, you
11 know, there's all kinds of unknown variables. But I think
12 that's safe to say with about any type of physical
13 restraint that has to be -- that takes a considerable
14 amount of action.
15 BY MR. DICELLO:
16     **Q**  **Well, no disrespect, Sergeant, but are you**
17 **aware that there is considerable research and literature**
18 **in your field that reports on the incidents and the**
19 **increased risk of sudden death in the prone restraint**
20 **position?**
21     A  I'm aware --
22     MR. PREGON: Objection.
23     A  I am aware of that.
24 BY MR. DICELLO:

                               Page 69

1    Q   You are aware that research has shown that the
2  prone restraint is a potentially hazardous and lethal
3  restraint position; correct?
4        MR. PREGON:  Objection.
5    A   Yes.  It's potentially hazardous, yes, sir.
6  BY MR. DICELLO:
7    Q   And that's what the governor of the State of
8  Ohio says in his executive order.  It says, "Research has
9  shown that prone restraint is a hazardous and potentially
10  lethal position"; correct?
11       MR. PREGON:  Objection.
12   A   I've never seen this document before.
13  BY MR. DICELLO:
14   Q   I'm showing this to you now for the first time
15  in your career; right?
16   A   If you're asking me if his remarks about a
17  prone position, could it lethal?  That has obviously been
18  backed up by numerous studies.
19   Q   And were you aware that there was a committee
20  that the governors had put together to study prone
21  restraint?
22   A   No, I wouldn't be made aware of that.
23   Q   So regardless of what is in this executive
24  order or not, you do agree with bullet three, that prone

Page 70

1    A   They know what can occur any time you restrain
2  somebody, including up to -- I mean, any time you have
3  struggles or interact with inmates within the correction
4  facility, the worst case scenario is death.
5    Q   True.
6    A   The best case scenario is a cuff release into
7  their pod, medical treatment, what have you.  They are
8  taught and trained of what all the variables are,
9  including positional, yes, sir.
10   Q   They're supposed to be taught that; correct?
11       MR. PREGON:  Objection.
12   A   They are taught that.
13  BY MR. DICELLO:
14   Q   So the folks who sit in this chair and answer
15  my questions should say, "I've been taught about all of
16  these variables that go into the risk of positional
17  asphyxia"?
18   A   I'm telling you what -- I should sit there and
19  say I'm telling you what we are taught as an agency of the
20  sheriff's office.  They go through a correctional training
21  as a corrections officer.  My assumption is that part,
22  because it is very similar to what my interactions would
23  be, even at the street level, would also be taught.  What
24  they are exactly taught during that corrections academy

Page 72

1  research has shown that the prone position is a hazardous
2  and potentially lethal restraint; correct?
3        MR. PREGON:  Objection.
4    A   Yes.
5  BY MR. DICELLO:
6    Q   And corrections officers working at the
7  Montgomery County Jail should know that; true?
8        MR. PREGON:  Objection.
9    A   We know what all of the hazards are any time we
10  have an interaction with an inmate, whether it's prone,
11  upright, standing.  We're aware of what all the variables
12  are.  We're taught that.
13  BY MR. DICELLO:
14   Q   I know you're speaking for yourself primarily.
15  My question is a little different.  Corrections
16  officers -- And I'm not talking about the folks that have
17  the experience that you have on the street and through
18  policing and your career.  I'm talking corrections
19  officers at the Montgomery County Jail should know about
20  the hazardous and potentially lethal position that is the
21  restraint position, correct, prone restraint position?
22       MR. PREGON:  Objection.
23  BY MR. DICELLO:
24   Q   They should know about that?

Page 71

1  and whatnot, I can't attest to.  I did not take the
2  corrections academy.
3    Q   You went a different route?
4    A   Yes, sir.
5    Q   It's your expectation that they should be
6  taught that stuff?
7    A   I would hope so, yes, sir.
8    Q   Sergeant, do you agree that corrections
9  officers or law enforcement personnel must never restrain
10  people in ways that pose an unnecessary risk of death?
11       MR. PREGON:  Objection.
12   A   Yes.
13  BY MR. DICELLO:
14   Q   That's a rule, isn't it, of law enforcement?
15   A   Yes.
16   Q   And the reason that's the rule is because if
17  you restrain somebody in a way that poses an unnecessary
18  risk of death, that's excessive force; right?
19       MR. PREGON:  Objection.
20  BY MR. DICELLO:
21   Q   Because it's unnecessary?
22   A   If you are purposefully using unnecessary means
23  when there's another -- And it's situational.  It's so
24  situational.

Page 73

19 (Pages 70 to 73)

1    Q   I understand that.  But there has to be some
2  rules; right?
3    A   There is no -- It's painting an incident with a
4  raw brush.  Excessive, any time you use the word -- you
5  throw the word "excessive" in there, if I'm doing
6  something outside of the reasonable realm and it can be
7  excessive, then that is unacceptable.  But there are
8  always situations out there where you have to get
9  something dealt with, restrained, and then -- and then
10  adapt from -- I think you used even transitional, we're
11  taught -- "transitional" is the word you used.
12  Transitional can be from that prone position to the chair
13  that we talked about.  That is transitional.
14    Q   Sure.
15    A   Maybe in the eyes of whoever, Joe Public, your
16  clients, or whoever, that transition took too long.
17  Again, that is -- that is -- that's a matter of opinion,
18  which is obviously why we're here, of what was --
19    Q   The lawyers will tell you that's a matter for
20  the Court.
21    A   -- of what that timeframe, what is that
22  acceptable timeframe.  And again, my belief is that we
23  weren't excessive.
24    Q   All right.

Page 74

1    A   And that we -- And had we been, yeah, then the
2  answer, the long-winded answer to your question is it's
3  unacceptable.
4    Q   Your answers are getting as long as my
5  questions.
6        MR. PREGON:  Are we at a good restroom break?
7        MR. DICELLO:  Yeah.
8        (Discussion held off the record.)
9  BY MR. DICELLO:
10    Q   Sergeant, we're back from a short break.  I
11  think before we did take a break, I was asking you a
12  question that you agreed with.  The question was
13  corrections officers must never restrain people in ways
14  that pose an unnecessary risk of death.  I think you
15  agreed with that; correct?
16    A   Yes, sir.
17    Q   And then I think what we were following up on
18  at the time we took our break is --
19        (Phone beeping.)
20    A   I'm sorry.
21  BY MR. DICELLO:
22    Q   Do you need to take it?
23    A   No, no.  I had it off.  I must have
24  accidentally bumped it.  I'm sorry.

Page 75

1    Q   My follow-up question as to that rule we just
2  talked about, I said if a corrections officer were to do
3  something like that, restrain someone in a way that posed
4  an unnecessary risk of death, it would amount to excessive
5  force because it is in fact unnecessary.  Do you agree
6  with that?
7    A   Yes.
8    Q   When faced with two or more ways to restrain a
9  member of the public or a detainee at the Montgomery
10  County Jail, do you agree a corrections officer must
11  choose the safer alternative?
12    A   What are -- I guess I caution the answer.
13  You're saying two or more ways.  When there's multiple
14  ways, whether it be two, three, four, we should always
15  choose the safer most reasonable means for the entirety of
16  what that situation is.  So it's not -- again, it's
17  definitely situational for sure.
18    Q   And you use the example of hog-tying.  And
19  there was probably a day decades ago where officers said,
20  "I think the safest way is to hog-tie somebody"; right?
21    A   Yeah.  I mean, I believe that probably at the
22  beginning of my career that was probably still an accepted
23  practice almost 18 years ago.
24    Q   And over the course of time, it no longer is an

Page 76

1  accepted practice; right?
2    A   It is not.
3    Q   And so even though hog-tying might represent
4  the safest way for everybody involved on the correction
5  officer side of things, it's no longer an accepted
6  practice because it puts the inmate at an unacceptable
7  risk of injury or death; correct?
8    A   It would be if we used hog-tying.  And again,
9  in this case we did not hog-tie anyone.
10    Q   I understand.  But what I'm getting at is there
11  can be multiple different ways to restrain someone, and
12  there might be some ways from the corrections officer's
13  standpoint that are the absolute safest, but they're
14  unreasonable, like hog-tying is an example of that;
15  correct?
16        MR. PREGON:  Objection.
17    A   Hog-tying will always be unreasonable.
18  BY MR. DICELLO:
19    Q   Well, it wasn't always; right?
20    A   Well, in today -- the way we are trained and we
21  have tools that are available to us, hence the restraint
22  chair, that is why we have things, tools of that nature
23  available to us to be able to transition, you know, at
24  that time, when we're able to safely do so, transition to

Page 77

20  (Pages 74 to 77)

1  those type of positions.
2      Q   The point I'm trying to make, and I'm being
3  clumsy about it, when a corrections officer is considering
4  ways to restrain an inmate under the totality of the
5  circumstances, the safety of the inmate has to be
6  considered?
7      A   Always.
8      Q   And so when we're talking about safety from the
9  standpoint of the inmate, if there are two or more ways to
10  restrain an inmate, all other things being equal, the
11  corrections officer must choose the safer way; agreed?
12     A   Yes.
13     Q   That's another rule in corrections; correct?
14         MR. PREGON:  Objection.
15     A   That we always use the safest means necessary
16  and the most appropriate?  I don't know what the exact
17  verbiage is.  But we would always use the most -- the
18  safest ways to restrain somebody, the most, you know,
19  what's going to be effective for that situation and the
20  safest, both for not only the officers, but also for the
21  inmate, yes.
22  BY MR. DICELLO:
23     Q   Has anybody ever trained you on kind of
24  developments in the case law as they're announced as to

Page 78

1  what are constitutional versus unconstitutional practices?
2      A   For restraints?
3      Q   Sure.
4      A   I go through -- We go through updates that are
5  sent, whether it be policy and procedure changes, where we
6  sign off on those policies and procedures.  There can be
7  updates that are, I don't know if they're necessarily
8  policy changes, but things to consider, whether it be from
9  case law, refreshers.  For example, they push out things
10  for breastfeeding laws.
11     Q   Yeah.
12     A   You know, to make people aware of those.
13  Because it's very -- it's misconstrued on what -- how you
14  handle that situation.  And it's pretty cut and dry.  So
15  they'll push out things like that that we would very
16  easily come on a day-to-day basis contact with, things of
17  that nature.
18         So the long-winded answer to your question is
19  yes, we get updates, sometimes legal updates, and we would
20  sign off on anything that comes through our agency through
21  what's called PowerDMS.
22     Q   What does DMS stand for?
23     A   I don't know what it stands for.  We just call
24  it PowerDMS.  It's an electronical -- or electronic

Page 79

1  web-based product that is for the sheriff's office.  There
2  are other agencies all across the country that use it.
3  But it can be supportive for training, all of our policies
4  and procedures are uploaded onto that, electronic means,
5  you know, everybody is trying to do the paper friendly, so
6  things of that nature.
7      Q   And what was the name of that?
8      A   PowerDMS.
9      Q   PowerDMS.  Okay.
10         There's been a lot of documents exchanged in
11  this case, binders and binders.  And I've looked at every
12  single page.  I didn't come across any kind of legal
13  update or bulletin that speaks to the status of the law on
14  prone restraint.  It might be in there, I didn't see it.
15  Can you call to mind any kind of legal update through this
16  system that you've told us about or things that people are
17  pushing out to you that advised you as to what the status
18  of the law is for issues concerning prone restraint?
19     A   In regards to whether we can do it or whether
20  we cannot do it?
21     Q   Yeah, whether it's constitutional or
22  unconstitutional.
23     A   I haven't seen anything that says we cannot
24  prone -- prone somebody out.  In this case, again, he

Page 80

1  wasn't -- he wasn't prone, we didn't prone him out.  He
2  was on -- He was out when -- You know, whether -- and that
3  would be something that obviously those corrections
4  officers and Sergeant Jackson would probably have to
5  answer to, whether he came out, was already on his face,
6  proning out.  The term of "proning out" is the physical
7  telling somebody, giving them a directive, them getting
8  themselves on the ground and proning themselves out.  That
9  is the -- That is the --
10     Q   That's not prone restraint?
11     A   That is proned -- proned out.
12     Q   Right.
13     A   So whether that person was already prone prior
14  to us getting them under control, they're -- they're
15  not -- they're not apples to apples.
16     Q   I think you and I are speaking the same
17  language.  We know the difference between telling somebody
18  to get prone and proning themselves out and prone
19  restraint.
20     A   Right.
21     Q   And in this case, we're talking about prone
22  restraint; correct?
23     A   Yes.
24     Q   All right.  So some medical folks from NaphCare

Page 81

21 (Pages 78 to 81)

1  did respond to this incident; correct?

2      A   They did.

3      Q   And like the corrections officers, the medical

4  staff, are you aware they complete their own reports and

5  their own -- they write everything down, try to make sure

6  they get it correct?

7      A   Yeah. They're supposed to, yes, sir.

8      Q   All right. And reading all these documents,

9  and I'm going to limit them for you today if I can, one of

10 the medical personnel that responded said, "The

11 patient" -- They refer to the inmate as a patient. "The

12 patient was being held down in a prone position by several

13 corrections officers." Because that's what was happening;

14 correct?

15     MR. PREGON:   Objection.

16     A   Several officers physically holding and

17 restraining Mr. Richardson down at the same time?  No.  I

18 mean, what is the term -- Was there multiple, several, is

19 that two, three, is it -- again, it's speculative and open

20 to interpretation.  No different than combative was that

21 we spoke about earlier.

22 BY MR. DICELLO:

23     Q   So the NaphCare employee that wrote, after this

24 incident occurred, in his or her report, based on his or

Page 82

---

1  her observations, that the patient was being Held down in

2  a prone position by several corrections officers, that

3  person got it wrong?

4      MR. PREGON:   Objection.

5      A   I think you're reading a sentence that, again,

6  whether you've asked him or you're going to ask him, I

7  assume -- my interpretation of what I saw was there was

8  transition between officers several times throughout

9  interaction with Mr. Richardson where several correction

10 officers were transitioning from either the leg position,

11 his shoulder, transitioning Mr. Richardson to his side.

12 So there was several officers involved in that process.

13 So a continuous of several officers or deputies physically

14 touching Mr. Richardson, I would say that that is

15 definitely inaccurate.

16 BY MR. DICELLO:

17     Q   You think that the video evidence would support

18 your statement?

19     A   I know the video evidence will support that.

20 Because I can account for myself, Sergeant Jackson, and at

21 times other corrections officers in the standing position

22 at and around Mr. Richardson, but not physically touching

23 him.  So -- And that transition changed throughout the

24 video.

Page 83

---

1      Q   So I don't want to revisit the questions, we'll

2  rely on the record where he wasn't being restrained, he

3  wanted to get up, but he wasn't being allowed to get up,

4  but he wasn't being held down.  Are we going to revisit

5  that or are we just going to let it stand where it is?

6      MR. PREGON:   Objection.

7      A   That's up to you.  You're steering this car,

8  not me.

9  BY MR. DICELLO:

10     Q   All right.  Are you aware of a rule in

11 corrections and law enforcement that as soon as a person

12 is handcuffed when they're in a prone position that you

13 have to get that person off of his or her stomach

14 immediately?

15     MR. PREGON:   Objection.

16     A   I don't -- Does it say immediately?

17 BY MR. DICELLO:

18     Q   I'm asking you.

19     A   I don't believe it says immediately.  I think

20 there's a reasonable timeframe to that.  And I think that

21 that is, again, it's -- every case is going to be --

22 What's reasonable, I think what was reasonable was

23 Mr. Richardson was restrained, and then restrained in the

24 most at that time comfortable position that we could keep

Page 84

---

1  Mr. Richardson under what we felt -- felt -- feeled,

2  sorry.

3      Q   That's all right.

4      A   -- was safe for him and for us under the

5  unknown circumstances, while we continually monitored him

6  both on his belly, onto his side, onto his belly, onto his

7  side, numerous different times, and then put into that

8  restraint chair.  That restraint chair was that part that

9  was initially asked for.  And that is why we know that,

10 again, we're not going to leave Mr. Richardson just flatly

11 laying on his belly throughout the process, which is not

12 what we did in this case, and then he would have been

13 transitioned to that chair.  And we just didn't get to

14 that point unfortunately.

15     Q   Mr. Richardson I think you -- I'm using a

16 little bit different word -- but I think you told me he

17 was subdued by the officers there; correct?

18     MR. PREGON:   Objection.

19     A   I never said "subdued."  We were monitoring

20 him.

21 BY MR. DICELLO:

22     Q   Well, you said he was restrained.

23     A   He was in cuffs, in handcuffs.  That would be

24 restrained.

Page 85

22 (Pages 82 to 85)

1    **Q**  He was under your control; correct?

2    **A**  Yeah, he was under control.

3    **Q**  **Was he subdued?**

4    **A**  I'm not sure I'm following you by the

5  difference of "subdued" and "restrained."  I mean, not --

6    **Q**  **Yeah, no longer violent, didn't present a**

7  **threat to anybody.  He had been subdued.**

8    **A**  Yeah, I don't know that.  If you disengage from

9  anybody, does that change after the fact?  That's

10  situational and that's hindsight and we never got to that

11  point.  So I don't know what would have happened.

12    **Q**  **When you're arresting people on the street and**

13  **they're being resistant, do you just keep them on their**

14  **stomach indefinitely?**

15    **A**  Do I keep people that have been arrested

16  without -- Well, again, it's not apples to apples.  I

17  don't --

18    **Q**  **I'm trying to understand when you'd get this**

19  **guy off of his belly.**

20    **A**  When we're able to.  When we're reasonably able

21  to, not only for our safety, but also for the fact that's

22  come in about the person that we're interacting with,

23  whether it be the person on the street.  We don't prone

24  somebody out and tell them and then handcuff them and walk

**Page 86**

1  away and go run a license, their driver's license, and

2  leave them proned out.  We don't do that.  Again, he was

3  -- It's not apples to apples with what Mr. Richardson's

4  demeanor, previous demeanor and behavior was prior to

5  being restrained or as he was restrained.

6    **Q**  **So it's your testimony that Mr. Richardson**

7  **needed to remain in the position that's depicted in the**

8  **video for at least 22 minutes?**

9    **A**  He wasn't in that position depicted in the

10  video that you showed me for all of 22 minutes.  He was

11  rolled over multiple times on his side, reassessed,

12  breathing mask, and things of that nature with medical

13  staff.  So the entirety of that incident he was not prone

14  for 22 minutes.

15    **Q**  **How many minutes was he prone?**

16    **A**  I don't know.

17    **Q**  **Did anybody investigate that?**

18    **A**  That would be something that you would,

19  obviously I'm sure, follow up with the investigators.

20    **Q**  **Who were the investigators?**

21    **A**  Well, the risk management investigation is

22  handled by the people assigned to Internal Affairs

23  Division, which at that time would have been Sergeant

24  Tommy Flanders and Detective Michael Sollenberger.  And

**Page 87**

1  then also called out in that process, always by

2  procedurally, is going to be investigators with the

3  Special Investigations Division.  In this case, it was

4  Detective Michael, which is John Clymer, but we call him

5  Michael, Detective Mike Clymer was the investigator that I

6  spoke to briefly that incident.  And I believe there was

7  another detective or two called out.  I want to say that

8  there might have been a Detective Conley also called out.

9  And I don't recall whether I had actual interactions with

10  him that day or not.  He might have been handling some

11  other aspects of it kind of on the back end of it.

12    **Q**  **Why do they call it a risk management**

13  **investigation?**

14    MR. PREGON:  Objection.

15    **A**  Any time that you have, in the line of duty,

16  deaths, jail deaths, custodial deaths, there has to be an

17  independent, maybe independent is not the right word, but

18  an agency who is overseeing that, one, was all the

19  policies and procedures that we were trained on, were

20  those followed.  If they weren't followed, why weren't

21  they followed?  All that write-up is done.  It's an aspect

22  of the internal investigation into what resulted or did or

23  did not result in the outcome of what the event was, in

24  this case Mr. Richardson's death.

**Page 88**

1  BY MR. DICELLO:

2    **Q**  **Shouldn't it be a criminal investigation?**

3    **A**  Well, Mr. -- It could involve that.  It could

4  come into that.  Or it could go criminally.  And that's

5  why John Clymer, Michael Clymer, and those detectives,

6  Special Investigations, they do that -- they do that as a

7  whole, both come in there, because it's easy for -- and

8  I'll put this as my own past of doing both of those

9  positions.

10    **Q**  **Okay.**

11    **A**  It's easy for me to come and sit there and say,

12  as an IA, here you guys go, this is everything.  But what

13  if what I saw is a little bit different than what you're

14  seeing right then and there and something that can be,

15  "Hey, did you see" -- It's no different than a homicide.

16  "Hey, did you notice that there's a little bit of blood on

17  the back of this bunk over here?  Did you see that"?  So

18  there again, it's covering the bases of not only, one, is

19  it going to get to that point, is somebody going to be

20  charged criminally, whether it be the roommate, whether it

21  be staff, it's done in conjunction so it can be as

22  thorough as possible.

23    **Q**  **Okay.**

24    **A**  You'll never get a sense of it's got to be

**Page 89**

1   video and everything else, seeing things live and what
2   you're seeing physically there is the best way to do any
3   investigation.  So that's why they're both called out at
4   the same time.
5       Q   Your narrative says that "Officers D. Johnson
6   and Henning were replaced by Officers Beach, Mayes and
7   Marshall who continued to maintain control of Inmate
8   Richardson to prevent him from further injuring himself."
9   Is that what you wrote?
10      A   Uh-huh.
11      Q   Yes?
12      A   Sorry.  I was drinking.  Yes.
13      Q   Your statement "further injuring himself," I
14  read that to mean that Mr. Richardson had already injured
15  himself once.
16      A   Yeah.  I mean, the blood, I don't know what the
17  blood was from at that point.  So was that him -- the
18  initial when they were trying to get him handcuffed?  Did
19  he bang his lip?  Again, I don't know.  Again, I just know
20  there was an injury, whether it be from medical, unknown
21  medical reason.
22      Q   So are you telling us that these, it looks like
23  three officers replaced two, so they could control Inmate
24  Richardson from moving so he didn't injure himself?

Page 90

1       MR. PREGON:  Objection.
2       A   From moving, from getting -- more so getting
3   up, yes.
4       BY MR. DICELLO:
5       Q   They were holding him down?
6       A   No.  I mean, if he had got to that point where
7   he was going to try to get up, would they have held him
8   down?  If that was necessary to keep him safe, then yes,
9   of course they would have.
10      Q   So you're telling us he wasn't trying to get
11  up?
12      A   He was initially.  But in this report, I don't
13  know whether he's 16 minutes into it when they
14  transitioned out, at what point was going on.  But we're
15  just not going to -- what initially happened, we're not
16  going to just 100 percent do an about-face.  We have to be
17  prepared based on what was originally presented to us.
18  And again, the safest means for that was putting him in
19  the chair.
20      Q   So why wasn't he put in the chair?
21      A   Because we weren't able to transition to that
22  point before we realized that he had stopped breathing.
23      Q   What was the plan in terms of when you were
24  going to put him in the chair?

Page 91

1       A   When the chair arrived and we could get the
2   chair up the steps and get him transitioned.
3       Q   I deposed two other officers who say the chair
4   was there.
5       A   The chair did arrive.
6       Q   And I believe the chair was there within the
7   first five minutes.
8       A   I don't know that to be the case.
9       MR. PREGON:  Objection.
10  BY MR. DICELLO:
11      Q   Because Officer Wittman just testified that he
12  saw the chair --
13      A   Uh-huh.
14      Q   -- get delivered.  So why wasn't the chair ever
15  brought upstairs?
16      A   There could be several factors.  And I don't
17  know that his timeframe would be from the timeframe that
18  he arrived on scene, which I don't know when that was.  So
19  was that 15 minutes after already what was going on?  I
20  don't know the answer to that.
21      Q   Let me break this down a bit.  It sounds to me
22  you're telling me, you said the safest position for
23  Mr. Richardson under the circumstances would be to get him
24  in the restraint chair; correct?

Page 92

1       A   For us to better assess him.  The safest point
2   was initially, yes, in the position that he was.
3       Q   Okay.
4       A   Continually moving him back and forth on his
5   side, monitoring him, and then transitioning him to the
6   chair.  Because in order to get him down to medical, we
7   would have to safely do so.  Walking was not an option.
8   So putting him in that restraint chair was the easiest
9   means to do so.
10      Q   And how long does it take to get a restraint
11  chair to a medical emergency?
12      A   It depends on staffing.  We can't leave cells
13  and other areas of the jail unsecured, so those have to be
14  maintained.  So it depends -- a lot of it has to do with
15  staffing.
16      Q   Do you know how long it took the restraint
17  chair to get to this emergency on May 19th, 2012?
18      A   I do not.  But what I do also know is that we
19  were -- there was also at some point a determination of
20  whether they, medically, what medical wanted to do as far
21  as whatever the shot was that they administered or whether
22  that was going to be implemented before they put him into
23  the chair.  There was a conversation about that.  So there
24  would have been a delay, also, for that.

Page 93

1        So that chair could very well be on scene four
2   or five minutes.  But there are other steps that at times,
3   and I'm not saying in this case that was the case, but I
4   believe there was some type of mitigating circumstances as
5   far as getting that shot dealt with first and then put him
6   in the chair.  I believe there was a discussion about
7   that.
8        Q    Would Robert Richardson have injured himself if
9   he was on his back?
10            MR. PREGON:  Objection.
11       A    I have no idea.
12   BY MR. DICELLO:
13       Q    So why didn't you roll him over onto his back?
14       A    It's a matter of perspective.  I mean, it's a
15   matter of opinion.  He was, again, continually being put
16   on his side, back to his stomach, on his side, and
17   monitored.  I have the full confidence that he was being
18   assessed in the proper means both medically and by the
19   corrections officers.
20       Q    So you thought it was easier for the medical
21   staff to get access to his face and mouth while he was
22   lying facedown as opposed to lying on his back?
23            MR. PREGON:  Objection.
24       A    Well, that's why he was transitioned to his

Page 94

1        A    He was already in a position where we had
2   everything under control.
3        Q    So is that why you didn't roll him onto his
4   back, because you were worried somebody might get hurt?
5        A    Because we already had the situation under
6   control.
7        Q    But we know there's an increased risk, or do
8   we, I thought we said, yeah, we know there's an increased
9   risk of positional asphyxia when you've got overweight
10   guys on their bellies and they're cuffed behind their back
11   and they're struggling and they're potentially on drugs
12   and --
13            MR. PREGON:  Objection.
14       A    And again, that's why we repeatedly put him on
15   his side.  He was not in the prone position for the
16   entirety of the 22 minutes.
17   BY MR. DICELLO:
18       Q    The video will show how long he was in the
19   prone position.
20       A    I understand.  And that's fine.
21       Q    Okay.
22       A    But again, we continually assessed him, put him
23   on his side, put him back to prone, and continually
24   monitored him with the assistance of medical.

Page 96

1   side, also.  And had they not -- had they needed him
2   transitioned to his back to better medical assess him,
3   then we would have done that at their direction.
4   BY MR. DICELLO:
5        Q    So you were able to roll him onto his back if
6   you guys wanted to; correct?
7        A    We were probably able to do a lot of things.
8        Q    Let's try to get from one question to the next,
9   Sergeant.  I do appreciate the banter, but we have to get
10   answers to the questions and move to the next one.
11            Between you and the number of other correction
12   officers that were there at the time, you could have
13   turned Mr. Richardson onto his back; correct?
14       A    We could have, but I would not have.
15       Q    And you could have done so without injuring
16   yourselves; correct?
17            MR. PREGON:  Objection.
18       A    I don't know that to be the case.
19   BY MR. DICELLO:
20       Q    So somebody probably would have got hurt if you
21   tried to roll him onto his back?
22       A    It's possible.
23       Q    But it wasn't possible that somebody would get
24   hurt by keeping him on his belly?

Page 95

1        Q    In terms of risk factors that increase the risk
2   of positional asphyxia for somebody in a prone position
3   being restrained, do you agree that obesity is a risk
4   factor for positional asphyxia?
5        A    It is a risk factor, yes.
6        Q    And particularly, a large abdomen; correct?
7            MR. PREGON:  Objection.
8        A    If you're -- A large abdomen probably comes
9   with obesity in most cases.  Not always.
10   BY MR. DICELLO:
11       Q    Right.  So particularly an obese person that
12   has a large abdomen is at greater risk of positional
13   asphyxia, because when they're laying on their belly, the
14   contents of the stomach press up into the diaphragm.  Do
15   you understand that?
16            MR. PREGON:  Objection.
17       A    I do.  But also at the time that I arrived on
18   scene, I was not assessing Mr. Richardson's abdomen.  I
19   mean, that wouldn't be part of my --
20   BY MR. DICELLO:
21       Q    You could have assessed that if you rolled him
22   over onto his back; correct?
23            MR. PREGON:  Objection.
24       A    Yeah, I guess I could have.

Page 97

25 (Pages 94 to 97)

BY MR. DICELLO:

Q And you know that's a risk factor for positional asphyxia; true?

MR. PREGON: Objection.

A Size and weight is a risk factor.

BY MR. DICELLO:

Q Is drug use a risk factor for positional asphyxia?

MR. PREGON: Objection.

BY MR. DICELLO:

Q Do you know?

A I don't know that all drug use is. I don't know that I could speak on that.

Q All right. Psychosis?

MR. PREGON: Objection.

A Yeah.

MR. DICELLO: What's the basis of these objections?

MR. PREGON: I'm not sure -- You haven't established a foundation for whether he would know that or not. If you're asking him if he knows that, that's fine. But you're asking leading questions.

MR. DICELLO: Yeah, I'm allowed to lead him. He's a defendant in the case.

Page 98

MR. PREGON: Then I'll object to foundation.

BY MR. DICELLO:

Q And if you don't know the answer, you can just say "I don't know."

A Yeah. As far as the medical, what medicines a person could be on or things of that nature, I would -- I have no idea.

Q My question is: Do you know whether psychosis is a risk factor for positional asphyxia?

A I do not.

Q Pre-existing heart disease?

A No. I mean, I -- I'm sure it could be a factor, but I don't know it to be a -- I mean, I don't know it to be 100 percent.

Q Pressure on the abdomen?

A Without even being obese? A person being on top of somebody putting pressure on their abdomen, that could be positional, yes.

Q Respiratory muscle fatigue?

A Yes.

Q And that comes about as a result of struggling with officers; correct?

MR. PREGON: Objection.

A Yeah, it could come -- that's one of the

Page 99

factors that it could come from, yes.

BY MR. DICELLO:

Q And that's why you understand that participation in a struggle is also a risk factor for sudden death by positional asphyxia; correct?

MR. PREGON: Objection.

A Say that one more time.

BY MR. DICELLO:

Q Yeah. Participation by the inmate in a struggle is a risk factor that increases the risk of positional asphyxia. Were you aware of that or were you not aware of that as of May 19th, 2012?

A No, it's a factor. Any time somebody is at a heightened state it can increase things, yes.

Q The use of rear handcuffing while in a prone position is a risk factor that increases the risk of positional asphyxia; true?

A Yes.

Q An enlarged heart, is that a risk factor for positional asphyxia?

A Medically, I don't know. I mean, I could make assumptions, but I'm not going to do that.

Q Foam or mucus coming from the nose or mouth, is that a risk factor that increases the risk that somebody

Page 100

might be asphyxiating from their positioning?

A Yeah, it could be, but I don't know that that was the case in this situation.

Q Signs of someone who is having trouble breathing, that's another risk factor for positional asphyxia; correct?

A Yes.

Q And obviously verbal complaints that somebody can't breathe is another risk factor for positional asphyxia; correct?

MR. PREGON: Objection.

A Yes, sir.

BY MR. DICELLO:

Q So I've seen the video, Sergeant Lewis, and we can look at it if you want. But it seems to me that you were positioned on the right side of Mr. Richardson for most of the time; correct?

A Yeah. I was at a bend in the rail of the -- kind of the way the catwalk works on that floor, I was kind of on this side of it. You can see where I had my elbow rested just monitoring.

Q And you were kind of closer to where his feet were pointing as opposed to where his head was pointing?

A No, I would have been closer to his head.

Page 101

1    Q   Closer to his head.  It's a little hard to tell
2  the dimensions.
3    A   Yeah, his feet were more towards where the
4  doorway was, and his head towards the railway, and you can
5  see I was sitting there, watching the COs, and at one
6  point I had walked into his housing unit, the 544, and
7  walked back out.
8    Q   Did you hear Mr. Richardson say anything other
9  than "Get off me" and "Let me up"?  And I think what you
10  told me is you heard him say that at or around the time he
11  was first cuffed up; right?
12    A   Yeah, in proximity of after we had -- I don't
13  know if he was completely restrained at that point or he
14  was not.  I don't -- I'm not positive about that.
15    Q   Did you hear him say anything else over the --
16  The video shows it's about 22 minutes long.  Did you hear
17  Mr. Richardson say anything else over the next 22 minutes
18  or so?
19    MR. PREGON:  Objection.
20    A   No, I don't recall.  I mean, I don't recall him
21  saying anything else.
22  BY MR. DICELLO:
23    Q   Did you hear him making any noises?
24    A   Nah.

Page 102

1    Q   Could you hear him breathing?
2    A   I could see that he was breathing.
3    Q   Did you see whether he was sweating or not?
4    A   I don't recall whether he was or whether he
5  wasn't.
6    Q   So Mr. Richardson was just lying there making
7  no noise at all and he wasn't saying anything?
8    A   I'm not saying that he was or he wasn't.  I
9  just don't recall.
10    Q   Don't remember?
11    A   Yeah.  I know he had that little bit of blood
12  around his mouth, which Medic Stockhauser was dealing
13  with.
14    Q   Medic Stockhauser reported that Richardson kept
15  yelling.  Did you ever hear him yelling?
16    A   I don't remember that he was.  He may have
17  been.  I don't remember.  It's been quite some time ago,
18  obviously.
19    Q   Medic Stockhauser said "Inmate Richardson kept
20  yelling 'I want loose' and 'Get out of here.'"  Do you
21  remember him yelling those things?
22    A   No, huh-uh.  Keep in mind, too, I was also in
23  and out of the Delta Pod.  So again, what was said and
24  what wasn't said could have also transpired during that

Page 103

1  timeframe.  I don't know.
2    Q   All right.
3    A   And I don't recall what part of that, even when
4  I came in and out of -- I know I was in and out of there,
5  but I don't recall whether I was out of the Delta Pod
6  prior to realizing that Mr. Richardson had stopped --
7  before we realized he had stopped breathing.  But I know
8  that I was probably out of the video a few times.  And
9  whether that was me going back down to the lower level or
10  whatnot, I don't know.
11    Q   Did you witness any uses of force on that date?
12    A   Well, I mean, restraining somebody technically
13  is use of force.  So yes.
14    Q   Okay.
15    A   I mean, restraining somebody from letting them
16  get up.  I mean, it's --
17    Q   That's what I think.
18    A   Yeah.
19    Q   So --
20    A   Is it the use of force for spray and along
21  those same lines under the same guidelines?  No.  I mean,
22  they are different.  I mean, I can use some type of
23  limited force.
24    Q   Well, no Use of Force Reports have been filled

Page 104

1  out that I can find.
2    A   Uh-huh.
3    Q   Yes?  Have you seen any?
4    A   No, huh-uh.
5    Q   But force was used against Mr. Richardson;
6  correct?
7    A   Not in the sense of that, no.
8    Q   Isn't it true, Sergeant, that force was used
9  against this man up until the point he died?
10    A   Not -- Not the force that you're -- you're --
11    Q   A different kind of force?
12    A   Yes.
13    Q   What kind of force was used against him, the
14  kind that doesn't have to be reported?
15    A   There are -- There are -- So if I put my hand,
16  and say, "Hey, come on over here," that's not a Use of
17  Force Report.
18    Q   What about putting somebody facedown on the
19  ground and handcuffing them, hands behind their back?
20    A   I don't -- I don't -- Again, he was facedown
21  when I got down there.
22    Q   How do you think he got there?
23    A   There was no -- That's something that you're
24  going to have to ask Sergeant Jackson and Dusty Johnson

Page 105

1 and Officer Henning, his position when he came out of that
2 door.
3   **Q   Are you surprised that there's no Use of Force**
4 **Reports considering this man was on the ground being**
5 **restrained, was handcuffed for the better part of 22**
6 **minutes until he died?**
7   A   I'm not surprised.
8   **Q   That's how it works at the jail, Use of Force**
9 **Reports aren't filled out in those circumstances; correct?**
10      MR. PREGON:  Objection.
11   A   That's not the case.  We're very diligent on
12 filling out our Use of Force Reports when appropriate.
13 BY MR. DICELLO:
14   **Q   So why weren't they filled out here?**
15   A   Because the assessment of what was reported
16 during this incident didn't require it.
17   **Q   Why not?**
18   A   It didn't meet the requirements.
19   **Q   What are the requirements then, if holding**
20 **someone down until they die doesn't meet it?**
21      MR. PREGON:  Objection.
22   A   Strikes, balance displacements, things of that
23 nature.  And none of that was reported to me and nor was
24 it witnessed by me.  Placing somebody and securing them in

Page 106

1 handcuffs and maintaining their position down on the
2 ground is not a Use of Force Report.  Using strikes and
3 things of that nature, pressure points, would be -- would
4 elevate that -- would change that situation.
5 BY MR. DICELLO:
6   **Q   So the escort position isn't force?**
7   A   Where was he put in the escort position?
8   **Q   Have you read the reports from your other**
9 **officers where they said they escorted him to the ground**
10 **to prevent him from unintentionally attacking people and**
11 **injuring himself?**
12   A   I didn't -- Yeah, I didn't see where they said
13 they escorted him to the ground.
14   **Q   Okay.  I think two officers list that that is**
15 **what they did.  So if they escorted him to the ground, is**
16 **that a use of force that should be reported in a Use of**
17 **Force Report?**
18   A   Depends on the sense of escort, I would say.
19   **Q   Okay.**
20   A   That would be something you would have to ask
21 them.
22   **Q   "He was assisted onto his stomach and secured**
23 **with two pair of handcuffs.  I placed my left knee over**
24 **his lower legs to prevent him from kicking."  That's not a**

Page 107

1 use of force?
2   A   No.
3   **Q   "Fearing an unintentional attack on staff,"**
4 **what is that?  What is an unintentional attack?  Do people**
5 **attack people unintentionally at the jail?**
6   A   Yeah, if they're jerking, whatever.  It could
7 be people that aren't aware or in the right state of mind,
8 could not intend to do any harm to anybody, but their
9 actions could cause harm to an individual.  No different
10 than the earlier scenario like I stated about
11 unintentionally everybody going over that rail.
12   **Q   Okay.**
13   A   The same thing.
14   **Q   Here's another statement in your reports.**
15 **"Fearing an unintentional attack on staff, I escorted -- I**
16 **assisted Richardson onto his stomach and secured his left**
17 **arm behind his back.  I straddled his lower hips in an**
18 **attempt to control Richardson's movements so he would not**
19 **injure himself or staff."  That's not a use of force?**
20   A   No.
21   **Q   "I took control of Inmate Richardson's**
22 **shoulders while he was on the ground to prevent him from**
23 **rolling over."  That's not a use of force?**
24   A   No, it's not.

Page 108

1   **Q   He was trying to roll over?**
2   A   It's not a use of force.
3   **Q   Mr. Richardson was trying to roll over though;**
4 **right?**
5      MR. PREGON:  Objection.
6   A   That's what his report says.
7 BY MR. DICELLO:
8   **Q   "I assisted in restraining him by controlling**
9 **his right arm and shoulder."  None of that stuff was use**
10 **of force?**
11   A   No.
12   **Q   When would it have gotten to the point where it**
13 **was a use of force that had to be reported as such?**
14   A   Well, I previously stated strikes, pressure
15 point manipulation, things of that nature.
16   **Q   Do you remember where you were when someone**
17 **noticed that Mr. Richardson was dead?**
18      MR. PREGON:  Objection.
19   A   You mean when -- when we noticed he stopped
20 breathing?
21 BY MR. DICELLO:
22   **Q   Right.  I mean, not breathing is inconsistent**
23 **with life; right?**
24   A   Well, not breathing and dead are two different

Page 109

things, actually.

Q   Do you remember where you were when Mr. Richardson stopped breathing?

A   I do.

Q   Can you tell me that?

A   Yeah.  I was at that split of the rail that I told you about.

Q   The same place you told me about before?

A   Yep.

Q   Are you the one that announced "I'm worried he's not breathing anymore" or was that somebody else?

A   It might have been a couple of us.  But I know that I said, "Hey, check his breathing."  Yeah, "check his breathing."  I noticed there was a change.

Q   And what did you notice?  That's a better question.

A   Yeah, he wasn't -- When I was watching and monitoring from that position, I could tell that he was breathing.  I mean, he still -- even his size, again, I don't know what his weight was, but he's a broad guy, a big guy, and I noticed that that stopped.  So that's when I said "Check him."

Q   Okay.  And who checked him; do you remember?  Was it Stumpff?

Page 110

A   There was Stumpff, Mayes was down there, also, in that area.  Again, Beach was already on the scene.  But at the head position, I want to say it was Mayes and Stumpff, I want to say.

Q   What do you remember them saying to you?

A   They advised that, yeah -- I mean, at some point they assessed him and stated that they did not believe he was breathing, and then he was transitioned to his back.

Q   Why?

A   For that situation, if he's not breathing, then we have protocol medical we may have to go into, one, opening his airway to perform, you know, we're hoping not CPR, but this case we have to be prepared for that.  But it's the best way to assess.

Q   His handcuffs weren't removed though; correct?

A   I don't know at what point they were.  Again, those handcuffs are a very -- that's why we put them on there, because it allows his arms to be to his side.  So even if he was rolled over, his arms would have been at his side without being underneath his body, because of the length of that chain.  That's why we had transitioned him previously to those.

Q   Okay.  I don't think we have to go through it

Page 111

blow-by-blow here, but you were present for the CPR efforts and --

A   Yes, I was.

Q   Did you stay with the body until Mr. Richardson was declared deceased?

A   The entire time, I don't believe I did.  I think I was -- Again, there's procedural stuff that takes place once the -- once it's determined -- resuscitation attempts are called to an end, which that decision is a protocol procedure through the fire department, EMS, they have protocols that they have to follow, that they test for and certify every year, and they renew.  And again, the only reason I know that is just my about to be dangerous knowledge of the back in the day doing that stuff.

So they either make a phone -- they make a phone call to medical and let -- be in the hospital, let them know the situation that they have.  They also let them know that they had a doctor on the scene that was concurring with their failure to reassess -- to bring Mr. Richardson back to life.

Q   Okay.

A   So I was -- Yeah, I was -- I believe I was out and back in.  I was definitely back into the pod when he

Page 112

was removed.

Q   You interviewed his cellmate?  You interviewed Mr. Richardson's cellmate?

A   I did.

Q   Did you interview any other detainees?

A   No, I don't believe I did.

Q   And then I think your report says a detective responded and you delivered all the information that you had to the detective?

A   Yeah, I gave Mike Clymer, John Clymer, a verbal of what Mr. Maxwell had told me, and then I had a brief discussion with Jim Fannin, he's the coroner's investigator that comes out when there's another procedure that's still going to take place, and just give him a brief synopsis.  So what he does for a write-up, I don't know what he does for a write-up.  But he takes photos similar to what it would be for one of our techs coming out and doing a criminal investigation.

Q   I saw there's a log, a pod log that shows every time somebody goes in and out, in and out.  And I saw -- One of the detectives you haven't mentioned is a Detective Michael Sollenberger.  Was he involved in investigating this at all to your knowledge?

A   Yeah.  He's in the Inspectional Services Unit,

Page 113

29 (Pages 110 to 113)

1    Internal Affairs.  He would have been involved in that --
2    into the risk management that we spoke of.
3        Q   Detective Sollenberger has no business being a
4    corrections officer, does he?
5        MR. PREGON:  Objection.
6        A   As far as what?  I don't understand what you
7    mean by that.
8    BY MR. DICELLO:
9        Q   He's racist?
10       A   That's a matter of your opinion.
11       MR. PREGON:  Objection.
12   BY MR. DICELLO:
13       Q   What's your opinion?
14       A   I've seen Detective Sollenberger throughout
15   investigations throughout his career treat everybody
16   fairly, properly.  I've never seen him act outside of that
17   means while -- during the presence of myself on duty.  And
18   I know what you're getting at.
19       Q   Yeah.  I'm not going to beat around.  You know
20   exactly what I'm getting at.
21       A   I'll just lead into that, so we can knock that
22   door down now.
23       Q   His behavior is totally unacceptable; agreed?
24       MR. PREGON:  Objection.

Page 114

1        Nick, will you give me a continuing on this
2    line so I don't have to keep objecting?
3        MR. DICELLO:  Sure.
4        MR. PREGON:  All right.
5        A   This is going to be stuff that Mike is going to
6    have to answer to, because when the investigation
7    initiated for our off-duty incident, our contact has not
8    -- we have not had contact.
9    BY MR. DICELLO:
10       Q   Good.
11       A   Over a timeframe of I think two to three years,
12   there were text messages.  What happened between Mike
13   Sollenberger and all the other people he was texting,
14   outside of me, is something that Mike is going to have to
15   answer to.  Whether -- And I've read the investigation,
16   not all of it in its entirety because, like you, I'm sure,
17   it's like, geez, do you know what I mean?  I just don't --
18   I don't want to sound like I don't -- I worry about what I
19   feel about people and how I am.  I have enough negativity
20   that I have to deal with on a day-to-day basis just from
21   what's going on in the world itself and everything else.
22   So I skimmed through a lot of their stuff.  I know it's
23   bad.  I saw what people saw on the news.  But I still to
24   this day haven't read every single text message.

Page 115

1        Whether those are really his, that's his
2    argument.  I know what his argument was during the
3    internal investigation, because I was told that he alleges
4    those aren't him and they were fabricated or whatnot, he
5    was going through a custody battle in a divorce.  He'll
6    have to answer to that.
7        All I know is my one text message that I was
8    disciplined for was a slang term that was not appropriate
9    in the context of the conversation that he sent me one
10   night.  And during those three years of text messages that
11   they had or whatnot, that was the only span where
12   anything.  So had I had known that he was just an outright
13   racist individual, he probably would have been sending me
14   a lot more text messages than what he did that night.  And
15   the only reason he sent me a text message that night was
16   because he ran into a friend that he knew was a close
17   friend of mine.  Otherwise, I probably never would have
18   received a text message from him.
19       Q   But excuse my language, okay?  Please.  But he
20   did send you a text message where he said, "I hate
21   niggers"?
22       A   He did.  And I did not respond.
23       Q   Black people in this community have the right,
24   the constitutional right, not to be subject to

Page 116

1    discrimination over at the jail; agreed?
2        A   I agree.
3        Q   Do you think that it was his wife that was
4    texting you that day that said -- when he said, "I hate
5    niggers"?
6        A   Well, if I'm responding to that text, obviously
7    my assumption would be that it was Mike Sollenberger,
8    which is what I reported in my investigation.
9        Q   When Detective Sollenberger texted you "I hate
10   niggers," did you report him?
11       A   Did I report him?  No, I did not.
12       Q   Why not?
13       A   I did not -- That was a private conversation.
14   And again, his interactions with people at work and around
15   me had never showed that side of him mistreating anybody.
16   And I took it as nothing more than just words.  I mean, no
17   matter how inappropriate they are, people say things that
18   are outside of color that could be considered harsh or
19   insensitive.
20       Q   Well, it's three words.  So how could it be
21   interpreted other than "I hate niggers"?
22       A   And again, I did not respond to that.
23       Q   I understand.  But I mean, you've told us you
24   have this duty to protect people's constitutional rights,

Page 117

30 (Pages 114 to 117)

1    and you know there's African American people, black people
2    like Robert Richardson, who you're responsible for the
3    care, custody, and control over; correct?
4        A   I am.  But that text message didn't have
5    anything to do with the care that we provided
6    Mr. Richardson.  And Detective Sollenberger wasn't there
7    during the care of Mr. Richardson.
8        Q   He showed up and investigated it.
9        A   So his -- his involvement in that would not
10   have changed the outcome of Mr. Richardson's -- whether he
11   lived or he died.  So what he said text messaging wise
12   really is a whole separate issue.  It's a whole separate
13   issue.
14       Q   That's what you think?
15       A   Yes, I do.
16       Q   Are you willing to take some responsibility
17   today on the record and say you should have reported him
18   for that kind of comment, that that should be brought to
19   the sheriff's attention?
20       A   What relevance does that have?
21       Q   He's not fit to be investigating uses of force
22   down at the jail against black people.
23       A   Again, at that time, I didn't even recall the
24   text messages.  And I only recall still the fact that he

Page 118

---

1    ran into a friend of mine at that -- at Boston's Bistro.
2        Q   Sergeant Lewis, are you making excuses for
3    Detective Sollenberger's text?
4        A   No.
5        Q   Then don't.
6        A   I think you need to ask him what his mind is.
7    They're not -- They're racist remarks.  It doesn't take me
8    to bring that up or you to bring that up.  You know what
9    is racist.  The word "I hate niggers" isn't appropriate.
10   But I still fail to see what relevance that has.
11       Q   To the death of a black man in the jail?
12       A   Yeah, for me.  Yes.
13       Q   This text message he sent to you was sent
14   before he showed up to investigate Robert Richardson's
15   death, wasn't it?
16       A   I don't know.
17       Q   It looks like it was sent to you March 30th of
18   2012; correct?
19       A   Yeah.  I'm well aware of the text.
20       Q   I'm sure you are.
21       A   And again, what his state of the mind is,
22   whether he is flatly using the term as a blanket statement
23   against a person of color, you'll have to ask him.  I
24   don't believe that he has a blanket statement against

Page 119

---

1    black people, that he hates black people, no matter how
2    inappropriate his text message was to me.
3        Q   Well, what does he say after he says "I hate
4    niggers"?
5        A   That's the last text I see on here.
6        Q   What are the next two words?
7        A   "That is all."  You'll have to ask him what he
8    means by that.
9        Q   You never asked him?
10       A   No.  Why would I?  I didn't respond to the
11   text.
12       Q   Are you telling me you had no reason to ask why
13   somebody who has risen to the ranks of a detective in your
14   department and who is responsible for investigating
15   potential excessive uses of force against black people who
16   are subject to the care, custody, and control of your
17   department, you had no reason to question whether this guy
18   was fit for the job after he sends you a text message a
19   few months before my client died saying "I hate niggers.
20   That is all"?
21       A   If I was concerned that Detective Sollenberger
22   based his investigations or was biased on his
23   investigations because of color, he would have been
24   reported.

Page 120

---

1        Q   You don't want to talk to me about his bias, do
2    you?  Do you want to talk about his bias towards black
3    people?
4        A   You're steering the car.  Whatever you want to
5    ask me.
6        Q   I'm trying to give you a chance to take some
7    responsibility and say "This is totally unacceptable and
8    it shouldn't happen."
9        A   I'm going to say this, hopefully for the last
10   time.  I am taking responsibility for my actions.  If I
11   thought that texting was all appropriate, Mike
12   Sollenberger and I would probably still be out drinking
13   beer, maybe at Boston's.  We don't do that.  So do I think
14   that those text messages are acceptable?  No, I do not.
15   Do I think that that had a bearing on this investigation
16   or how Mr. Richardson was treated by the staff that I was
17   in control of during that timeframe?  One hundred percent
18   absolutely not.
19       Q   Why not?  How can you be so positive of that?
20       A   Because I'm a good judgment of what's right and
21   what's wrong and how investigations are handled.  And the
22   agency as a whole, there are steps and procedures that
23   take place.  Mike Clymer, who does that side-by-side
24   investigation, if Mike Clymer, who is not implemented in

Page 121

31 (Pages 118 to 121)

1  any of these text messages, felt that something was being
2  covered up, then we would have been down that different
3  road, that criminal investigation aspect. I mean, it
4  would have been reported, and then so on for the following
5  steps. That was not the case.
6      Q  Captain Flanders was implicated in this?
7      A  Yes, he was.
8      Q  Deputy Jamie Horton was implicated in this?
9      A  Yes, he was.
10     Q  Does he work at the jail?
11     A  No, he does not.
12     Q  Deputy Joseph Connelly, he was implicated in
13  this? Does he work at the jail?
14     A  I don't know where -- He was a deputy on the
15  road as far as I know.
16     Q  Why does it say Jail Division next to Deputy
17  Jamie Horton's name if he doesn't work at the jail?
18     A  He works at the jail -- He works at courts,
19  which is under the Jail Division. So he does transports
20  back and forth to the courts.
21     Q  Deputy Brad Daugherty, he was implicated in
22  this. Do you know if he works at the jail?
23     A  He does not.
24     Q  The first time he uses a racial slur "nigger"

Page 122

1  trying to take over Boston's", the local restaurant?
2      A  Yes, sir. That's what I was disciplined for,
3  yes, sir.
4      Q  So what gate were you talking about?
5      A  That is a term that we use in law enforcement
6  meaning --
7      Q  Who was letting the black people in?
8      A  No, that's not what it means. That's your
9  words, not mine. And if you read my investigation, you'll
10  see that that's not my words nor will it ever be my words.
11  The gates meaning we have areas that we patrol, like
12  Washington Township, and we'll use the same thing when we
13  have a rash of break-ins, which is uncommon for an area,
14  "who left the gates open," meaning the bubble of the
15  Emerald City. So that is a common term that we use, and
16  not in the context that you're alluding to.
17     Q  And what is nog beer?
18     A  Nog beer is black thug.
19     Q  "Nog" means black thug?
20     A  "Nog" means thug in the sense of black, just
21  like calling somebody white trash. It's the same. It's
22  no more -- It's no nicer than calling a person white
23  trash. And that's no nicer than what I -- what I -- what
24  I said.

Page 124

1  during your text messages with Detective Sollenberger is
2  -- BTW, do you understand that means by the way?
3      A  Yes.
4      Q  "BTW, the niggers are trying to take over
5  Boston's." That's the text message he sent you?
6      A  Yes.
7      Q  What did you think --
8      A  That's based on --
9      Q  What did you think he meant by that?
10     MR. PREGON:  Objection.
11     A  What do I think he meant by that?
12  BY MR. DICELLO:
13     Q  How did you interpret that text?
14     A  I interpreted it as he is talking about black
15  thugs and he's using a word -- he's using a word I don't
16  use. Now, whether he chooses to use that word, that's
17  something he has to answer to. I don't agree with that.
18  That's why you're not seeing me talk like that on there.
19     Q  Well, your response is "Who left their gate!"
20  Exclamation point, exclamation point, exclamation point,
21  exclamation point, exclamation point, exclamation point,
22  exclamation point, exclamation point, exclamation point.
23  "The don't serve Nog beer there." That was your response
24  to the detective saying, "By the way, the niggers are

Page 123

1      MS. STARTS:  Can we take a quick break?
2      MR. DICELLO:  Sure.
3      (Discussion held off the record.)
4  BY MR. DICELLO:
5      Q  So we're back from a short break. I appreciate
6  your patience with me here, Sergeant.
7      Just for purposes of identifying these text
8  messages for the record, I'm showing you what's been
9  marked as -- the Bates stamp is MC 3548. And do you
10  recognize this series of text messages as text messages
11  that were exchanged between you and Detective Sollenberger
12  in March of 2012?
13     A  Yes. They would be consistent with text
14  messages exchanged between us, yes.
15     MR. PREGON:  You didn't make that an exhibit,
16  did you?
17     MR. DICELLO:  I didn't.
18  BY MR. DICELLO:
19     Q  And in addition to some of the things we
20  already read, Detective Sollenberger, when he mentioned to
21  you that there were four -- again, I'm going to use
22  the language he uses, and it's frustrating to have to do
23  that, but when he said there were four niggers at the bar,
24  you said, "I hope u packing"; right?

Page 125

1    A  Uh-huh.

2    Q  Yes?

3    A  Yes.

4    Q  And then he said, "I'm not.  I'll stab a coon."

5    A  Uh-huh.  Yes, sir.

6    Q  And you said, "Thataboy."

7    A  Yes, sir.

8    Q  Now, in terms of the organization, captain is

9  pretty high up there; right?

10    A  Yes, sir.

11    Q  If I understand this correctly, it goes

12  sheriff, chief deputy, major, captain?

13    A  Yes, sir.

14    Q  Correct?

15    A  Yes, sir.

16    Q  And when it comes to the Jail Division side of

17  things, there's a major that oversees the jail; yes?

18    A  Yes, sir.

19    Q  And then right underneath the major are two

20  captains; correct?

21    A  Yes, sir.

22    Q  A captain on the administrative side and a

23  captain on the operations side; correct?

24    A  Yes, sir.

Page 126

---

1    Q  What was Captain Flanders?  Do you know if he

2  was operations or administrative?

3    A  He wasn't a captain then.  He was a sergeant

4  assigned to the Inspectional Services Unit.

5    Q  So at the time he was text messaging with

6  Detective Sollenberger, he was not yet a captain?

7    A  No, I don't believe he was.

8    Q  As of May 7th of 2012?

9    A  Yeah, I'm fairly certain he was a sergeant back

10  then.  Because I think if you -- you probably have copies

11  of the risk management, is that right, I would assume?  I

12  believe that Tommy Flanders's signature is probably on

13  that as a sergeant, if I'm not mistaken.  I've never seen

14  the risk management.  But I don't think Tommy was a

15  captain yet during that.

16    MR. PREGON:  You're talking about the one from

17  the Richardson matter, that report?

18    THE WITNESS:  Yeah.

19    MR. PREGON:  Okay.

20    A  I mean, he may have been.  But I don't think he

21  was, because -- I'm trying to think who was assigned to

22  Internal Affairs with Mike when that investigation was

23  done.  And he might -- he might have been.  He might have

24  been.  I'm just not positive.  Sorry.

Page 127

---

1  BY MR. DICELLO:

2    Q  So I'm showing you.  It says Sergeant Tom

3  Flanders.

4    A  Yeah.  I didn't think he had been a captain.  I

5  wasn't positive.

6    Q  Well, thanks.

7    So as of November 2012 when the risk management

8  review report was completed by the Inspectional Services

9  Unit, Tom Flanders was a sergeant; correct?

10    A  He was.

11    Q  And he has since that time been promoted to

12  captain?

13    A  Yeah.  He was promoted to captain prior to his

14  termination, yes, sir.  After the incident with

15  Mr. Richardson, he was promoted to captain.

16    Q  And then at some point in time, Captain

17  Flanders was terminated; correct?

18    A  He was.

19    Q  For engaging in racist text messages with

20  Sergeant -- or I'm sorry -- Detective Sollenberger;

21  correct?

22    A  Yeah.  The conditions of his termination, I

23  don't know whether they were for the totality of the text

24  messaging or the violation of insubordination as far as

Page 128

---

1  the truthfulness during an investigation.  And I don't

2  recall which, if not both, were mitigating or one

3  outweighed the other as far as the termination.  I think

4  that would probably be in his disciplinary hearing

5  finding.

6    Q  Do you think members of the black community in

7  this area should have faith and confidence in the sheriff

8  that he's not employing racist corrections officers?

9    MR. PREGON:  Objection.

10    A  I think that the citizens of Montgomery County

11  should be very -- oh, what's the word -- satisfied with

12  Sheriff Plummer's handling of the Montgomery County

13  Sheriff's Office.  Those text messages, and I'll speak for

14  myself, I'm not going to be speak on behalf of Mike

15  Sollenberger or Tommy Flanders, but for myself are --

16  obviously, I wish it never happened.  Whether I sent the

17  one text, the one response, at the end of the day, one,

18  ten, what did it really matter in hindsight now that I

19  look back at it?  It can't change what I did, what I said.

20  And I'm not going to speak to whether he thinks he should

21  have changed or whether he should have changed anything.

22    So that's something that I think Detective

23  Sollenberger or Mike Sollenberger and Tommy Flanders will

24  have to answer to.  But I think the sheriff's office --

Page 129

1  and I know the sheriff's office does not condone this
2  behavior, and Sheriff Plummer did exactly what I think
3  anybody would expect a man to do, and, more, since then.
4  And I know for a fact that he is beloved by the community
5  in Montgomery County for his interactions with all the
6  public, including the black community. And I don't think
7  that there's any black leader in Dayton that would
8  disagree with that, because of his interactions, and
9  continued. And this was prior to all of this. And I
10  think that's why they have a great deal of respect and did
11  meetings in public and talked about this. They were able
12  to do that side by side and implement even further changes
13  with the sheriff's office. So as a whole, I think our
14  sheriff's office does a great job hiring people.
15      Q   Were you ever interviewed by any investigators
16  as to what happened?
17      MR. PREGON:  Are we back on the Richardson?
18      MR. DICELLO:  Yeah. Sorry.
19  BY MR. DICELLO:
20      Q   Yeah, let's put the text messaging aside,
21  hopefully for the last time for you, frankly. But were
22  you interviewed by investigators surrounding the death of
23  Robert Richardson?
24      A   No. There was no interview. There was a brief

Page 130

1  pass-on, preliminary pass-on to Mike Clymer, again, that I
2  had talked to Mr. Maxwell, and then John had some -- John
3  and Mike being the same person, Clymer had some -- I
4  believe a follow-up with Mr. Maxwell.
5      Q   Did the investigators interview anyone?
6      A   Yeah. I mean, they did. Who they interviewed,
7  I don't know.
8      Q   Would they have documented those interviews
9  based on your experience? I think you said you've handled
10  some of these kinds of investigations.
11      A   Yeah, they would put -- No different than what
12  I did here. I did a brief of what Mr. Maxwell told me,
13  implemented in my report. They would do similar
14  documentation. It could be either in the form of actually
15  injected into their investigation, or they could refer to
16  that information saying "see statements" or things of that
17  nature. So there are a couple of different variables of
18  how that could be done.
19      Q   Do they -- In your experience, do they record
20  these interviews?
21      A   Not all interviews, no.
22      Q   So we have to rely on the investigator's
23  version of what the people who were interviewed said?
24      A   That's correct.

Page 131

1      Q   The people that were investigating this death
2  work for the county; correct?
3      A   They do.
4      Q   They're fellow officers; right?
5      A   They are.
6      Q   And you guys would lay down your life for one
7  another; right?
8      A   I would lay down my life for anybody deemed --
9  that is deemed necessary if it gets to that point, whether
10  an officer or a citizen.
11      Q   But there is a brotherhood amongst fellow
12  officers?
13      A   Of course there is. Yes, sir.
14      Q   So these folks who are supposed to be
15  conducting an independent investigation into the death of
16  a non-officer at the hands of officers, you have to
17  understand, I mean, admit, they've got some bias; right?
18      MR. PREGON:  Objection.
19      A   No. I don't -- I'm not going to -- Again, it
20  goes back to that oath that you asked. Again, I don't
21  have it memorized by any means. But within that oath it
22  talks about integrity and honesty, and things of that
23  nature. So that comes into that oath. And that's exactly
24  what we are held to, that standard. And then when we

Page 132

1  don't do things within that standard, there are
2  repercussions. No different than the repercussions that I
3  faced that we've previously discussed, and the other
4  officers.
5      So no, I do not believe the investigation is
6  biased. And that's why we're put in these positions, to
7  be able to do an unbiased investigation.
8      Q   Well, given that's the standard and that the
9  investigation needs to be unbiased, why wouldn't a record
10  be created of what the witnesses are saying when they're
11  being interviewed, much like we're doing right now?
12      A   Yeah, I can't speak for who they spoke to, and
13  I'm not 100 percent about this, but I believe there are
14  some witness statements. I don't know that to be a fact,
15  but I believe there are some witness statements even
16  taken.
17      Q   Well, you're the first person I've deposed who
18  was interviewed.
19      A   Uh-huh.
20      Q   Yeah?
21      A   I'm sorry, what?
22      Q   You're the first person I've deposed who was
23  even spoken to or interviewed by an investigator. So the
24  other officers were not.

Page 133

34 (Pages 130 to 133)

1    A   Well, I don't know.  Yeah, I don't know that.
2  I mean, I don't know at what point when -- Is it okay if I
3  keep referring to John Clymer as Mike Clymer?
4    Q   Sure.
5    A   So I don't know if when Mike got there, if he
6  had -- who he had talked to yet.  I wasn't meeting him at
7  the door.  And I don't even remember what part of the jail
8  I was in by the time that Mike arrived.  I could very well
9  have been back in the booking office and they called me
10 back to that floor.  I don't know the answer to that.
11   **Q   But wouldn't you expect somebody is**
12 **investigating the death of a young man in the jail to**
13 **interview the people who were there when he died?**
14   MR. PREGON:  Objection.
15   A   I think that as an investigator, the employees
16 of the sheriff's office, we are required to complete
17 thorough and complete reports.  If Detective Clymer feels
18 it's necessary during -- it comes to his knowledge during
19 that investigation, he's there, that he needs to talk to
20 us individually to gather more information, he will do so
21 and would have done so.  Also, looking at reports is
22 another means for him to conduct his investigation,
23 because we're taught to do complete, thorough reports.
24   BY MR. DICELLO:

Page 134

1  aware once I got served with the lawsuit.
2    Q   What's your understanding of how Mr. Richardson
3  died?
4    A   I believe it was cardiac arrest, and then he
5  also had some marijuana in his system from what I
6  understand.
7    Q   And what's your understanding of what caused
8  him to have cardiac arrest?
9    A   I don't know that I know the reason for that.
10   Q   Do you understand that it was a result of his
11 interaction with the officers?
12   MR. PREGON:  Objection.
13   A   I don't know that that's the case.
14 BY MR. DICELLO:
15   Q   So he just had a heart attack before the
16 officers ever got there, or do you know?
17   A   Well, that might very well have been what was
18 potentially occurring, that unknown medical.  I don't
19 know.
20   Q   So if the unknown medical was he had a heart
21 attack, and that's why you guys were responding, you
22 restrained Mr. Richardson in the moments after he suffered
23 a heart attack?
24   A   Well, in the report, what's found in that

Page 136

1    Q   And in the reports, there are a lot of
2  statements from inmates that say people had their knee on
3  his back, people were -- you saw those statements, too;
4  right?
5    A   I did.  And it would be no different than I
6  guess what you asked me about us being biased towards our
7  own.  I guess I could sit there and say that those inmates
8  could potentially be biased towards a fellow inmate, or it
9  could be perception from their point of view from where
10 they were at, also.
11   Q   Absolutely.  How did you learn about the cause
12 of death?
13   A   I don't know if it was until I got served.
14   Q   With this complaint?
15   A   Yeah.  I don't know if I -- I don't know if I
16 knew before then or not.  I don't know if I knew the
17 results of the risk management, which wouldn't be anything
18 crazy if I did.  But I don't know that I did.  I may have
19 known the results of the risk management once it was
20 completely done with the coroners.  Because nothing is
21 finalized, really, until they got everything done with the
22 coroner and he has his official report.  I wouldn't ever
23 see a copy of that.  But I don't know if I ever heard,
24 hey, it ended up being this or that.  But I definitely was

Page 135

1  report is going to be the after effect of what's known
2  after.  We don't know at that time.  And we're -- It's a
3  rapidly evolving, and making a lot of -- hoping, you know,
4  that you're doing -- you're making the right -- it's --
5  making the right decisions as far as this needs to be the
6  next step, let's do this, let's do that.
7    Again, in our case, we didn't know he was
8  having a heart attack.  We didn't know what was going on.
9  And that's why we assessed the situation that we did.
10 Whether anybody agrees that we did it the right way or
11 not, that was the decision we made to continually monitor
12 him and try to make that determination.  That
13 determination had -- unless he had said something to us,
14 physically been able to say, "Hey, I'm having chest pains"
15 or something like that, I think that would give us a good
16 indication that, hey, this guy might be having a heart
17 attack.  But again, that wasn't known to us at that time.
18 We were trying to figure it out.
19   Q   And why weren't you able to figure it out?
20   A   Those tools just aren't -- Those tools aren't
21 available.  That requires -- I mean, going just back to
22 fire days, putting people on leads, things like that, that
23 wasn't -- again, those tools weren't available to us.
24   Q   I guess what I'm getting at is if he was having

Page 137

35 (Pages 134 to 137)

1  a heart attack while he was on the ground and handcuffed,
2  why didn't you get him to the hospital?
3      A  Well, that may have been very well the next
4  step that we got to.  Again, we were dealing with what we
5  knew at the time.  And the progress was, again, checking
6  his airway, maintaining that, keeping things, you know,
7  the assessment process going on with the oxygen, the
8  putting him on his side, to getting him at what point
9  whether -- what the medicine was, again, I don't know what
10 the medicine was, to what that was going to do based on
11 what they felt was the necessity of doing that medicine
12 before transitioning him to that restraint chair that we
13 had asked for.
14      If we had got him down into the restraint chair
15 and then his demeanor changed to that full arrest where we
16 were doing CPR, then we would have had to transition him
17 out of the restraint chair and onto the floor and done
18 what we needed to do.  Had he gone to medical and then
19 gone into some kind of cardiac arrest, that transport to
20 the hospital, had it got to that point, would have been
21 that process.  We just never made it to that process.
22      Q  We'll let the forensic pathologist explain to
23 the jury how Mr. Richardson died.  But if it's going to be
24 the defense in this case, which I've heard, that he died

Page 138

1  from a heart attack, you agree that he needed emergency
2  medical care as soon as possible; right?
3      MR. PREGON:  Objection.
4      A  And he was getting that with not only the
5  training that we have, nurses, medics, and then
6  immediately calling and requesting assistance of the
7  paramedics from the Dayton Fire Department, and having a
8  doctor present on the scene.  So he -- That's why we staff
9  that facility the way that we do.
10 BY MR. DICELLO:
11     Q  Last couple of questions here.  I presume,
12 because I've asked everybody else, that no one was
13 disciplined as a result of this; correct?
14     A  Not that I'm aware of.
15     Q  Nobody underwent additional training as a
16 result his death; correct?
17     A  No, we had just -- again, I was present during
18 a little bit of Deputy Wittman's testimony -- the
19 continual training that we do yearly, yes, sir.
20     Q  No one had to undergo any type of remedial
21 training as a result of this; correct?
22     A  Not that I'm aware of.
23     Q  And I know we've looked at some policies, and
24 the language is what it is and the jury can decide what

Page 139

1  they want about that.  But as far as you understand the
2  policies and procedures, not what's written down, but
3  what's actually happening practically speaking, the way
4  things are done around the jail, those kind of policies
5  and procedures, those were all followed as far as you
6  understand on May 19th, 2012 by everybody involved;
7  correct?
8      MR. PREGON:  Objection.
9      A  Yeah.  Maybe you threw me off, though.  What do
10 you mean by "the way things are done around the jail"?
11 BY MR. DICELLO:
12     Q  It's one thing to write something down on a
13 piece of paper and say, this is the policy.  As you know,
14 it's another thing everyday what happens inside the jail.
15 So I'm not focused on what's written down in the books
16 anymore.  I'm focusing now on the way you understood
17 things are supposed to be done and are done at the jail.
18 All those policies and procedures, as you understood them,
19 were followed on May 19th, 2012 by everyone?
20     A  Yeah.  All the policies and procedures that I
21 observed and witnessed, and the interactions with
22 personnel, those written policies and procedures and
23 everything that we were taught unwritten through training,
24 whether it be CPR and what have you, everything was

Page 140

1  followed to the letter of the law as far as what I saw.
2      Q  In your position as a sergeant, I know you're
3  not responsible for training, I mean, there's a whole
4  separate division that does that; correct?
5      A  That's correct.
6      Q  But as somebody who is responsible for
7  supervising other corrections officers, do you have to
8  have some understanding of what the training is that
9  they're supposed to have?
10     A  Yeah.  I mean, I'm going through the same
11 training.  So yeah, I mean, I have a fairly accurate of
12 what's going on, because I'm going through the same
13 training that they are, as far as the deputies go.
14     Q  So the sheriff himself or the sheriff's office
15 itself, you know, kind of the same way, different way to
16 say the same thing, do you understand that the sheriff's
17 office has to instruct and train corrections officers to
18 restrain detainees in a way that does not pose an
19 unnecessary risk of death?
20     A  Yes.
21     Q  And do you understand that the sheriff's office
22 has to instruct and train corrections officers on the
23 dangers of positional asphyxia?
24     A  Yes.

Page 141

1    Q   Same question.  Does the sheriff's office have

2 to instruct and train its corrections officers on what

3 positional asphyxia is?

4    A   Yes.

5    Q   Does the sheriff's office have to instruct and

6 train corrections officers about who is at risk of dying

7 from positional asphyxia?

8    A   Yes.

9        MR. PREGON:  Objection.

10   A   All the risk factors that are involved, yes.

11 BY MR. DICELLO:

12   Q   And does the sheriff's office have to instruct

13 and train its officers on measures that must be taken to

14 minimize the risk of death due to positional asphyxia?

15       MR. PREGON:  Objection.

16   A   I'm sure that's in the training.

17 BY MR. DICELLO:

18   Q   All right.  I'm done.  Thanks for your

19 patience.

20   A   You're welcome.

21       MR. PREGON:  We'll read.

22            - - -

23       (Signature not waived.)

24            - - -

Page 142

---

1                      December 3, 2015

2 Dear Mr. Lewis,

3    You have chosen to read and sign your transcript.
Please do not mark on the transcript.  Any

4 corrections/changes you may desire to make in your
testimony should be typewritten or printed on the errata

5 sheet at the end of testimony, giving the page number,
line number and desired correction/change.  After you have

6 read the transcript, sign your name on the correction
sheet and where indicated at the close of testimony before

7 a notary public.

8    The Rules of Civil Procedure allow thirty days for
you to read and sign.  Please return the signature page

9 and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
Dublin, Ohio 43017 within that time.  Failure to do so in

10 the allotted time will result in your transcript being
used as though read and signed by you.

11

12               Sincerely,

13               _____
Whitney Layne
Professional Reporter

14

Cc:

15 Nick DiCello
Carrie Starts

16 Jamey Pregon

17

18

19

20

21

22

23

24

Page 144

---

1        And, thereupon, the deposition was concluded at

2 5:48 p.m.

3            - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 143

---

1 State of _____

2 County of _____

3    I, BRIAN LEWIS, do hereby certify that I have

4 read the foregoing transcript of my deposition given on

5 November 17, 2015: that together with the correction page

6 attached hereto noting changes in form or substance, if

7 any, it is true and correct.

8               _____

9               BRIAN LEWIS

10   I do hereby certify that the foregoing transcript

11 of the deposition of BRIAN LEWIS was submitted to the

12 witness for reading and signing: that after he had stated

13 to the undersigned Notary Public that he had read and

14 examined his deposition, he signed the same in my presence

15 on the ____ day of _____, 2015.

16               _____

17               Notary Public

18 My Commission Expires on _____

19            - - -

20

21

22

23

24

Page 145

Page 145

1    State of _____Ohio_____

2    County of ___Montgomery___

3        I, BRIAN LEWIS, do hereby certify that I have

4    read the foregoing transcript of my deposition given on

5    November 17, 2015; that together with the correction page

6    attached hereto noting changes in form or substance, if

7    any, it is true and correct.

8                            _Sgt. B. Lewis #B23_

9                            BRIAN LEWIS

10       I do hereby certify that the foregoing transcript

11   of the deposition of BRIAN LEWIS was submitted to the

12   witness for reading and signing; that after he had stated

13   to the undersigned Notary Public that he had read and

14   examined his deposition, he signed the same in my presence

15   on the _4_ day of _Jan._, 2016.

16                            _Kathy R. Dunkly_

17                            Notary Public

18   My Commission Expires on __12-10-17__

19                    - - -

20

21

22

23

24

Page 146

1 TO THE REPORTER:

2 I have read the entire transcript of my deposition taken

3 on the 17ᵗʰ day of November, 2015, or the same has been

4 read to me. I request that the following changes be

5 entered upon the record for the reasons indicated.

6

7 Page    Line    Correction and reason therefore

8 ___No Changes_____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 Date  1-4-2016  Signature  Sgt. B____ #523

24

Page 147

1                          CERTIFICATE

2      State of Ohio      :

3      County of Franklin:

4

5           I, Whitney Layne, Notary Public in and for the

6      State of Ohio, duly commissioned and qualified, certify

7      that the within named BRIAN LEWIS was by me duly sworn to

8      testify to the whole truth in the cause aforesaid; that

9      the testimony was taken down by me in stenotype in the

10     presence of said witness; afterwards transcribed upon a

11     computer; that the foregoing is a true and correct

12     transcript of the testimony given by said witness taken at

13     the time and place in the foregoing caption specified.

14

15          IN WITNESS WHEREOF, I have set my hand and

16     affixed my seal of office at Dublin, Ohio, on this 3rd day

17     of Decemer, 2015.

18                         _____

19                         Whitney Layne, Notary Public

20                         In and for the State of Ohio

21     My Commission expires May 4, 2020

22

23

24

**A**

abdomen 97:6,8,12
97:18 99:15,17
ability 52:4
able 32:8 37:4,23
44:20 47:5 48:5,9
51:7 53:9 77:23
77:24 86:20,20
91:21 95:5,7
130:11 133:7
137:14,19
about-face 91:16
absolute 77:13
absolutely 121:18
135:11
academy 10:1 12:11
62:13 72:24 73:2
acceptable 58:16
61:16 74:22
121:14
accepted 64:20
76:22 77:1,5
access 94:21
accidentally 75:24
account 46:12 83:20
accuracy 7:7
accurate 32:4 68:24
141:11
act 114:16
acting 37:13
action 69:14
actions 108:9
121:10
actual 88:9
Ad 19:8 22:12
adapt 74:10
add 20:20
addition 125:19
additional 139:15
adequate 28:20
administer 51:15
administered 93:21
administrative
12:21 14:15 15:2
15:8 126:22 127:2
Administrator 1:4
admit 132:17
advised 80:17 111:6
Affairs 87:22 114:1
127:22
affixed 147:16
afforded 27:23 28:1
aforesaid 147:8
African 25:2,12
118:1
afternoon 5:6
agencies 15:14
62:16,17,17 80:2
agency 10:5,12
15:21 72:19 79:20

88:18 121:22
ago 20:18 76:19,23
103:17
agree 53:22 54:6
58:18 66:16 67:2
67:17 70:24 73:8
76:5,10 97:3
117:2 123:17
139:1
agreed 56:6,7,9,10
56:12,14,19 58:16
75:12,15 78:11
114:23 117:1
agrees 137:10
ahead 25:7 41:10
43:11 52:9 55:18
57:20 59:13 67:5
airway 111:13
138:6
al 1:9
alleges 116:3
allotted 144:10
allow 144:8
allowed 84:3 98:23
allows 111:19
alluding 51:1,4
124:16
altercation 19:18
alternative 76:11
American 25:3,13
118:1
amount 19:20 43:15
46:11 69:14 76:4
And/or 56:13
Andrew 1:5
ankle 61:9
ANNE 2:17
announced 78:24
110:10
answer 6:16,21 37:8
57:12 72:14 75:2
75:2 76:12 79:18
81:5 92:20 99:3
115:6,15 116:6
123:17 129:24
134:10
answers 6:10 7:7
75:4 95:10
anybody 8:12 27:23
33:4 34:11 55:5
78:23 86:7,9
87:17 108:8
117:15 130:3
132:8 137:10
anymore 110:11
140:16
apologize 11:4
appear 52:17
APPEARANCES
2:1
appears 43:7

apples 81:15,15
86:16,16 87:3,3
applicable 1:15 3:6
applies 61:19 63:14
apply 53:23 54:7
55:13 56:8
applying 61:8
appreciate 37:8
52:14 66:18 95:9
125:5
approached 60:15
appropriate 78:16
106:12 116:8
119:9 121:11
approved 18:13
approximately 13:4
32:10
April 12:17,17,18
area 9:3 22:13 25:5
44:18 111:2
124:13 129:7
areas 15:10 93:13
124:11
argument 116:2,2
arm 108:17 109:9
arms 31:2,8 41:12
111:19,20
arrest 136:4,8
138:15,19
arrested 86:15
arresting 86:12
arrival 33:20
arrive 17:5 30:14
92:5
arrived 17:1,3,4,10
29:22,23 30:14
32:3,6,10,15,19
40:1 43:14 66:12
92:1,18 97:17
134:8
arriving 35:5 40:1,3
Asian 25:3
aside 130:20
asked 6:13,16 62:4
67:8 83:6 85:9
120:9 132:20
135:6 138:13
139:12
asking 12:8 20:9
28:10,14 29:23
36:17 46:2 70:16
75:11 84:18 98:21
98:22
aspect 88:21 122:3
aspects 15:12 88:11
asphyxia 72:17 96:9
97:2,4,13 98:3,8
99:9 100:5,11,17
100:20 101:6,10
141:23 142:3,7,14
asphyxiating 101:1

assault 19:12,13
38:18
assess 37:4 40:17,21
41:14 44:17 49:17
93:1 95:2 111:15
assessed 42:10
45:10 48:10 49:6
51:13 52:13 94:18
96:22 97:21 111:7
137:9
assessing 52:23
97:18
assessment 37:9
48:1,3 106:15
138:7
assigned 10:22,23
13:1 24:2 55:6
87:22 127:4,21
assignment 15:7
21:17
assist 30:21 31:7
47:6
assistance 31:21
96:24 139:6
ASSISTANT 2:17
assisted 39:21
107:22 108:16
109:8
assisting 39:4 40:6
ASSOCIATES 1:21
assume 6:16 21:21
83:7 127:11
assumed 34:11
assumption 22:19
72:21 117:7
assumptions 100:22
attached 145:6
attack 108:3,4,5,15
136:15,21,23
137:8,17 138:1
139:1
attacking 107:10
attempt 108:18
attempting 30:5
attempts 112:9
attending 11:13
33:7 39:5
attention 35:18
118:19
attest 73:1
ATTORNEY 2:17
audible 6:2
available 10:12
77:21,23 137:21
137:23
Avenue 1:16 2:3,7
aware 38:13,14,16
38:17 39:9 58:24
61:17,18 63:3,6
63:14 69:17,21,23
70:1,19,22 71:11

79:12 82:4 84:10
100:11,12 108:7
119:19 136:1
139:14,22

**B**

B 21:17
back 14:14 15:17
17:21 19:17 20:13
20:24 23:23 29:3
31:3 34:10 35:6
36:23 39:24 49:14
52:17 57:6 75:10
88:11 89:17 93:4
94:9,13,16,22
95:2,5,13,21 96:4
96:10,23 97:22
102:7 104:9
105:19 108:17
111:9 112:14,21
112:24,24 122:20
125:5 127:9
129:19 130:17
132:20 134:9,10
135:3 137:21
backdrop 33:6
backed 70:18
background 8:21
15:13 16:1
bad 42:5 115:23
balance 106:22
Ban 62:24
bang 90:19
banter 95:9
bar 125:23
Barbara 66:10
based 24:7 33:17
46:12 60:18 82:24
91:17 120:22
123:8 131:9
138:10
bases 89:18
basically 12:8 29:15
68:6
basis 15:15 79:16
98:17 115:20
Bates 125:9
battle 116:5
Beach 90:6 111:2
bear 66:17
bearing 66:18
121:15
beat 114:19
beeping 75:19
beer 121:13 123:23
124:17,18
beginning 44:2
45:15,22 76:22
behalf 2:5,9,13,19
5:13 129:14
behavior 19:14,21

37:22 44:17 47:2
47:3,8 87:4
114:23 130:2
**belief** 33:18,18
74:22
**believe** 13:3 16:21
21:9 35:2,17 40:2
44:11 46:6,10
50:13,14,20 76:21
84:19 88:6 92:6
94:4,6 111:8
112:6,23 113:6
119:24 127:7,12
131:4 133:5,13,15
136:4
**believed** 53:2
**bellies** 96:10
**belly** 49:23 60:6
66:3 68:7 85:6,6
85:11 86:19 95:24
97:13
**beloved** 130:4
**bend** 101:18
**benefited** 41:13
**best** 40:23 72:6 90:2
111:15
**better** 16:1,2 19:24
22:11 31:12 40:17
55:16 93:1 95:2
106:5 110:15
**Beyoglides** 1:4
**beyond** 61:19
**bias** 121:1,2 132:17
**biased** 120:22 133:6
135:6,8
**big** 24:21 28:2
110:21
**binders** 80:11,11
**Bistro** 119:1
**bit** 8:21 11:1 18:3
20:19,20 32:18
85:16 89:13,16
92:21 103:11
139:18
**biting** 38:24
**black** 22:20 23:22
24:4 25:3,13
116:23 118:1,22
119:11 120:1,1,15
121:2 123:14
124:7,18,19,20
129:6 130:6,7
**blanket** 19:10
119:22,24
**bleeding** 38:21
52:18
**blood** 35:13 39:3,5
39:18 55:23 56:3
56:11 89:16 90:16
90:17 103:11
**blow-by-blow** 112:1

**blown** 38:1
**body** 39:22 66:24
67:15 111:21
112:4
**Boehringer** 2:14
**booking** 16:7,9
17:20 29:4 134:9
**books** 140:15
**Boston's** 119:1
121:13 123:5
124:1
**Brad** 122:21
**Bravo** 21:17,23
**break** 6:19,22 11:1
17:22 66:20 75:6
75:10,11,18 92:21
125:1,5
**break-ins** 124:13
**breastfeeding** 79:10
**breathe** 52:5 53:9
101:9
**breathing** 39:7 40:9
43:17,18 50:19
51:18,21 52:21,24
53:1,2,24 54:4,8
54:12 55:14 56:13
87:12 91:22 101:5
103:1,2 104:7
109:20,22,24
110:3,11,13,14,19
111:8,11
**Brenda** 2:15
**Brian** 1:14 3:5 4:2
5:1,8 145:3,9,11
147:7
**brief** 113:11,15
130:24 131:12
**briefly** 88:6
**bring** 112:20 119:8
119:8
**broad** 31:5,5 36:2
36:11 110:20
**broadcast** 29:11,17
**broadness** 40:14
**brotherhood**
132:11
**brought** 92:15
118:18
**brush** 74:4
**BTW** 123:2,4
**bubble** 124:14
**bullet** 70:24
**bulletin** 80:13
**bumped** 75:24
**bunk** 89:17
**bunkee** 22:8
**business** 114:3
**Butler** 11:21
**button** 20:10

──────── **C** ────────

**call** 12:7 21:10
79:23 80:15 88:4
88:12 112:17
**called** 1:14 3:5
79:21 88:1,7,8
90:3 112:9 134:9
**calling** 124:21,22
139:6
**camera** 57:5
**cannula** 51:22
**captain** 14:16 122:6
126:8,12,22,23
127:1,3,6,15
128:4,12,13,15,16
**captains** 126:20
**caption** 147:13
**car** 60:15 84:7
121:4
**cardiac** 136:4,8
138:19
**care** 28:21,24 50:14
50:14 118:3,5,7
120:16 139:2
**career** 12:3 14:23
70:15 71:18 76:22
114:15
**Carrie** 2:10 144:15
**case** 1:7 7:4 10:4,17
44:8 46:6 54:11
57:5 72:4,6 77:9
78:24 79:9 80:11
80:24 81:21 84:21
85:12 88:3,24
92:8 94:3,3 95:18
98:24 101:3
106:11 111:14
122:5 136:13
137:7 138:24
**cases** 9:18 10:13
97:9
**catwalk** 101:19
**cause** 21:22 108:9
135:11 147:8
**caused** 136:7
**causing** 56:4
**caution** 76:12
**cautious** 44:21
**Cc** 144:14
**cell** 22:7 29:23
30:11 39:22 40:20
42:16 47:19,20
**cellmate** 35:12
38:18 113:2,3
**cells** 93:12
**center** 10:19 13:5
14:15,16,17 15:3
15:4,9,11,22
29:15
**certain** 30:17 68:12
127:9
**CERTIFICATE**

147:1
**certification** 9:24
59:2,3
**certified** 5:3 62:14
**certify** 112:12 145:3
145:10 147:6
**chain** 41:9,10
111:22
**chair** 40:15,19,24
41:2 42:12,13
45:1 48:8,13 50:3
50:23 72:14 74:12
77:22 85:8,8,13
91:19,20,24 92:1
92:2,3,5,6,12,14
92:24 93:6,8,11
93:17,23 94:1,6
138:12,14,17
**chance** 5:9 121:6
**change** 19:23 25:10
27:24 86:9 107:4
110:14 129:19
**changed** 18:3 83:23
118:10 129:21,21
138:15
**changes** 79:5,8
130:12 145:6
146:4
**character** 3:8
**charged** 89:20
**check** 17:18 33:3
110:13,13,22
**checked** 110:23
**checking** 33:12
47:20 138:5
**checks** 22:1
**cherry** 55:17,19
**chest** 137:14
**chief** 126:12
**chiefs** 15:20,20
**choose** 76:11,15
78:11
**chooses** 123:16
**chosen** 144:3
**Christmastime** 13:9
14:14
**chronologically**
32:18
**cinch** 41:11
**Cincinnati** 2:12
**circulation** 56:4,11
**circumstances** 15:6
56:19 78:5 85:5
92:23 94:4 106:9
**citizen** 132:10
**citizens** 58:9 129:10
**city** 11:22 12:6
15:19 124:15
**Civil** 1:15 3:6 144:8
**civilian** 9:20
**classification** 18:24

19:6,6,20
**classifications** 20:4
**clearly** 47:4
**clerk** 9:22
**Cleveland** 2:4
**client** 120:19
**clients** 74:16
**close** 116:16 144:6
**closer** 101:22,24
102:1
**clumsy** 78:3
**Clymer** 88:4,5 89:5
89:5 113:10,10
121:23,24 131:1,3
134:3,3,17
**college** 11:9,11,12
**color** 117:18 119:23
120:23
**combative** 45:12
46:3,7,11,13
47:21 49:3,23
50:10 54:13 82:20
**come** 9:19 18:16
79:16 80:12 86:22
89:4,7,11 99:24
100:1 105:16
**comes** 18:24 36:12
79:20 97:8 99:21
113:13 126:16
132:23 134:18
**comfortable** 44:15
50:16 51:1,3,6,11
51:12 52:12 84:24
**coming** 12:19 30:17
35:13 39:6 41:20
100:23 113:17
**comment** 118:18
**Commission** 145:18
147:21
**commissioned**
147:6
**committed** 38:12
**committee** 70:19
**common** 26:11,14
52:5,7 57:22 60:7
124:15
**communicate** 37:24
44:20 51:7 52:18
**communicated** 48:6
**communicating**
34:14 43:17 48:11
**community** 11:12
25:4,13,14 26:5
58:7,10,14 59:8
116:23 129:6
130:4,6
**comp'd** 17:18
**complaint** 135:14
**complaints** 101:8
**complete** 33:5 82:4
134:16,17,23

**completed** 128:8
**completely** 45:9
48:2 57:21 61:1
102:13 135:20
**compliant** 60:5
**computer** 147:11
**concept** 59:20 67:23
68:5,11,14
**concern** 45:5 52:2
53:1,2
**concerned** 34:3,6
34:17,19 120:21
**concerning** 80:18
**concerns** 52:10,20
52:23 53:8
**concluded** 143:1
**conclusion** 17:12
**concurring** 112:20
**conditions** 39:9
128:22
**condone** 130:1
**conducive** 40:13
**conduct** 134:22
**conducting** 132:15
**confidence** 94:17
129:7
**confident** 53:3
**confirmed** 34:23
**conflicts** 16:15
**conjunction** 89:21
**Conley** 88:8
**connection** 5:11,18
7:8
**Connelly** 122:12
**conscious** 57:22
**consider** 24:6 37:19
38:4 79:8
**considerable** 69:13
69:17
**considered** 19:23
38:2 78:6 117:18
**considering** 78:3
106:4
**consistent** 13:20
31:22 35:11 37:22
38:23 125:13
**Constitution** 26:19
28:12
**constitutional** 26:4
26:7 27:3,12,19
28:7 79:1 80:21
116:24 117:24
**contact** 79:16 115:7
115:8
**contents** 97:14
**context** 116:9
124:16
**continual** 23:15
139:19
**continually** 45:10
50:17,21 85:5

93:4 94:15 96:22
96:23 137:11
**continue** 6:1 65:1
**continued** 63:4 90:7
130:9
**continuing** 115:1
**continuous** 83:13
**contours** 59:20
**control** 29:1,14 33:8
37:3,7 40:23
41:13,22 42:2
43:15 44:18,18
50:5,6,9 65:23
67:14 81:14 86:1
86:2 90:7,23 96:2
96:6 108:18,21
118:3 120:16
121:17
**controlled** 29:14
50:2,15
**controlling** 109:8
**conversation** 93:23
116:9 117:13
**coon** 126:4
**Cooperstone** 1:21
144:9
**copies** 127:10
**copy** 135:23
**coroner** 135:22
**coroner's** 113:12
**coroners** 135:20
**correct** 13:4,15
14:21 16:8 19:2
20:5 25:19 26:5
26:20 27:3,8,9,10
29:9,20 30:2,3
32:9,23 34:18,24
35:6,18 36:3,17
36:20,24 37:16
43:1,5,9 53:12,15
53:20 56:20,22,23
58:2,8 59:10
61:12,13 65:21
70:3,10 71:2,21
72:10 75:15 77:7
77:15 78:13 81:22
82:1,6,14 85:17
86:1 92:24 95:6
95:13,16 97:6,22
99:22 100:5 101:6
101:10,17 105:6
106:9 111:16
118:3 119:18
126:14,20,23
128:9,17,21
131:24 132:2
139:13,16,21
140:7 141:4,5
145:7 147:11
**correction** 63:15,23
72:3 77:4 83:9

95:11 144:6 145:5
146:7
**Correction's** 63:18
65:5,18
**correction/change**
144:5
**correctional** 28:3
72:20
**corrections** 9:8,12
9:13,21 17:21
18:6 22:17,20
23:22,22 24:1
33:15 40:5 42:11
47:17,23 53:23
54:7 55:4,6 56:17
64:19 68:16,22
69:4 71:6,15,18
72:21,24 73:2,8
75:13 76:2,10
77:12 78:3,11,13
81:3 82:3,13 83:2
83:21 84:11 94:19
114:4 129:8 141:7
141:17,22 142:2,6
**corrections/chang...**
144:4
**correctly** 126:11
**COs** 102:5
**counsel** 3:4
**country** 80:2
**county** 1:8 2:20
5:13 9:17 10:7
13:2 14:19 24:20
28:24 29:16 56:18
60:19 64:5 65:12
71:7,19 76:10
129:10,12 130:5
132:2 145:2 147:3
**couple** 18:21 41:3
110:12 131:17
139:11
**course** 14:23 28:18
54:2 68:20 76:24
91:9 132:13
**court** 1:1 5:7 74:20
**courteous** 26:13
**courts** 122:18,20
**covered** 122:2
**covering** 89:18
**CPR** 111:14 112:1
138:16 140:24
**crazy** 135:18
**create** 20:7
**created** 133:10
**crime** 21:16 38:12
**crimes** 25:14
**criminal** 11:12 19:1
89:2 113:18 122:3
**criminally** 89:4,20
**criminals** 20:5
**cross** 39:1

**CROSS-EXAMI...**
5:4
**crossed** 34:9
**cuff** 22:15 42:17
72:6
**cuffed** 31:1,10,14
31:17,18,22 32:8
32:20 34:17 36:3
36:23 39:4 40:21
47:5 49:13 61:24
96:10 102:11
**cuffing** 39:4 60:18
60:18
**cuffs** 31:4,8 36:13
40:12 41:6 45:23
68:4,6 85:23
**current** 15:1
**cursory** 33:12
**custodial** 88:16
**custody** 28:24 116:5
118:3 120:16
**customer** 15:17
**cut** 79:14

**D**

**D** 18:19,23,24 20:2
21:14 90:5
**dabbing** 39:6
**dangerous** 112:14
**dangers** 141:23
**date** 13:4,18,23
104:11 146:23
**Daugherty** 122:21
**day** 16:18,20,21,22
22:22 50:15 76:19
88:10 112:14
115:24 117:4
129:17 145:15
146:3 147:16
**day-in-and-day-out**
15:15
**day-to-day** 16:12
25:8 79:16 115:20
**days** 137:22 144:8
**Dayton** 1:16 2:8,19
12:6,11,13 15:16
130:7 139:7
**dead** 66:13 109:17
109:24
**deaf** 67:10
**deal** 16:14,14
115:20 130:10
**dealing** 32:2 103:12
138:4
**dealt** 74:9 94:5
**Dear** 144:2
**death** 44:8 68:16
69:6,19 72:4
73:10,18 75:14
76:4 77:7 88:24
100:5 119:11,15

130:22 132:1,15
134:12 135:12
139:16 141:19
142:14
**deaths** 88:16,16,16
**decades** 76:19
**deceased** 1:5 112:5
**December** 13:11
14:19,19 144:1
**Decemer** 147:17
**decide** 9:22 139:24
**decided** 51:21
**decision** 42:11
112:9 137:11
**decisions** 137:5
**declare** 66:13
**declared** 112:5
**deemed** 132:8,9
**defendant** 1:14 2:19
3:5 98:24
**Defendants** 1:9 2:9
2:13
**defense** 138:24
**defensive** 54:10,15
**definitely** 23:18
35:22 39:8 76:17
83:15 112:24
135:24
**definition** 66:15
67:19
**degree** 57:4,7
**delay** 93:24
**delivered** 92:14
113:8
**Delta** 22:3,4,5 29:24
32:1 103:23 104:5
**demeanor** 37:15
87:4,4 138:15
**department** 11:22
11:22,23 12:5,7
15:16 63:15,17,22
65:4,17 110:10
120:14,17 139:7
**department's** 15:20
**departments** 15:10
15:12,13
**depends** 93:12,14
107:18
**depicted** 87:7,9
**depose** 18:21
**deposed** 6:7 31:20
92:3 133:17,22
**deposes** 5:3
**deposition** 1:14 3:5
3:6 5:1 7:11
143:1 145:4,11,14
146:2
**deputies** 25:22 26:1
83:13 141:13
**deputy** 10:2,7,7
25:24 122:8,12,14

122:16,21 126:12
139:18
**described** 36:1
47:23 51:10
**describing** 45:11
**designed** 9:18
**desire** 144:4
**desired** 144:5
**detail** 18:14 19:6
**detained** 28:23
**detainee** 76:9
**detainees** 18:24
19:1 24:3 113:5
141:18
**detective** 10:9 87:24
88:4,5,7,8 113:7,9
113:21 114:3,14
117:9 118:6 119:3
120:13,21 123:1
123:24 125:11,20
127:6 128:20
129:22 134:17
**detectives** 89:5
113:21
**determination**
93:19 137:12,13
**determine** 35:21
**determined** 19:20
112:8
**determining** 48:11
**developments** 78:24
**diaphragm** 97:14
**DiCello** 2:2 4:4 5:5
5:10 9:5,7 20:17
24:11 25:17 26:16
27:6,16 28:5,15
28:19 33:2 35:24
45:16 46:15,23
49:11,21 50:4
51:9 53:7 54:5,19
57:9,24 58:6,19
59:19 61:5 63:10
64:3,11 65:3,16
65:24 66:8 67:7
67:20 69:15,24
70:6,13 71:5,13
71:23 72:13 73:13
73:20 75:7,9,21
77:18 78:22 82:22
83:16 84:9,17
85:21 89:1 91:4
92:10 94:12 95:4
95:19 96:17 97:10
97:20 98:1,6,10
98:17,23 99:2
100:2,8 101:13
102:22 106:13
107:5 109:7,21
114:8,12 115:3,9
123:12 125:2,4,17
125:18 128:1

130:18,19 134:24
136:14 139:10
140:11 142:11,17
144:15
**die** 48:15 106:20
**died** 41:17 105:9
106:6 118:11
120:19 134:13
136:3 138:23,24
**difference** 81:17
86:5
**different** 9:12 10:8
18:10,10,15 19:8
24:17,18,19 33:8
33:10,19 43:8
46:13 48:2,19
49:18 58:9 59:24
60:1 64:24 68:13
71:15 73:3 77:11
82:20 85:7,16
89:13,15 104:22
105:11 108:9
109:24 122:2
131:11,17 133:2
135:5 141:15
**differently** 49:17
**difficult** 28:6
**diligent** 106:11
**dimensions** 102:2
**Dinkler** 1:16 2:7
**directing** 43:4
**direction** 45:7 95:3
**directive** 81:7
**directly** 17:23 54:23
**disagree** 130:8
**disciplinary** 129:4
**disciplined** 116:8
124:2 139:13
**discretion** 20:3
**discrimination**
117:1
**discussed** 133:3
**discussion** 9:6 75:8
94:6 113:12 125:3
**disease** 39:14 99:11
**disengage** 86:8
**disoriented** 36:24
37:10,12 42:3
52:17
**dispatch** 10:19 13:5
14:15,16,17 15:3
15:4,9,9,11,12,22
29:15
**dispatcher** 9:21
**displacements**
106:22
**displayed** 44:16
47:2
**disrespect** 69:16
**distance** 36:13
**distinct** 15:11

**distinctly** 39:5
**distinguish** 21:18
**DISTRICT** 1:1,1
**diverse** 25:10
**division** 1:2 10:20
10:22,24 13:10
55:6 87:23 88:3
122:16,19 126:16
141:4
**divorce** 116:5
**DMS** 79:22
**doctor** 66:9 112:19
139:8
**doctors** 50:20 53:4
66:7
**document** 70:12
**documentation**
131:14
**documented** 131:8
**documents** 7:13
80:10 82:8
**doing** 33:6,7 34:23
40:3 47:9 48:24
49:1 55:8 58:5
74:5 89:8 112:14
113:18 133:11
137:4 138:11,16
**door** 30:16,17 33:22
106:2 114:22
134:7
**doorway** 30:12
102:4
**double** 31:4 40:12
41:6 47:5
**Dr** 66:10
**drinking** 90:12
121:12
**Drive** 1:21 144:9
**driver's** 87:1
**drug** 98:7,12
**drugs** 96:11
**dry** 79:14
**Dublin** 1:22 144:9
147:16
**due** 142:14
**duly** 5:2 147:6,7
**duration** 44:7
**Dustin** 29:24
**Dusty** 105:24
**duties** 33:10
**duty** 27:2 88:15
114:17 117:24
**dying** 142:6

**E**

**e-mails** 8:6,8,10
**eagle** 61:15
**ear** 67:10
**earlier** 16:22 18:22
82:21 108:10
**early** 17:5,18,19

**ease** 48:7
**easier** 94:20
**easiest** 93:8
**easily** 79:16
**east** 25:11,13
**easy** 89:7,11
**effect** 36:18 51:23
137:1
**effective** 78:19
**effects** 37:22 38:1,3
**efforts** 112:2
**eight** 13:4
**either** 11:14 39:6
47:8 60:5,17
83:10 112:16
131:14
**elbow** 101:21
**electronic** 79:24
80:4
**electronical** 79:24
**elevate** 107:4
**elevated** 68:15
**Ellis** 2:15 66:10
**Emerald** 124:15
**emergency** 29:9,19
35:9 52:16 93:11
93:17 139:1
**employee** 9:20 10:4
82:23
**employees** 134:15
**employing** 129:8
**EMS** 15:14 112:10
**EMT** 11:19,24
**encountered** 21:6
**ended** 135:24
**endorsed** 63:4
**enforcement** 14:23
15:10 23:15 59:3
59:16 60:2 62:17
68:21 73:9,14
84:11 124:5
**enforcing** 53:14
**engaging** 128:19
**English** 62:3
**enlarged** 100:19
**ensured** 34:20
**ensuring** 33:6
**entered** 11:17 146:5
**entire** 14:17 49:2
112:6 146:2
**entirety** 55:15 76:15
87:13 96:16
115:16
**entitled** 27:19
**equal** 78:11
**errata** 144:4,9
**error** 13:23
**escort** 107:6,7,18
**escorted** 107:9,13
107:15 108:15
**ESQUIRE** 2:2,6,10

2:17
**essentially** 54:11
**established** 98:20
**Establishing** 62:23
**estate** 1:5 5:17
**et** 1:9
**event** 88:23
**everybody** 19:5
21:1 22:8 28:18
29:13 33:9,11
36:5 45:19 77:4
80:5 108:11
114:15 139:12
140:6
**everybody's** 33:6
46:12
**everyday** 54:15
140:14
**evidence** 83:17,19
**evolve** 60:17
**evolving** 137:3
**exact** 42:1 78:16
**exactly** 36:4,9,10
42:11 72:24
114:20 130:2
132:23
**exam** 10:10,11
**EXAMINATION**
4:1
**examined** 145:14
**example** 8:3 19:15
60:14 76:18 77:14
79:9
**excessive** 28:16
56:24 57:2,3,4,16
57:23 58:2 73:18
74:4,5,7,23 76:4
120:15
**exchanged** 80:10
125:11,14
**exclamation** 123:20
123:20,20,21,21
123:21,22,22,22
**exclude** 55:23
**excuse** 116:19
**excuses** 119:2
**executive** 62:8,11
62:23 63:4,14
64:6,13,14 70:8
70:23
**exhibit** 125:15
**expand** 36:13
**expect** 33:14 130:3
134:11
**expectation** 73:5
**experience** 14:18,23
15:16,24 16:5
24:7 71:17 131:9
131:19
**expires** 145:18
147:21

explain 9:15 138:22
explained 18:23
    29:4 68:12
extend 31:4
extended 67:1,16
extending 50:16
extremely 19:9
eyes 26:2 30:9 74:15

_____ F _____

fabricated 116:4
face 60:6 81:5 94:21
faced 76:8 133:3
facedown 30:10
    31:2 32:20 34:17
    36:23 59:23,24
    66:3 67:1,16
    94:22 105:18,20
facilities 62:19
facility 28:3 72:4
    139:9
fact 28:1 47:10 76:5
    86:9,21 118:24
    130:4 133:14
factor 97:4,5 98:2,5
    98:7 99:9,13
    100:4,10,13,16,19
    100:24 101:5,9
factors 69:9 92:16
    97:1 100:1 142:10
fail 119:10
failure 112:20 144:9
fair 6:17,18 14:6,7
    22:16 34:6,16
fairly 21:4,4 30:17
    36:14 53:3 114:16
    127:9 141:11
faith 129:7
familiar 55:10
    59:21 68:5
family 5:14,17
Fannin 113:12
far 1:16 2:7 8:11,19
    21:19 59:17 66:18
    68:22 93:20 94:5
    99:5 114:6 122:15
    128:24 129:3
    137:5 140:1,5
    141:1,13
fast 11:4
fatigue 99:19
Fearing 108:3,15
feasible 68:9,9
feel 8:20 29:6
    115:19
feeled 85:1,1
feels 8:22 134:17
feet 49:6,9,10,15
    101:22 102:3
Felicia 2:13
fellow 18:22 132:4

132:11 135:8
felt 34:10 41:22
    42:17 45:5 49:9
    85:1 122:1 138:11
fidgety 60:15
field 68:12 69:18
figure 35:15,16 37:2
    37:6 137:18,19
figured 13:19
filed 5:12
filled 104:24 106:9
    106:14
filling 106:12
final 12:10
finalized 135:21
find 105:1
finding 129:5
fine 96:20 98:21
fire 11:21,22,23
    12:5 15:10,12,12
    15:14,20 23:15
    112:10 137:22
    139:7
firefighter 11:19,24
firm 1:16
first 5:2 13:1,13
    30:9 37:4 48:8
    67:8 70:14 92:7
    94:5 102:11
    122:24 133:17,22
fit 118:21 120:18
five 32:13 47:12
    48:4 92:7 94:2
five-eight 20:10
    36:5
Flanders 87:24
    122:6 127:1 128:3
    128:9,17 129:15
    129:23
Flanders's 127:12
flatly 85:10 119:22
floor 2:18 16:14
    48:16 101:19
    134:10 138:17
fluctuation 25:8,9
Foam 100:23
focus 16:5 32:17
    37:5
focused 140:15
focusing 140:16
folks 20:2,4 25:21
    42:21 43:7 56:17
    58:8 71:16 72:14
    81:24 132:14
folks' 53:17
follow 41:3 42:14
    65:10 87:19
    112:11
follow-up 76:1
    131:4
followed 88:20,20

88:21 140:5,19
    141:1
following 75:17
    86:4 122:4 146:4
follows 5:3 64:6
footage 7:22
force 28:16 43:15
    56:19,21,24,24
    57:2,15 58:1 65:5
    73:18 76:5 104:11
    104:13,20,23,24
    105:5,8,10,11,13
    105:17 106:3,8,12
    107:2,6,16,17
    108:1,19,23 109:2
    109:10,13 118:21
    120:15
foregoing 145:4,10
    147:11,13
forensic 138:22
form 131:14 145:6
forth 93:4 122:20
forwarded 62:12
Foster 2:13
found 13:23 136:24
foundation 98:20
    99:1
four 43:8 76:14
    94:1 125:21,23
frailing 47:13
Franklin 147:3
frankly 130:21
free 28:16 29:6
freedom 22:1 28:1
    28:10,13
freedoms 20:1
    22:11 28:3
friend 116:16,17
    119:1
friendly 80:5
front 7:4
frustrating 125:22
full 38:1 94:17
    138:15
full-time 9:24
function 42:12
functioning 66:23
    67:14
functions 55:8
further 90:8,13
    130:12

_____ G _____

G 1:4
gaining 48:12
Garrett 2:15
gate 123:19 124:4
gates 124:11,14
gather 134:20
geez 115:17
general 25:4 26:11

getting 20:2 31:2
    32:5 33:7 39:4,21
    40:16 60:6,15
    66:16 75:4 77:10
    81:7,14 91:2,2
    94:5 114:18,20
    137:24 138:8
    139:4
give 6:1 8:14 17:20
    52:1,3,19 113:14
    115:1 121:6
    137:15
given 6:15 25:21
    133:8 145:4
    147:12
gives 19:24
giving 52:24 65:17
    81:7 144:5
glanced 7:14
go 9:23 10:12,17
    11:9,9 15:17 19:4
    19:8 21:20 25:7
    36:19 41:1 42:4,4
    43:11 52:9 55:18
    57:20 59:13 67:5
    68:13 72:16,20
    79:4,4 87:1 89:4
    89:12 111:12,24
    141:13
goes 113:20 126:11
    132:20
going 6:16 7:6 12:9
    16:16 23:24 25:12
    25:13 29:7 33:19
    34:15 35:10 36:12
    37:1,5,6,23 40:16
    42:5 44:20,24
    47:18,18,19 48:3
    48:5,6,9 54:3,16
    60:10,11 64:23
    78:19 82:9 83:6
    84:4,5,21 85:10
    88:2 89:19,19
    91:7,14,15,16,24
    92:19 93:22
    100:22 104:9
    105:24 108:11
    113:14 114:19
    115:5,5,14,21
    116:5 121:9
    125:21 129:14,20
    132:19 137:1,8,21
    138:7,10,23
    141:10,12,12
good 5:6 6:5 19:14
    21:4,4 54:24 75:6
    115:10 121:20
    137:15
gotten 109:12
Govenor 63:7
govern 15:21

governor 62:9,22
    63:3 70:7
governors 70:20
graduate 11:6 48:12
graduated 12:11
great 130:10,14
greater 97:12
ground 30:24 32:20
    36:3 42:18 43:8
    46:18,19 52:15
    81:8 105:19 106:4
    107:2,9,13,15
    108:22 138:1
guess 18:1 19:10
    20:2 46:16 50:12
    54:22 55:16 57:11
    76:12 97:24 135:6
    135:7 137:24
guessing 62:15
guesstimation 17:7
guidelines 104:21
guy 49:6,22 51:17
    52:4 60:14 86:19
    110:20,21 120:17
    137:16
guy's 49:18
guys 20:18 89:12
    95:6 96:10 132:6
    136:21

_____ H _____

hairs 24:16 54:13
    54:20
half 9:10
hand 43:20 105:15
    147:15
hand-held 29:12
handcuff 47:5 59:5
    86:24
handcuffed 35:5
    39:23 41:8 43:14
    48:4 52:16 54:17
    58:23 84:12 90:18
    106:5 138:1
handcuffing 30:22
    59:18 100:15
    105:19
handcuffs 30:6 31:3
    39:21 41:5,7,16
    48:7,13 50:6
    58:12,15 61:8,9
    85:23 107:1,23
    111:16,18
handle 53:5 79:14
handled 18:10,15
    34:21 87:22
    121:21 131:9
handling 88:10
    129:12
hands 35:5 40:6
    47:24 49:13 52:17

60:6 61:24 105:19
132:16
handwritten 8:3
happen 17:6 44:7
121:8
happened 8:13
12:18 39:20 42:15
45:13 67:21 86:11
91:15 115:12
129:16 130:16
happening 39:24
51:16 82:13 140:3
happens 140:14
hard 102:1
harm 108:8,9
Harrison 11:22
Harry 1:4
harsh 117:18
hate 116:20 117:4,9
117:21 119:9
120:3,19
hates 120:1
hazardous 70:2,5,9
71:1,20
hazards 71:9
He'll 116:5
head 23:5,10,20
101:23,24 102:1,4
111:3
health 69:10
hear 102:8,15,16,23
103:1,15
heard 48:20 62:20
62:22 102:10
135:23 138:24
hearing 129:4
heart 39:14 99:11
100:19 136:15,20
136:23 137:8,16
138:1 139:1
height 20:8 36:9
heightened 100:14
held 9:6 30:24 31:8
44:23 45:2 75:8
82:12 83:1 84:4
91:7 125:3 132:24
help 46:24
helping 14:16 16:3
Henning 30:1 32:7
90:6 106:1
here.' 103:20
hereinafter 5:2
hereto 145:6
hey 6:22 89:15,16
105:16 110:13
135:24 137:14,16
high 11:7 19:7,9
20:5 22:14 23:12
24:23 39:18 126:9
Hills 1:16 2:7
hindsight 35:1

86:10 129:18
hips 108:17
hiring 23:16 130:14
histories 19:1
history 39:14
hog-tie 76:20 77:9
hog-tying 60:24
61:3,12,14,19,23
76:18 77:3,8,14
77:17
hold 44:14 67:24
68:6
holding 43:9,13
44:10,12 82:16
91:5 106:19
holiday 14:13
holidays 13:9 14:14
home 17:10
homegrown 10:4
homicidal 21:21
homicide 89:15
honesty 132:22
hope 73:7 125:24
hopefully 48:10
121:9 130:21
hoping 111:13
137:3
Horton 122:8
Horton's 122:17
hospital 112:17
138:2,20
hour 22:10
hours 16:24,24 17:8
house 22:7
housed 18:19 19:5,5
19:19 33:22
houses 24:20
housing 18:11,11
19:24 102:6
housings 19:22
huh-uh 21:7 103:22
105:4
huh-uhs 6:3
hundred 121:17
hurt 38:8,10 95:20
95:24 96:4
Hypertension 39:16

_____

I

IA 89:12
idea 17:20 23:2,6,17
23:21 24:5,10,24
39:2 94:11 99:7
ideas 64:17
identifying 125:7
imagine 55:7
immediately 46:1
84:14,16,19 139:6
implement 130:12
implementation
53:19

implemented 64:20
93:22 121:24
131:13
implicated 122:6,8
122:12,21
importance 42:8
important 5:23 6:1
inaccurate 83:15
inappropriate
117:17 120:2
incident 7:23 8:11
10:24 13:18 14:8
19:12,13,17 21:3
49:19,22 74:3
82:1,24 87:13
88:6 106:16 115:7
128:14
incidents 19:17
69:18
include 14:22 58:12
60:20
included 40:2
includes 27:7,9
including 62:24
72:2,9 130:6
incoming 16:12
inconsistent 109:22
increase 97:1
100:14
increased 69:5,19
96:7,8
increases 100:10,16
100:24
indefinitely 86:14
independent 21:2
88:17,17 132:15
INDEX 4:1
indicated 144:6
146:5
indication 137:16
indirectly 17:23
individual 31:5 36:8
36:11,14 41:24
46:12 67:1,16
108:9 116:13
individual's 66:24
67:15
individually 134:20
inflict 56:8
influence 38:5
information 35:11
48:12 113:8
131:16 134:20
initial 41:8,18 90:18
initially 10:18 39:4
41:8,21 43:13
44:1 48:4 85:9
91:12,15 93:2
initiated 115:7
injected 131:15
injure 90:24 108:19

injured 90:14 94:8
injuring 90:8,13
95:15 107:11
injury 77:7 90:20
inmate 19:18 21:18
27:24 30:5 32:14
33:15 68:14 69:6
71:10 77:6 78:4,5
78:9,10,21 82:11
90:7,23 100:9
103:19 108:21
135:8
inmates 16:13 19:9
22:5 54:16 72:3
135:2,7
inner 24:22
insensitive 117:19
inside 25:2 28:3
140:14
Inspectional 113:24
127:4 128:8
instruct 33:24
141:17,22 142:2,5
142:12
instructed 34:4
54:14
instructing 34:13
instruction 59:15
68:19
insubordination
128:24
integrity 132:22
intelligible 37:18
intend 108:8
interact 15:15,19
72:3
interacting 86:22
interaction 33:17
44:3 60:13 71:10
83:9 136:11
interactions 8:19
25:14 33:20,21
41:18,19,20 43:16
43:19 47:16,22
49:1 66:6 72:22
88:9 117:14 130:5
130:8 140:21
interested 8:7 12:22
internal 87:22
88:22 114:1 116:3
127:22
interpret 61:22,23
61:24 123:13
interpretation 46:3
46:5 61:21 62:4,7
82:20 83:7
interpreted 117:21
123:14
interview 113:5
130:24 131:5
134:13

interviewed 113:2,2
130:15,22 131:6
131:23 133:11,18
133:23
interviews 131:8,20
131:21
intoxicated 37:16
52:18
intoxicating 38:5
investigate 87:17
119:14
investigated 118:8
investigating
113:22 118:21
120:14 132:1
134:12
investigation 87:21
88:13,22 89:2
90:3 113:18 115:6
115:15 116:3
117:8 121:15,24
122:3 124:9
127:22 129:1
131:15 132:15
133:5,7,9 134:19
134:22
investigations 88:3
89:6 114:15
120:22,23 121:21
131:10
investigator 88:5
113:13 133:23
134:15
investigator's
131:22
investigators 87:19
87:20 88:2 130:15
130:22 131:5
involve 89:3
involved 8:17 29:19
77:4 83:12 113:22
114:1 140:6
142:10
involvement 118:9
involves 29:5
involving 34:20
issue 18:11,12 34:20
52:4 118:12,13
issues 16:15 22:6
80:18
ISU 7:17
items 66:22 67:13

_____

J

jacket 19:4
Jackson 30:1 32:7
43:1 47:18 81:4
83:20 105:24
JAGIELSKI 2:17
jail 7:23 9:16 10:20
10:22,24 13:2,9

13:14 14:5,10,12
14:18,22 15:7
16:2,5,12,12 17:1
19:4,16 21:8,8,12
21:15,24 22:3,12
22:17,21 24:2,4
24:20,20,22 25:2
27:7 28:24 29:14
29:16 38:15 49:12
53:12 54:24 55:6
56:18 58:8 60:3
60:19,23 63:23
64:6 65:11 71:7
71:19 76:10 88:16
93:13 106:8 108:5
117:1 118:22
119:11 122:10,13
122:16,17,18,19
122:22 126:16,17
134:7,12 140:4,10
140:14,17
**jail's** 65:19
**jails** 13:16
**Jamey** 2:6 144:16
**Jamie** 122:8,17
**jerking** 108:6
**Jim** 113:12
**job** 15:17 16:9
23:13 27:20
120:18 130:14
**jobs** 27:11
**Joe** 74:15
**John** 88:4 89:5
113:10 131:2,2
134:3
**Johnson** 29:24
31:20 32:7 90:5
105:24
**Jon** 2:14
**Joseph** 122:12
**Jr** 1:4
**judge** 7:4
**judgment** 121:20
**July** 12:11
**jump** 32:18
**jumped** 13:24
**jumpsuits** 22:13
**jury** 7:4 138:23
139:24
**justice** 11:12

**K**

**Kasich** 63:3,11
**keep** 32:2 49:13
50:8 84:24 86:13
86:15 91:8 103:22
115:2 134:3
**keeping** 95:24 138:6
**kept** 44:4,5 103:14
103:19
**keys** 16:3

**kicking** 47:14 48:21
49:4 107:24
**kind** 7:3 10:15 25:3
29:19,21 33:5
35:9 38:15 60:14
69:9 78:23 80:12
80:15 88:11
101:19,20,22
105:11,13,14
118:18 138:19
140:4 141:15
**kinds** 33:8 69:11
131:10
**King** 57:7
**knee** 107:23 135:2
**knew** 15:24 32:22
36:2,7 40:11
116:16 135:16,16
138:5
**knock** 114:21
**know** 5:16 11:5
17:4,17,24 19:11
21:11 22:14 23:11
24:1,15,16 25:15
26:11,12,12,13,14
27:17 30:16 33:1
33:4,13 34:8,9
35:10,15,20,20
36:15 37:1 39:3
40:16 42:1,19,20
42:23 47:3,9 51:6
54:12 57:2,13,13
64:9,17,23 66:12
66:20 68:13 69:11
71:7,9,14,19,24
72:1 77:23 78:16
78:18 79:7,12,23
80:5 81:2,17
83:19 85:9 86:8
86:11 87:16 90:16
90:19,19 91:13
92:8,17,18,20
93:16,18 95:18
96:7,8 98:2,11,12
98:13,20 99:3,4,8
99:13,14 100:21
101:2 102:13
103:11 104:1,4,7
104:10 110:12,20
111:13,17 112:13
112:18,19 113:16
114:18,19 115:17
115:22 116:2,7
118:1 119:8,16
122:14,15,22
127:1 128:23
130:1,4 131:7
133:14 134:1,1,2
134:5,10 135:13
135:15,15,16,18
135:23 136:9,9,13

136:16,19 137:2,3
137:7,8 138:6,9
139:23 140:13
141:2,15
**knowing** 17:14 48:5
53:11
**knowledge** 15:11
21:6 112:14
113:23 134:18
**known** 47:23
116:12 135:19
137:1,17
**knows** 98:21
**Krisandra** 2:14

**L**

**L-E-W-I-S** 5:8
**lack** 16:2 31:11
55:16
**laid** 30:9
**Lakeside** 2:3
**language** 62:3 65:8
81:17 116:19
125:22 139:24
**large** 36:4,6,14
41:24 97:6,8,12
**larger** 40:11
**late** 12:17,18
**law** 1:16 14:23
15:10 23:15 59:3
59:15 60:2 62:17
68:21 73:9,14
78:24 79:9 80:13
80:18 84:11 124:5
141:1
**laws** 79:10
**lawsuit** 5:11,18 7:8
7:15 136:1
**lawyers** 8:8,13
74:19
**lay** 44:24 132:6,8
**laying** 39:23 85:11
97:13
**Layne** 1:15,21 3:6
144:9,13 147:5,19
**lead** 98:23 114:21
**leader** 10:7
**leading** 98:22
**leads** 137:22
**leaned** 45:7
**learn** 135:11
**leave** 17:2 42:21
85:10 87:2 93:12
**leaving** 15:7 42:9
**left** 107:23 108:16
123:19 124:14
**leg** 40:11 41:9,11
50:17 61:3,9
83:10
**legal** 79:19 80:12,15
**legs** 40:6 43:20

47:24 48:21 49:5
61:24 107:24
**length** 19:14 46:11
50:16 111:22
**let's** 6:22 14:8,9
16:5 19:15 22:23
56:3 95:8 130:20
137:6,6
**lethal** 70:2,10,17
71:2,20
**letter** 141:1
**letting** 104:15 124:7
**level** 29:24 32:1,16
41:19 42:2 72:23
104:9
**Lewis** 1:14 3:5 4:2
5:1,8 101:14
119:2 144:2 145:3
145:9,11 147:7
**LIBER** 2:3
**license** 87:1,1
**life** 109:23 112:21
132:6,8
**likewise** 58:1
**limit** 66:23 67:14
82:9
**limited** 28:2 104:23
**line** 10:19 11:2
88:15 115:2 144:5
146:7
**lines** 60:17 104:21
**linked** 41:7
**lip** 90:19
**list** 107:14
**listed** 14:3 59:7
**literature** 69:17
**little** 8:21 11:1 18:2
18:3 20:19,20,24
20:24 31:18 32:18
60:15 71:15 85:16
89:13,16 102:1
103:11 139:18
**live** 90:1
**lived** 118:11
**lives** 26:12 27:18
**local** 124:1
**located** 29:23
**lock** 22:6
**locked** 31:9 33:9
**log** 113:19,19
**long** 9:8 11:24
12:13 20:18 41:10
44:23 74:16 75:4
93:10,16 96:18
102:16
**long-winded** 75:2
79:18
**longer** 76:24 77:5
86:6
**look** 65:19 101:15
129:19

**looked** 7:13 8:9
80:11 139:23
**looking** 134:21
**looks** 90:22 119:17
**loose'** 103:20
**lot** 20:15 24:14,18
42:4 62:15 64:17
80:10 93:14 95:7
115:22 116:14
135:1 137:3
**lower** 104:9 107:24
108:17
**LPA** 2:11
**lucky** 10:13
**lying** 36:3,23 94:22
94:22 103:6

**M**

**M** 2:17 5:8
**M.D** 2:15
**mad** 67:12
**main** 37:5
**maintain** 90:7
**maintained** 42:10
93:14
**maintaining** 40:22
107:1 138:6
**maintenance** 18:12
**major** 126:12,17,19
**making** 33:10
102:23 103:6
119:2 137:3,4,5
**man** 36:5 105:9
106:4 119:11
130:3 134:12
**management** 87:21
88:12 114:2
127:11,14 128:7
129:19
**manager** 15:20
**manipulation**
109:15
**manual** 60:19,23
64:6 65:11
**March** 13:3 119:17
125:12
**marijuana** 136:5
**mark** 143:3
**marked** 125:9
**Marshall** 90:7
**mask** 39:7,8 40:9
50:19 51:21,22
52:20 87:12
**matter** 50:13 74:17
74:19 94:14,15
114:10 117:17
120:1 127:17
129:18
**Maxwell** 113:11
131:2,4,12
**Mayes** 90:6 111:1,3

**mayor** 15:19
**MC** 125:9
**mean** 7:20 18:8
19:3,4 23:2,4
24:13,17 25:10
28:10,12 31:11
35:11 37:21,21
43:12,20 44:3,12
44:21 45:8 51:19
57:3,21 58:12
60:1,10 68:18,24
72:2 76:21 82:18
86:5 90:14,16
91:6 94:14 97:19
99:12,13 100:21
102:20 104:12,15
104:16,21,22
109:19,22 110:19
111:6 114:7
115:17 117:16,23
122:3 127:20
131:6 132:17
134:2 137:21
140:10 141:3,10
141:11
**meaning** 60:5 124:6
124:11,14
**means** 40:18 55:3
64:18 73:22 76:15
78:15 80:4 91:18
93:9 94:18 114:17
120:8 123:2 124:8
124:19,20 132:21
134:22
**meant** 123:9,11
**measures** 66:22
67:13 142:13
**medic** 2:14 40:2
51:15 103:12,14
103:19
**medical** 28:20 29:8
29:19,21 35:9,18
39:9,13 40:1,4,4
42:10 45:4,10
49:8,14 52:3,11
52:16 55:8,10
66:7 72:7 81:24
82:3,10 87:12
90:20,21 93:6,11
93:20 94:20 95:2
96:24 99:5 111:12
112:17 136:18,20
138:18 139:2
**medically** 42:3,3
50:21 51:13 52:11
93:20 94:18
100:21
**medicine** 138:9,10
138:11
**medicines** 99:5
**medics** 39:5 139:5

**meet** 5:9 106:18,20
**meeting** 134:6
**meetings** 130:11
**mellowed** 43:16
**member** 53:24
68:15 76:9
**members** 5:14 26:4
55:3,5,13 56:5
58:7,10,14 59:8
61:8 129:6
**memorandums**
62:16
**memorized** 26:10
28:12,12 132:21
**memory** 21:3 30:6
**mentioned** 113:21
125:20
**merely** 60:11
**message** 115:24
116:7,15,18,20
118:4,11 119:13
120:2,18 123:5
**messages** 115:12
116:10,14 118:24
121:14 122:1
123:1 125:8,10,10
125:14 128:19
129:13
**messaging** 127:5
128:24 130:20
**messing** 39:7
**Michael** 87:24 88:4
88:5 89:5 113:22
**midnight** 17:12
**Mike** 88:5 113:10
115:5,12,14 117:7
121:11,23,24
127:22 129:14,23
131:1,3 134:3,5,8
**Miles** 2:14
**mind** 9:12 32:2 34:9
39:1 51:17 52:7
80:15 103:22
108:7 119:6,21
**mine** 28:4 33:19
116:17 119:1
124:9
**minimal** 43:15
**minimize** 142:14
**minute** 31:21
**minutes** 41:17 44:7
45:19 46:4,7
47:13,14 48:4,15
48:24 49:2,4,19
49:23 50:9 68:17
68:22 69:4 87:8
87:10,14,15 91:13
92:7,19 94:2
96:16 102:16,17
106:6
**misconstrued** 79:13

**misinterpreting**
44:12
**missing** 8:2 28:2
**mistaken** 127:13
**mistreating** 117:15
**mitigating** 94:4
129:2
**moments** 136:22
**monitor** 50:22
137:11
**monitored** 50:7,17
50:19 66:6 85:5
94:17 96:24
**monitoring** 66:9
85:19 93:5 101:21
110:18
**Montgomery** 2:20
5:12 9:17 10:7
13:2 14:18 24:19
25:2 28:24 29:15
56:18 60:19 64:5
65:12 71:7,19
76:9 129:10,12
130:5
**month-to-month**
25:9
**months** 13:5 14:5
120:19
**Moraine** 11:23 12:5
**morning** 17:9
**mouth** 35:14 38:21
39:6 52:19 94:21
100:23 103:12
**mouthful** 60:17
**move** 14:9 40:13
47:22 54:14 95:10
**movement** 22:3,14
22:15 66:23 67:14
**movements** 108:18
**moving** 90:24 91:2
93:4
**mucus** 100:23
**multiple** 76:13
77:11 82:18 87:11
**muscle** 99:19

---

**N**

**Nah** 102:24
**name** 5:7,10 27:20
28:7 40:3 80:7
122:17 144:6
**named** 147:7
**names** 23:12
**NaphCare** 2:13
81:24 82:23
**narrative** 29:6 90:5
**nasal** 51:22
**nationally** 57:6
**nature** 22:15 28:13
38:2 40:7,20
47:20 60:24 61:4

68:20 77:22 79:17
80:6 87:12 99:6
106:23 107:3
109:15 131:17
132:23
**necessarily** 23:11
79:7
**necessary** 22:4
56:21 78:15 91:8
132:9 134:18
**necessitated** 41:23
**necessity** 138:11
**neck** 56:5
**need** 8:20 11:3 33:6
35:18 37:8 41:16
44:14,23 45:2
46:19 50:10 53:5
75:22 119:6
**needed** 35:21 41:14
41:22 42:17 45:6
49:9 87:7 95:1
138:18 139:1
**needs** 18:12 133:9
134:19 137:5
**negativity** 115:19
**never** 9:13 19:12
24:5 42:18 46:20
53:23 54:7 55:13
56:5 58:15 61:9
61:16 62:18,19,20
62:22 63:12 64:9
64:12,12 70:12
73:9 75:13 85:19
86:10 89:24
114:16 116:17
117:15 120:9
127:13 129:16
138:21
**new** 23:16
**news** 115:23
**nicer** 124:22,23
**NICHOLAS** 2:2
**Nick** 5:10 6:22
115:1 144:15
**nigger** 122:24
**niggers** 116:21
117:5,10,21 119:9
120:4,19 123:4,24
125:23
**night** 18:15 116:10
116:14,15
**nine** 15:10
**nog** 123:23 124:17
124:18,19,20
**noise** 103:7
**noises** 102:23
**non-officer** 132:16
**normal** 16:23 51:19
66:23 67:14
**normally** 22:9
**nose** 100:23

**notary** 1:15 3:6,7,8
144:7 145:13,17
147:5,19
**notes** 3:7 8:3
**notice** 89:16 110:15
**noticed** 39:8 109:17
109:19 110:14,21
**noting** 145:6
**November** 1:16 3:1
128:7 145:5
**nudge** 47:22
**number** 23:6 24:24
25:15 35:22 64:23
95:11 144:5,5
**numbers** 18:2 25:9
**numerous** 70:18
85:7
**Nurse** 2:13,14,14
**nurses** 40:2 50:19
139:5
**nursing** 53:4
**nutshell** 14:16

---

**O**

**oath** 6:24 7:2,3
25:18,21,23,24
26:2,3,10,18,18
27:1 132:20,21,23
**obese** 36:3,14 97:11
99:16
**obesity** 97:3,9
**object** 99:1
**objecting** 115:2
**Objection** 24:9 25:6
26:9 27:4,15,22
28:9,17 32:24
35:19 43:10 45:14
46:9,21 49:7,16
50:1 51:5 52:22
54:1,9 57:1,19
58:3,17 59:12
60:22 63:9 64:1,8
64:16 65:15,22
66:4 67:4,18 69:7
69:22 70:4,11
71:3,8,22 72:11
73:11,19 77:16
78:14 82:15 83:4
84:6,15 85:18
88:14 91:1 92:9
94:10,23 95:17
96:13 97:7,16,23
98:4,9,15 99:23
100:6 101:11
102:19 106:10,21
109:5,18 114:5,11
114:24 123:10
129:9 132:18
134:14 136:12
139:3 140:8 142:9
142:15

**objections** 98:18
**obligated** 52:6
**observations** 83:1
**observed** 140:21
**obviously** 41:22
  70:17 74:18 81:3
  87:19 101:8
  103:18 117:6
  129:16
**occur** 53:6 72:1
**occurred** 10:24
  82:24
**occurring** 47:15
  136:18
**off-duty** 115:7
**offender** 19:15
**office** 2:20 5:13
  9:18,20,22 10:5,8
  10:9 12:19,20
  29:1 65:12 72:20
  80:1 129:13,24
  130:1,13,14 134:9
  134:16 141:14,17
  141:21 142:1,5,12
  147:16
**officer** 9:8,9,11,12
  9:13,14,21 10:6
  12:9,10,14 19:6
  20:4,8 25:18,24
  29:7,24 30:1,13
  30:14,21 31:20
  32:6,6,7 33:15
  34:19 54:7 57:15
  72:21 76:2,10
  77:5 78:3,11
  92:11 106:1 114:4
  132:10
**officer's** 77:12
**officers** 8:17 17:21
  18:6,22 22:17,20
  23:22,23 24:1
  26:1 40:5,20 42:6
  42:11,16 43:4,8
  44:9,19 47:17,24
  53:23 55:4,7
  56:17 68:16 69:4
  71:6,16,19 73:9
  75:13 76:19 78:20
  81:4 82:3,13,16
  83:2,8,10,12,13
  83:21 85:17 90:5
  90:6,23 92:3
  94:19 95:12 99:22
  107:9,14 129:8
  132:4,12,16 133:4
  133:24 136:11,16
  141:7,17,22 142:2
  142:6,13
**official** 3:8 135:22
**oh** 7:18 22:24 24:15
  34:5 55:12 129:11

**Ohio** 1:1,15,16,22
  2:4,8,12,19 26:2
  26:19 59:3,7,15
  62:14 63:15,17,22
  65:4,17 66:16
  70:8 144:9 147:2
  147:6,16,20
**Ohio's** 63:20
**okay** 5:23 6:5,10,13
  6:22 7:19 14:2
  15:23 16:4 20:11
  20:22 22:16 24:12
  47:7 48:20 49:14
  55:9 56:15 57:10
  58:14 61:7 62:6
  64:15 65:14 66:17
  66:18 67:11 80:9
  89:10,23 93:3
  96:21 104:14
  107:14,19 108:12
  110:23 111:24
  112:22 116:19
  127:19 134:2
**old** 19:8,8 22:12
**once** 19:21 32:10
  34:17 47:12 90:15
  112:8,8 135:19
  136:1
**ones** 64:22,22
**open** 10:14 13:10
  15:9 82:19 124:14
**opened** 33:22
**opening** 10:18
  111:13
**operations** 16:11,12
  25:11,11 60:3
  126:23 127:2
**opinion** 74:17 94:15
  114:10,13
**OPOTA** 9:23 59:2
  62:12,14
**opportunity** 18:21
**opposed** 6:2 94:22
  101:23
**option** 10:17 93:7
**order** 10:16 37:3
  60:5 62:8,11,19
  62:23 63:4,14
  64:6,13,14 70:8
  70:24 93:6
**ordered** 40:15 41:1
  41:1
**orders** 62:15
**organization** 14:17
  126:8
**originally** 91:17
**outcome** 88:23
  118:10
**outgoing** 16:13
**outright** 116:12
**outside** 10:5 21:17

30:11,12 39:22
  57:22 68:22 74:6
  114:16 115:14
  117:18
**outstretched** 60:7
**outweighed** 129:3
**oversee** 53:19
**overseeing** 33:10
  88:18
**overseen** 18:13
**oversees** 19:7
  126:17
**oversight** 16:16
**overtime** 16:15
**overweight** 96:9
**oxygen** 51:15 52:3
  52:19,24 138:7

_____
**P**
**p.m** 1:17 3:2 143:2
**packing** 125:24
**page** 4:4 80:12
  144:5,8 145:5
  146:7
**pain** 55:24 56:4,9
**pains** 137:14
**painting** 74:3
**pair** 107:23
**pairs** 41:7
**paper** 64:19 80:5
  140:13
**paperwork** 7:14
**paramedics** 50:20
  139:7
**part** 72:21 85:8
  97:19 104:3 106:5
  134:7
**part-time** 10:1
**participation** 100:4
  100:9
**particularly** 97:6,11
**parties** 3:5
**parts** 55:23
**pass-on** 131:1,1
**pass-ons** 17:5
**passed** 22:1 62:16
**pat** 60:12
**pat-down** 33:5
**pathologist** 138:22
**patience** 125:6
  142:19
**patient** 82:11,11,12
  83:1
**patrol** 10:9 60:2
  124:11
**patrolled** 25:10
**pecking** 10:16
**pending** 6:21
**people** 16:13 19:7
  20:20 22:13 23:7
  23:8,13,16 24:21

27:7,18 41:21
  45:11 49:13 55:9
  60:1,8 62:9,9
  64:17 65:2 68:12
  68:19 73:10 75:13
  79:12 80:16 86:12
  86:15 87:22
  107:10 108:4,5,7
  115:13,19,23
  116:23 117:14,17
  118:1,1,22 120:1
  120:1,15 121:3
  124:7 130:14
  131:23 132:1
  134:13 135:2,3
  137:22
**people's** 25:11 27:2
  52:6 56:3 117:24
**percent** 19:11 24:2
  24:8,14 91:16
  99:14 121:17
  133:13
**percentage** 23:21
  24:3
**perception** 24:17,19
  25:12 46:2,12,13
  46:18 135:9
**perform** 111:13
**period** 11:11 20:24
  67:2,17
**permitted** 56:18
  61:1
**person** 21:19 22:10
  37:23 39:13 49:14
  49:14 57:22 60:4
  60:9 61:23 67:8
  69:9 81:13 83:3
  84:11,13 86:22,23
  97:11 99:6,16
  119:23 124:22
  131:3 133:17,22
**personnel** 9:19 73:9
  82:10 140:22
**perspective** 19:4
  36:8 50:13 94:14
**petty** 19:15,16
**Phil** 1:8
**phone** 12:7 75:19
  112:16,17
**photos** 113:16
**physical** 55:24 56:4
  56:9 68:2 69:12
  81:6
**physically** 50:11
  82:16 83:13,22
  90:2 137:14
**picked** 34:15 55:17
  55:19
**piece** 140:13
**place** 54:24 56:5
  110:8 112:8

113:14 121:23
  147:13
**placed** 107:23
**places** 11:21
**placing** 58:7,10,14
  59:8 61:14 106:24
**Plaintiff** 1:6,14 2:5
  3:5
**plan** 91:23
**please** 5:6 11:3 56:2
  116:19 144:3,8
**Plummer** 130:2
**Plummer's** 129:12
**Plummer/Montgo**
  1:8
**pod** 18:19,23,24
  20:3 21:14,17,17
  21:20,23 23:3,4,5
  22:7,10 29:24
  30:20 32:1 41:19
  41:20 42:2 72:7
  103:23 104:5
  112:24 113:19
**pods** 21:22,23
**point** 16:17 28:2
  31:16 33:4,10,23
  36:16 39:2,3,8
  40:7,9,10,15,22
  42:20,24 44:1,16
  48:10 53:8,10
  78:2 85:14 86:11
  89:19 90:17 91:6
  91:14,22 93:1,19
  102:6,13 105:9
  109:12,15 111:7
  111:17 123:20,20
  123:20,21,21,21
  123:22,22,22
  128:16 132:9
  134:2 135:9 138:8
  138:20
**pointing** 101:23,23
**points** 107:3
**police** 9:9,11,14,24
  10:6 12:6,8,10,11
  12:13 15:13,16,20
  15:20 25:18,24
  26:1 59:3
**policies** 53:20 59:1
  62:23 63:18,20
  64:21 65:5,8,10
  65:11,18,19 79:6
  80:3 88:19 139:23
  140:2,4,18,20,22
**policing** 64:18
  71:18
**policy** 54:24 55:15
  61:3,17,18,21,23
  62:1,5 64:4,5,6,10
  64:12 79:5,8
  140:13

policy/procedure 15:18
pop 52:7
population 25:2,4
portable 29:13,18
portion 66:24 67:15
pose 73:10 75:14 141:18
posed 76:3
poses 73:17
position 10:14 13:10 15:1,8,18 15:19 16:2 30:8 40:17 42:9 45:6 50:8,16 51:1,3,4 51:11,12 58:15,22 59:5,9,17 66:2 67:1,16,22 68:9 68:17 69:20 70:3 70:10,17 71:1,20 71:21,21 74:12 82:12 83:2,10,21 84:12,24 87:7,9 92:22 93:2 96:1 96:15,19 97:2 100:16 106:1 107:1,6,7 110:18 111:3 141:2
positional 53:3 72:9 72:16 96:9 97:2,4 97:12 98:3,7 99:9 99:18 100:5,11,17 100:20 101:5,9 141:23 142:3,7,14
positionals 68:19
positioned 101:16
positioning 101:1
positions 10:9 61:15 78:1 89:9 133:6
positive 102:14 121:19 127:24 128:5
possible 41:15 68:7 89:22 95:22,23 139:2
possibly 37:12
potential 21:21 120:15
potentially 21:19 70:2,5,9 71:2,20 96:11 135:8 136:18
pounds 20:23 36:10
PowerDMS 79:21 79:24 80:8,9
practically 140:3
practice 58:16 64:21 76:23 77:1 77:6
practices 61:16 79:1
Pre-existing 99:11

Pregon 1:16 2:6,7 20:16 24:9 25:6 26:9 27:4,15,22 28:9,17 32:24 35:19 43:10 45:14 46:9,21 49:7,16 50:1 51:5 52:22 54:1,9 57:1,19 58:3,17 59:12 60:22 63:9 64:1,8 64:16 65:15,22 66:4 67:4,18 69:7 69:22 70:4,11 71:3,8,22 72:11 73:11,19 75:6 77:16 78:14 82:15 83:4 84:6,15 85:18 88:14 91:1 92:9 94:10,23 95:17 96:13 97:7 97:16,23 98:4,9 98:15,19 99:1,23 100:6 101:11 102:19 106:10,21 109:5,18 114:5,11 114:24 115:4 123:10 125:15 127:16,19 129:9 130:17 132:18 134:14 136:12 139:3 140:8 142:9 142:15,21 144:16
preliminary 131:1
prepare 7:11
prepared 91:17 111:14
presence 3:7 114:17 145:14 147:10
present 86:6 112:1 139:8,17
presented 91:17
press 97:14
pressure 39:18 99:15,17 107:3 109:14
presume 20:3 34:4 55:3 59:6 139:11
pretty 8:18 16:15 16:16 79:14 126:9
prevent 90:8 107:10 107:24 108:22
prevents 62:9
previous 43:19 47:2 87:4
previously 43:21 109:14 111:23 133:3
primarily 71:14
printed 144:4
prior 12:7 17:3 21:5 33:20 44:8 66:14

81:13 87:4 104:6 128:13 130:9
prisoner 56:6
prisoners 61:14,14
private 117:13
probability 35:23
probably 5:16 8:22 17:11 18:1,5 20:15,23 24:18,18 24:20 34:8 35:2 62:15 68:24 76:19 76:21,22 81:4 95:7,20 97:8 104:8 116:13,17 121:12 127:10,12 129:4
problem 52:21
problems 20:7 21:23 51:17
procedural 112:7
procedurally 88:2
procedure 1:15 3:6 59:16 79:5 112:10 113:13 144:8
procedures 53:20 63:18,20 64:21 65:11 79:6 80:4 88:19 121:22 140:2,5,18,20,22
process 12:9,22 83:12 85:11 88:1 138:7,21,21
processed 16:13
processes 22:2
product 80:1
Professional 144:13
progress 138:5
progressed 48:14
prohibited 59:9,15 61:2,16 65:9,21
promise 8:22
promoted 13:7 128:11,13,15
promotional 10:10 10:11
prompt 28:20
prone 58:15,22 59:4 59:9,17,21,22 60:4,10 61:15 62:9,24 65:1,6,9 65:18,20,20 66:1 66:15,22 67:2,13 67:17,22 68:4,17 69:10,19 70:2,9 70:17,20,24 71:1 71:10,21 74:12 80:14,18,24,24 81:1,1,10,13,18 81:18,21 82:12 83:2 84:12 86:23 87:13,15 96:15,19

96:23 97:2 100:15
proned 69:5 81:11 81:11 87:2
proning 60:8,23 61:2 81:6,6,8,18
proof 3:8
proper 50:14,14 94:18
properly 37:14 53:18 114:16
property 26:12 27:18
PROSECUTING 2:17
protect 26:4,11,19 27:2,12,17,20 28:8 52:6 117:24
protocol 111:12 112:10
protocols 112:11
provide 6:9
provided 50:18 118:5
proximity 102:12
pry 8:22
psychosis 98:14 99:8
public 1:15 23:14 68:15 74:15 76:9 130:6,11 144:7 145:13,17 147:5 147:19
public's 53:24
publish 63:23
pull 41:12
pulling 31:11
purposefully 54:2 73:22
purposes 125:7
push 47:9 79:9,15
pushing 80:17
put 11:1 19:9,23 22:5 24:24 25:15 39:7 40:8 45:23 49:10 50:15,18 51:10,21 55:10 56:3 59:4,20 64:19,22 68:4,6,8 70:20 85:7 89:8 91:20,24 93:22 94:5,15 96:14,22 96:23 105:15 107:7 111:18 130:20 131:11 133:6
puts 77:6
putting 40:7,18 59:17 62:9 91:18 93:8 99:17 105:18 137:22 138:8

Q

qualification 3:8
qualified 147:6
quarter 11:14,15,16
question 6:12,16,21 6:21 34:16 37:9 49:3 52:14 63:6 71:15 75:2,12,12 76:1 79:18 95:8 99:8 110:16 120:17 142:1
questions 5:18 6:9 72:15 75:5 84:1 95:10 98:22 139:11
quick 33:12 125:1
quickly 42:4
quite 48:19 103:17

R

racial 122:24
racist 114:9 116:13 119:7,9 128:19 129:8
radios 29:12,18
rail 101:18 108:11 110:6
railing 42:5
railings 41:19
railway 102:4
ran 116:16 119:1
rank 10:2
ranks 9:19 120:13
rapidly 137:3
rare 10:14
rash 124:13
rate 23:13
raw 74:4
re-read 67:9
reaching 60:14
read 7:12 54:20,23 55:19,24 60:20 61:6 67:6 90:14 107:8 115:15,24 124:9 125:20 142:21 144:3,6,8 144:10 145:4,13 146:2,4
reading 82:8 83:5 145:12
reads 61:17 62:2
realize 24:21
realized 91:22 104:7
realizing 104:6
really 24:10,21 25:15 35:15 39:2 40:18 116:1 118:12 129:18 135:21

**realm** 74:6
**rear** 100:15
**reason** 6:20,20 8:16
  35:17 55:7 73:16
  90:21 112:13
  116:15 120:12,17
  136:9 146:7
**reasonable** 56:19
  74:6 76:15 84:20
  84:22,22
**reasonably** 34:10
  56:21 86:20
**reasons** 18:17 146:5
**reassess** 112:20
**reassessed** 87:11
**recall** 47:13,15
  51:22 68:23 69:1
  69:3 88:9 102:20
  102:20 103:4,9
  104:3,5 118:23,24
  129:2
**received** 12:7
  116:18
**recognize** 125:10
**recollect** 34:9
**recollection** 8:13
  13:20 31:23
**record** 5:10 6:5 9:5
  9:6 34:15 61:6
  67:10 75:8 84:2
  118:17 125:3,8
  131:19 133:9
  146:5
**records** 17:18 21:2
**recs** 22:8
**reduced** 3:7
**refer** 82:11 131:15
**reference** 29:6
**referring** 134:3
**reflect** 57:6
**reflective** 25:4
**refresh** 8:13
**refreshers** 79:9
**regarding** 8:11
**regardless** 70:23
**regards** 8:10 80:19
**Regional** 10:19 13:5
  15:2
**regulations** 15:21
**Rehabilitation**
  63:15,18,23 65:5
  65:18
**relative** 61:3
**relayed** 35:23
**release** 72:6
**relevance** 118:20
  119:10
**relieving** 17:7
**rely** 84:2 131:22
**relying** 7:7
**remain** 87:7

**remarks** 70:16
  119:7
**remedial** 139:20
**remember** 11:15
  16:19 18:23 31:16
  34:22 36:4,7,10
  39:5,24 40:10
  47:10 103:10,16
  103:17,21 109:16
  110:2,23 111:5
  134:7
**remind** 6:3
**REMINGER** 2:11
**removed** 111:16
  113:1
**renew** 112:12
**repeat** 19:15 34:16
**repeatedly** 96:14
**repercussions** 133:2
  133:2
**replaced** 90:6,23
**report** 7:12,17 8:18
  20:20 30:4 46:10
  82:24 91:12
  105:17 107:2,17
  109:6 113:7
  117:10,11 127:17
  128:8 131:13
  135:22 136:24
  137:1
**reported** 38:19
  103:14 105:14
  106:15,23 107:16
  109:13 117:8
  118:17 120:24
  122:4
**reporter** 5:7 144:13
  146:1
**reporting** 18:7,8
**reports** 13:22 69:18
  82:4 104:24 106:4
  106:9,12 107:8
  108:14 134:17,21
  134:23 135:1
**reposition** 53:5
**represent** 5:16 77:3
**request** 6:15 146:4
**requesting** 139:6
**require** 49:22
  106:16
**required** 50:21
  134:16
**requirements**
  106:18,19
**requires** 137:21
**research** 69:17 70:1
  70:8 71:1
**resistant** 46:3 86:13
**resisting** 31:10 46:8
  49:24
**resistive** 45:12

**resort** 54:14
**respect** 27:18
  130:10
**respective** 3:5
**Respiratory** 99:19
**respond** 82:1
  116:22 117:22
  120:10
**responded** 21:10,14
  29:8 30:9,13
  38:13 39:10 42:22
  82:10 113:8
**responding** 29:18
  35:12 42:17 117:6
  136:21
**response** 123:19,23
  129:17
**responses** 6:2
**responsibilities**
  16:10 53:18
**responsibility**
  118:16 121:7,10
**responsible** 33:11
  43:3 53:11,14
  118:2 120:14
  141:3,6
**restaurant** 124:1
**rested** 101:21
**restrain** 50:11 54:3
  60:11 65:2 72:1
  73:9,17 75:13
  76:3,8 77:11 78:4
  78:10,18 141:18
**restrained** 46:17,19
  66:1 68:20 69:5
  74:9 84:2,23,23
  85:22,24 86:5
  87:5,5 97:3
  102:13 106:5
  136:22
**restraining** 54:16
  82:17 104:12,15
  109:8
**restraint** 40:15,19
  40:24 41:2 48:8
  48:13 54:24 59:21
  62:10,23 63:19
  65:6,9,19,20,20
  66:15,22 67:2,13
  67:17 68:2,2
  69:13,19 70:2,3,9
  70:21 71:2,21,21
  77:21 80:14,18
  81:10,19,22 85:8
  85:8 92:24 93:8
  93:10,16 138:12
  138:14,17
**restraints** 40:11
  53:23 54:7 55:10
  55:13 56:5,8
  58:11,11 59:9

**60:9 61:4,9,15
  62:24 64:5 79:2
**restrict** 53:24 54:3
  54:8,11 55:14
  56:11
**restricted** 59:16
**restricting** 56:3
**restrictions** 19:19
  55:24
**restroom** 75:6
**result** 21:16 88:23
  99:21 136:10
  139:13,16,21
  144:10
**resulted** 88:22
**results** 135:17,19
**resuscitation** 112:8
**return** 144:8
**review** 7:17,22 8:6
  13:22 21:2 65:4
  128:8
**reviewed** 7:20 8:3
  29:5
**revisit** 84:1,4
**Richardson** 1:5
  5:13 8:19 18:18
  18:19 21:6,12
  27:9,19 28:23
  30:5,8,22,24
  31:10,13,19,22
  32:3,5,19,22 33:7
  33:22 34:7,17
  35:5,17 36:1,2,17
  36:24 37:2,4,7,9
  37:19 38:4,8,12
  39:10,14,21 40:23
  41:16,24 42:5,7
  42:16,18 43:9
  46:17 47:19 48:15
  50:15,22 51:2,16
  53:9 66:1 67:21
  82:17 83:9,11,14
  83:22 84:23 85:1
  85:10,15 87:6
  90:8,14,24 92:23
  94:8 95:13 101:16
  102:8,17 103:6,14
  103:19 104:6
  105:5 108:16
  109:3,17 110:3
  112:4,21 118:2,6
  118:7 121:16
  127:17 128:15
  130:17,23 136:2
  136:22 138:23
**Richardson's** 5:17
  27:12 35:14 49:18
  87:3 88:24 97:18
  108:18,21 113:3
  118:10 119:14
**right** 9:1 13:8 14:4

**14:13 18:19 23:5
  23:9 27:7 28:16
  28:20 29:12,22
  30:15,17,19 32:14
  32:17 37:13 42:11
  42:21 45:4 46:24
  56:15 58:10 59:6
  61:10 62:19 70:15
  73:18 74:2,24
  76:20 77:1,19
  81:12,20,24 82:8
  84:10 85:3 88:17
  89:14 97:11 98:14
  101:16 102:11
  104:2 108:7 109:4
  109:9,22,23 115:4
  116:23,24 121:20
  125:24 126:9,19
  127:11 132:4,7,17
  133:11 135:4
  137:4,5,10 139:2
  142:18
**rights** 26:4,7 27:3
  27:12,19,23 28:4
  28:7 52:6 117:24
**risen** 120:13
**risk** 19:7,9 20:5
  22:14 68:15 69:5
  69:8,19 72:16
  73:10,18 75:14
  76:4 77:7 87:21
  88:12 96:7,9 97:1
  97:1,3,5,12 98:2,5
  98:7 99:9 100:4
  100:10,10,16,16
  100:19,24,24
  101:5,9 114:2
  127:11,14 128:7
  135:17,19 141:19
  142:6,10,14
**road** 10:13 60:2
  122:3,15
**Robert** 1:5 5:13
  18:19 21:6,11
  27:9,12,19 30:5
  94:8 118:2 119:14
  130:23
**Rodney** 57:7
**roll** 94:13 95:5,21
  96:3 109:1,3
**rolled** 45:9 87:11
  97:21 111:20
**rolling** 108:23
**roommate** 89:20
**round** 23:24
**route** 73:3
**rude** 6:4
**rule** 6:4 53:22 56:15
  58:20 68:14 73:14
  73:16 76:1 78:13
  84:10

**rules** 1:15 3:6 15:21
38:15 53:12,15
68:13 74:2 144:8
**run** 14:16 87:1
**rusty** 18:2

**S**

**safe** 22:19 44:21
60:12 69:12 85:4
91:8
**safeguard** 43:22
**safely** 77:24 93:7
**safer** 76:11,15
78:11
**safest** 76:20 77:4,13
78:15,18,20 91:18
92:22 93:1
**safety** 34:19 41:23
41:23 42:6 44:18
44:19 51:13 78:5
78:8 86:21
**sat** 46:16
**satisfied** 129:11
**Saturday** 13:19
14:4 16:6
**saw** 14:3 33:21
38:20 39:3,3
51:16,20 62:8
83:7 89:13 92:12
113:19,20 115:23
115:23 135:3
141:1
**saying** 19:10 31:13
31:17,18 37:12
43:12 44:4,4,5
61:1 76:13 94:3
102:21 103:7,8
111:5 120:19
123:24 131:16
133:10
**says** 5:3 26:18 46:7
46:10 49:14 58:21
58:23 59:8,16
61:18 70:8,8
80:23 84:19 90:5
109:6 113:7 120:3
128:2
**scenario** 60:18 72:4
72:6 108:10
**scenarios** 54:11
**scene** 30:2 32:3,10
39:11 43:14 66:11
66:12 92:18 94:1
97:18 111:2
112:19 139:8
**scheduling** 16:15
**school** 11:7
**seal** 147:16
**search** 33:12,24
**second** 11:16 16:22
29:24

**seconds** 32:1,8,13
35:4
**secure** 30:5 60:9
61:2
**secured** 31:9 32:2,5
32:14 45:1 107:22
108:16
**securing** 106:24
**security** 29:14
**see** 17:18 33:15 38:8
38:10 47:16 52:15
57:5 65:9,13
66:16 80:14 89:15
89:17 101:20
102:5 103:2,3
107:12 119:10
120:5 124:10
131:16 135:23
**seeing** 89:14 90:1,2
123:18
**seen** 43:6 62:20
63:12,17 64:9,12
64:13 70:12 80:23
101:14 105:3
114:14,16 127:13
**Seg** 19:9 22:12
**seizure** 37:20,23
38:1,3,24
**send** 116:20
**sending** 116:13
**sends** 120:18
**seniority** 10:15
**sense** 16:4 26:11,15
44:12 52:5,7
89:24 105:7
107:18 124:20
**sent** 79:5 116:9,15
119:13,13,17
123:5 129:16
**sentence** 83:5
**separate** 118:12,12
141:4
**sergeant** 5:6,9 7:10
9:3 10:3,23 13:7
14:15 15:2,8 16:7
17:20 18:12,14
28:6 29:4 30:1
32:7 47:18 50:24
52:2 53:11,22
69:16 73:8 75:10
81:4 83:20 87:23
95:9 101:14 105:8
105:24 119:2
125:6 127:3,9,13
128:2,9,20 141:2
**sergeant's** 10:10,11
16:9
**sergeants** 42:24
55:7
**series** 125:10
**serve** 123:23

**served** 135:13 136:1
**service** 15:18 23:14
**Services** 113:24
127:4 128:8
**Session** 3:1
**set** 147:15
**sets** 36:13
**seven** 12:15 23:18
**shackles** 41:4,9,11
50:17 58:12
**sheet** 144:5,6,9
**sheriff** 1:9 2:9
126:12 129:7,12
130:2 141:14
**sheriff's** 2:20 5:13
9:17,19,22 10:5,8
10:9 12:19,20
29:1 65:12 72:20
80:1 118:19
129:13,24 130:1
130:13,14 134:16
141:14,16,21
142:1,5,12
**SHIBLEY** 2:3
**shift** 10:20 13:5
16:12,21 17:3,5,6
17:11,12,16
**shifts** 12:5
**Shoot** 9:2
**short** 11:11 69:3
75:10 125:5
**shot** 93:21 94:5
**shoulder** 43:20 48:1
83:11 109:9
**shoulders** 108:22
**show** 45:18 96:18
**showed** 64:4 87:10
117:15 118:8
119:14
**showing** 50:24
70:14 125:8 128:2
**shown** 19:14,21
70:1,9 71:1
**shows** 102:16
113:19
**shrugs** 6:2
**shut** 22:10
**shy** 12:15
**sic** 47:13
**sick** 21:1
**side** 19:8 22:12 40:8
45:9 50:18 66:5
77:5 83:11 85:6,7
87:11 93:5 94:16
94:16 95:1 96:15
96:23 101:16,20
111:19,21 117:15
126:16,22,23
130:12,12 138:8
**side-by-side** 121:23
**sign** 79:6,20 144:3,6

144:8
**signature** 127:12
142:23 144:8
146:23
**signed** 144:10
145:14
**signing** 145:12
**Signs** 101:4
**similar** 37:16 72:22
113:17 131:13
**Sincerely** 144:12
**Sinclair** 10:1 11:12
11:13
**single** 80:12 115:24
**sir** 5:15,19,21,24
6:11,14,23 7:5,9
12:24 13:8,12
14:24 15:5 18:20
29:10 32:11 35:7
53:21 55:12 58:13
63:4 66:3 67:22
70:5 72:9 73:4,7
75:16 82:7 101:12
124:2,3 126:5,7
126:10,13,15,18
126:21,24 128:14
132:13 139:19
**sit** 34:22 45:3,3,18
72:14,18 89:11
135:7
**sitting** 102:5
**situation** 19:24
21:20 33:8 48:2,7
49:17,18,19 53:5
57:3 60:3,16,17
64:23 76:16 78:19
79:14 96:5 101:3
107:4 111:11
112:18 137:9
**situational** 73:23,24
76:17 86:10
**situations** 18:10
55:9 64:24 65:1
68:3 74:8
**six** 14:5
**size** 36:12 40:13
41:11 98:5 110:19
**skimmed** 115:22
**skinnier** 20:15
**skinny** 20:24,24
**slang** 116:8
**slots** 10:12
**slow** 11:3
**slur** 122:24
**small** 24:20
**society** 24:18
**Sollenberger** 87:24
113:22 114:3,14
115:13 117:7,9
118:6 120:21
121:12 123:1

125:11,20 127:6
128:20 129:15,23
129:23
**Sollenberger's**
119:3
**somebody** 6:3 34:4
41:1 42:2 45:18
48:3 52:2,15,19
54:3 58:22 59:4
59:17 60:10 61:2
68:4,6 72:2 73:17
76:20 78:18 80:24
81:7,17 86:24
89:19 95:20,23
96:4 97:2 99:17
100:13,24 101:8
104:12,15 105:18
106:24 110:11
113:20 120:13
124:21 134:11
141:6
**somebody's** 54:11
**someone's** 54:8
**soon** 68:7 84:11
139:2
**sorry** 52:8 55:22
75:20,24 85:2
90:12 127:24
128:20 130:18
133:21
**sound** 115:18
**sounds** 92:21
**south** 42:4
**SOUTHERN** 1:1
**span** 116:11
**SPANGENBERG**
2:3
**speak** 5:23 8:12,16
22:4 41:22 98:13
129:13,14,20
133:12
**speaking** 37:13
48:11 71:14 81:16
140:3
**speaks** 8:18 80:13
**Special** 1:4 88:3
89:6
**specified** 147:13
**speculative** 82:19
**speech** 28:10,13
**split** 54:20 110:6
**splitting** 24:16
54:12
**spoke** 82:21 88:6
114:2 133:12
**spoken** 133:23
**spray** 104:20
**spread** 40:12 41:8
61:15
**Sr** 1:5
**stab** 126:4

**staff** 40:1 42:7,10
  43:23 44:22 45:4
  45:10 49:8 52:11
  53:4 55:3,5,8,13
  56:4 61:8 66:7
  82:4 87:13 89:21
  94:21 108:3,15,19
  121:16 139:8
**staffing** 17:15 93:12
  93:15
**stamp** 125:9
**stand** 79:22 84:5
**standard** 132:24
  133:1,8
**standards** 63:24
  64:21
**standing** 42:19
  71:11 83:21
**standpoint** 77:13
  78:9
**stands** 79:23
**start** 9:20 11:6
  22:23 55:1,2
**started** 12:9 13:13
**Starts** 2:10 125:1
  144:15
**state** 1:15 5:6 26:2
  59:2,3,7 62:14,17
  63:20,22 66:16
  70:7 100:14 108:7
  119:21 145:1
  147:2,6,20
**stated** 44:6,6 108:10
  109:14 111:7
  145:12
**statement** 19:10
  29:5 54:6 60:20
  83:18 90:13
  108:14 119:22,24
**statements** 131:16
  133:14,15 135:2,3
**states** 1:1 26:20
  59:4
**status** 80:13,17
**stay** 112:4
**stayed** 46:1
**steering** 84:7 121:4
**stenotype** 147:9
**stenotypy** 3:7
**step** 9:23 12:2 137:6
  138:4
**steps** 12:10 92:2
  94:2 121:22 122:5
**Steven** 2:14
**stipulated** 3:4
**STIPULATIONS**
  3:3
**Stockhauser** 2:14
  40:2,3,8 51:20
  53:2,4 103:12,14
  103:19

**Stockhauser's** 53:1
**stomach** 39:23
  49:13 84:13 86:14
  94:16 97:14
  107:22 108:16
**stop** 11:13 14:12
  45:23 47:12 60:14
**stopped** 91:22 104:6
  104:7 109:19
  110:3,21
**straddled** 108:17
**street** 2:11,18 71:17
  72:23 86:12,23
**stress** 20:19
**Strickland's** 62:22
**strikes** 106:22 107:2
  109:14
**struggle** 45:20
  100:4,10
**struggles** 72:3
**struggling** 45:23
  68:16 69:4,9
  96:11 99:21
**studies** 24:5 70:18
**study** 70:20
**stuff** 57:5,7 73:6
  109:9 112:7,15
  115:5,22
**Stumpff** 30:13,14
  30:21 32:6 110:24
  111:1,4
**subdued** 85:17,19
  86:3,5,7
**subject** 37:16
  116:24 120:16
**submitted** 145:11
**subsequent** 19:2
**substance** 38:6
  145:6
**sudden** 68:15 69:6
  69:19 100:5
**suddenly** 48:6
**suffered** 37:20
  136:22
**Suite** 1:16 2:4,8,12
**supervising** 17:22
  17:23 52:2 141:7
**supervisor** 10:19
  13:6 17:16 18:11
  18:13
**supervisors** 16:3
  17:7,15,17 18:9
  18:16
**support** 47:16 83:17
  83:19
**supportive** 80:3
**supposed** 72:10
  82:7 132:14
  140:17 141:9
**sure** 18:4 33:11
  34:14,23 35:22

36:9 43:15 51:2
  53:18 57:12 60:12
  64:2 74:14 76:17
  79:3 82:5 86:4
  87:19 98:19 99:12
  115:3,16 119:20
  125:2 134:4
  142:16
**surprised** 106:3,7
**surrounding** 15:6
  130:22
**suspected** 35:9
**swapped** 41:4
**sweating** 45:20
  103:3
**swore** 26:3
**sworn** 5:2 8:14 9:14
  10:6,7,23 25:22
  26:7 28:8 147:7
**synopsis** 113:15
**system** 80:16 136:5

――――――――
**T**
――――――――

**table** 6:3
**tactics** 54:10,15
**take** 5:10 6:19,22
  9:23 10:11 25:23
  32:17 48:6 66:20
  73:1 75:11,22
  93:10 113:14
  118:16 119:7
  121:6,23 123:4
  124:1 125:1
**taken** 1:15 3:6
  25:18 133:16
  142:13 146:2
  147:9,12
**takes** 69:13 112:7
  113:16
**talk** 11:3 14:8 21:11
  60:24 121:1,2
  123:18 134:19
**talked** 12:19 43:6
  74:13 76:2 130:11
  131:2 134:6
**talking** 54:13,15
  61:10 68:1,3
  71:16,18 78:8
  81:21 123:14
  127:16
**talks** 60:23 132:22
**tall** 20:10 36:6,7
**taller** 36:7
**taught** 54:10 71:12
  72:8,10,12,15,19
  72:23,24 73:6
  74:11 134:23
  140:23
**teachings** 62:12
**technically** 104:12
**techs** 113:17

**tell** 6:13 11:3 12:2
  16:9 17:1 39:13
  48:19 74:19 86:24
  102:1 110:5,18
**telling** 34:12 44:9
  48:18,20 57:14
  72:18,19 81:7,17
  90:22 91:10 92:22
  120:12
**temporarily** 54:12
**ten** 12:1 23:7,9,18
  24:2,14 45:19
  129:18
**term** 26:1 59:21
  60:4 81:6 82:18
  116:8 119:22
  124:5,15
**terminated** 128:17
**termination** 128:14
  128:22 129:3
**terms** 25:2 32:5
  91:23 97:1 126:8
**test** 112:11
**tested** 12:6
**testified** 92:11
**testify** 147:8
**testimony** 8:14
  48:19 63:1,2 87:6
  139:18 144:4,5,6
  147:9,12
**text** 115:12,24
  116:7,10,14,15,18
  116:20 117:6
  118:4,11,24 119:3
  119:13,19 120:2,5
  120:11,18 121:14
  122:1 123:1,5,13
  125:7,10,10,13
  127:5 128:19,23
  129:13,17 130:20
**texted** 117:9
**texting** 115:13
  117:4 121:11
**thank** 11:5
**thanks** 128:6
  142:18
**Thataboy** 126:6
**theft** 19:15,16
**thereabout** 17:13
  18:6
**thing** 14:13 25:3
  42:14 45:17,19
  48:24 52:7 56:1
  108:13 124:12
  140:12,14 141:16
**things** 7:15 17:6
  18:15 22:9,15
  28:13 33:9 37:24
  38:2 40:6 41:3
  42:4 47:20 52:5
  52:12 59:7 60:24

61:4 68:13,20
  77:5,22 78:10
  79:8,9,15,16 80:6
  80:16 87:12 90:1
  95:7 99:6 100:14
  103:21 106:22
  107:3 109:15
  110:1 117:17
  125:19 126:17
  131:16 132:22
  133:1 137:22
  138:6 140:4,10,17
**think** 13:18 19:3
  23:4,4,7,8,9,10,19
  24:6,7,16,17,23
  24:23 25:1,8
  32:12 35:1 36:1
  37:15 38:23 43:13
  47:15 51:17 57:4
  62:2 64:15 66:13
  69:11 74:10 75:11
  75:14,17 76:20
  81:16 83:5,17
  84:19,20,22 85:15
  85:16 102:9
  104:17 105:22
  107:14 111:24
  112:7 113:7
  115:11 117:3
  118:14 119:6
  121:13,15 123:7,9
  123:11 127:10,14
  127:20,21 128:4
  129:3,6,10,22,24
  130:2,6,10,13
  131:9 134:15
  137:15
**thinking** 57:5
**thinks** 129:20
**third** 2:18 16:23
**thirty** 144:8
**thorough** 89:22
  134:17,23
**thought** 20:4 46:16
  50:5 94:20 96:8
  121:11
**thousand** 24:21
**thrashing** 48:21
  49:4
**threat** 86:7
**three** 17:17 23:8
  43:7 47:12 68:17
  68:22 69:3 70:24
  76:14 82:19 90:23
  115:11 116:10
  117:20
**three-minute** 68:14
**threw** 140:9
**throw** 74:5
**thug** 124:18,19,20
**thugs** 123:15

**tie** 61:9
**time** 3:6 6:19 11:2
11:12 13:13 17:4
19:14,20 21:10
31:13,24 32:15,19
32:22 35:8 36:2
36:22 39:10 46:11
47:21 49:24 53:8
55:20 66:12 67:2
67:6,17 70:14
71:9 72:1,2 74:4
75:18 76:24 77:24
82:17 84:24 87:23
88:15 90:4 95:12
97:17 100:7,13
101:17 102:10
103:17 112:6
113:20 118:23
121:10 122:24
127:5 128:11,16
130:21 134:8
137:2,17 138:5
144:9,10 147:13
**timeframe** 10:23
12:4 68:23 69:1,3
74:21,22 84:20
92:17,17 104:1
115:11 121:17
**times** 7:20 43:8 44:6
47:11,12 50:18
57:14 60:3 66:5
83:8,21 85:7
87:11 94:2 104:8
**tired** 38:1
**today** 5:11 6:24 7:3
7:7,11 18:22
20:16 34:22 48:20
77:20 82:9 118:17
**told** 29:3 32:12 35:4
38:20 39:20 80:16
85:16 102:10
110:7,8 113:11
116:3 117:23
131:12
**Tom** 128:2,9
**Tommy** 87:24
127:12,14 129:15
129:23
**tone** 37:15
**tongue** 38:24
**tools** 77:21,22
137:20,20,23
**top** 23:5,10,19
99:17
**totality** 78:4 128:23
**totally** 48:13 114:23
121:7
**touching** 83:14,22
**Township** 11:21,22
124:12
**trade** 16:21

**traffic** 60:14
**train** 54:17 141:17
141:22 142:2,6,13
**trained** 53:18 54:4
62:13 67:23 68:8
68:11 72:8 77:20
78:23 88:19
**Trainee** 30:1
**training** 7:15 40:5
52:3 58:21 59:1
62:18 68:21 72:20
80:3 139:5,15,19
139:21 140:23
141:3,8,11,13
142:16
**trainings** 62:12
**transcribed** 3:7
147:10
**transcript** 144:3,3,6
144:10 145:4,10
146:2 147:12
**transferred** 10:20
13:9
**transition** 74:16
77:23,24 83:8,23
91:21 138:16
**transitional** 67:24
68:1,5 74:10,11
74:12,13
**transitioned** 40:14
42:13 50:22 85:13
91:14 92:2 94:24
95:2 111:8,22
**transitioning** 83:10
83:11 93:5 138:12
**transpired** 103:24
**transport** 138:19
**transportation**
54:16
**transports** 122:19
**trash** 124:21,23
**treat** 114:15
**treated** 52:11
121:16
**treatment** 72:7
**trend** 20:16
**trial** 7:4
**tried** 38:18 43:21
95:21
**trouble** 101:4
**true** 27:13,14 29:1
35:9 56:24 66:2
67:21 71:7 72:5
98:3 100:17 105:8
145:7 147:11
**truly** 25:16
**trusted** 22:3
**truth** 147:8
**truthfulness** 129:1
**try** 32:17 38:10 47:8
82:5 91:7 95:8

137:12
**trying** 26:17 28:6
31:3 34:9 35:15
35:16 37:2 39:7
40:8 42:2 43:24
51:15 52:3,19
55:23 78:2 80:5
86:18 90:18 91:10
109:1,3 121:6
123:4 124:1
127:21 137:18
**Tuesday** 3:1
**turned** 95:13
**turning** 16:3
**turnover** 23:12,12
**two** 23:8 36:13 41:6
42:24 76:8,13,14
78:9 82:19 88:7
90:23 92:3 107:14
107:23 109:24
115:11 120:6
126:19
**type** 15:18,18 16:15
19:16,24 38:5
44:17 59:2 69:12
78:1 94:4 104:22
139:20
**typewritten** 144:4

_____
**U**

**u** 125:24
**Uh-huh** 26:21 57:8
90:10 92:13 105:2
126:1,5 133:19
**uh-huhs** 6:3
**unacceptable** 74:7
75:3 77:6 114:23
121:7
**unarmed** 32:23
**unbiased** 133:7,9
**uncommon** 124:13
**unconstitutional**
79:1 80:22
**undergo** 139:20
**underneath** 111:21
126:19
**undersigned** 145:13
**understand** 5:14,20
6:6,12,24 7:2,6
27:1 31:19 42:18
43:1,12 46:18
48:16 57:12 58:13
74:1 77:10 86:18
96:20 97:15 100:3
114:6 117:23
123:2 126:11
132:17 136:6,10
140:1,6 141:16,21
**understanding** 6:15
16:6 18:18 21:15
26:18 29:8 42:15

69:2 136:2,7
141:8
**understood** 6:17
29:19 35:8 36:24
46:17 140:16,18
**underwent** 139:15
**unfortunately**
85:14
**unintelligible** 31:15
37:11
**unintentional** 108:3
108:4,15
**unintentionally**
107:10 108:5,11
**unit** 102:6 113:24
127:4 128:9
**United** 1:1 26:20
**unknown** 29:8,21
33:23 44:17 52:16
60:13 69:8,11
85:5 90:20 136:18
136:20
**unnecessary** 58:1,4
58:4 73:10,17,21
73:22 75:14 76:4
76:5 141:19
**unreasonable** 56:24
57:2,15,17,21
77:14,17
**unsecured** 93:13
**unwritten** 140:23
**update** 80:13,15
**updates** 79:4,7,19
79:19
**uphold** 26:8,19 28:8
**uploaded** 80:4
**upper** 31:24 32:15
41:19 42:2
**upright** 42:19 45:6
68:9 71:11
**upstairs** 92:15
**upwards** 17:16
**use** 36:13 43:15
54:23 55:17 56:18
57:15 58:11 60:7
60:13,16 64:5
65:5,8,8 74:4
76:18 78:15,17
80:2 98:7,12
100:15 104:13,20
104:22,24 105:16
106:3,8,12 107:2
107:16,16 108:1
108:19,23 109:2,9
109:13 123:16,16
124:5,12,15
125:21
**uses** 104:11 118:21
120:15 122:24
125:22
**usually** 10:15 36:11

**utilize** 65:11
**utilized** 16:1
**utmost** 42:7

_____
**V**

**vacationed** 17:19
**variables** 69:11
71:11 72:8,16
131:17
**verbal** 101:8 113:10
**verbally** 48:10
**verbiage** 78:17
**verifying** 34:12
**version** 131:23
**versus** 23:22 50:14
79:1
**video** 7:22 43:6 45:8
45:9 47:15 83:17
83:19,24 87:8,10
90:1 96:18 101:14
102:16 104:8
**view** 135:9
**Vine** 2:11
**violated** 38:15
**violation** 128:24
**violent** 19:1,11,12
20:5 21:16,20
86:6
**vs** 1:7

_____
**W**

**wait** 10:15
**waiting** 50:2
**waived** 3:8 142:23
**walk** 86:24
**walked** 102:6,7
**walking** 47:19 93:7
**want** 6:13,19 17:22
23:13 32:17 42:14
44:4 51:2 54:2,20
54:20,23 55:16
56:1 57:12 59:20
66:16,20 84:1
88:7 101:15
103:20 111:3,4
115:18 121:1,2,4
140:1
**wanted** 12:8 15:17
40:10,12 84:3
93:20 95:6
**Washington** 124:12
**wasn't** 10:21 21:15
37:13,13,13 43:17
46:8 49:3,4,23
50:10 51:7 77:19
81:1,1 84:2,3,4
87:9 91:10,20
92:14 95:23 103:5
103:7,8,24 110:17
118:6 119:15
127:3 128:5 134:6

137:17,23
**watch** 16:18,22,23
  16:23 45:8
**watched** 45:8
**watching** 102:5
  110:17
**way** 9:17 10:2 11:6
  40:23 45:12 52:12
  73:17 76:3,20
  77:4,20 78:11
  90:2 101:19
  111:15 123:2,24
  137:10 139:9
  140:3,10,16
  141:15,15,18
**ways** 53:23 54:7
  55:14 56:8 60:1,2
  73:10 75:13 76:8
  76:13,14 77:11,12
  78:4,9,18
**we'll** 11:5 21:11
  42:21 84:1 124:12
  138:22 142:21
**we're** 23:16 26:1,1
  29:7 36:12 41:19
  47:18 48:3 54:4
  54:12,17 61:1,1
  71:11,12 74:10,18
  75:10 77:24 78:8
  81:21 85:10 86:20
  86:20,22 91:14,15
  106:11 111:13
  125:5 133:6,11
  134:23 137:2
**we've** 5:9 13:19
  22:4 48:19 68:8
  68:18,18,20 133:3
  139:23
**weapon** 33:16 34:1
  34:7,11,18,20
**weapons** 33:3
**web-based** 80:1
**week-to-week** 25:9
**weigh** 20:12
**weighed** 36:9
**weight** 20:8,13,20
  36:10 42:1 98:5
  110:20
**welcome** 142:20
**went** 7:15 10:8,18
  11:11,14,15 12:21
  16:22 17:10 20:23
  41:10 45:20 73:3
**weren't** 34:6,16
  37:18 44:9 51:7
  74:23 88:20,20
  91:21 106:14
  111:16 137:19,23
**west** 2:18 25:10,12
**WESTERN** 1:2
**whatnot** 73:1

**wheel** 23:15
**WHEREOF** 147:15
**white** 22:18 23:22
  25:14 124:21,22
**Whitney** 1:15 3:6
  5:22 144:9,13
  147:5,19
**wife** 117:3
**willing** 118:16
**wise** 118:11
**wish** 129:16
**witness** 3:8 104:11
  127:18 133:14,15
  145:12 147:10,12
  147:15
**witnessed** 106:24
  140:21
**witnesses** 133:10
**Wittman** 92:11
**Wittman's** 139:18
**wondering** 21:1
**word** 16:2 31:12
  55:17 57:4 58:11
  60:7 61:22 74:4,5
  74:11 85:16 88:17
  119:9 123:15,15
  123:16 129:11
**word-for-word**
  26:17
**words** 6:2 26:14
  37:17 55:16
  117:16,20 120:6
  124:9,10,10
**work** 10:2 11:10
  12:13 14:9 23:11
  117:14 122:10,13
  122:17 132:2
**worked** 10:21 12:5
  13:16 16:20
**workers** 21:18,24
  22:2
**workforce** 11:18
**working** 9:16 10:19
  10:23 12:4 13:14
  14:5,12 16:18,20
  17:16,17 18:1,6,9
  18:12,14 22:17,21
  42:6 56:17 71:6
**workings** 24:22
**works** 49:12 101:19
  106:8 122:18,18
  122:22
**world** 115:21
**worried** 8:24 96:4
  110:10
**worries** 66:19
**worry** 115:18
**worst** 54:10 57:5
  72:4
**wouldn't** 17:15 48:1

52:1 70:22 97:19
  133:9 134:11
  135:17,22
**write** 30:4 82:5
  140:12
**write-up** 88:21
  113:15,16
**writing** 3:7
**written** 60:21 140:2
  140:15,22
**wrong** 83:3 121:21
**wrote** 82:23 90:9

**X**

**Y**

**yeah** 5:8 7:18,18
  9:13 11:5 12:17
  13:23 16:11 17:10
  18:4 20:19 21:4,4
  22:19,24 24:13,16
  27:17 28:11 29:13
  30:15,16 34:5
  35:10 36:19,21
  37:17,18,21 55:21
  57:11,18 59:22
  67:8,11 68:3,23
  69:1 75:1,7 76:21
  79:11 80:21 82:7
  86:2,6,8 90:16
  96:8 97:24 98:16
  98:23 99:5,24
  100:9 101:2,18
  102:3,12 103:11
  104:18 107:12
  108:6 110:6,13,17
  111:6 112:23
  113:10,24 114:19
  119:12,19 127:9
  127:18 128:4,13
  128:22 130:18,20
  131:6,11 133:12
  133:20 134:1
  135:15 140:9,20
  141:10,11
**year** 10:21,22 14:19
  112:12
**year's** 10:23
**yearly** 139:19
**years** 9:9,10 12:1,7
  12:15 76:23
  115:11 116:10
**yell** 67:11
**yelling** 103:15,15,20
  103:21
**yellow** 22:13
**yep** 6:6 14:3 31:12
  36:21 66:19 110:9
**young** 57:6 134:12

**Z**

---

**0**

**05** 12:18
**06:30** 17:4,8

---

**1**

**100** 19:11 91:16
  99:14 133:13
**1001** 2:3
**11** 14:19
**117** 1:16
**12** 14:20
**123** 2:8
**15** 32:1,8,13 35:4
  92:19
**15:00** 16:23
**15:15** 16:24
**16** 15:10 91:13
**16-hour** 16:21
**165** 20:23
**17** 1:16 3:1 9:10,10
  9:10 145:5
**1700** 2:4,12
**175** 20:12
**18** 9:9 76:23
**18:47** 50:24
**19** 12:12 18:5
**1992** 11:8,17
**1998** 12:12,16 19:17
**19th** 13:19 14:4
  16:6 17:2 21:5
  27:11 29:3 93:17
  100:12 140:6,19

---

**2**

**2:45** 1:17 3:2
**20** 23:8 32:1,8,13
  35:4 146:3
**200** 36:10
**2005** 12:17
**2009-13S** 62:23
**2011** 13:3,11
**2012** 13:19 14:4,14
  16:6 17:21 20:14
  21:5 22:16,23
  23:23 27:11 29:3
  93:17 100:12
  119:18 125:12
  127:8 128:7 140:6
  140:19
**2015** 1:10 3:1 144:1
  145:5,15 147:17
**2020** 147:21
**20th** 14:3
**22** 41:17 44:7 46:3,7
  47:14 48:15,24
  49:2,4,23 50:9
  87:8,10,14 96:16
  102:16,17 106:5
**23:45** 16:24 17:12
**24-hour** 12:5

---

**0**

---

**25** 18:5

---

**3**

**3** 144:1
**3:14-CV-00158** 1:7
**30** 49:19
**301** 2:18
**30th** 119:17
**3548** 125:9
**3rd** 12:11 147:16

---

**4**

**4** 147:21
**43017** 1:22 144:9
**44114** 2:4
**45202** 2:12
**45422** 2:19
**45439** 1:16 2:8
**4th** 2:18

---

**5**

**5** 4:4
**5:48** 143:2
**50** 24:8
**525** 2:11
**5335** 1:16 2:7
**544** 29:23 30:12,13
  102:6

---

**6**

**6:30** 17:9
**614-309-1669** 1:22
**6723** 1:21 144:9

---

**7**

**7th** 127:8

---

**8**

---

**9**

**93** 11:17