UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -

Harry G. Beyoglides, Jr.,
Special Administrator of the
Estate of Robert Andrew
Richardson, Sr., Deceased,
    Plaintiff,

    vs.                              Case No. 3:14-CV-00158

Phil Plummer/Montgomery County
Sheriff, et al.,
    Defendants

                    - - -


DEPOSITION OF BRADLEY MARSHALL
the Defendant herein, called by the Plaintiff under the
applicable Rules of Civil Procedure, taken before me,
Whitney Layne, a Notary Public for the State of Ohio, at
the law firm of Dinkler & Pregon, 5335 Far Hills Avenue,
Suite 117, Dayton, Ohio 45429 on December 9, 2015 at
3:30 p.m.


LAYNE & ASSOCIATES
6723 COOPERSTONE DRIVE
DUBLIN, OHIO  43017
614-309-1669

## Page 2

APPEARANCES

NICHOLAS DICELLO, ESQUIRE
SPANGENBERG, SHIBLEY & LIBER
1001 Lakeside Avenue
Suite 1700
Cleveland, Ohio  44114
   on behalf of the Plaintiff

JAMEY PREGON, ESQUIRE
DINKLER & PREGON
5335 Far Hills Avenue
Suite 123
Dayton, Ohio  45429
   on behalf of the Sheriff
   Defendants

CARRIE STARTS, ESQUIRE
REMINGER CO., LPA
525 Vine Street
Suite 1700
Cincinnati, Ohio  45202
   on behalf of the Defendants
   NaphCare, Inc., Nurse Felicia Foster,
   Nurse Jon Boehringer, Nurse Krisandra
   Miles, Medic Steven Stockhauser,
   and Brenda Garrett Ellis, M.D.

## Page 3

December 9, 2015
Wednesday Session
3:30 p.m.
- - -
STIPULATIONS

It is stipulated by and among counsel for the respective parties that the deposition of BRADLEY MARSHALL, the Defendant herein, called by the Plaintiff under the applicable Rules of Civil Procedure, may be taken at this time by the notary Whitney Layne: that said deposition may be reduced to writing in stenotypy by the notary, whose notes thereafter may be transcribed out of the presence of the witness: and that the proof of the official character and qualification of the notary is waived.

## Page 4

EXAMINATION INDEX

BRADLEY MARSHALL

BY MR. DICELLO...............................Page 5

## Page 5

BRADLEY MARSHALL

Being first duly sworn, as hereinafter certified, deposes and says as follows:

CROSS-EXAMINTION

BY MR. DICELLO:

Q   Good afternoon.  Could you state your name for our court reporter and can you spell your last name, please?

A   Bradley Michael Marshall, M-A-R-S-H-A-L-L.

Q   Mr. Marshall, my name is Nick DiCello.  We just met off the record.  You understand you're here to have your deposition taken today?

A   I do.

Q   Ever been deposed before?

A   No.

Q   By way of introduction, I represent the family of Robert Richardson, who died while in the care, custody, and control of the Montgomery County Jail back in 2012.  Do you understand that?

A   I do.

Q   Do you understand a lawsuit has been filed on behalf of his family members against yourself, against the county, against NaphCare, and some other individuals?

A   I do.

1    Q   Do you understand that today's deposition is
2  being taken in connection with that pending federal
3  lawsuit?
4    A   I do.
5    Q   A couple ground rules just to make sure we get
6  an accurate record.  Whitney is taking everything that we
7  say down.  We have to wait for each other to stop talking.
8  She can only take one at a time.  So please wait for me to
9  finish my question.  Even though you know what I'm going
10  to ask, wait for me to finish and I'll wait for you to
11  finish.  Understood?
12    A   I do.
13    Q   The way this will go is I'll ask the questions
14  and you'll provide the answers.  Understood?
15    A   I do.
16    Q   If you don't understand a question that I've
17  asked, I want you to tell me that, okay?
18    A   Okay.
19    Q   Given that arrangement, if you answer a
20  question that I've asked you, I'm going to assume you
21  understood it; is that fair?
22    A   Yes.
23    Q   It's also important to remember to answer with
24  words; yes, no, or an explanation as opposed to shrugs of

Page 6

1  the shoulders, uh-huhs and huh-uhs, okay?
2    A   Okay.
3    Q   One of us may remind you if you fall into habit
4  of saying uh-huh or something like that.  It happens to
5  everybody.
6    Do you understand you're under oath today, sir?
7    A   I do.
8    Q   Have you ever testified in a court?
9    A   Yes.
10    Q   And you understand the oath you're under today
11  is the same oath that you take when you testify in front
12  of a judge and a jury in a court of law?
13    A   Yes.
14    Q   Any reason you couldn't answer honestly and
15  truthfully today?
16    A   No.
17    Q   You understand that there are penalties
18  associated with giving dishonest answers under oath?
19    A   I do.
20    Q   Criminal and civil?
21    A   I do.
22    Q   If at any time today something jogs your
23  memory -- We're going to be talking about things that
24  happened a few years back.  So if ten minutes from now

Page 7

1  your memory gets jogged about a question that I've asked
2  and you want to revisit the question and supplement your
3  answer or change it, I want you to take the opportunity to
4  do that during the deposition, okay?
5    A   All right.
6    Q   And do you understand, sir, that I'm going to
7  be relying on the accuracy of the answers you give me
8  today in connection with this lawsuit?
9    A   I do.
10    Q   Just a little bit of background information,
11  Mr. Marshall.  It's not to pry into your personal life,
12  but just to get some background on you.  Are you from this
13  area?
14    A   I am.
15    Q   Whereabouts?
16    A   West Carrollton.
17    Q   Did you attend high school in West Carrollton?
18    A   I did.
19    Q   What year did you graduate?
20    A   2010.
21    Q   What is your date of birth?
22    MR. PREGON:  Let's go off the record for that.
23    MR. DICELLO:  Sure.
24    (Discussion held off the record.)

Page 8

1  BY MR. DICELLO:
2    Q   How long have you been employed as a
3  corrections officer at the Montgomery County Jail?
4    A   Four years.
5    Q   What was your start date?
6    A   December 2011.
7    Q   So as of the time of Mr. Richardson's death at
8  the jail, you had been working there for about six to
9  seven months?
10    A   That's correct.
11    Q   Any formal education after high school?
12    A   Besides corrections training, no.
13    Q   When did you know you wanted to become a
14  corrections officer?
15    A   Honestly, I wanted to become a police officer
16  first, and I knew that becoming a corrections officer was
17  a foot in the door.
18    Q   So when did you decide you wanted to become a
19  police officer?
20    A   I would say probably after high school, around
21  age 18.
22    Q   And tell me a little bit about why you wanted
23  to pursue a career as a police officer in law enforcement?
24    A   It always interested me.  My family was on the

Page 9

3 (Pages 6 to 9)

1 opposite side of the law when I grew up, so I wanted to be
2 on the other hand of that.
3     **Q** Okay, that's a good reason. Are you still
4 trying to pursue a career in law enforcement as a police
5 officer?
6     A Yes.
7     **Q** May 19th, 2012 was a Saturday. I'm going to
8 ask you about what documents or anything you reviewed
9 before today's deposition. But my first question is: Do
10 you have a memory of that day?
11     A Yes.
12     **Q** Do you have a memory of the episode that
13 involved Mr. Richardson?
14     A I do.
15     **Q** Prior to May 19th, 2012, do you know if you had
16 ever met Mr. Richardson before?
17     A No.
18     **Q** Now, what if anything did you do to prepare for
19 today's deposition?
20     MR. PREGON: Outside of meeting with counsel.
21     A I reviewed my report that I generated on that
22 day.
23   BY MR. DICELLO:
24     **Q** The Tiburon?

Page 10

1     A Yes.
2     **Q** Did you review the video?
3     A Yes.
4     **Q** Anything else?
5     A That's it.
6     **Q** Prior to this lawsuit being filed, it was filed
7 in May of 2014, it takes a while for things to wind
8 through the system, but had you reviewed the video at any
9 time prior to a lawsuit being filed?
10     A No.
11     **Q** Did any of your supervisors ever instruct you
12 to watch the video?
13     A No.
14     **Q** Were you ever interviewed by any investigators
15 about what happened to Mr. Richardson?
16     A No.
17     **Q** Do you recall what shift you were working on
18 May 19th, 2012?
19     A I would have been third shift, but the incident
20 took place on second watch between shift change.
21     **Q** By habit and practice, what time did you arrive
22 to work when you were working third shift on a Saturday?
23     A I would have arrived at around three p.m.,
24 gotten dressed in the locker room, and then reported to

Page 11

1 the platform to see where I would be at that shift.
2     **Q** So as of the time that you heard the radio
3 broadcast requesting officers to respond to D Pod, had you
4 yet been assigned to a post?
5     A I would have, yes. But I wouldn't have taken
6 over until 15:30 hours or 3:30.
7     **Q** What was your assignment on May 19th, 2012?
8     A Third floor officer.
9     **Q** Is that in a particular pod, or no?
10     A It's a -- We've got the pod housing and then
11 we've got rollover housing, higher -- higher risk or
12 charged inmates, it would be -- we've got third, fourth
13 floor, those are male inmates that have higher charges in
14 the facility.
15     **Q** Is that the linear complex?
16     A Yes.
17     **Q** As of May 2012, were you still in the training?
18     A No.
19     **Q** Is there a training period that you undergo
20 when you first hire on with the jail?
21     A Yes.
22     **Q** How long does that last?
23     A Thirty working days.
24     **Q** Do you remember what your start date was in

Page 12

1 December of 2011?
2     A I do not.
3     **Q** Do you remember if it was early in the month or
4 late in the month?
5     A I believe it was earlier in the month.
6     **Q** So fair to say sometime in early January of
7 2012 you would have completed your training portion
8 orientation; correct?
9     A That's correct.
10     **Q** How old were you as of -- I should be able to
11 do the math. But how old were you as of May of 2012?
12     A Nineteen.
13     **Q** Any criminal history?
14     A No.
15     **Q** Your current rank is still corrections officer?
16     A That's correct.
17     **Q** Mr. Marshall, I'm going to ask you some
18 questions about what you remember happening vis-a-vis the
19 incident with Mr. Richardson. Before we get to that, I
20 want to ask some general questions about some more general
21 topics, okay?
22     A All right.
23     **Q** Do you understand or do you agree that
24 corrections officers must never apply restraints to a

Page 13

4 (Pages 10 to 13)

1  member of the community who is detained at the Montgomery
2  County Jail in a way that could restrict his or her
3  breathing?
4      A   I do.
5      Q   That's a rule at the jail; right?
6      A   I believe so.
7      Q   So one of the jobs of the COs at the jail is to
8  make sure that members of the community who find
9  themselves detained in the jail are not restrained in ways
10 that could restrict their breathing; correct?
11     A   That's correct.
12     Q   And I think you indicated that you've had your
13 own family members who have been detained at the county
14 jail, haven't you?
15         MR. PREGON:  Objection.
16     A   Uh-huh.
17 BY MR. DICELLO:
18     Q   Yes?
19     A   I have.
20     Q   And your family members are loved members of
21 the community like other people who find themselves
22 detained there from time to time; true?
23     A   That's correct.
24     Q   Do you understand that the rule that applies at

Page 14

1  the jail is that corrections officers must only use force
2  that is reasonably necessary under the circumstances?
3      A   I do.
4      Q   That's another rule; correct?
5      A   That is correct.
6      Q   So one of the jobs of corrections staff at the
7  Montgomery County Jail is to make sure that they never use
8  force that is unreasonable or unnecessary; true?
9      A   That's correct.
10     Q   And isn't another job that if a corrections
11 officer sees another corrections officer engaging in
12 unnecessary or unreasonable force that you have to
13 intervene; true?
14     A   Yes.
15     Q   Do you agree that force that is unnecessary
16 under the circumstances is excessive?
17     A   Yes.
18         MR. PREGON:  Objection: legal conclusion.
19         Go ahead.
20 BY MR. DICELLO:
21     Q   The answer is yes?
22     A   Yes.
23     Q   Another asking you if you agree, this is
24 another rule:  Placing members of the community who are in

Page 15

1  handcuffs with their hands cuffed behind their back in a
2  prone position is never an acceptable practice and is
3  prohibited; do you agree?
4      A   No.
5      Q   You disagree with that?
6      A   Yes.
7      Q   So your testimony is that it is acceptable and
8  it is permissible to put members of the community who are
9  in restraints with their hands cuffed behind their back in
10 a prone position; correct?
11         MR. PREGON:  Objection.
12     A   In certain circumstances, yes.
13 BY MR. DICELLO:
14     Q   Are those circumstances limited to applying the
15 restraints?
16     A   No.
17     Q   So you understand that even after the
18 restraints are applied that corrections officers at the
19 Montgomery County Jail can continue to restrain members of
20 the community in a prone position; true?
21         MR. PREGON:  Objection.
22     A   I would say that we can place them on the
23 ground.  It depends on the situation that is evolving.  We
24 have inmates that come in the facility, you know, multiple

Page 16

1  times a day, that are entering the facility uncooperative.
2  We have to search them before they come in.  And sometimes
3  they don't allow us to do that.  So we have to place those
4  inmates on the ground, while they're still in restraints,
5  to complete a search to make sure they don't have any
6  weapons, drugs, or anything that they cannot enter the
7  facility with.  And then after completing that search, we
8  would move them to another -- it would be a cell on the
9  first floor.
10 BY MR. DICELLO:
11     Q   Okay.
12     A   And we would place them on their stomach to
13 remove the cuffs, to put them in a position of
14 disadvantage, that way they don't assault staff because
15 they're entering the facility uncooperative.
16     Q   So it sounds to me like you just described some
17 circumstances where you believe handcuffing behind the
18 back and restraining in a prone position is acceptable;
19 correct?
20     A   That's correct.
21     Q   Any other circumstances other than those that
22 you just described where you believe it's acceptable and
23 permissible to continue to restrain somebody in a prone
24 position with their hands cuffed behind their back after

Page 17

5 (Pages 14 to 17)

1    the restraints are applied?

2        A  I could think of a million different scenarios.

3    We've had fights where, you know, we've had to go in and

4    have inmates lay on their stomachs, go in, cuff them, and

5    then remove them from the cell. You know, there's --

6        **Q  If I can interrupt. I appreciate that. It**

7    **sounds to me like in the situation you just described, as**

8    **soon as you apply the cuffs, you get them off their belly**

9    **and you get them out of their cell; correct?**

10      A  In most circumstances, yes.

11     **Q  As you sit here today, can you think of any**

12    **circumstances, outside of the ones you just described,**

13    **where after the cuffs are applied and somebody is placed**

14    **in a prone position to apply the cuffs with their hands**

15    **cuffed behind their back, that it's acceptable and**

16    **permissible to continue to restrain them in that position?**

17      A  No.

18     **Q  Officer Marshall, do you agree that corrections**

19    **officers must never restrain members of the community who**

20    **are in the Montgomery County Jail in a way that poses an**

21    **unnecessary risk of death?**

22      A  Yes.

23     **Q  And when a corrections officer like yourself**

24    **has two or more reasonable ways to go about restraining a**

Page 18

---

1    **detainee, do you agree that the corrections officer has to**

2    **choose the safer way?**

3        MR. PREGON: Object to form.

4        Go ahead.

5      A  Do you mean to the officer or to the detainee?

6    BY MR. DICELLO:

7     **Q  To the detainee.**

8      A  I would say yes.

9     **Q  Just looking at that bracelet. What does that**

10    **bracelet mean?**

11      A  It is a -- It's a guy I follow on YouTube.

12    He's a workout -- He does --

13     **Q  All right, man.**

14      A  That's his logo.

15     **Q  All right. So you appear to be in physically**

16    **good shape.**

17      A  (Nods head.)

18     **Q  Yes?**

19      A  Yes.

20     **Q  Are you committed to working out?**

21      A  Yes.

22     **Q  Was that true back in 2012?**

23      A  Yes.

24     **Q  What kind of workouts? Do you lift weights?**

Page 19

---

1      A  Yes.

2     **Q  What do you do; bench press, squat, all that**

3    **stuff?**

4      A  Yes.

5     **Q  How much can you bench press?**

6      A  Around 315.

7     **Q  How much can you squat?**

8      A  A lot less than that. I'd say about 300.

9     **Q  How many times a week do you work out?**

10      A  About five times a week.

11     **Q  All right. Do you feel like you can handle**

12    **yourself?**

13      A  Yes.

14     **Q  Have you been trained that the prone restraint**

15    **position where somebody is on their belly with their hands**

16    **cuffed behind their back while being restrained is a**

17    **potentially dangerous and lethal position?**

18        MR. PREGON: Object to form.

19        Go ahead.

20      A  Yes.

21    BY MR. DICELLO:

22     **Q  So tell me about what kind of training you've**

23    **had that you remember where you learned that.**

24      A  Before employment, they send you to --

Page 20

---

1    Montgomery County Sheriff's Office sends you to our range

2    where they practice defensive tactics, handcuffing with

3    new officers that are currently hired -- or being

4    currently hired, and then just use while on your 30-day

5    training in the jail.

6     **Q  Do you remember receiving any kind of pamphlets**

7    **or booklets or watching any videos or anything that**

8    **educated you about the dangers associated with prone**

9    **restraint with hands cuffed behind the back?**

10      A  No.

11     **Q  So it sounds to me like what you're talking**

12    **about, it was just all verbal instruction?**

13      A  And physical.

14     **Q  Demonstrations?**

15      A  Yeah, demonstrations, and then we would

16    practice on either other officers or the training staff

17    that was providing the training.

18     **Q  So were you specifically instructed either by**

19    **way of demonstration or verbal instruction to avoid**

20    **putting people in prone positions with their hands cuffed**

21    **behind their back?**

22      A  No.

23     **Q  So I'm a little confused, because my first**

24    **question was have you ever been trained that the prone**

Page 21

1 restraint position with hands cuffed behind their back is
2 potentially dangerous and lethal, and I think you said,
3 yeah, you have received that training.
4     A  I have.
5     Q  But in the same training, you were never told
6 not to put people in that position.  Is that what you're
7 saying?
8         MR. PREGON:  Objection.
9         Go ahead.
10    A  The way the training was explained was they
11 explained about positional asphyxiation.
12 BY MR. DICELLO:
13    Q  Yeah.
14    A  Things like that.  But a lot of the handcuffing
15 work that we do is with subjects on their stomach, ways
16 to -- you know, an inmate is laying on their stomach with
17 their arms underneath their chest, not cooperating with
18 staff, ways to get their arms out and to place handcuffs
19 on them while they're in a prone position.
20    Q  Were you trained to not continue to restrain
21 people in prone positions once you have them cuffed?
22    A  Yes.
23    Q  And what's your understanding of why you
24 shouldn't do that?

Page 22

1     A  It's because there's no -- I don't -- There was
2 no -- There would be no need to leave them laying there.
3 It's not like I'm going to cuff them and then we're just
4 going to say "see you later" and walk out.  If they're
5 uncooperative or if there's a reason why we're cuffing
6 them, if we have to remove them from the housing unit and
7 transport them to a first floor cell, or if they're being
8 placed in the emergency restraint chair, it factored -- it
9 depends on what we would be doing.  But we would be
10 trained on, you know, assisting the inmate to their feet
11 and then taking them to wherever we're going.
12    Q  Did you receive any training that one of the
13 reasons to get somebody off their belly when their hands
14 are cuffed behind their back is because there's a risk
15 they could die from positional asphyxia?
16    A  Yes.
17    Q  So is that another reason why you wouldn't
18 leave somebody on their belly with their hands cuffed
19 behind their back?
20    A  Agreed.
21    Q  Were you trained as to how quickly you should
22 try to accomplish that, meaning getting someone up off
23 their belly after they're cuffed behind their back?
24    A  With a specific timeframe?  No.

Page 23

1     Q  Were you ever trained that it should be done as
2 soon as possible?
3     A  Yes.
4     Q  Mr. Richardson was restrained in a prone
5 position with his hands cuffed behind his back; true?
6     A  Yes.
7     Q  And I know you've seen the video.  I've been
8 putting the video between the time that Mr. Richardson is
9 pulled out of his cell until the time it's noticed that
10 he's no longer breathing, it's about 22 minutes.  Is that
11 consistent with your memory?
12    A  Yes.
13    Q  And is that consistent with what you saw in the
14 video?
15    A  Yes.
16    Q  Would you agree during that 22-minute time that
17 there are times where Mr. Richardson is being restrained
18 by multiple officers in a prone position with his hands
19 cuffed behind his back?
20    A  No.
21    Q  So can you explain for me your last couple of
22 answers, which what I heard is Mr. Richardson was
23 restrained with his hands cuffed behind his back in a
24 prone position, and then your next answer was during the

Page 24

1 22-minute interval there weren't times where he was
2 restrained in that position.
3     A  Can you explain what you mean by "restrain"?
4 Do you mean us holding him in position or just being
5 cuffed for the 22 minutes?
6     Q  Okay.  Well, we agree that he was handcuffed
7 with his hands cuffed behind his back for the entire 22
8 minutes; correct?
9     A  Yes.
10    Q  And there are times during that 22-minute
11 interval where he's also on his belly; correct?
12    A  Yes.
13    Q  And so the times where his hands were cuffed
14 behind his back and he's on his belly, would you agree
15 that he's in a prone position while his hands are
16 restrained behind his back?
17    A  Yes.
18    Q  And that's prone restraint?
19    A  Yes.
20    Q  There are also times during that 22-minute
21 interval where you and other officers are holding
22 Mr. Richardson down; correct?
23    A  No.
24    Q  Mr. Richardson wasn't trying to get up?

Page 25

7 (Pages 22 to 25)

1       A   He was trying to move forward.  I wouldn't say
2   we were holding him down.  I wasn't putting pressure -- I
3   was -- In the video, I have my knee in front of his
4   shoulder, that way he can't keep moving forward towards
5   the stairs at that point.
6       Q   So if Mr. Richardson was trying to get up and
7   he wasn't being held down, why didn't he get up?
8       MR. PREGON:  Objection.
9       A   I would say because at times when he was
10  moving, it would have been -- it would be hard for him to
11  stand up on his two feet while he's on his stomach or in a
12  prone position.  Most of the time when we -- when we have
13  inmates that are cuffed in a prone position, when we
14  assist them up, we have to roll them to their side.  And
15  we're trained to have them kick their knees or push their
16  knees up towards their stomachs so we can sit them on
17  their -- on their butt, and then we assist them to their
18  feet.
19      Q   Did any of your supervisors ever instruct you
20  to sit Mr. Richardson on his butt?
21      A   No.
22      Q   Did you ever suggest that that should be done?
23      A   No.
24      Q   Why not?

Page 26

1       A   Because we had NaphCare there at the time, and
2   they didn't -- they were working on him to try to figure
3   out what was medically going on with him.  And they never
4   stated to move him from the position that he was in.
5       Q   If NaphCare had instructed you to roll
6   Mr. Richardson over onto his back, do you think you and
7   the other officers were capable of doing that?
8       A   Absolutely.
9       Q   And would you have followed those instructions?
10      A   Absolutely.
11      Q   If NaphCare had instructed you and the other
12  officers to sit Mr. Richardson on his butt, do you think
13  you and the other officers were capable of accomplishing
14  that?
15      A   Absolutely.
16      Q   And would you have followed those instructions?
17      A   Yes.
18      Q   I got the chance to depose most of your fellow
19  corrections officers already, one of whom was Officer
20  Stumpff.  Do you work with Officer Stumpff?
21      A   I do.
22      Q   Officer Stumpff's testimony will speak for
23  itself.  I'm doing my best to recall what he said.  But I
24  believe his testimony was that he believed that between

Page 27

1   himself and you and the other corrections officers that
2   were there, that if instructed to put Mr. Richardson into
3   the restraint chair, you all could have accomplished that.
4   Do you agree?
5       MR. PREGON:  Objection.
6       A   Yes.
7   BY MR. DICELLO:
8       Q   While you were there, do you ever remember
9   anybody from NaphCare instructing you to put
10  Mr. Richardson in the restraint chair?
11      A   No.
12      Q   Do you remember any sergeant instructing you to
13  put Mr. Richardson in the restraint chair?
14      A   No.
15      Q   Did you ever see the restraint chair come up
16  onto the second floor?
17      A   No.
18      Q   To your knowledge, was the restraint chair ever
19  brought into the pod?
20      A   No.
21      Q   I want to understand the timing of things a
22  little bit.  I've looked at this video many times.  I'm
23  going to ask you to identify yourself in a moment.  But
24  before we get there, I presume, because I've asked a lot

Page 28

1   of people questions before meeting you, that you learned
2   about the incident on the second floor of Pod D through
3   radio transmission?
4       A   Yes.
5       Q   And you learned that there was a medical
6   episode?  It was a medical call?
7       A   No.
8       Q   Or tell me.
9       A   I believe the call was an uncooperative inmate
10  in Delta Pod.  And that's all that it was broadcasted as.
11      Q   Did you respond immediately?
12      A   Yes.
13      Q   And my understanding is the way you guys do it
14  is you respond in numbers, get control of the situation,
15  and then maybe some of you can go back to your other
16  posts.  Is that fair?
17      A   Yes.
18      Q   So when you responded, did you respond alone or
19  did you respond with other officers if you remember?
20      A   I believe there were other officers with me,
21  but I don't know who they were.
22      Q   When you arrived, can you tell me who was there
23  and what was happening?
24      A   When I arrived, it was I believe Sergeant

Page 29

8 (Pages 26 to 29)

1  Jackson and Dustin Johnson were there.  I don't recall
2  anybody else to my memory.  And they were there attempting
3  to cuff or already had cuffed Mr. Richardson.
4      Q    Did you assist in cuffing Mr. Richardson up?
5      A    I don't believe so.
6      Q    When you arrived, did someone instruct you what
7  to do or did you just instinctively do something?
8      A    With the number of officers that were there,
9  being just a sergeant and one other corrections officer, I
10 believe, I immediately just tried to assist with what I
11 thought needed to -- you know, where help needed to be
12 done.
13     Q    So do you remember what action you took?
14     A    I believe we were -- they had removed him from
15 the cell at the time that I had already arrived, and he
16 was on his side.  And I basically -- I think I'm closest
17 to the railing.  I just kneeled down, and I'm trying to
18 just keep him in place from moving forward, because at
19 this time I don't know if it's a medical emergency, if
20 this guy has been into a fight.  You know, it's an
21 evolving situation going on that I'm coming into.  I
22 really don't know what's exactly happening at this point.
23     Q    At the time you arrived or as you were able to
24 kind of get your bearings, did you appreciate that

Page 30

1      Mr. Richardson was an overweight guy?
2      A    I understood that he was, you know, larger than
3  the average human.
4      Q    And did you hear him saying anything?
5      A    I remember him mumbling, but not -- not
6  anything, you know, telling us to, you know, stop what we
7  were doing.  And at the time, I'm trying to -- you know,
8  you've got everybody else talking, whether that be other
9  corrections officers speaking with the other inmate that's
10 in the room, there's a lot of -- you know, there's a lot
11 of background noise --
12     Q    Commotion?
13     A    -- going on, and you have other inmates in
14 cells, you know, banging on doors, screaming out, stuff
15 like that.
16     Q    All right.
17     A    So --
18     Q    So you would agree with me that there are times
19 where you place both hands on Mr. Richardson's back;
20 correct?
21     A    Yes.
22     Q    And there are times when you have one hand
23 placed on his back; correct?
24     A    Yes.

Page 31

1      Q    And that was to control Mr. Richardson's
2  movements; correct?
3      A    Yes.
4      Q    And at times you had to put some pressure on
5  his back; correct?
6      A    Pressure on his shoulder.  It wouldn't be his
7  back.  It would have been his right shoulder I had my
8  hands on, pressure.
9      Q    And sometimes you had to put more pressure than
10 others; true?
11     A    Yes.
12     Q    The video is pretty good evidence, but it is a
13 little grainy; agreed?
14     A    Yes.
15     Q    And it only takes kind of a snapshot every
16 second or something; right?
17     A    Yes.
18     Q    So it's not a fluid image; right?
19     A    Yes.
20     Q    There are times where I've watched the video
21 and you appear to kind of get off of your knees and kind
22 of get into what I'm calling like a catcher's like
23 position.  Do you remember doing that?
24     A    I do.

Page 32

1      Q    And there are times you can be seen with your
2  arm resting on the railing?
3      A    Yes.
4      Q    And the way I look at those images, there are
5  times where it appears that your right knee may be over
6  top of Mr. Richardson's right shoulder area; is that true?
7      A    No.
8      Q    Your testimony is you never put your knee on
9  Mr. Richardson's shoulder?
10     A    No.
11     Q    Why didn't you do that?
12     A    Because there would be no need to.  With how he
13 was moving, if I put my knee in front of his right
14 shoulder, that's going to stop him from -- how I was
15 trained, it's going to stop him from moving forward, by
16 just placing my knee in front of him, with him being
17 handcuffed behind his back at that time.
18     Q    So he wasn't trying to -- You know, if this was
19 his right shoulder, at the time that you were -- had your
20 knee where it was, he wasn't thrashing around like that,
21 was he?
22     A    At times, yes.
23     Q    So at the times that he was struggling, that's
24 when you had to use your hands to hold him down?

Page 33

1    A  That's correct.

2    Q  I think it was Officer Stumpff who was kind of

3 in your similar position but on the opposite shoulder. Is

4 that your recollection?

5    A  I believe so.

6    Q  And was Officer Stumpff more or less doing what

7 you just told us you were doing?

8    A  Yes, I believe so.

9    Q  So at times he was putting his hands on

10 Mr. Richardson's shoulder blades and holding him down?

11    A  Just trying to control him from thrashing his

12 body and moving forward. Because at that time, while we

13 were in place where we're at, the medic is trying to work

14 on him. And we're trying to just keep him in a position

15 to where the medic can continue to provide whatever care

16 that he was trying to provide at that time to

17 Mr. Richardson.

18    Q  Before I get to some questions about the medic,

19 though, do you think based on your observations that

20 Officer Stumpff was doing the same thing that you just

21 described that you were doing, where at times Officer

22 Stumpff had to put more pressure on the shoulder than at

23 other times?

24    MR. PREGON:  Objection.

Page 34

---

1    A  I would say yes, depending on if he was doing

2 the same thing with his left shoulder that I recall that

3 he was doing with his right. There are times where he

4 would start thrashing his body, and I would place my hands

5 to try to, I don't want to say push him to the ground, but

6 just to hold him in place and to kind of calm him down.

7 That way the medic could continue to work on him.

8  BY MR. DICELLO:

9    Q  There was a period of several minutes, however,

10 where the medic stopped working on him; correct?

11    A  Yes.

12    Q  And during that time, you and Officer Stumpff

13 and Officer Mayes took control over the upper half of the

14 body; correct?

15    A  Yes.

16    Q  And continued to hold Mr. Richardson in the

17 position that is depicted on the video; true?

18    A  I wouldn't say holding him in position. I

19 continued to keep the position that I had while the medic

20 was working on him with my knee in front of his shoulder

21 and then my hands resting on his shoulder. And then at

22 times when he would start to thrash his body, I would put

23 a little bit of pressure just to try to keep him in place

24 and calm him down. And then when he would stop, I would,

Page 35

---

1 you know, take pressure off. But I would keep my knee in

2 that spot. That way, he couldn't move forward from the

3 position that we were in.

4    Q  Officer Marshall, have you ever received any

5 training that the use of prone restraint is prohibited in

6 the State of Ohio?

7    A  No.

8    Q  Have you ever reviewed any documents that

9 indicate that the use of prone restraint is prohibited in

10 the State of Ohio?

11    A  No.

12    Q  Has anyone from Montgomery County Sheriff's

13 Office or NaphCare ever provided you with a copy of what

14 I'm going to show you right now, which is an executive

15 order from the governor of the State of Ohio that includes

16 a ban on prone restraint?

17    MR. PREGON:  Are you wanting him to read this

18 whole document?

19    MR. DICELLO:  It looks like that's his

20 preference. If that's his preference to read it, I'm not

21 going to tell him not to read it.

22  BY MR. DICELLO:

23    Q  My question is: Has anybody from the sheriff's

24 office ever provided you with that document?

Page 36

---

1    A  No.

2    Q  The first time you as a corrections officer at

3 the Montgomery County Jail are becoming aware of this

4 document is by way of me, a civil rights lawyer, handing

5 it to you within the context of a wrongful death case

6 where somebody died at the jail; correct?

7    MR. PREGON:  I'll object to the extent it calls

8 for privileged communications with your attorneys. You

9 can't tell him if you and I have discussed that.

10    A  Can you repeat the question?

11  BY MR. DICELLO:

12    Q  Yeah. Let's focus on folks either from the

13 Montgomery County Sheriff's Office or folks from NaphCare,

14 and then me. Amongst the group of those people, am I the

15 first person to give you this executive order and make you

16 aware of it, me, a civil rights lawyer, in the context of

17 a wrongful death lawsuit where a detainee died at the

18 jail?

19    A  Yes.

20    Q  As somebody who aspires to pursue a career in

21 law enforcement, do you think that you should have been

22 made aware of that document?

23    MR. PREGON:  Objection. He said he hasn't seen

24 it or read it. It's not a fair question.

Page 37

BY MR. DICELLO:

Q You can take your time and read it if you want, Mr. Marshall.

A (Reviewing document.)

MR. PREGON: Do you want some water?

THE WITNESS: Yes, please.

MR. PREGON: Can we go off the record while he reads?

(Discussion held off the record.)

BY MR. DICELLO:

Q Have you had a chance to read it?

A Yes.

Q Do you think that that is the kind of document that you should have been made aware of in connection with your duties and responsibilities as it relates to restraining people at the jail?

MR. PREGON: Objection.

Go ahead and answer.

A If this is the law, yes, I believe I should have been made aware of it.

BY MR. DICELLO:

Q And this executive order, I know you took some time to read it, but this executive order indicates that the use of prone restraint is prohibited across all state

Page 38

Q Can you access PowerDMS -- I presume PowerDMS has the jail manual on it?

A Yes.

Q Can you access PowerDMS from within the facility?

A Yes.

Q Can you access PowerDMS from outside the facility?

A I believe so.

Q To become a corrections officer, is it your understanding that you're required to read and be familiar with the jail manual policies?

A Yes.

Q And do you rely on your supervisors to provide you with the training necessary to make sure you're following the policies?

A Yes.

Q I haven't made this an exhibit just because it's kind of bulky. I guess I could have. But I want to show you the copy I have brought down here of the Montgomery County Jail Manual's use of restraints policy.

A Uh-huh.

Q Mine is all highlighted and tabbed. But is that a policy that you're expected to be familiar with and

Page 40

systems. Do you see that's what it says?

A Uh-huh.

Q Yes?

A Yes, I do.

Q Now that I've made you aware of this, is this something you're going to go look into after today's deposition?

MR. PREGON: Objection.

A Yes.

BY MR. DICELLO:

Q The jail manual, is that something you were provided during your orientation or training?

A Yes.

Q Do you have your own copy or do you just have a copy you can access?

A It's an online copy that we can access.

Q On Tiburon?

A Yes. No, I apologize.

Q No?

A No, it's on PowerDMS.

Q That's a new term. What is PowerDMS?

A It is a -- It's an online source where we can go on and sign all of our documents to cut back on paper used in the facility.

Page 39

follow?

A Yes.

Q And this policy addresses, does it not, Mr. Marshall, the use of restraints at the jail?

A Yes.

Q And when using restraints, I want to point your attention to number six. It says "When applying handcuffs" -- that's what happened to Mr. Richardson; correct?

A Yes.

Q -- "staff members must never tie the handcuffs to the leg or ankle restraints." That didn't happen, did it?

A No.

Q And there's a period at the end of that sentence; correct?

A Yes.

Q And then there's another sentence that starts off, "Hog-tying prisoners." Mr. Richardson wasn't hog-tied, was he?

A No.

Q It says, "Hog-tying prisoners or placing prisoners who are in restraints in a prone or spread eagle position" -- So let's break that down. Mr. Richardson

Page 41

11 (Pages 38 to 41)

1   wasn't placed in a spread eagle position; correct?

2       A   Correct.

3       Q   And if Mr. Richardson was hog-tied, he couldn't

4   even be put in a spread eagle position; correct?

5       A   Correct.

6       Q   So is it apparent to you from reading this that

7   hog-tying, placing someone prone whose in restraints, and

8   spread eagle are three separate positions?

9       A   Yes.

10      Q   So I want to focus on the position referenced

11  in the policy that deals with placing prisoners who are in

12  restraints in a prone position, okay?

13      A   Okay.

14      Q   Because that's how Mr. Richardson was placed;

15  correct?

16          MR. PREGON:  Objection.

17      A   Correct.

18  BY MR. DICELLO:

19      Q   So placing prisoners who are in restraints in a

20  prone position is never an acceptable practice and is

21  prohibited according to the written policies at the jail;

22  correct?

23      A   According to this policy, yes.

24      Q   This policy isn't consistent with the actual

Page  42

---

1   customs and practices that took place at the jail;

2   correct?

3          MR. PREGON:  Objection.

4       A   The way I understand that policy, how it reads

5   to me, is that I cannot place -- I cannot handcuff

6   somebody that's standing and place them on or in a prone

7   position.  At the time that I arrived to this incident,

8   Mr. Richardson was on his -- was being cuffed or had been

9   cuffed and was on his side or in a prone position at that

10  time already.

11  BY MR. DICELLO:

12      Q   Okay.  So if somebody is already in a prone

13  position, you think you can cuff them up and keep them

14  there?

15      A   No, I did not say that.

16      Q   Showing you the video, we don't need the

17  lights, but the time stamp is 11:58 on the video.  Would

18  you agree Mr. Richardson is in a prone position with his

19  hands cuffed behind his back there?

20          MR. PREGON:  You tell us if you want the lights

21  off.

22          THE WITNESS:  I can see it.

23      A   At that point, yes, I believe he's in a prone

24  position.

Page  43

---

1   BY MR. DICELLO:

2       Q   With his hands cuffed behind his back?

3       A   That's correct.

4       Q   According to the policy, that is not an

5   acceptable practice and is prohibited; correct?

6          MR. PREGON:  Objection.

7       A   How the policy reads, yes, it is prohibited.

8   But at the time, we were attempting to assist medical, and

9   Mr. Richardson at the time was not cooperating, and we

10  were keeping him in the position that, you know, that was

11  easiest for medical to, at the time, to provide care.

12  BY MR. DICELLO:

13      Q   So the time stamp we just looked at, is it your

14  testimony that that's the position that medical wanted

15  Mr. Richardson in?

16      A   That's the position that he was in when medical

17  arrived, and we weren't advised by medical to change that

18  position.

19      Q   I want to show you now a stamp 18:15.

20  Mr. Richardson is in a prone position with his hands

21  cuffed behind his back; true?

22          MR. PREGON:  Objection.

23      A   I'm not a hundred percent sure.

24  BY MR. DICELLO:

Page  44

---

1       Q   Okay.

2       A   I'll have to watch, actually watch the video to

3   --

4       Q   What about 17:35?  Mr. Richardson in a prone

5   position with his hands cuffed behind his back there?

6       A   It appears so, yes.

7       Q   And medical is not assessing him, are they?

8       A   At the time, no.  Because I believe we were

9   waiting on medical.  It had been determined that they were

10  going to give him some sort of shot, and we were waiting

11  on medical staff to arrive with that shot.

12      Q   At any point in time when you were waiting for

13  medical to come back with the shot, did medical say,

14  "Well, while you guys are waiting for us to bring this

15  shot, get Mr. Richardson off his belly"?

16      A   No.

17      Q   If they had instructed you to do that, would

18  you have done that?

19      A   Yes.

20      Q   And do you believe you and the other officers

21  would have been capable of doing that?

22      A   Yes.

23      Q   Would you describe Mr. Richardson as violent?

24      A   At the time?

Page  45

---

12  (Pages  42 to 45)

Q   Yeah.

A   Violent towards staff?  I don't want to say yes or no, because when I had arrived, they were placing him in cuffs.  I don't -- Like I said earlier, I don't know if he had just been assaulted or was involved in a fight with another inmate.  I didn't even know if he had assaulted staff.  Because they had called for an uncooperative inmate at the time, I didn't know if he had assaulted staff.

Q   So let me try to narrow it.  I want to try to focus on when you were there what you knew, what you observed.  Was Mr. Richardson being violent?

A   Towards staff at the time?  It would have been hard for him to be violent with us, but he wasn't cooperating with what we were asking him to do or telling him to do.

Q   I appreciate the explanation.  And I'm not suggesting your answer is not responsive, because I believe it is.  But I'm focusing on this word "violent."  Would you describe his behavior while you were there as violent?

MR. PREGON:  Asked and answered.

A   Yes.

BY MR. DICELLO:

Page 46

Q   Do you know why he was behaving the way he was?

A   I did not.

Q   Something else in the restraint policy that I didn't direct your attention to, but the restraint policy indicates that violent behavior may mask dangerous medical conditions.  Did you receive that training?

A   Yes.

Q   And is that something that you have to be conscientious about when an inmate or detainee is engaged in behavior that appears to be violent or uncooperative?

A   We do.

Q   So one of the things a corrections officer has to understand is that this person may be acting in this way out of a willful desire to be violent, but because they have some kind of medical or mental health condition; correct?

A   That's correct.

Q   At any point in time while you were participating in this episode, did anybody from NaphCare instruct you that Mr. Richardson had heart disease?

A   No.

Q   Did anybody instruct you that he had high blood pressure?

A   I wouldn't have been allowed access to that

Page 47

information.

Q   So you wouldn't have expected them to tell you even if they knew?

A   No, because I know that's a violation of the HIPAA law.

Q   All right.  Did anybody from NaphCare or medical say that it was dangerous for Mr. Richardson to be in the position that he was in as depicted on the video?

A   No.

Q   You were there while Medic Stockhauser was there; correct?

A   That's correct.

Q   Were you there before Medic Stockhauser arrived?

A   Yes.

Q   How long after you arrived did Medic Stockhauser arrive?

A   I honestly couldn't give a specific timeframe if I had to, just because at that time it's -- I mean, you have -- we've got it feels like a million things going on at once.

Q   Yeah.

A   And I've kind of got, I don't want to say tunnel vision, but I'm focused on that.  I'm not focused

Page 48

on who else is coming up and walking in the pod and walking out of the pod and stuff like that.

Q   I had Captain Crosby in here, I think you saw him on his way out.  He's your superior?

A   Yes.

Q   And I was going through a memo that Captain Crosby put together.  I think it's marked as Plaintiff's Exhibit 10.  And he put together his timeline of events.  And according to his timeline of events, he testified that it was -- it took about 12 seconds -- I'm sorry, about 14 seconds or so, or 16 seconds to get Mr. Richardson cuffed up.  Is that consistent with your recollection, or was he already cuffed when you got there?

A   I believe he was already cuffed when I arrived, or he was -- they were in the final process of cuffing him.

Q   Okay.  All right.  So I want to ask kind of what you knew at the time that you were present.  Did you have any concerns that Mr. Richardson was armed with a weapon?

A   No.

Q   You knew Mr. Richardson was handcuffed; true?

A   Yes.

Q   And he had his hands cuffed behind his back;

Page 49

1   correct?

2     A  Correct.

3     Q  You had some concern that he may be in the

4  throws of some kind of medical episode; correct?

5     A  Possibly.

6     Q  You knew that he was obese; true?

7     A  Yes.

8     Q  Did you witness Medic Stockhauser trying to

9  administer oxygen to Mr. Richardson?

10    A  I did.

11    Q  Based on the fact that you saw a medical person

12  trying to administer oxygen to Mr. Richardson, did that in

13  your own mind give you some reason to believe that maybe

14  Mr. Richardson was having trouble breathing?

15     MR. PREGON:  Objection.

16    A  No.

17  BY MR. DICELLO:

18    Q  So why did you think they were trying to give

19  him oxygen?

20    A  To -- From my knowledge, that's a common

21  practice when somebody is going through a medical

22  emergency that they did not -- they couldn't identify what

23  exactly was happening, they want to provide him with

24  oxygen to, you know, assist with what's going on.

Page 50

---

1    Q  Did Mr. Richardson appear disoriented to you?

2    A  Yes.

3    Q  Did you have the understanding that he needed

4  medical attention?

5    A  After -- After Medic Stockhauser had arrived

6  and began wiping blood and mucus from his mouth and when

7  medical was -- when Stockhauser was trying to put the

8  oxygen mask on him and he was knocking it off, I wasn't

9  sure if he was refusing medical attention at the time or

10  if it was a medical emergency.

11    Q  So you also knew that Mr. Richardson had some

12  blood and mucus coming from his mouth or nose area?

13    A  Yes.

14    Q  Did Mr. Richardson hurt anyone during this

15  episode?

16    A  Not that I believe.

17    Q  Were you injured?

18    A  No.

19    Q  Did Mr. Richardson ever try to injure you?

20    A  No.

21    Q  Did you witness Mr. Richardson ever try to

22  injure anyone?

23    A  No.

24    Q  Did Mr. Richardson have some kind of history of

Page 51

---

1  violence that you were aware of?

2    A  Not that I was aware of.  That would have been

3  my first encounter with him.

4    Q  The fact that he was on the D Pod, did you know

5  at the time that he had been classified as a low risk for

6  violence?

7    A  Yes.

8    Q  You didn't witness Mr. Richardson violate any

9  jail rules on May 19th, 2012, did you?

10    A  No.

11    Q  You didn't witness him commit any crime on May

12  19th, 2012 against anyone, did you?

13    A  No.

14    Q  Once the numbers had responded, you know, let's

15  just go through some names here.  Yourself, Stumpff,

16  Mayes, Johnson, Henning, Jackson, Lewis.  So I count seven

17  officers that responded at one point?

18    A  (Nods head.)

19    Q  Yes?

20    A  Yes.

21    Q  Once you had the seven of you all there, did

22  you believe that you had the situation under control?

23    A  Yes.

24    Q  Did you believe that you had eliminated any

Page 52

---

1  potential threat that Mr. Richardson could pose?

2    A  Yes.

3    Q  We talked a little bit about positional

4  asphyxia.  I think you might have used the term

5  "positional asphyxiation."  Do you understand that that's

6  a medical condition?

7    A  Yes.

8    Q  And do you understand that it can kill?

9    A  Yes.

10    Q  There are certain risk factors that make one

11  person more prone, pardon to use the term, but more prone

12  to die from positional asphyxia when restrained than

13  others.  Were you aware of that?

14    A  Yes.

15    Q  And I want to go through some of those risk

16  factors and see if you were aware of that as of May 19th,

17  2012.  Obesity.  Do you understand that that was a risk

18  factor that makes someone more likely to die from

19  positional asphyxia when they're restrained in a prone

20  position?

21    A  Yes.

22    Q  And even within the group of people who are

23  obese, did you know that someone who has a particularly

24  large abdomen is at an even higher risk of dying from

Page 53

**Page 54**

1  positional asphyxia when they're restrained on their
2  belly?
3     A  On the abdomen, no, I did not know that.
4     Q  All right. Preexisting heart disease. Did you
5  know or had you been trained that that is a risk factor
6  that increases someone's risk of dying from positional
7  asphyxia from being restrained on their belly?
8     A  No.
9     Q  How about pressure on the abdomen itself? Did
10 you know that that was -- if that was a risk factor that
11 increased the likelihood of death by positional asphyxia
12 during restraint?
13    A  On the abdomen?
14    Q  Yes.
15    A  No.
16    Q  Pressure on the back? Did you know that that
17 was a risk factor that increases the risk of positional
18 asphyxia as a result -- when being restrained on the
19 belly?
20    A  Yes.
21    Q  And when I say "back," would that include --
22 were you aware that pressure on the back of the neck can
23 increase the risk of positional asphyxia, or no?
24    A  I would -- From training, I would say yes.

**Page 55**

1     Q  And how about pressure on the shoulder blades?
2  Were you trained that that is a risk factor that increases
3  the risk of death by positional asphyxia when someone is
4  restrained on their belly?
5     A  No.
6     Q  Somebody who has been in a struggle with
7  officers. Were you trained that that person is at a
8  higher risk of in-custody death when restrained on their
9  belly?
10    MR. PREGON: Objection.
11    Go ahead.
12    A  No.
13 BY MR. DICELLO:
14    Q  Enlarged heart. Have you ever heard that
15 that's a risk factor for positional asphyxia?
16    A  No.
17    Q  I asked you about if you heard Mr. Richardson
18 say anything. I think we might have focused on the
19 beginning of the incident where you said he was making
20 some unintelligible sounds. Is that fair?
21    A  Yes.
22    Q  Over the course of the 22 minutes, did he ever
23 get to the point where he was actually saying anything --
24    A  I believe --

**Page 56**

1     Q  -- that you remember?
2     A  I believe in my report I put that he had said
3  at times "get off me" and "stop."
4     Q  Okay.
5     A  And that was --
6     Q  That's what you remember?
7     A  That's what I remember, yes.
8     Q  Did you say anything to him?
9     A  I was -- At that time, I can't remember exact
10 words, but I would be telling him to calm -- you know,
11 calm down, we're here to help you, we're not -- you know,
12 at this point when it's been discovered that it's actually
13 a medical, something medically is going on with him, I'm
14 trying to calm him down and tell him medical is just
15 trying to help you.
16    Because we have guys that come out of seizures
17 that want to fight with staff that we've had to, you know,
18 kind of keep down on the ground until they realize that
19 they just had a medical emergency, being a seizure, and,
20 you know, we're there to help them, not to cause more
21 damage or to hurt them.
22    Q  Did Mr. Richardson appear to be appreciating
23 what you were saying?
24    A  No.

**Page 57**

1     Q  Did you hear him grunting or gasping?
2     A  Gasping, no. Grunting, I would say -- I would
3  say yes. And that was more of him trying to move forward
4  like he was trying to, you know, to retch his body up to
5  move -- to move from where he was at.
6     Q  Yeah.
7     A  I don't want to say move forward, but to move
8  from positions.
9     Q  Did you know whether or not an officer was
10 straddling Mr. Richardson?
11    A  Straddling where?
12    Q  Near the rear thighs, knees, or hips area?
13    A  I believe they were -- they were -- they
14 weren't sitting on him, but they had both knees over top
15 of him, I believe so.
16    Q  Did you hear Mr. Richardson at any time up to
17 the time he was noticed to have stopped breathing emit
18 like a gurgling sound?
19    A  No.
20    Q  Did you hear Mr. Richardson at any time
21 complain that he couldn't breathe?
22    A  No.
23    Q  Did you ever consider rolling him over onto his
24 back to get him off his belly?

1  A  I would have -- At the time when medical is
2  providing care, I would have -- because they have a higher
3  training than I would in the medical field, I would -- you
4  know, they kind of take over.  And whatever they're doing,
5  it takes top priority.  So if they need him in a certain
6  position, that's where we're going to, you know, place
7  him.
8  Q  Did you ever hear Medic Stockhauser request
9  that Mr. Richardson be cuffed in the front and laid on his
10  back?
11  A  No.
12  Q  If Medic Stockhauser had said that, would you
13  have done it?
14  A  Absolutely.
15  Q  Did you ever hear Nurse Miles give any
16  instruction about cuffing Mr. Richardson in the front and
17  putting him on his back?
18  A  No.
19  Q  Did you ever hear Sergeant Jackson or Lewis
20  instruct any of you on how to position Mr. Richardson?
21  A  No.
22  Q  Who made the decision to position him the way
23  you guys had him?
24  A  I don't think it was a decision made.  I think

Page 58

1  it was just how he was, you know, I don't want to say not
2  cooperating, but how he was moving his body.  He kind of
3  went from his side and then ended up on his, you know, in
4  the prone position on his stomach.
5  Q  What did you understand the plan to be?  Let me
6  give you some context to this question, Officer.  At the
7  time you've told me that seven of you are there, you've
8  got this man under control, he's handcuffed with his hands
9  behind his back, and he's in the position that can be
10  depicted on the video.  What was your understanding of
11  what the plan was in terms of what was going to be done
12  with Mr. Richardson?
13  A  I was under the assumption from --
14  Q  Excuse me.  Go ahead.
15  A  I believe it was Sergeant Jackson ordered to
16  place him in the emergency restraint chair.
17  Q  Do you remember when in the sequence of events
18  that order was made?  Was it early?  Was it late?  Was it
19  in the middle?
20  A  I believe it was after the time that they had
21  -- we had determined that he wasn't going to cooperate
22  with us after, you know, multiple asks and orders, that
23  because he's not cooperating, that he was going to be
24  placed in the emergency restraint chair.

Page 59

1  Q  So how long did it take you all to realize this
2  guy isn't going to be cooperating?  In the first five
3  minutes, ten minutes?
4  A  That would be up to a sergeant's decision
5  whether or not, you know, he's gonna -- if he thinks that
6  he needs to be placed in the chair.  A corrections officer
7  can't decide that.  It has to be a supervisor.
8  Q  I know you're doing your best to answer the
9  question, but I'm not sure I got an answer.  When you
10  understood the plan was to put him in the restraint chair,
11  was that early, middle, or near the end?
12  A  I would say it was early on after he had been
13  removed from the cell.
14  Q  Have you ever been ordered to retrieve the
15  emergency restraint chair?
16  A  Yes.
17  Q  Is it your understanding that one of the
18  purposes of a restraint chair is to restrain somebody in a
19  safe position?
20  MR. PREGON:  Objection.
21  A  Yes.
22  BY MR. DICELLO:
23  Q  And is it your understanding that the chair is
24  designed for restraint?

Page 60

1  A  Yes.
2  Q  The times that you've been ordered to retrieve
3  the emergency restraint chair, have you ever been ordered
4  to retrieve it and bring it to the Delta Pod?
5  A  No.
6  Q  Based on your understanding of where the chair
7  is, what's the your expectation that once a sergeant
8  provides you an order, "go get that emergency restraint
9  chair and bring it here," what's your expectation of how
10  long it should take to get it to the D Pod?
11  A  I would say anywhere from one to two minutes.
12  Q  All right.
13  A  Generally, what -- he's not -- a sergeant
14  wouldn't send one of us that's already in the housing
15  location.  He's going to call for it over the radio.
16  Q  Gotcha.
17  A  Whoever is on the first floor that's going to
18  be closest to it, they're going to retrieve it and bring
19  it to cut down on the time that it takes to get it there.
20  Q  Makes sense.
21  MR. PREGON:  Can we have a five-minute restroom
22  break?
23  MR. DICELLO:  Yeah.
24  (Discussion held off the record.)

Page 61

BY MR. DICELLO:

Q Were you asked to fill out any Use of Force Reports as a result of your interaction with Mr. Richardson?

A No.

Q Did Mr. Richardson pose any risk to you that you appreciated at the time?

A No.

Q And what about any risk to any others? Did you appreciate that he posed some kind of risk to other people?

MR. PREGON: Objection.

BY MR. DICELLO:

Q That you appreciated.

MR. PREGON: At what time?

BY MR. DICELLO:

Q During the time that you were there.

A I would say he was a risk to himself.

Q Anybody else?

A No.

Q Do you remember Stockhauser saying anything?

MR. PREGON: Asked and answered.

Go ahead.

A I believe he, at the time he was telling him

Page 62

that he, you know, he's there to help him, he's trying to give him oxygen while he's wiping -- you know, he's telling him obviously not to bite him because he's got to take a towel and wipe the blood from his mouth, he's putting his hand very close to his mouth, stuff like that. He's just telling him things, that way he doesn't do things before he does them. You know, like wiping his mouth, he doesn't bite his hand. He's telling him, "I'm just here to give you oxygen, we're here to help you," stuff like that.

Q Do you remember Nurse Miles saying anything?

A No.

Q At some point in time, do you remember that Nurse Felicia Foster responded?

A Yes.

Q Do you remember her saying anything?

A No.

Q So I think you were present throughout the entire incident; is that fair?

A Yes.

Q Were you there when a second -- You were there when the first shot was attempted; correct?

A Yes.

Q And for whatever reason, the medicine spilled

Page 63

out of the syringe and didn't get injected; correct?

A As far as to my knowledge, yes.

Q I can't recall who I asked this, but at the time that Mr. Richardson received the first injection, I believe it was going to be administered to his buttocks area; correct?

A I believe so.

Q So his pants were pulled down a little bit; correct?

A They weren't pulled down. It was -- I don't want to say they were pulled down to expose his lower half.

Q Yeah.

A But they were pulled down slightly to give the shot. And I believe at the time they were possibly already down a little bit from him scooting forward and, you know, those jail uniforms don't -- it's not one size fits all. Some of them are -- Some of the guys order them big, some of them will order them small. So they could have been down a little bit to begin with.

Q All right. Was Mr. Richardson struggling at the time the shot was administered, the first shot?

A I would say he still wasn't cooperating with us, he wasn't staying still, he is, you know, what

Page 64

appeared to be moved from the location he was at.

Q And were you present when the second shot was administered?

A Yes.

Q And that one, if I understand, was administered by Nurse Foster; correct?

A I believe so.

Q And do you remember who tried to administer the first one? Was it Nurse Miles?

A I believe it was Nurse Miles, yes.

Q After the second shot was administered, did you observe a change in Mr. Richardson's demeanor or behavior?

A He appeared to be calming down.

MR. PREGON: Did you say the first shot or the second?

MR. DICELLO: After the second shot.

BY MR. DICELLO:

Q Did you in your own mind attribute that to a reaction of the medication that was administered?

A Yes.

Q How long after the second shot was given did you in your own mind appreciate that Mr. Richardson appeared to be calming down?

A I would say maybe a minute, two minutes.

Page 65

1     Q   But Mr. Richardson was kept in the same
2   position even after that time; true?
3     A   I believe so, yes.
4     Q   And according to Captain Crosby's timeline, the
5   shot administered by Nurse Foster was at 15:37:15.  Is
6   that consistent with your recollection?
7     A   I believe so.
8     Q   And Mr. Richardson was rolled onto his back at
9   15:41:11.  So that is about four minutes later; correct?
10     A   Yes.
11     Q   And you're telling us that within kind of the
12   first minute of receiving the injection, you noticed a
13   change in his demeanor?
14     A   I would believe so, yes.  In this case, yes.
15   I've seen shots where they've administered them before and
16   they don't -- it seems like it takes an hour before --
17     Q   Yeah.
18     A   -- the person begins to calm down.  This one,
19   it seemed like it was, you know, working like it should,
20   it should be, to my knowledge.
21     Q   So when you perceived that within a minute of
22   the second shot being administered, why didn't you sit
23   Mr. Richardson up to get him off his belly?
24     A   I wasn't advised to.

Page 66

1     Q   Is your answer the same for the questions of
2   why you didn't stand him up or roll him over onto his back
3   at that time?
4     A   Yes.
5     Q   You were waiting for medical to provide that
6   instruction?
7     A   Either medical or my sergeant.
8     Q   I'm just trying to find your Tiburon statement
9   here so I don't miss anything.
10     MR. PREGON:  1287.
11     MR. DICELLO:  Thank you.
12     MR. PREGON:  It goes over onto 88.  That's just
13   his name, though.
14   BY MR. DICELLO:
15     Q   Let me give you a copy, so you and I are
16   looking at the same thing.  Handing you what's been marked
17   is Plaintiff's Exhibit 1.  And if you go to MC 1287, is
18   that your written statement on the Tiburon?  Starts at
19   1287.
20     MR. PREGON:  It's right there.  Just at the
21   top.
22     A   Yes.
23   BY MR. DICELLO:
24     Q   It looks like you entered this at 5:41 p.m. on

Page 67

1   the same day; correct?
2     A   Yes.
3     Q   So you entered this statement within a couple
4   of hours of this incident occurring; true?
5     A   Yes.
6     Q   And you're pretty specific in the second, or
7   the third paragraph I guess, about what you saw coming
8   from Inmate or Detainee Richardson's kind of mouth and
9   nose area.  You describe it as blood, sweat, saliva, and
10   mucus; correct?
11     A   Yes.
12     Q   Because you saw all those things; true?
13     A   Yes.
14     Q   You do describe him as thrashing his body.  Do
15   you see that?
16     A   Yes.
17     Q   And so you had to put enough pressure on his
18   shoulder to prevent him from thrashing it at times; true?
19     A   I wasn't putting pressure, I was placing my
20   hands on him just to control it.  I wasn't taking and
21   pushing it and forcing him to the ground.  I was just
22   trying to control him from --
23     Q   Thrashing?
24     A   From thrashing, yes.

Page 68

1     Q   Because you've described him as violent and
2   you've described him as thrashing.  You were using the
3   force necessary to control him from doing that; correct?
4     A   Yes.
5     Q   When I watched the video, there's portions
6   where I think I see Corrections Officer Hayes laughing.
7   Did you see that?
8     MR. PREGON:  Hayes?  Mayes.
9   BY MR. DICELLO:
10     Q   Mayes.
11     A   No.
12     Q   And in fact, Officer Mayes testified in the
13   chair that you're sitting in a few weeks ago and
14   acknowledged that there was some point where he has
15   laughing when he was talking with some other people.  Did
16   you hear that?
17     A   Not to my recollection, no.
18     Q   Did you ever hear Officer Mayes tell one of the
19   inmates that if that inmate didn't shut up, he was next?
20     A   No.
21     Q   If that was said, that would be totally
22   inappropriate; true?
23     MR. PREGON:  Objection.
24     A   I would believe so, yes.  Especially in front

Page 69

18 (Pages 66 to 69)

1 of a supervisor.
2 BY MR. DICELLO:
3 Q So after you completed this Tiburon report at
4 about 5:41 that night, did anyone come to talk to you
5 about what happened?
6 A What do you mean, supervisor or --
7 Q Yeah, let's start with a supervisor. Were you
8 ever kind of debriefed about the incident?
9 A We have -- On this particular incident, at the
10 time by a sergeant, no. We do have debriefings after we
11 have in-custody death. We are -- We meet. Basically, we
12 are provided with information of our mental health
13 counseling. If we were having trouble with, you know,
14 coping with what has happened, they basically give us the
15 information saying you can speak with mental health if
16 you're having, you know, trouble sleeping, you know, if
17 you're having flashbacks, stuff like that.
18 Q So they offer those services to you?
19 A Yes.
20 Q Other than offering mental health counseling
21 services to the officers who were involved in
22 Mr. Richardson's death, are you aware of any other kind of
23 debriefing that occurred from supervisors about the
24 situation?

Page 70

1 A No.
2 MR. PREGON: Involving him?
3 MR. DICELLO: Yeah.
4 A No.
5 BY MR. DICELLO:
6 Q So did anyone ever come to you and say you did
7 or didn't follow policy or procedure?
8 A No.
9 Q Did anybody ever come to you and offer any
10 critique on how to handle the situation differently?
11 A No.
12 Q I presume of course you weren't disciplined as
13 a result of this; correct?
14 A No.
15 Q And you weren't instructed to undergo any new
16 or different retraining or anything like that?
17 A No.
18 Q Did anybody, any of your supervisors ever
19 inform you how Mr. Richardson died?
20 A No.
21 Q Did you ask anybody how he died?
22 A No.
23 Q Do you know how he died?
24 A I do not.

Page 71

1 Q So I know you are a co-workers with some of the
2 corrections officers who were involved; true?
3 A Yes.
4 Q Are you friends with these guys?
5 A Yes.
6 Q Which one of the guys that were there in
7 particular do you consider yourself to be friends with?
8 MR. PREGON: Involved in this case? Or is that
9 a general?
10 MR. DICELLO: No, I'm talking about who was on
11 D Pod that day when Mr. Richardson died.
12 A I mean, I have a, you know, close friendship
13 with Michael Beach.
14 BY MR. DICELLO:
15 Q Beach?
16 A Stumpff.
17 Q Stumpff?
18 A Yeah.
19 Q Are these guys that you are friends with
20 outside of work?
21 A Yeah.
22 Q Okay, good. Have you guys talked about what
23 happened?
24 A No.

Page 72

1 Q Why not?
2 A It's -- It's a pending court case, you know.
3 Q What about before the -- The case was filed
4 almost two years after it happened. What about the two
5 years after this happened? Did you guys ever talk about
6 what happened?
7 A No.
8 Q You know, I don't work in corrections, but do
9 you know how old Mr. Richardson was?
10 A I do not.
11 Q Well, I'll tell you. He was a 28-year-old guy,
12 okay? A 28-year-old man died while you all were
13 restraining him; correct?
14 A Correct.
15 Q And that wasn't an occurrence that even caused
16 you guys to even talk about; right?
17 A I mean, during that day, you know, it's -- not
18 -- it's not like we waited two, three weeks down the road
19 and said, "Hey, do you remember that time this happened,"
20 you know. It's, you know, people come back, go back and
21 read reports, and they'll come up and say, "Hey, what
22 happened" here and there. But I don't particularly
23 remember anybody coming up and asking me, "Hey, what did
24 you do during this," you know.

Page 73

19 (Pages 70 to 73)

1    Q  All right.

2    A  Anything like that.

3    Q  Do you have any interest in knowing how

4  Mr. Richardson died?

5    A  Absolutely.

6    Q  So what have you done, if anything, to satisfy

7  that interest of knowing how a member of the community

8  under your care, custody, and control died?  Have you done

9  anything?

10    MR. PREGON:  Anything we talk about is off

11  limits.  So he's asking outside --

12    A  Outside of here, no.

13  BY MR. DICELLO:

14    Q  Sorry, I lost my train of thought.  I had a

15  next question for you.

16    If faced with the same circumstances today, you

17  would expect yourself and the other correction officers to

18  respond in the same way; true?

19    A  Yes.

20    Q  And nobody at the jail has ever told you to go

21  about restraining somebody under these circumstances any

22  differently?

23    A  No.

24    Q  Correct?

Page  74

---

1    Was Sergeant Flanders one of your supervisors

2  for awhile?

3    A  I don't believe he was a sergeant at the time.

4  I believe he was a captain.

5    Q  Captain?  Tell me, where along the rank does

6  captain -- That sounds pretty high up.

7    A  It would follow after sergeant, but I'm not

8  sure how -- you know, we don't have lieutenants or

9  anything like that at the facility.  It's, you know, after

10  you've been a sergeant, I don't know how long it takes

11  before or what it takes to become a captain.  But --

12    Q  In terms of the chain of command, there's a

13  major; true?

14    A  Yes.

15    Q  And then there's a captain below the major?

16    A  Yes.

17    Q  And then it goes to sergeant and then

18  corrections officer?

19    A  Yes.

20    Q  Did you work with Captain Flanders?

21    A  No.  Personally, I knew he was a supervisor.

22  But I didn't --

23    Q  Didn't work with him?

24    A  I had never, you know, worked alongside him at

Page  75

---

1  any particular time in the jail.

2    Q  Did any of the medical folks ever announce that

3  they had any concerns that Mr. Richardson was suffering a

4  heart attack?

5    A  No.

6    Q  Did Mr. Richardson ever grab his chest and say

7  he was having chest pain?

8    A  At the time I was there, he was already cuffed.

9  He wouldn't have been able to.

10    Q  Did he say that he was having chest pain?

11    A  No.

12    Q  Going through my notes here.  I think I'm done.

13    MR. DICELLO:  Carrie, do you have any questions

14  for him?

15    MS. STARTS:  No.

16  BY MR. DICELLO:

17    Q  Do you understand that when something like this

18  happens, the medical staff kind of has their own paperwork

19  that they fill out about what happened?

20    A  I do.

21    Q  And do you understand that there's a health

22  services administrator at the jail?

23    A  Yes.

24    Q  The HSA?

Page  76

---

1    A  Yes.

2    Q  Is it your understanding that that's one of the

3  people that is kind of administratively in charge of the

4  medical personnel?

5    A  Yes.

6    Q  The HSA completed an incident report as well in

7  this case.  And the HSA says something to the effect that,

8  you know, prior to the injection being administered, that

9  the patient, they refer to him as a patient, that the

10  patient was being restrained in a prone position by

11  several correctional officers.  Is that consistent with

12  your recollection of what happened?

13    MR. PREGON:  Objection.

14    Go ahead.

15    A  Yes.

16  BY MR. DICELLO:

17    Q  Do you remember why it was or do you know why

18  it was that Mayes replaced Medic Stockhauser near

19  Mr. Richardson's head?

20    A  No.

21    Q  When Medic Stockhauser got up to move away from

22  the head, did he provide any instructions to anybody?

23    A  No.

24    Q  Did you ever see anybody's knee on

Page  77

1    Mr. Richardson's back or neck?

2       A  No.

3       Q  I remember what it was. Prior to

4    Mr. Richardson's incident, had you ever participated in an

5    episode where someone was maintained in the position

6    Mr. Richardson was maintained in with his hands cuffed

7    behind his back for that length of time?

8       A  No.

9       Q  Since Mr. Richardson's death, have you ever

10   participated in a restraint situation where officers

11   restrained somebody with their hands cuffed behind their

12   back in a position similar to Mr. Richardson for that

13   length of time?

14      A  No.

15      Q  The situations that you've been involved in in

16   the jail where you've had to put somebody, and you

17   mentioned some of them, on their belly with their hands

18   cuffed behind their back, how long, other than

19   Mr. Richardson's situation, what's the longest time you've

20   ever maintained somebody in that position?

21       MR. PREGON: Object to form.

22      A  Honestly, I honestly don't know. It depends on

23   how soon they cooperate with us or cooperate with what

24   we're trying to accomplish, whether that be putting them

Page 78

---

1    in the chair or, you know, coming out of a medical

2    emergency.

3       BY MR. DICELLO:

4       Q  Okay.

5      A  Or, you know, just cooperating with us in

6    general after we're explaining -- you know, when we take

7    them into a cell, when we lay them down on their stomach

8    to remove cuffs, from somebody coming from receiving,

9    we'll explain to them, we're going to take your cuffs off,

10   you need to put your arms down to your side, you need to

11   stay there until the door shuts. We have inmates that

12   we'll explain that to them and they'll say, okay, as soon

13   as you take the cuffs off we're going to jump up. So that

14   prolongs the time that it takes that he would be on his

15   stomach or in the prone position, because we're going to

16   have to explain that again. And usually a sergeant is

17   going to come in at that point. They're going to be at

18   the incident, but they're going to come in and explain,

19   listen, you need to listen to what they're telling you.

20   If you don't, you're going to get pepper sprayed, tased,

21   we're going to put you in the chair, you know, if you

22   don't follow the orders that they're telling you to do.

23      Q  So I'm trying to -- Maybe I can help. But you

24   told me that you've never maintained somebody in the

Page 79

---

1    position Mr. Richardson was in for as long as 22 minutes

2    ever before other than Mr. Richardson; correct?

3       MR. PREGON: Object to form.

4       Go ahead.

5      A  No, I have not.

6    BY MR. DICELLO:

7      Q  Have you ever done it, maintained somebody in

8    that position for as long as ten minutes, do you think?

9       MR. PREGON: Object to form.

10      Go ahead.

11      A  Not to my knowledge.

12    BY MR. DICELLO:

13      Q  Have you ever maintained somebody in that

14   position for as long as five minutes, do you think?

15       MR. PREGON: Object to form.

16      Go ahead.

17      A  I would say yes.

18    BY MR. DICELLO:

19      Q  So it sounds to me like other than the

20   Richardson situation, it sounds to me like you've been

21   involved in situations where you've had people on their

22   belly with their hands cuffed behind their back for maybe

23   as long as between five and ten minutes, but no longer

24   than that; is that fair?

Page 80

---

1       MR. PREGON: Object to form.

2       Go ahead.

3      A  Sometimes, yes.

4    BY MR. DICELLO:

5      Q  Ever been involved in any other situations

6    where a member of the community died where you were

7    restraining them?

8      A  No.

9      Q  This is the only one?

10      A  Yes.

11      Q  Have you ever heard of any other situations

12   where, while you've been employed at the Montgomery County

13   Jail, where a detainee died while being restrained?

14      A  No.

15       MR. PREGON: Objection.

16    BY MR. DICELLO:

17      Q  Have you ever had anybody die in the restraint

18   chair at Montgomery County Sheriff's Office while you've

19   been there?

20      A  To my knowledge, no.

21      Q  Those are all the questions I have. I

22   appreciate you coming in. Thank you.

23       MR. PREGON: And we'll read.

24       - - -

Page 81

21 (Pages 78 to 81)

1       (Signature not waived.)

2               - - -

3       And, thereupon, the deposition was concluded at

4   5:04 p.m.

5               - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Page 82**

---

1   State of _____

2   County of _____

3       I, BRADLEY MARSHALL, do hereby certify that I

4   have read the foregoing transcript of my deposition given

5   on December 9, 2015; that together with the correction

6   page attached hereto noting changes in form or substance,

7   if any, it is true and correct.

8       _____

9               BRADLEY MARSHALL

10      I do hereby certify that the foregoing transcript

11  of the deposition of BRADLEY MARSHALL was submitted to the

12  witness for reading and signing; that after he had stated

13  to the undersigned Notary Public that he had read and

14  examined his deposition, he signed the same in my presence

15  on the _____ day of _____, 2015.

16      _____

17              Notary Public

18  My Commission Expires on _____

19              - - -

20

21

22

23

24

**Page 84**

---

1           December 29, 2015

2   Dear Mr. Marshall,

3       You have chosen to read and sign your transcript.
    Please do not mark on the transcript.  Any

4   corrections/changes you may desire to make in your
    testimony should be typewritten or printed on the errata

5   sheet at the end of testimony, giving the page number,
    line number and desired correction/change.  After you have

6   read the transcript, sign your name on the correction
    sheet and where indicated at the close of testimony before

7   a notary public.

8       The Rules of Civil Procedure allow thirty days for
    you to read and sign.  Please return the signature page

9   and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
    Dublin, Ohio 43017 within that time.  Failure to do so in

10  the allotted time will result in your transcript being
    used as though read and signed by you.

11

12                  Sincerely,
                    _____

13                  Whitney Layne
                    Professional Reporter

14

    Cc:
15  Nick DiCello
    Carrie Starts

16  Jamey Pregon

17

18

19

20

21

22

23

24

**Page 83**

1  State of _Ohio_

2  County of _Montgomery_

3      I, BRADLEY MARSHALL, do hereby certify that I

4  have read the foregoing transcript of my deposition given

5  on December 9, 2015; that together with the correction

6  page attached hereto noting changes in form or substance,

7  if any, it is true and correct.

8                   _Bradley Marshall_

9              BRADLEY MARSHALL

10     I do hereby certify that the foregoing transcript

11 of the deposition of BRADLEY MARSHALL was submitted to the

12 witness for reading and signing; that after he had stated

13 to the undersigned Notary Public that he had read and

14 examined his deposition, he signed the same in my presence

15 on the _28_ day of _JANUARY_, ~~2015~~ _2016_

16               _Alice Logan_

17             Notary Public

18 My Commission Expires on _3/29/2017_

19        - - -

20

21                   **ALICE LOGAN**

                  Notary Public, State of Ohio

22                   My Commission Expires

                  March 29, 2017

23                   Recorded in Warren County

24

1  TO THE REPORTER:

2  I have read the entire transcript of my deposition taken

3  on the __28th__ day of __January__, 20_16_, or the same has been

4  read to me.  I request that the following changes be

5  entered upon the record for the reasons indicated.

6

7  Page      Line      Correction and reason therefore

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 Date _1/28/2016_     Signature _R. Mull_

24

1                          CERTIFICATE

2     State of Ohio       :

3     County of Franklin:

4

5          I, Whitney Layne, Notary Public in and for the

6     State of Ohio, duly commissioned and qualified, certify

7     that the within named BRADLEY MARSHALL was by me duly

8     sworn to testify to the whole truth in the cause

9     aforesaid; that the testimony was taken down by me in

10    stenotype in the presence of said witness; afterwards

11    transcribed upon a computer; that the foregoing is a true

12    and correct transcript of the testimony given by said

13    witness taken at the time and place in the foregoing

14    caption specified.

15

16         IN WITNESS WHEREOF, I have set my hand and

17    affixed my seal of office at Dublin, Ohio, on this 29th

18    day of Decemer, 2015.

19                         _____

20                         Whitney Layne, Notary Public

21                         In and for the State of Ohio

22    My Commission expires May 4, 2020

23

24

**A**

abdomen 53:24
54:3,9,13
able 13:10 30:23
76:9
Absolutely 27:8,10
27:15 58:14 74:5
acceptable 16:2,7
17:18,22 18:15
42:20 44:5
access 39:15,16
40:1,4,7 47:24
accomplish 23:22
78:24
accomplished 28:3
accomplishing
27:13
accuracy 8:7
accurate 6:6
acknowledged
69:14
acting 47:13
action 30:13
actual 42:24
addresses 41:3
administer 50:9,12
65:8
administered 64:5
64:22 65:3,5,11
65:19 66:5,15,22
77:8
administratively
77:3
administrator 1:4
76:22
advised 44:17 66:24
affixed 86:17
aforesaid 86:9
afternoon 5:6
age 9:21
ago 69:13
agree 13:23 15:15
15:23 16:3 18:18
19:1 24:16 25:6
25:14 28:4 31:18
43:18
agreed 23:20 32:13
ahead 15:19 19:4
20:19 22:9 38:18
55:11 59:14 62:23
77:14 80:4,10,16
81:2
al 1:8
allotted 83:10
allow 17:3 83:8
allowed 47:24
alongside 75:24
Andrew 1:5
ankle 41:12
announce 76:2

answer 6:19,23 7:14
8:3 15:21 24:24
38:18 46:18 60:8
60:9 67:1
answered 46:22
62:22
answers 6:14 7:18
8:7 24:22
anybody 28:9 30:2
36:23 47:19,22
48:6 62:19 71:9
71:18,21 73:23
77:22 81:17
anybody's 77:24
apologize 39:18
apparent 42:6
appear 19:15 32:21
51:1 56:22
APPEARANCES
2:1
appeared 65:1,13
65:23
appears 33:5 45:6
47:10
applicable 1:14 3:6
applied 16:18 18:1
18:13
applies 14:24
apply 13:24 18:8,14
applying 16:14 41:7
appreciate 18:6
30:24 46:17 62:10
65:22 81:22
appreciated 62:7,14
appreciating 56:22
area 8:13 33:6
51:12 57:12 64:6
68:9
arm 33:2
armed 49:19
arms 22:17,18
79:10
arrangement 6:19
arrive 11:21 45:11
48:17
arrived 11:23 29:22
29:24 30:6,15,23
43:7 44:17 46:3
48:14,16 49:14
51:5
asked 6:17,20 8:1
28:24 46:22 55:17
62:2,22 64:3
asking 15:23 46:15
73:23 74:11
asks 59:22
asphyxia 23:15 53:4
53:12,19 54:1,7
54:11,18,23 55:3
55:15
asphyxiation 22:11

53:5
aspires 37:20
assault 17:14
assaulted 46:5,6,8
assessing 45:7
assigned 12:4
assignment 12:7
assist 26:14,17 30:4
30:10 44:8 50:24
assisting 23:10
associated 7:18 21:8
ASSOCIATES 1:20
assume 6:20
assumption 59:13
attached 84:6
attack 76:4
attempted 63:22
attempting 30:2
44:8
attend 8:17
attention 41:7 47:4
51:4,9
attorneys 37:8
attribute 65:18
Avenue 1:15 2:3,7
average 31:3
avoid 21:19
aware 37:3,16,22
38:14,20 39:5
52:1,2 53:13,16
54:22 70:22
awhile 75:2

**B**

back 5:18 7:24 16:1
16:9 17:18,24
18:15 19:22 20:16
21:9,21 22:1
23:14,19,23 24:5
24:19,23 25:7,14
25:16 27:6 29:15
31:19,23 32:5,7
33:17 39:23 43:19
44:2,21 45:5,13
49:24 54:16,21,22
57:24 58:10,17
59:9 66:8 67:2
73:20,20 78:1,7
78:12,18 80:22
background 8:10
8:12 31:11
ban 36:16
banging 31:14
based 34:19 50:11
61:6
basically 30:16
70:11,14
Beach 72:13,15
bearings 30:24
becoming 9:16 37:3
began 51:6

beginning 55:19
begins 66:18
behalf 2:5,9,13 5:22
behaving 47:1
behavior 46:20 47:5
47:10 65:12
believe 13:5 14:6
17:17,22 27:24
29:9,20,24 30:5
30:10,14 34:5,8
38:19 40:9 43:23
45:8,20 46:19
49:14 50:13 51:16
52:22,24 55:24
56:2 57:13,15
59:15,20 62:24
64:5,7,15 65:7,10
66:3,7,14 69:24
75:3,4
believed 27:24
belly 18:8 20:15
23:13,18,23 25:11
25:14 45:15 54:2
54:7,19 55:4,9
57:24 66:23 78:17
80:22
bench 20:2,5
best 27:23 60:8
Beyoglides 1:4
big 64:19
birth 8:21
bit 8:10 9:22 28:22
35:23 53:3 64:8
64:16,20
bite 63:3,8
blades 34:10 55:1
blood 47:22 51:6,12
63:4 68:9
body 34:12 35:4,14
35:22 57:4 59:2
68:14
Boehringer 2:14
booklets 21:7
bracelet 19:9,10
Bradley 1:13 3:5
4:2 5:1,9 84:3,9
84:11 86:7
break 41:24 61:22
breathe 57:21
breathing 14:3,10
24:10 50:14 57:17
Brenda 2:15
bring 45:14 61:4,9
61:18
broadcast 12:3
broadcasted 29:10
brought 28:19
40:20
bulky 40:19
butt 26:17,20 27:12
buttocks 64:5

**C**

call 29:6,9 61:15
called 1:14 3:5 46:7
calling 32:22
calls 37:7
calm 35:6,24 56:10
56:11,14 66:18
calming 65:13,23
capable 27:7,13
45:21
captain 49:3,6 66:4
75:4,5,6,11,15,20
caption 86:14
care 5:17 34:15
44:11 58:2 74:8
career 9:23 10:4
37:20
Carrie 2:11 76:13
83:15
Carrollton 8:16,17
case 1:7 37:5 66:14
72:8 73:2,3 77:7
catcher's 32:22
cause 56:20 86:8
caused 73:15
Cc 83:14
cell 17:8 18:5,9 23:7
24:9 30:15 60:13
79:7
cells 31:14
certain 16:12 53:10
58:5
CERTIFICATE
86:1
certified 5:3
certify 84:3,10 86:6
chain 75:12
chair 23:8 28:3,10
28:13,15,18 59:16
59:24 60:6,10,15
60:18,23 61:3,6,9
69:13 79:1,21
81:18
chance 27:18 38:11
change 8:3 11:20
44:17 65:12 66:13
changes 84:6 85:4
character 3:8
charge 77:3
charged 12:12
charges 12:13
chest 22:17 76:6,7
76:10
choose 19:2
chosen 83:3
Cincinnati 2:13
circumstances 15:2
15:16 16:2,14
17:17,21 18:10,12
74:16,21

**civil** 1:14 3:6 7:20
  37:4,16 83:8
**classified** 52:5
**Cleveland** 2:4
**close** 63:5 72:12
  83:6
**closest** 30:16 61:18
**co-workers** 72:1
**come** 16:24 17:2
  28:15 45:13 56:16
  70:4 71:6,9 73:20
  73:21 79:17,18
**coming** 30:21 49:1
  51:12 68:7 73:23
  79:1,8 81:22
**command** 75:12
**Commission** 84:18
  86:22
**commissioned** 86:6
**commit** 52:11
**committed** 19:20
**common** 50:20
**Commotion** 31:12
**communications**
  37:8
**community** 14:1,8
  14:21 15:24 16:8
  16:20 18:19 74:7
  81:6
**complain** 57:21
**complete** 17:5
**completed** 13:7
  70:3 77:6
**completing** 17:7
**complex** 12:15
**computer** 86:11
**concern** 50:3
**concerns** 49:19 76:3
**concluded** 82:3
**conclusion** 15:18
**condition** 47:15
  53:6
**conditions** 47:6
**confused** 21:23
**connection** 6:2 8:8
  38:14
**conscientious** 47:9
**consider** 57:23 72:7
**consistent** 24:11,13
  42:24 49:12 66:6
  77:11
**context** 37:5,16
  59:6
**continue** 16:19
  17:23 18:16 22:20
  34:15 35:7
**continued** 35:16,19
**control** 5:18 29:14
  32:1 34:11 35:13
  52:22 59:8 68:20
  68:22 69:3 74:8

**cooperate** 59:21
  78:23,23
**cooperating** 22:17
  44:9 46:15 59:2
  59:23 60:2 64:23
  79:5
**Cooperstone** 1:21
  83:9
**coping** 70:14
**copy** 36:13 39:14,15
  39:16 40:20 67:15
**correct** 9:10 13:8,9
  13:16 14:10,11,23
  15:4,5,9 16:10
  17:19,20 18:9
  25:8,11,22 31:20
  31:23 32:2,5 34:1
  35:10,14 37:6
  41:9,16 42:1,2,4,5
  42:15,17,22 43:2
  44:3,5 47:16,17
  48:11,12 50:1,2,4
  63:22 64:1,6,9
  65:6 66:9 68:1,10
  69:3 71:13 73:13
  73:14 74:24 80:2
  84:7 86:12
**correction** 74:17
  83:6 84:5 85:7
**correction/change**
  83:5
**correctional** 77:11
**corrections** 9:3,12
  9:14,16 13:15,24
  15:1,6,10,11
  16:18 18:18,23
  19:1 27:19 28:1
  30:9 31:9 37:2
  40:10 47:12 60:6
  69:6 72:2 73:8
  75:18
**corrections/chang...**
  83:4
**COs** 14:7
**counsel** 3:4 10:20
**counseling** 70:13,20
**count** 52:16
**county** 1:8 5:18,23
  9:3 14:2,13 15:7
  16:19 18:20 21:1
  36:12 37:3,13
  40:21 81:12,18
  84:2 86:3
**couple** 6:5 24:21
  68:3
**course** 55:22 71:12
**court** 1:1 5:7 7:8,12
  73:2
**crime** 52:11
**criminal** 7:20 13:13
**critique** 71:10

**Crosby** 49:3,7
**Crosby's** 66:4
**CROSS-EXAMI...**
  5:4
**cuff** 18:4 23:3 30:3
  43:13
**cuffed** 16:1,9 17:24
  18:15 20:16 21:9
  21:20 22:1,21
  23:14,18,23 24:5
  24:19,23 25:5,7
  25:13 26:13 30:3
  43:8,9,19 44:2,21
  45:5 49:11,13,14
  49:24 58:9 76:8
  78:6,11,18 80:22
**cuffing** 23:5 30:4
  49:15 58:16
**cuffs** 17:13 18:8,13
  18:14 46:4 79:8,9
  79:13
**current** 13:15
**currently** 21:3,4
**custody** 5:17 74:8
**customs** 43:1
**cut** 39:23 61:19

──────────

**D**

**D** 12:3 29:2 52:4
  61:10 72:11
**damage** 56:21
**dangerous** 20:17
  22:2 47:5 48:7
**dangers** 21:8
**date** 8:21 9:5 12:24
  85:23
**day** 10:10,22 17:1
  68:1 72:11 73:17
  84:15 85:3 86:18
**days** 12:23 83:8
**Dayton** 1:16 2:8
**deals** 42:11
**Dear** 83:2
**death** 9:7 18:21
  37:5,17 54:11
  55:3,8 70:11,22
  78:9
**debriefed** 70:8
**debriefing** 70:23
**debriefings** 70:10
**Deceased** 1:5
**December** 1:16 3:1
  9:6 13:1 83:1 84:5
**Decemer** 86:18
**decide** 9:18 60:7
**decision** 58:22,24
  60:4
**Defendant** 1:14 3:5
**Defendants** 1:9 2:9
  2:13
**defensive** 21:2

**Delta** 29:10 61:4
**demeanor** 65:12
  66:13
**demonstration**
  21:19
**demonstrations**
  21:14,15
**depending** 35:1
**depends** 16:23 23:9
  78:22
**depicted** 35:17 48:8
  59:10
**depose** 27:18
**deposed** 5:14
**deposes** 5:3
**deposition** 1:13 3:5
  3:7 5:12 6:1 8:4
  10:9,19 39:7 82:3
  84:4,11,14 85:2
**describe** 45:23
  46:20 68:9,14
**described** 17:16,22
  18:7,12 34:21
  69:1,2
**designed** 60:24
**desire** 47:14 83:4
**desired** 83:5
**detained** 14:1,9,13
  14:22
**detainee** 19:1,5,7
  37:17 47:9 68:8
  81:13
**determined** 45:9
  59:21
**DiCello** 2:2 4:4 5:5
  5:10 8:23 9:1
  10:23 14:17 15:20
  16:13 17:10 19:6
  20:21 22:12 28:7
  35:8 36:19,22
  37:11 38:1,10,21
  39:10 42:18 43:11
  44:1,12,24 46:24
  50:17 55:13 60:22
  61:23 62:1,13,16
  65:16,17 67:11,14
  67:23 69:9 70:2
  71:3,5 72:10,14
  74:13 76:13,16
  77:16 79:3 80:6
  80:12,18 81:4,16
  83:15
**die** 23:15 53:12,18
  81:17
**died** 5:17 37:6,17
  71:19,21,23 72:11
  73:12 74:4,8 81:6
  81:13
**different** 18:2 71:16
**differently** 71:10
  74:22

**Dinkler** 1:15 2:7
**direct** 47:4
**disadvantage** 17:14
**disagree** 16:5
**disciplined** 71:12
**discovered** 56:12
**discussed** 37:9
**Discussion** 8:24
  38:9 61:24
**disease** 47:20 54:4
**dishonest** 7:18
**disoriented** 51:1
**DISTRICT** 1:1,1
**DIVISION** 1:2
**document** 36:18,24
  37:4,22 38:4,13
**documents** 10:8
  36:8 39:23
**doing** 23:9 27:7,23
  31:7 32:23 34:6,7
  34:20,21 35:1,3
  45:21 58:4 60:8
  69:3
**door** 9:17 79:11
**doors** 31:14
**dressed** 11:24
**Drive** 1:21 83:9
**drugs** 17:6
**Dublin** 1:21 83:9
  86:17
**duly** 5:2 86:6,7
**Dustin** 30:1
**duties** 38:15
**dying** 53:24 54:6

──────────

**E**

**eagle** 41:23 42:1,4,8
**earlier** 13:5 46:4
**early** 13:3,6 59:18
  60:11,12
**easiest** 44:11
**educated** 21:8
**education** 9:11
**effect** 77:7
**either** 21:16,18
  37:12 67:7
**eliminated** 52:24
**Ellis** 2:15
**emergency** 23:8
  30:19 50:22 51:10
  56:19 59:16,24
  60:15 61:3,8 79:2
**emit** 57:17
**employed** 9:2 81:12
**employment** 20:24
**encounter** 52:3
**ended** 59:3
**enforcement** 9:23
  10:4 37:21
**engaged** 47:9
**engaging** 15:11

**Enlarged** 55:14
**enter** 17:6
**entered** 67:24 68:3
  85:5
**entering** 17:1,15
**entire** 25:7 63:19
  85:2
**episode** 10:12 29:6
  47:19 50:4 51:15
  78:5
**errata** 83:4,9
**Especially** 69:24
**ESQUIRE** 2:2,6,11
**Estate** 1:5
**et** 1:8
**events** 49:8,9 59:17
**everybody** 7:5 31:8
**evidence** 32:12
**evolving** 16:23
  30:21
**exact** 56:9
**exactly** 30:22 50:23
**EXAMINATION**
  4:1
**examined** 84:14
**excessive** 15:16
**Excuse** 59:14
**executive** 36:14
  37:15 38:22,23
**exhibit** 40:18 49:8
  67:17
**expect** 74:17
**expectation** 61:7,9
**expected** 40:24 48:2
**expires** 84:18 86:22
**explain** 24:21 25:3
  79:9,12,16,18
**explained** 22:10,11
**explaining** 79:6
**explanation** 6:24
  46:17
**expose** 64:11
**extent** 37:7

**F**

**faced** 74:16
**facility** 12:14 16:24
  17:1,7,15 39:24
  40:5,8 75:9
**fact** 50:11 52:4
  69:12
**factor** 53:18 54:5,10
  54:17 55:2,15
**factored** 23:8
**factors** 53:10,16
**Failure** 83:9
**fair** 6:21 13:6 29:16
  37:24 55:20 63:19
  80:24
**fall** 7:3
**familiar** 40:11,24

**family** 5:16,22 9:24
  14:13,20
**far** 1:15 2:7 64:2
**federal** 6:2
**feel** 20:11
**feels** 48:20
**feet** 23:10 26:11,18
**Felicia** 2:14 63:14
**fellow** 27:18
**field** 58:3
**fight** 30:20 46:5
  56:17
**fights** 18:3
**figure** 27:2
**filed** 5:21 11:6,6,9
  73:3
**fill** 62:2 76:19
**final** 49:15
**find** 14:8,21 67:8
**finish** 6:9,10,11
**firm** 1:15
**first** 5:2 9:16 10:9
  12:20 17:9 21:23
  23:7 37:2,15 52:3
  60:2 61:17 63:22
  64:4,22 65:9,14
  66:12
**fits** 64:18
**five** 20:10 60:2
  80:14,23
**five-minute** 61:21
**Flanders** 75:1,20
**flashbacks** 70:17
**floor** 12:8,13 17:9
  23:7 28:16 29:2
  61:17
**fluid** 32:18
**focus** 37:12 42:10
  46:11
**focused** 48:24,24
  55:18
**focusing** 46:19
**folks** 37:12,13 76:2
**follow** 19:11 41:1
  71:7 75:7 79:22
**followed** 27:9,16
**following** 40:16
  85:4
**follows** 5:3
**foot** 9:17
**force** 15:1,8,12,15
  62:2 69:3
**forcing** 68:21
**foregoing** 84:4,10
  86:11,13
**form** 19:3 20:18
  78:21 80:3,9,15
  81:1 84:6
**formal** 9:11
**forward** 26:1,4
  30:18 33:15 34:12

36:2 57:3,7 64:16
**Foster** 2:14 63:14
  65:6 66:5
**four** 9:4 66:9
**fourth** 12:12
**Franklin** 86:3
**friends** 72:4,7,19
**friendship** 72:12
**front** 7:11 26:3
  33:13,16 35:20
  58:9,16 69:24

**G**

**G** 1:4
**Garrett** 2:15
**gasping** 57:1,2
**general** 13:20,20
  72:9 79:6
**Generally** 61:13
**generated** 10:21
**getting** 23:22
**give** 8:7 37:15 45:10
  48:18 50:13,18
  58:15 59:6 63:2,9
  64:14 67:15 70:14
**given** 6:19 65:21
  84:4 86:12
**giving** 7:18 83:5
**go** 6:3 8:22 15:19
  18:3,4,24 19:4
  20:19 22:9 29:15
  38:7,18 39:6,23
  52:15 53:15 55:11
  59:14 61:8 62:23
  67:17 73:20 74:20
  77:14 80:4,10,16
  81:2
**goes** 67:12 75:17
**going** 6:9,20 7:23
  8:6 10:7 13:17
  23:3,4,11 27:3
  28:23 30:21 31:13
  33:14,15 36:14,21
  39:6 45:10 48:20
  49:6 50:21,24
  56:13 58:6 59:11
  59:21,23 60:2
  61:15,17,18 64:5
  76:12 79:9,13,15
  79:17,17,18,20,21
**gonna** 60:5
**good** 5:6 10:3 19:16
  32:12 72:22
**Gotcha** 61:16
**gotten** 11:24
**governor** 36:15
**grab** 76:6
**graduate** 8:19
**grainy** 32:13
**grew** 10:1
**ground** 6:5 16:23

17:4 35:5 56:18
  68:21
**group** 37:14 53:22
**grunting** 57:1,2
**guess** 40:19 68:7
**gurgling** 57:18
**guy** 19:11 30:20
  31:1 60:2 73:11
**guys** 29:13 45:14
  56:16 58:23 64:18
  72:4,6,19,22 73:5
  73:16

**H**

**habit** 7:3 11:21
**half** 35:13 64:12
**hand** 10:2 31:22
  63:5,8 86:16
**handcuff** 43:5
**handcuffed** 25:6
  33:17 49:22 59:8
**handcuffing** 17:17
  21:2 22:14
**handcuffs** 16:1
  22:18 41:8,11
**handing** 37:4 67:16
**handle** 20:11 71:10
**hands** 16:1,9 17:24
  18:14 20:15 21:9
  21:20 22:1 23:13
  23:18 24:5,18,23
  25:7,13,15 31:19
  32:8 33:24 34:9
  35:4,21 43:19
  44:2,20 45:5
  49:24 59:8 68:20
  78:6,11,17 80:22
**happen** 41:12
**happened** 7:24
  11:15 41:8 70:5
  70:14 72:23 73:4
  73:5,6,19,22
  76:19 77:12
**happening** 13:18
  29:23 30:22 50:23
**happens** 7:4 76:18
**hard** 26:10 46:14
**Harry** 1:4
**Hayes** 69:6,8
**head** 19:17 52:18
  77:19,22
**health** 47:15 70:12
  70:15,20 76:21
**hear** 31:4 57:1,16
  57:20 58:8,15,19
  69:16,18
**heard** 12:2 24:22
  55:14,17 81:11
**heart** 47:20 54:4
  55:14 76:4
**held** 8:24 26:7 38:9

61:24
**help** 30:11 56:11,15
  56:20 63:1,9
  79:23
**Henning** 52:16
**hereinafter** 5:2
**hereto** 84:6
**Hey** 73:19,21,23
**high** 8:17 9:11,20
  47:22 75:6
**higher** 12:11,11,13
  53:24 55:8 58:2
**highlighted** 40:23
**Hills** 1:15 2:7
**HIPAA** 48:5
**hips** 57:12
**hire** 12:20
**hired** 21:3,4
**history** 13:13 51:24
**hog-tied** 41:20 42:3
**hog-tying** 41:19,22
  42:7
**hold** 33:24 35:6,16
**holding** 25:4,21
  26:2 34:10 35:18
**honestly** 7:14 9:15
  48:18 78:22,22
**hour** 66:16
**hours** 12:6 68:4
**housing** 12:10,11
  23:6 61:14
**HSA** 76:24 77:6,7
**huh-uhs** 7:1
**human** 31:3
**hundred** 44:23
**hurt** 51:14 56:21

**I**

**identify** 28:23 50:22
**image** 32:18
**images** 33:4
**immediately** 29:11
  30:10
**important** 6:23
**in-custody** 55:8
  70:11
**inappropriate**
  69:22
**incident** 11:19
  13:19 29:2 43:7
  55:19 63:19 68:4
  70:8,9 77:6 78:4
  79:18
**include** 54:21
**includes** 36:15
**increase** 54:23
**increased** 54:11
**increases** 54:6,17
  55:2
**INDEX** 4:1
**indicate** 36:9

indicated 14:12
  83:6 85:5
indicates 38:23 47:5
individuals 5:23
inform 71:19
information 8:10
  48:1 70:12,15
injected 64:1
injection 64:4 66:12
  77:8
injure 51:19,22
injured 51:17
inmate 22:16 23:10
  29:9 31:9 46:6,8
  47:9 68:8 69:19
inmates 12:12,13
  16:24 17:4 18:4
  26:13 31:13 69:19
  79:11
instinctively 30:7
instruct 11:11 26:19
  30:6 47:20,22
  58:20
instructed 21:18
  27:5,11 28:2
  45:17 71:15
instructing 28:9,12
instruction 21:12
  21:19 58:16 67:6
instructions 27:9,16
  77:22
interaction 62:3
interest 74:3,7
interested 9:24
interrupt 18:6
interval 25:1,11,21
intervene 15:13
interviewed 11:14
introduction 5:16
investigators 11:14
involved 10:13 46:5
  70:21 72:2,8
  78:15 80:21 81:5
Involving 71:2

**J**

Jackson 30:1 52:16
  58:19 59:15
jail 5:18 9:3,8 12:20
  14:2,5,7,9,14 15:1
  15:7 16:19 18:20
  21:5 37:3,6,18
  38:16 39:11 40:2
  40:12,21 41:4
  42:21 43:1 52:9
  64:17 74:20 76:1
  76:22 78:16 81:13
Jamey 2:6 83:16
January 13:6
job 15:10
jobs 14:7 15:6

jogged 8:1
jogs 7:22
Johnson 30:1 52:16
Jon 2:14
Jr 1:4
judge 7:12
jump 79:13
jury 7:12

**K**

keep 26:4 30:18
  34:14 35:19,23
  36:1 43:13 56:18
keeping 44:10
kept 66:1
kick 26:15
kill 53:8
kind 19:24 20:22
  21:6 30:24 32:15
  32:21,21 34:2
  35:6 38:13 40:19
  47:15 48:23 49:17
  50:4 51:24 56:18
  58:4 59:2 62:10
  66:11 68:8 70:8
  70:22 76:18 77:3
knee 26:3 33:5,8,13
  33:16,20 35:20
  36:1 77:24
kneeled 30:17
knees 26:15,16
  32:21 57:12,14
knew 9:16 46:11
  48:3 49:18,22
  50:6 51:11 75:21
knocking 51:8
know 6:9 9:13
  10:15 16:24 18:3
  18:5 22:16 23:10
  24:7 29:21 30:11
  30:19,20,22 31:2
  31:6,6,7,10,14
  33:18 36:1 38:22
  44:10 46:4,6,8
  47:1 48:4 50:24
  52:4,14 53:23
  54:3,5,10,16
  56:10,11,17,20
  57:4,9 58:4,6 59:1
  59:3,22 60:5,8
  63:1,2,7 64:17,24
  66:19 70:13,16,16
  71:23 72:1,12
  73:2,8,9,17,20,20
  73:24 75:8,9,10
  75:24 77:8,17
  78:22 79:1,5,6,21
knowing 74:3,7
knowledge 28:18
  50:20 64:2 66:20
  80:11 81:20

Krisandra 2:14

**L**

laid 58:9
Lakeside 2:3
large 53:24
larger 31:2
late 13:4 59:18
laughing 69:6,15
law 1:15 7:12 9:23
  10:1,4 37:21
  38:19 48:5
lawsuit 5:21 6:3 8:8
  11:6,9 37:17
lawyer 37:4,16
lay 18:4 79:7
laying 22:16 23:2
Layne 1:15,20 3:6
  83:9,13 86:5,20
learned 20:23 29:1
  29:5
leave 23:2,18
left 35:2
leg 41:12
legal 15:18
length 78:7,13
let's 8:22 37:12
  41:24 52:14 70:7
lethal 20:17 22:2
Lewis 52:16 58:19
LIBER 2:3
lieutenants 75:8
life 8:11
lift 19:24
lights 43:17,20
likelihood 54:11
limited 16:14
limits 74:11
line 83:5 85:7
linear 12:15
listen 79:19,19
little 8:10 9:22
  21:23 28:22 32:13
  35:23 53:3 64:8
  64:16,20
location 61:15 65:1
locker 11:24
logo 19:14
long 9:2 12:22
  48:16 60:1 61:10
  65:21 75:10 78:18
  80:1,8,14,23
longer 24:10 80:23
longest 78:19
look 33:4 39:6
looked 28:22 44:13
looking 19:9 67:16
looks 36:19 67:24
lost 74:14
lot 20:8 22:14 28:24
  31:10,10

loved 14:20
low 52:5
lower 64:11
LPA 2:11

**M**

M-A-R-S-H-A-L-L
  5:9
M.D 2:15
maintained 78:5,6
  78:20 79:24 80:7
  80:13
major 75:13,15
making 55:19
male 12:13
man 19:13 59:8
  73:12
manual 39:11 40:2
  40:12
Manual's 40:21
mark 83:3
marked 49:7 67:16
Marshall 1:13 3:5
  4:2 5:1,9,10 8:11
  13:17 18:18 36:4
  38:3 41:4 83:2
  84:3,9,11 86:7
mask 47:5 51:8
math 13:11
Mayes 35:13 52:16
  69:8,10,12,18
  77:18
MC 67:17
mean 19:5,10 25:3,4
  48:19 70:6 72:12
  73:17
meaning 23:22
medic 2:15 34:13,15
  34:18 35:7,10,19
  48:10,13,16 50:8
  51:5 58:8,12
  77:18,21
medical 29:5,6
  30:19 44:8,11,14
  44:16,17 45:7,9
  45:11,13,13 47:5
  47:15 48:7 50:4
  50:11,21 51:4,7,9
  51:10 53:6 56:13
  56:14,19 58:1,3
  67:5,7 76:2,18
  77:4 79:1
medically 27:3
  56:13
medication 65:19
medicine 63:24
meet 70:11
meeting 10:20 29:1
member 14:1 74:7
  81:6
members 5:22 14:8

14:13,20,20 15:24
  16:8,19 18:19
  41:11
memo 49:6
memory 7:23 8:1
  10:10,12 24:11
  30:2
mental 47:15 70:12
  70:15,20
mentioned 78:17
met 5:11 10:16
Michael 5:9 72:13
middle 59:19 60:11
Miles 2:15 58:15
  63:11 65:9,10
million 18:2 48:20
mind 50:13 65:18
  65:22
Mine 40:23
minute 65:24 66:12
  66:21
minutes 7:24 24:10
  25:5,8 35:9 55:22
  60:3,3 61:11
  65:24 66:9 80:1,8
  80:14,23
moment 28:23
Montgomery 5:18
  9:3 14:1 15:7
  16:19 18:20 21:1
  36:12 37:3,13
  40:21 81:12,18
month 13:3,4,5
months 9:9
mouth 51:6,12 63:4
  63:5,8 68:8
move 17:8 26:1 27:4
  36:2 57:3,5,5,7,7
  77:21
moved 65:1
movements 32:2
moving 26:4,10
  30:18 33:13,15
  34:12 59:2
mucus 51:6,12
  68:10
multiple 16:24
  24:18 59:22
mumbling 31:5

**N**

name 5:6,7,10 67:13
  83:6
named 86:7
names 52:15
NaphCare 2:14
  5:23 27:1,5,11
  28:9 36:13 37:13
  47:19 48:6
narrow 46:10
near 57:12 60:11

77:18
**necessary** 15:2
40:15 69:3
**neck** 54:22 78:1
**need** 23:2 33:12
43:16 58:5 79:10
79:10,19
**needed** 30:11,11
51:3
**needs** 60:6
**never** 13:24 15:7
16:2 18:19 22:5
27:3 33:8 41:11
42:20 75:24 79:24
**new** 21:3 39:21
71:15
**NICHOLAS** 2:2
**Nick** 5:10 83:15
**night** 70:4
**Nineteen** 13:12
**Nods** 19:17 52:18
**noise** 31:11
**nose** 51:12 68:9
**notary** 1:15 3:6,7,8
83:7 84:13,17
86:5,20
**notes** 3:7 76:12
**noticed** 24:9 57:17
66:12
**noting** 84:6
**number** 30:8 41:7
83:5,5
**numbers** 29:14
52:14
**Nurse** 2:14,14,14
58:15 63:11,14
65:6,9,10 66:5

_____

**O**
**oath** 7:6,10,11,18
**obese** 50:6 53:23
**Obesity** 53:17
**object** 19:3 20:18
37:7 78:21 80:3,9
80:15 81:1
**Objection** 14:15
15:18 16:11,21
22:8 26:8 28:5
34:24 37:23 38:17
39:8 42:16 43:3
44:6,22 50:15
55:10 60:20 62:12
69:23 77:13 81:15
**observations** 34:19
**observe** 65:12
**observed** 46:12
**obviously** 63:3
**occurred** 70:23
**occurrence** 73:15
**occurring** 68:4
**offer** 70:18 71:9

**offering** 70:20
**office** 21:1 36:13,24
37:13 81:18 86:17
**officer** 9:3,14,15,16
9:19,23 10:5 12:8
13:15 15:11,11
18:18,23 19:1,5
27:19,20,22 30:9
34:2,6,20,21
35:12,13 36:4
37:2 40:10 47:12
57:9 59:6 60:6
69:6,12,18 75:18
**officers** 12:3 13:24
15:1 16:18 18:19
21:3,16 24:18
25:21 27:7,12,13
27:19 28:1 29:19
29:20 30:8 31:9
45:20 52:17 55:7
70:21 72:2 74:17
77:11 78:10
**official** 3:8
**Ohio** 1:1,15,16,21
2:4,8,13 36:6,10
36:15 83:9 86:2,6
86:17,21
**okay** 6:17,18 7:1,2
8:4 10:3 13:21
17:11 25:6 42:12
42:13 43:12 45:1
49:17 56:4 72:22
73:12 79:4,12
**old** 13:10,11 73:9
**once** 22:21 48:21
52:14,21 61:7
**ones** 18:12
**online** 39:16,22
**opportunity** 8:3
**opposed** 6:24
**opposite** 10:1 34:3
**order** 36:15 37:15
38:22,23 59:18
61:8 64:18,19
**ordered** 59:15
60:14 61:2,3
**orders** 59:22 79:22
**orientation** 13:8
39:12
**outside** 10:20 18:12
40:7 72:20 74:11
74:12
**overweight** 31:1
**oxygen** 50:9,12,19
50:24 51:8 63:2,9

_____

**P**
**p.m** 1:16 3:2 11:23
67:24 82:4
**page** 4:4 83:5,8 84:6
85:7

**pain** 76:7,10
**pamphlets** 21:6
**pants** 64:8
**paper** 39:23
**paperwork** 76:18
**paragraph** 68:7
**pardon** 53:11
**participated** 78:4
78:10
**participating** 47:19
**particular** 12:9 70:9
72:7 76:1
**particularly** 53:23
73:22
**parties** 3:5
**patient** 77:9,9,10
**penalties** 7:17
**pending** 6:2 73:2
**people** 14:21 21:20
22:6,21 29:1
37:14 38:16 53:22
62:11 69:15 73:20
77:3 80:21
**pepper** 79:20
**perceived** 66:21
**percent** 44:23
**period** 12:19 35:9
41:15
**permissible** 16:8
17:23 18:16
**person** 37:15 47:13
50:11 53:11 55:7
66:18
**personal** 8:11
**Personally** 75:21
**personnel** 77:4
**Phil** 1:8
**physical** 21:13
**physically** 19:15
**place** 11:20 16:22
17:3,12 22:18
30:18 31:19 34:13
35:4,6,23 43:1,5,6
58:6 59:16 86:13
**placed** 18:13 23:8
31:23 42:1,14
59:24 60:6
**placing** 15:24 33:16
41:22 42:7,11,19
46:3 68:19
**Plaintiff** 1:6,14 2:5
3:5
**Plaintiff's** 49:7
67:17
**plan** 59:5,11 60:10
**platform** 12:1
**please** 5:8 6:8 38:6
83:3,8
**Plummer/Montgo...**
1:8
**pod** 12:3,9,10 28:19

29:2,10 49:1,2
52:4 61:4,10
72:11
**point** 26:5 30:22
41:6 43:23 45:12
47:18 52:17 55:23
56:12 63:13 69:14
79:17
**police** 9:15,19,23
10:4
**policies** 40:12,16
42:21
**policy** 40:21,24 41:3
42:11,23,24 43:4
44:4,7 47:3,4 71:7
**portion** 13:7
**portions** 69:5
**pose** 53:1 62:6
**posed** 62:10
**poses** 18:20
**position** 16:2,10,20
17:13,18,24 18:14
18:16 20:15,17
22:1,6,19 24:5,18
24:24 25:2,4,15
26:12,13 27:4
32:23 34:3,14
35:17,18,19 36:3
41:24 42:1,4,10
42:12,20 43:7,9
43:13,18,24 44:10
44:14,16,18,20
45:5 48:8 53:20
58:6,20,22 59:4,9
60:19 66:2 77:10
78:5,12,20 79:15
80:1,8,14
**positional** 22:11
23:15 53:3,5,12
53:19 54:1,6,11
54:17,23 55:3,15
**positions** 21:20
22:21 42:8 57:8
**possible** 24:2
**possibly** 50:5 64:15
**post** 12:4
**posts** 29:16
**potential** 53:1
**potentially** 20:17
22:2
**PowerDMS** 39:20
39:21 40:1,1,4,7
**practice** 11:21 16:2
21:2,16 42:20
44:5 50:21
**practices** 43:1
**Preexisting** 54:4
**preference** 36:20,20
**Pregon** 1:15 2:6,7
8:22 10:20 14:15
15:18 16:11,21

19:3 20:18 22:8
26:8 28:5 34:24
36:17 37:7,23
38:5,7,17 39:8
42:16 43:3,20
44:6,22 46:22
50:15 55:10 60:20
61:21 62:12,15,22
65:14 67:10,12,20
69:8,23 71:2 72:8
74:10 77:13 78:21
80:3,9,15 81:1,15
81:23 83:16
**prepare** 10:18
**presence** 3:8 84:14
86:10
**present** 49:18 63:18
65:2
**press** 20:2,5
**pressure** 26:2 32:4
32:6,8,9 34:22
35:23 36:1 47:23
54:9,16,22 55:1
68:17,19
**presume** 28:24 40:1
71:12
**pretty** 32:12 68:6
75:6
**prevent** 68:18
**printed** 83:4
**prior** 10:15 11:6,9
77:8 78:3
**priority** 58:5
**prisoners** 41:19,22
41:23 42:11,19
**privileged** 37:8
**probably** 9:20
**procedure** 1:14 3:6
71:7 83:8
**process** 49:15
**Professional** 83:13
**prohibited** 16:3
36:5,9 38:24
42:21 44:5,7
**prolongs** 79:14
**prone** 16:2,10,20
17:18,23 18:14
20:14 21:8,20,24
22:19,21 24:4,18
24:24 25:15,18
26:12,13 36:5,9
36:16 38:24 41:23
42:7,12,20 43:6,9
43:12,18,23 44:20
45:4 53:11,11,19
59:4 77:10 79:15
**proof** 3:8
**provide** 6:14 34:15
34:16 40:14 44:11
50:23 67:5 77:22
**provided** 36:13,24

39:12 70:12
**provides** 61:8
**providing** 21:17
58:2
**pry** 8:11
**public** 1:15 83:7
84:13,17 86:5,20
**pulled** 24:9 64:8,10
64:11,14
**purposes** 60:18
**pursue** 9:23 10:4
37:20
**push** 26:15 35:5
**pushing** 68:21
**put** 16:8 17:13 22:6
28:2,9,13 32:4,9
33:8,13 34:22
35:22 42:4 49:7,8
51:7 56:2 60:10
68:17 78:16 79:10
79:21
**putting** 21:20 24:8
26:2 34:9 58:17
63:5 68:19 78:24

**Q**

**qualification** 3:8
**qualified** 86:6
**question** 6:9,16,20
8:1,2 10:9 21:24
36:23 37:10,24
59:6 60:9 74:15
**questions** 6:13
13:18,20 29:1
34:18 67:1 76:13
81:21
**quickly** 23:21

**R**

**radio** 12:2 29:3
61:15
**railing** 30:17 33:2
**range** 21:1
**rank** 13:15 75:5
**reaction** 65:19
**read** 36:17,20,21
37:24 38:2,11,23
40:11 73:21 81:23
83:3,6,8,10 84:4
84:13 85:2,4
**reading** 42:6 84:12
**reads** 38:8 43:4
44:7
**realize** 56:18 60:1
**really** 30:22
**rear** 57:12
**reason** 7:14 10:3
23:5,17 50:13
63:24 85:7
**reasonable** 18:24
**reasonably** 15:2

**reasons** 23:13 85:5
**recall** 11:17 27:23
30:1 35:2 64:3
**receive** 23:12 47:6
**received** 22:3 36:4
64:4
**receiving** 21:6
66:12 79:8
**recollection** 34:4
49:12 66:6 69:17
77:12
**record** 5:11 6:6
8:22,24 38:7,9
61:24 85:5
**reduced** 3:7
**refer** 77:9
**referenced** 42:10
**refusing** 51:9
**relates** 38:15
**rely** 40:14
**relying** 8:7
**remember** 6:23
12:24 13:3,18
20:23 21:6 28:8
28:12 29:19 30:13
31:5 32:23 56:1,6
56:7,9 59:17
62:21 63:11,13,16
65:8 73:19,23
77:17 78:3
**remind** 7:3
**REMINGER** 2:11
**remove** 17:13 18:5
23:6 79:8
**removed** 30:14
60:13
**repeat** 37:10
**replaced** 77:18
**report** 10:21 56:2
70:3 77:6
**reported** 11:24
**reporter** 5:7 83:13
85:1
**reports** 62:3 73:21
**represent** 5:16
**request** 58:8 85:4
**requesting** 12:3
**required** 40:11
**respective** 3:5
**respond** 12:3 29:11
29:14,18,19 74:18
**responded** 29:18
52:14,17 63:14
**responsibilities**
38:15
**responsive** 46:18
**resting** 33:2 35:21
**restrain** 16:19
17:23 18:16,19
22:20 25:3 60:18
**restrained** 14:9

20:16 24:4,17,23
25:2,16 53:12,19
54:1,7,18 55:4,8
77:10 78:11 81:13
**restraining** 17:18
18:24 38:16 73:13
74:21 81:7
**restraint** 20:14 21:9
22:1 23:8 25:18
28:3,10,13,15,18
36:5,9,16 38:24
47:3,4 54:12
59:16,24 60:10,15
60:18,24 61:3,8
78:10 81:17
**restraints** 13:24
16:9,15,18 17:4
18:1 40:21 41:4,6
41:12,23 42:7,12
42:19
**restrict** 14:2,10
**restroom** 61:21
**result** 54:18 62:3
71:13 83:10
**retch** 57:4
**retraining** 71:16
**retrieve** 60:14 61:2
61:4,18
**return** 83:8
**review** 11:2
**reviewed** 10:8,21
11:8 36:8
**Reviewing** 38:4
**revisit** 8:2
**Richardson** 1:5
5:17 10:13,16
11:15 13:19 24:4
24:8,17,22 25:22
25:24 26:6,20
27:6,12 28:2,10
28:13 30:3,4 31:1
34:17 35:16 41:8
41:19,24 42:3,14
43:8,18 44:9,15
44:20 45:4,15,23
46:12 47:20 48:7
49:11,19,22 50:9
50:12,14 51:1,11
51:14,19,21,24
52:8 53:1 55:17
56:22 57:10,16,20
58:9,16,20 59:12
62:4,6 64:4,21
65:22 66:1,8,23
71:19 72:11 73:9
74:4 76:3,6 78:6
78:12 80:1,2,20
**Richardson's** 9:7
31:19 32:1 33:6,9
34:10 65:12 68:8
70:22 77:19 78:1

78:4,9,19
**right** 8:5 13:22 14:5
19:13,15 20:11
31:16 32:7,16,18
33:5,6,13,19 35:3
36:14 48:6 49:17
54:4 61:12 64:21
67:20 73:16 74:1
**rights** 37:4,16
**risk** 18:21 18:21
23:14 52:5 53:10
53:15,17,24 54:5
54:6,10,17,17,23
55:2,3,8,15 62:6,9
62:10,18
**road** 73:18
**Robert** 1:5 5:17
**roll** 26:14 27:5 67:2
**rolled** 66:8
**rolling** 57:23
**rollover** 12:11
**room** 11:24 31:10
**rule** 14:5,24 15:4,24
**rules** 1:14 3:6 6:5
52:9 83:8

**S**

**safe** 60:19
**safer** 19:2
**saliva** 68:9
**satisfy** 74:6
**Saturday** 10:7
11:22
**saw** 24:13 49:3
50:11 68:7,12
**saying** 7:4 22:7 31:4
55:23 56:23 62:21
63:11,16 70:15
**says** 5:3 39:1 41:7
41:22 77:7
**scenarios** 18:2
**school** 8:17 9:11,20
**scooting** 64:16
**screaming** 31:14
**seal** 86:17
**search** 17:2,5,7
**second** 11:20 28:16
29:2 32:16 63:21
65:2,11,15,16,21
66:22 68:6
**seconds** 49:10,11,11
**see** 12:1 23:4 28:15
39:1 43:22 53:16
68:15 69:6,7
77:24
**seen** 24:7 33:1
37:23 66:15
**sees** 15:11
**seizure** 56:19
**seizures** 56:16
**send** 20:24 61:14

**sends** 21:1
**sense** 61:20
**sentence** 41:16,18
**separate** 42:8
**sequence** 59:17
**sergeant** 28:12
29:24 30:9 58:19
59:15 61:7,13
67:7 70:10 75:1,3
75:7,10,17 79:16
**sergeant's** 60:4
**services** 70:18,21
76:22
**Session** 3:1
**set** 86:16
**seven** 4:9 52:16,21
59:7
**shape** 19:16
**sheet** 83:5,6,9
**Sheriff** 1:8 2:9
**sheriff's** 21:1 36:12
36:23 37:13 81:18
**SHIBLEY** 2:3
**shift** 11:17,19,20,22
12:1
**shot** 45:10,11,13,15
63:22 64:15,22,22
65:2,11,14,16,21
66:5,22
**shots** 66:15
**shoulder** 26:4 32:6
32:7 33:6,9,14,19
34:3,10,22 35:2
35:20,21 55:1
68:18
**shoulders** 7:1
**show** 36:14 40:20
44:19
**Showing** 43:16
**shrugs** 6:24
**shut** 69:19
**shuts** 79:11
**side** 10:1 26:14
30:16 43:9 59:3
79:10
**sign** 39:23 83:3,6,8
**signature** 82:1 83:8
85:23
**signed** 83:10 84:14
**signing** 84:12
**similar** 34:3 78:12
**Sincerely** 83:12
**sir** 7:6 8:6
**sit** 18:11 26:16,20
27:12 66:22
**sitting** 57:14 69:13
**situation** 16:23 18:7
29:14 30:21 52:22
70:24 71:10 78:10
78:19 80:20
**situations** 78:15

80:21 81:5,11
**six** 9:8 41:7
**size** 64:17
**sleeping** 70:16
**slightly** 64:14
**small** 64:19
**snapshot** 32:15
**somebody** 17:23
18:13 20:15 23:13
23:18 37:6,20
43:6,12 50:21
55:6 60:18 74:21
78:11,16,20 79:8
79:24 80:7,13
**someone's** 54:6
**soon** 18:8 24:2
78:23 79:12
**sorry** 49:10 74:14
**sort** 45:10
**sound** 57:18
**sounds** 17:16 18:7
21:11 55:20 75:6
80:19,20
**source** 39:22
**SOUTHERN** 1:1
**SPANGENBERG**
2:3
**speak** 27:22 70:15
**speaking** 31:9
**Special** 1:4
**specific** 23:24 48:18
68:6
**specifically** 21:18
**specified** 86:14
**spell** 5:7
**spilled** 63:24
**spot** 36:2
**sprayed** 79:20
**spread** 41:23 42:1,4
42:8
**squat** 20:2,7
**Sr** 1:5
**staff** 15:6 17:14
21:16 22:18 41:11
45:11 46:2,7,9,13
56:17 76:18
**stairs** 26:5
**stamp** 43:17 44:13
44:19
**stand** 26:11 67:2
**standing** 43:6
**start** 9:5 12:24 35:4
35:22 70:7
**starts** 2:11 41:18
67:18 76:15 83:15
**state** 1:15 5:6 36:6
36:10,15 38:24
84:1 86:2,6,21
**stated** 27:4 84:12
**statement** 67:8,18
68:3

**STATES** 1:1
**stay** 79:11
**staying** 64:24
**stenotype** 86:10
**stenotypy** 3:7
**Steven** 2:15
**stipulated** 3:4
**STIPULATIONS**
3:3
**Stockhauser** 2:15
48:10,13,17 50:8
51:5,7 58:8,12
62:21 77:18,21
**stomach** 17:12
22:15,16 26:11
59:4 79:7,15
**stomachs** 18:4
26:16
**stop** 6:7 31:6 33:14
33:15 35:24 56:3
**stopped** 35:10 57:17
**straddling** 57:10,11
**Street** 2:12
**struggle** 55:6
**struggling** 33:23
64:21
**stuff** 20:3 31:14
49:2 63:5,10
70:17
**Stumpff** 27:20,20
34:2,6,20,22
35:12 52:15 72:16
72:17
**Stumpff's** 27:22
**subjects** 22:15
**submitted** 84:11
**substance** 84:6
**suffering** 76:3
**suggest** 26:22
**suggesting** 46:18
**Suite** 1:16 2:4,8,12
**superior** 49:4
**supervisor** 60:7
70:1,6,7 75:21
**supervisors** 11:11
26:19 40:14 70:23
71:18 75:1
**supplement** 8:2
**sure** 6:5 8:23 14:8
15:7 17:5 40:15
44:23 51:9 60:9
75:8
**sweat** 68:9
**sworn** 5:2 86:8
**syringe** 64:1
**system** 11:8
**systems** 39:1

_____
**T**
**tabbed** 40:23
**tactics** 21:2

**take** 6:8 7:11 8:3
36:1 38:2 58:4
60:1 61:10 63:4
79:6,9,13
**taken** 1:14 3:6 5:12
6:2 12:5 85:2 86:9
86:13
**takes** 11:7 32:15
58:5 61:19 66:16
75:10,11 79:14
**talk** 70:4 73:5,16
74:10
**talked** 53:3 72:22
**talking** 6:7 7:23
21:11 31:8 69:15
72:10
**tased** 79:20
**tell** 6:17 9:22 20:22
29:8,22 36:21
37:9 43:20 48:2
56:14 69:18 73:11
75:5
**telling** 31:6 46:15
56:10 62:24 63:3
63:6,8 66:11
79:19,22
**ten** 7:24 60:3 80:8
80:23
**term** 39:21 53:4,11
**terms** 59:11 75:12
**testified** 7:8 49:9
69:12
**testify** 7:11 86:8
**testimony** 16:7
27:22,24 33:8
44:14 83:4,5,6
86:9,12
**Thank** 67:11 81:22
**thighs** 57:12
**thing** 34:20 35:2
67:16
**things** 7:23 11:7
22:14 28:21 47:12
48:20 63:6,7
68:12
**think** 14:12 18:2,11
22:2 27:6,12
30:16 34:2,19
37:21 38:13 43:13
49:3,7 50:18 53:4
55:18 58:24,24
63:18 69:6 76:12
80:8,14
**thinks** 60:5
**third** 11:19,22 12:8
12:12 68:7
**thirty** 12:23 83:8
**thought** 30:11 74:14
**thrash** 35:22
**thrashing** 33:20
34:11 35:4 68:14

68:18,23,24 69:2
**threat** 53:1
**three** 11:23 42:8
73:18
**throws** 50:4
**Tiburon** 10:24
39:17 67:8,18
70:3
**tie** 41:11
**time** 3:6 6:8 7:22
9:7 11:9,21 12:2
14:22,22 24:8,9
24:16 26:12 27:1
30:15,19,23 31:7
33:17,19 34:12,16
35:12 37:2 38:2
38:23 43:7,10,17
44:8,9,11,13 45:8
45:12,24 46:8,13
47:18 48:19 49:18
51:9 52:5 56:9
57:16,17,20 58:1
59:7,20 61:19
62:7,15,17,24
63:13 64:4,15,22
66:2 67:3 70:10
73:19 75:3 76:1,8
78:7,13,19 79:14
83:9,10 86:13
**timeframe** 23:24
48:18
**timeline** 49:8,9 66:4
**times** 17:1 20:9,10
24:17 25:1,10,13
25:20 26:9 28:22
31:18,22 32:4,20
33:1,5,22,23 34:9
34:21,23 35:3,22
56:3 61:2 68:18
**timing** 28:21
**today** 5:12 7:6,10
7:15,22 8:4,8
18:11 74:16
**today's** 6:1 10:9,19
39:6
**told** 22:5 34:7 59:7
74:20 79:24
**top** 33:6 57:14 58:5
67:21
**topics** 13:21
**totally** 69:21
**towel** 63:4
**train** 74:14
**trained** 20:14 21:24
22:20 23:10,21
24:1 26:15 33:15
54:5 55:2,7
**training** 9:12 12:17
12:19 13:7 20:22
21:5,16,17 22:3,5
22:10 23:12 36:5

39:12 40:15 47:6
54:24 58:3
**transcribed** 3:7
86:11
**transcript** 83:3,3,6
83:10 84:4,10
85:2 86:12
**transmission** 29:3
**transport** 23:7
**tried** 30:10 68:5
**trouble** 50:14 70:13
70:16
**true** 14:22 15:8,13
16:20 19:22 24:5
32:10 33:6 35:17
44:21 49:22 50:6
66:2 68:4,12,18
69:22 72:2 74:18
75:13 84:7 86:11
**truth** 86:8
**truthfully** 7:15
**try** 23:22 27:2 35:5
35:23 46:10,10
51:19,21
**trying** 10:4 25:24
26:1,6 30:17 31:7
33:18 34:11,13,14
34:16 50:8,12,18
51:7 56:14,15
57:3,4 63:1 67:8
68:22 78:24 79:23
**tunnel** 48:24
**two** 18:24 26:11
61:11 65:24 73:4
73:4,18
**typewritten** 83:4

_____
**U**
**uh-huh** 7:4 14:16
39:2 40:22
**uh-huhs** 7:1
**uncooperative** 17:1
17:15 23:5 29:9
46:7 47:10
**undergo** 12:19
71:15
**underneath** 22:17
**undersigned** 84:13
**understand** 5:11,19
5:21 6:1,16 7:6,10
7:17 8:6 13:23
14:24 16:17 28:21
43:4 47:13 53:5,8
53:17 59:5 65:5
76:17,21
**understanding**
22:23 29:13 40:11
51:3 59:10 60:17
60:23 61:6 77:2
**understood** 6:11,14
6:21 31:2 60:10

**uniforms** 64:17
**unintelligible** 55:20
**unit** 23:6
**UNITED** 1:1
**unnecessary** 15:8
  15:12,15 18:21
**unreasonable** 15:8
  15:12
**upper** 35:13
**use** 15:1,7 21:4
  33:24 36:5,9
  38:24 40:21 41:4
  53:11 62:2
**usually** 79:16

**V**

**verbal** 21:12,19
**video** 11:2,8,12 24:7
  24:8,14 26:3
  28:22 32:12,20
  35:17 43:16,17
  45:2 48:8 59:10
  69:5
**videos** 21:7
**Vine** 2:12
**violate** 52:8
**violation** 48:4
**violence** 52:1,6
**violent** 45:23 46:2
  46:12,14,19,21
  47:5,10,14 69:1
**vis-a-vis** 13:18
**vision** 48:24
**vs** 1:7

**W**

**wait** 6:7,8,10,10
**waited** 73:18
**waiting** 45:9,10,12
  45:14 67:5
**waived** 3:9 82:1
**walk** 23:4
**walking** 49:1,2
**want** 6:17 8:2,3
  13:20 28:21 35:5
  38:2,5 40:19 41:6
  42:10 43:20 44:19
  46:2,10 48:23
  49:17 50:23 53:15
  56:17 57:7 59:1
  64:11
**wanted** 9:13,15,18
  9:22 10:1 44:14
**wanting** 36:17
**wasn't** 25:24 26:2,7
  33:18,20 41:19
  42:1 46:14 51:8
  59:21 64:23,24
  66:24 68:19,20
  73:15
**watch** 11:12,20 45:2

45:2
**watched** 32:20 69:5
**watching** 21:7
**water** 38:5
**way** 5:16 6:13 14:2
  17:14 18:20 19:2
  21:19 22:10 26:4
  29:13 33:4 35:7
  36:2 37:4 43:4
  47:1,14 49:4
  58:22 63:6 74:18
**ways** 14:9 18:24
  22:15,18
**we'll** 79:9,12 81:23
**we're** 7:23 23:3,5,11
  26:15 34:13,14
  56:11,11,20 58:6
  63:9 78:24 79:6,9
  79:13,15,21
**we've** 12:10,11,12
  18:3,3 48:20
  56:17
**weapon** 49:20
**weapons** 17:6
**Wednesday** 3:1
**week** 20:9,10
**weeks** 69:13 73:18
**weights** 19:24
**went** 59:3
**weren't** 25:1 44:17
  57:14 64:10 71:12
  71:15
**West** 8:16,17
**WESTERN** 1:2
**Whereabouts** 8:15
**WHEREOF** 86:16
**Whitney** 1:15 3:6
  6:6 83:9,13 86:5
  86:20
**willful** 47:14
**wind** 11:7
**wipe** 63:4
**wiping** 51:6 63:2,7
**witness** 3:8 38:6
  43:22 50:8 51:21
  52:8,11 84:12
  86:10,13,16
**word** 46:19
**words** 6:24 56:10
**work** 11:22 20:9
  22:15 27:20 34:13
  35:7 72:20 73:8
  75:20,23
**worked** 75:24
**working** 9:8 11:17
  11:22 12:23 19:20
  27:2 35:10,20
  66:19
**workout** 19:12
**workouts** 19:24
**wouldn't** 12:5 23:17

26:1 32:6 35:18
  47:24 48:2 61:14
  76:9
**writing** 3:7
**written** 42:21 67:18
**wrongful** 37:5,17

**X**

**Y**

**yeah** 21:15 22:3,13
  37:12 46:1 48:22
  57:6 61:23 64:13
  66:17 70:7 71:3
  72:18,21
**year** 8:19
**years** 7:24 9:4 73:4
  73:5
**YouTube** 19:11

**Z**

**0**

**1**

**1** 67:17
**10** 49:8
**1001** 2:3
**11:58** 43:17
**117** 1:16
**12** 49:10
**123** 2:8
**1287** 67:10,17,19
**14** 49:10
**15:30** 12:6
**15:37:15** 66:5
**15:41:11** 66:9
**16** 49:11
**17:35** 45:4
**1700** 2:4,12
**18** 9:21
**18:15** 44:19
**19th** 10:7,15 11:18
  12:7 52:9,12
  53:16

**2**

**20** 85:3
**2010** 8:20
**2011** 9:6 13:1
**2012** 5:18 10:7,15
  11:18 12:7,17
  13:7,11 19:22
  52:9,12 53:17
**2014** 11:7
**2015** 1:16 3:1 83:1
  84:5,15 86:18
**2020** 86:22
**22** 24:10 25:5,7
  55:22 80:1
**22-minute** 24:16

25:1,10,20
**28-year-old** 73:11
  73:12
**29** 83:1
**29th** 86:17

**3**

**3:14-CV-00158** 1:7
**3:30** 1:16 3:2 12:6
**30-day** 21:4
**300** 20:8
**315** 20:6

**4**

**4** 86:22
**43017** 1:21 83:9
**44114** 2:4
**45202** 2:13
**45429** 1:16 2:8

**5**

**5** 4:4
**5:04** 82:4
**5:41** 67:24 70:4
**525** 2:12
**5335** 1:15 2:7

**6**

**614-309-1669** 1:22
**6723** 1:21 83:9

**7**

**8**

**88** 67:12

**9**

**9** 1:16 3:1 84:5