UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -


Harry G. Beyoglides, Jr.,
Special Administrator of the
Estate of Robert Andrew
Richardson, Sr., Deceased,
     Plaintiff,

     vs.                          Case No. 3:14-CV-00158


Phil Plummer/Montgomery County
Sheriff, et al.,
     Defendants

                    - - -




PART I
DEPOSITION OF BRYAN CASTO, M.D.
the Witness herein, called by the Plaintiff under the
applicable Rules of Civil Procedure, taken before me,
Whitney Layne, a Notary Public for the State of Ohio, at
the law firm of Dinkler & Pregon, 5335 Far Hills Avenue,
Suite 117, Dayton, Ohio 45429 on December 7, 2015 at
2:26 p.m.




LAYNE & ASSOCIATES
6723 COOPERSTONE DRIVE
DUBLIN, OHIO  43017
614-309-1669

APPEARANCES

NICHOLAS DICELLO, ESQUIRE
SPANGENBERG, SHIBLEY & LIBER
1001 Lakeside Avenue
Suite 1700
Cleveland, Ohio 44114
    on behalf of the Plaintiff

JAMEY PREGON, ESQUIRE
LYNNETTE DINKLER, ESQUIRE
DINKLER & PREGON
5335 Far Hills Avenue
Suite 123
Dayton, Ohio 45429
    on behalf of the Sheriff
    Defendants

CARRIE STARTS, ESQUIRE
ROBERT HOJNOSKI, ESQUIRE
REMINGER CO., LPA
525 Vine Street
Suite 1700
Cincinnati, Ohio 45202
    on behalf of the Defendants
    NaphCare, Inc., Nurse Felicia Foster,
    Nurse Jon Boehringer, Nurse Krisandra
    Miles, Medic Steven Stockhauser,
    and Brenda Garrett Ellis, M.D.

Page 2

---

EXAMINATION INDEX

BRYAN CASTO, M.D.

BY MR. DICELLO.........................Page 5

EXHIBIT INDEX

Exhibit                    Marked
1 .....................................Page 14
2 .....................................Page 14
3 .....................................Page 55
4 .....................................Page 77

Page 4

---

December 7, 2015
Monday Session
2:26 p.m.
          - - -
STIPULATIONS

It is stipulated by and among counsel for the respective parties that the deposition of BRYAN CASTO, M.D., the Witness herein, called by the Plaintiff under the applicable Rules of Civil Procedure, may be taken at this time by the notary Whitney Layne; that said deposition may be reduced to writing in stenotypy by the notary, whose notes thereafter may be transcribed out of the presence of the witness; and that the proof of the official character and qualification of the notary is waived.

Page 3

---

BRYAN CASTO, M.D.

Being first duly sworn, as hereinafter certified, deposes and says as follows:

CROSS-EXAMINTION

BY MR. DICELLO:

Q   Good afternoon.

A   Good afternoon.

Q   Could you please state your name and spell your last name, Doctor?

A   Bryan Douglas Casto.  Last name is C-A-S-T-O.

Q   Dr. Casto, my name is Nick DiCello.  We had a chance to meet off the record.  You understand you're here to have your deposition taken today?

A   Correct.

Q   I presume you've been deposed a number of times before?

A   Correct.

Q   And by way of introduction, I think you probably understand, but you understand you're here to have your deposition taken in connection with the death of Robert Richardson?

A   That's right.

Q   And you understand that I'm an attorney who represents the family and the estate of Robert Richardson

Page 5

---

2 (Pages 2 to 5)

1    in a lawsuit that's been filed against the Montgomery
2    County Sheriff and some other individuals?
3       A   Yes.
4       Q   Do you understand that?
5       A   Yes.
6       Q   Doctor, you and I have never met before today;
7    correct?
8       A   That's correct.
9       Q   And you and I have never had the opportunity to
10   speak before today; correct?
11      A   Correct.
12      Q   And it's your understanding that I have been
13   prohibited from contacting you about the death of
14   Mr. Richardson; true?
15      A   No, I -- I speak to all parties if they're --
16   if they call or want to set up an appointment.
17      Q   Because that's how the public coroner's office
18   works; right?
19      A   That's right.
20      Q   And I've had experience with some of your
21   fellow coroners down there, for example, I met at your
22   office with Dr. Russell Uptegrove when I had a question
23   about a death of the member of the community, and he
24   invited me down to come speak with him.  Is that

Page 6

1    consistent of what coroners do?
2          MS. DINKLER:  Objection to form, assumes facts
3    not in evidence.
4          Go ahead.
5       A   Yes.  Generally, we will meet with any
6    attorneys involved.
7    BY MR. DICELLO:
8       Q   And so what is your understanding of why I have
9    not been afforded that opportunity to do that in this
10   case?
11      A   I wasn't aware --
12         MS. DINKLER:  Objection to form.
13         Go ahead.
14      A   I wasn't aware of that --
15   BY MR. DICELLO:
16      Q   Oh, you weren't?
17      A   -- prevention, no.
18      Q   That's atypical, isn't it, that somebody would
19   instruct an attorney you are not to contact the coroner
20   about your client's death?
21         MS. DINKLER:  Objection to form, time, and
22   scope.
23      A   I would --
24         MS. DINKLER:  Go ahead.

Page 7

1       A   I would not know if that kind of tactic is
2    being used.  That would be outside my knowledge.
3    BY MR. DICELLO:
4       Q   Okay.
5       A   I'm not usually told not to talk to someone, so
6    --
7       Q   Oh, all right.
8       A   And I wasn't told that in your case.
9       Q   Well, that is what I was told.  Is Ms. Dinkler
10   your lawyer?
11         MS. DINKLER:  Objection to form.
12         Go ahead.
13      A   I do not have an attorney.  I understand she's
14   representing the county.  I am here at the request of a
15   deposition regarding this case.
16   BY MR. DICELLO:
17      Q   So you don't have an attorney so you haven't
18   had any attorney/client communications with any counsel;
19   correct?
20      A   Oh, no.
21         MS. DINKLER:  Objection to form.  He's an
22   employee of the county and he does have attorney/client
23   privilege with this firm and the civil department of the
24   prosecutor's office in the civil litigation.

Page 8

1       A   Yes, I have met with Ms. Dinkler and others in
2    her office.
3    BY MR. DICELLO:
4       Q   I'm just asking, are they your attorneys?  Are
5    they representing you in this case?
6          MS. DINKLER:  Objection to form.
7    BY MR. DICELLO:
8       Q   If you know?
9       A   I'm not aware that I needed an attorney.
10      Q   I didn't think you did, either.  But when you
11   came in here, you had a thick file with you; correct?
12      A   Yes.
13      Q   And you brought that to the deposition because
14   you knew we would be talking about information about
15   Mr. Richardson's death; correct?
16         MS. DINKLER:  Objection to form.
17      A   Correct.
18   BY MR. DICELLO:
19      Q   And so you said, "I've been deposed a lot when
20   it comes down to a death of a member of the community and
21   I'm going to bring this file of information with me to
22   this deposition because it's relevant"; correct?
23         MS. DINKLER:  Objection to form.  And I've
24   already told you off the record and I'll state on the

Page 9

1 record that was not his official file and he was not
2 requested to bring a file formally or informally. And
3 we've provided you with the report that he produced.
4 BY MR. DICELLO:
5 **Q My question was just: You brought a file with**
6 **you today; correct?**
7 A Yes.
8 **Q What was in that file?**
9 MS. DINKLER: Objection to form.
10 I'm not going to instruct you not to answer
11 because the contents are privileged other than what's been
12 placed on the table.
13 THE WITNESS: Okay.
14 BY MR. DICELLO:
15 **Q So are you going to follow Ms. Dinkler's legal**
16 **advice to you, Doctor?**
17 MS. DINKLER: As an employee of the county,
18 Dr. Casto, this is not a criminal case, this is a civil
19 case, and you do have an attorney/client privilege
20 communication privilege with the county. And I'm
21 instructing you not to answer his question.
22 THE WITNESS: Okay.
23 BY MR. DICELLO:
24 **Q I have to ask and then she instructs you not to**

Page 10

1 off the record, that's fine. But I would just ask that
2 there's no more speaking objections.
3 Back to the question.
4 MS. DINKLER: We're treading here on very thin
5 ice given that a privilege is at stake. And I want
6 Dr. Casto to be crystal clear on the parameters of an
7 attorney/client privilege in this particular context. In
8 no way am I trying to suggest an answer to him.
9 Go right ahead.
10 BY MR. DICELLO:
11 **Q Because when you sat down, you told me you**
12 **didn't have a lawyer and you didn't think you needed one.**
13 **But Ms. Dinkler has told you otherwise today; is that**
14 **true?**
15 MS. DINKLER: That is true.
16 BY MR. DICELLO:
17 **Q You're supposed to be answering the questions,**
18 **but Ms. Dinkler is answering them for you?**
19 A What's your question?
20 **Q Before you got here today, you didn't think you**
21 **had a lawyer in this case, did you?**
22 MS. DINKLER: Objection.
23 A I know there was an attorney representing my
24 employer, Montgomery County.

Page 12

1 **answer. But having done this not as many times as you,**
2 **Doctor, but having done this a number of times, this is**
3 **the first time I've ever encountered a county public**
4 **official, a coroner, who is through their lawyer unwilling**
5 **to share information with the representative of the**
6 **deceased. Have you ever experienced that before?**
7 MS. DINKLER: Objection to form.
8 If you understand the question in the context
9 of civil litigation where the county, your employer, is a
10 defendant, then you can answer the question. But if you
11 don't understand the question under that context, you
12 shouldn't answer it.
13 A Okay.
14 MS. DINKLER: You should seek clarification.
15 BY MR. DICELLO:
16 **Q You know to answer questions that you only**
17 **understand in a deposition?**
18 A Yes.
19 **Q All right.**
20 MR. DICELLO: And, Ms. Dinkler, I would just
21 ask that an objection to form, foundation, make as many
22 objections as you want. But we've had two lengthy
23 speaking objections on the record providing the witness
24 with instructions. If you want to break and talk to him

Page 11

1 BY MR. DICELLO:
2 **Q Okay.**
3 A Not me personally. So when you say my lawyer,
4 no, I'm not -- as far as I know, I'm not named in your
5 lawsuit yet.
6 **Q No.**
7 A So I do not see her as my personal lawyer. Is
8 she representing my employer? Yes. Do I respect her
9 advice in that regard? Yes.
10 **Q Understood. So the materials that were in your**
11 **file that you brought here have been removed from the**
12 **file; correct?**
13 MS. DINKLER: Objection to form.
14 A Yes.
15 BY MR. DICELLO:
16 **Q And you're going to follow counsel's advice and**
17 **you're not going to share with me what documents were in**
18 **the file that you deemed pertinent to bring to today's**
19 **deposition; correct?**
20 MS. DINKLER: Objection to form.
21 A I'm going to follow her advice. As far as what
22 I brought today, normally what I would bring to a
23 deposition is what is in front of you.
24 BY MR. DICELLO:

Page 13

4 (Pages 10 to 13)

**Page 14**

1  **Q** Okay.

2  **A** Because I have a subpoena, you know, giving me

3  some guidance. I don't recall having a subpoena in this

4  case.

5  **Q** Nope.

6  **A** I had no guidance. So I brought materials that

7  I had used in preparation for today. But these are the

8  materials from -- or the work product of our office.

9  **Q** Okay. And just so --

10  MR. DICELLO: Why don't we mark these.

11  (Exhibit No. 1 marked for identification.)

12  BY MR. DICELLO:

13  **Q** Doctor, handing you what's been marked as

14  Plaintiff's Exhibit 1 with your name, your last name Casto

15  at the bottom. You reference this as part of your work

16  product. Can you identify what Plaintiff's Exhibit 1 is?

17  MS. DINKLER: Objection to form.

18  **A** Yes. This is a photocopy of the signed autopsy

19  report signed by me on Mr. Robert Richardson. Also, not

20  attached but commonly would be attached or included in

21  mailing of such a report is the toxicology report

22  generated by our office but not by myself.

23  BY MR. DICELLO:

24  **Q** And then I'm going to hand you what's been

**Page 15**

1  marked as Plaintiff's Exhibit 2 that has your last name

2  Casto underneath it.

3  (Exhibit No. 2 marked for identification.)

4  BY MR. DICELLO:

5  **Q** First, is that something else that you brought

6  with you to the deposition?

7  **A** Yes.

8  **Q** Is that what you're referring to when you say

9  "work product"?

10  **A** Correct.

11  **Q** And can you tell us what Exhibit 2 is please?

12  **A** Exhibit 2 is a pair of investigative reports.

13  The first and longer of the two is by Mr. Jim Fannin, one

14  of our coroner investigators. The second of the two is

15  actually an investigative note typed by myself.

16  **Q** So what other documents do you have at the

17  coroner's office that would make up Mr. Richardson's file

18  that aren't here with you today?

19  **A** Common things in the file, and of course this

20  is 2012, so now it's on microfiche so there's no paper

21  file, would be things like fingerprint card, generally a

22  log of requested items, so I'm sure everyone at this

23  table, their requests are logged in there at some point,

24  and requests, I'm saying requests of the photographs, the

**Page 16**

1  autopsy report, whatever, and then a property sheet

2  detailing what property may have come with the decedent.

3  And that's about it.

4  **Q** Photographs?

5  **A** Photographs are also part of our product. They

6  are in digital format. We retrieve them as needed.

7  They're not printed photographs included in some files

8  somewhere.

9  **Q** I have a copy of some files that I know were

10  produced ultimately through your office. And I'm going to

11  show you those in a moment.

12  **A** Okay.

13  **Q** But while we're on this topic, it makes sense

14  to ask you: Did you take any photographs of your internal

15  examination?

16  **A** I don't believe so, not in this case.

17  **Q** And I only saw a single photograph of a --

18  looked like a large cross section of the heart. Do you

19  recall taking that photograph?

20  **A** Yes.

21  **Q** What was the purpose of documenting that

22  photograph?

23  **A** That photograph is meant to be a pictorial

24  representation of the decedent's dilated left ventricle.

**Page 17**

1  **Q** Okay.

2  **A** And it's a common photograph that I do request

3  be taken in cases such as this.

4  **Q** In terms of your microscopic examination, did

5  you perform any photographs of any slides?

6  **A** No. That would not be a standard thing that we

7  would do.

8  **Q** All right. Did you preserve the slides

9  themselves?

10  **A** Oh, yes.

11  **Q** And those are also back at the coroner's

12  office?

13  **A** That's right.

14  **Q** And did you preserve any tissue samples in

15  paraffin?

16  **A** The blocks?

17  **Q** The blocks, yeah.

18  **A** Tissue blocks in paraffin used to make the

19  slides are saved for recut purposes.

20  **Q** Okay.

21  **A** We do not release the original slides outside

22  the office, because they tend to disappear or get damaged.

23  And so when someone wants to review the microscopic

24  evaluation, they will order recuts, and so we make new

**Page 18**

1    slides from the same tissue blocks. If for some reason,
2    rarely, those recuts won't be representative of what was
3    in the original slides, then someone can make an
4    appointment, and I'll sit there as long as they want and
5    watch them look at the original slides.
6        Q    Okay.
7        A    We provide a microscope in our conference room
8    to do that.
9        Q    The options that you've just described, are
10   those things that you regularly offer to the public,
11   either taking recuts or inviting someone to come in and
12   look at the actual slides under a microscope?
13       A    The recuts are a common request, by attorneys
14   generally. Coming in to view the original slides is
15   always available. It tends not to be necessary, although
16   I have had it once or twice over the years.
17       Q    And if somebody from my office makes that kind
18   of request for recuts or to look at the original slides
19   through Ms. Dinkler's office, would you accommodate those
20   requests?
21       A    Sure.
22       MS. DINKLER: For the record, I've already
23   offered all of that to you.
24   BY MR. DICELLO:

**Page 19**

1        Q    The last time I had occasion to reach out to
2    the Montgomery County Coroner's Office, I contacted
3    Mr. Uptegrove, Dr. Uptegrove, and Dr. Uptegrove invited me
4    down and we sat in a conference room and there was a TV on
5    the wall and he showed me the photographs and went through
6    the autopsy and explained things to me as the decedent's
7    representative. Is that something that you are often
8    asked to do by members of the public?
9        MS. DINKLER: Objection to form.
10       A    Generally, it's -- we -- we do that for
11   prosecution or defense attorneys. Occasionally we will be
12   asked to do that by family members. We discourage it.
13   But ultimately, they can get the photographs if they want
14   them.
15   BY MR. DICELLO:
16       Q    And what about counsel for family members? Is
17   that something --
18       A    Oh, sure.
19       MS. DINKLER: Objection to form.
20       A    Absolutely.
21   BY MR. DICELLO:
22       Q    And just to make sure -- And I want to get away
23   from this topic. But in this case, it's your
24   understanding now that I've been told that I'm not allowed

**Page 20**

1    to do that?
2        MS. DINKLER: Objection to form.
3        If you don't know what I've told him, then --
4        A    Right. I have no opinion about what you've
5    been told or not told to do as far as regarding contacting
6    me.
7    BY MR. DICELLO:
8        Q    As the coroner whose job it is to meet with
9    members of the public, representatives on behalf of
10   deceased family members, that kind of thing, have you ever
11   encountered a situation where the representative of a
12   decedent is prohibited from going down to your office and
13   sitting down with you and having you go over the causes of
14   death?
15       MS. DINKLER: Objection to form.
16       A    Well, again, I probably would never know that,
17   just like in this case, if that restriction has been made
18   prior to them contacting me. And the reason I say that is
19   I get a voice mail, I call them back that day, and we
20   talk. So --
21   BY MR. DICELLO:
22       Q    Good.
23       A    Do you see what I'm saying?
24       Q    I do.

**Page 21**

1        A    I would never know if that prevention has been
2    made.
3        Q    So let me follow up with you. I'm now letting
4    you know that I've been instructed that I cannot contact
5    you except through Ms. Dinkler's office. Is this the only
6    circumstance in your career that you're ever aware of that
7    prohibition being issued?
8        MS. DINKLER: Objection to form.
9        A    I've been asked by prosecutors in the past,
10   once I think, not to talk to -- or to tell them when I've
11   talked to the defense.
12   BY MR. DICELLO:
13       Q    But you were still permitted to talk to the
14   defense?
15       A    Yes.
16       Q    So is this case involving Mr. Richardson's
17   death in a case that is filed against the Montgomery
18   County Sheriff's Office the only case that you can ever
19   remember there being a prohibition against the
20   representative of a deceased family member from contacting
21   you, the coroner?
22       MS. DINKLER: Objection to form. And the
23   question is misleading.
24       Go ahead.

6 (Pages 18 to 21)

1     A   Once again, to my knowledge, it's the only

2   case.

3   BY MR. DICELLO:

4     Q   That's all I'm asking.

5     A   But it doesn't mean it's the only case, because

6   I would not know about those --

7     Q   Okay.

8     A   -- prohibitions and all that.

9     Q   Do you have any understanding why that

10   prohibition exists in this case and it's never existed in

11   any others that you're aware of?

12        MS. DINKLER:  Objection to form, calls for

13   legal conclusion.

14     A   Yeah, I would not have an interest in answering

15   that.  I don't know what you're -- I'm not an attorney, so

16   I don't know why that is.

17   BY MR. DICELLO:

18     Q   Well, let me start off, Doctor, just by setting

19   some rules on the record.  I know you've been through this

20   plenty of times, but it helps to have them all right there

21   on the transcript.  You have to answer audibly; shrugs and

22   uh-huhs and huh-uhs are hard to take down.  As you have

23   done, please wait for me to finish my question, I'll wait

24   for you to finish your answer, and we'll get a clear

Page  22

---

1     Q   Can you tell me what you reviewed?

2     A   I reviewed some medical records of Robert

3   Richardson.

4     Q   Can we do this one at a time?  It might be

5   faster.

6     A   Sure.

7     Q   I'll make sure you get out all of your answer,

8   Doctor.  But what medical records did you review of

9   Mr. Richardson in advance of today's deposition?

10     A   I believe one item was generated by the jail

11   healthcare professionals themselves --

12     Q   Okay.

13     A   -- regarding -- on the day of his death.  The

14   other medical record I reviewed was actually from I think

15   an admission in -- or an ER, a couple ER visits in 2010

16   regarding pain of varying types.

17     Q   Any other medical records that you reviewed?

18     A   Not to my knowledge.

19     Q   Doctor, did you review either of the two sets

20   of medical records you just described at any time prior to

21   completing your postmortem examination?

22     A   As far as generating the report?

23     Q   Correct.

24     A   Most likely I did, yes.

Page  24

---

1   record.  I only want you to answer questions that you

2   understand today, okay?

3     A   Sure.

4     Q   If you don't understand a question that I've

5   asked you, I want you to tell me that, all right?

6     A   I will.

7     Q   Given that arrangement that we've just created,

8   if you answer a question that I've asked, I'm going to

9   assume you understood it; is that fair?

10     A   Okay.

11     Q   Do you understand that you're under oath today?

12     A   Yes.

13     Q   Do you understand that it's the same oath that

14   you've been under when you testify in front of a jury and

15   in front of a judge in a court of law?

16     A   Yes.

17     Q   You know if you need to take a break at any

18   time, just let me know.  I'd just ask that if a question

19   is pending, answer it first, and then we'll take a break,

20   okay?

21     A   Okay.

22     Q   Doctor, in advance of today's deposition, did

23   you review any documents to prepare?

24     A   Yes.

Page  23

---

1     Q   So your file, then, should have somewhere in it

2   the NaphCare medical records from the jail as well as this

3   2010 emergency room visit?

4     A   No.

5     Q   So how would you review these sets of medical

6   records before issuing your autopsy report and then no

7   longer have them?

8     A   Well, we get, as you can imagine, reams and

9   reams of paper records to review on the, whatever, 1,600

10   autopsies we do, plus a lot of other death certificates we

11   generate.  And there's no physical way we would have the

12   staff or resources to retain all of that or to scan it

13   somehow or whatever.  So basically, my practice, as well

14   as the practice of multiple -- of the other pathologists,

15   is once the report is signed, then those items are

16   destroyed, meaning we recycle the paper.

17     Q   So do you have a specific recollection in your

18   mind of having reviewed the records that you just

19   described for me that you reviewed prior to signing your

20   report?

21     A   No, I do not have an independent recollection

22   of reviewing those at that time.  You know, it was three

23   years ago.

24     Q   Sure.  Are you just saying by habit or

Page  25

1 practice, more likely than not you would have reviewed the
2 records that you reviewed in anticipation of today's
3 deposition before you completed the autopsy report?
4     A    That's correct.
5     Q    And would there be documentation somewhere in
6 your file of having received or reviewed these medical
7 records?
8     A    No.
9     Q    So you told me what medical records you
10 reviewed.  Back to my question.  What else did you review
11 to prepare for today's deposition?
12     A    Okay.  I do remember reviewing corrections
13 officers' reports or accounts of the event on the date of
14 Mr. Richardson's death.  I don't remember the content of
15 those reports, but I do recall reading multiple
16 corrections officers' statements.
17     Q    Again, maybe one at a time.  I promise I think
18 it's going to be faster.
19     A    Sure.
20     Q    Who provided you with those CO accounts?
21     A    Probably our -- our investigator.
22     Q    Mr. Fannin?
23     A    Yes.  And he would have acquired them I'm sure
24 from the jail.

Page 26

1 happened to Mr. Richardson?
2     A    I don't recall.
3     Q    Let me just follow up.  As you sit here today,
4 you recall reviewing correction officer statements; true?
5     A    Uh-huh.
6     Q    Yes?
7     A    Yes.
8     Q    As you sit here today, you don't recall having
9 reviewed any detainee eyewitness accounts; correct?
10     A    I just don't recall.  I would do that, and I
11 have done that in other jail deaths, and I just cannot --
12 I don't want to confuse it with this case, so I'm not sure
13 about that.
14     Q    So your best answer --
15     A    But that would be a common thing for me to do.
16     Q    So I think, did you mean to say that you
17 reviewed the correction officer accounts before issuing
18 the report and then you reviewed them again before today's
19 deposition?
20         MS. DINKLER:  Objection.
21         Go ahead.
22     A    I have not reviewed them a second time.
23 BY MR. DICELLO:
24     Q    All right.

Page 28

1     Q    And do you remember the format -- I'm going to
2 show you what is Plaintiff's Exhibit 1, doesn't have your
3 name underneath it.  But kind of going through this, does
4 this appear to be the format that you read the corrections
5 officers' statements?
6     A    I do not remember that kind of detail, no.
7     Q    The accounts of the correction officers that
8 you believe you reviewed before issuing your autopsy
9 report, are those documents that you would maintain in
10 your record for this case?
11     A    No.
12     Q    So those would also be destroyed?
13     A    That's right.
14     Q    Is there any documentation anywhere in your
15 files that show which correction officers' accounts you
16 reviewed?
17     A    No.
18     Q    Do you know whether you reviewed all of them or
19 some of them?
20     A    I would have reviewed -- We would have
21 requested all of them and I would have reviewed all of the
22 ones that I received.
23     Q    Did you receive any narrative statements on
24 behalf of detainees who claim to have witnessed what

Page 27

1     A    They have not been provided to me.
2     Q    What other documents have you reviewed to
3 prepare for today's deposition?
4     A    Mainly the medical literature regarding
5 restraint-type deaths.
6     Q    Can you cite any of it to me, either by
7 citation or just source, Doctor?
8     A    I can probably just tell you some authors.
9     Q    Sure.
10     A    Di Maio.
11     Q    Oh, boy.  Okay.
12     A    Hollaran.
13     Q    How are we spelling Hollaran?
14     A    H-O-L-L-A-R-A-N, I think.  Chan, C-H-A-N, I
15 believe.  Reay, R-A-E-Y-E (sic), I believe.  And then
16 there's others that I do not recall names.
17     Q    Dr. Vincent Di Maio; correct?
18     A    Correct.
19     Q    He's a frequently used defense expert; you
20 understand that?
21         MS. DINKLER:  Objection to form.
22     A    Actually, I'm not familiar with that part of
23 his career.
24 BY MR. DICELLO:

Page 29

8 (Pages 26 to 29)

1    Q   Okay.
2    A   I'm more interested in his writings while he
3  was practicing forensic pathology prior to his defense
4  career.
5    Q   Did you do anything to evaluate the potential
6  bias that Dr. Di Maio may have?
7       MS. DINKLER:  Objection to form; assumes facts
8  not in evidence.
9       Go ahead.
10   A   Well, maybe it's just me, but I assume there's
11 bias in every, even the best planned research paper or
12 text.  So I read things knowing that there's bias there.
13 BY MR. DICELLO:
14   Q   Were you aware that Dr. Di Maio has published
15 and authored a book entitled Excited Delirium?
16   A   I have the book.
17   Q   How long have you had Dr. Di Maio's book
18 Excited Delirium?
19   A   Years.
20   Q   Are you a doctor who is in the camp of doctors
21 who believe excited delirium is a legitimate diagnosis?
22   A   Yes.
23   Q   It's not a diagnosis that applies to
24 Mr. Richardson; correct?

Page 30

1    A   It may or may not.
2    Q   Okay.
3    A   I did not use that diagnosis in my report as --
4  as you know.
5    Q   And in coming to conclusions about the cause of
6  death to a reasonable degree of medical certainty, you
7  excluded excited delirium as a cause from your report;
8  correct?
9    A   I would not say that.
10   Q   So did Mr. Richardson die from excited
11 delirium?
12   A   I do not know.  I would not argue with someone
13 if they wanted to place him in that category.
14   Q   Well, let me put it this way, Doctor.  To a
15 reasonable --
16      MS. DINKLER:  Hold on.
17      Were you finished?
18      THE WITNESS:  Yeah.
19 BY MR. DICELLO:
20   Q   If you're not, just let me know.
21      To a reasonable degree of medical certainty,
22 can you tell us that Mr. Richardson died from excited
23 delirium?
24   A   Why don't you rephrase that question?  I want

Page 31

1  to make sure I understand what you're asking.
2    Q   Yeah, I'll do my best.  Not sure if I'll
3  rephrase it or just repeat it.
4    A   Okay.
5    Q   To a reasonable degree of medical certainty,
6  can you tell us that Mr. Richardson died from excited
7  delirium?
8       MS. DINKLER:  Objection to form, lacks
9  foundation.
10      Go ahead.
11   A   Well, my opinion on the report I would place in
12 the category of reasonable medical certainty.
13 BY MR. DICELLO:
14   Q   Sure.
15   A   And does it use the term "excited delirium?"
16 No, it does not.  Is there anything in my report that
17 would counter the argument that this could be an excited
18 delirium death?  No, there is not.  And so when you ask me
19 have I ruled that out, I would say no, because there's
20 nothing in my written opinion that would prevent someone
21 from saying, "Hey, this could fall under the camp of
22 excited delirium in some way."  And I would say, "I can
23 see your opinion on that."
24   Q   Okay.

Page 32

1    A   I did not use that term in my report.
2    Q   Why not?
3    A   I don't know.  It's three years ago, or three
4  and a half years ago.  I don't -- probably wouldn't
5  accurately recall the exact logic I was using.  But the
6  way I phrased it seems to be logical, seems to be
7  understandable, and accurate, and easy for someone to
8  understand.  Putting down "excited delirium" as the term
9  itself being the cause of death I think can create a lot
10 of misunderstandings, a lot of confusion for families and
11 attorneys.  And so I did not use that term in this case.
12   Q   If it was your conclusion to a reasonable
13 degree of medical certainty that Mr. Richardson died from
14 excited delirium, you would be obligated to put that in
15 your report; true?
16   A   The term "excited delirium" is just someone's
17 term.  Chosen phrase.  But it really refers to more
18 of a physiology or mechanism.  And so I don't feel
19 obligated to use that term.  I don't feel obligated to use
20 the exact terminology of Vincent Di Maio or any of these
21 other authors I've read.
22      My goal when I'm generating a report, whether
23 it's this case or a straightforward heart attack, is that
24 it be a working report that someone can understand and

Page 33

9 (Pages 30 to 33)

1  that I can understand years later when I'm in this
2  situation.  And so I have phrased it in that way.
3      But my unwillingness in 2012 to use the term
4  "excited delirium" as the cause of death opinion, again,
5  in my mind, does not rule that diagnosis out just because
6  I didn't use the term.
7      Q   Have you ever used that term in an autopsy
8  report?
9      A   I have probably once or twice, generally in
10  parentheses after saying something like this.
11     Q   Okay.
12     A   Again, just trying to be clear in those
13  circumstances.
14     Q   Excited delirium as a diagnosis is not
15  recognized by the American Medical Association, is it?
16     A   Well, I don't know what the American Medical
17  Association recognizes.  I find myself at odds with them
18  on a lot of things.
19     Q   You find yourself at odds with the AMA on a lot
20  of things?
21     A   Well, I'm saying political.  But I do not know
22  what they recognize as a legitimate diagnosis or not.
23  It's a -- That changes all the time, what they recognize
24  and what they don't recognize.

Page 34

1      Q   Okay.
2      A   I don't try to keep up with that.
3      Q   To your knowledge, has the AMA ever recognized
4  excited delirium as a legitimate diagnosis?
5      A   Oh, I have no idea.
6      Q   Are you aware of any professional organizations
7  that do recognize excited delirium as a legitimate
8  diagnosis?
9      MS. DINKLER:  Objection to form.
10     Go ahead.
11     A   Well, I'm not -- I'm not aware of organizations
12  that make a practice of recognizing or not recognizing
13  each individual diagnostic terminology.
14  BY MR. DICELLO:
15     Q   Oh.  What about the DSM IV?  Are you familiar
16  with that?
17     A   Sure.
18     Q   That's a whole book that recognizes diagnoses;
19  correct?
20     A   Psychiatric diagnoses, that's right.
21     Q   And aren't there similar publications published
22  by the AMA and the association of forensic pathology
23  groups that recognize legitimate diagnoses in the field?
24     A   I'm not aware of that kind of handbook --

Page 35

1      Q   Okay.
2      A   -- like the DSM IV for something like forensic
3  pathology.
4      Q   For the reasons I think you've tried to explain
5  for us, you did not include excited delirium anywhere in
6  your autopsy; correct?
7      MS. DINKLER:  Asked and answered.
8      A   Correct.
9  BY MR. DICELLO:
10     Q   And the term "excited delirium" doesn't appear
11  on any work product that you generated in connection with
12  Mr. Richardson's death; correct?
13     A   Correct.
14     Q   Excluding any conversations you've had with
15  your attorneys in this case, have you ever suggested to
16  anyone that Mr. Richardson died from excited delirium?
17     MS. DINKLER:  Objection to form.
18     Go ahead.
19     A   No.
20  BY MR. DICELLO:
21     Q   The medical literature that you've told me you
22  reviewed in advance of today's deposition, did you review
23  that medical literature prior to issuing your autopsy
24  report in June of 2012?

Page 36

1      A   Not all of it, but probably some of it.
2      Q   Did you document anywhere in your file what
3  medical literature you reviewed?
4      A   No.
5      Q   Did you rely on any of that literature to come
6  to your conclusions in the autopsy?
7      A   Well, I rely on my working knowledge of the
8  literature all the time.  So I guess that would be true in
9  some ways, yes.
10     Q   And how did you access this medical literature
11  where you were kind enough to share with me the authors of
12  the medical literature?  A lot of doctors have different
13  ways of doing that, Doctor.  How do you access this
14  literature?
15     A   The textbooks I would own or the office would
16  own in the library.  And then the articles would be
17  through internet searches.
18     Q   What textbooks did you review, if any?
19     A   Well, you mentioned --
20     Q   Di Maio.
21     A   Of course, he's written multiple textbooks.
22     Q   Yeah.
23     A   And I'm not limiting my review of his writings
24  just to the excited delirium text.  So what's your

Page 37

1  question?

2  Q  I'm just trying to understand what textbooks

3  did you review versus what articles did you look at?

4  MS. DINKLER:  And this is in what time period?

5  BY MR. DICELLO:

6  Q  Prior to issuing your autopsy.

7  A  Oh, okay.

8  MS. DINKLER:  So before.  Before the autopsy.

9  A  2012, I would not be able to recall the exact

10  writings I reviewed at that time.

11  BY MR. DICELLO:

12  Q  And how about in advance of today's deposition?

13  Can you tell me which texts versus which articles?

14  A  Di Maio's Handbook of Forensic Pathology as

15  well as his main forensic pathology text, I think it's

16  just called Forensic Pathology.  Excited Delirium text I

17  read years ago.  I have not referred to that recently.

18  Q  So that's the only texts you reviewed, were --

19  A  No, Spitz and Fisher, Medicolegal Death

20  Investigation, I reviewed that.

21  Q  Spitz and Fisher, you regard those authors as

22  reliable sources?

23  A  Well, you know, I'm asked that question all the

24  time.

Page 38

---

1  Q  Yeah.

2  A  It's always asked in the vein do you agree with

3  it, if it's written, do you agree with it.  No, I don't,

4  okay?

5  Q  But it's a text that you refer to in your work?

6  A  Sure.

7  Bernard Knight, forensic pathology text, I have

8  used that many times over the years.

9  Q  And Spitz, it's Werner Spitz?

10  A  Correct.

11  Q  And his son Daniel?

12  A  Correct.

13  Q  That's a book that you have at the coroner's

14  office?

15  A  Yes.

16  Q  All right.  Did you refer to the Spitz text in

17  -- before sitting for today's deposition?

18  A  No.

19  Q  And so we've talked about the Di Maio text and

20  some other texts.  But all the other folks on here that

21  you listed, Hollaran, Chan, Reay, and others, those are

22  the actual articles that you reviewed?

23  A  Articles or editorials or summaries of

24  literature.

Page 39

---

1  Q  How did you access these articles?

2  A  Through the internet.

3  Q  And what portal or source do you use?

4  A  Multiple.  I would not -- You mean like what

5  search engine, or --

6  Q  Yeah.

7  A  I just Google, or MEDLINE.

8  Q  MEDLINE?

9  A  Yeah.

10  Q  What were your search terms?

11  A  Probably just restraint to deaths, restraint

12  asphyxia, prone or hog-tie positions.  That's probably

13  about it.  Where I got most of those.

14  Q  Did you print any of these articles out?

15  A  Yes.

16  Q  And where are those articles?

17  A  Several of them are right in there.

18  Q  Okay.  Can you retrieve those for me, please?

19  MS. DINKLER:  Are you wanting to take a break?

20  MR. DICELLO:  Sure.

21  (Recess taken.)

22  BY MR. DICELLO:

23  Q  We're back on the record, Doctor, after you

24  were kind enough to go retrieve the medical literature

Page 40

---

1  that's contained in the file you brought with you to

2  today's deposition.  Those -- Do you remember when we

3  started out the deposition, you had a file with you, you

4  then stepped out of the room with Ms. Dinkler and

5  Mr. Pregon, and came back in with the two documents you've

6  identified as Exhibit 1 and 2 for the Casto deposition;

7  correct?

8  A  Correct.

9  Q  So the medical literature that you just

10  referred to me was removed from the file while you were

11  out of the room?

12  MS. DINKLER:  Objection to form.

13  A  That's correct.

14  BY MR. DICELLO:

15  Q  Did you remove that from the file or did

16  Ms. Dinkler?

17  MS. DINKLER:  I did, because I didn't know if

18  it was anything that he was referring to or referencing in

19  terms of this deposition.

20  Go ahead.

21  A  That's true.

22  BY MR. DICELLO:

23  Q  And I think what Ms. Dinkler said on the record

24  is that -- or maybe it wasn't on the record, was that she

Page 41

1    was going to remove all of the documents in there that
2    were subject to some kind of attorney/client privilege.
3    Were you instructed to look at the medical literature by
4    counsel?
5        MS. DINKLER:  Objection to form.  If he were,
6    he is instructed not to answer, because it would be
7    attorney/client privilege.  He did not bring an official
8    file, nor was he commanded to bring a file.  He brought a
9    folder that is of no, quote, unquote, "title," it's not an
10   official folder from anything.  He has -- He is going to
11   be identified not only as a lay witness but as an expert
12   witness.  There are protections to work product and
13   privilege.  It is those protections I was relying upon
14   with regard to the file.
15   BY MR. DICELLO:
16       Q    Did anybody instruct you to go find that
17   medical literature or did you do that on your own?
18       MS. DINKLER:  Objection to form.
19   You can't testify to anything that I told you,
20   but you can testify to things that I didn't tell you.
21       A    No.  Just my typical preparation for a
22   deposition.  It has nothing to do with someone telling me
23   to look up an article or review the literature.
24   BY MR. DICELLO:

Page  42

1        Q    Yeah, that's why I thought it was odd that
2    those materials were removed from the file.
3        A    And she had not seen those articles until at
4    this moment.
5        Q    Okay.
6        MS. DINKLER:  Move to strike.
7    BY MR. DICELLO:
8        Q    I guess what I'm getting at, and I guess this
9    is a question for Ms. Dinkler, is --
10       MR. DICELLO:  What other non-privileged
11   documents are in a file that this witness brought with him
12   to this deposition?  Because as he told me, he believed it
13   was relevant documents in there, that have been withheld
14   in addition to the medical literature.  Because I think
15   you'll agree the medical literature isn't privileged;
16   correct?
17       MS. DINKLER:  And you're receiving it.  It's
18   being copied.
19       MR. DICELLO:  Right.  So why wasn't that turned
20   over.
21       MS. DINKLER:  He had communication from my
22   office.
23   BY MR. DICELLO:
24       Q    How thick is this medical literature, a inch or

Page  43

1    two?
2        A    Quarter inch, half inch.
3        Q    All right.
4        MS. DINKLER:  There's six documents being
5    copied for you that are his literature.  On top of that,
6    there was communication from my office, which I saw.  And
7    I saw this.  I did not thumb through everything that was
8    in the folder.  He was not asked to bring a folder.  He
9    was not subpoenaed to bring a folder.  I've given you
10   Exhibits 1 and 2.  You're getting the medical literature,
11   which I was not aware he relied upon, he was not commanded
12   to bring anything, and the communications from my office
13   are not being produced.
14   BY MR. DICELLO:
15       Q    Doctor, other than any correspondence from
16   Ms. Dinkler's office, what was in your file you brought
17   with you to the deposition?  I'm sorry we're taking so
18   much time on this.
19       A    That's okay.  These two documents.
20       Q    Referring to Exhibits 1 and 2 for the Casto?
21       A    That's correct.
22       Q    Okay.
23       A    The literature that I think they're making a
24   copy of.

Page  44

1        Q    Anything else?
2        A    And the medical records I referred to earlier.
3        Q    Okay.
4        MR. DICELLO:  Will you retrieve them?
5        A    Again, I don't know, ten pages of NaphCare and
6    the 2010 complaint.
7        MR. DICELLO:  Can you retrieve the medical
8    records for us, too, so we can --
9        MS. DINKLER:  Yes.  Those are documents that he
10   received from my office, that is work product, and they're
11   documents that were exchanged here.  And he's already
12   testified that he reviewed them and didn't rely upon them.
13   Is that correct?
14       MR. DICELLO:  Well, how is it work product?
15   You didn't create those records.  They're hospital records
16   of my client.  How is that work product?
17       MS. DINKLER:  He received them from me.
18       MR. DICELLO:  So?  So what?  How does that make
19   them work product?  Am I missing something?
20       MS. DINKLER:  I'll go through them and see if
21   there's any notes that need to be redacted from them on
22   another break.  Do you want me to go do that now?
23       MR. DICELLO:  What I wanted to do was just
24   review his file while he was here.

Page  45

1    MS. DINKLER: Well, you refer to this, Nick,
2  and I'm not trying to be difficult or get off on a bad
3  foot, but you refer to this as a file that the doctor was
4  commanded to bring.
5    MR. DICELLO: He called it a file.
6    MS. DINKLER: That's not it.
7    I didn't say I commanded him. I
8  said, "Doctor, is that your file" and he goes, "yeah,
9  that's my file."
10    THE WITNESS: It's a manilla folder.
11    MS. DINKLER: It's a folder. It's not a file,
12  quote, unquote.
13    MR. DICELLO: Okay.
14  BY MR. DICELLO:
15    **Q So the manilla folder you brought with you.**
16  **I'm not trying to make this something it's not.**
17    A Yeah, it's a manilla folder with paper in it.
18  When you say "file," that's what I --
19  BY MR. DICELLO:
20    **Q That's what I meant.**
21    A We've already talked about the official file at
22  the coroner's office.
23    MS. DINKLER: I have produced the official
24  file, in discovery, of the coroner office so that we

Page 46

1  were prepared for today.
2  BY MR. DICELLO:
3    **Q Well, Doctor, I appreciate you bringing those**
4  **materials in your manilla folder and, hopefully, we'll get**
5  **this sorted out sooner rather than later.**
6    **But while we're waiting for the materials from**
7  **your manilla folder that you brought with you, let me see**
8  **if I can get some information about your background a**
9  **little bit, Doctor.**
10    A Okay.
11    **Q When did you become licensed to practice**
12  **forensic pathology?**
13    A Well, I got an Ohio training license during my
14  fellowship, and probably my permanent license somewhere
15  around 2002.
16    **Q Are you licensed to practice medicine in the**
17  **State of Ohio?**
18    A Yes.
19    **Q Any other states?**
20    A Indiana.
21    **Q How long have you been practicing forensic**
22  **pathology in Ohio?**
23    A Including my fellowship years? Since 2002.
24    **Q And when was it that you completed your**

Page 47

1  fellowship in forensic pathology?
2    A 2004.
3    **Q In 2004, where did you go to practice forensic**
4  **pathology?**
5    A Stayed at the place of my fellowship, at
6  Montgomery County Coroner's Office.
7    **Q What is your position at the coroner's office?**
8    A I'm one of the deputy coroners for the
9  pathologist. I'm also the Director of Operations, which
10  basically means I'm in charge of the morgue, the
11  investigations, and photography.
12    **Q Is that a full-time position ever since you've**
13  **been employed with the Montgomery County Coroner's Office**
14  **after your fellowship?**
15    A Yes.
16    **Q Have you held any other professional jobs or**
17  **positions where you've been practicing forensic pathology,**
18  **other than Montgomery County Coroner's Office?**
19    A I did some --
20    THE WITNESS: I'm sorry.
21    MS. DINKLER: Pass that down to the court
22  reporter.
23    THE WITNESS: Okay.
24  BY MR. DICELLO:

Page 48

1    **Q Answer this question and then we'll be able to**
2  **move on to the documents.**
3    A Okay. Repeat it.
4    **Q It sounds to me like you had a fellowship in**
5  **forensic pathology at Montgomery County Coroner's Office,**
6  **and then you said, I stayed there for my employment and**
7  **I've been practicing forensic pathology there as a deputy**
8  **county coroner and some other things you described since**
9  **2004. My question is: Have you had any other**
10  **professional positions outside of your employment history**
11  **with Montgomery County where you've practiced forensic**
12  **pathology?**
13    A For pay or just any --
14    **Q Let's start with the for pay.**
15    A Okay. I have done some medical/legal
16  consultation for a local attorney in Dayton for about a
17  year and a half.
18    **Q You said -- Did you say a local attorney?**
19    A Uh-huh.
20    **Q Who was that?**
21    A Dwight Brannon.
22    **Q Dwight Brannon?**
23    A Correct.
24    **Q What kind of law does Mr. Brannon practice?**

Page 49

13 (Pages 46 to 49)

1          MS. DINKLER:  Objection.

2          If you know.

3       A   I do not know.

4   BY MR. DICELLO:

5       Q   Well, what kind of cases was Mr. Brannon having

6   you review?

7       A   They were medical-legal, medical malpractice

8   cases, I guess.  But I do not know if that's the limit of

9   his practice.

10      Q   Was Mr. Brannon representing plaintiffs or the

11  defendants?

12      A   I do not know.

13      Q   Do you know if he was representing a healthcare

14  provider or a patient?

15      A   I do not know.

16      Q   Did you issue any reports in connection with

17  any cases Mr. Brannon retained you on?

18      A   Yes.

19      Q   How many times, approximately, did Mr. Brannon

20  retain you for medical/legal consultation?

21      A   Probably ten cases probably.

22      Q   Ten cases all within that -- how long did you

23  say, about --

24      A   Year and a half.

Page 50

---

1       Q   Year and a half?  Yes?

2       A   Yes.

3       Q   Were you ever deposed in connection with those

4   cases?

5       A   I believe in one case.

6       Q   Did you ever testify at trial in any of those

7   cases?

8       A   Prepared to, but it settled.

9       Q   What was the name of the case you were deposed

10  in if you remember?

11      A   I do not know.

12      Q   Did it involve any issues that are at issue

13  similar to Mr. Richardson's death?

14      A   No.  It was a natural death, it was a cardiac

15  death.

16      Q   Were you providing causation opinions?

17      A   Yes.  Most of my work with Mr. Brannon was as a

18  screener to direct him, reviewing records and directing

19  him, hey, I don't think there's anything here, or he would

20  ask me specific questions about issues on particular

21  cases.

22      Q   Sure.  Did you have an understanding that at

23  some point in time someone from Mr. Brannon's office

24  represented Robert Richardson?

Page 51

---

1       A   Oh, I had no idea about that.

2       Q   Would that have represented any kind of

3   conflict for you as a coroner --

4          MS. DINKLER:  Objection.

5   BY MR. DICELLO:

6       Q   -- if Mr. Brannon, someone from Dwight

7   Brannon's office researched Mr. Richardson?

8          MS. DINKLER:  Objection to form, time, and

9   scope.  No foundation.

10      A   Well, I work with attorneys that I know all the

11  time, so --

12  BY MR. DICELLO:

13      Q   Sure.

14      A   No, I cannot see that that would be a problem.

15      Q   All right.  I presume you were an independent

16  contractor?

17      A   Correct.

18      Q   And did you have any kind of incorporated

19  business that these medical/legal evaluation consultation

20  fees were paid into, or was it just --

21      A   No.

22      Q   -- you personally?

23      A   Personally.

24      Q   All right.  Have you reviewed any cases for any

Page 52

---

1   other attorneys other than Mr. Brannon?

2       A   No.

3       Q   It sounds to me that you did that for about a

4   year and a half; correct?

5       A   Correct.

6       Q   From when to when?

7       A   I do not know.  It's been within the past six

8   years probably.

9       Q   And it sounds to me like you stopped doing that

10  at some point?

11      A   That's right.

12      Q   What were the circumstances surrounding you no

13  longer doing that kind of work?

14      A   He sued our office.

15      Q   Mr. Brannon sued the coroner?

16      A   That's right.

17      Q   Okay.  Why did Mr. Brannon sue the coroner's

18  office?

19      A   A case unrelated to me.  And of course that

20  created hard feelings, so I offered to stop working for

21  Mr. Brannon.

22      Q   Have you ever -- Were you a named defendant in

23  that case?

24      A   No, no.

Page 53

---

14  (Pages 50 to 53)

1    Q   Okay.

2    A   I had no connection to the case.  It was a

3  separate issue.

4    Q   Have you ever worked for any other attorneys in

5  medical/legal expert review?

6    MS. DINKLER:  Asked and answered.

7    Go ahead.

8    A   No.

9  BY MR. DICELLO:

10   Q   So you were telling me what other kind of

11 professional employment you've had as a forensic

12 pathologist outside of Montgomery County.  You told me

13 about the medical/legal reviews for Mr. Brannon.  Anything

14 else?

15   A   Everything else has been volunteer lectures,

16 Wright State School of Medicine, local forensic meetings.

17   Q   I did receive a copy of your CV.  I don't know

18 if it's updated or not.  But it does show some research

19 experience.  Let me ask you:  Have you been published in

20 any peer review journals?

21   A   Yes.

22   Q   And have you published in any peer review

23 journals on any of the topics that are at issue in

24 Mr. Richardson's death?

Page 54

1    A   No.

2    Q   Have you ever been published in any peer review

3  journals on the issue of positional asphyxiation?

4    A   No.

5    Q   Or restraint asphyxiation?

6    A   No.

7    Q   We have now Plaintiff's Exhibit 3 that has your

8  name at the bottom, Doctor.

9    (Exhibit No. 3 marked for identification.)

10   A   Okay.

11 BY MR. DICELLO:

12   Q   Is this the medical literature you had in your

13 manilla folder that you brought with you to your

14 deposition?  Take a look at it.

15   A   Yes.

16   Q   And now having the benefit of actually looking

17 at the medical literature that you printed out, does this

18 refresh your recollection at all if this is stuff that you

19 read before issuing your autopsy report, or after?

20   MS. DINKLER:  Objection to form.

21   A   No, it does not.

22 BY MR. DICELLO:

23   Q   Okay.  In your own mind, do you recall having

24 looked at some medical literature in advance of this

Page 55

1  deposition that you didn't look at before you issued your

2  autopsy?

3    MS. DINKLER:  Objection to form.

4    A   Well, it's hard -- hard to answer that, because

5  I don't recall exactly what I reviewed back in 2012.

6  BY MR. DICELLO:

7    Q   When did you retrieve this information?  It

8  looks like this was all off the internet.  When did you

9  retrieve the documents that are contained in Exhibit 3?

10   A   Last week, I believe.

11   Q   Have you read all of this?

12   A   Yes.

13   Q   So between last week and today, you read what

14 is Exhibit 3?

15   A   That's correct.

16   Q   Doctor, how many autopsies have you performed?

17   A   About 3,700 at this point.

18   Q   And you were the lead forensic pathologist on

19 all 3,700 of those?

20   A   Yes.

21   Q   How many autopsies have you performed that

22 involved folks who died at the Montgomery County Jail?

23   A   We do not have an easy way of searching that on

24 our computer system.  But jail deaths as a group are not

Page 56

1  that uncommon.  So I would say dozens.

2    Q   Dozens?

3    A   I would say dozens of jail deaths.  I would not

4  be able to separate those out from Montgomery County,

5  because we do autopsies for numerous counties.

6    Q   Did you use a county computer to search for and

7  retrieve what is in your Exhibit 3 here for your

8  deposition?

9    A   That's right.

10   Q   Where is that computer located?

11   A   In my office.

12   Q   And we could go look at the search history and

13 figure out what you searched for and what you looked at;

14 right?

15   A   I don't know.

16   MS. DINKLER:  Objection: form.

17 BY MR. DICELLO:

18   Q   I'm going to ask you not to clear your search

19 history in case we may ask to see what it is that you

20 searched and when you searched for it, okay?

21   A   Okay.  I do that regularly, so I have no idea

22 whether it's there or not.

23   Q   Of the dozens of jail deaths that you have

24 investigated, how many have you concluded were homicides

Page 57

15 (Pages 54 to 57)

1   at the hands of corrections officers?
2   A   None.
3   Q   Zero?
4   A   That's right.
5   Q   Including Mr. Richardson?
6   A   Correct.
7   Q   How many have you found of the dozens of jail
8   deaths that you've performed autopsies on, how many have
9   you found were the result of an accident?
10  A   Probably just a few.
11  Q   Including Mr. Richardson?
12  A   Yes, correct.
13  Q   Are you a member of any professional
14  organizations, Doctor?
15  A   Yes.
16  Q   Can you list those for me?
17  A   Yeah.  Currently American Academy of Forensic
18  Sciences and the National Association of Medical
19  Examiners.  In the past, numerous other general pathology
20  organizations.  I'm no longer current with those.
21  Q   Are you board certified in any specialty?
22  A   No.
23  Q   Have you ever sought board certification?
24  A   Yes.

Page 58

1   Q   When did you first seek board certification?
2   A   Probably 2004.
3   Q   And was there a written examination associated
4   with that?
5   A   Yes.
6   Q   Did you pass that portion?
7   A   No.
8   Q   Did you pursue board certification again after
9   2004?
10  A   Yes.
11  Q   What year?
12  A   Probably just the following year.
13  Q   2005?
14  A   Uh-huh.
15  Q   Did you sit for the written portion of the
16  examination?
17  A   Correct.
18  Q   Did you pass it on the second attempt?
19  A   No.
20  Q   Did you seek board certification again?
21  A   Probably 2006.
22  Q   Okay.  And you sat for the test a third time?
23  A   Right.
24  Q   Did you pass it that time?

Page 59

1   A   No.
2   Q   Did you try again?
3   A   No.  And that would be for anatomic pathology
4   is what we're talking about.
5   Q   Were the results of these written examinations
6   published for you?
7   A   Usually it's just a letter pass or fail.
8   Q   Does the letter indicate your score on the
9   test, what section you didn't pass?
10  A   No.
11  Q   Why was it that you were pursuing board
12  certification in '04, '05, and '06?
13  A   Well, board certification is desirable.  Not
14  only as a qualification, but also for compensation.  It's
15  not required --
16  Q   Understood.
17  A   -- of me.  But it is a desirable thing.  And in
18  my setting, you have to pass general pathology boards
19  before you can even sit for forensic boards.
20  Q   Okay.
21  A   So to gain access to forensic board
22  certification, I needed to go through anatomic and
23  clinical pathology.  And so the three settings were all
24  for anatomic.

Page 60

1   Q   Is board certification a recognition by one's
2   peers in their field of obtaining a level of expertise in
3   the field?
4   A   I do not know.  Everyone views board
5   certification with different levels of competency.  Some
6   hold it very high, some feel like it's a hoop to jump
7   through.
8   Q   What board were you applying to?
9   A   This would be the American Board of Pathology.
10  Q   Have you abandoned any efforts to seek board
11  certification?
12  A   Yes.
13  Q   Do you subscribe to any -- Do you or through
14  the coroner's office, Doctor, subscribe to any medical
15  journals or literature?
16  A   Well, both the American Academy of Forensic
17  Sciences and NAME, both produce their own journals, which
18  do come with membership.
19  Q   And what are those journals?
20  A   I would not be able to give you an exact title.
21  Q   In addition to the official journal of the AAFS
22  and the NAME, do you either through your employment or
23  personally regularly receive any other medical journals in
24  your field?

Page 61

16 (Pages 58 to 61)

## Page 62

1    A    We receive something called a check sample.

2    Q    What is that?

3    A    It's a -- Basically, a mail -- by mail

4    publication.  It may contain photographs, microscopic, it

5    may not.  It varies.  It's usually geared towards a

6    specific topic.  And we go through those as a group at

7    times, mainly for CME efforts.

8    Q    Any other journals that you regularly receive?

9    A    No.

10    Q    Ever heard of UpToDate, Doctor?

11    A    UpToDate?

12    Q    Yeah.

13    A    No.

14    Q    UpToDate is not a resource that you use in your

15    practice?

16    MS. DINKLER:  Objection to form, lacks

17    foundation.

18    A    No.

19    BY MR. DICELLO:

20    Q    Any other online resources that you regularly

21    refer to or use in your practice?

22    A    Beyond just MEDLINE type searches?

23    Q    MEDLINE is one?

24    A    Yeah, sure.

Page 62

## Page 63

1    Q    And you said Google?

2    A    Right.

3    Q    Anything else that you use?

4    A    No, that would be the two main ways.

5    Q    All right.

6    A    And that's in addition to meetings, of course.

7    Q    Yeah.  And I think that you --

8    MS. DINKLER:  In addition to what?

9    THE WITNESS:  Meetings.

10    MS. DINKLER:  Meetings, okay.

11    BY MR. DICELLO:

12    Q    I think you told me about some texts that you

13    have access to and refer to; right?

14    A    Correct.

15    Q    Any others that you generally refer to?

16    A    General pathology text, Robbins' Pathologic

17    Basis of Disease is a common text we might refer to.

18    Q    What about any handbooks or guidelines?  For

19    example, are you familiar with the Medical Examiner's

20    Handbook that is published by the federal government?

21    A    No.

22    Q    Any other handbooks or guidelines that you're

23    familiar with that apply in your field?

24    A    Sure.  The National Association of Medical

Page 63

## Page 64

1    Examiners has forensic autopsy performance standards or

2    guidelines that have been published.

3    Q    Do you do your best to try to adhere to those?

4    A    Yes.

5    Q    And do you have access to those in your office?

6    A    Yes.

7    Q    Do you agree that in order to stay competent in

8    your field of practice, a forensic pathologist has to stay

9    current on the medical literature and research in his or

10    her field?

11    A    You have to make an effort to learn new things,

12    yes.

13    Q    Okay.  Do you consider yourself a public

14    official?

15    MS. DINKLER:  Objection to form, calls for a

16    legal conclusion.

17    A    When you say "official," I think of an elected

18    official.  I'm not an elected official.  I'm a public

19    employee.

20    BY MR. DICELLO:

21    Q    The coroner in Montgomery County, is that

22    individual an elected position down here?

23    A    Yes, it is.

24    Q    And is that who you report to, Dr.

Page 64

## Page 65

1    Harshbarger?

2    A    One of them, yes.

3    Q    And is Dr. Harshbarger the person who hired

4    you?

5    MS. DINKLER:  Objection to form.

6    A    No.

7    BY MR. DICELLO:

8    Q    Who hired you over there at the coroner's

9    office?

10    MS. DINKLER:  Objection to form.

11    A    A pair of people, former elected coroner Jim

12    Davis.

13    BY MR. DICELLO:

14    Q    Yep.

15    A    And then the director of the crime lab, Ken

16    Betz.

17    Q    Do you know any Montgomery County corrections

18    officers?

19    A    No.

20    Q    Have you worked with any of them over the

21    course of your career at the coroner's office?

22    A    Oh, sure.

23    Q    Who are some of the folks that you've had

24    occasion to work with on any kind of regular basis?

Page 65

**Page 66**

1     A  I would not work with a corrections officer on

2  a regular basis. It would be on a case-by-case, and

3  generally it would be only through their reports.

4     Q  What about anybody from the Montgomery County

5  Sheriff's Office? Do you know anybody in the sheriff's

6  office?

7     A  Oh, sure. Detectives mainly.

8     Q  Let me start just first personally. Are you

9  personally friends with any folks from the sheriff's

10  office?

11     A  Outside of work, do you mean?

12     Q  Yeah.

13     A  No.

14     Q  And then through your professional activities,

15  there are folks over at the sheriff's office that you work

16  with on some kind of regular basis?

17     MS. DINKLER: Objection to form.

18     A  Over the years, I've encountered regular

19  detectives, and then of course they move on or retire or

20  whatever.

21  BY MR. DICELLO:

22     Q  Who are those folks by name?

23     A  One would be Mike Clymer was a long time

24  detective.

**Page 67**

1     Q  Uh-huh.

2     A  And I only know Hutch as Hutch. Hutchinson is

3  his last name. I do not know Hutch's first name.

4     Q  Okay, Hutch. Anybody else?

5     A  Just faces. I can't recall names.

6     Q  Now, it's my understanding that the sheriff's

7  office can attend autopsies; correct?

8     A  Oh, absolutely.

9     Q  Is that something that a representative from

10  the family member of the decedent is ever offered, or no?

11     A  What's your question?

12     Q  It's my understanding that the coroner can

13  invite and permit members from the Montgomery County

14  Sheriff's Office to attend autopsies, and I think you told

15  me that's correct; yes?

16     A  Yes.

17     Q  Is the representative for the decedent ever

18  given that same opportunity, or no?

19     MS. DINKLER: Objection to form.

20     A  You mean the attorney or --

21  BY MR. DICELLO:

22     Q  Sure.

23     A  I've never encountered that scenario, so I

24  would not know if that would be permitted.

**Page 68**

1     MS. DINKLER: Assumes facts not in evidence.

2  BY MR. DICELLO:

3     Q  So independent of your review of the medical

4  records and of your documentation that you reviewed in

5  advance of today's deposition, do you have any independent

6  memory of Mr. Richardson's death or autopsy?

7     A  No.

8     Q  I saw one photograph of what appears to be a

9  doctor, it may not be a doctor, but somebody who was

10  rolling Mr. Richardson over on his back, and there was a

11  photograph taken of the back. And that individual was

12  African American. So I know it wasn't you. Who else was

13  present during the autopsy?

14     A  Well, the person you're describing --

15     Q  Yeah, start there.

16     A  Is Peter Lane.

17     Q  And what is Mr. Lane's position?

18     A  He's no longer with us. But at that time he

19  would have been a morgue technician.

20     Q  Are you required to document who attends an

21  autopsy?

22     A  Well, yes. Well, we do it by practice. We're

23  not required to.

24     Q  Did a member from the Montgomery County

**Page 69**

1  Sheriff's Office attend Mr. Richardson's autopsy?

2     A  I do not recall.

3     Q  I've looked at your documentation and I see

4  documentation where people are referenced, and it doesn't

5  include anyone from the Montgomery County Sheriff's

6  Office.

7     A  That's right.

8     Q  So we can assume that nobody from the

9  Montgomery County Sheriff's Office was there at the

10  autopsy; correct?

11     A  Yes.

12     Q  So I want to go about this, maybe, Doctor, it

13  would help me to kind of go through by habit and practice

14  how the -- what the protocol is for an in-custody death

15  like we have here, knowing that you don't have a specific

16  recollection, and then I've got documents and we can refer

17  to documents. But can you kind of walk me through what

18  the time line is by habit and practice, what happens when

19  somebody is ruled to be deceased at a jail and the coroner

20  needs to be contacted? Can you maybe walk me through the

21  steps of what happens?

22     A  Okay. The first thing that would happen would

23  be the death would be reported to us, either by if the --

24  if the inmate makes it to the hospital, that report might

1  come from the hospital. If they're pronounced at the
2  jail, then it may come from an employee or a medic at the
3  scene. And that call would go to our coroner's
4  investigator. We have several. And so they would
5  document in a written report the details and answers to
6  their questions as best as possible to provide a basic
7  history of what kind of case we're dealing with.
8      Q   Okay.
9      A   And then that information would generally be
10 presented to all the pathologists in a morning meeting.
11 And if it happens during the daytime, then it may be just
12 presented to the pathologist that's going to do the
13 autopsy.
14     Q   How is a pathologist selected to do any given
15 autopsy?
16     A   There's really no -- We don't have a system for
17 assigning pathologists.
18     Q   So when you said that you had done dozens of
19 jail custody deaths, were you referring to yourself specifically
20 or to the office generally?
21     A   Myself.
22     Q   Is there any kind of one pathologist takes the
23 jail custody deaths over another, or are they pretty
24 evenly distributed?

Page 70

1      A   No, it's random.
2      Q   Got it.
3          So once you are as a pathologist assigned to a
4  jail custody death, what is the next step?
5      A   Well, keep in mind when you asked me about jail
6  deaths I wasn't referring just to custody restraint type
7  deaths. I hope we understand that.
8      Q   Yeah. Thank you for the clarification.
9          So what's your question?
10     Q   After someone like you or after you, one of the
11 pathologists is assigned to a jail death, what is the next
12 step for the coroner's office?
13     A   Well, we would -- every autopsy begins with the
14 history or the story, what do we know about the person and
15 circumstances as best as possible, as much detail as
16 possible prior to the autopsy. So we would gather that
17 through our coroner's investigator. If an officer attends
18 the autopsy, then we would continue to have that exchange
19 of information. Once we feel like we have all the
20 available information submitted to us that's currently
21 known about the case or currently available, then we would
22 actually proceed to the actual autopsy.
23     Q   So up to this point in time, you're gathering
24 your information from the folks who work at the jail;

Page 71

1  correct?
2      MS. DINKLER: Objection to form.
3      A   From whatever sources are available. Are you
4  speaking of Mr. Richardson specifically?
5  BY MR. DICELLO:
6      Q   Sure, if you want to use that as an example. I
7  think you said we talk with the officers to get as much
8  information as we can about the circumstances.
9      A   Right.
10     Q   So it sounds to me like you are talking to
11 people who are employed at the Montgomery County Jail to
12 gather the circumstances?
13     MS. DINKLER: Objection to form.
14     Go ahead.
15     A   The first person we talked to is actually a
16 Dayton fireman or paramedic.
17 BY MR. DICELLO:
18     Q   All right.
19     A   He's the one reporting the death. So I have no
20 idea if Paramedic McGinnis is employed in other ways. But
21 he has identified himself as a Dayton paramedic for Dayton
22 Fire.
23     Q   And this is going to -- this information is
24 being gathered by an investigator?

Page 72

1      A   Correct.
2      Q   And this is -- The investigator in
3  Mr. Richardson's case was Mr. Jim Fannin?
4      A   That's correct.
5      Q   Is Mr. Fannin a physician?
6      A   No. He's a former officer, police officer.
7      Q   Former police officer?
8      A   That's right.
9      Q   For what municipality?
10     A   Sheriff's department, Montgomery County.
11     Q   So the coroner's office's lead investigator on
12 the Robert Richardson case is a former Montgomery County
13 Sheriff's Office employee; correct?
14     A   That's right.
15     Q   And you're relying on Mr. Fannin gathering
16 sufficient information that you can then do your job;
17 correct?
18     A   In part, yes.
19     Q   And Mr. Fannin, I understand, actually went to
20 the jail; correct?
21     A   He did.
22     Q   Did you ever go to the jail?
23     A   Not in this case.
24     Q   Did you then just observe photographs of what

Page 73

1    Mr. Fannin saw at the jail?
2    A    That's right.
3    Q    Did you interview any corrections officers?
4    A    No.
5    Q    Did Mr. Fannin?
6    A    He did speak to -- He talks about speaking to
7    multiple correction officers at the scene. But I do not
8    know if that is interviewing them or just, you know, just
9    being hosted by them in the jail.
10   Q    Did you interview any of the eyewitness
11   detainees who saw what happened to Mr. Richardson?
12   A    No, I did not.
13   Q    Did Mr. Fannin interview any of those
14   detainees?
15   A    No.
16   Q    Did you contact any family members of
17   Mr. Richardson before starting your autopsy?
18   A    No.
19   Q    Did Mr. Fannin contact any family members?
20   A    Yes. He would have notified the decedent's
21   grandparents of the death.
22   Q    Did he include any information that he obtained
23   from the grandparents?
24   A    Not in his report, no.

Page 74

1    Q    So I should have asked you. Based on the
2    number of autopsies you've done, I think you told me it's
3    about 3,700; correct?
4    A    Correct.
5    Q    How many times have you included in a cause of
6    death positional asphyxia?
7    A    Quite a few. Usually with infants.
8    Q    Outside of the infant context, how many times
9    have you concluded or included positional asphyxia as a
10   cause of death in an adult autopsy?
11   A    I would just have to say several.
12   Q    Some people say several, they mean three. Some
13   people say several, they mean a hundred.
14   A    Well, it would not be a hundred.
15   Q    Yeah.
16   A    I would not have an exact number. Have I used
17   the diagnosis in adults more than once? Sure, yeah.
18   Q    More than five times?
19   A    Actually probably so, yes.
20   Q    More than ten?
21   A    I do not know.
22   Q    So somewhere between five and ten you're
23   comfortable saying that you've included positional
24   asphyxia as a cause of death in an adult autopsy?

Page 75

1    A    Sure.
2    Q    And do you differentiate between positional
3    asphyxia and restraint asphyxia in an autopsy if you were
4    faced with a restraint asphyxia?
5    MS. DINKLER: Objection to form.
6    A    Well, some people seem to make a big difference
7    between the two. I'm not sure I see their point about
8    that.
9    BY MR. DICELLO:
10   Q    Have you ever included the term "restraint
11   asphyxia" in an autopsy?
12   A    No.
13   Q    Of the five to ten positional asphyxias that
14   you have included in your cause of death, have any of
15   those been as a result of restraint?
16   A    By someone else, you mean?
17   Q    Yes.
18   A    I don't think so, no.
19   Q    Do you consider yourself an expert in restraint
20   asphyxia?
21   A    No. I have a working knowledge of it, but I'm
22   not published or no one is knocking down my door asking to
23   talk about it, no.
24   Q    Except me?

Page 76

1    A    Yeah, except you.
2    Q    So I'm going to hand you another exhibit and
3    I'm going to try not to get too much paper in front of
4    you, Doctor.
5    (Exhibit No. 4 marked for identification.)
6    BY MR. DICELLO:
7    Q    But this is number four. Casto. Handing you
8    what's been marked as Plaintiff's Exhibit 4, it says your
9    name on the bottom, Doctor, and there's Bates stamps at
10   the bottom of this that start out MC 3206, and they should
11   go sequentially, all the way up to MC 3293. And this was
12   produced by Montgomery County in this litigation. And I
13   just want to have you review it and tell me whether or not
14   that is the sum and substance of the materials that were
15   produced by your office. And if you're going through
16   there and you see something that isn't in there, let me
17   know. Be careful. Some of those are two-sided, some of
18   them aren't. Just the way I paginated them out.
19   A    (Reviewing document.)
20   Okay.
21   Q    I appreciate you taking the time to go through
22   that, Doctor. Is there any documentation that is a part
23   of the work product of the coroner's office that isn't
24   contained within that exhibit?

Page 77

1    A  Not to my knowledge, no.

2    Q  Nothing jumps out at you that says, hey, here's
3  this form that isn't in there or anything like that?

4    A  No.

5    Q  We talked about the slides and the medical
6  literature and the medical records.  But in terms of the
7  working file, is Exhibit 4 pretty complete?

8    MS. DINKLER:  Photographs, you talked about
9  that.

10    MR. DICELLO:  They're in there.

11  BY MR. DICELLO:

12    Q  Photographs are in there; right?

13    A  Yes.

14    MS. DINKLER:  Are all the photographs in there?

15    THE WITNESS:  I believe so.

16  BY MR. DICELLO:

17    Q  So my question is, that's -- You know, I'm not
18  going to hold you to it if we find another piece of paper
19  later, Doctor.  But based on your analysis of Exhibit 4
20  right now, that is more or less the complete working file
21  of the coroner's office for this case; is that true?

22    A  Yes.  And in fact, there are other documents in
23  here that I've never seen, like the DNA request for
24  paternity, things like that.

Page 78

---

1  certain risk factors associated with positional asphyxia
2  that a coroner needs to consider when rendering a
3  diagnosis; agreed?

4    A  Yes.

5    Q  Among the risk factors that make it more likely
6  that someone will die from positional asphyxia include the
7  following:  Obesity is a risk factor for positional
8  asphyxia; true?

9    A  Yes.

10    Q  And within the context of obesity, an obese
11  person that has a protuberant, if I'm saying that
12  correctly, or big belly is at an even higher risk of
13  positional asphyxia when placed prone; correct?

14    A  It can be, yes.

15    Q  And the reason for that is because a bigger
16  belly, when there's weight applied to the abdomen, either
17  by weight of the body from laying on top of it or
18  pressure, external pressure on a patient's back, can force
19  the contents of the belly up under the rib cage; correct?

20    A  Against the diaphragm.

21    Q  Correct?

22    A  In certain individuals, that's right.

23    Q  And that can restrict breathing; correct?

24    A  It can.

Page 80

---

1    Q  It just gets processed by your office?

2    A  That's right.

3    Q  I want to ask you some questions about
4  positional asphyxia and/or restraint asphyxia as you've
5  told us about.  But, Doctor, ultimately, people who suffer
6  death from positional asphyxia die from a fatal arrhythmia
7  of the heart; true?

8    A  That would probably be the final mechanism,
9  yes.

10    Q  Positional asphyxia, the terminal event
11  associated with positional asphyxia is a fatal arrhythmia;
12  correct?

13    A  That's right.

14    Q  And the terminal event that killed
15  Mr. Richardson was a fatal arrhythmia; true?

16    A  Yes.

17    Q  And that's the number one diagnosis you had on
18  your cause of death?

19    A  They have different etiologies, but --

20    Q  Understood.  But the number one diagnosis for
21  Mr. Richardson's cause of death according to you was a
22  fatal arrhythmia of the heart; true?

23    A  Correct.

24    Q  In terms of positional asphyxia, there are

Page 79

---

1    Q  And that can contribute to positional
2  asphyxiation death; correct?

3    A  As the theory goes, that's right.

4    Q  Do you subscribe to the theory of restraint
5  positional asphyxia causing death?

6    A  Well, why don't you define the theory?  What
7  are you referring to?

8    Q  Are you a doctor who more or less rejects the
9  theory of death by positional asphyxia in custody?

10    A  No.

11    Q  You accept that it happens?

12    A  Sure.

13    Q  Members of the community who are detained by
14  law enforcement die in this country from positional
15  asphyxiation; true?

16    A  Again, I probably would like you to define --
17  what are you -- when you say "positional asphyxia," what
18  do you mean?

19    Q  How do you define it?  I mean, that's more
20  important.

21    A  Well, positional asphyxia, restraint asphyxia
22  is referring to the idea that someone is in a position
23  where their ability to breathe effectively is impaired.

24    Q  Okay.

Page 81

21 (Pages 78 to 81)

1     A   And so in the setting of restraint asphyxia,
2   that is referring to -- that impairment is due to being
3   restrained, physically restrained, either by shackles,
4   handcuffs, individuals, all three, okay?
5     Q   (Nods head.)
6     A   And I actually prefer that term over positional
7   asphyxia, because, to me, positional asphyxia is used in
8   lots of other settings: drunk upside down between the bed
9   and the wall, someone in a car that's on its top.
10     Q   Going up the chimney, that kind of stuff?
11     A   I'm sorry?
12     Q   I said going up the chimney; right?
13     A   I'm not sure what you're referring to.
14     Q   You haven't heard of one of those yet?  Go
15   ahead.
16     A   Yeah, I do know what you're talking about.
17     Q   All right.
18     A   So if we're talking about restraint asphyxia,
19   it's this idea that you can place someone in a position of
20   restraint that is dangerous in their ability to breathe.
21     Q   So restraint asphyxia is a legitimate medical
22   condition that occurs; true?
23     A   Sure.
24     Q   And are you aware of people dying from

Page 82

---

1   restraint asphyxia at the hands of law enforcement being
2   reported in the medical literature?
3     A   Sure.  I mean, ten guys on someone's back is
4   restraint asphyxia.
5     Q   Okay.
6     A   That has happened, yes.
7     Q   So you recognize that it's a legitimate
8   diagnosis that happens, you've just never seen it;
9   correct?
10     A   Well, there's no -- There's no diagnostic
11   feature of restraint asphyxia.
12     Q   There isn't?
13     A   No.
14     Q   Okay.
15     A   In autopsy.  You can't do an autopsy and say
16   this is restraint asphyxia without taking in the
17   investigative information.
18     Q   So is it a diagnosis by exclusion?
19     A   I would not label it as that, no.
20     Q   But what I'm getting from you is one of the
21   rules that applies to a coroner they have to consider
22   all of the circumstances surrounding the time and place of
23   death when considering a diagnosis on autopsy; correct?
24     A   That's right.

Page 83

---

1     Q   And to exclude the surrounding facts and
2   circumstances of an in-custody death where somebody dies
3   with their hands cuffed behind their back while they're on
4   the ground would violate the rules that apply to a
5   forensic pathologist; correct?
6     A   Okay.  So what's your question?
7     Q   Yeah, that was a long-worded question.  Thank
8   you for following up.
9         I think you said one of the rules that applies
10   to coroners is they have to consider all the facts and
11   circumstances surrounding the time and place of death;
12   correct?
13     A   As best they can, that's right.
14     Q   Right.  And if a coroner were to come to a
15   diagnosis and exclude that information, that would be
16   inappropriate; right?
17     A   Yes.
18     Q   All right.  So with respect to restraint --
19     A   And by "exclude," you mean not consider it?
20     Q   Correct.
21     A   Okay.  Right.  Yes, I agree with that.
22     Q   The surrounding circumstances of a death cannot
23   be ignored; true?
24     A   Correct.

Page 84

---

1     Q   So back to the risk factors of positional or
2   restraint asphyxia.  And you've explained to us the subtle
3   difference that you're putting on those terms.  Do we
4   agree that drug use is a risk factor that puts someone at
5   an increased risk of positional asphyxia death?
6         MS. DINKLER:  Objection to the form of the
7   question.
8         Go ahead.
9     A   Being under the influence can certainly
10   increase your likelihood to die during restraint.
11   BY MR. DICELLO:
12     Q   Preexisting heart disease is a risk factor that
13   increases the risk of positional and restraint asphyxia;
14   true?
15     A   Yes.
16     Q   Cardiac hypertrophy is a risk factor that
17   increases the risk of positional and restraint asphyxia;
18   true?
19     A   It can, that's right.
20     Q   Pressure on the abdomen is a risk factor; yes?
21     A   Can be.
22     Q   Respiratory muscle fatigue is a risk factor
23   that puts someone at an increased risk of positional
24   asphyxiation death; correct?

Page 85

1    A    Sure.

2    Q    And sometimes when we say "respiratory muscle

3  fatigue," a layman's way of putting that is physical

4  exhaustion as a result of exertion; true?

5    A    That's right.

6    Q    So in other words, somebody who has been

7  struggling with another person is at a higher risk of

8  dying from positional asphyxia; true?

9    A    I would say can be. It depends on the

10  individual's condition.

11    Q    But when someone is struggling, their muscles

12  require more oxygen; true?

13    A    That's right.

14    Q    And if someone's breathing is inhibited, then

15  the tissues, the muscles don't get the oxygen, and that

16  can lead to death; correct?

17    A    That's right.

18    Q    That's what positional asphyxiation is; true?

19  Part of it? Part of positional asphyxiation is after a

20  struggle the tissues and the muscle tissues in the body

21  need more oxygen and they can't get it and that condition

22  contributes to the death; correct?

23    A    It can, yes.

24    Q    Cardiomegaly makes someone more susceptible or

1  mouth, while not exclusively consistent with positional

2  asphyxia death, is a sign that is consistent with a

3  positional asphyxiation death; true?

4    A    Can be, yes.

5    Q    Signs that someone during the struggle in the

6  prone restraint is having trouble breathing is a sign that

7  is consistent with positional asphyxiation; correct?

8    A    What kind of signs as far as trouble breathing?

9    Q    Someone who is evaluated to be in need of

10  supplemental oxygen.

11    A    Okay. So what's your question?

12    Q    That's another sign. So when we're talking

13  about risk factors and we're putting all this information

14  together to create a constellation of signs and symptoms

15  that are consistent with or might militate in favor of

16  positional asphyxiation, one thing the coroner should

17  consider is was this person demonstrating the need for

18  air; true?

19    A    For supplemental oxygen?

20    Q    Yes.

21    A    Sure, absolutely.

22    Q    And so someone who is showing signs that

23  they're having trouble breathing while restrained is a

24  sign consistent with positional asphyxiation; true?

1  at higher risk for positional and restraint asphyxiation

2  death; correct?

3    A    That's one kind of death that cardiomegaly is a

4  negative to have, that's right.

5    Q    Gasping sounds or gurgling during the restraint

6  is a sign or symptom that is consistent with someone dying

7  from positional asphyxiation; true?

8    A    It can go with that, yes.

9    Q    Foam or mucus coming from the nose or mouth is

10  a sign that is consistent with someone dying from

11  positional asphyxiation; true?

12    A    Well, you keep saying "consistent with" and

13  naming these things that are not really specific. And so

14  that's why I keep saying "it can be."

15    Q    Sure.

16    A    Yes, it can be. It's not unique to restraint

17  asphyxia or positional asphyxia.

18    Q    I think what you told us is nothing is unique

19  to restraint or positional asphyxia; correct?

20    MS. DINKLER: Objection to form.

21    Go ahead.

22    A    Except for ten guys on your back.

23    BY MR. DICELLO:

24    Q    Sure. So foam or mucus coming from the nose or

1    MS. DINKLER: Asked and answered.

2    A    It can be.

3    BY MR. DICELLO:

4    Q    And someone who is trying to gasp for air

5  during a struggle while they're in a prone position is

6  consistent with positional asphyxiation; true?

7    A    Also can be, yes.

8    Q    Someone who verbalizes, "I can't breathe, get

9  off of me," is another sign that is consistent with a

10  positional asphyxiation death; correct?

11    A    Sure.

12    Q    All of the signs and symptoms that I just went

13  through were present with Mr. Richardson; true?

14    A    I don't recall whether he made statements about

15  "I can't breathe, get off of me."

16    Q    Did you review the -- Are you familiar with

17  NaphCare?

18    A    I just know the jail has a contract with

19  someone to provide medical services.

20    Q    Okay.

21    A    That's what I know.

22    Q    My understanding is that the folks that are

23  providing the medical care over at the Montgomery County

24  Jail are employed by a company called NaphCare.

1      A   Okay.

2      Q   Did you review at any time, now let's focus on

3   prior to you creating your autopsy, did you review any

4   documentation created by the people responsible for

5   providing medical care at the jail?

6      MS. DINKLER:  Asked and answered.

7      Go ahead.

8      A   That would be my usual practice, but I do not

9   recall.

10  BY MR. DICELLO:

11     Q   Do you recall reviewing any death summaries

12  issued by NaphCare?  I'm showing you what's been marked as

13  NaphCare 143, 144, 146.  Did you review any of these

14  documents?

15     A   Prior to signing my report, is that what you

16  mean?

17     Q   Yeah.

18     A   I do not recall.

19     Q   Did you review the incident report authored by

20  NaphCare at any time prior to issuing your autopsy?  And

21  it looks something like this.  I'm showing you what's been

22  marked as NaphCare 9 to NaphCare 10.  Do you remember

23  reviewing this?

24     A   Again, incident reports would, again, be part

Page 90

---

of the thing that I would be interested in in coming to my

2   conclusions.  But I do not recall that specific document.

3      Q   The health services administrator for NaphCare

4   documented in the incident report on May 21st, 2012 at

5   nine a.m., so two days after Mr. Richardson died, she

6   documented "prior to injection" -- is your

7   understanding that an Ativan injection was administered?

8      A   That's right.

9      Q   "Prior to injection, patient was being held

10  down in a prone position by several correctional

11  officers."  Did you know that that was the HSA's

12  documentation of what happened?

13     MS. DINKLER:  Objection to form.

14     Go ahead.

15     A   HSA?

16  BY MR. DICELLO:

17     Q   Health services administrator.  Sorry.

18     A   Okay.  Again, I likely reviewed that, but I do

19  not remember that.

20     Q   Do you have any reason to challenge the

21  incident report by NaphCare that prior to receiving the

22  Ativan injection that Mr. Richardson was being held down

23  in a prone position by several corrections officers?

24     MS. DINKLER:  Objection to form.

Page 91

---

1      A   No.

2   BY MR. DICELLO:

3      Q   Because that's what happened; correct?

4      MS. DINKLER:  Objection to form.

5      A   That's correct.

6   BY MR. DICELLO:

7      Q   There's documentation in here, Doctor, that

8   says that when you reviewed the video, okay?  Did you --

9   Let me ask you some questions about the video.

10     A   Okay.

11     Q   When were you first given a copy of the video?

12  I think it was June 21st, 2012; is that right?

13     A   June 20th, 2012.

14     Q   June 20th, thank you.  So that was over a month

15  after Mr. Richardson died?

16     A   That's right.

17     Q   And it was about a month after you performed

18  your autopsy?

19     A   Correct.

20     Q   Did you request video evidence of this man's

21  death?

22     A   Yes.

23     Q   And it took the jail about a month to get it to

24  you?

Page 92

---

1      A   I don't know when I requested it, so I don't

2   know how long it took them to, you know, to supply that.

3      Q   You issued a death certificate, did you not,

4   Doctor, identifying the cause of death for Mr. Richardson

5   before watching that video; true?

6      A   Yes, a -- the first death certificate on May

7   25th.

8      Q   So at the time you issued your first death

9   certificate on May 25th, which finds that Mr. Richardson

10  died from hypertensive and arteriosclerotic cardiovascular

11  disease, at the time you issued that cause of death, you

12  had not had the benefit of watching the incident of

13  Mr. Richardson's demise; true?

14     A   That's right.

15     Q   And it was a detective from the sheriff's

16  office who brought you the video to watch; correct?

17     A   I don't know if he's a detective, but Mike

18  Sollenberger.

19     Q   And did Detective Sollenberger give you a copy

20  of the video or did he show it to you?

21     A   No, he showed it to me.

22     Q   Did he leave you with a copy of the video so

23  you could watch it a second time?

24     A   Not to my knowledge.

Page 93

24 (Pages 90 to 93)

1   Q   How long was the video that you watched?

2   A   I think it's 20 some minutes.

3   Q   Did you sit there and watch the entire video?

4   A   Yeah.

5   Q   And Detective Sollenberger was with you while

6   you watched it?

7   A   That's right.

8   Q   Did Detective Sollenberger provide you any

9   commentary while the two of were you watching the video?

10  A   I'm sure he did.

11  Q   And did he tell you what was happening as you

12  were watching it?

13  A   Yeah.  In some ways, yeah.

14  Q   How many times before issuing your autopsy

15  report did you watch the video, Doctor?

16  A   Probably just that one day.  I don't know how

17  many times we went through it.  I don't recall that.  But

18  --

19  Q   Did you show that video to any of your other

20  forensic pathologists at the coroner's office?

21  A   I don't know who all was present at this

22  viewing that Detective Sollenberger brought over.

23  Q   Do you remember other people being present?

24  A   I just do not remember.

Page 94

---

1   Q   Let me ask you.  Why didn't you ask -- So here

2   we have a video that captures the subject of your

3   autopsy's actual demise, his death; correct?

4   A   Uh-huh.

5   Q   Yes?

6   A   That's right.

7   Q   Do you consider that to be good evidence of the

8   circumstances surrounding his death?

9   A   I found it very useful, yes.

10  Q   So let me ask you:  Why didn't the coroner's

11  office keep and retain a copy of the actual footage of the

12  decedent's death?

13      MS. DINKLER:  Objection to form.

14      Go ahead.

15  A   I do not know.

16  BY MR. DICELLO:

17  Q   Did Detective Sollenberger ever offer to leave

18  you with a copy of the footage of Mr. Richardson's death?

19  A   I do not recall.

20  Q   If he did offer to give you that evidence, the

21  video evidence of the death, would you have kept it?

22  A   Oh, sure.

23  Q   So fair to say more likely than not Detective

24  Sollenberger didn't offer to give you a copy of the video;

Page 95

---

1   correct?

2       MS. DINKLER:  Objection to form.

3   A   I would not say that.

4   BY MR. DICELLO:

5   Q   So you're telling me he might have said, Hey,

6   Dr. Casto, here's a copy of the video of this man dying

7   and you said, no, I don't need it, take it out of here?

8       MS. DINKLER:  Objection to form.

9   A   I would accept it if it's offered.  Would I be

10  able to find it three years later?  I have no idea.

11  BY MR. DICELLO:

12  Q   Oh, okay.  So if he was providing -- if

13  Detective Sollenberger came by and gave you your copy, why

14  did -- what is your understanding of why Detective

15  Sollenberger stayed there and viewed it with you?

16      MS. DINKLER:  Objection to form.

17  A   Well, there's certain things about the video

18  that, if not given some commentary about, you would not

19  know what is happening.  Like for example, the injection.

20  You know, the video is of fairly good quality, but you

21  cannot see a syringe, do you know what I'm saying?

22  BY MR. DICELLO:

23  Q   Yeah.

24  A   So he was there to basically tell me this is

Page 96

---

1   what is being performed right now.

2   Q   Okay.  Did you ever watch the video outside the

3   presence of someone from the Montgomery County Sheriff's

4   Office?

5   A   I have, yes.

6   Q   And that was after the lawsuit was filed;

7   correct?

8   A   Correct.

9   Q   Doctor, how common is left ventricular

10  hypertrophy in American society?

11  A   Common.

12  Q   I think -- You tell me, you know.  But I think

13  as high as 50 percent of people have some level of left

14  ventricular hypertrophy?

15  A   Oh, wow.  I would not know that.  That's

16  cardiologist-type knowledge.

17  Q   The concept that I've heard in your business is

18  there's a big difference between dying with a condition

19  and dying from a condition.  Would you agree with that?

20  A   That's right.

21  Q   And you would agree that a lot of people,

22  millions of people, die with left ventricular hypertrophy

23  but not from left ventricular hypertrophy; would you agree

24  with that?

Page 97

25 (Pages 94 to 97)

1      MS. DINKLER: Objection to form.

2     A  I do regularly see people who are dead from

3 other reasons who do have a thickened left ventricle, and

4 an enlarged heart and coronary artery disease.

5 BY MR. DICELLO:

6     **Q  Right. I'm going to get to those.**

7     A  I figured you were.

8     **Q  Would you agree with me that a lot of people in**

9 **this country died with a diagnosis of left ventricular**

10 **hypertrophy but they don't die from left ventricular**

11 **hypertrophy based on your experience?**

12     MS. DINKLER: Asked and answered.

13     A  That's true.

14 BY MR. DICELLO:

15     **Q  And so most people with LVH in your experience**

16 **don't die from it; true?**

17     MS. DINKLER: Asked and answered for a third

18 time.

19     MR. DICELLO: No, this is a different question.

20 BY MR. DICELLO:

21     **Q  Go ahead.**

22     A  Again, I would not know the percentage of

23 people dying from left ventricular hypertrophy.

24     **Q  How many times have you found someone dying**

Page 98

---

1 from LVH?

2     A  Well, I don't say someone died from left

3 ventricular hypertrophy. That's not the manner I would

4 say that. I would call it hypertensive cardiovascular

5 disease or cardiomegaly of undetermined etiology or

6 something like that. I would not say left ventricular

7 hypertrophy. That's a feature of a thick and enlarged

8 heart.

9     **Q  So let me use the medical term "hypertensive**

10 **cardiovascular disease," okay?**

11     A  Okay.

12     **Q  So do you agree that a lot of people die with**

13 **hypertensive cardiovascular disease, but not from**

14 **hypertensive cardiovascular disease?**

15     MS. DINKLER: Objection to form, specifically a

16 lot of people. It's vague.

17     A  I commonly see hypertensive cardiovascular

18 disease as the cause of death and not the cause of death.

19 BY MR. DICELLO:

20     **Q  Is there any percentage?**

21     A  No.

22     **Q  More often than not?**

23     A  No, I can't give you that.

24     **Q  How many times have you included hypertensive**

Page 99

---

1 **cardiovascular disease as the cause of death in somebody**

2 **who is in the age range of 28 years old?**

3     MS. DINKLER: Of 20 what?

4     MR. DICELLO: 28.

5     A  Actually, it is increasingly common. So yes,

6 I've seen fatal heart disease in 19-year-olds of this

7 type. So yes, it does happen.

8 BY MR. DICELLO:

9     **Q  Recognizing that it does happen, would you**

10 **agree that it is exceedingly rare in that age category?**

11     MS. DINKLER: Objection to form.

12     A  It is rare, sure.

13 BY MR. DICELLO:

14     **Q  I'm going to jump around a little bit, Doctor.**

15 **I'm trying to do this as efficiently as I can. Bear with**

16 **me.**

17     **Robert Richardson had atherosclerotic heart**

18 **disease only of the left anterior descending artery;**

19 **correct?**

20     A  That's correct.

21     **Q  He was right coronary artery dominant; true?**

22     A  Correct.

23     **Q  Meaning the majority of the circulation to his**

24 **heart was through the right coronary artery distribution;**

Page 100

---

1 **correct?**

2     A  No.

3     **Q  So tell me why you describe him as right**

4 **coronary artery dominant and what I got wrong with my last**

5 **question.**

6     A  Right dominant or left dominant circulation of

7 the coronary artery is only referring to what side of the

8 coronary vasculature does the posterior descending

9 coronary artery come from. So the artery that runs down

10 the back of the heart, if it comes off of the right main

11 coronary, it's right dominant. If it comes off the

12 circumflex, it's left dominant. Some people are

13 co-dominant.

14     **Q  And that posterior artery that runs down the**

15 **back, does that supply the heart muscle?**

16     A  Sure. They all do.

17     **Q  You found no thrombus on autopsy; true?**

18     A  That's right.

19     **Q  So there was no total occlusion of**

20 **Mr. Richardson's artery; correct?**

21     A  That's right.

22     **Q  So in terms of an occluded left anterior**

23 **descending artery, totally occluded, what some people**

24 **refer to as the widowmaker, that's not what Mr. Richardson**

Page 101

Page 102

```
 1   suffered, is it?
 2       A   He does not have that.  He has a 75 percent
 3   stenosis of his left anterior descending coronary artery.
 4       Q   You did not document whether or not that lesion
 5   was proximal or distal in the left anterior descending,
 6   did you?
 7       A   I did not.
 8       Q   Was it distal?
 9       A   I would not remember at this point.
10       Q   That makes a big difference, doesn't it,
11   Doctor?
12           MS. DINKLER:  Objection to form.
13       A   I would not agree with that.
14   BY MR. DICELLO:
15       Q   Well, if the lesion that is 75 percent stenosed
16   is at the proximal portion of the left anterior
17   descending, then you would agree that the blood flow to
18   the remaining portion of the artery is compromised; true?
19       A   It can be, sure.
20       Q   And if that lesion is at the distal end of the
21   left anterior descending artery, then all the component of
22   the left anterior descending artery that is proximal to
23   the distal portion where the lesion is is not compromised;
24   true?
```

Page 103

```
 1           MS. DINKLER:  Objection.
 2       A   Well, that's true.  But you're -- you're
 3   neglecting the idea of the cardiac conduction system.  A
 4   75 percent lesion can be lethal at any portion of the
 5   coronary tree.
 6   BY MR. DICELLO:
 7       Q   It's more dangerous if it's in the proximal
 8   portion; true?
 9           MS. DINKLER:  Objection.
10       A   I wouldn't agree with that.  I don't think
11   that -- In an individual, I don't think that that's
12   predictable.
13   BY MR. DICELLO:
14       Q   Well, let me ask you:  Are you aware of the --
15       A   They're more fixable.
16       Q   Okay.  Fair enough.  Are you aware of what the
17   literature would say as to which lesion is more dangerous,
18   proximal or distal in the LAD?
19           MS. DINKLER:  Objection to form, vague, no
20   foundation.
21       A   I would not be able to answer that.
22   BY MR. DICELLO:
23       Q   Is there anything that we could do to determine
24   the location of this lesion that you said was 75 percent,
```

Page 104

```
 1   at this point?
 2       A   No.
 3       Q   How did you go about evaluating it was 75
 4   percent?
 5       A   I would make serial cross sections of the
 6   coronary vasculature at close intervals, and then estimate
 7   the remaining lumen from that occluded plaque.
 8       Q   Did you maintain those serial sections so that
 9   we could evaluate the extent of stenosis?
10           MS. DINKLER:  Objection: form.
11       A   There would be a microscopic section submitted
12   of the coronary atherosclerosis.  Estimating coronary
13   stenosis at autopsy is actually better done in the gross
14   rather than microscopic.
15       Q   Right.  Did you --
16       A   And --
17       Q   I'm sorry.
18       A   And I would have retained sections of the
19   coronary to make sure all the organs, including the
20   coronary atherosclerosis, that wasn't submitted for
21   microscopic examination.  But again, that would not be
22   retained forever.
23       Q   Are you telling me that the section of the left
24   anterior descending artery that you believe had this 75
```

Page 105

```
 1   percent lesion is preserved at your office in a block?
 2       A   That's right.
 3       Q   And you're telling me that the slide that was
 4   submitted is a slide of some portion of that lesion that
 5   you believed grossly appeared to be 75 percent?
 6       A   Right.
 7       Q   75 percent is the cut-off for severe
 8   arteriosclerotic disease; true?
 9       A   In a normal sized heart, that's right.
10       Q   Once you get under 75 percent, you're dealing
11   with mild; true?
12       A   I do not know the current cardiology
13   classification of that.
14       Q   All right.
15       A   Generally, in a normal size heart, we would
16   like to see at least 75 percent atherosclerotic narrowing,
17   or thrombus, to call that the cause of death, to call
18   atherosclerosis the cause of death.  In a normal size
19   heart.  That is not true in an enlarged heart.
20       Q   Mr. Richardson had an enlarged heart?
21       A   Yes.
22       Q   Based on his height and weight, how many grams
23   would you say it was enlarged; in other words, for a
24   person like Mr. Richardson, what would you expect the
```

1    normal range to be for his heart?

2        A    Well, the literature is full of normal heart

3    ranges that are all over the place. And some of them are

4    probably reasonable, some of them are not reasonable.

5        Q    What do you consider reasonable for a six foot

6    280 pound 28-year-old man?

7        A    I think the mean that you would expect in this

8    kind of individual would be like in the mid 400s as an

9    upper limit. Just because you're heavier doesn't mean you

10   get to have a larger than normal heart.

11       Q    So we've talked about the 75 percent lesion.

12   But the remaining vasculature to the heart, the arteries

13   at least, were widely patent; correct?

14       A    That's right.

15       Q    So there was no arteriosclerotic heart disease

16   other than this one lesion found in the LAD; correct?

17       A    That's right.

18       Q    And let's focus on just the condition, the

19   anatomical condition of Mr. Richardson's heart. Would you

20   agree that that condition of his heart is not incompatible

21   with life?

22       A    Oh, sure. People can walk around with worse

23   heart disease than he has.

24       Q    Right. And Mr. Richardson's condition of his

Page 106

1        MS. DINKLER: Objection to form.

2    BY MR. DICELLO:

3        Q    I mean all --

4        A    That's my opinion. But I don't know what the

5    "all" is.

6        Q    Ultimately the terminal event for most

7    everybody is your heart stops beating; true?

8        MS. DINKLER: Objection.

9        A    That is an overgeneralization I wouldn't agree

10   with.

11   BY MR. DICELLO:

12       Q    So but what you're telling us today is the

13   conduct of the officers in connection with their

14   interaction with Mr. Richardson, that struggle, that

15   restraint, whatever the jury decides it is, contributed to

16   causing Mr. Richardson's fatal arrythmia; true?

17       A    I would not say that.

18       MS. DINKLER: Objection; form.

19       A    I would not say that.

20       MS. DINKLER: Go ahead.

21   BY MR. DICELLO:

22       Q    I thought you just did?

23       A    I don't believe so.

24       Q    I thought you said, well, the exercise involved

Page 108

1    heart as you observed it on autopsy, that was the

2    condition of his heart for at least weeks and months

3    leading up to his death; true?

4        A    Well, I wouldn't age his atherosclerotic

5    plaques. But yeah, it's --

6        Q    It's chronic?

7        A    Preexisting disease, yes. It was there --

8        Q    It's a chronic condition?

9        A    That's right.

10       Q    Doctor, the interaction with the officers, the

11   jury can decide what it was and what it wasn't. I'm

12   asking you: That interaction with the corrections

13   officers on May 19th, 2012 contributed to causing

14   Mr. Richardson's death; true?

15       MS. DINKLER: Objection to form.

16       A    Well, I think I need a little bit more specific

17   question. You mean the exercise of being restrained?

18   BY MR. DICELLO:

19       Q    Yeah.

20       A    Oh, sure. I mean, exercise is a cardiac

21   stressor, no doubt about it.

22       Q    So we all agree he died of a fatal arrythmia,

23   don't we all?

24       A    Well, I don't know who "all" is.

Page 107

1    with the restraint, you said, sure, that contributed to

2    causing his death; right?

3        A    That's true.

4        Q    So the process of struggling while being

5    restrained is what put stress on the heart; true?

6        MS. DINKLER: Objection to form.

7        Go ahead.

8        A    In this case, that's one stressor.

9    BY MR. DICELLO:

10       Q    Okay.

11       A    One.

12       Q    So that is one stressor that, to a reasonable

13   degree of medical certainty, contributed to causing a

14   fatal arrhythmia; correct?

15       A    I don't have any trouble with that, sure.

16       Q    Some of the autopsy findings I want to get

17   into, and please refer to the autopsy, Doctor.

18       A    Okay.

19       Q    You recognized pulmonary edema in this man?

20       A    No.

21       Q    I'm probably using "pulmonary edema" in the

22   wrong way. But you found abundant congestive blood in the

23   lungs?

24       A    That's right.

Page 109

28 (Pages 106 to 109)

Q And the lungs were outside the range of normal weight; correct?

A Slightly, yes.

Q Well, what would you consider the normal lung weight -- right and left, because I know they weigh different. What would you consider the average lung weight of the right lung of a man, a 28-year-old man?

A Well --

Q It's in the 400s, isn't it?

A It's probably in the range of 350 to 500 for the average lung weight.

Q Okay, for the right lung? And then how about the left?

A The left is going to be less.

Q Less. So Mr. Richardson's lungs were 695 grams on the right and 605 grams on the left; correct?

A That's right.

Q That's because they were heavy because they were retaining fluid; correct?

A Well, they were congested. Congestion and pulmonary edema are not the same thing.

Q But they were congested with -- as a result of edema; correct?

A No.

Page 110

MS. DINKLER: Objection to form.

BY MR. DICELLO:

Q So what were they congested with?

A Congested with blood.

Q And how did it come --

A Blood backing up into the lungs.

Q Right.

A That's not pulmonary edema.

Q I understand that. How is it that the blood was backing up into Mr. Richardson's lungs?

A Most likely due to his heart condition.

Q Are you telling us that that's a chronic condition that he had?

A I have no way of knowing that.

Q I guess what I'm saying, in a very clumsy way, Doctor, is what you found on autopsy regarding the weight and the gross findings of the pulmonary parenchyma are consistent with a respiratory mechanism of death; true?

A No.

Q So your testimony in this case is that your findings on autopsy concerning Mr. Richardson's lungs are inconsistent with a respiratory cause of death?

A What I'm saying is his lung findings are actually much more common with a cardiac death rather than

Page 111

a respiratory death.

Q Okay.

A You expect pulmonary edema in respiratory depression. He does not have pulmonary edema. It is not the same as congestion.

Q So I think you told me that positional asphyxia is a cardiac death; correct?

A Okay. But just a minute ago, you're asking me whether the lung findings are due to a respiratory death.

Q Okay.

A If I understood you.

Q You're exactly right.

A If I'm misunderstanding, tell me.

Q No, no, you're exactly right. So let me --

MS. DINKLER: Remember, it's your job to tell him if you don't understand something. Don't assume anything.

BY MR. DICELLO:

Q I'm with you. I think I understand your answer.

So let me say it this way: Mr. Richardson's findings on autopsy with respect to his lungs, the pulmonary parenchyma, is persistent by a death by positional or restraint asphyxiation; true?

Page 112

MS. DINKLER: Objection, form.

A I would not say that.

BY MR. DICELLO:

Q Why not?

A It's a very nonspecific -- pulmonary congestion is a very nonspecific thing. It is extremely common in cardiac deaths. It is not unusual in prolonged CPR. You can see it in lots of things. But trying to say that that is somehow consistent with a respiratory death, I would not agree with that.

Q There was diffuse congestion in the organs; correct?

A Correct.

Q And what is your opinion as to what accounts for that?

A Also goes very well with the cardiac etiology of the death.

Q So, Doctor, are you telling us that had Mr. Richardson not had this encounter with the officers that he would have died at the same exact time?

A I think there's --

MS. DINKLER: Objection to form.

Go ahead.

A I think there is a possibility that he would

Page 113

1   have died that day with or without restraint.
2     BY MR. DICELLO:
3       Q   Can you say without restraint, more likely than
4   not, to a reasonable degree of medical certainty, that
5   Mr. Richardson would have died on May 19th, 2012?
6       A   I have no way of knowing whether he would have
7   died that day.
8       Q   I appreciate that.  I'm not trying to sound
9   glib, and I apologize if I am.  But the lawyers live in
10  the world of, as you know, reasonable degree of medical
11  certainty.  So let me just state the question and get the
12  answer for the record.
13        Can you say to a reasonable degree of medical
14  certainty that had Mr. Richardson not had this encounter
15  with corrections officers that he would have died on May
16  19th, 2012 none the less?
17      MS. DINKLER:  Asked and answered.
18      Go ahead.
19      A   I do not know whether he would have died.  He
20  was having a medical event of some type before the
21  restraint began.  That is very important to me.  So could
22  he -- Would I be surprised if he passed away in his cell
23  without restraint after the reported, you know, passing
24  out or seizure activity or whatever he was having?  I

Page 114

1       MS. DINKLER:  You can tell him for a fourth
2   time.
3     BY MR. DICELLO:
4       Q   Go ahead.
5       MS. DINKLER:  Or you can just have the question
6   and your answer read back.
7       A   You're asking do I know?
8     BY MR. DICELLO:
9       Q   No, I'm not.
10      A   Okay.
11      Q   Okay?  That's why I want you to listen.
12      A   I know.  I'm trying.
13      MS. DINKLER:  Do I know and can you state are
14  the same thing.
15    BY MR. DICELLO:
16      Q   Doctor, we have to fit these into a certain
17  language.
18      A   Well, you have to.  I don't.
19      Q   I know.  That's why it's kind of odd.  But I'm
20  saying you can't state to a reasonable degree of medical
21  certainty that but for Mr. Richardson's interaction with
22  the corrections officers that he would have died on May
23  19th, 2012; correct?
24      MS. DINKLER:  Asked and answered for a fifth

Page 116

1   would not be surprised by that.
2     BY MR. DICELLO:
3       Q   I appreciate that.  I know we're not talking
4   past each other.  But I need an answer.  You can't say to
5   a reasonable degree of medical certainty that
6   Mr. Richardson would have died on May 19th, 2012 even
7   without encountering the restraint and struggle he had
8   with the corrections officers; true?
9       MS. DINKLER:  Asked and answered.
10      A   I cannot --
11      MS. DINKLER:  Tell him a third time.
12      A   -- answer that question.
13    BY MR. DICELLO:
14      Q   You can't --
15      A   That's a crystal ball type question.  I can't
16  answer that.
17      Q   I understand that.  You can't state that to a
18  reasonable degree of medical certainty; true?
19      MS. DINKLER:  Asked and answered.  He's
20  answered it.  You've asked him the same question now four
21  times.  He's given you an explanation as to why he can't
22  answer it.
23    BY MR. DICELLO:
24      Q   Go ahead, Doctor.

Page 115

1   time.  You can give him your same answer again.
2       A   My answer is I do not know.
3     BY MR. DICELLO:
4       Q   What is acute marijuana intoxication?
5       A   Well, marijuana intoxication, acute, is
6   indicating that the decedent was under the influence of
7   marijuana at time of his death.
8       Q   Okay.
9       A   And generally, I would not use that term unless
10  there is more than just marijuana metabolite in the
11  decedent's blood.  So in other words, we like to see THC
12  to say that this person is acutely under the influence of
13  it.
14      Q   Do you know, can you say to a reasonable degree
15  of medical certainty that Mr. Richardson was intoxicated?
16      A   Well, many people confuse the term
17  "intoxication" with someone stumbling drunk alongside the
18  road.  When we say "intoxication," we just mean they're
19  under the influence.  I have no ability to know his level
20  of impairment.
21      Q   Okay.
22      A   In other words, don't confuse intoxication with
23  impairment.  It just means he's under the influence of the
24  drug.

Page 117

30 (Pages 114 to 117)

1    Q   Okay.

2    A   Okay?

3    Q   Can you state to a reasonable degree of medical

4    certainty how much marijuana he consumed?

5    A   No.

6    Q   Can you state to a reasonable degree of medical

7    certainty when he last consumed marijuana?

8    A   No.

9    Q   One of the analytes that was found is not

10   psychoactive; correct?

11   A   Are you talking about

12   11-carboxy-Tetrahydrocannabinol?

13   Q   Correct.  If you know.

14   A   I do not know.

15   Q   I want you to assume that that is not a

16   psychoactive metabolite.  If I'm correct, would you agree

17   that the presence of that would not contribute to any

18   intoxication?

19   A   Right.  THC, the parent -- the primary

20   psychoactive component of marijuana is really what we're

21   interested in --

22   Q   Okay.

23   A   -- in an acute intoxication situation.

24   Q   So the carboxy doesn't tell us anything about

Page 118

1    Q   Do you know if it could be as little as one

2    puff of a marijuana cigarette?

3    MS. DINKLER:  Objection to form.

4    A   I do not know that.

5    BY MR. DICELLO:

6    Q   This isn't a toxic level of marijuana you

7    found, is it?

8    A   I would not agree with that.

9    Q   What does the medical literature say, Doctor,

10   it takes to rise to the level of being toxic in a human

11   being, marijuana?

12   A   Are you saying toxic as the cause of death?

13   Q   Yeah.

14   A   Killing you?

15   Q   Yeah.

16   A   Oh, no, this is not a lethal number.

17   Q   Right.

18   A   It doesn't mean it's not toxic.  Toxic and

19   lethal are not the same thing.

20   Q   How are you using the term "toxic," then?

21   A   Toxic is having a -- is having a physiologic

22   impact on your body.

23   Q   Oh.

24   A   Speeding up your heart --

Page 120

1    intoxication?

2    A   It's the breakdown product of the drug.

3    Q   And carboxy can tell us that that could mean

4    Mr. Richardson smoked marijuana upwards of five, six days

5    ago.  Do you know that, or no?

6    A   It does vary with chronic users and naive users

7    as far as how long it will stick around.

8    Q   Okay.

9    A   As well as body habitus.

10   Q   And hydroxy -- I'm going to stumble with the

11   names, you're better than I am, Doctor.  But the hydroxy

12   analyte was also, or metabolite was also tested for and it

13   was negative; correct?

14   A   Yes.

15   Q   Hydroxy is psychoactive; true?

16   A   I do not know that.

17   Q   And then we look, you have THC at 16 nanograms

18   per milliliter; correct?

19   A   Correct.

20   Q   Do you have any opinion to a reasonable degree

21   of medical certainty as to how much marijuana one must

22   ingest to have 16 nanograms per milliliter as of the time

23   the blood was tested?

24   A   No.

Page 119

1    Q   So --

2    A   Giving you hallucinations, making you

3    psychotic.  Those are toxic effects of a drug.  It may not

4    necessarily kill you.

5    Q   So you can't ingest marijuana without it being

6    toxic, then?

7    A   I would agree with that.

8    Q   According to your definition, any amount of

9    marijuana is toxic?

10   A   I don't believe marijuana to be a healthy drug,

11   no.

12   Q   Other physicians disagree with you.

13   A   I get that.

14   Q   Okay.  And I understand what you're talking

15   about, your opinions, and I respect that, Doctor.  But in

16   Dr. Casto's opinion, any amount of marijuana is toxic to

17   the body?

18   A   I guess I'm just not saying that.  We're

19   talking -- You're using "toxic" -- Let's go back to -- You

20   were using this word "toxic."  And in your second or third

21   question it seemed apparent you were implying lethal.

22   They're not the same thing.

23   Q   Well, I'm using "toxic" the way a toxicologist

24   would use it.  Do you know how a toxicologist would

Page 121

31 (Pages 118 to 121)

1  consider whether an amount of marijuana is toxic or not?

2  MS. DINKLER: Objection to form.

3  A  I know several toxicologists. I'm not going to

4  opine on what they -- how they use the term "toxic."

5  BY MR. DICELLO:

6  Q  That's why I'm just trying to get an

7  understanding. When you are using the word "toxic" in

8  this deposition, I think what you're telling me is any

9  amount of marijuana in the system is toxic?

10  A  I do not know that for the -- for an

11  individual. You may smoke a roach everyday and I may not

12  be able to tell there's anything wrong with you; your

13  heart rate may be the same, your breathing is the same.

14  So in that setting, no, I would not stand and say you're

15  toxic from marijuana, no.

16  Q  I understand. But before we move on from this,

17  are you aware of any studies in the literature that

18  identify what a lethal level of marijuana is for an animal

19  or a human being?

20  A  Yeah, there have been lethal ingestions of

21  marijuana, sure.

22  Q  Can you cite me to one in the literature for a

23  human being?

24  A  Yeah.

Page 122

---

1  Q  Okay.

2  A  Basalt's (phonetic) textbook, I think has two

3  cases in it.

4  Q  Basalt?

5  A  Correct.

6  Q  And those are two cases of lethal marijuana

7  ingestion by humans?

8  A  Right.

9  Q  How much marijuana did they ingest?

10  A  One was in the thousands.

11  Q  Thousands of what?

12  A  I'm sorry, not what they ingested. Their blood

13  level was in the thousands. Another one was comatose in

14  the hundreds.

15  Q  Did that person die?

16  A  No.

17  Q  So you're aware of one reported case in the

18  literature of death by marijuana?

19  A  I do not have the details of those individual

20  cases. What I'm saying to you is there are levels of

21  marijuana that will place you in a life-threatening

22  situation that have been documented in the literature.

23  Now, is that marijuana laced with something that's not in

24  those citations? Possibly. I don't know.

Page 123

---

1  Q  I guess my question, before I came in today,

2  was going to be to you, so I'll put it to you, there is no

3  documented case of marijuana ever killing anyone outside

4  the circumstances associated with smoking it, somebody

5  gets high and climbs a tree or something. I'm talking

6  there is no report of anyone ever having died from

7  marijuana ingestion; correct?

8  A  I do not know that to be true.

9  Q  All right. You've never diagnosed someone as

10  having died from ingesting marijuana in your career;

11  correct?

12  A  No, not alone. That's right.

13  Q  How many times have you included in an autopsy

14  that the physiological effects of ingesting marijuana

15  contributed to someone's death from a physiological basis?

16  A  I probably have a few times --

17  Q  How many --

18  A  -- in multiple drug intoxications.

19  Q  How many times where there wasn't multiple

20  other drugs on board have you ever found that someone died

21  or a contributing cause of death was the physiological

22  cause of ingesting marijuana?

23  A  I do not know that.

24  Q  Robert Richardson is the only case; true?

Page 124

---

1  A  I do not know that to be true.

2  Q  How would you go about finding out that

3  information, Doctor?

4  A  Read 4,000 autopsy reports.

5  Q  Okay. You'll have Lynette do that for us?

6  A  I doubt that.

7  MR. PREGON: Objection.

8  MR. DICELLO: Well, then it's going to be you,

9  Jamey.

10  MS. DINKLER: That's not even worthy of an

11  objection.

12  BY MR. DICELLO:

13  Q  Doctor, your finding in this case that

14  ingestion of marijuana -- you have no idea how much and

15  you don't know when -- contributed to causing

16  Mr. Richardson's death is highly unusual in your career;

17  agreed?

18  MS. DINKLER: Objection to form.

19  A  His death is unusual.

20  BY MR. DICELLO:

21  Q  I appreciate that. But please answer my

22  question. It's highly unusual for you to include

23  marijuana ingestion as a contributing cause to

24  Mr. Richardson's death; correct?

Page 125

---

32 (Pages 122 to 125)

MS. DINKLER: Objection to the form of the question. It's misleading.

A I guess rephrase your question. I'm not sure what you're asking me.

BY MR. DICELLO:

Q Well, first, I started down this road by trying to ask you how many times you've included marijuana ingestion as contributing to a physiological death in an autopsy, and I think you said there's a handful, but there were other drugs on board in those cases; correct?

A Usually.

Q And then I said, okay, well, how many times have you included marijuana as contributing to the physiological death process when there weren't other drugs on board, and I don't think you could recall one other than Mr. Richardson; fair?

A I said I do not recall.

Q Okay.

A I'm not saying there aren't other cases where I have not used that as a cardiac stressor as a contributor to a death.

Q Outside of just looking at all 3,700 autopsy reports, there's no way to search that in your system?

A Not that specific kind of detail, no.

Page 126

---

Q As you sit here today, other than Mr. Richardson, you can't bring one case to mind where marijuana was identified as contributing to the physiological process causing death; correct?

MS. DINKLER: Asked and answered.

A Not with a name and number, no.

BY MR. DICELLO:

Q Okay. Doctor, do you know what percentage of people in the United States use marijuana on a chronic basis?

MS. DINKLER: Objection to form.

A Well, I don't know about United States, but I can tell you it's very high in the population I see.

BY MR. DICELLO:

Q So --

A In the forensic death population, it's high.

Q When you say "high," what percentage are you talking?

A I would not be surprised if it's a majority, greater than 50 percent.

Q So greater than 50 percent of the autopsies you do, there's evidence of marijuana ingestion; correct?

A That is an estimate. I would not be surprised, yes.

Page 127

---

Q And even though more than 50 percent of the autopsies you do you find evidence of marijuana ingestion, you can't name a single one, other than Mr. Richardson, where you've said that that -- the presence of that contributed to cause the death; correct?

A I couldn't have named Mr. Richardson until being identified to come talk about this. I mean, I don't remember case by case like that.

Q Well, Doctor, if marijuana had the propensity to contribute to causing people's death and you see it on board in over 50 percent of the autopsies you perform, wouldn't you expect that a substantial number of your autopsies would include a finding that marijuana contributed to the death?

A No. That doesn't make sense.

Q Because marijuana doesn't contribute to causing people's deaths?

A No, because the people I see are dying of other things; gunshot wounds, motor vehicle crashes, drownings.

Q All right. Did Mr. Richardson overdose on marijuana?

A Once again, using the terminology "overdose," are you saying lethal, that it killed him?

Q I think that's what overdose means.

Page 128

---

A No, it's not.

MS. DINKLER: Objection to form.

A People overdose and are resuscitated from heroin everyday in this city. I bet they are in Cleveland as well.

BY MR. DICELLO:

Q Oh, yeah. Did Mr. Richardson die from a marijuana overdose?

A It's a contributing factor to his death, because it's a cardiac stressor, and it seems to have the ability -- it may have produced the reason for his resistance to accepting help.

Q To a reasonable degree --

A He is highly agitated for some reason.

Q To a reasonable degree of medical certainty, did ingesting marijuana contribute to causing Mr. Richardson's death on May 19th, 2012?

A That's what my report says, yes.

Q What evidence do you have of that?

A The historical and documented evidence.

Q What is it? I want to write it down.

A Okay.

Q One.

A You've got someone who is having some kind of

Page 129

---

33 (Pages 126 to 129)

1   event prior to ever being restrained, whether its a
2   cardiac event or whether he's just under the strong
3   influence of marijuana, I don't know. Or whether it's a
4   combination.
5       Q   So you don't know.
6       A   It's clearly -- He's having something wrong
7   with him.
8       Q   And you don't know if marijuana is contributing
9   to that or not?
10      A   I'm saying it is, yes.
11      Q   Oh, okay. So it's your opinion to a reasonable
12  degree of medical certainty that marijuana contributed to
13  Mr. Richardson's --
14      A   Behavior.
15      Q   -- initial event?
16      A   No, no. To his behavior.
17      Q   His behavior?
18      A   Yeah.
19      Q   And you're saying his behavior brought about
20  the restraint?
21      A   Well, absolutely.
22      Q   So what evidence do you have of that, that the
23  marijuana was contributing to Mr. Richardson's behavior?
24  What evidence do you have?

                                    Page 130

1       A   He is acting very agitated, I think some people
2   may even say paranoid --
3       Q   Okay. But what evidence do you have that the
4   marijuana --
5       A   -- in the process of someone helping him.
6       Q   What evidence do you have that the marijuana
7   contributed to it?
8       A   Because that's the only drug on board that
9   we've been able to identify.
10      Q   What other evidence other than it's the only
11  drug on board do you have that marijuana contributed to
12  Mr. Richardson's behavior?
13      A   That would be the main thing, as well as the
14  account of his behavior.
15      Q   Okay.
16      A   So the toxicology testing and the account of
17  his behavior, those are the two things that are important
18  to me.
19      Q   What evidence do you have outside of, and maybe
20  there's none, because if I understand it, you're saying
21  the marijuana brought about the behavior that brought
22  about the restraint that contributed to his death;
23  correct?
24      MS. DINKLER: Objection to form.

                                    Page 131

1       A   I think that --
2       MS. DINKLER: That is misleading.
3   Go ahead.
4       A   State it again, please.
5   BY MR. DICELLO:
6       Q   Well, you know, it's interesting that you were
7   about to answer until your counsel said it was a
8   misleading question. Is that true?
9       MS. DINKLER: Well --
10  BY MR. DICELLO:
11      Q   Is that true, that you were about to answer
12  until your attorney --
13      A   Yeah. Absolutely. Right.
14      Q   So you know
15      A   And someone else entered the conversation.
16      Q   I know.
17      A   And now I'm interested in you rephrasing --
18      Q   Right.
19      A   -- or hearing you say it again.
20      Q   Right. I think that's called coaching the
21  witness in my line of work.
22      MS. DINKLER: No, it's not. It's called you
23  leaving out a substantial part of his testimony and
24  you've asked him about multiple times over and over and

                                    Page 132

1   over because you're trying to put words into his mouth.
2       MR. DICELLO: Oh.
3       MS. DINKLER: And the record should be fair.
4   So I'm making a record. Objection. The grounds for the
5   objection is lack of foundation, the question is
6   misleading. I didn't say what was misleading about it.
7   All I said was misleading.
8       MR. DICELLO: Okay. Well, I don't --
9       MS. DINKLER: Why don't we just have it read
10  back? Actually, why don't we answer this question, have
11  it read back, and why don't we take a break? Because
12  we've been going at this quite a bit now.
13      MR. DICELLO: Sure.
14      MS. DINKLER: It's 5:00.
15      MR. DICELLO: Happy to take a break. But I do
16  want to address the objection. I think what you're
17  telling me is that you're objecting as to form or
18  foundation, and I think those are perfectly acceptable
19  bases for objections. What I don't think is acceptable is
20  for you to cut the witness off and say "Objection, that's
21  misleading," and then he stops his answer and he asks me
22  to rephrase. I think telling a witness that a question is
23  misleading is an improper objection, Lynette, and I would
24  ask that you stop doing it.

                                    Page 133

                                    34 (Pages 130 to 133)

**Page 134**

1    MS. DINKLER:  Nick, I did not cut him off.  If
2    he started to talk while I was talking, that was fate.
3    But I did not cut my witness off.
4        MR. DICELLO:  Well, I'd appreciate if you don't
5    object on the basis of misleading.  Because I just don't
6    think that's -- I think that's a speaking objection,
7    Lynette.
8        MS. DINKLER:  You have your opinions and I've
9    got mine.  Do you want the question read back for him to
10   answer?
11   A   I will delay my answers to allow for time
12   for --
13   BY MR. DICELLO:
14   Q   **For your lawyer to tell you it's misleading or**
15   **not?**
16       MS. DINKLER:  Listen.  You're doing fine.
17   You're not the kid between --
18   BY MR. DICELLO:
19   Q   **No, you're doing great.**
20       MS. DINKLER:  -- the two parents who are
21   arguing here.  You're fine.
22   A   Well, I just find it interesting that I'm
23   encouraged to make sure I understand your question, but
24   then when I ask for you to do that, then I'm being

**Page 135**

1    coached.  Now, which one is it?
2    BY MR. DICELLO:
3    Q   **That's fair.  And I want you to say, "Hey,**
4    **Nick, I don't understand your question."  But I thought**
5    **you were about to answer and then Lynnette says, hey,**
6    **that's misleading, and puts her hand on your shoulder.**
7        MS. DINKLER:  Yeah, just now.
8        MR. DICELLO:  Look --
9        MS. DINKLER:  Now when I told him he's not the
10   kid.  So don't mischaracterize the record.
11       MR. DICELLO:  You made the objection, you had
12   your hand on his shoulder.  I don't want to argue.
13   A   I don't know what a hand on my shoulder means,
14   okay?  We met like three times, so --
15   BY MR. DICELLO:
16   Q   **So listen.  My question is:  What you're saying**
17   **about the marijuana --**
18       MS. DINKLER:  Here, it just happened another
19   time.  We really need to take a break.  It's getting hot
20   in here.
21   BY MR. DICELLO:
22   Q   **The evidence that you have that marijuana**
23   **contributed to this death, if I understand you, is you**
24   **believe it contributed to his behavior, which brought**

**Page 136**

1    about the need for restraint, which then contributed to
2    causing his death.  Is that how you're including marijuana
3    in this?
4        MS. DINKLER:  Objection.
5    A   It brought about his behavior, requiring
6    restraint.  And the exercise of a restraint, whether done
7    correctly or not, is a cardiac stressor.  That's where I'm
8    coming from.
9    BY MR. DICELLO:
10   Q   **And outside of that, that marijuana you believe**
11   **contributed to his behavior to a reasonable degree of**
12   **medical certainty, outside of that, do you have any**
13   **evidence that marijuana contributed physiologically to**
14   **causing his death?**
15       MS. DINKLER:  Objection.
16   A   Marijuana is a known cardiac stressor in some
17   individuals.
18   BY MR. DICELLO:
19   Q   **Do you have a conclusion to a reasonable degree**
20   **of medical certainty that it was a cardiac stressor in**
21   **whatever amount was ingested that you don't know in this**
22   **case?**
23   A   I can't answer that.  I don't have him hooked
24   up to an EKG machine when he's taking the dope.

**Page 137**

1    Q   **All right.**
2    A   Or when he's being restrained.
3    Q   **Okay.  So you can't say to a reasonable degree**
4    **of medical certainty that the amount of marijuana that**
5    **this guy ingested contributed to his heart failing;**
6    **correct?**
7        MS. DINKLER:  Objection.
8    A   I tuned -- I tuned out or I'm coached or
9    whatever.  Please repeat the question.
10   BY MR. DICELLO:
11   Q   **You can't state to a --**
12       MS. DINKLER:  And I asked for a break after the
13   last question.
14   BY MR. DICELLO:
15   Q   **You can't state to a reasonable degree of**
16   **medical certainty that some amount of marijuana that this**
17   **man ingested, that you don't know, at some point in time**
18   **but you don't know when, had a physiological effect that**
19   **contributed to Mr. Richardson's heart stopping; correct?**
20       MS. DINKLER:  Objection.
21   A   I just can't understand that question.  It's
22   so -- It's so convoluted.  If you want to rephrase it,
23   I'll be glad to --
24   BY MR. DICELLO:

Page 138

1    Q   As soon as we get an answer to this question,
2    we'll take a break.
3         MS. DINKLER:  I'll tell you what.  We're going
4    to take -- With all due respect, you don't have one
5    pending.  He's taking a break.
6         MR. DICELLO:  Yes, I do.  He just asked me to
7    rephrase it.
8         MS. DINKLER:  He said it's convoluted.
9         Do you need a break?  I don't want you to --
10        THE WITNESS:  I can answer another question.
11        MS. DINKLER:  All right.  Because I don't want
12   you to sit in here if you're having problems focusing.
13        THE WITNESS:  No, no.  I'm fine.  I'll be ready
14   for a break, but one more question --
15   BY MR. DICELLO:
16        Q   All right.  Maybe I'm getting tired, too,
17   Doctor.  But I think this is critical and it's important.
18   This is my one chance to ask you questions, and I've got
19   you here.
20        MS. DINKLER:  Move to strike.
21        MR. DICELLO:  Do I have another chance to ask
22   him questions?
23        MS. DINKLER:  You do.  But we don't need all of
24   the lead-in.  Just ask the question and let the man have a

Page 139

1    break.
2    BY MR. DICELLO:
3         Q   With respect to this marijuana and how it did
4    or didn't affect Mr. Richardson, you've done a nice job
5    explaining that you have a conclusion to a reasonable
6    degree of medical certainty that it affected him in a way
7    that contributed to his behavior.  And I want to move
8    outside of that now.
9         A   Okay.
10        Q   I'm asking you now:  What evidence do you have
11   that leads you to a conclusion to a reasonable degree of
12   medical certainty, okay, that there was a physiological
13   effect on Mr. Richardson's heart from smoking some unknown
14   amount of marijuana at some unknown time?
15        MS. DINKLER:  Objection to form.
16        A   He's under the influence of the drug when he
17   has what I believe to be a sudden cardiac death.  That's
18   how I'm connecting the two.
19   BY MR. DICELLO:
20        Q   And so based on those two facts, you're saying
21   that the marijuana did something to his heart that
22   contributed to causing it to fail?
23        A   I'm saying that it altered his behavior
24   requiring him to be restrained.

Page 140

1         Q   Okay.
2         A   I'm also saying that marijuana is a known
3    cardiac toxin, and he has preexisting heart disease.  And
4    so from those two points, I consider the marijuana to be a
5    significant finding in this case.
6         Q   But can you say to a reasonable degree of
7    medical certainty that it changed his heart rhythm?
8         MS. DINKLER:  This is the last question before
9    a break.  This is not fair to the witness.  It's not.
10        A   I cannot answer that yes or no.  I don't know
11   what his heart is doing.
12   BY MR. DICELLO:
13        Q   Okay.  That's all.  Got it.  Sorry about the
14   delay.
15             (Recess taken.)
16   BY MR. DICELLO:
17        Q   Doctor, we're back on the record after an
18   overdue break.  And I'm not sure with respect to this
19   marijuana issue if I ever did get an answer to the
20   question of whether you have an opinion to a reasonable
21   degree of medical certainty that Mr. Richardson overdosed
22   on marijuana.
23        A   Well, again, I think you need to define your
24   idea of "overdose," because you said a minute ago that you

Page 141

1    didn't think you could use that term in a non-lethal
2    situation.
3         Q   Well, you're the forensic pathologist, so how
4    do you define the term "overdose"?
5         MS. DINKLER:  Asked and answered.
6         A   Taking too much of a substance.  That's
7    probably the most basic definition of an overdose.
8    BY MR. DICELLO:
9         Q   You don't know how much of the substance
10   Mr. Richardson took?
11        A   No, I do not.
12        MS. DINKLER:  Asked and answered.
13   BY MR. DICELLO:
14        Q   So do you have a conclusion to a reasonable
15   degree of medical certainty that Mr. Richardson overdosed
16   on marijuana?
17        A   It contributes to his death.
18        Q   Do you have a conclusion to a reasonable degree
19   of medical certainty that Mr. Richardson overdosed on
20   marijuana?
21        A   It is a contributing factor to his death.
22        Q   I need an answer to my question.
23        A   It's toxic.  I'm not tied to how you phrase
24   your question.  You're phrasing it in a way that is

**Page 142**

1  nebulous to me.

2  **Q  What's nebulous about it?**

3  A  I'm not trying to be -- I'm not trying to be --

4  **Q  The term overdose?**

5  A  Well, just a minute ago you said that overdose

6  means you die from it.  Well, that's not my definition.

7  That's not true.  It's just not true.

8  **Q  So do you have a conclusion to a reasonable**

9  **degree of medical certainty that Mr. Richardson overdosed,**

10  **according to your definition, on marijuana?**

11  A  He is -- I believe he is acting like he is

12  toxic for marijuana by his behavior.  And I think it is

13  affecting his heart.

14  **Q  And that's --**

15  A  Is that answering your question?

16  **Q  I mean, I'm not choosing the word "overdose",**

17  **am I, Doctor?**

18  MS. DINKLER:  Objection.

19  A  I didn't write that.

20  MS. DINKLER:  That misstates the record.

21  BY MR. DICELLO:

22  **Q  Who included "drug overdose" on the**

23  **supplemental medical certification that you signed?**

24  A  When -- When you include a non -- I'm sorry, an

**Page 143**

1  unnatural manner of death, then line thirty -- I'm sorry,

2  I can't even read it -- 33 F, I think, is how injury

3  occurred.  It's the vital statistics line, okay?  How

4  injury occurred when it's a non-natural death.  And so

5  what do you want to put in there?  In my opinion, the drug

6  is a contributing factor, so drug overdose.  The overdose

7  there does not mean that he died solely due to marijuana.

8  That's not what it means.

9  **Q  Well, let's make sure we understand what we're**

10  **looking at.  I'm showing you, and this is contained within**

11  **this exhibit that I have in front of you, that you said is**

12  **more or less the file, and that's exhibit number, is it**

13  **four, Doctor?**

14  A  Four, yes.

15  **Q  I'm showing you MC 3210.  This is a Ohio**

16  **Department of Health Vital Statistics Supplementary**

17  **Medical Certification executed by you; correct?**

18  A  That's right.

19  **Q  This is an official public record; correct?**

20  A  Correct.

21  **Q  And this is a document, you understand, that**

22  **creates a presumption as to what caused this person's**

23  **death.  Do you understand that?**

24  A  That's the purpose of it.

**Page 144**

1  **Q  So did a drug overdose cause his death?**

2  MS. DINKLER:  Objection to form.

3  A  A drug plays a role in his death.  It

4  contributes to his death.  And so how did the injury

5  occur, why is it an accident.  It's an accident because of

6  the marijuana, okay?  And so in the how injury occurred,

7  drug overdose is the easiest way to say it.  I could

8  have put marijuana use.  It would have been the same thing

9  in my mind.  How someone else interprets that, I don't

10  have control over that.

11  BY MR. DICELLO:

12  **Q  Okay.  What injury was caused by the drug**

13  **overdose?**

14  A  When I'm saying how injury occurred, that's

15  just the -- that's just how the form is worded.  That's

16  not my wording.

17  **Q  I appreciate that, doctor.  But I'm doing my**

18  **best to interpret this form.  You told me that its purpose**

19  **is to communicate to the public how Mr. Richardson died.**

20  **You've included in this document, before you signed it,**

21  **that he was injured by a drug overdose.  I'm asking you**

22  **what injury was caused by a drug overdose?**

23  A  Again, back to it's creating him -- it's

24  altering his behavior and it has the potential to be

**Page 145**

1  cardiac toxic.  That's the -- That's the injury, if you

2  want to phrase that.  It's a form.  It doesn't make

3  grammatical sense at times.  I didn't make the form.

4  **Q  Did Mr. Richardson accidentally ingest**

5  **marijuana?**

6  MS. DINKLER:  Objection to form.

7  A  No, that's not what that is saying.

8  BY MR. DICELLO:

9  **Q  Do you know if he smoked it or ate it?**

10  A  I do not know.

11  **Q  So what was the accident that occurred?**

12  A  Okay.

13  MS. DINKLER:  Objection: form.

14  Go ahead.

15  A  Manner of death in Ohio, we have natural,

16  accident, suicide, homicide, undetermined.  Those are our

17  five categories.

18  BY MR. DICELLO:

19  **Q  Okay.**

20  A  Okay?  And so by convention, anything that is

21  contributing to the death that is of unnatural origin,

22  okay?

23  **Q  Marijuana is natural.**

24  A  No, no.

1    MS. DINKLER:  Objection to form.  Please don't
2  interrupt him.
3    Do you need the question read back?
4    THE WITNESS:  No.
5    A    So explaining manner of death.  In a death
6  where there's any contributing factor, either immediate
7  cause of death or a contributing factor, that is of
8  unnatural means, then that -- that rules the manner.  For
9  most people.  Some people make exceptions on what's the
10  overwhelming picture, okay, even though there might be
11  unnatural means.  But in general, if you have something
12  that is playing a role in the person's death that is not
13  natural disease, then it's not a natural death.
14  BY MR. DICELLO:
15    Q    Okay.
16    A    If it's trauma, then it's, you know, then
17  that's the accidental.  If it's a drug intoxication,
18  again, most of those are going to fall in the category of
19  accident, some of them fall in the category of suicide, a
20  tiny percentage fall in the category of homicide.  Okay?
21    Q    Okay.
22    A    And then there's certain ones where you don't
23  know.  But in the case of Robert Richardson, the reason I
24  am ruling it an accident as far as the manner is due to

Page 146

1  the marijuana.
2    Q    Okay.
3    A    Regardless if it's a natural plant or not, that
4  has nothing to do with my -- my logic on that, okay?
5    Q    So the stress on the heart brought on by the
6  restraint was a result of the conduct of, I think in your
7  opinion, you would say both Mr. Richardson and the
8  corrections officers; true?
9    A    No.  I would say he's requiring restraint based
10  on his behavior.
11    Q    So you're making conclusions on whether the
12  restraint was appropriate?
13    MS. DINKLER:  Objection to form.
14    A    No, I'm not.
15  BY MR. DICELLO:
16    Q    I think you've told me the restraint
17  contributed to causing his death; correct?
18    A    From a point of exercise, yeah, or -- you know,
19  strenuous activity, yes.
20    Q    So why isn't it ruled a homicide?
21    A    Well, you probably would have to go through
22  some scenarios to make this clear.  This does not fall in
23  the category of homicide in my opinion.
24    Q    Why not?  Wasn't his death brought about by the

Page 147

1  conduct of others, whether intentional or not?
2    A    At the hands of others?  Do you want to use
3  that definition?
4    Q    Whether intentional or unintentional?
5    A    Okay.
6    MS. DINKLER:  Objection to the form.
7    Q    What about if you hit somebody with your car
8  going home and kill them?  Is that a homicide?  No, it is
9  not.  That is ruled an accident, even if it's at your
10  hands, intentional or unintentional.  Intentional, it
11  would be a homicide.  Unintentional, it's an accident.
12  BY MR. DICELLO:
13    Q    What if I've blown the stop sign?
14    A    Accident.
15    Q    Oh, okay.
16    A    You seem in disbelief to that.  Do you see a
17  lot of motor vehicle accidents ruled homicides?  Because I
18  don't.  I don't see that.
19    Q    Okay.
20    MS. DINKLER:  Nick, before you switch topics,
21  it's 5:24.  Dr. Casto needs to be someplace.  I need to be
22  someplace.  We were planning on having another witness
23  after him today, so we weren't planning on this schedule.
24  And I'd like to be present when his deposition is

Page 148

1  concluded.  I am not available to do that tomorrow.  And
2  so I just wanted to let you know what the lay of the land
3  was.
4  BY MR. DICELLO:
5    Q    Your original death certificate ruled the
6  manner of death natural; correct?
7    A    That's correct.  That was five days after the
8  autopsy.
9    Q    And you didn't conclude cardiac arrhythmia;
10  correct?
11    A    I still had the same cause of death, I just
12  didn't have the mechanism in there.  I listed hypertensive
13  arteriosclerotic cardiovascular disease, which is the
14  underlying cause of death on the supplemental.  I just
15  didn't have the mechanism as cardiac arrhythmia.
16    Q    Okay.
17    A    And it's natural, because at this point we
18  don't know about the marijuana.  That comes weeks later,
19  okay?  Toxicology takes time.
20    Q    But at the point where you completed the
21  original death certificate on May 25th, 2012, you hadn't
22  yet looked at the video; true?
23    MS. DINKLER:  Asked and answered.
24    A    Correct.

Page 149

BY MR. DICELLO:

1  Q   And the toxicology reports weren't returned
2  yet; correct?
3  A   That's right.
4  Q   But you did know that he died as a result of
5  the stress on his heart as a result of the restraint with
6  the officers; correct?
7     MS. DINKLER:  Objection to form.
8  A   Yeah, I understand that.
9  BY MR. DICELLO:
10 Q   All right.  But it was still just his natural
11 disease process that caused his death?
12 A   That's right.  And I can provide you scenarios
13 where I would not call that natural.
14 Q   You have the time of injury due to drug
15 overdose occurring at 4:00 p.m.  What evidence do you have
16 to support that, Doctor?
17 A   Oh, what time was he pronounced here?
18 Q   16:08.  So what injury --
19 A   So 4:00.
20 Q   What injury --
21 A   Okay, that's just --
22 Q   Let me finish my question.
23 A   Sorry.

Page 150

---

1  Q   What injury did the patient experience four
2  minutes before he died as a result of a drug overdose?
3     MS. DINKLER:  Objection to form.
4     Go ahead.
5  A   You're splitting hairs regarding this form,
6  okay?
7  BY MR. DICELLO:
8  Q   All right.
9  A   The 16:00 hours is just, that's near the time
10 he's pronounced.  That by no means is meant to say that
11 somehow I know he ingested the marijuana at 16:00 hours or
12 that he became toxic at 16:00 hours.  That's not the
13 purpose.
14 Q   So what happened at 16:00 hours?
15 A   Well, he's just about dead.
16 Q   The toxicology reports, from what I saw, don't
17 show any lorazepam on board.
18 A   That's right.
19 Q   Why do you think that is, given that they
20 injected it?
21 A   Because it's not detectable.
22 Q   Was it tested for, or no?
23 A   Oh, yeah.
24 Q   Just Ativan isn't detectable in the blood?

Page 151

---

1  A   Oh, no, it's detectable.  We see that all day.
2  Q   So why do you think there was no detectable
3  level of Ativan or lorazepam in this case?
4  A   Because he is receiving an injection in either
5  fat or muscle, okay?  So that does not have immediate
6  access to the blood.  In other words, you don't push it in
7  the fat and muscle and then all of a sudden it goes right
8  into the blood system where you can detect it.  It takes
9  time to diffuse into the blood system.  And he died
10 shortly after that injection.  So my opinion is that it
11 just has not had time to reach the detectable level in his
12 blood, because of his short time of survival after the
13 injection.
14 Q   And if this is outside of your area of
15 expertise, let me know.  But as a forensic pathologist,
16 you kind of have to look at a lot of disciplines
17 sometimes.
18 A   That's correct.
19 Q   But given the fact that you -- the drug had not
20 made it from the musculature or the tissue into the blood
21 yet, would you expect that drug to have any effect on the
22 patient?
23 A   No.
24 Q   So the lorazepam that was administered had no

Page 152

---

1  effect on Mr. Richardson; correct?
2  A   That's my opinion.
3     MR. DICELLO:  Can we go off the record for a
4  minute?
5     (Discussion held off the record.)
6  BY MR. DICELLO:
7  Q   I just want to say something.  And I understand
8  people's scheduling issues, and I'm not trying to be
9  difficult about scheduling, Doctor, but it was my
10 intention to take your deposition from start to finish
11 today.  Sometimes they take a long time, sometimes they're
12 quick.  This one is taking a long time.  You know, I take
13 responsibility for that.  But I've got questions about
14 things that are at issue I believe in this case.
15    MR. DICELLO:  And I was not ever told that
16 there would be a stop time today where we couldn't get his
17 deposition scheduled.
18    MS. DINKLER:  Nick, you scheduled a deposition
19 after this deposition.  So is it unfair for me to presume
20 that his deposition is going to be completed as the second
21 of three depositions today before the close of business?
22    MR. DICELLO:  Well --
23    MS. DINKLER:  That was your schedule.  That
24 wasn't something that we imposed on you.  You represented

Page 153

1  that you were going to do three depositions today.  So
2  please don't act like we're denying you the opportunity to
3  finish his deposition when it's 5:30 and I have child care
4  arrangements that I need to make for my three children,
5  which I had no reason to do when he's one of two and he's
6  in the middle.
7       You weren't planning on being here until ten
8  o'clock.  I know I'm joining the party because I was out
9  for surgery, but have you all been working until ten
10  o'clock at night?
11       MR. DICELLO:  Well, I don't think I was making
12  that suggestion, but --
13       MS. DINKLER:  Well, I don't know what
14  suggestion you're making, then.  I mean, we had damage
15  depositions set up that we were expecting to take when,
16  tomorrow?
17       MR. PREGON:  Thursday.
18       MS. DINKLER:  Thursday?  That we learned today
19  are not showing up, depriving us of the ability to explore
20  what the damages are in this case.  And that's something
21  that the defense lawyers want to talk about.  I'm sure
22  we'll work through it.  But please don't cast us versions
23  that we're not going to be able to get this deposition
24  done because Mr. Casto and I have to leave at 5:30.

Page 154

1       MR. DICELLO:  I've got to be honest, I have no
2  idea what you're talking about with these other
3  witnesses.  But let's not waste the doctor's time.  I just
4  want the record to say that, yes, in the past weeks before
5  you got involved, Lynnette, yes, we have gone past 5:30
6  and we have rescheduled people for the following day.  And
7  we've done the best we can.  And that's why I've scheduled
8  Ms. Smiley, as we discussed, that as somebody who is not
9  all that important, and if we couldn't get to her that we
10  wouldn't.  I'm not trying to say this is intentional in
11  any way.  It is what it is.  But I just want the record to
12  reflect that I am here prepared to conclude this
13  deposition and avoid the cost and expense of calling
14  Dr. Casto for a second deposition, and I was never
15  notified that everybody had a 5:30 deadline today.  And
16  that's all I'm saying.  I'm not trying to say you did it
17  intentionally or it's --
18       MS. DINKLER:  Well, I don't have an obligation
19  to notify you that I need to be somewhere at 5:30 when
20  you're planning on doing him as number two out of three
21  witnesses.  Likewise, I wouldn't have expected him to have
22  to be here beyond 5:30, to even ask him that.  We're happy
23  to reschedule it.  I have no idea what additional expense
24  you're going to incur by having him back.

Page 155

1       MR. DICELLO:  Well, I have to come back down
2  here, unless, you know --
3       MS. DINKLER:  Well, you're going to have to
4  come back down here for all of the mothers of the children
5  in this case that we were supposed to depose this week
6  that you said you were producing that you've told Jamey
7  you're not producing now this week.  So we're going to be
8  together --
9       MR. DICELLO:  I've had open conversation with
10  the other side as to my ability to obtain these people.
11  And I told Jamey last week that I expect to be able to
12  have a couple, I don't know if I will, but at a minimum
13  we'll be able to do the parents and the grandparents.  And
14  that's what we're doing.  I've been open about
15  communicating that.  I don't have full control over these
16  people.
17       MS. DINKLER:  Well, we need to subpoena these
18  people so that we can get some idea on damages.  We don't
19  have any paper on damages, we're not getting witnesses
20  that we need to get for damages.
21       MR. DICELLO:  So to let the doctor go, can we
22  agree on the record that subject to everyone's calendar to
23  get him back under deposition --
24       MS. DINKLER:  You have my word that he will be

Page 156

1  produced as he was today to finish his deposition.  It is
2  that simple.
3       MR. DICELLO:  I'm just trying to get an
4  agreement on the record that given that his deposition
5  testimony is critical to expert witness reports that I
6  have to produce by early January, that subject to making
7  him available for deposition --
8       MS. DINKLER:  I have a doctor's appointment
9  tomorrow that I cannot cancel.  I will reproduce him as
10  quickly as possible so that you can finish.  We have
11  worked with you on scheduling and we will continue to do
12  that.
13       MR. DICELLO:  Okay.  That's all I wanted to
14  say.
15       MS. DINKLER:  But I'm not --
16       MR. DICELLO:  Can we get some reprieve on the
17  January 4th deadline for Plaintiff's expert reports
18  assuming we can't complete the doctor's deposition?
19       MS. DINKLER:  Yeah, we'll have him -- we can
20  work something out.
21       MR. DICELLO:  Okay.  That's all I wanted to
22  know.
23       MS. DINKLER:  But we just need to do that with
24  Tina, because I have to leave and he has to leave.

Page 157

40 (Pages 154 to 157)

1     MR. DICELLO:  Doctor, thank you.  Pleasure

2 meeting you.  I look forward to seeing you again.

3     THE WITNESS:  Thank you.

4         - - -

5     (Signature not waived.)

6         - - -

7     And, thereupon, the deposition was concluded at

8 5:34 p.m.

9         - - -

Page 158

---

1  State of _____

2  County of _____

3     I, BRYAN CASTO, M.D., do hereby certify that I

4  have read the foregoing transcript of my deposition given

5  on December 7, 2015; that together with the correction

6  page attached hereto noting changes in form or substance,

7  if any, it is true and correct.

8     _____

9         BRYAN CASTO, M.D.

10    I do hereby certify that the foregoing transcript

11 of the deposition of BRYAN CASTO, M.D. was submitted to

12 the witness for reading and signing; that after he had

13 stated to the undersigned Notary Public that he had read

14 and examined his deposition, he signed the same in my

15 presence on the _____ day of _____, 2015.

16    _____

17         Notary Public

18 My Commission Expires on _____

19         - - -

Page 160

---

1         December 14, 2015

2  Dear Dr. Casto,

3     You have chosen to read and sign your transcript.
Please do not mark on the transcript.  Any

4  corrections/changes you may desire to make in your
testimony should be typewritten or printed on the errata

5  sheet at the end of testimony, giving the page number,
line number and desired correction/change.  After you have

6  read the transcript, sign your name on the correction
sheet and where indicated at the close of testimony before

7  a notary public.

8     The Rules of Civil Procedure allow thirty days for
you to read and sign.  Please return the signature page

9  and errata sheet to Whitney Layne, 6723 Cooperstone Drive,
Dublin, Ohio 43017 within that time.  Failure to do so in

10 the allotted time will result in your transcript being
used as though read and signed by you.

11

12         Sincerely,

         _____
13         Whitney Layne
         Professional Reporter

14
Cc:
15 Nick DiCello
Carrie Starts
16 Jamey Pregon

Page 159

Page 160

1   State of _Ohio_

2   County of _Montgomery_

3        I, BRYAN CASTO, M.D., do hereby certify that I

4   have read the foregoing transcript of my deposition given

5   on December 7, 2015; that together with the correction

6   page attached hereto noting changes in form or substance,

7   if any, it is true and correct.

8                                   _____

9                                   BRYAN CASTO, M.D.

10       I do hereby certify that the foregoing transcript

11  of the deposition of BRYAN CASTO, M.D. was submitted to

12  the witness for reading and signing; that after he had

13  stated to the undersigned Notary Public that he had read

14  and examined his deposition, he signed the same in my

15  presence on the _17th_ day of _Dec_ , 2015.

16                                   _Lora Chenoweth_

17                                   Notary Public

18  My Commission Expires on _July 16, 2017_

19                        - - -   **LORA L. CHENOWETH, Notary Public,**

20                                   In and for the State of Ohio
                                     My Commission Expires July 16, 2017

21

22

23

24

Page 161

1  TO THE  REPORTER:

2  I have read the entire transcript of my deposition taken

3  on the 7th day of Dec , 2015, or the same has been

4  read to me.  I request that the following changes be

5  entered upon the record for the reasons indicated.

6

7  Page    Line    Correction and reason therefore

8  5       10      "Douglass" (spelling)

9  40      11      "Restraint deaths" rather than "Restraint to deaths"

10 48      8-9     "Forensic pathologist" not "for the pathologist"

11 99      17-18   "disease as a cause of death"

12 123     2       "Baselt" (spelling)

13 142     12      "Toxic from marijuana" (grammar)

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 Date 12-17-2015  Signature

24                              Bryan D. Casto

Page 162

1                        CERTIFICATE

2    State of Ohio      :

3    County of Franklin:

4

5         I, Whitney Layne, Notary Public in and for the

6    State of Ohio, duly commissioned and qualified, certify

7    that the within named BRYAN CASTO, M.D. was by me duly

8    sworn to testify to the whole truth in the cause

9    aforesaid; that the testimony was taken down by me in

10   stenotype in the presence of said witness; afterwards

11   transcribed upon a computer; that the foregoing is a true

12   and correct transcript of the testimony given by said

13   witness taken at the time and place in the foregoing

14   caption specified.

15

16        IN WITNESS WHEREOF, I have set my hand and

17   affixed my seal of office at Dublin, Ohio, on this 14th

18   day of December, 2015.

19                       _____

20                       Whitney Layne, Notary Public

21                       In and for the State of Ohio

22   My Commission expires May 4, 2020

23

24

**A**

a.m 91:5
AAFS 61:21
abandoned 61:10
abdomen 80:16
85:20
ability 81:23 82:20
117:19 129:11
154:19 156:10
able 38:9 49:1 57:4
61:20 96:10
103:21 122:12
131:9 154:23
156:11,13
absolutely 19:20
67:8 88:21 130:21
132:13
abundant 109:22
Academy 58:17
61:16
accept 81:11 96:9
acceptable 133:18
133:19
accepting 129:12
access 37:10,13
40:1 60:21 63:13
64:5 152:6
accident 58:9 144:5
144:5 145:11,16
146:19,24 148:9
148:11,14
accidental 146:17
accidentally 145:4
accidents 148:17
accommodate
18:19
account 131:14,16
accounts 26:13,20
27:7,15 28:9,17
113:14
accurate 33:7
accurately 33:5
acquired 26:23
act 154:2
acting 131:1 142:11
activities 66:14
activity 114:24
147:19
actual 18:12 39:22
71:22 95:3,11
acute 117:4,5
118:23
acutely 117:12
addition 43:14
61:21 63:6,8
additional 155:23
address 133:16
adhere 64:3
administered 91:7
152:24

administrator 1:4
91:3,17
admission 24:15
adult 75:10,24
adults 75:17
advance 23:22 24:9
36:22 38:12 55:24
68:5
advice 10:16 13:9
13:16,21
affect 139:4
affixed 162:17
afforded 7:9
aforesaid 162:9
African 68:12
afternoon 5:6,7
age 100:2,10 107:4
agitated 129:14
131:1
ago 25:23 33:3,4
38:17 112:8 119:5
140:24 142:5
agree 39:2,3 43:15
64:7 84:21 85:4
97:19,21,23 98:8
99:12 100:10
102:13,17 103:10
106:20 107:22
108:9 113:10
118:16 120:8
121:7 156:22
agreed 80:3 125:17
agreement 157:4
ahead 7:4,13,24
8:12 12:9 21:24
28:21 30:9 32:10
35:10 36:18 41:20
54:7 72:14 82:15
85:8 87:21 90:7
91:14 95:14 98:21
108:20 109:7
113:23 114:18
115:24 116:4
132:3 145:14
151:4
air 88:18 89:4
al 1:9
allotted 159:10
allow 134:11 159:8
allowed 19:24
alongside 117:17
altered 139:23
altering 144:24
AMA 34:19 35:3,22
American 34:15,16
58:17 61:9,16
68:12 97:10
amount 121:8,16
122:1,9 136:21
137:4,16 139:14
analysis 78:19

analyte 119:12
analytes 118:9
anatomic 60:3,22
60:24
anatomical 106:19
and/or 79:4
Andrew 1:5
animal 122:18
answer 10:10,21
11:1,10,12,16
12:8 22:21,24
23:1,8,19 24:7
28:14 42:6 49:1
56:4 103:21
112:20 114:12
115:4,12,16,22
116:6 117:1,2
125:21 132:7,11
133:10,21 134:10
135:5 136:23
138:1,10 140:10
140:19 141:22
answered 36:7 54:6
89:1 90:6 98:12
98:17 114:17
115:9,19,20
116:24 127:5
141:5,12 149:23
answering 12:17,18
22:14 142:15
answers 70:5
134:11
anterior 100:18
101:22 102:3,5,16
102:21,22 104:24
anticipation 26:2
anybody 42:16 66:4
66:5 67:4
apologize 114:9
apparent 121:21
appear 27:4 36:10
APPEARANCES
2:1
appeared 105:5
appears 68:8
applicable 1:15 3:6
applied 80:16
applies 30:23 83:21
84:9
apply 63:23 84:4
applying 61:8
appointment 6:16
18:4 157:8
appreciate 47:3
77:21 114:8 115:3
125:21 134:4
144:17
appropriate 147:12
approximately
50:19
area 152:14

argue 31:12 135:12
arguing 134:21
argument 32:17
arrangement 23:7
arrangements
154:4
arrhythmia 79:6,11
79:15,22 109:14
149:9,15
arrythmia 107:22
108:16
arteries 106:12
arteriosclerotic
93:10 105:8
106:15 149:13
artery 98:4 100:18
100:21,24 101:4,7
101:9,9,14,20,23
102:3,18,21,22
104:24
article 42:23
articles 37:16 38:3
38:13 39:22,23
40:1,14,16 43:3
asked 19:8,12 21:9
23:5,8 36:7 38:23
39:2 44:8 54:6
71:5 75:1 89:1
90:6 98:12,17
114:17 115:9,19
115:20 116:24
127:5 132:24
137:12 138:6
141:5,12 149:23
asking 9:4 22:4 32:1
76:22 107:12
112:8 116:7 126:4
139:10 144:21
asks 133:21
asphyxia 40:12 75:6
75:9,24 76:3,3,4
76:11,20 79:4,4,6
79:10,11,24 80:1
80:6,8,13 81:5,9
81:17,21,21 82:1
82:7,7,18,21 83:1
83:4,11,16 85:2,5
85:13,17 86:8
87:17,17,19 88:2
112:6
asphyxias 76:13
asphyxiation 55:3,5
81:2,15 85:24
86:18,19 87:1,7
87:11 88:3,7,16
88:24 89:6,10
112:24
assigned 71:3,11
assigning 70:17
associated 59:3
79:11 80:1 124:4

ASSOCIATES 1:21
association 34:15
34:17 35:22 58:18
63:24
assume 23:9 30:10
69:8 112:16
118:15
assumes 7:2 30:7
68:1
assuming 157:18
ate 145:9
atherosclerosis
104:12,20 105:18
atherosclerotic
100:17 105:16
107:8
Ativan 91:7,22
151:24 152:3
attached 14:20,20
160:6
attack 33:23
attempt 59:18
attend 67:7,14 69:1
attends 68:20 71:17
attorney 5:23 7:19
8:13,17 9:9 12:23
22:15 49:16,18
67:20 132:12
attorney/client 8:18
8:22 10:19 12:7
42:2,7
attorneys 7:6 9:4
18:13 19:11 33:11
36:15 52:10 53:1
54:4
atypical 7:18
audibly 2:21
authored 30:15
90:19
authors 29:8 33:21
37:11 38:21
autopsies 25:10
56:16,21 57:5
58:8 67:7,14 75:2
127:21 128:2,11
128:13
autopsy 14:18 16:1
19:6 25:6 26:3
27:8 34:7 36:6,23
37:6 38:6,8 55:19
56:2 64:1 68:6,13
68:21 69:1,10
70:13,15 71:13,16
71:18,22 74:17
75:10,24 76:3,11
83:15,15,23 90:3
90:20 92:18 94:14
101:17 104:13
107:1 109:16,17
111:16,21 112:22
124:13 125:4

126:9,22 149:8
**autopsy's** 95:3
**available** 18:15
71:20,21 72:3
149:1 157:7
**Avenue** 1:16 2:3,8
**average** 110:6,11
**avoid** 155:13
**aware** 7:11,14 9:9
21:6 22:11 30:14
35:6,11,24 44:11
82:24 103:14,16
122:17 123:17

**B**

**back** 12:3 17:11
20:19 26:10 40:23
41:5 56:5 68:10
68:11 80:18 83:3
84:3 85:1 87:22
101:10,15 116:6
121:19 133:10,11
134:9 140:17
144:23 146:3
155:24 156:1,4,23
**background** 47:8
**backing** 111:6,10
**bad** 46:2
**ball** 115:15
**Basalt** 123:4
**Basalt's** 123:2
**based** 75:1 78:19
98:11 105:22
139:20 147:9
**bases** 133:19
**basic** 70:6 141:7
**basically** 25:13
48:10 62:3 96:24
**basis** 63:17 65:24
66:2,16 124:15
127:10 134:5
**Bates** 77:9
**Bear** 100:15
**beating** 108:7
**bed** 82:8
**began** 114:21
**begins** 71:13
**behalf** 2:5,9,14 20:9
27:24
**behavior** 130:14,16
130:17,19,23
131:12,14,17,21
135:24 136:5,11
139:7,23 142:12
144:24 147:10
**believe** 16:16 24:10
27:8 29:15,15
30:21 51:5 56:10
78:15 104:24
108:23 121:10
135:24 136:10

139:17 142:11
153:14
**believed** 43:12
105:5
**belly** 80:12,16,19
**benefit** 55:16 93:12
**Bernard** 39:7
**best** 28:14 30:11
32:2 64:3 70:6
71:15 84:13
144:18 155:7
**bet** 129:4
**better** 104:13
119:11
**Betz** 65:16
**Beyoglides** 1:4
**beyond** 62:22
155:22
**bias** 30:6,11,12
**big** 76:6 80:12
97:18 102:10
**bigger** 80:15
**bit** 47:9 100:14
107:16 133:12
**block** 105:1
**blocks** 17:16,17,18
18:1
**blood** 102:17
109:22 111:4,6,9
117:11 119:23
123:12 151:24
152:6,8,9,12,20
**blown** 148:13
**board** 58:21,23 59:1
59:8,20 60:11,13
60:21 61:1,4,8,9
61:10 124:20
126:10,15 128:11
131:8,11 151:17
**boards** 60:18,19
**body** 80:17 86:20
119:9 120:22
121:17
**Boehringer** 2:15
**book** 30:15,16,17
35:18 39:13
**bottom** 14:15 55:8
77:9,10
**boy** 29:11
**Brannon** 49:21,22
49:24 50:5,10,17
50:19 51:17 52:6
53:1,15,17,21
54:13
**Brannon's** 51:23
52:7
**break** 11:24 23:17
23:19 40:19 45:22
133:11,15 135:19
137:12 138:2,5,9
138:14 139:1

140:9,18
**breakdown** 119:2
**breathe** 81:23 82:20
89:8,15
**breathing** 80:23
86:14 88:6,8,23
122:13
**Brenda** 2:16
**bring** 9:21 10:2
13:18,22 42:7,8
44:8,9,12 46:4
127:2
**bringing** 47:3
**brought** 9:13 10:5
13:11,22 14:6
15:5 41:1 42:8
43:11 44:16 46:15
47:7 55:13 93:16
94:22 130:19
131:21,21 135:24
136:5 147:5,24
**Bryan** 1:14 3:5 4:2
5:1,10 160:3,9,11
162:7
**business** 52:19
97:17 153:21

**C**

**C-A-S-T-O** 5:10
**C-H-A-N** 29:14
**cage** 80:19
**calendar** 156:22
**call** 6:16 20:19 70:3
99:4 105:17,17
150:14
**called** 1:14 3:5
38:16 46:5 62:1
89:24 132:20,22
**calling** 155:13
**calls** 22:12 64:15
**camp** 30:20 32:21
**cancel** 157:9
**caption** 162:14
**captures** 95:2
**car** 82:9 148:7
**carboxy** 118:24
119:3
**card** 15:21
**cardiac** 51:14 85:16
103:3 107:20
111:24 112:7
113:7,16 126:20
129:10 130:2
136:7,16,20
139:17 140:3
145:1 149:9,15
**cardiologist-type**
97:16
**cardiology** 105:12
**cardiomegaly** 86:24
87:3 99:5

**cardiovascular**
93:10 99:4,10,13
99:14,17 100:1
149:13
**care** 69:23 90:5
154:3
**career** 21:6 29:23
30:4 65:21 124:10
125:16
**careful** 77:17
**Carrie** 2:11 159:15
**case** 1:7 7:10 8:8,15
9:5 10:18,19
12:21 14:4 16:16
19:23 20:17 21:16
21:17,18 22:2,5
22:10 27:10 28:12
33:11,23 36:15
51:5,9 53:19,23
54:2 57:19 70:7
71:21 73:3,12,23
78:21 109:8
111:20 123:17
124:3,24 125:13
127:2 128:8,8
136:22 140:5
146:23 152:3
153:14 154:20
156:5
**case-by-case** 66:2
**cases** 17:3 50:5,8,17
50:21,22 51:4,7
51:21 52:24 123:3
123:6,20 126:10
126:19
**cast** 154:22
**Casto** 1:14 3:5 4:2
5:1,10,11 10:18
12:6 14:14 15:2
41:6 44:20 77:7
96:6 148:21
154:24 155:14
159:2 160:3,9,11
162:7
**Casto's** 121:16
**categories** 145:17
**category** 31:13
32:12 100:10
146:18,19,20
147:23
**causation** 51:16
**cause** 31:5,7 33:9
34:4 75:5,10,24
76:14 79:18,21
93:4,11 99:18,18
100:1 105:17,18
111:22 120:12
124:21,22 125:23
128:5 144:1 146:7
149:11,14 162:8
**caused** 143:22

144:12,22 150:12
**causes** 20:13
**causing** 81:5 107:13
108:16 109:2,13
125:15 127:4
128:10,16 129:16
136:2,14 139:22
147:17
**Cc** 159:14
**cell** 114:22
**certain** 80:1,22
96:17 116:16
146:22
**certainly** 85:9
**certainty** 31:6,21
32:5,12 33:13
109:13 114:4,11
114:14 115:5,18
116:21 117:15
118:4,7 119:21
129:15 130:12
136:12,20 137:4
137:16 139:6,12
140:7,21 141:15
141:19 142:9
**certificate** 93:3,6,9
149:5,21 162:1
**certificates** 25:10
**certification** 58:23
59:1,8,20 60:12
60:13,22 61:1,5
61:11 142:23
143:17
**certified** 5:3 58:21
**certify** 160:3,10
162:6
**challenge** 91:20
**Chan** 29:14 39:21
**chance** 5:12 138:18
138:21
**changed** 140:7
**changes** 34:23
160:6 161:4
**character** 3:8
**charge** 48:10
**check** 62:1
**child** 154:3
**children** 154:4
156:4
**chimney** 82:10,12
**choosing** 142:16
**chosen** 33:17 159:3
**chronic** 107:6,8
111:12 119:6
127:9
**cigarette** 120:2
**Cincinnati** 2:14
**circulation** 100:23
101:6
**circumflex** 101:12
**circumstance** 21:6

circumstances
  34:13 53:12 71:15
  72:8,12 83:22
  84:2,11,22 95:8
  124:4
citation 29:7
citations 123:24
cite 29:6 122:22
city 129:4
civil 1:15 3:6 8:23
  8:24 10:18 11:9
  159:8
claim 27:24
clarification 11:14
  71:8
classification
  105:13
clear 12:6 22:24
  34:12 57:18
  147:22
clearly 130:6
Cleveland 2:4 129:4
client 45:16
client's 7:20
climbs 124:5
clinical 60:23
close 104:6 153:21
  159:6
clumsy 111:15
Clymer 66:23
CME 62:7
co-dominant
  101:13
coached 135:1
  137:8
coaching 132:20
comatose 123:13
combination 130:4
come 6:24 16:2
  18:11 37:5 61:18
  70:1,2 84:14
  101:9 111:5 128:7
  156:1,4
comes 9:20 101:10
  101:11 149:18
comfortable 75:23
coming 18:14 31:5
  87:9,24 91:1
  136:8
commanded 42:8
  44:11 46:4,7
commentary 94:9
  96:18
Commission 160:18
  162:22
commissioned
  162:6
common 15:19 17:2
  18:13 28:15 63:17
  97:9,11 100:5
  111:24 113:6

commonly 14:20
  99:17
communicate
  144:19
communicating
  156:15
communication
  10:20 43:21 44:6
communications
  8:18 44:12
community 6:23
  9:20 81:13
company 89:24
compensation
  60:14
competency 61:5
competent 64:7
complaint 45:6
complete 78:7,20
  157:18
completed 26:3
  47:24 149:20
  153:20
completing 24:21
component 102:21
  118:20
compromised
  102:18,23
computer 56:24
  57:6,10 162:11
concept 97:17
concerning 111:21
conclude 149:9
  155:12
concluded 57:24
  75:9 149:1 158:7
conclusion 22:13
  33:12 64:16
  136:19 139:5,11
  141:14,18 142:8
conclusions 31:5
  37:6 91:2 147:11
condition 82:22
  86:10,21 97:18,19
  106:18,19,20,24
  107:2,8 111:11,13
conduct 108:13
  147:6 148:1
conduction 103:3
conference 18:7
  19:4
conflict 52:3
confuse 28:12
  117:16,22
confusion 33:10
congested 110:20
  110:22 111:3,4
congestion 110:20
  112:5 113:5,11
congestive 109:22
connecting 139:18

connection 5:20
  36:11 50:16 51:3
  54:2 108:13
consider 64:13
  76:19 80:2 83:21
  84:10,19 88:17
  95:7 106:5 110:4
  110:6 122:1 140:4
considering 83:23
consistent 7:1 87:6
  87:10,12 88:1,2,7
  88:15,24 89:6,9
  111:18 113:9
constellation 88:14
consultation 49:16
  50:20 52:19
consumed 118:4,7
contact 7:19 21:4
  74:16,19
contacted 19:2
  69:20
contacting 6:13
  20:5,18 21:20
contain 62:4
contained 41:1 56:9
  77:24 143:10
content 26:14
contents 10:11
  80:19
context 11:8,11
  12:7 75:8 80:10
continue 71:18
  157:11
contract 89:18
contractor 52:16
contribute 81:1
  118:17 128:10,16
  129:16
contributed 107:13
  108:15 109:1,13
  124:15 125:15
  128:5,14 130:12
  131:7,11,22
  135:23,24 136:1
  136:11,13 137:5
  137:19 139:7,22
  147:17
contributes 86:22
  141:17 144:4
contributing 124:21
  125:23 126:8,13
  127:3 129:9 130:8
  130:23 141:21
  143:6 145:21
  146:6,7
contributor 126:20
control 144:10
  156:15
convention 145:20
conversation
  132:15 156:9

conversations 36:14
convoluted 137:22
  138:8
Cooperstone 1:21
  159:9
copied 43:18 44:5
copy 16:9 44:24
  54:17 92:11 93:19
  93:22 95:11,18,24
  96:6,13
coronary 98:4
  100:21,24 101:4,7
  101:8,9,11 102:3
  103:5 104:6,12,12
  104:19,20
coroner 7:19 11:4
  15:14 20:8 21:21
  49:8 52:3 53:15
  64:21 65:11 67:12
  69:19 80:2 83:21
  84:14 88:16
coroner's 6:17
  15:17 17:11 19:2
  39:13 46:22,24
  48:6,7,13,18 49:5
  53:17 61:14 65:8
  65:21 70:3 71:12
  71:17 73:11 77:23
  78:21 94:20 95:10
coroners 6:21 7:1
  48:8 84:10
correct 5:14,17 6:7
  6:8,10,11 8:19
  9:11,15,17,22
  10:6 13:12,19
  15:10 24:23 26:4
  28:9 29:17,18
  30:24 31:8 35:19
  36:6,8,12,13
  39:10,12 41:7,8
  41:13 43:16 44:21
  45:13 49:23 52:17
  53:4,5 56:15 58:6
  58:12 59:17 63:14
  67:7,15 69:10
  72:1 73:1,4,13,17
  73:20 75:3,4
  79:12,23 80:13,19
  80:21,23 81:2
  83:9,23 84:5,12
  84:20,24 85:24
  86:16,22 87:2,19
  88:7 89:10 92:3,5
  92:19 93:16 95:3
  96:1 97:7,8
  100:19,20,22
  101:1,20 106:13
  106:16 109:14
  110:2,16,19,23
  112:7 113:12,13
  116:23 118:10,13

118:16 119:13,18
  119:19 123:5
  124:7,11 125:24
  126:10 127:4,22
  128:5 131:23
  137:6,19 143:17
  143:19,20 147:17
  149:6,7,10,24
  150:3,7 152:18
  153:1 160:7
  162:12
correction 27:7,15
  28:4,17 74:7
  159:6 160:5 161:7
correction/change
  159:5
correctional 91:10
corrections 26:12
  26:16 27:4 58:1
  65:17 66:1 74:3
  91:23 107:12
  114:15 115:8
  116:22 147:8
corrections/chang...
  159:4
correctly 80:12
  136:7
correspondence
  44:15
cost 155:13
counsel 3:4 8:18
  19:16 42:4 132:7
counsel's 13:16
counter 32:17
counties 57:5
country 81:14 98:9
county 1:8 6:2 8:14
  8:22 10:17,20
  11:3,9 12:24 19:2
  21:18 48:6,13,18
  49:5,8,11 54:12
  56:22 57:4,6
  64:21 65:17 66:4
  67:13 68:24 69:5
  69:9 72:11 73:10
  73:12 77:12 89:23
  97:3 160:2 162:3
couple 24:15 156:12
course 15:19 37:21
  53:19 63:6 65:21
  66:19
court 1:1 23:15
  48:21
CPR 113:7
crashes 128:19
create 33:9 45:15
  88:14
created 23:7 53:20
  90:4
creates 143:22
creating 90:3

144:23
**crime** 65:15
**criminal** 10:18
**critical** 138:17
157:5
**cross** 16:18 104:5
**CROSS-EXAMI...**
5:4
**crystal** 12:6 115:15
**cuffed** 84:3
**current** 58:20 64:9
105:12
**currently** 58:17
71:20,21
**custody** 70:23 71:4
71:6 81:9
**cut** 133:20 134:1,3
**cut-off** 105:7
**CV** 54:17

_____
**D**
**damage** 154:14
**damaged** 17:22
**damages** 154:20
156:18,19,20
**dangerous** 82:20
103:7,17
**Daniel** 39:11
**date** 26:13 161:23
**Davis** 65:12
**day** 20:19 24:13
94:16 114:1,7
152:1 155:6
160:15 161:3
162:18
**days** 91:5 119:4
149:7 159:8
**daytime** 70:11
**Dayton** 1:16 2:9
49:16 72:16,21,21
**dead** 98:2 151:15
**deadline** 155:15
157:17
**dealing** 70:7 105:10
**Dear** 159:2
**death** 5:20 6:13,23
7:20 9:15,20
20:14 21:17 24:13
25:10 26:14 31:6
32:18 33:9 34:4
36:12 38:19 51:13
51:14,15 54:24
68:6 69:14,23
71:4,11 72:19
74:21 75:6,10,24
76:14 79:6,18,21
81:2,5,9 83:23
84:2,11,22 85:5
85:24 86:16,22
87:2,3 88:2,3
89:10 90:11 92:21

93:3,4,6,8,11 95:3
95:8,12,18,21
99:18,18 100:1
105:17,18 107:3
107:14 109:2
111:18,22,24
112:1,7,9,23
113:9,17 117:7
120:12 123:18
124:15,21 125:16
125:19,24 126:8
126:14,21 127:4
127:16 128:5,10
128:14 129:9,17
131:22 135:23
136:2,14 139:17
141:17,21 143:1,4
143:23 144:1,3,4
145:15,21 146:5,5
146:7,12,13
147:17,24 149:5,6
149:11,14,21
150:12
**deaths** 28:11 29:5
40:11 56:24 57:3
57:23 58:8 70:19
70:23 71:6,7
113:7 128:17
**deceased** 1:5 11:6
20:10 21:20 69:19
**decedent** 16:2 20:12
67:10,17 117:6
**decedent's** 16:24
19:6 74:20 95:12
117:11
**December** 1:16 3:1
159:1 160:5
162:18
**decide** 107:11
**decides** 108:15
**deemed** 13:18
**defendant** 11:10
53:22
**defendants** 1:9 2:10
2:14 50:11
**defense** 19:11 21:11
21:14 29:19 30:3
154:21
**define** 81:6,16,19
140:23 141:4
**definition** 121:8
141:7 142:6,10
148:3
**degree** 31:6,21 32:5
33:13 109:13
114:4,10,13 115:5
115:18 116:20
117:14 118:3,6
119:20 129:13,15
130:12 136:11,19
137:3,15 139:6,11

140:6,21 141:15
141:18 142:9
**delay** 134:11 140:14
**delirium** 30:15,18
30:21 31:7,11,23
32:7,15,18,22
33:8,14,16 34:4
34:14 35:4,7 36:5
36:10,16 37:24
38:16
**demise** 93:13 95:3
**demonstrating**
88:17
**denying** 154:2
**department** 8:23
73:10 143:16
**depends** 86:9
**depose** 156:5
**deposed** 5:15 9:19
51:3,9
**deposes** 5:3
**deposition** 1:14 3:5
3:7 5:13,20 8:15
9:13,22 11:17
13:19,23 15:6
23:22 24:9 26:3
26:11 28:19 29:3
36:22 38:12 39:17
41:2,3,6,19 42:22
43:12 44:17 55:14
56:1 57:8 68:5
122:8 148:24
153:10,17,18,19
153:20 154:3,23
155:13,14 156:23
157:1,4,7,18
158:7 160:4,11,14
161:2
**depositions** 153:21
154:1,15
**depression** 112:4
**depriving** 154:19
**deputy** 48:8 49:7
**descending** 100:18
101:8,23 102:3,5
102:17,21,22
104:24
**describe** 101:3
**described** 18:9
24:20 25:19 49:8
**describing** 68:14
**desirable** 60:13,17
**desire** 159:4
**desired** 159:5
**destroyed** 25:16
27:12
**detail** 27:6 71:15
126:24
**detailing** 16:2
**details** 70:5 123:19
**detained** 81:13

**detainee** 28:9
**detainees** 27:24
74:11,14
**detect** 152:8
**detectable** 151:21
151:24 152:1,2,11
**detective** 66:24
93:15,17,19 94:5
94:8,22 95:17,23
96:13,14
**detectives** 66:7,19
**determine** 103:23
**Di** 29:10,17 30:6,14
30:17 33:20 37:20
38:14 39:19
**diagnosed** 124:9
**diagnoses** 35:18,20
35:23
**diagnosis** 30:21,23
31:3 34:5,14,22
35:4,8 75:17
79:17,20 80:3
83:8,18,23 84:15
98:9
**diagnostic** 35:13
83:10
**diaphragm** 80:20
**DiCello** 2:2 4:4 5:5
5:11 7:7,15 8:3,16
9:3,7,18 10:4,14
10:23 11:15,20
12:10,16 13:1,15
13:24 14:10,12,23
15:4 18:24 19:15
19:21 20:7,21
21:12 22:3,17
28:23 29:24 30:13
31:19 32:13 35:14
36:9,20 38:5,11
40:20,22 41:14,22
42:15,24 43:7,10
43:19,23 44:14
45:4,7,14,18,23
46:5,7,13,14,19
47:2 48:24 50:4
52:5,12 54:9
55:11,22 56:6
57:17 62:19 63:11
64:20 65:7,13
66:21 67:21 68:2
72:5,17 76:9 77:6
78:10,11,16 85:11
87:23 89:3 90:10
91:16 92:2,6
95:16 96:4,11,22
98:5,14,19,20
99:19 100:4,8,13
102:14 103:6,13
103:22 107:18
108:2,11,21 109:9
111:2 112:18

113:3 114:2 115:2
115:13,23 116:3,8
116:15 117:3
120:5 122:5 125:8
125:12,20 126:5
127:7,14 129:6
132:5,10 133:2,8
133:13,15 134:4
134:13,18 135:2,8
135:11,15,21
136:9,18 137:10
137:14,24 138:6
138:15,21 139:2
139:19 140:12,16
141:8,13 142:21
144:11 145:8,18
146:14 147:15
148:12 149:4
150:1,10 151:7
153:3,6,15,22
154:11 155:1
156:1,9,21 157:3
157:13,16,21
158:1 159:15
**die** 31:10 79:6 80:6
81:14 85:10 97:22
98:10,16 99:12
123:15 129:7
142:6
**died** 31:22 32:6
33:13 36:16 56:22
91:5 92:15 93:10
98:9 99:2 107:22
113:20 114:1,5,7
114:15,19 115:6
116:22 124:6,10
124:20 143:7
144:19 150:5
151:2 152:9
**dies** 84:2
**difference** 76:6 85:3
97:18 102:10
**different** 37:12 61:5
79:19 98:19 110:6
**differentiate** 76:2
**difficult** 46:2 153:9
**diffuse** 113:11
152:9
**digital** 16:6
**dilated** 16:24
**Dinkler** 1:16 2:7,7
7:2,12,21,24 8:9
8:11,21 9:1,6,16
9:23 10:9,17 11:7
11:14,20 12:4,13
12:15,18,22 13:13
13:20 14:17 18:22
19:9,19 20:2,15
21:8,22 22:12
28:20 29:21 30:7
31:16 32:8 35:9

36:7,17 38:4,8
40:19 41:4,12,16
41:17,23 42:5,18
43:6,9,17,21 44:4
45:9,17,20 46:1,6
46:11,23 48:21
50:1 52:4,8 54:6
55:20 56:3 57:16
62:16 63:8,10
64:15 65:5,10
66:17 67:19 68:1
72:2,13 76:5 78:8
78:14 85:6 87:20
89:1 90:6 91:13
91:24 92:4 95:13
96:2,8,16 98:1,12
98:17 99:15 100:3
100:11 102:12
103:1,9,19 104:10
107:15 108:1,8,18
108:20 109:6
111:1 112:15
113:1,22 114:17
115:9,11,19 116:1
116:5,13,24 120:3
122:2 125:10,18
126:1 127:5,11
129:2 131:24
132:2,9,22 133:3
133:9,14 134:1,8
134:16,20 135:7,9
135:18 136:4,15
137:7,12,20 138:3
138:8,11,20,23
139:15 140:8
141:5,12 142:18
142:20 144:2
145:6,13 146:1
147:13 148:6,20
149:23 150:8
151:3 153:18,23
154:13,18 155:18
156:3,17,24 157:8
157:15,19,23
**Dinkler's** 10:15
18:19 21:5 44:16
**direct** 51:18
**directing** 51:18
**director** 48:9 65:15
**disagree** 121:12
**disappear** 17:22
**disbelief** 148:16
**disciplines** 152:16
**discourage** 19:12
**discovery** 46:24
**discussed** 155:8
**Discussion** 153:5
**disease** 63:17 85:12
93:11 98:4 99:5
99:10,13,14,18
100:1,6,18 105:8

106:15,23 107:7
140:3 146:13
149:13 150:12
**distal** 102:5,8,20,23
103:18
**distributed** 70:24
**distribution** 100:24
**DISTRICT** 1:1,1
**DIVISION** 1:2
**DNA** 78:23
**doctor** 5:9 6:6 10:16
11:2 14:13 22:18
23:22 24:8,19
29:7 30:20 31:14
37:13 40:23 44:15
46:3,8 47:3,9 55:8
56:16 58:14 61:14
62:10 68:9,9
69:12 77:4,9,22
78:19 79:5 81:8
92:7 93:4 94:15
97:9 100:14
102:11 107:10
109:17 111:16
113:18 115:24
116:16 119:11
120:9 121:15
125:3,13 127:8
128:9 138:17
140:17 142:17
143:13 144:17
150:17 153:9
156:21 158:1
**doctor's** 155:3
157:8,18
**doctors** 30:20 37:12
**document** 37:2
68:20 70:5 77:19
91:2 102:4 143:21
144:20
**documentation**
26:5 27:14 68:4
69:3,4 77:22 90:4
91:12 92:7
**documented** 91:4,6
123:22 124:3
129:20
**documenting** 16:21
**documents** 13:17
15:16 23:23 27:9
29:2 41:5 42:1
43:11,13 44:4,19
45:9,11 49:2 56:9
69:16,17 78:22
90:14
**doing** 37:13 53:9,13
133:24 134:16,19
140:11 144:17
155:20 156:14
**dominant** 100:21
101:4,6,6,11,12

**door** 76:22
**dope** 136:24
**doubt** 107:21 125:6
**Douglas** 5:10
**dozens** 57:1,2,3,23
58:7 70:18
**Dr** 5:11 6:22 10:18
12:6 19:3,3 29:17
30:6,14,17 64:24
65:3 96:6 121:16
148:21 155:14
159:2
**Drive** 1:21 159:9
**drownings** 128:19
**drug** 85:4 117:24
119:2 121:3,10
124:18 131:8,11
139:16 142:22
143:5,6 144:1,3,7
144:12,21,22
146:17 150:15
151:2 152:19,21
**drugs** 124:20
126:10,14
**drunk** 82:8 117:17
**DSM** 35:15 36:2
**Dublin** 1:22 159:9
162:17
**due** 82:2 111:11
112:9 138:4 143:7
146:24 150:15
**duly** 5:2 162:6,7
**Dwight** 49:21,22
52:6
**dying** 82:24 86:8
87:6,10 96:6
97:18,19 98:23,24
128:18

_____

**E**

**earlier** 45:2
**early** 157:6
**easiest** 144:7
**easy** 33:7 56:23
**edema** 109:19,21
110:21,23 111:8
112:3,4
**editorials** 39:23
**effect** 137:18 139:13
152:21 153:1
**effectively** 81:23
**effects** 121:3 124:14
**efficiently** 100:15
**effort** 64:11
**efforts** 61:10 62:7
**either** 9:10 18:11
24:19 29:6 61:22
69:23 80:16 82:3
146:6 152:4
**EKG** 136:24
**elected** 64:17,18,22

65:11
**Ellis** 2:16
**emergency** 25:3
**employed** 48:13
72:11,20 89:24
**employee** 8:22
10:17 64:19 70:2
73:13
**employer** 11:9
12:24 13:8
**employment** 49:6
49:10 54:11 61:22
**encounter** 113:19
114:14
**encountered** 11:3
20:11 66:18 67:23
**encountering** 115:7
**encouraged** 134:23
**enforcement** 81:14
83:1
**engine** 40:5
**enlarged** 98:4 99:7
105:19,20,23
**entered** 132:15
161:5
**entire** 94:3 161:2
**entitled** 30:15
**ER** 24:15,15
**errata** 159:4,9
**ESQUIRE** 2:2,6,7
2:11,12
**estate** 1:5 5:24
**estimate** 104:6
127:23
**Estimating** 104:12
**et** 1:9
**etiologies** 79:19
**etiology** 99:5 113:16
**evaluate** 30:5 104:9
**evaluated** 88:9
**evaluating** 104:3
**evaluation** 17:24
52:19
**evenly** 70:24
**event** 26:13 79:10
79:14 108:6
114:20 130:1,2,15
**everybody** 108:7
155:15
**everyday** 122:11
129:4
**everyone's** 156:22
**evidence** 7:3 30:8
68:1 92:20 95:7
95:20,21 127:22
128:2 129:19,20
130:22,24 131:3,6
131:10,19 135:22
136:13 139:10
150:16
**exact** 33:5,20 38:9

61:20 75:16
113:20
**exactly** 56:5 112:12
112:14
**examination** 4:1
16:15 17:4 24:21
59:3,16 104:21
**examinations** 60:5
**examined** 160:14
**Examiner's** 63:19
**Examiners** 58:19
64:1
**example** 6:21 63:19
72:6 96:19
**exceedingly** 100:10
**exceptions** 146:9
**exchange** 71:18
**exchanged** 45:11
**excited** 30:15,18,21
31:7,10,22 32:6
32:15,17,22 33:8
33:14,16 34:4,14
35:4,7 36:5,10,16
37:24 38:16
**exclude** 84:1,15,19
**excluded** 31:7
**Excluding** 36:14
**exclusion** 83:18
**exclusively** 88:1
**executed** 143:17
**exercise** 107:17,20
108:24 136:6
147:18
**exertion** 86:4
**exhaustion** 86:4
**exhibit** 4:6,7 14:11
14:14,16 15:1,3
15:11,12 27:2
41:6 55:7,9 56:9
56:14 57:7 77:2,5
77:8,24 78:7,19
143:11,12
**Exhibits** 44:10,20
**existed** 22:10
**exists** 22:10
**expect** 105:24 106:7
112:3 128:12
152:21 156:11
**expected** 155:21
**expecting** 154:15
**expense** 155:13,23
**experience** 6:20
54:19 98:11,15
151:1
**experienced** 11:6
**expert** 29:19 42:11
54:5 76:19 157:5
157:17
**expertise** 61:2
152:15
**expires** 160:18

162:22
**explain** 36:4
**explained** 19:6 85:2
**explaining** 139:5
146:5
**explanation** 115:21
**explore** 154:19
**extent** 104:9
**external** 80:18
**extremely** 113:6
**eyewitness** 28:9
74:10

**F**

**F** 143:2
**faced** 76:4
**faces** 67:5
**fact** 78:22 152:19
**factor** 80:7 85:4,12
85:16,20,22 129:9
141:21 143:6
146:6,7
**factors** 80:1,5 85:1
88:13
**facts** 7:2 30:7 68:1
84:1,10 139:20
**fail** 60:7 139:22
**failing** 137:5
**Failure** 159:9
**fair** 23:9 95:23
103:16 126:16
133:3 135:3 140:9
**fairly** 96:20
**fall** 32:21 146:18,19
146:20 147:22
**familiar** 29:22
35:15 63:19,23
89:16
**families** 33:10
**family** 5:24 19:12
19:16 20:10 21:20
67:10 74:16,19
**Fannin** 15:13 26:22
73:3,5,15,19 74:1
74:5,13,19
**far** 1:16 2:8 13:4,21
20:5 24:22 88:8
119:7 146:24
**faster** 24:5 26:18
**fat** 152:5,7
**fatal** 79:6,11,15,22
100:6 107:22
108:16 109:14
**fate** 134:2
**fatigue** 85:22 86:3
**favor** 88:15
**feature** 83:11 99:7
**federal** 63:20
**feel** 33:18,19 61:6
71:19
**feelings** 53:20

**fees** 52:20
**Felicia** 2:15
**fellow** 6:21
**fellowship** 47:14,23
48:1,5,14 49:4
**field** 35:23 61:2,3
61:24 63:23 64:8
64:10
**fifth** 116:24
**figure** 57:13
**figured** 98:7
**file** 9:11,21 10:1,2,5
10:8 13:11,12,18
15:17,19,21 25:1
26:6 37:2 41:1,3
41:10,15 42:8,8
42:14 43:2,11
44:16 45:24 46:3
46:5,8,9,11,18,21
46:24 78:7,20
78:22 121:16
**filed** 6:1 21:17 97:6
**files** 16:7,9 27:15
**final** 79:8
**find** 34:17,19 42:16
78:18 96:10 128:2
134:22
**finding** 125:2,13
128:13 140:5
**findings** 109:16
111:17,21,23
112:9,22
**finds** 93:9
**fine** 12:1 134:16,21
138:13
**fingerprint** 15:21
**finish** 22:23,24
150:23 153:10
154:3 157:1,10
**finished** 31:17
**Fire** 72:22
**fireman** 72:16
**firm** 1:16 8:23
**first** 5:2 11:3 15:5
15:13 23:19 59:1
66:8 67:3 69:22
72:15 92:11 93:6
93:8 126:6
**Fisher** 38:19,21
**fit** 116:16
**five** 75:18,22 76:13
119:4 145:17
149:7
**fixable** 103:15
**flow** 102:17
**fluid** 110:19
**foam** 87:9,24
**focus** 90:2 106:18
**focusing** 138:12
**folder** 42:9,10 44:8
44:8,9 46:10,11

46:15,17 47:4,7
55:13
**folks** 39:20 56:22
65:23 66:9,15,22
71:24 89:22
**follow** 10:15 13:16
13:21 21:3 28:3
**following** 59:12
80:7 84:8 155:6
161:4
**follows** 5:3
**foot** 46:3 106:5
**footage** 95:11,18
**force** 80:18
**foregoing** 160:4,10
162:11,13
**forensic** 30:3 35:22
36:2 38:14,15,16
39:7 47:12,21
48:1,3,17 49:5,7
49:11 54:11,16
56:18 58:17 60:19
60:21 61:16 64:1
64:8 84:5 94:20
127:16 141:3
152:15
**forever** 104:22
**form** 7:2,12,21 8:11
8:21 9:6,16,23
10:9 11:7,21
13:13,20 14:17
19:9,19 20:2,15
21:8,22 22:12
29:21 30:7 32:8
35:9 36:17 41:12
42:5,18 52:8
55:20 56:3 57:16
62:16 64:15 65:5
65:10 66:17 67:19
72:2,13 76:5 78:3
85:6 87:20 91:13
91:24 92:4 95:13
96:2,8,16 98:1
99:15 100:11
102:12 103:19
104:10 107:15
108:1,18 109:6
111:1 113:1,22
120:3 122:2
125:18 126:1
127:11 129:2
131:24 133:17
139:15 144:2,15
144:18 145:2,3,6
145:13 146:1
147:13 148:6
150:8 151:3,5
160:6
**formally** 10:2
**format** 16:6 27:1,4
**former** 65:11 73:6,7

73:12
**forward** 158:2
**Foster** 2:15
**found** 58:7,9 95:9
98:24 101:17
106:16 109:22
111:16 118:9
120:7 124:20
**foundation** 11:21
32:9 52:9 62:17
103:20 133:5,18
**four** 77:7 115:20
143:13,14 151:1
**fourth** 116:1
**Franklin** 162:3
**frequently** 29:19
**friends** 66:9
**front** 13:23 23:14
23:15 77:3 143:11
**full** 106:2 156:15
**full-time** 48:12

**G**

**G** 1:4
**gain** 60:21
**Garrett** 2:16
**gasp** 89:4
**Gasping** 87:5
**gather** 71:16 72:12
**gathered** 72:24
**gathering** 71:23
73:15
**geared** 62:5
**general** 58:19 60:18
63:16 146:11
**generally** 7:5 15:21
18:14 19:10 34:9
63:15 66:3 70:9
70:20 105:15
117:9
**generate** 25:11
**generated** 14:22
24:10 36:11
**generating** 24:22
33:22
**getting** 43:8 44:10
83:20 135:19
138:16 156:19
**give** 61:20 93:19
95:20,24 99:23
117:1
**given** 12:5 23:7 44:9
67:18 70:14 92:11
96:18 115:21
151:19 152:19
157:4 160:4
162:12
**giving** 14:2 121:2
159:5
**glad** 137:23
**glib** 114:9

**go** 7:4,13,24 8:12
12:9 20:13 21:24
28:21 30:9 32:10
35:10 36:18 40:24
41:20 42:16 45:20
45:22 48:3 54:7
57:12 60:22 62:6
69:12,13 70:3
72:14 73:22 77:11
77:21 82:14 85:8
87:8,21 90:7
91:14 95:14 98:21
104:3 108:20
109:7 113:23
114:18 115:24
116:4 121:19
125:2 132:3
145:14 147:21
151:4 153:3
156:21
**goal** 33:22
**goes** 46:8 81:3
113:16 152:7
**going** 9:21 10:10,15
13:16,17,21 14:24
16:10 20:12 23:8
26:18 27:1,3 42:1
42:10 57:18 70:12
72:23 77:2,3,15
78:18 82:10,12
98:6 100:14
110:14 119:10
122:3 124:2 125:8
133:12 138:3
146:18 148:8
153:20 154:1,23
155:24 156:3,7
**good** 5:6,7 20:22
95:7 96:20
**Google** 40:7 63:1
**government** 63:20
**grammatical** 145:3
**grams** 105:22
110:15,16
**grandparents** 74:21
74:23 156:13
**great** 134:19
**greater** 127:20,21
**gross** 104:13 111:17
**grossly** 105:5
**ground** 84:4
**grounds** 133:4
**group** 56:24 62:6
**groups** 35:23
**guess** 37:8 43:8,8
50:8 111:15
121:18 124:1
126:3
**guidance** 14:3,6
**guidelines** 63:18,22
64:2

**gunshot** 128:19
**gurgling** 87:5
**guy** 137:5
**guys** 83:3 87:22

———————
**H**
**H-O-L-L-A-R-A-N**
29:14
**habit** 25:24 69:13
69:18
**habitus** 119:9
**hairs** 151:5
**half** 33:4 44:2 49:17
50:24 51:1 53:4
**hallucinations**
121:2
**hand** 14:24 77:2
135:6,12,13
162:16
**handbook** 35:24
38:14 63:20
**handbooks** 63:18
63:22
**handcuffs** 82:4
**handful** 126:9
**handing** 14:13 77:7
**hands** 58:1 83:1
84:3 148:2,10
**happen** 69:22 100:7
100:9
**happened** 28:1
74:11 83:6 91:12
92:3 135:18
151:14
**happening** 94:11
96:19
**happens** 69:18,21
70:11 81:11 83:8
**happy** 133:15
155:22
**hard** 22:22 53:20
56:4,4
**Harry** 1:4
**Harshbarger** 65:1,3
**head** 82:5
**health** 91:3,17
143:16
**healthcare** 24:11
50:13
**healthy** 121:10
**heard** 62:10 82:14
97:17
**hearing** 132:19
**heart** 16:18 33:23
79:7,22 85:12
98:4 99:8 100:6
100:17,24 101:10
101:15 105:9,15
105:19,19,20
106:1,2,10,12,15
106:19,20,23

107:1,2 108:7
109:5 111:11
120:24 122:13
137:5,19 139:13
139:21 140:3,7,11
142:13 147:5
150:6
**heavier** 106:9
**heavy** 110:18
**height** 105:22
**held** 48:16 91:9,22
153:5
**help** 69:13 129:12
**helping** 131:5
**helps** 22:20
**hereinafter** 5:2
**hereto** 160:6
**heroin** 129:4
**hey** 32:21 51:19
78:2 96:5 135:3,5
**high** 61:6 97:13
124:5 127:13,16
127:17
**higher** 80:12 86:7
87:1
**highly** 125:16,22
129:14
**Hills** 1:16 2:8
**hired** 65:3,8
**historical** 129:20
**history** 49:10 57:12
57:19 70:7 71:14
**hit** 148:7
**hog-tie** 40:12
**HOJNOSKI** 2:12
**hold** 31:16 61:6
78:18
**Hollaran** 29:12,13
39:21
**home** 148:8
**homicide** 145:16
146:20 147:20,23
148:8,11
**homicides** 57:24
148:17
**honest** 155:1
**hooked** 136:23
**hoop** 61:6
**hope** 71:7
**hopefully** 47:4
**hospital** 45:15
69:24 70:1
**hosted** 74:9
**hot** 135:19
**hours** 151:9,11,12
151:14
**HSA** 91:15
**HSA's** 91:11
**huh-uhs** 22:22
**human** 120:10
122:19,23

**humans** 123:7
**hundred** 75:13,14
**hundreds** 123:14
**Hutch** 67:2,2,4
**Hutch's** 67:3
**Hutchinson** 67:2
**hydroxy** 119:10,11
119:15
**hypertensive** 93:10
99:4,9,13,14,17
99:24 149:12
**hypertrophy** 85:16
97:10,14,22,23
98:10,11,23 99:3
99:7

———————
**I**
**ice** 12:5
**idea** 35:5 52:1 57:21
72:20 81:22 82:19
96:10 103:3
125:14 140:24
155:2,23 156:18
**identification** 14:11
15:3 55:9 77:5
**identified** 41:6
42:11 72:21 127:3
128:7
**identify** 14:16
122:18 131:9
**identifying** 93:4
**ignored** 84:23
**imagine** 25:8
**immediate** 146:6
152:5
**impact** 120:22
**impaired** 81:23
**impairment** 82:2
117:20,23
**implying** 121:21
**important** 81:20
114:21 131:17
138:17 155:9
**imposed** 153:24
**improper** 133:23
**in-custody** 69:14
84:2
**inappropriate**
84:16
**inch** 43:24 44:2,2
**incident** 90:19,24
91:4,21 93:12
**include** 36:5 69:5
74:22 80:6 125:22
128:13 142:24
**included** 14:20 16:7
75:5,9,23 76:10
76:14 99:24
124:13 126:7,13
142:22 144:20
**including** 47:23

58:5,11 104:19
136:2
**incompatible**
106:20
**inconsistent** 111:22
**incorporated** 52:18
**increase** 85:10
**increased** 85:5,23
**increases** 85:13,17
**increasingly** 100:5
**incur** 155:24
**independent** 25:21
52:15 68:3,5
**INDEX** 4:1,6
**Indiana** 47:20
**indicate** 60:8
**indicated** 159:6
161:5
**indicating** 117:6
**individual** 35:13
64:22 68:11
103:11 106:8
122:11 123:19
**individual's** 86:10
**individuals** 6:2
80:22 82:4 136:17
**infant** 75:8
**infants** 75:7
**influence** 85:9
117:6,12,19,23
130:3 139:16
**informally** 10:2
**information** 9:14,21
11:5 47:8 56:7
70:9 71:19,20,24
72:8,23 73:16
74:22 83:17 84:15
88:13 125:3
**ingest** 119:22 121:5
123:9 145:4
**ingested** 123:12
136:21 137:5,17
151:11
**ingesting** 124:10,14
124:22 129:16
**ingestion** 123:7
124:7 125:14,23
126:8 127:22
128:2
**ingestions** 122:20
**inhibited** 86:14
**initial** 130:15
**injected** 151:20
**injection** 91:6,7,9
91:22 96:19 152:4
152:10,13
**injured** 144:21
**injury** 143:2,4
144:4,6,12,14,22
145:1 150:15,19
150:21 151:1

**inmate** 69:24
**instruct** 7:19 10:10
42:16
**instructed** 21:4 42:3
42:6
**instructing** 10:21
**instructions** 11:24
**instructs** 10:24
**intention** 153:10
**intentional** 148:1,4
148:10,10 155:10
**intentionally**
155:17
**interaction** 107:10
107:12 108:14
116:21
**interest** 22:14
**interested** 30:2 91:1
118:21 132:17
**interesting** 132:6
134:22
**internal** 16:14
**internet** 37:17 40:2
56:8
**interpret** 144:18
**interprets** 144:9
**interrupt** 146:2
**intervals** 104:6
**interview** 74:3,10
74:13
**interviewing** 74:8
**intoxicated** 117:15
**intoxication** 117:4,5
117:17,18,22
118:18,23 119:1
146:17
**intoxications**
124:18
**introduction** 5:18
**investigated** 57:24
**Investigation** 38:20
**investigations** 48:11
**investigative** 15:12
15:15 83:17
**investigator** 26:21
70:4 71:17 72:24
73:2,11
**investigators** 15:14
**invite** 67:13
**invited** 6:24 19:3
**inviting** 18:11
**involve** 51:12
**involved** 7:6 56:22
108:24 155:5
**involving** 21:16
**issue** 50:16 51:12
54:3,23 55:3
140:19 153:14
**issued** 21:7 56:1
90:12 93:3,8,11
**issues** 51:12,20

153:8
**issuing** 25:6 27:8
28:17 36:23 38:6
55:19 90:20 94:14
**item** 24:10
**items** 15:22 25:15
**IV** 35:15 36:2

**J**

**jail** 24:10 25:2
26:24 28:11 56:22
56:24 57:3,23
58:7 69:19 70:2
70:19,23 71:4,5
71:11,24 72:11
73:20,22 74:1,9
89:18,24 90:5
92:23
**Jamey** 2:6 125:9
156:6,11 159:16
**January** 157:6,17
**Jim** 15:13 65:11
73:3
**job** 20:8 73:16
112:15 139:4
**jobs** 48:16
**joining** 154:8
**Jon** 2:15
**journal** 61:21
**journals** 54:20,23
55:3 61:15,17,19
61:23 62:8
**Jr** 1:4
**judge** 23:15
**jump** 61:6 100:14
**jumps** 78:2
**June** 36:24 92:12,13
92:14
**jury** 23:14 107:11
108:15

**K**

**keep** 35:2 71:5
87:12,14 95:11
**Ken** 65:15
**kept** 95:21
**kid** 134:17 135:10
**kill** 121:4 148:8
**killed** 79:14 128:23
**killing** 120:14 124:3
**kind** 8:1 18:17
20:10 27:3,6
35:24 37:11 40:24
42:2 49:24 50:5
52:2,18 53:13
54:10 65:24 66:16
69:13,17 70:7,22
82:10 87:3 88:8
106:8 116:19
126:24 129:24
152:16

**knew** 9:14
**Knight** 39:7
**knocking** 76:22
**know** 8:1 9:8 11:16
12:23 13:4 14:2
16:9 20:3,16 21:1
21:4 22:6,15,16
22:19 23:17,18
25:22 27:18 31:4
31:12,20 33:3
34:16,21 38:23
41:17 45:5 50:2,3
50:8,12,13,15
51:11 52:10 53:7
54:17 57:15 61:4
65:17 66:5 67:2,3
67:24 68:12 71:14
74:8,8 75:21
77:17 78:17 82:16
89:18,21 91:11
93:1,2,2,17 94:16
94:21 95:15 96:19
96:20,21 97:12,15
98:22 105:12
107:24 108:4
110:5 114:10,19
114:23 115:3
116:7,12,13,19
117:2,14,19
118:13,14 119:5
119:16 120:1,4
121:24 122:3,10
123:24 124:8,23
125:1,15 127:8,12
130:3,5,8 132:6
132:14,16 135:13
136:21 137:17,18
140:10 141:9
145:9,10 146:16
146:23 147:18
149:2,18 150:5
151:11 152:15
153:12 154:8,13
156:2,12 157:22
**knowing** 30:12
69:15 111:14
114:6
**knowledge** 8:2 22:1
24:18 35:3 37:7
76:21 78:1 93:24
97:16
**known** 71:21
136:16 140:2
**Krisandra** 2:15

**L**

**lab** 65:15
**label** 83:19
**laced** 123:23
**lack** 133:5
**lacks** 32:8 62:16

**LAD** 103:18 106:16
**Lakeside** 2:3
**land** 149:2
**Lane** 68:16
**Lane's** 68:17
**language** 116:17
**large** 16:18
**larger** 106:10
**law** 1:16 23:15
49:24 81:14 83:1
**lawsuit** 6:1 13:5
97:6
**lawyer** 8:10 11:4
12:12,21 13:3,7
134:14
**lawyers** 114:9
154:21
**lay** 42:11 149:2
**laying** 80:17
**layman's** 86:3
**Layne** 1:15,21 3:6
159:9,13 162:5,20
**lead** 56:18 73:11
86:16
**lead-in** 138:24
**leading** 107:3
**leads** 139:11
**learn** 64:11
**learned** 154:18
**leave** 93:22 95:17
154:24 157:24,24
**leaving** 132:23
**lectures** 54:15
**left** 16:24 97:9,13
97:22,23 98:3,9
98:10,23 99:2,6
100:18 101:6,12
101:22 102:3,5,16
102:21,22 104:23
110:5,13,14,16
**legal** 10:15 22:13
64:16
**legitimate** 30:21
34:22 35:4,7,23
82:21 83:7
**lengthy** 11:22
**lesion** 102:4,15,20
102:23 103:4,17
103:24 105:1,4
106:11,16
**let's** 49:14 90:2
106:18 121:19
149:3 155:3
**lethal** 103:4 120:16
120:19 121:21
122:18,20 123:6
128:23
**letter** 60:7,8
**letting** 21:3
**level** 61:2 97:13
117:19 120:6,10

122:18 123:13
152:3,11
**levels** 61:5 123:20
**LIBER** 2:3
**library** 37:16
**license** 47:13,14
**licensed** 47:11,16
**life** 106:21
**life-threatening**
123:21
**likelihood** 85:10
**Likewise** 155:21
**limit** 50:8 106:9
**limiting** 37:23
**line** 69:18 132:21
143:1,3 159:5
161:7
**list** 58:16
**listed** 39:21 149:12
**listen** 116:11 134:16
135:16
**literature** 29:4
36:21,23 37:3,5,8
37:10,12,14 39:24
40:24 41:9 42:3
42:17,23 43:14,15
43:24 44:5,10,23
55:12,17,24 61:15
64:9 78:6 83:2
103:17 106:2
120:9 122:17,22
123:18,22
**litigation** 8:24 11:9
77:12
**little** 47:9 100:14
107:16 120:1
**live** 114:9
**local** 49:16,18 54:16
**located** 57:10
**location** 103:24
**log** 15:22
**logged** 15:23
**logic** 33:5 147:4
**logical** 33:6
**long** 18:4 30:17
47:21 50:22 66:23
93:2 94:1 119:7
153:11,12
**long-worded** 84:7
**longer** 15:13 25:7
53:13 58:20 68:18
**look** 18:5,12,18 38:3
42:3,23 55:14
56:1 57:12 119:17
135:8 152:16
158:2
**looked** 16:18 55:24
57:13 69:3 149:22
**looking** 55:16
126:22 143:10
**looks** 56:8 90:21

122:18 123:13
152:3,11
**lorazepam** 151:17
152:3,24
**lot** 9:19 25:10 33:9
33:10 34:18,19
37:12 97:21 98:8
99:12,16 148:17
152:16
**lots** 82:8 113:8
**LPA** 2:12
**lumen** 104:7
**lung** 110:4,6,7,11
110:12 111:23
112:9
**lungs** 109:23 110:1
110:15 111:6,10
111:21 112:22
**LVH** 98:15 99:1
**Lynette** 125:5
133:23 134:7
**Lynnette** 2:7 135:5
155:5

**M**

**M.D** 1:14 2:16 3:5
4:2 5:1 160:3,9,11
162:7
**machine** 136:24
**mail** 20:19 62:3,3
**mailing** 14:21
**main** 38:15 63:4
101:10 131:13
**maintain** 27:9 104:8
**Maio** 29:10,17 30:6
30:14 33:20 37:20
39:19
**Maio's** 30:17 38:14
**majority** 100:23
127:19
**making** 44:23 121:2
133:4 147:11
154:11,14 157:6
**malpractice** 50:7
**man** 96:6 106:6
109:19 110:7,7
137:17 138:24
**man's** 92:20
**manilla** 46:10,15,17
47:4,7 55:13
**manner** 99:3 143:1
145:15 146:5,8,24
149:6
**marijuana** 117:4,5
117:7,10 118:4,7
118:20 119:4,21
120:2,6,11 121:5
121:9,10,16 122:1
122:9,15,18,21
123:6,9,18,21,23
124:3,7,10,14,22
125:14,23 126:7
126:13 127:3,9,22

128:2,9,13,16,21
129:8,16 130:3,8
130:12,23 131:4,6
131:11,21 135:17
135:22 136:2,10
136:13,16 137:4
137:16 139:3,14
139:21 140:2,4,19
140:22 141:16,20
142:10,12 143:7
144:6,8 145:5,23
147:1 149:18
151:11
**mark** 14:10 159:3
**marked** 4:7 14:11
14:13 15:1,3 55:9
77:5,8 90:12,22
**materials** 13:10
14:6,8 43:2 47:4,6
77:14
**MC** 77:10,11
143:15
**McGinnis** 72:20
**mean** 22:5 28:16
40:4 66:11 67:20
75:12,13 76:16
81:18,19 83:3
84:19 90:16 106:7
106:9 107:17,20
108:3 117:18
119:3 120:18
128:7 142:16
143:7 154:14
**meaning** 25:16
100:23
**means** 48:10 117:23
128:24 135:13
142:6 143:8 146:8
146:11 151:10
**meant** 16:23 46:20
151:10
**mechanism** 33:18
79:8 111:18
149:12,15
**medic** 2:16 70:2
**medical** 24:2,8,14
24:17,20 25:2,5
26:6,9 29:4 31:6
31:21 32:5,12
33:13 34:15,16
36:21,23 37:3,10
37:12 40:24 41:9
42:3,17 43:14,15
43:24 44:10 45:2
45:7 50:7 55:12
55:17,24 58:18
61:14,23 63:19,24
64:9 68:3 78:5,6
82:21 83:2 89:19
89:23 90:5 99:9
109:13 114:4,10

114:13,20 115:5
115:18 116:20
117:15 118:3,6
119:21 120:9
129:15 130:12
136:12,20 137:4
137:16 139:6,12
140:7,21 141:15
141:19 142:9,23
143:17
**medical-legal** 50:7
**medical/legal** 49:15
50:20 52:19 54:5
54:13
**medicine** 47:16
54:16
**Medicolegal** 38:19
**MEDLINE** 40:7,8
62:22,23
**meet** 5:12 7:5 20:8
**meeting** 70:10
158:2
**meetings** 54:16 63:6
63:9,10
**member** 6:23 9:20
21:20 58:13 67:10
68:24
**members** 19:8,12
19:16 20:9,10
67:13 74:16,19
81:13
**membership** 61:18
**memory** 68:6
**mentioned** 37:19
**met** 6:6,21 9:11
135:14
**metabolite** 117:10
118:16 119:12
**microfiche** 73:9
**microscope** 18:7,12
**microscopic** 17:4,23
62:4 104:11,14,21
**mid** 106:8
**middle** 154:6
**Mike** 66:23 93:17
**mild** 105:11
**Miles** 2:16
**militate** 88:15
**milliliter** 119:18,22
**millions** 97:22
**mind** 25:18 34:5
55:23 71:5 127:2
144:9
**mine** 134:9
**minimum** 156:12
**minute** 112:8
140:24 142:5
153:4
**minutes** 94:2 151:2
**mischaracterize**
135:10

misleading 21:23
126:2 132:2,8
133:6,6,7,21,23
134:5,14 135:6
**missing** 45:19
**misstates** 142:20
**misunderstanding**
112:13
**misunderstandings**
33:10
**moment** 16:11 43:4
**Monday** 3:1
**Montgomery** 6:1
12:24 19:2 21:17
48:6,13,18 49:5
49:11 54:12 56:22
57:4 64:21 65:17
66:4 67:13 68:24
69:5,9 72:11
73:10,12 77:12
89:23 97:3
**month** 92:14,17,23
**months** 107:2
**morgue** 48:10 68:19
**morning** 70:10
**mothers** 156:4
**motor** 128:19
148:17
**mouth** 87:9 88:1
133:1
**move** 43:6 49:2
66:19 122:16
138:20 139:7
**mucus** 87:9,24
**multiple** 25:14
26:15 37:21 40:4
74:7 124:18,19
132:24
**municipality** 73:9
**muscle** 85:22 86:2
86:20 101:15
152:5,7
**muscles** 86:11,15
**musculature** 152:20

**N**
**naive** 119:6
**name** 5:8,9,10,11
14:14,14 15:1
27:3 51:9 55:8
61:17,22 66:22
67:3,3 77:9 127:6
128:3 159:6
**named** 13:4 53:22
128:6 162:7
**names** 29:16 67:5
119:11
**naming** 87:13
**nanograms** 119:17
119:22
**NaphCare** 2:15

25:2 45:5 89:17
89:24 90:12,13,20
90:22,22 91:3,21
**narrative** 27:23
**narrowing** 105:16
**National** 58:18
63:24
**natural** 51:14
145:15,23 146:13
146:13 147:3
149:6,17 150:11
150:14
**near** 151:9
**nebulous** 142:1,2
**necessarily** 121:4
**necessary** 18:15
**need** 23:17 45:21
86:21 88:9,17
96:7 107:16 115:4
135:19 136:1
138:9,23 140:23
141:22 146:3
148:21 154:4
155:19 156:17,20
157:23
**needed** 9:9 12:12
16:6 60:22
**needs** 69:20 80:2
148:21
**negative** 87:4
119:13
**neglecting** 103:3
**never** 6:6,9 20:16
21:1 22:10 67:23
78:23 83:8 124:9
155:14
**new** 17:24 64:11
**nice** 139:4
**NICHOLAS** 2:2
**Nick** 5:11 46:1
134:1 135:4
148:20 153:18
159:15
**night** 154:10
**nine** 91:5
**Nods** 82:5
**non** 142:24
**non-lethal** 141:1
**non-natural** 143:4
**non-privileged**
43:10
**nonspecific** 113:5,6
**Nope** 14:5
**normal** 105:9,15,18
106:1,2,10 110:1
110:4
**normally** 13:22
**nose** 87:9,24
**notary** 1:15 3:6,7,8
159:7 160:13,17
162:5,20

**note** 15:15
**notes** 3:7 45:21
**notified** 74:20
155:15
**notify** 155:19
**noting** 160:6
**number** 5:15 11:2
75:2,16 77:7
79:17,20 120:16
127:6 128:12
143:12 155:20
159:5,5
**numerous** 57:5
58:19
**Nurse** 2:15,15,15

**O**
**o'clock** 154:8,10
**oath** 23:11,13
**obese** 80:10
**obesity** 80:7,10
**object** 134:5
**objecting** 133:17
**objection** 7:2,12,21
8:11,21 9:6,16,23
10:9 11:7,21
12:22 13:13,20
14:17 19:9,19
20:2,15 21:8,22
22:12 28:20 29:21
30:7 32:8 35:9
36:17 41:12 42:5
42:18 50:1 52:4,8
55:20 56:3 57:16
62:16 64:15 65:5
65:10 66:17 67:19
72:2,13 76:5 85:6
87:20 91:13,24
92:4 95:13 96:2,8
96:16 98:1 99:15
100:11 102:12
103:1,9,19 104:10
107:15 108:1,8,18
109:6 111:1 113:1
113:22 120:3
122:2 125:7,11,18
126:1 127:11
129:2 131:24
133:4,5,16,20,23
134:6 135:11
136:4,15 137:7,20
139:15 142:18
144:2 145:6,13
146:1 147:13
148:6 150:8 151:3
**objections** 11:22,23
12:2 133:19
**obligated** 33:14,19
33:19
**obligation** 155:18
**observe** 73:24

**observed** 107:1
**obtain** 156:10
**obtained** 74:22
**obtaining** 61:2
**occasion** 19:1 65:24
**Occasionally** 19:11
**occluded** 101:22,23
104:7
**occlusion** 101:19
**occur** 144:5
**occurred** 143:3,4
144:6,14 145:11
**occurring** 150:16
**occurs** 82:22
**odd** 43:1 116:19
**odds** 34:17,19
**offer** 18:10 95:17,20
95:24
**offered** 18:23 53:20
67:10 96:9
**office** 6:17,22 8:24
9:2 14:8,22 15:17
16:10 17:12,22
18:17,19 19:2
20:12 21:5,18
37:15 39:14 43:22
44:6,12,16 45:10
46:22,24 48:6,7
48:13,18 49:5
51:23 52:7 53:14
53:18 57:11 61:14
64:5 65:9,21 66:5
66:6,10,15 67:7
67:14 69:1,6,9
70:20 71:12 73:13
77:15,23 78:21
79:1 93:16 94:20
95:11 97:4 105:1
162:17
**office's** 73:11
**officer** 28:4,17 66:1
71:17 73:6,6,7
**officers** 27:7 58:1
65:18 72:7 74:3,7
91:11,23 107:10
107:13 108:13
113:19 114:15
115:8 116:22
147:8 150:7
**officers'** 26:13,16
27:5,15
**official** 3:8 10:1
11:4 42:7,10
46:21,23 61:21
64:14,17,18,18
143:19
**Oh** 7:16 8:7,20
17:10 19:18 29:11
35:5,15 38:7 52:1
65:22 66:7 67:8
95:22 96:12 97:15

106:22 107:20
120:16,23 129:7
130:11 133:2
148:15 150:18
151:23 152:1
**Ohio** 1:1,15,16,22
2:4,9,14 47:13,17
47:22 143:15
145:15 159:9
162:2,6,17,21
**okay** 8:4 10:13,22
11:13 13:2 14:1,9
16:12 17:1,20
18:6 22:7 23:2,10
23:20,21 24:12
26:12 29:11 30:1
31:2 32:4,24
33:17 34:11 35:1
36:1 38:7 39:4
40:18 43:5 44:19
44:22 45:3 46:13
47:10 48:23 49:3
49:15 53:17 54:1
55:10,23 57:20,21
59:22 60:20 63:10
64:13 67:4 69:22
70:8 77:20 81:24
82:4 83:5,14 84:6
84:21 88:11 89:20
90:1 91:18 92:8
92:10 96:12 97:2
99:10,11 103:16
109:10,18 110:12
112:2,8,10 116:10
116:11 117:8,21
118:1,2,22 119:8
121:14 123:1
125:5 126:12,18
127:8 129:22
130:11 131:3,15
133:8 135:14
137:3 139:9,12
140:1,13 143:3
144:6,12 145:12
145:19,20,22
146:10,15,20,21
147:2,4 148:5,15
148:19 149:16,19
150:22 151:6
152:5 157:13,21
**old** 100:2
**once** 18:16 21:10
22:1 25:15 34:9
71:3,19 75:17
105:10 128:22
**one's** 61:1
**ones** 27:22 146:22
**online** 62:20
**open** 156:9,14
**Operations** 48:9
**opine** 122:4

**opinion** 20:4 32:11
32:20,23 34:4
108:4 113:14
119:20 121:16
130:11 140:20
143:5 147:7,23
152:10 153:2
**opinions** 51:16
121:15 134:8
**opportunity** 6:9 7:9
67:18 154:2
**options** 18:9
**order** 17:24 64:7
**organizations** 35:6
35:11 58:14,20
**organs** 104:19
113:11
**origin** 145:21
**original** 17:21 18:3
18:5,14,18 149:5
149:21
**outside** 8:2 17:21
49:10 54:12 66:11
75:8 97:2 110:1
124:3 126:22
131:19 136:10,12
139:8 152:14
**overdose** 128:20,22
128:24 129:3,8
140:24 141:4,7
142:4,5,16,22
143:6,6 144:1,7
144:13,21,22
150:16 151:2
**overdosed** 140:21
141:15,19 142:9
**overdue** 140:18
**overgeneralization**
108:9
**overwhelming**
146:10
**oxygen** 86:12,15,21
88:10,19

_____
**P**
_____

**p.m** 1:17 3:2 150:16
158:8
**page** 4:4,8,8,9,9
159:5,8 160:6
161:7
**pages** 45:5
**paginated** 77:18
**paid** 52:20
**pain** 24:16
**pair** 15:12 65:11
**paper** 15:20 25:9,16
30:11 46:17 77:3
78:18 156:19
**paraffin** 17:15,18
**paramedic** 72:16,20
72:21

**parameters** 12:6
**paranoid** 131:2
**parenchyma** 111:17
112:23
**parent** 118:19
**parentheses** 34:10
**parents** 134:20
156:13
**part** 1:13 14:15
16:5 29:22 73:18
77:22 86:19,19
90:24 132:23
**particular** 12:7
51:20
**parties** 3:5 6:15
**party** 154:8
**pass** 48:21 59:6,18
59:24 60:7,9,18
**passed** 114:22
**passing** 114:23
**patent** 106:13
**paternity** 78:24
**Pathologic** 63:16
**pathologist** 48:9
54:12 56:18 64:8
70:12,14,22 71:3
84:5 141:3 152:15
**pathologists** 25:14
70:10,17 71:11
94:20
**pathology** 30:3
35:22 36:3 38:14
38:15,16 39:7
47:12,22 48:1,4
48:17 49:5,7,12
58:19 60:3,18,23
61:9 63:16
**patient** 50:14 91:9
151:1 152:22
**patient's** 80:18
**pay** 49:13,14
**peer** 54:20,22 55:2
**peers** 61:2
**pending** 23:19
138:5
**people** 65:11 69:4
72:11 75:12,13
76:6 79:5 82:24
90:4 94:23 97:13
97:21,22 98:2,8
98:15,23 99:12,16
101:12,23 106:22
117:16 127:9
128:18 129:3
131:1 146:9,9
155:6 156:10,16
156:18
**people's** 128:10,17
153:8
**percent** 97:13 102:2
102:15 103:4,24

104:4 105:1,5,7
105:10,16 106:11
127:20,21 128:1
128:11
**percentage** 98:22
99:20 127:8,17
146:20
**perfectly** 133:18
**perform** 17:5
128:11
**performance** 64:1
**performed** 56:16,21
58:8 92:17 97:1
**period** 38:4
**permanent** 47:14
**permit** 67:13
**permitted** 21:13
67:24
**persistent** 112:23
**person** 65:3 68:14
71:14 72:15 80:11
86:7 88:17 105:24
117:12 123:15
**person's** 143:22
146:12
**personal** 13:7
**personally** 13:3
52:22,23 61:23
66:8,9
**pertinent** 13:18
**Peter** 68:16
**Phil** 1:8
**phonetic** 123:2
**photocopy** 14:18
**photograph** 16:17
16:19,22,23 17:2
68:8,11
**photographs** 15:24
16:4,5,7,14 17:5
19:5,13 62:4
73:24 78:8,12,14
**photography** 48:11
**phrase** 33:17
141:23 145:2
**phrased** 33:6 34:2
**phrasing** 141:24
**physical** 25:11 86:3
**physically** 82:3
**physician** 73:5
**physicians** 121:12
**physiologic** 120:21
**physiological**
124:14,15,21
126:8,14 127:4
137:18 139:12
**physiologically**
136:13
**physiology** 33:18
**pictorial** 16:23
**picture** 146:10
**piece** 78:18

**place** 31:13 32:11
  48:5 82:19 83:22
  84:11 106:3
  123:21 162:13
**placed** 10:12 80:13
**Plaintiff** 1:6,14 2:5
  3:5
**Plaintiff's** 14:14,16
  15:1 27:2 55:7
  77:8 157:17
**plaintiffs** 50:10
**planned** 30:11
**planning** 148:22,23
  154:7 155:20
**plant** 147:3
**plaque** 104:7
**plaques** 107:5
**playing** 146:12
**plays** 144:3
**please** 5:8 15:11
  22:23 40:18
  109:17 125:21
  132:4 137:9 146:1
  154:2,22 159:3,8
**Pleasure** 158:1
**plenty** 22:20
**Plummer/Montgo...**
  1:8
**plus** 25:10
**point** 15:23 51:23
  53:10 56:17 71:23
  76:7 102:9 104:1
  137:17 147:18
  149:17,20
**points** 140:4
**police** 73:6,7
**political** 34:21
**population** 127:13
  127:16
**portal** 40:3
**portion** 59:6,15
  102:16,18,23
  103:4,8 105:4
**position** 48:7,12
  64:22 68:17 81:22
  82:19 89:5 91:10
  91:23
**positional** 55:3 75:6
  75:9,23 76:2,13
  79:4,6,10,11,24
  80:1,6,7,13 81:1,5
  81:9,14,17,21
  82:6,7 85:1,5,13
  85:17,23 86:8,18
  86:19 87:1,7,11
  87:17,19 88:1,3,7
  88:16,24 89:6,10
  112:6,24
**positions** 40:12
  48:17 49:10
**possibility** 113:24

**possible** 70:6 71:15
  71:16 157:10
**Possibly** 123:24
**posterior** 101:8,14
**postmortem** 24:21
**potential** 30:5
  144:24
**pound** 106:6
**practice** 25:13,14
  26:1 35:12 47:11
  47:16 48:3 49:24
  50:9 62:15,21
  64:8 68:22 69:13
  69:18 90:8
**practiced** 49:11
**practicing** 30:3
  47:21 48:17 49:7
**predictable** 103:12
**preexisting** 85:12
  107:7 140:3
**prefer** 82:6
**Pregon** 1:16 2:6,7
  41:5 125:7 154:17
  159:16
**preparation** 14:7
  42:21
**prepare** 23:23
  26:11 29:3
**prepared** 47:1 51:8
  155:12
**presence** 3:8 97:3
  118:17 128:4
  160:15 162:10
**present** 68:13 89:13
  94:21,23 148:24
**presented** 70:10,12
**preserve** 17:8,14
**preserved** 105:1
**pressure** 80:18,18
  85:20
**presume** 5:15 52:15
  153:19
**presumption**
  143:22
**pretty** 70:23 78:7
**prevent** 32:20
**prevention** 7:17
  21:1
**primary** 118:19
**print** 40:1
**printed** 16:7 55:17
  159:4
**prior** 20:18 24:20
  25:19 30:3 36:23
  38:6 71:16 90:3
  90:15,20 91:6,9
  91:21 130:1
**privilege** 8:23 10:19
  10:20 12:5,7 42:2
  42:7,13
**privileged** 10:11

43:15
**probably** 5:19
  20:16 26:21 29:8
  33:4 34:9 37:1
  40:11,12 47:14
  50:21,21 53:8
  58:10 59:2,12,21
  75:19 79:8 81:16
  94:16 106:4
  109:21 110:10
  124:16 141:7
  147:21
**problem** 52:14
**problems** 138:12
**Procedure** 1:15 3:6
  159:8
**proceed** 71:22
**process** 109:4
  126:14 127:4
  131:5 150:12
**processed** 79:1
**produce** 61:17
  157:6
**produced** 10:3
  16:10 44:13 46:23
  77:12,15 129:11
  157:1
**producing** 156:6,7
**product** 14:8,16
  15:9 16:5 36:11
  42:12 45:10,14,16
  45:19 77:23 119:2
**professional** 35:6
  48:16 49:10 54:11
  58:13 66:14
  159:13
**professionals** 24:11
**prohibited** 6:13
  20:12
**prohibition** 21:7,19
  22:10
**prohibitions** 22:8
**prolonged** 113:7
**promise** 26:17
**prone** 40:12 80:13
  88:6 89:5 91:10
  91:23
**pronounced** 70:1
  150:18 151:10
**proof** 3:8
**propensity** 128:9
**property** 16:1,2
**prosecution** 19:11
**prosecutor's** 8:24
**prosecutors** 21:9
**protections** 42:12
  42:13
**protocol** 69:14
**protuberant** 80:11
**provide** 18:7 70:6
  89:19 94:8 150:13

**provided** 10:3 26:20
  29:1
**provider** 50:14
**providing** 11:23
  51:16 89:23 90:5
  96:12
**proximal** 102:5,16
  102:22 103:7,18
**Psychiatric** 35:20
**psychoactive**
  118:10,16,20
  119:15
**psychotic** 121:3
**public** 1:15 6:17
  11:3 18:10 19:8
  20:9 64:13,18
  143:19 144:19
  159:7 160:13,17
  162:5,20
**publication** 62:4
**publications** 35:21
**published** 30:14
  35:21 54:19,22
  55:2 60:6 63:20
  64:2 76:22
**puff** 120:2
**pulmonary** 109:19
  109:21 110:21
  111:8,17 112:3,4
  112:23 113:5
**purpose** 16:21
  143:24 144:18
  151:13
**purposes** 17:19
**pursue** 59:8
**pursuing** 60:11
**push** 152:6
**put** 31:14 33:14
  109:5 124:2 133:1
  143:5 144:8
**puts** 85:4,23 135:6
**putting** 33:8 85:3
  86:3 88:13

———————

**Q**

**qualification** 3:8
  60:14
**qualified** 162:6
**quality** 96:20
**Quarter** 44:2
**question** 6:22 10:5
  10:21 11:8,10,11
  12:3,19 21:23
  22:23 23:4,8,18
  26:10 31:24 38:1
  38:23 43:9 49:1,9
  67:11 71:9 78:17
  84:6,7 85:7 88:11
  98:19 101:5
  107:17 114:11
  115:12,15,20

116:5 121:21
  124:1 125:22
  126:2,3 132:8
  133:5,10,22 134:9
  134:23 135:4,16
  137:9,13,21 138:1
  138:10,14,24
  140:8,20 141:22
  141:24 142:15
  146:3 150:23
**questions** 11:16
  12:17 23:1 51:20
  70:6 79:3 92:9
  138:18,22 153:13
**quick** 153:12
**quickly** 157:10
**quite** 75:7 133:12
**quote** 42:9 46:12

———————

**R**

**R-A-E-Y-E** 29:15
**random** 71:1
**range** 100:2 106:1
  110:1,10
**ranges** 106:3
**rare** 100:10,12
**rarely** 18:2
**rate** 122:13
**reach** 19:1 152:11
**read** 27:4 30:12
  33:21 38:17 55:19
  56:11,13 116:6
  125:4 133:9,11
  134:9 143:2 146:3
  159:3,6,8,10
  160:4,13 161:2,4
**reading** 26:15
  160:12
**ready** 138:13
**really** 33:17 70:16
  87:13 118:20
  135:19
**reams** 25:8,9
**reason** 18:1 20:18
  80:15 91:20
  129:11,14 146:23
  154:5 161:7
**reasonable** 31:6,15
  31:21 32:5,12
  33:12 106:4,4,5
  109:12 114:4,10
  114:13 115:5,18
  116:20 117:14
  118:3,6 119:20
  129:13,15 130:11
  136:11,19 137:3
  137:15 139:5,11
  140:6,20 141:14
  141:18 142:8
**reasons** 36:4 98:3
  161:5

**Reay** 29:15 39:21
**recall** 14:3 16:19
26:15 28:2,4,8,10
29:16 33:5 38:9
55:23 56:5 67:5
69:2 89:14 90:9
90:11,18 91:2
94:17 95:19
126:15,17
**receive** 27:23 54:17
61:23 62:1,8
**received** 26:6 27:22
45:10,17
**receiving** 43:17
91:21 152:4
**Recess** 40:21 140:15
**recognition** 61:1
**recognize** 34:22,23
34:24 35:7,23
83:7
**recognized** 34:15
35:3 109:19
**recognizes** 34:17
35:18
**recognizing** 35:12
35:12 100:9
**recollection** 25:17
25:21 55:18 69:16
**record** 5:12 9:24
10:1 11:23 12:1
18:22 22:19 23:1
24:14 27:10 40:23
41:23,24 114:12
133:3,4 135:10
140:17 142:20
143:19 153:3,5
155:4,11 156:22
157:4 161:5
**records** 24:2,8,17
24:20 25:2,6,9,18
26:2,7,9 45:2,8,15
45:15 51:18 68:4
78:6
**recut** 17:19
**recuts** 17:24 18:2
18:11,13,18
**recycle** 25:16
**redacted** 45:21
**reduced** 3:7
**refer** 39:5,16 46:1,3
62:21 63:13,15,17
69:16 101:24
109:17
**reference** 14:15
**referenced** 69:4
**referencing** 41:18
**referred** 38:17
41:10 45:2
**referring** 15:8
41:18 44:20 70:19
71:6 81:7,22 82:2

82:13 101:7
**refers** 33:17
**reflect** 155:12
**refresh** 55:18
**regard** 13:9 38:21
42:14
**regarding** 8:15 20:5
24:13,16 29:4
111:16 151:5
**Regardless** 147:3
**regular** 65:24 66:2
66:16,18
**regularly** 18:10
57:21 61:23 62:8
62:20 98:2
**rejects** 81:8
**release** 17:21
**relevant** 9:22 43:13
**reliable** 38:22
**relied** 44:11
**rely** 37:5,7 45:12
**relying** 42:13 73:15
**remaining** 102:18
104:7 106:12
**remember** 21:19
26:12,14 27:1,6
41:2 51:10 90:22
91:19 94:23,24
102:9 112:15
128:8
**REMINGER** 2:12
**remove** 41:15 42:1
**removed** 13:11
41:10 43:2
**rendering** 80:2
**repeat** 32:3 49:3
137:9
**rephrase** 31:24 32:3
126:3 133:22
137:22 138:7
**rephrasing** 132:17
**report** 10:3 14:19
14:21,21 16:1
24:22 25:6,15,20
26:3 27:9 28:18
31:3,7 32:11,16
33:1,15,22,24
34:8 36:24 55:19
64:24 69:24 70:5
74:24 90:15,19
91:4,21 94:15
124:6 129:18
**reported** 69:23 83:2
114:23 123:17
**reporter** 48:22
159:13 161:1
**reporting** 72:19
**reports** 15:12 26:13
26:15 50:16 66:3
90:24 125:4
126:23 150:2

151:16 157:5,17
**representation**
16:24
**representative** 11:5
18:2 19:7 20:11
21:20 67:9,17
**representatives**
20:9
**represented** 51:24
52:2 153:24
**representing** 8:14
9:5 12:23 13:8
50:10,13
**represents** 5:24
**reprieve** 157:16
**reproduce** 157:9
**request** 8:14 17:2
18:13,18 78:23
92:20 161:4
**requested** 10:2
15:22 27:21 93:1
**requests** 15:23,24
15:24 18:20
**require** 86:12
**required** 60:15
68:20,23
**requiring** 136:5
139:24 147:9
**reschedule** 155:23
**rescheduled** 155:6
**research** 30:11
54:18 64:9
**researched** 52:7
**resistance** 129:12
**resource** 62:14
**resources** 25:12
62:20
**respect** 13:8 84:18
112:22 121:15
138:4 139:3
140:18
**respective** 3:5
**respiratory** 85:22
86:2 111:18,22
112:1,3,9 113:9
**responsibility**
153:13
**responsible** 90:4
**restrained** 82:3,3
88:23 107:17
109:5 130:1 137:2
139:24
**restraint** 40:11,11
55:5 71:6 76:3,4
76:10,15,19 79:4
81:4,21 82:1,18
82:20,21 83:1,4
83:11,16 84:18
85:2,10,13,17
87:1,5,16,19 88:6
108:15 109:1

112:24 114:1,3,21
114:23 115:7
130:20 131:22
136:1,6,6 147:6,9
147:12,16 150:6
**restraint-type** 29:5
**restrict** 80:23
**restriction** 20:17
**result** 58:9 76:15
86:4 110:22 147:6
150:5,6 151:2
159:10
**results** 60:5
**resuscitated** 129:3
**retain** 25:12 50:20
95:11
**retained** 50:17
104:18,22
**retaining** 110:19
**retire** 66:19
**retrieve** 16:6 40:18
40:24 45:4,7 56:7
56:9 57:7
**return** 159:8
**returned** 150:2
**review** 17:23 23:23
24:8,19 25:5,9
26:10 36:22 37:18
37:23 38:3 42:23
45:24 50:6 54:5
54:20,22 55:2
68:3 77:13 89:16
90:2,3,13,19
**reviewed** 24:1,2,14
24:17 25:18,19
26:1,2,6,10 27:8
27:16,18,20,21
28:9,17,18,22
29:2 36:22 37:3
38:10,18,20 39:22
45:12 52:24 56:5
68:4 91:18 92:8
**reviewing** 25:22
26:12 28:4 51:18
77:19 90:11,23
**reviews** 54:13
**rhythm** 140:7
**rib** 80:19
**Richardson** 1:5
5:21,24 6:14
14:19 24:3,9 28:1
30:24 31:10,22
32:6 33:13 36:16
51:24 52:7 58:5
58:11 68:10 72:4
73:12 74:11,17
79:15 89:13 91:5
91:22 92:15 93:4
93:9 100:17
101:24 105:20,24
108:14 113:19

114:5,14 115:6
117:15 119:4
124:24 126:16
127:2 128:3,6,20
129:7 139:4
140:21 141:10,15
141:19 142:9
144:19 145:4
146:23 147:7
153:1
**Richardson's** 9:15
15:17 21:16 26:14
36:12 51:13 54:24
68:6 69:1 73:3
79:21 93:13 95:18
101:20 106:19,24
107:14 108:16
110:15 111:10,21
112:21 116:21
125:16,24 129:17
130:13,23 131:12
137:19 139:13
**right** 5:22 6:18,19
8:7 11:19 12:9
17:8,13 20:4
22:20 23:5 27:13
28:24 35:20 39:16
40:17 43:19 44:3
52:15,24 53:11,16
57:9,14 58:4
59:23 63:2,5,13
69:7 72:9,18 73:8
73:14 74:2 78:12
78:20 79:2,13
80:22 81:3 82:12
82:17 83:24 84:13
84:14,16,18,21
85:19 86:5,13,17
87:4 91:8 92:12
92:16 93:14 94:7
95:6 97:1,20 98:6
100:21,24 101:3,6
101:10,11,18,21
104:15 105:2,6,9
105:14 106:14,17
106:24 107:9
109:2,24 110:5,7
110:12,16,17
111:7 112:12,14
118:19 120:17
123:8 124:9,12
128:20 132:13,18
132:20 137:1
138:11,16 143:18
150:4,11,13 151:8
151:18 152:7
**rise** 120:10
**risk** 80:1,5,7,12
85:1,4,5,12,13,16
85:17,20,22,23
86:7 87:1 88:13

roach 122:11
road 117:18 126:6
Robbins' 63:16
Robert 1:5 2:12
  5:21,24 14:19
  24:2 51:24 73:12
  100:17 124:24
  146:23
role 144:3 146:12
rolling 68:10
room 18:7 19:4 25:3
  41:4,11
rule 34:5
ruled 32:19 69:19
  147:20 148:9,17
  149:5
rules 1:15 3:6 22:19
  83:21 84:4,9
  146:8 159:8
ruling 146:24
runs 101:9,14
Russell 6:22

_____
            S
sample 62:1
samples 17:14
sat 12:11 19:4 59:22
saved 17:19
saw 16:17 44:6,7
  68:8 74:1,11
  151:16
saying 15:24 20:23
  25:24 32:21 34:10
  34:21 75:23 80:11
  87:12,14 96:21
  111:15,23 116:20
  120:12 121:18
  123:20 126:19
  128:23 130:10,19
  131:20 135:16
  139:20,23 140:2
  144:14 145:7
  155:16
says 5:3 77:8 78:2
  92:8 129:18 135:5
scan 25:12
scenario 67:23
scenarios 147:22
  150:13
scene 70:3 74:7
schedule 148:23
  153:23
scheduled 153:17
  153:18 155:7
scheduling 153:8,9
  157:11
School 54:16
Sciences 58:18
  61:17
scope 7:22 52:9
score 60:8

screener 51:18
seal 162:17
search 40:5,10 57:6
  57:12,18 126:23
searched 57:13,20
  57:20
searches 37:17
  62:22
searching 56:23
second 15:14 28:22
  59:18 93:23
  121:20 153:20
  148:13 159:8
section 16:18 60:9
  104:11,23
sections 104:5,8,18
see 13:7 20:23 32:23
  45:20 47:7 52:14
  57:19 69:3 76:7
  77:16 96:21 98:2
  99:17 105:16
  113:8 117:11
  127:13 128:10,18
  148:16,18 152:1
seeing 158:2
seek 11:14 59:1,20
  61:10
seen 43:3 78:23
  83:8 100:6
seizure 114:24
selected 70:14
sense 16:13 128:15
  145:3
separate 54:3 57:4
sequentially 77:11
serial 104:5,8
services 89:19 91:3
  91:17
Session 3:1
set 6:16 154:15
  162:16
sets 24:19 25:5
setting 22:18 60:18
  82:1 122:14
settings 60:23 82:8
settled 51:8
severe 105:7
shackles 82:3
share 11:5 13:17
  37:11
sheet 16:1 159:5,6,9
Sheriff 1:9 2:9 6:2
sheriff's 21:18 66:5
  66:5,9,15 67:6,14
  69:1,5,9 73:10,13
  93:15 97:3
SHIBLEY 2:3
short 152:12
shortly 152:10
shoulder 135:6,12
  135:13

show 16:11 27:2,15
  54:18 93:20 94:19
  151:17
showed 19:5 93:21
showing 88:22
  90:12,21 143:10
  143:15 154:19
shrugs 22:21
sic 29:15
side 101:7 156:10
sign 87:6,10 88:2,6
  88:12,24 89:9
  148:13 159:3,6,8
signature 158:5
  159:8 161:23
signed 14:18,19
  25:15 142:23
  144:20 159:10
  160:14
significant 140:5
signing 25:19 90:15
  160:12
signs 88:5,8,14,22
  89:12
similar 35:21 51:13
simple 157:2
Sincerely 159:12
single 16:17 128:3
sit 18:4 28:3,8 59:15
  60:19 94:3 127:1
  138:12
sitting 20:13 39:17
situation 20:11 34:2
  118:23 123:22
  141:2
six 44:4 53:7 106:5
  119:4
size 105:15,18
sized 105:9
slide 105:3,4
slides 17:5,8,19,21
  18:1,3,5,12,14,18
  78:5
Slightly 110:3
Smiley 155:8
smoke 122:11
smoked 119:4 145:9
smoking 124:4
  139:13
society 97:10
solely 143:7
Sollenberger 93:18
  93:19 94:5,8,22
  95:17,24 96:13,15
somebody 7:18
  18:17 68:9 69:19
  84:2 86:6 100:1
  124:4 148:7 155:8
someone's 33:16
  83:3 86:14 124:15
someplace 148:21

148:22
son 39:11
soon 138:1
sooner 47:5
sorry 44:17 48:20
  82:11 91:17
  104:17 123:12
  140:13 142:24
  143:1 150:24
sorted 47:5
sought 58:23
sound 114:8
sounds 49:4 53:3,9
  72:10 87:5
source 29:7 40:3
sources 38:22 72:3
SOUTHERN 1:1
SPANGENBERG
  2:3
speak 6:10,15,24
  74:6
speaking 11:23 12:2
  72:4 74:6 134:6
Special 1:4
specialty 58:21
specific 25:17 51:20
  62:6 69:15 87:13
  91:2 107:16
  126:24
specifically 70:19
  72:4 99:15
specified 162:14
Speeding 120:24
spell 5:8
spelling 29:13
Spitz 38:19,21 39:9
  39:9,16
splitting 151:5
Sr 1:5
staff 25:12
stake 12:5
stamps 77:9
stand 122:14
standard 17:6
standards 64:1
start 22:18 49:14
  66:8 68:15 77:10
  153:10
started 41:3 126:6
  134:2
starting 74:17
Starts 2:11 159:15
state 1:15 5:8 9:24
  47:17 54:16
  114:11 115:17
  116:13,20 118:3,6
  132:4 137:11,15
  160:1 162:2,6,21
stated 160:13
statements 26:16
  27:5,23 28:4

89:14
states 1:1 47:19
  127:9,12
statistics 143:3,16
stay 64:7,8
stayed 48:5 49:6
  96:15
stenosed 102:15
stenosis 102:3 104:9
  104:13
stenotype 162:10
stenotypy 3:7
step 71:4,12
stepped 41:4
steps 69:21
Steven 2:16
stick 119:7
stipulated 3:4
STIPULATIONS
  3:3
Stockhauser 2:16
stop 53:20 133:24
  148:13 153:16
stopped 53:9
stopping 137:19
stops 108:7 133:21
story 71:14
straightforward
  33:23
Street 2:13
strenuous 147:19
stress 109:5 147:5
  150:6
stressor 107:21
  109:8,12 126:20
  129:10 136:7,16
  136:20
strike 43:6 138:20
strong 130:2
struggle 86:20 88:5
  89:5 108:14 115:7
struggling 86:7,11
  109:4
studies 122:17
stuff 55:18 82:10
stumble 119:10
stumbling 117:17
subject 42:2 95:2
  156:22 157:6
submitted 71:20
  104:11,20 105:4
  160:11
subpoena 14:2,3
  156:17
subpoenaed 44:9
subscribe 61:13,14
  81:4
substance 77:14
  141:6,9 160:6
substantial 128:12
  132:23

subtle 85:2
sudden 139:17
    152:7
sue 53:17
sued 53:14,15
suffer 79:5
suffered 102:1
sufficient 73:16
suggest 12:8
suggested 36:15
suggestion 154:12
    154:14
suicide 145:16
    146:19
Suite 1:16 2:4,8,13
sum 77:14
summaries 39:23
    90:11
supplemental 88:10
    88:19 142:23
    149:14
Supplementary
    143:16
supply 93:2 101:15
support 150:17
supposed 12:17
    156:5
sure 15:22 18:21
    19:18,22 23:3
    24:6,7 25:24
    26:19,23 28:12
    29:9 32:1,2,14
    35:17 39:6 40:20
    51:22 52:13 62:24
    63:24 65:22 66:7
    67:22 72:6 75:17
    76:1,7 81:12
    82:13,23 83:3
    86:1 87:15,24
    88:21 89:11 94:10
    95:22 100:12
    101:16 102:19
    104:19 106:22
    107:20 109:1,15
    122:21 126:3
    133:13 134:23
    140:18 143:9
    154:21
surgery 154:9
surprised 114:22
    115:1 127:19,23
surrounding 53:12
    83:22 84:1,11,22
    95:8
survival 152:12
susceptible 86:24
switch 148:20
sworn 5:2 162:8
symptom 87:6
symptoms 88:14
    89:12

syringe 96:21
system 56:24 70:16
    103:3 122:9
    126:23 152:8,9

――――――――
T
――――――――

table 10:12 15:23
tactic 8:1
take 16:14 22:22
    23:17,19 40:19
    55:14 96:7 133:11
    133:15 135:19
    138:2,4 153:10,11
    153:12 154:15
taken 1:15 3:6 5:13
    5:20 17:3 40:21
    68:11 140:15
    161:2 162:9,13
takes 70:22 120:10
    149:19 152:8
talk 8:5 11:24 20:20
    21:10,13 72:7
    76:23 128:7 134:2
    154:21
talked 21:11 39:19
    46:21 72:15 78:5
    78:8 106:11
talking 9:14 60:4
    72:10 82:16,18
    88:12 115:3
    118:11 121:14,19
    124:5 127:18
    134:2 155:2
talks 74:6
technician 68:19
tell 15:11 21:10
    23:5 24:1 29:8
    31:22 32:6 38:13
    42:20 77:13 94:11
    96:24 97:12 101:3
    112:13,15 115:11
    116:1 118:24
    119:3 122:12
    127:13 134:14
    138:3
telling 42:22 54:10
    96:5 104:23 105:3
    108:12 111:12
    113:18 122:8
    137:22
ten 45:5 50:21,22
    75:20,22 76:13
    83:3 87:22 154:7
    154:9
tend 17:22
tends 18:15
term 32:15 33:1,8
    33:11,16,17,19
    34:3,6,7 36:10
    76:10 82:6 99:9
    117:9,16 120:20

122:4 141:1,4
    142:4
terminal 79:10,14
    108:6
terminology 33:20
    35:13 128:22
terms 17:4 40:10
    41:19 78:6 79:24
    85:3 101:22
test 59:22 60:9
tested 119:12,23
    151:22
testified 45:12
testify 23:14 42:19
    42:20 51:6 162:8
testimony 111:20
    132:23 157:5
    159:4,5,6 162:9
    162:12
testing 131:16
text 30:12 37:24
    38:15,16 39:5,7
    39:16,19 63:16,17
textbook 123:2
textbooks 37:15,18
    37:21 38:2
texts 38:13,18 39:20
    63:12
thank 71:8 84:7
    92:14 158:1,3
THC 117:11 118:19
    119:17
theory 81:3,4,6,9
thick 91:13 43:24
    99:7
thickened 98:3
thin 12:4
thing 17:6 20:10
    28:15 60:17 69:22
    88:16 91:1 110:21
    113:6 116:14
    120:19 121:22
    131:13 144:8
things 15:19,21
    18:10 19:6 30:12
    34:18,20 42:20
    49:8 64:11 78:24
    87:13 96:17 113:8
    128:19 131:17
    153:14
think 5:18 9:10
    12:12,20 21:10
    24:14 26:17 28:16
    29:14 33:9 36:4
    38:15 41:23 43:14
    44:23 51:19 63:7
    63:12 64:17 67:14
    72:7 75:2 76:18
    84:9 87:18 92:12
    94:2 97:12,12
    103:10,11 106:7

107:16 112:6,19
    113:21,24 122:8
    123:2 126:9,15
    128:24 131:1
    132:1,20 133:16
    133:18,19,22
    134:6,6 138:17
    140:23 141:1
    142:12 143:2
    147:6,16 151:19
    152:2 154:11
third 59:22 98:17
    115:11 121:20
thirty 143:1 159:8
thought 43:1 108:22
    108:24 135:4
thousands 123:10
    123:11,13
three 25:22 33:3,3
    60:23 75:12 82:4
    96:10 135:14
    153:21 154:1,4
    155:20
thrombus 101:17
    105:17
thumb 44:7
Thursday 154:17
    154:18
tied 141:23
time 3:6 7:21 11:3
    19:1 23:18 24:4
    24:20 25:22 26:17
    28:22 34:23 37:8
    38:4,10,24 44:18
    51:23 52:8,11
    59:22,24 66:23
    68:18 69:18 71:23
    77:21 83:22 84:11
    90:2,20 93:8,11
    93:23 98:18
    113:20 115:11
    116:2 117:1,7
    119:22 134:11
    135:19 137:17
    139:14 149:19
    150:15,18 151:9
    152:9,11,12
    153:11,12,16
    155:3 159:9,10
    162:13
times 5:15 11:1,2
    22:20 39:8 50:19
    62:7 75:5,8,18
    94:14,17 98:24
    99:24 115:21
    124:13,16,19
    126:7,12 132:24
    135:14 145:3
    Tina 157:24
    tiny 146:20
    tired 138:16

tissue 17:14,18 18:1
    152:20
tissues 86:15,20,20
title 42:9 61:20
today 5:13 6:6,10
    10:6 12:13,20
    13:22 14:7 15:18
    23:2,11 28:3,8
    47:1 56:13 108:12
    124:1 127:1
    148:23 153:11,16
    153:21 154:1,18
    155:15 157:1
today's 13:18 23:22
    24:9 26:2,11
    28:18 29:3 36:22
    38:12 39:17 41:2
    68:5
told 8:5,8,9 9:24
    12:11,13 19:24
    20:3,5,5 26:9
    36:21 42:19 43:12
    54:12 63:12 67:14
    75:2 79:5 87:18
    112:6 135:9
    144:18 147:16
    153:15 156:6,11
tomorrow 149:1
    154:16 157:9
top 44:5 80:17 82:9
topic 16:13 19:23
    62:6
topics 54:23 148:20
total 101:19
totally 101:23
toxic 120:6,10,12,18
    120:18,20,21
    121:3,6,9,16,19
    121:20,23 122:1,4
    122:7,9,15 141:23
    142:12 145:1
    151:12
toxicologist 121:23
    121:24
toxicologists 122:3
toxicology 14:21
    131:16 149:19
    150:2 151:16
toxin 140:3
training 47:13
transcribed 3:7
    162:11
transcript 22:21
    159:3,3,6,10
    160:4,10 161:2
    162:12
trauma 146:16
treading 12:4
tree 103:5 124:5
trial 51:6
tried 36:4

**trouble** 88:6,8,23
  109:15
**true** 6:14 12:14,15
  28:4 33:15 37:8
  41:21 78:21 79:7
  79:15,22 80:8
  81:15 82:22 84:23
  85:14,18 86:4,8
  86:12,18 87:7,11
  88:3,18,24 89:6
  89:13 93:5,13
  98:13,16 100:21
  101:17 102:18,24
  103:2,8 105:8,11
  105:19 107:3,14
  108:7,16 109:3,5
  111:18 112:24
  115:8,18 119:15
  124:8,24 125:1
  132:8,11 142:7,7
  147:8 149:22
  160:7 162:11
**truth** 162:8
**try** 35:2 60:2 64:3
  77:3
**trying** 12:8 34:12
  38:2 46:2,16 89:4
  100:15 113:8
  114:8 116:12
  122:6 126:6 133:1
  142:3,3 153:8
  155:10,16 157:3
**tuned** 137:8,8
**turned** 43:19
**TV** 19:4
**twice** 18:16 34:9
**two** 11:22 15:13,14
  24:19 41:5 44:1
  44:19 63:4 76:7
  91:5 94:9 123:2,6
  131:17 134:20
  139:18,20 140:4
  154:5 155:20
**two-sided** 77:17
**type** 62:22 71:6
  100:7 114:20
  115:15
**typed** 15:15
**types** 24:16
**typewritten** 159:4
**typical** 42:21

———————
**U**
**Uh-huh** 28:5 49:19
  59:14 67:1 95:4
**uh-huhs** 22:22
**ultimately** 16:10
  19:13 79:5 108:6
**uncommon** 57:1
**underlying** 149:14
**underneath** 15:2

27:3
**undersigned** 160:13
**understand** 5:12,19
  5:19,23 6:4 8:13
  11:8,11,17 23:2,4
  23:11,13 29:20
  32:1 33:8,24 34:1
  38:2 71:7 73:19
  111:9 112:16,19
  115:17 121:14
  122:16 131:20
  134:23 135:4,23
  137:21 143:9,21
  143:23 150:9
  153:7
**understandable**
  33:7
**understanding** 6:12
  7:8 19:24 22:9
  51:22 67:6,12
  89:22 91:7 96:14
  122:7
**understood** 13:10
  23:9 60:16 79:20
  112:11
**undetermined** 99:5
  145:16
**unfair** 153:19
**unintentional** 148:4
  148:10,11
**unique** 87:16,18
**United** 1:1 127:9,12
**unknown** 139:13,14
**unnatural** 143:1
  145:21 146:8,11
**unquote** 42:9 46:12
**unrelated** 53:19
**unusual** 113:7
  125:16,19,22
**unwilling** 11:4
**unwillingness** 34:3
**updated** 54:18
**upper** 106:9
**upside** 82:8
**Uptegrove** 6:22
  19:3,3,3
**UpToDate** 62:10,11
  62:14
**upwards** 119:4
**use** 31:3 32:15 33:1
  33:11,19,19 34:3
  34:6 40:3 57:6
  62:14,21 63:3
  72:6 85:4 99:9
  117:9 121:24
  122:4 127:9 141:1
  144:8 148:2
**useful** 95:9
**users** 119:6,6
**usual** 90:8
**usually** 8:5 60:7

62:5 75:7 126:11

———————
**V**
**vague** 99:16 103:19
**varies** 62:5
**vary** 119:6
**varying** 24:16
**vasculature** 101:8
  104:6 106:12
**vehicle** 128:19
  148:17
**vein** 39:2
**ventricle** 16:24 98:3
**ventricular** 97:9,14
  97:22,23 98:9,10
  98:23 99:3,6
**verbalizes** 89:8
**versions** 154:22
**versus** 38:3,13
**video** 92:8,9,11,20
  93:5,16,20,22
  94:1,3,9,15,19
  95:2,21,24 96:6
  96:17,20 97:2
  149:22
**view** 18:14
**viewed** 96:15
**viewing** 94:22
**views** 61:4
**Vincent** 29:17 33:20
**Vine** 2:13
**violate** 84:4
**visit** 25:3
**visits** 24:15
**vital** 143:3,16
**voice** 20:19
**volunteer** 54:15
**vs** 1:7

———————
**W**
**wait** 22:23,23
**waiting** 47:6
**waived** 3:9 158:5
**walk** 69:17,20
  106:22
**wall** 19:5 82:9
**want** 6:16 11:22,24
  12:5 18:4 19:13
  19:22 23:1,5
  28:12 31:24 45:22
  69:12 72:6 77:13
  79:3 109:16
  116:11 118:15
  129:21 133:16
  134:9 135:3,12
  137:22 138:9,11
  139:7 143:5 145:2
  148:2 153:7
  154:21 155:4,11
**wanted** 31:13 45:23
  149:2 157:13,21

**wanting** 40:19
**wants** 17:23
**wasn't** 7:11,14 8:8
  41:24 43:19 68:12
  71:6 104:20
  107:11 124:19
  147:24 153:24
**waste** 155:3
**watch** 18:5 93:16,23
  94:3,15 97:2
**watched** 94:1,6
**watching** 93:5,12
  94:9,12
**way** 5:18 12:8 25:11
  31:14 32:22 33:6
  34:2 56:23 77:11
  77:18 86:3 109:22
  111:14,15 112:21
  114:6 121:23
  126:23 139:6
  141:24 144:7
  155:11
**ways** 37:9,13 63:4
  72:20 94:13
**we'll** 22:24 23:19
  47:4 49:1 138:2
  154:22 156:13
  157:19
**we're** 12:4 16:13
  40:23 44:17 47:6
  60:4 68:22 70:7
  82:18 88:12,13
  115:3 118:20
  121:18 138:3
  140:17 143:9
  154:2,23 155:22
  156:7,14,19
**we've** 10:3 11:22
  23:7 39:19 46:21
  106:11 131:9
  133:12 155:7
**week** 56:10,13
  156:5,7,11
**weeks** 107:2 149:18
  155:4
**weigh** 110:5
**weight** 80:16,17
  105:22 110:2,5,7
  110:11 111:16
**went** 19:5 73:19
  89:12 94:17
**weren't** 7:16 126:14
  148:23 150:2
  154:7
**Werner** 39:9
**WESTERN** 1:2
**WHEREOF** 162:16
**Whitney** 1:15 3:6
  159:9,13 162:5,20
**widely** 106:13
**widowmaker**

101:24
**withheld** 43:13
**witness** 1:14 3:5,8
  10:13,22 11:23
  31:18 42:11,12
  43:11 46:10 48:20
  48:23 63:9 78:15
  132:21 133:20,22
  134:3 138:10,13
  140:9 146:4
  148:22 157:5
  158:3 160:12
  162:10,13,16
**witnessed** 27:24
**witnesses** 155:3,21
  156:19
**word** 121:20 122:7
  142:16 156:24
**worded** 144:15
**wording** 144:16
**words** 86:6 105:23
  117:11,22 133:1
  152:6
**work** 14:8,15 15:9
  36:11 39:5 42:12
  45:10,14,16,19
  51:17 52:10 53:13
  65:24 66:1,11,15
  71:24 77:23
  132:21 154:22
  157:20
**worked** 54:4 65:20
  157:11
**working** 33:24 37:7
  53:20 76:21 78:7
  78:20 154:9
**works** 6:18
**world** 114:10
**worse** 106:22
**worthy** 125:10
**wouldn't** 33:4
  103:10 107:4
  108:9 128:12
  155:10,21
**wounds** 128:19
**wow** 97:15
**Wright** 54:16
**write** 129:21 142:19
**writing** 3:7
**writings** 30:2 37:23
  38:10
**written** 32:20 37:21
  39:3 59:3,15 60:5
  70:5
**wrong** 4:10 109:22
  122:12 130:6

———————
**X**

———————
**Y**
**yeah** 17:17 22:14

31:18 32:2 37:22
39:1 40:6,9 43:1
46:8,17 58:17
62:12,24 63:7
66:12 68:15 71:8
75:15,17 77:1
82:16 84:7 90:17
94:4,13,13 96:23
107:5,19 120:13
120:15 122:20,24
129:7 130:18
132:13 135:7
147:18 150:9
151:23 157:19
**year** 49:17 50:24
51:1 53:4 59:11
59:12
**years** 18:16 25:23
30:19 33:3,4 34:1
38:17 39:8 47:23
53:8 66:18 96:10
100:2
**Yep** 65:14

_____ **Z** _____
**Zero** 58:3

_____ **0** _____
**04** 60:12
**05** 60:12
**06** 60:12

_____ **1** _____
**1** 4:8 14:11,14,16
27:2 41:6 44:10
44:20
**1,600** 25:9
**10** 90:22
**1001** 2:3
**11-carboxy-Tetra...**
118:12
**117** 1:16
**123** 2:8
**14** 4:8,8 159:1
**143** 90:13
**144** 90:13
**146** 90:13
**14th** 162:17
**16** 119:17,22
**16:00** 151:9,11,12
151:14
**16:08** 150:19
**1700** 2:4,13
**19-year-olds** 100:6
**19th** 107:13 114:5
114:16 115:6
116:23 129:17

_____ **2** _____
**2** 4:8 15:1,3,11,12
41:6 44:10,20

**2:26** 1:17 3:2
**20** 94:2 100:3 161:3
**2002** 47:15,23
**2004** 48:2,3 49:9
59:2,9
**2005** 59:13
**2006** 59:21
**2010** 24:15 25:3
45:6
**2012** 15:20 34:3
36:24 38:9 56:5
91:4 92:12,13
107:13 114:5,16
115:6 116:23
129:17 149:21
**2015** 1:16 3:1 159:1
160:5,15 162:18
**2020** 162:22
**20th** 92:13,14
**21st** 91:4 92:12
**25th** 93:7,9 149:21
**28** 100:2,4
**28-year-old** 106:6
110:7
**280** 106:6

_____ **3** _____
**3** 4:9 55:7,9 56:9,14
57:7
**3,700** 56:17,19 75:3
126:22
**3:14-CV-00158** 1:7
**3206** 77:10
**3210** 143:15
**3293** 77:11
**33** 143:2
**350** 110:10

_____ **4** _____
**4** 4:9 77:5,8 78:7,19
162:22
**4,000** 125:4
**4:00** 150:16,20
**400s** 106:8 110:9
**43017** 1:22 159:9
**44114** 2:4
**45202** 2:14
**45429** 1:16 2:9
**4th** 157:17

_____ **5** _____
**5** 4:4
**5:00** 133:14
**5:24** 148:21
**5:30** 154:3,24 155:5
155:15,19,22
**5:34** 158:8
**50** 97:13 127:20,21
128:1,11
**500** 110:10
**525** 2:13

**5335** 1:16 2:8
**55** 4:9

_____ **6** _____
**605** 110:16
**614-309-1669** 1:22
**6723** 1:21 159:9
**695** 110:15

_____ **7** _____
**7** 1:16 3:1 160:5
**75** 102:2,15 103:4
103:24 104:3,24
105:5,7,10,16
106:11
**77** 4:9

_____ **8** _____

_____ **9** _____
**9** 90:22